647

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE EDWARD RAFEEDIE JUDGE PRESIDING

– – – –

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )
                                )
        vs.                     )   Case No. CR-87-422-ER
                                )
RAFAEL CARO-QUINTERO, et al.,   )
                                )
                Defendants.     )
_____ )

ORIGINAL

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

MONDAY, DECEMBER 7, 1992

MARY TUCKER, CSR 9308
Official Court Reporter
429-D U.S. Courthouse
312 North Spring Street
Los Angeles, Calif. 90012
213/687-0530

648

1   APPEARANCES:

2

3       For the Plaintiff:

4           TERREE A. BOWERS
            United States Attorney
5           ROBERT BROSIO
            Assistant United States Attorney
6           Chief, Criminal Division
            JOHN CARLTON
7           Assistant United States Attorney
            MANUEL MEDRANO
8           Special Assistant United States Attorney
            312 North Spring Street
9           Los Angeles, California  90012

10

11      For the Defendant:

12          JAMES E. BLANCARTE
            MARY FULGINITI
13          JEFFER, MANGELS, BUTLER & MARMARO
            2121 Avenue of the Stars
14          10th Floor
            Los Angeles, California  90067
15                  - and -
            EDWARD M. MEDVENE
16          JACK R. LUELLEN
            MITCHELL, SILBERBERG & KNUPP
17          11377 West Olympic Boulevard
            Los Angeles, California  90064

18

19

20

21

22

23

24

25

649

# I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| HARRISON, LAWRENCE | | | | |
| By Mr. Carlton | 652 | | 731 | |
| By Mr. Medvene | | 655 | | |
| By Mr. Rubin | | 699 | | |
| | | | | |
| SEARS, WILBURN | | | | |
| By Mr. Carlton | 736 | | | |
| By Mr. Rubin | | 743 | | |
| | | | | |
| VARENHORST, HARVEY | | | | |
| By Mr. Medrano | 747 | | | |
| By Mr. Rubin | | 753 | | |
| | | | | |
| BORIS, MARY | | | | |
| By Mr. Carlton | 754 | | | |
| By Mr. Blancarte | | 760 | | |
| | | | | |
| GODOY, JORGE | | | | |
| By Mr. Carlton | 765 | | | |

650

| EXHIBITS | I N D E X<br>FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 26 | | 750 |
| 105 | | 777 |
| 121A | | 789 |
| 121B | | 789 |
| 124 | | 760 |
| 127 | | 777 |
| 130 | | 795 |
| 131 | | 800 |
| 170 | | 795 |

651

LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 7, 1992

(9:00 A.M.)

(Jury in.)

THE COURT:  Good morning.

THE COURTROOM:  Good morning, Your Honor.

THE COURT:  Glad to see you all made it.  I left home at 5:20 this morning, and got here at 6:00, so I had to wait a while.

But before we begin the cross-examination of this witness, on Friday this witness testified that he -- that his sentence in Mexico was enhanced or made greater because of the fact that he testified against Mr. Zuno.

I order that that testimony is to be stricken, and is to be disregarded by the jury.

When testimony is stricken by the Court, the jurors must treat it as though it does not exist and that you never heard of it.  You may not discuss it or consider it in your deliberations in this case.  It's simply not part of the evidence.

LAWRENCE HARRISON, PLAINTIFF'S WITNESS, RESUMED STAND

THE COURT:  You may cross-examine the witness.

MR. CARLTON:  Your Honor, with the consent of the defendants and the permission of the Court, I'd like to reopen for two or three brief questions.

THE COURT:  Very well.

652

1  DIRECT EXAMINATION (Continued)

2  BY MR. CARLTON:

3  Q    Mr. Harrison, are you familiar with an individual

4  named Emilio Quintero-Payan?

5  A    Yes, I am.

6  Q    And who is he?

7  A    He is Rafael Caro-Quintero's uncle.

8  Q    Was he a member of this group that associated with

9  Ernesto Fonseca?

10  A    Yes.  He's a member, not one of the close members.

11  Kind of -- he operates mostly in the northern part of the

12  country; but, yes, he is a member of their group.

13  Q    Looking in front of you, I believe there's a laser

14  pointer.

15  A    Yes.

16  Q    And if you would look at the large photograph on the

17  easel to your right, which I believe is marked 125-B.  Do

18  you see Emilio Quintero-Payan in that photograph, and if

19  you do, would you please indicate generally with the laser

20  pointer, where he is?

21  A    Well, Mr. Payan -- Quintero-Payan is here

22  (indicating).  He's standing to the left of Dr. Machain.

23          MR. RUBIN:  Objection, Your Honor.  Move to strike

24  the last part as non-responsive to the question.

25          THE COURT:  Well, the question was asking you to

653

1    identify where this --

2              MR. CARLTON:  Just locate him on that picture.

3              THE COURT:  Have you located him?

4              THE WITNESS:  Yes, right here (indicating).

5              THE COURT:  All right.

6    BY MR. CARLTON:

7    Q    And do you also see Dr. Alvarez-Machain in that

8    photograph?

9    A    Yes, I do.

10   Q    You may indicate with the laser pointer where he is?

11   A    (Indicating.)

12             MR. CARLTON:  Thank you.  Nothing further, Your

13   Honor.

14             THE COURT:  You may cross-examine the witness.

15                   (Continued on next page)

16   //

17   //

18   //

19

20

21

22

23

24

25

655

BY MR. MEDVENE:

Q    Mr. Harrison, during the time that you worked for
Ernesto Fonseca, did you observe him to meet on a number of
occasions with a specific group of individuals?

A    Yes, I did.

Q    And who was at those meetings?

A    Normally, they -- if you are you referring to the
high-level planning meetings of the core group of
traffickers.

Q    Yes.

A    Present at those meeting were normally Rafael
Caro-Quintero and Ernesto.  Sometimes, and on many
occasions they were joined by Miguel Felix-Gallardo; Juan
Esparragoza; Javier Barba, on some occasions; and
Cochiloco.

Q    And approximately how many of those meetings did you
observe from afar?

A    Many meetings.  It's hard to put a number on them.
It's greater than ten, less than a hundred, I believe.

Q    Now, each of those individuals had their own retinue
of people?

A    Yes, they did.

Q    And it appeared to you as if they met on the occasions
you saw them to discuss matters of importance to the group?

656

A     It was obvious that they were making decisions,
because when they came out of these meetings they would
relay the conclusions they'd come to, or they would
indicate to us the dispositions that were to be taken on
the decisions they had taken.

Q     The meetings were on serious sensitive business
matters for the group?

A     Yes.

Q     Now, no one was allowed into the room while the men
were discussing these serious sensitive matters; isn't that
correct?

A     Well, they weren't always in a room by themselves.
They would go off by themselves to an area where nobody
was.   It was understood that you weren't to get close to
them.

Q     And others were not allowed to be physically present
or close; isn't that correct?

A     Yes, it was -- the order was given not to get too
close.

Q     Now, at these meetings that you have told us about,
these sensitive meetings of the group, Mr. Zuno was never
present at any of those meetings, was he?

A     Never.

Q     You know Ernesto Fonseca's main people, do you not?

A     I think I do, yes.

657

Q    And who are they?

A    Samuel Razo-Ramirez, Javier Barba-Hernandez,

Comandante Molina.  There were many people.  I mean, many

people in what areas?  There were many assistants for those

people.

Q    How about Felix-Gallardo's main people?

A    Well, Felix-Gallardo was an entity of -- so he was not

part of Mr. Fonseca's retinue.  He was a partner.  If you

want to talk about his partners, then you shouldn't have

gone down the totem pole, but to the side.

Q    How about Caro-Quintero's main people?

A    That's to the side.  Those are all people that are on

the same level, Caro-Quintero, Felix-Gallardo, Ernesto

Fonseca, Cochiloco.

Q    Some of the Caro-Quintero retinue included who?

A    Mr. Caro's retinue included the Chief of Homicide

Bureau, the State Judicial Police.  On many occasions the

Head of the Federal Judicial Police.  He had another person

called Samuel.  There was another person whose name was

Pacheco [phonetic], who was a major figure of his.  I don't

remember all of their names.

Q    Now, is it correct, sir, that you maintained a radio

system that you had set up for Ernesto Fonseca and

Caro-Quintero?

A    Well, I set it up for Ernesto Fonesca on the orders of

658

1  Gobernacion, but it later came to include Mr. Caro-Quintero

2  because Ernesto invited him to use it.

3  Q    You maintained that system?

4  A    Did I maintain it, sir?  Yes, I did.

5  Q    And did you monitor it on a 24-hour a day basis?

6  A    Yes, sir, I did.

7  Q    And there was a telephone system?

8  A    Well, it had an interface with the telephone system.

9  From the radio you could call on the telephone or you could

10  also answer telephone calls on the radio.

11  Q    Those calls were taped?

12  A    I had intervened many of the telephones in Mr.

13  Fonseca's residence and some of the telephones in Mr.

14  Caro's residence on instructions from the Minister of the

15  Interior.  I taped those calls.  I did not tape

16  specifically the ones that were on the radio.

17  Q    Is it correct that you overheard literally thousands

18  of conversations that in one way or another were

19  drug-related?

20  A    Yes, sir, that's true.

21  Q    And those conversations were basically between people

22  in the Fonseca-Quintero group and their various underlings

23  and various officials of one kind or another?

24  A    Yes.

25  Q    And you never heard Ruben Zuno's voice on those tapes,

659

1  did you?

2  A    I did not specifically recognize the voice of Mr. Zuno

3  on any of those conversations.

4  Q    And --

5  A    Maybe he was on them, but I didn't specifically

6  recognize his voice.

7  Q    You never heard his name mentioned?

8  A    No, I did not.

9  Q    To your personal knowledge, Mr. Zuno was not involved

10  in drug dealing?

11        MR. CARLTON:   Objection.   Lack of foundation.

12  Irrelevant.

13        THE COURT:   The objection is sustained.

14  BY MR. MEDVENE:

15  Q    As far as you personally knew, Mr. Zuno was not a

16  member of the Cartel; isn't that correct?   Your personal

17  knowledge?

18  A    Did I know him to be a partner of theirs --

19  Q    Yes, sir.

20  A    No, I did not.

21  Q    Now, you told us on Friday of an occasion when you

22  escorted certain trucks.

23        On those occasions, would you meet those trucks at

24  a prearranged meeting spot?

25  A    Yes, we would.

660

1   Q    And you were dispatched from Ernesto Fonseca's house

2   to go to a particular meeting spot?

3   A    Yes, sir.

4   Q    You would wait at that meeting spot until you saw the

5   trucks?

6   A    We would wait until we received radio communications

7   from them.  Usually they were between 15-20 kilometers

8   away, and they would say, "We are on our way."

9   Q    You'd be sitting in your car and you would see the

10  trucks arrive?

11  A    We would be outside the cars.  We normally would set

12  up roadblocks.  Because of the sensitive nature of what we

13  were doing, we couldn't have other people driving by or

14  being there at that particular time, so we would set up a

15  roadblock to keep the road clear, and we would be outside

16  manning the roadblock.

17  Q    When you saw the truck come, you would be in your car

18  or get in your car and lead the convoy wherever you were

19  going to lead them?

20  A    That was the purpose of the radio communication

21  beforehand, to be able to be in the car, waiting on the

22  side of the road.  At the time that the trucks past, all we

23  had to do was to form up --

24  Q    And -- I'm sorry, were you finished?

25  A    That's -- yes, sir.

661

1    Q    And when the trucks came, the trucks always were

2    covered with a tarp on so you couldn't see what was inside?

3    A    I couldn't, no.

4    Q    And you always, on these four occasions you told us

5    about, escorted the trucks to an access road around the

6    City of Guadalajara; is that correct?

7    A    Yes, sir, that's true.

8    Q    And once you --

9    A    More or less.  We did not -- our destination wasn't

10   that road, but more or less arriving in that area.  On the

11   outskirts of the city, we would break off and go on to Mr.

12   Fonseca's house.

13   Q    Once you got the trucks safely into the access area of

14   Guadalajara, you would go off in one direction and the

15   trucks would go off in another?

16   A    Yes, sir.

17   Q    And you would go off to Mr. Fonseca's house or

18   wherever you were going?

19   A    We would go to Mr. Fonseca's house.

20   Q    You didn't follow the trucks to see where they were

21   going?

22   A    No, sir.  We knew where they were going, but we didn't

23   follow them.

24   Q    And you didn't ride back to see the trucks, you went

25   to -- you'd done your job and you went to Mr. Fonseca's

662

1  house and you did whatever you were supposed to do?

2  A    On those days, yes.  The days -- the next day we might

3  be ordered to go where the trucks went, and we would see

4  the trucks there.  We knew where they were going; but as

5  far as that point in time, yes, we would.

6  Q    Now, you said Friday you attended some classes at a

7  U.S. University.  Were you making reference to the

8  University of California at Berkeley?

9  A    Yes, sir, I was.

10 Q    And did you previously say under oath that you had

11 done undergraduate work at Berkeley before going to law

12 school there?

13 A    Yes, I did.

14 Q    And did you previously say in substance under oath

15 that you graduated from Berkeley and went on to the law

16 school at Ball?

17 A    No, I did not.

18 Q    I read from your testimony given approximately June of

19 1990, at 13, Page 147:

20           "Question:  You told them that you

21        took undergraduate courses at Berkeley

22        before going to law school at Ball.  Is

23        that correct?

24           "Answer:  I believe I said I did

25        undergraduate work at Berkeley.

663

1              "Question:  The implications of

2        what you told the Grand Jury was that

3        you graduated from Berkeley and then went

4        to law school at Ball; is that correct,

5        sir?

6              "Answer:  Yes."

7        Now, sir, you never graduated from Berkeley, did

8    you?

9    A    No, I did not.

10   Q    You never took a course for credit at Berkeley, did

11   you?

12   A    No, I did not.

13   Q    You never graduated from Ball Law School, did you?

14   A    No, I did not.

15   Q    You never took one course for credit at Ball Law

16   School, did you?

17   A    No, I did not.

18   Q    You never graduated from any American university?

19   A    No, I did not.

20   Q    And never took any accredited courses at any American

21   law school?

22   A    American law school, no.

23   Q    You were in prison, were you not, sir, from

24   approximately September 11th of 1984, through approximately

25   May of 1985 in Mexico?

664

1    A    Well, I was in the hospital -- Civil Hospital of

2    Guadalajara for approximately two months, and then they --

3    the rest of the time of which you are speaking of I was in

4    the State Prison, yes.

5    Q    And being in the hospital or the prison you have no

6    personal knowledge of the event surrounding the kidnapping

7    and murder of Enrique Camarena; isn't that true?

8    A    That is correct.

9    Q    You've been convicted of extortion, yes or no, sir?

10   A    Well, it's hard for me to say, sir.  When I was -- I

11   had not been convicted when I came here.

12   Q    Excuse me, sir.  My question is --

13   A    I can't tell you.  I can't -- how can I know that if I

14   wasn't there, sir?  I mean --

15   Q    I will read from the man's prior testimony under oath

16   in June of '90, Volume 13, Page 193, Lines 8 and 9.

17              "Question:  And were you convicted

18         of extortion?

19              "Answer:  I do not know, sir.  I

20         think I was."

21   A    That's it.  I don't want to mislead you, Mr. Medvene.

22   We had such a ruckus last -- on Friday that I'm trying to

23   be careful about my answer.  I just don't want to --

24   Q    Mr. Harrison, you were convicted of robbery; is that

25   correct, sir?

665

1   A    Once again, I don't know.  I was told by my attorney

2   that I was convicted and that conviction was reversed.

3   Q    You were convicted of gangsterism?

4   A    I was told by my attorney that I was convicted on that

5   charge and that that conviction was reversed.

6   Q    Do you have any record of any kind to show -- let's

7   take it a step at a time.

8         First, you were convicted of gangsterism; correct,

9   sir?

10  A    I was told that by my attorney.  In a telephone

11  conversation he later told me the conviction was reversed.

12  Q    Do you have papers to show the conviction was

13  reversed?

14  A    Neither one way or the other.  I was here.  I was not

15  allowed to go to Mexico.  How could I know.

16  Q    I read from Page 13, 193, Lines 16 and 17:

17             "Question:  You were convicted of

18         gangerism; is that correct?

19             "Answer:  I believe that was one

20         of the charges, too, yes, sir."

21  Q    Were you convicted --

22  A    I still believe --

23  Q    -- Mr. Harrison, of impersonating an official?

24  A    I was told by my attorney that I was convicted of that

25  and that that charge was reversed on an appeal.  That

666

1  conviction was vacated.

2  Q    Do you have any record of any kind to show that, sir?

3  A    I don't have any record to show I was convicted, and I

4  don't have any record to show it was reversed on appeal,

5  other than what my attorney told me.

6  Q    You did not say when you testified under oath in June

7  of '90, when you said that you were convicted, anything

8  about anything being reversed, did you?

9  A    It hadn't been reversed yet.  The appeal hadn't been

10  taken, Mr. Medvene.  Time has passed.

11  Q    Were you convicted of illegally transporting firearms,

12  sir?

13  A    Yes, I know I was convicted of that.  It was

14  possessing firearms.

15  Q    Now, you previously worked for Garate-Bustamante?

16  A    Yes, sir.

17  Q    And you worked for him for a couple years in the early

18  '80's?

19  A    I didn't work for him for a couple of years.  I did

20  piece work for him, as well as other comandantes.

21  Q    And Garate-Bustamante worked for Ernesto Fonseca?

22  A    Mr. Garate-Bustamante, when I met him, had just been

23  either suspended or had left the State Riot Squad, the Riot

24  Squad of the State Police Department, and he represented

25  himself to me to be a chief of a special squad authorized

667

by the governor.  In fact, he had a plaque on his desk that
said he was the chief of a special -- you want to know what
he was?  That's what I understood he was.

Q    Was Mr. Bustamante, to your knowledge, involved in
working with and for drug traffickers?

A    Yes.  As every police officer I knew at that time,
yes.

Q    If you would answer my question, sir.  I asked about
Mr. Bustamante --

A    That's the only way I know --

Q    Excuse me --

A    That's the only way I know, Mr. Medvene --

Q    Excuse me, sir --

A    Okay.  I'll have to answer no.

        THE COURT:  Counsel, he's answered your question.

BY MR. MEDVENE:

Q    Now, the first time you spoke to any D.E.A.
representative in connection with the overall Camerena
investigation, was some time in September of 1989; is that
correct, sir?

A    That is correct.

Q    And your initial contact in getting to see the D.E.A.
was Garate-Bustamante; is that true, sir?

A    I'm not sure of the connection there.  I don't know.
I would assume that to be so, but I'm not sure.  I couldn't

668

1    testify yes or no because I don't know.  They contacted me

2    in 1987.  Whether they were sent by Mr. Garate-Bustamante,

3    I really don't know, Mr. Medvene.

4    Q    I read from your testimony under oath in June of 1990,

5    at Volume 13, Page 194, Lines 17 to 19:

6              "Question:  And who did you first

7         contact before you came here about

8         coming here?

9              "Answer:  Garate-Bustamante."

10   A    That was -- he called me on the telephone --

11   Q    Excuse me, sir, there is no question pending.

12        Mr. Harrison, did Mr. Bustamante send someone to

13   see you as an intermediary between him and the D.E.A.?

14   A    Could you indicate a time reference, Mr. Medvene?

15   Q    Yes, sir.  When there were discussions about or

16   negotiations about you coming to see the D.E.A.?

17   A    They were -- about me coming to the United States?

18   Q    The time period is -- the time period --

19        THE COURT:  At any time?

20        THE WITNESS:  Mr. Garate-Bustamante, from the time

21   he came to the United States, he called me continuously.

22   He called every week.  He would locate me wherever I was

23   and call me.  He would say, "What's happening?  I just

24   wanted to talk to you.  Hello.  How are you?"

25        And I would most of the time hang up on him or

669

1    tell him I didn't want to talk to him.  So you have to be

2    specific because he called me continuously.  We never

3    discussed coming to the United States.  That was discussed

4    by the people that I think he put me in touch with, but I'm

5    not sure whether he did or not, since they contacted me and

6    didn't tell me whether they were doing it at the insistence

7    of Mr. Garate-Bustamante or not.

8    BY MR. MEDVENE:

9    Q    Were you contacted sometime in or around July of 1989,

10   by someone you understood was calling you on the behest of

11   Mr. Bustamante?

12   A    Yes.

13   Q    Who was that?

14   A    Do I have to reveal the names of Mr.

15   Garate-Bustamante's operatives in Mexico?  They are still

16   there, and I don't know what will happen to them if I do

17   reveal their names.

18           THE COURT:  Well, you may answer the question.

19           MR. CARLTON:  Your Honor, the government would

20   object to the revelation of those names.

21           THE COURT:  Overruled.

22           THE WITNESS:  I was contacted by Mr.

23   Garate-Bustamante's brother in 1989, but it had absolutely

24   nothing to do with coming up here or testifying or anything

25   else.

670

BY MR. MEDVENE:

Q    Under oath in June of '90, were you asked if you
recalled the name of the person that contacted you, and did
you say you did not recall the name?

A    I was not referring to that person, and I did say I
did not recall the name, yes.

Q    Do you recall the name now?

MR. CARLTON:  Objection, Your Honor.  Same
objection.

THE COURT:  Well, there -- the question is not
clear.

BY MR. MEDVENE:

Q    The name of the individual that you spoke to, Mr.
Harrison, about coming to the United States?

MR. CARLTON:  Objection; lack of relevance.

THE COURT:  Overruled.

THE WITNESS:  Your Honor, I strongly petition the
Court not to give his name up.  This man will be killed.
This man is -- his career will be destroyed, Your Honor.

MR. MEDVENE:  Objection, Your Honor.

MR. RUBIN:  Objection, Your Honor.

MR. MEDVENE:  Move to strike, Your Honor.

THE COURT:  I will direct you to pass that
inquiry.  Move on to something else until we can take this
up at the recess.

671

1    MR. MEDVENE:  I'm not going to ask for the name

2    right now, Your Honor, but I'm just staying in that area.

3    BY MR. MEDVENE:

4    Q    Did you say under oath in June of 1990, that you had

5    previously met this particular person on more than a

6    hundred occasions?

7    A    Yes, Mr. Medvene, I did.

8    Q    And did you say that even though you had met this

9    person on more than a hundred occasions, you did not recall

10   their name?

11   A    Yes, sir, I did.

12   Q    And when you said you did not recall their name under

13   oath --

14   A    Yes, sir.

15   Q    -- that was not correct; isn't that true?

16   A    That was a lie, Mr. Medvene, and I freely admit it.  I

17   tried to save this man's life --

18   Q    Thank you, sir.  You have answered my question.

19   A    -- I don't want him to die.

20   Q    Mr. Harrison, the first person you spoke to with the

21   D.E.A. when you came to this country in September of '89

22   was Mr. Berrellez?

23   A    Which Mr. Berrellez?

24   Q    Mr. Hector Berrellez?

25   A    No.

672

1    Q    What D.E.A. agent did you first speak with when you

2    came to this country?

3    A    I believe the first person I spoke with here was Mr.

4    Berrellez' brother, Art.

5    Q    And where did you -- was he a D.E.A. agent?

6    A    Yes.

7    Q    Where did you meet him?

8    A    Met him in Hermosillo, Mexico.

9    Q    And could you tell us your route from Hermosillo,

10   Mexico to Los Angeles?

11   A    Just --

12            MR. CARLTON:  Objection; lack of relevance.

13            THE COURT:  Sustained.

14   BY MR. MEDVENE:

15   Q    From the time you arrived at Hermosillo, Mexico,

16   approximately how many hours did it take until you arrived

17   in Los Angeles?

18   A    I think it took four or five hours.

19   Q    And you were with D.E.A. agents all of that time; is

20   that correct?

21   A    Yes, I was.

22   Q    Is it true, sir, that not once in that four or five

23   hours did you mention to those agents that you had any

24   information or knowledge of any kind with reference to Mr.

25   Zuno and knowing any drug dealers or anything such as that?

673

1    Is that a correct statement, sir?

2    A     Your question is compound.  I did not mention knowing

3    Mr. Zuno.  I certainly mentioned knowing some drug dealers,

4    yes.

5    Q     You told us already you didn't know Mr. Zuno to be a

6    drug dealer.  I'm asking you during the four or five hours,

7    sir, Mr. Harrison, is it --

8              THE COURT:  Counsel, it appears to me he's

9    answered the question.

10   BY MR. MEDVENE:

11   Q     Now, in front of you, Mr. Harrison, is what has been

12   marked Defendants' 402.  It's underneath the water pitcher,

13   sir.

14             And we have stipulated with the --

15             MR. MEDVENE:  I might inform Your Honor that we

16   have stipulated with the prosecution that the dates and

17   payments shown there are correct.

18             THE COURT:  On this exhibit?

19             MR. MEDVENE:  Yes, sir.

20             MR. CARLTON:  Your Honor, we stipulated to the

21   amount, the dates, and the payments, but not to the

22   exhibit.

23             MR. MEDVENE:  No.  No, that's correct.

24             THE COURT:  To the information on it?

25             MR. MEDVENE:  Yes.

674

1          THE COURT:  The amounts and the information on the

2    exhibit is correct?

3          MR. CARLTON:  Yes.

4    BY MR. MEDVENE:

5    Q    Using that, Mr. Harrison, to refresh your

6    recollection, sir, is it correct that on September 8th of

7    '89, you were paid $2,000?

8    A    According to this exhibit, yes.

9    Q    On September 15th, $2,000?

10   A    Yes.

11   Q    September 19th, $2,000?

12   A    Yes, I think so.

13   Q    September 27th, $1,000?

14   A    Yes.

15   Q    September 28th, $2,000?

16   A    Yes.

17   Q    October 3rd, $2,000?

18   A    Yes.

19   Q    October 17th, $1,000?

20   A    Yes.

21   Q    February 8th of '90, $3,000?

22   A    Yes.

23   Q    February 15th, $1,000?

24   A    Yes.

25   Q    February 21st, $2,000?

675

1    A    Yes.

2    Q    February 28th, $3,000?

3    A    Yes.

4    Q    March 7th, $2,000?

5    A    Of what year?

6    Q    '90?

7    A    Yes.

8    Q    April 3rd, $3,000?

9    A    Yes, sir.

10    Q    June 1st, $3,500?

11    A    Yes, sir.

12    Q    June 7th, $1,900?

13    A    Yes, sir.

14    Q    July 3rd, $3,500?

15    A    Yes.

16    Q    July 19th, $6,000?

17    A    Yes, sir.

18    Q    August 3rd, $3,500?

19    A    Yes, sir.

20    Q    August 11, $470?

21    A    Yes, sir.

22    Q    September 1, $3,500?

23    A    Yes.

24    Q    September 4, $6,000?

25    A    Yes, sir.

676

1   Q    September 18, $400?

2   A    Yes, sir.

3   Q    September 25th, $3,500?

4   A    That is correct.

5   Q    October 2nd, $500?

6   A    Yes, sir.

7   Q    October 19th, $500?

8   A    Yes.

9   Q    November 2nd, $3,500?

10  A    Yes.

11  Q    November 14th, $1,500?

12  A    Yes.

13  Q    November 30, $3,500?

14  A    Yes.

15  Q    January 2nd, $3,500, of '91?

16  A    Yes.  Yes, that is correct.

17  Q    January 28, $5,400?

18  A    Yes.

19  Q    January 29th, $500?

20  A    Yes.

21  Q    February 1st, $3,500?

22  A    Yes.

23  Q    March 25th, $500?

24  A    Yes.

25  Q    April 2nd, $3,500?

677

1   A   Yes.

2   Q   April 7th, $5,000?

3   A   Yes.

4   Q   April 30, $3,500?

5   A   Yes.

6   Q   May 31, $3,500.  I'm skipping some smaller payments.

7   A   May 31st, yes.  Yes, that's here.

8   Q   July 1, $3,500?

9   A   It stops there.  I'm sorry.

10  Q   July 1, $3,500?

11  A   I'm sorry.  It goes and skips back up again.  I don't

12  see that July 1st on there.

13          THE COURT:  What date?

14          MR. MEDVENE:  July 1 of '91.

15          THE COURT:  Well, let's just stipulate to that if

16  it's true.

17          THE WITNESS:  As you can see, it goes see from May

18  to June and skips back up to June, and I don't --

19  BY MR. MEDVENE:

20  Q   At the top of the page, sir.

21  A   I'm sorry.  You say July 1st?  Yes, sir, I got it.

22  Okay.  I'm sorry.

23  Q   $3,500?

24  A   It skips around.

25  Q   Is that correct, sir?

678

1    A    Yes, that is correct.

2    Q    August 2nd, $3,500?

3    A    Yes.

4    Q    Another August '91 payment of $3,500?

5    A    It's black there.  I can't make it out.  If you say

6    so, I'm sure it is.

7    Q    When you say it's "black," you mean -- you mean the

8    date?

9    A    It's black.  It's not legible, I believe.

10   Q    Is the $3,500 legible, sir?  It says August '91,

11   $3,500?

12   A    You mean on the 2nd of August?

13   Q    The 2nd of August, you see $3,500; correct, sir?

14   A    Yes.  That's legible.

15   Q    You go down, one, two, three, four spaces.  I'm

16   skipping the smaller payments.

17   A    Uh-huh.

18   Q    It's another $3,500; is that correct, in August?

19   A    In August, yes.

20   Q    In September, did you receive payments of $548,

21   $1,155, $800, $3,500, and $418?

22   A    According to this, yes.

23   Q    In November, $1,750, and another $1,750, and another

24   $1,000 or another $1,100, and another $500?

25   A    Yes.

679

1   Q    In December, $3,000 and another payment of one or more

2   $1,000?

3   A    Only the amount -- the dates are wiped out.  Only the

4   amounts.  There's one for $3,000, one for $500.

5   Q    In January of '92, payments --

6   A    Yes, sir.

7   Q    -- of $8,000?

8   A    I'd have to add them up.  I don't know.

9   Q    $2,500, $2,500, and $3,500?

10  A    Yes, sir.

11          No.  It's $2,500, $2,000 and $3,500.

12  Q    In February, $2,000?

13  A    Yes, sir.

14  Q    In March, $4,300?

15  A    Yes, sir.

16  Q    In April $4,000?

17  A    Yes, sir.

18  Q    In May, $4,700?

19  A    Yes, sir.

20  Q    In June, approximately $3,400?

21  A    $3,485, sir.

22  Q    In July, $3,500?

23  A    Yes, sir.

24  Q    August, $3,500?

25  A    Yes, sir.

680

1  Q    September, $3,500?

2  A    Yes, sir.

3  Q    How about October?

4  A    I get $3,500 a month.  I don't know.  It's not on

5  here.

6  Q    You received $3,500 in October and November and

7  December of this year?

8  A    Yes.

9  Q    You mentioned on Friday being asked to go look at a

10  gate at 881 Lope de Vega.

11       When was that?

12  A    It was shortly after we had driven by that house.  I

13  don't remember the exact date.  I don't -- I didn't note it

14  down, but I can't think -- it was -- what can I tell you?

15  It was somewhere around the end of 1983, the first part of

16  1984.  I was -- in my own mind, I'd situate it somewhere

17  around January or February of 1984.

18  Q    Did you previously say under oath that it was in

19  August?

20  A    That it was what?

21  Q    In August?

22  A    I may have.  I may have given a range of dates.  I'm

23  not -- I don't want to say that I'm sure on the date,

24  because I really am not.

25  Q    You said the other day it was approximately January or

681

1    February?

2    A    As more -- as much as I can think about it, every time

3    I testified to this, and every time it comes up, I try to

4    situate dates.  I didn't take it down.  I tried to relate

5    it with other things that happened and figure out a better

6    date.  Maybe I'm not very good at it.  I can assure you

7    that it happened.

8    Q    That's what we are here to find out, Mr. Harrison.

9    A    Well, I --

10   Q    Mr. Harrison, did you know that Mr. Zuno did not live

11   at the house at Lope de Vega in January or February of

12   1984?

13   A    Did I know it when?  In 1984?  In 1984, I had no idea

14   whether Mr. Zuno lived there or not.  I didn't --

15   Q    All right, sir.

16   A    Mr. Zuno didn't cross my mind in 1984.

17   Q    Now, did you knock on the gate when you came up to the

18   house?

19   A    Yeah, I knocked on the gate.  As I say, I said on

20   Friday, Mr. Medvene --

21   Q    Excuse me, sir --

22   A    -- I just -- we're not going to be able to understand

23   each other in these questions.  I mistranslated.  "Puerta"

24   in Spanish means door, gate, and garage door.  I was

25   speaking -- when I was told to go there, I understood it to

682

1    be the garage door.  I knocked on the side gate and the

2    person came out of it.

3           So I don't want to mix it up.  I just -- there are

4    not three words in Spanish for those three types of doors.

5    I mistranslated.  I hadn't spoken English in a long time

6    and --

7    Q    What did you knock on, the garage door?

8    A    No, a gate that's in front of the front door.

9    Q    Isn't it true, sir, that there is no gate in front of

10   the front door?

11   A    Well, I'm not sure if it was in front of the front

12   door --

13   Q    Excuse me.

14   A    I knocked on what you -- on what you normally knock on

15   for the people to come out.  I saw the guy come out of the

16   house.

17          MR. MEDVENE:  May I approach the witness, Your

18   Honor, just for purposes of --

19   BY MR. MEDVENE:

20   Q    Well, next to you Mr. Harrison --

21          THE COURT:  What is it?

22          MR. MEDVENE:  I want to show him -- I want to

23   exhibit to the jury --

24          THE COURT:  The exhibit in front of him?

25          MR. MEDVENE:  Yes, sir.  I put it next to him.

683

1   It's a picture.

2           THE COURT:  Do you see the picture there?

3           All right.  You may approach.

4   BY MR. MEDVENE:

5   Q    Mr. Harrison --

6           MR. MEDVENE:  May I stand here for just a moment,

7   Your Honor?

8           MR. CARLTON:  Could we have an exhibit number,

9   Your Honor?

10          MR. MEDVENE:  Yes, sir.  13-A.

11  BY MR. MEDVENE:

12  Q    Is 13-A a picture of 881 Lope de Vega?

13  A    Yes, it is.

14  Q    Isn't it true, Mr. Harrison, that the gate or garage

15  door that you said you knocked on, it would make no sense

16  to knock on it because nobody lives in the garage?

17          MR. CARLTON:  Objection.  Speculative.  Ambiguous.

18          THE COURT:  Sustained.

19          THE WITNESS:  You want to know, sir --

20          THE COURT:  Just a moment.

21          THE WITNESS:  -- I knocked here (indicating).

22          THE COURT:  Just a moment.  You have another

23  question?

24          MR. MEDVENE:  Yes, sir.

25  BY MR. MEDVENE:

684

1   Q    Are you saying, Mr. Harrison, that you knocked

2   whereyou pointed, and I'll put an "X" there?

3            THE COURT:  Let the witness put the "X".

4   BY MR. MEDVENE:

5   Q    Will you put an "X" there, sir.  Right by the gate.

6   A    Right around here (indicating).  In front of the door.

7   Where you stand in front of the front door.

8   Q    You said on the gate, so will you put it by the gate

9   where you -- okay.

10           MR. CARLTON:  Your Honor, may I approach so I can

11  see what has been marked?

12           THE COURT:  Well, I'm about to send him back, so

13  you don't need to.  You can see it later.

14  BY MR. MEDVENE:

15  Q    Mr. Harrison, isn't the gate that you claim that you

16  knocked on about 20 feet in front of the door?

17  A    It's the next thing -- well, which door are you

18  talking about?

19  Q    Isn't there just a small gate about four feet high

20  that you would open and then walk up to the front door,

21  which is 20 feet in, and you're going to knock, you would

22  knock on the front door, but if you were --

23  A    No way.  No way.

24  Q    All right, sir --

25  A    Number one, for --

685

1   Q      Excuse me --

2   A      -- in Mexico you don't do that; and number two, at Mr.

3   Caro-Quintero's house, if you think he lives here, you

4   don't do that either.   There's no way.   I had some kind of

5   coin and I banged on the gate, I banged on the metal part

6   of the fence.

7   Q      Does the 13-A accurately depict, sir --

8   A      Yes, it does.

9   Q      -- the four-foot gate, three-and-a-half, four-foot

10  gate, that you can open to walk to the front door.   Is it

11  accurately depicted in that picture, sir?

12  A      Well, it's there, yes.   That's the area.

13  Q      Is this picture an accurate picture, sir?

14  A      Yes.   I think so, yes.

15  Q      Okay.   Now, you made some reference Friday,

16  Mr. Harrison, about a radio transmission?

17  A      Yes, sir.

18  Q      When was that that you overheard allegedly this radio

19  transmission?

20  A      That would have also been in the same time frame as

21  when I was sent over, because I was -- it was shortly

22  before the incident where I was sent over to see the garage

23  door.

24  Q      And again, so in the January-February '84 timeframe?

25  A      That's where I have it situated in my mind.

686

1   Q    As you told us, you didn't know if Mr. Zuno was then

2   living permanently in Mascota or not; isn't that correct?

3   A    That is correct.

4   Q    Do you know whether at that time Serjio Velasco-Virgin

5   and his family were actually renting the 881 Lope de Vega

6   house?

7   A    I don't know Serjio Velasco.

8   Q    You have no knowledge one way or the other if he was

9   renting the house?

10  A    No.

11  Q    How did you happen to be in the vicinity of 881 Lope

12  de Vega on this particular occasion?

13  A    Which occasion, sir?

14  Q    The occasion when you claim that you overheard some

15  transmission?

16  A    We were driving past Jardines Del Bosque to get into

17  downtown, get into the downtown area.

18  Q    Now, what side of the street is 881 Lope de Vega on?

19  A    It's on the --

20        MR. CARLTON:  Objection.  Ambiguous.

21        THE WITNESS:  Depends on which way you are going.

22  BY MR. MEDVENE:

23  Q    Well, which way --

24        THE COURT:  It wouldn't depend on which way you

25  were going, on what -- if it's on the north side, it's on

687

1   the north side.  If it's on the east side, it's on the east

2   side.  Whether you're going either way.

3            THE WITNESS:  Well, I could only situate on the

4   left or the right.  And the truth is, I don't know north

5   and south.  I'm not very good at that.

6   BY MR. MEDVENE:

7   Q    Well, how did you approach the house?  In which

8   direction were you driving?

9   A    We were driving on Sol.  We were driving on Sol

10  Street, S-O-L, and we happened to go pass that house.  I

11  think it's on the corner or near the corner.  And I just

12  got a remark that that's, you know --

13  Q    Did you go pass the front of the house?

14  A    I think we went pass just part -- a portion of it.  We

15  may have driven in front of it.  I don't really remember.

16  Q    Did you or didn't you?

17  A    I was concentrating on the radio, not on the house.  I

18  was bringing this radio up and down.  I had the antenna

19  down on the floor.  We were driving pass.  You'll have to

20  excuse me, but I really didn't -- I don't have a

21  photographic picture in my mind of how we did it.  We just

22  happened to be going by there.

23  Q    Are you saying now you don't recall if you went past

24  the front of the house or not?

25  A    We went past the house.  I assume we went past the

688

1    front of the house.  But as we were moving right in front

2    of that house, I had the radio down on the floor.

3           As I testified on Friday, the signal was so strong

4    that what I wanted to do was to ground the antenna --

5    Q    Excuse me.

6    A    -- when you bend over in the seat, you don't really

7    see a lot out of the window.

8    Q    Did I hear you correctly -- I don't mean to

9    misstate -- did you say as you drove past the front of the

10   house you did this?

11   A    I believe we drove past the house, yes.

12   Q    Now, when you drive down El Sol, you don't go pass the

13   front of the house, do you?

14   A    If you turn onto Lope de Vega, yes.

15   Q    Well, I thought you told us before you drove down El

16   Sol.  Now are you telling us you drove down El Sol and you

17   turned on Lope de Vega?

18   A    I'm not sure whether we turned or not.  I don't want

19   to lie to you.  But I don't want to give you a false

20   impression of what we were doing.  I wasn't driving.  It

21   wasn't my car.  I was more concentrating on the radio.

22   I've only seen this house twice in my life.  I never went

23   back.  I didn't know whose house it was, as a matter of

24   fact, until much later.

25   Q    Where did you start from that day when you claim you

1  went by the house?

2  A    We started on Mariano Otero.  On the street of Mariano

3  Otero.

4  Q    And your destination was where?

5  A    We were going into the downtown area.  We were going

6  over to -- close to the American Consulate.

7  Q    Were you starting from a house?

8  A    We started out from the house on Cuarzo.

9  Q    I'm sorry?

10 A    We started out from the house on Cuarzo, yes.

11 Q    From Ernesto Fonseca's house?

12 A    Yes.

13 Q    Going downtown to the American Consulate?

14 A    Going straight over.

15 Q    Okay.  Were you using a hand held radio?

16 A    Yes, sir.

17 Q    Is that susceptible to distortion?

18 A    Yes, sir.

19 Q    What type of antenna did you have on the radio that

20 you claimed you received the transmission on?

21 A    I had a quarter inch -- quarter wave rubber duck

22 antenna.

23 Q    What frequency was the radio receiving on?

24 A    At that particular time it was receiving on 148350.

25 Q    Were there any repeater sites in the area?

690

1   A   Oh, yes.

2   Q   Where was the closest repeater site?

3   A   The closest repeater site was in the telephone

4   building about four blocks away from the American Consulate

5   in Guadalajara.

6   Q   Were there any transmitters in the area?

7   A   Well, there are -- the Guadalajara is supersaturated

8   with VHF transmitters.  I'm sure there were plenty.

9   Q   And there was a VHF system, a VHF band?

10  A   Yes.  That is the VHF band.  That's the very high

11  frequency band, FM Band, and the city is saturated with

12  those.

13  Q   And those bands are sufficiently wide so they pick up

14  other signals; isn't that correct?

15  A   The band width of the radio frequencies that are

16  assigned are five kilohertz.  They do pick up adjacent

17  channel and even beat frequency where two frequencies come

18  together and create a third.  They pick up interference all

19  the time.

20  Q   There were lots of houses in that area; weren't there?

21  A   Oh, yes, sir.

22  Q   Now, you didn't make any determination that there were

23  no other sources of transmission, did you, cause that

24  wasn't your particular interest at that time?

25  A   It was to quick, number one.  It all happened really

691

1    quick.  We were driving by a place.  I'm bending over

2    putting the radio on the floor.

3          What I can tell you is, I took it off the repeater

4    and put it on the normal radio-to-radio frequency.  And

5    that type of frequency comes in through the radio case and

6    will override any interference.  You'd have to have a

7    20,000 watt transmitter on one side, and even if you were

8    just one kilicycle up, you still would not get interference

9    if you have a -- if you were just standing right in front

10   of a radio, it is so strong that even if you took the

11   antenna off, you'd still receive it because the radio's

12   receiving the frequency through the case.  It's

13   disregarding the antenna.  I mean, it has nothing.

14          That's why you ground the antenna to see how

15   strong it is.

16   Q    Do you recall now, eight years later, whatever it is,

17   what Mr. Quintero was saying on the phone?

18   A    Oh, yes.  That I recall very well.

19   Q    What was he saying?

20   A    He was bawling out -- see, there was a friend of mine

21   who had gotten in trouble with him and he had been sent in

22   exile to a ranch, this Ranch Pueyna [phonetic], owned by

23   Ernesto Fonseca.  And this man's name was Mario.  He had

24   come back into the Guadalajara area.

25          And Mr. Caro got on him right way and said,

692

1   "What are you doing?  Why did you leave the ranch?  What

2   are you doing back here?  I told you to stay there."

3   Q    Did you see Caro-Quintero on that occasion?

4   A    No.

5   Q    Did you see him broadcasting?

6   A    No.

7   Q    On September 20, 1989, didn't you have a conversation

8   with D.E.A. Agents Martinez and Morales?

9   A    I assume so, yes.

10  Q    Didn't you tell them on that occasion that you saw

11  Caro-Quintero?

12  A    I would never have said that.  No, I didn't.

13  Q    Didn't you tell them you saw him dispatching out of

14  the house?

15  A    No.

16  Q    If you said that, it was in error?

17  A    Totally.  I never saw him.  I'm not saying that I ever

18  saw Mr. Caro-Quintero in that house.  I don't want to say

19  that.  That would be a lie.

20  Q    But what you --

21  A    I think that Mr. Caro-Quintero was broadcasting from

22  that house, even though the radio could just as well have

23  been behind me as in front of me.  I don't want to give

24  anybody the false impression here.  There's -- I don't have

25  X-ray eyes.  I couldn't say that he was definitely in that

693

1   house.  All I know is that he was broadcasting in an area

2   within 40 or 50 feet in a circle around me.

3   Q    All right.

4   A    That could have been behind and on the side just as

5   well.

6   Q    You are saying under oath here that you never told the

7   D.E.A. agents that you saw him actually dispatching on that

8   occasion?

9   A    No.  I never told anybody that, and I wouldn't have

10  said that.

11  Q    All right, sir.

12        Now, directing you to the area of your testimony

13  Friday when you made reference to a party, about 175 to 200

14  people?

15  A    Yes, sir.

16  Q    How many years ago was that when you have memory of

17  the people that were there?

18  A    Well, I would assume it was 1983.  This is 1992.  I

19  would suppose that makes it nine years.

20  Q    Now, did Ernesto Fonesca order you to go to that

21  party?

22  A    Yes, sir.

23  Q    And what time did you get there?

24  A    I got there that afternoon about three or four

25  o'clock, I think.  I had to bring some supplies.

694

Q    And when was that?  What day?

A    It was -- I can't tell you the exact day.  I understood it was De La Saint Rafael, which would have been the Saint Day of Saint Rafael in Mexico.

Q    How many hours were you at the party?

A    I was there from that afternoon continuously.  I left around, I guess, 11:30 or 12:00 o'clock to go to the repeater site.  I came back around 1:00 o'clock in the morning, and I was there until the next day -- or the afternoon of the next day or the midday of the next day.

Q    Now, from the time you got there about three or four o'clock until, let's say, about eight o'clock in the evening, what were you doing?  Were you busy or just sitting around or --

A    I was busy all afternoon.  I brought the beer.  I was helping Mr. Fonseca's brother-in-law make pork rinds.  I was doing everything.  I had a lot of work to do there, yes.

Q    Fair to say that during the hours you were there, you were very active, moving around, doing a variety of things?

A    Yes.

Q    Did you make any notes eight, nine years ago of who was at the party?

A    No, sir, I did not.

Q    Since the party eight, nine years ago, did you make

695

1    any notes of who was there?

2    A    No, sir.

3    Q    Is it correct, sir, that you did not see Mr. Zuno

4    allegedly arrive?

5    A    Well, let me --

6    Q    Excuse me, sir.  My question is:  Did you see him

7    arrive?

8    A    You don't -- just a minute.  What does "arrive" mean?

9    I didn't see you arrive.  I saw you come into the courtroom

10   today, but I don't know what time you drove up in your car.

11   Q    Arrive, sir --

12   A    Let's get it straight in our minds, okay.

13   Q    All right.  Sir, let me try to be helpful --

14   A    I saw him here for the first time in my field of

15   vision.  I assumed he had arrived --

16           THE COURT:  Just a moment.  It might be a better

17   question to ask whether he knows how long Mr. Zuno had been

18   there at the time he first saw him.

19   BY MR. MEDVENE:

20   Q    Do you know how long Mr. Zuno had been there before

21   you first saw him?

22   A    No, I did not.

23   Q    You did not see him come in, allegedly come in to the

24   party, did you?

25   A    Well, I didn't see him pass the front gate.  I saw

696

1    him --

2    Q    Excuse me, sir --

3    A    I saw him appear there, yes.  He appeared.

4    Q    I read from your testimony under oath in June of '90,

5    14-43, Lines 5 and 6:

6                   "Question:  Did you see him come in?

7                   "Answer:  No, I did not?"

8    A    That's true.  I didn't.

9    Q    Now, is it true, sir, that you also, after this brief

10   incident you described, you also didn't see Mr. Zuno later

11   in the afternoon?

12   A    That's true also.

13   Q    You were surprised Mr. Zuno was at the party?

14   A    Yes, I was.

15   Q    You didn't think he knew Caro-Quintero; isn't that

16   true?

17   A    I was just wondering what he was doing there.  I

18   didn't -- you know, a meeting of two worlds.

19   Q    Now, you claimed you had this long relationship with

20   his family.  You claim that; is that right?

21   A    Well --

22   Q    Strike that.  Let me ask you another question.

23   A    You're characterizing the relationship.  I had a

24   relationship with his family, yes.

25   Q    You hadn't seen Mr. Zuno for a period of time before

697

1   this alleged incident --

2   A    That is correct.

3   Q    -- when you briefly saw him at the party?

4   A    That's true.

5   Q    Did you go up and say hello to him?

6   A    No.  I was there as a servant.

7   Q    Now, you also made reference Friday to Ernesto

8   Fonseca's house?

9   A    Yes, sir.

10  Q    You claim that in all of the times you were there,

11  worked there, lived there, whatever, there was one occasion

12  you saw Mr. Zuno; right?

13  A    Yes, sir.

14  Q    What was the address of that house where you claim you

15  saw Mr. Zuno?

16  A    I don't know the address.  I couldn't tell you.  It

17  was at the corner of Cuarzo and Obsidiana.  The number

18  address, I don't know.

19  Q    I'm sorry.  It was on the corner of where?

20  A    Cuarzo and Obsidiana.  I don't know the number.  The

21  number of the street I don't know.  I believe the number

22  was on Obsidiana, if I'm not -- the number was on the front

23  door that we never used.  We didn't enter from that side.

24  We didn't enter from that street.

25  Q    Excuse me one second, sir.

698

1          MR. MEDVENE:  One second, Your Honor.

2     BY MR. MEDVENE:

3     Q    Could you spell the street address, sir, where you --

4     oh, I found it.  Can you spell the street address where you

5     said the -- where you saw Mr. Zuno?

6     A    Cuarzo is C-U-A-R-Z-O, okay.  Obsidiana is

7     O-B-S-I-D-I-A-N-A, Obsidiana.

8     Q    Didn't you previously state under oath, sir, in May of

9     '90, that that wasn't the house at all?  That then you

10    claimed that house was at Circunvalacion Sur 113, Colonial

11    Las Fuentes?

12    A    Mr. Medvene, I hoped you wouldn't do that again, but

13    as you did before, you're confusing the two incidents.  You

14    are confusing the two houses.  One house is on

15    Circunvalacion Sur and the other one is where I said it

16    was.  There are two houses, two separate incidents.

17    Q    I read Volume 14, Page 46, testimony of June of '90,

18    question with reference to the Fonseca meeting:

19              "Question:  Where is the house?

20              "Answer:  The house is located at

21         Circunvalacion Sur 113, Colonial Las

22         Fuentes."

23         I apologize to the people for my pronunciation.

24              "Question:  Is that the house you

25         told us the birthday party was for

699

1          Caro-Quintero?

2                "Answer:  That's where I said I saw

3          him, sir."

4          Is it correct, sir, that up through and including

5     the time you had been with D.E.A. agents for some five

6     hours, that you never previously had said you had ever seen

7     Mr. Zuno with Mr. Fonseca or Mr. Quintero on one occasion

8     or any occasions?

9          THE COURT:  Just a moment.  Is this relating to

10    this drive or trip from Hermosillo?

11          MR. MEDVENE:  I'm asking him now just as a final

12    question, Your Honor, is it --

13          THE COURT:  This question has been asked and

14    answered previously.

15          MR. MEDVENE:  All right, sir.

16          I have nothing further.

17          THE COURT:  You may cross-examine the witness.

18          MR. RUBIN:  Thank you, Your Honor.

19                    CROSS-EXAMINATION

20    BY MR. RUBIN:

21    Q    First, Mr. Harrison, turning your attention to your

22    statement that you don't want to give anyone a false

23    impression.  It's true, is it not, that in June 1990, when

24    you testified under oath that you didn't recall the name of

25    the person, you were lying at that time; isn't that right?

700

1          MR. CARLTON:  Objection, Your Honor.  Vague and

2    ambiguous.

3          THE COURT:  The question is vague and ambiguous.

4    Be more specific.

5    BY MR. RUBIN:

6    Q    Mr. Harrison, in June 1990, you testified that you

7    didn't recall the name of the individual who contacted you

8    about coming to the United States; is that correct?

9    A    That is correct, sir.

10   Q    And at that time you were under oath and sworn to tell

11   the truth, correct?

12   A    Yes, sir.

13   Q    And that wasn't the truth, was it, Mr. Harrison?

14   A    No, sir.  I freely admit that I lied on that occasion.

15   Q    In fact, you lied under oath; correct?

16   A    Oh, yes, I did.

17   Q    Did you tell anybody in the courtroom that you were

18   lying under oath at that time?

19   A    I have a feeling everybody in the courtroom knew I was

20   lying under oath.

21   Q    And did they do that by looking at your face and

22   telling that you were lying under oath?

23   A    No --

24          MR. CARLTON:  Objection.

25          THE WITNESS:  His Honor reprimanded me on that

701

1   occasion.  I understand why, but I also understand why I

2   did it.  It's the only time I ever lied, and I did it to

3   save a life and I'd do it again.  I don't want these people

4   to be killed.  I feel strongly about it.  I'm sorry.

5   BY MR. RUBIN:

6   Q    So it's your testimony then that you would lie again

7   under oath; is that correct?

8   A    No, sir.  On that particular thing, if I could find

9   some way not to give that name up, yes, sir, I would.

10  Q    So it's your determination in your mind when it's

11  appropriate to lie under oath and when it's not appropriate

12  to lie under oath; is that correct?

13  A    No, sir.  It would have to be the very high -- really

14  high reason, such as saving an innocent person's life.

15  Q    And you decided that without consultation with

16  anybody, correct, that it was appropriate?

17  A    Nine bullets --

18  Q    You were entitled --

19  A    -- it doesn't take too much to decide.

20  Q    Sir, you had decided without any consultation or

21  questioning of anybody that you felt it was okay to lie

22  when you were sworn not to under oath; isn't that true?

23  A    I consulted my conscience, sir.  And, boy, it told me

24  not to tell that name.

25  Q    Now, when did you first come to an agreement with the

1  government to cooperate and testify for them?

2  A    Again, a compound question, cooperate and testify.  I

3  came to an agreement to cooperate with the government in

4  1989.  I told them I didn't want to testify.  I left it

5  completely off the list.

6          I said I was totally against testifying and they

7  said, "Well, what if you're needed, would you assist your

8  government?  Will you help the government of the United

9  States?"

10          And I said, "If it is necessary, I will give you

11  my word that I will go ahead."

12          I'm keeping my word here today, not to my liking.

13  Q    Sir, the first time then that you came to an agreement

14  to cooperate was in 19 --

15          THE COURT:  Is it necessary to repeat the witness'

16  answer, Counsel?  Just move on to another question.

17          MR. RUBIN:  Yes, Your Honor.

18  BY MR. RUBIN:

19  Q    Did you approach the government or did the government

20  approach you?

21  A    They approached me.

22  Q    They had previously approached you for your

23  cooperation, had they not?

24  A    Give me a time reference, date?

25  Q    Well, in fact, in 1985, right after you had been shot,

703

1   Special Agent Camarena came to you and asked for your

2   cooperation, did he not?

3   A    He asked if I wanted him to help me.

4   Q    And?

5   A    Not he specifically.  He was accompanied by another

6   person who wasn't from the D.E.A.

7   Q    You understood that to mean that he wanted -- that he

8   could help you if would cooperate with him; true?

9   A    I understood that to be the import of what he said to

10  me, yes.

11  Q    At the time, you refused to cooperate with him; isn't

12  that true?

13  A    That's true.  I refused his help.

14  Q    You refused his help.

15       And you refused his help even though you had just

16  been shot by the drug traffickers that you had been working

17  for; correct?

18  A    I was surrounded by guards of those same drug

19  traffickers.  There were nine of them standing in a row

20  around my bed, and I felt it better to say no.

21  Q    Well, in fact, you left the hospital in May and

22  June, May or June; hadn't you?

23  A    No, sir.  I was standing -- he was standing beside the

24  bed in the hospital.  And I had only been shot four or five

25  days, and I was surrounded by nine special guards who were

704

1    there to keep me from having a lawyer or being able to

2    contact my family or --

3    Q    Sir, but you eventually left the hospital in May or

4    June of that year, did you not?

5    A    In May or June of that year?  No, sir, I did not.

6    Q    Of the following year?  Excuse me.

7    A    No, sir, I did not.

8    Q    When did you leave the hospital?

9    A    I left the hospital I would think -- it must have been

10   around November the 14th or 15th of 1984.

11   Q    After you left the hospital, did you contact Special

12   Agent Camarena or call the D.E.A. to offer your cooperation

13   or your assistance at that time?

14   A    Well, I was taken under custody, tortured, and I

15   didn't really have a lot of chances to get to a phone.

16   Q    Did you ever become free at all to get to a telephone?

17   A    When I -- if you're referring to the fact that at the

18   time I got out of the state prison, where I was falsely

19   imprisoned, in May of 1985, from that time, no, I did not

20   contact the D.E.A. and I didn't want to.

21   Q    And at that point, you didn't have this patriotic

22   ferver to help your government at that time that you

23   testified that led you to be willing to testify?

24           MR. CARLTON:  Objection.  Argumentative.

25           THE COURT:  Overruled.  Answer the question.

705

1      THE WITNESS:   The question is:  Was I a patriot?

2  Yes, I always have been, Mr. Rubin, a long, long time.

3  BY MR. RUBIN:

4  Q    You have been a patriot for a long, long time?

5  A    Yes.

6  Q    All right.   You knew when you joined Ernesto Fonseca's

7  organization that he was importing narcotics, did you not?

8  A    I knew that he was working closely with a foreign

9  government.   He was a close ally of the United States.

10 Q    Did you know that he was a drug trafficker, sir?

11 A    Eventually, yes, I did know.

12 Q    And you continued to work for Mr. Fonseca, even though

13 you knew he was a drug trafficker; true?

14 A    Worked for the intelligence division of a foreign

15 country, who was an ally of the United States.

16 Q    Sir, were you working for Mr. Fonseca knowing that he

17 was a drug trafficker?

18 A    I worked for that entire government knowing it was

19 drug trafficking.

20 Q    So you felt you were an undercover operative working

21 for the police when you worked for him?

22 A    I was -- working for which police?  The intelligence

23 agency of the Mexican Government?  Yes, sir.  Absolutely.

24 Q    Did you think that police agency that you were working

25 for was also involved in drug trafficking?

706

1    A    Yes.

2    Q    Isn't it, in fact, true that during the years you were

3    working for Mr. Fonseca and the agency, that you were part

4    of a conspiracy to traffic in narcotics?

5    A    I particularly was part of a conspiracy to put in a

6    radio system.

7    Q    That radio system was to help this organization

8    traffic in narcotics; isn't that correct?

9    A    Well, the radio system was for them to pick it up and

10   talk on it.  What they did with it was their business.

11   Q    And, sir, isn't it also true that you knew that all of

12   these narcotics or most of these narcotics were being sent

13   into the United States; isn't that true?

14   A    I assumed that, yes.

15   Q    Do you consider it part of your patriotism and feeling

16   for the government to be part of a conspiracy that imports

17   narcotics into the United States?

18          MR. CARLTON:  Objection.  Argumentative.

19   Irrelevant.

20          THE COURT:  You may answer.

21          THE WITNESS:  Let me try be clear on this.  A

22   person who is set in a place to watch and report, watches

23   and reports.  What decisions are taken father up the line

24   don't really -- didn't really concern me.  Had it been

25   within my scope, I would have wiped out all that drug

707

1  traffic in one instant.  It wasn't, unfortunately, within

2  my scope.   It isn't today.

3  BY MR. RUBIN:

4  Q    But you worked for them for three years; is that

5  right?

6  A    I worked for the Federal Security Director, which is

7  intelligence agency, the National Security Agency of the

8  Mexican Republic.

9  Q    You knew those people were drug traffickers --

10 A    I knew that the entire government was part of a larger

11 plan was cooperating and doing all of that, yes, I did.

12 Q    Did you call the D.E.A. and tell them:  I don't want

13 to be involved in drug trafficking because of this

14 patriotic ferver you had for the government of the United

15 States?

16 A    Well, I didn't -- I didn't have their telephone

17 number, and it wasn't -- I wasn't reporting to the D.E.A.,

18 Mr. Rubin.  I was reporting to the Mexicans.

19 Q    Do you know if the Mexican telephone systems has

20 information?

21 A    I wouldn't have needed information.  I had ample

22 access to every line in Guadalajara, sir.

23 Q    So I take it, then, you could have called the D.E.A.;

24 isn't that true?

25 A    I could have broken in on their telephone

708

conversations.  I wouldn't have had to call them.

Q    And, in fact, you didn't call them, did you?

A    No, I didn't.  I wasn't reporting to that government.
I was reporting to another one.  I wasn't reporting to this
government.  I was reporting to another one.

Q    Now, you have given a number of interviews to
government agents during the course of your cooperation;
correct?

A    Every time they've asked, yes.

Q    And, in fact, isn't it true that before 1989 you gave
information to the D.E.A.?

        Let me make it clear.  I'll withdraw the question.

        Isn't it true that on June 2nd of 1987, you gave
information to D.E.A. Agent Benito Mayestrez (phonetic)?

A    I had contact with people in 1987 who told me they
were from the D.E.A.  I had -- I'm not sure who I had
contact with in 1987, though.  I have come to understand
that that was the D.E.A.

Q    Did they show you credentials that they were from the
D.E.A.?

A    No, they did not.

Q    Did you understand that they were from the D.E.A. at
the time?

A    Well, that was my impression at first, yes.

Q    And at that time in 1987, the specific area of

709

1  conversation was your knowledge of drug trafficking in the

2  Enrique Camarena investigation; correct?

3  A    We did not discuss the Enrique Camarena problem.  That

4  wasn't the substance of our talks.  They were trying to get

5  me to talk to them, and I was trying to get them to leave

6  me alone.

7  Q    Well, you thought these were representative of the

8  U.S. Government, did you not?

9         THE COURT:  He already answered that.

10  BY MR. RUBIN:.

11  Q    And at this patriotic feeling you had for the

12  government, you were trying to get agents away from you and

13  not give them any information?

14  A    Yes.

15  Q    Now, you didn't talk about Camarena at that time; is

16  that your testimony?

17         THE COURT:  He answered that question.

18  BY MR. RUBIN:

19  Q    Now, isn't it true that at no time during that meeting

20  in June 1987, did you ever mention that you knew Dr.

21  Humberto Alvarez-Machain?

22  A    I answered such questions as were asked me.  That

23  question was not asked.

24  Q    You were trying to give information to them, weren't

25  you?

710

1    A    What time is that, 1987?

2    Q    June of 1987.

3    A    Trying to get them to go away.

4    Q    Now then, in September of 1989, you had another series

5    of interviews with the D.E.A. agents?

6    A    Yes.

7    Q    Correct?

8    A    That is correct.

9    Q    Now, at that time you had decided now to cooperate and

10   give information to them?

11   A    Yes.

12   Q    And so at that time, you were trying to help them as

13   much as you could; isn't that correct?

14   A    I was keeping my word to them, yes.

15   Q    And did you have an immunity agreement at that point?

16   A    No, I did not.

17   Q    But you certainly weren't trying to hold anything back

18   from them, hide any information?

19   A    As I wasn't wanted for anything, and I wasn't the

20   subject of any criminal investigation, you know, what would

21   I need the immunity for?  I hadn't done anything.

22   Q    Now, on September 7th of 1989, you were interviewed

23   for over an hour by Special Agent Wayne Schmidt; isn't that

24   correct?

25   A    The date again?

711

Q    September 7th, 1989?

A    I -- I'm assuming the date to be correct.  I was interviewed on two or three occasions by Agent Wayne Schmidt.

Q    That was immediately prior to your testifying in front of a Federal Grand Jury?  Do you remember that day?

A    It was around the same time.

Q    Now, and at that time, isn't it true, on September 7th, 1989, in this interview with Special Agent Schmidt, you never mentioned that you had seen Dr. Machain giving injections at parties at Fonseca's house?

A    Once again, I answer you in the same vein.  I answered such questions as were asked me.  These questions were never asked.  Mr. -- Dr. Machain never came up in that conversation.

Q    Sir, it was clear to you that the D.E.A. wanted as much information as you had; isn't that right?

A    I could have given information on Mr. Fonseca's daughters, too.  I answered such questions that were asked. You misunderstand the way these interviews are conducted.

        MR. RUBIN:  Your Honor, there is no question pending, I don't believe.

        THE COURT:  Pose one then.

BY MR. RUBIN:.

Q    Sir, they didn't prohibit you from giving them names,

712

1   did they?

2   A    Once again, you misunderstand --

3   Q    Sir, did they prohibit --

4   A    Sir, they ask, you answer.

5   Q    My question was to you:  Did they prohibit you from

6   giving any names?

7   A    They didn't prohibit me from anything.  They asked.  I

8   answered.

9   Q    In fact, sir, isn't it true that the D.E.A. wanted you

10  to give them as many names as you could; isn't that true?

11          MR. CARLTON:  Objection.  Speculation.

12          THE COURT:  Overruled.

13          THE WITNESS:  I don't know whether -- I don't know

14  if that's true or not.

15  BY MR. RUBIN:

16  Q    In fact, sir, isn't it also true that that's the very

17  purpose of being interviewed, as to get as much information

18  and as many names as they can so they can do as broad scope

19  an investigation as they can; isn't that true?

20  A    As you're sure doing in this trial.  I think the

21  agent's attempt to direct your attention to a certain

22  thing, and ask you questions about it, that's what it is.

23  And I say to you again, they asked, you answer.

24          MR. RUBIN:  Your Honor, I move to strike and ask

25  now the witness --

713

THE COURT:   The motion is denied.

Ask another question.

BY MR. RUBIN:

Q    In fact, sir, isn't it true that in that meeting you

never indicated that Dr. Machain gave injections at Mr.

Fonseca's house?

A    That's true.

Q    In fact, isn't it also true that you never even

mentioned Dr. Machain's name to Special Agent Schmidt?

A    Mutually true.  We never mentioned Dr. Machain's name.

Q    Then, sir, that same day you went into the Grand Jury;

isn't that right?

A    That's right.

Q    And you took the same oath to tell the truth that you

took today; isn't that true?

A    Yes.

Q    And at that time, you discussed one party; isn't that

right?  The one with the horse?

A    I answered questions in the Grand Jury also -- it's

not a discussion group, it's like a grand jury.  They kind

of ask you questions, you answer.

Q    And, in fact, isn't it true that in your Grand Jury

testimony that you never mentioned that you had seen Dr.

Machain giving injections at parties?

A    Equally true.  They didn't ask.  I didn't answer.

714

1          MR. CARLTON:  Objection; irrelevant.

2          THE COURT:  Just a moment.  What is your

3    objection?

4          MR. CARLTON:  The objection was irrelevant, Your

5    Honor.

6          THE COURT:  Well, it's an improper question to ask

7    a witness if what he told the Grand Jury, unless you can

8    show what they asked him.

9          MR. RUBIN:  Well, it's a lack of a question, Your

10   Honor, that there was nothing mentioned.

11         THE COURT:  Well, just go on.

12   BY MR. RUBIN:

13   Q    Now, on September 8th of 1989, you were interviewed

14   again by Agent Schmidt; correct?

15   A    Yes, sir.

16   Q    And that was over another hour interview?

17   A    I think it was a little more than an hour, I think.

18   Q    And --

19   A    Short on the time.

20   Q    Again, in that interview on September 8th, 1989, you

21   didn't mention a word about Dr. Machain, did you?

22   A    Same answer.  Neither asked, nor answered.

23   Q    Did you ever volunteer names, in any of the

24   interviews, did you ever volunteer names that they didn't

25   ask you about?

715

1    A    Mr. Rubin, they weren't asking me to write a book.

2    They were asking me questions.  I was answering.

3    Q    Sir, in the interviews that you gave to the agents,

4    did you ever volunteer names that they didn't ask you

5    about?

6    A    That I know of, no.  I answered the questions they

7    asked.

8    Q    So they gave you a specific name; is that correct?

9    A    No.  They gave me a specific incident or a specific

10   topic.  They said, "What do you know about this?"

11   Q    And they certainly discussed who were associated with

12   Ernesto Fonseca, did they not?

13   A    That is correct.

14   Q    And they certainly asked who was at Fonseca's house,

15   didn't they ask you that?

16   A    They asked me who his associates were.  They never

17   asked me who his doctor was.  I'm sorry.

18   Q    So Dr. Machain is not one of Mr. Fonseca's associates;

19   correct?

20   A    I didn't know he was one of the drug associates.  No,

21   I did not.

22   Q    Now, September 9th, another interview, almost two

23   hours, and again never mentioned Dr. Machain's name; isn't

24   that right?

25   A    Neither asked, nor answered.

716

Q    Never volunteered by you; correct?

A    I was totally unaware that Dr. Machain figured in the case.  I'm sorry, Mr. Rubin, but I just, I thought he was their doctor.

Q    In fact, there are about, oh --

          THE COURT:  Counsel, I think you should ask one question to cover all meetings and not just go through these.  You are wasting a lot of time here.

          MR. RUBIN:  Well --

          THE COURT:  Ask him if he had at any time mentioned your client.

          MR. RUBIN:  I want to -- if I can bring up two questions, Your Honor.

BY MR. RUBIN:

Q    You had meetings, two groups of meetings.  You had meetings also September 11th, September 20th, and October 4th, and February of '89, and February 9th of 1990; true?

A    I rely on your recollection of the dates.

Q    In fact, one of those meetings was even tape recorded?  One of those interviews was even tape recorded?

A    Oh, yes, one of those interviews was tape recorded.

Q    And in none of those meetings did you ever mention Dr. Machain's name, did you?

A    I never mentioned Dr. Machain's name until I was asked if I knew him.

717

1  Q     Now --

2  A     Then I said, yes, I know him.

3  Q     Now, on June 6th, when you testified, you were

4  questioned about many of the same events that you were

5  questioned about yesterday, were you not?

6  A     June?

7  Q     June 6th, 1990?

8  A     Will you refresh my memory.

9         THE COURT:  It's irrelevant.

10 BY MR. RUBIN:

11 Q     Well, sir, at the parties that you -- you worked for

12 Fonseca for three years; is that right?

13 A     I was assigned to Mr. Fonseca on and off for, I think,

14 four years.

15 Q     Four years?

16 A     Yes.

17 Q     That is forty-eight months?

18 A     I don't want to get into months.

19         THE COURT:  Just a moment.  Stop wasting time.

20         MR. RUBIN:  Your Honor --

21         THE COURT:  Four years is 48 months.

22         MR. RUBIN:  That's true, Your Honor.

23         THE COURT:  That's not a question that needs to be

24 asked.

25 BY MR. RUBIN:

718

1   Q    And, in fact, seeing Dr. Machain, allegedly seeing Dr.

2   Machain at Mr. Fonseca's house 25 times would average out

3   to once every two months; is that correct?

4   A    Well, however you average it out.  I saw him a number

5   of times at Mr. Fonseca's house, yes.

6   Q    Now, at these parties that you allegedly saw Dr.

7   Machain at, the individuals in the house were smoking

8   crack?

9   A    Yes.

10  Q    Is that right?

11  A    Yes.

12  Q    Were you smoking crack at the time?

13  A    No, I wasn't.

14  Q    Was Dr. Machain smoking crack?

15  A    Not that I ever saw him smoke crack.

16  Q    Now, when was the first party you saw Dr. Machain give

17  an injection?

18  A    Injections, it would have been between the last part

19  of '83 and the first part of '84.

20  Q    Do you remember the month?

21  A    I really don't.

22  Q    Do you remember the person he gave the injection to?

23  A    He gave the injections to Ernesto, he gave the

24  injections to Barba.  I know who brought the injections.

25  Yes, I know that entire story, yes.

719

1    Q    Did these people take injections regularly, Ernesto,

2    Barba?

3    A    They were sold a series of injections that would

4    supposedly rejuvenate them by another doctor and he left,

5    and I guess somebody -- he left and I guess somebody else

6    had to give the injections.

7    Q    So somebody else?

8    A    Another doctor.

9    Q    Another doctor sold them injections?

10   A    Another doctor came down and sold them a bunch of

11   so-called rejuvenation injections, and also some supposedly

12   super secret anti-cancer -- he called them "The Bombs," and

13   he charged them thousands of dollars for them, and he left

14   them there.  He left.  I think he wanted to get out of

15   there before they discovered he was a fraud, and somebody

16   else was left to complete the series of injections.

17   Q    So then Fonseca had in his house syringes and --

18   A    Yes.

19   Q    Dr. Machain didn't bring them with him?

20   A    I didn't -- I wasn't invited.  I didn't see them being

21   injected.

22   Q    But you do know of your personal knowledge that Mr.

23   Fonseca had syringes of rejuvenating liquids in his house?

24   A    I don't know where he kept the medicine.  I know that

25   he had it in his house.  I know he had syringes.  How many

720

1   of them, I don't know.  I saw two or three of them.

2   Q    And did you ever see anyone else other than

3   Dr. Machain inject people?

4   A    Yes.

5   Q    Who did you see inject?

6   A    Dr. Cisneros [phonetic] and Dr. Everes [phonetic].

7   Dr. Everes died.  Dr. Cisneros is still around, as far as I

8   know.  All three of them were doctors of the D.F.S.

9   Q    Did any non-medical personnel ever inject each other?

10  A    Not that I know of.

11  Q    Not that you saw?

12  A    No.

13  Q    You know an individual named Fredrico Castel del Oro?

14  A    Yes, sir, I do.

15  Q    And he worked for what agency?

16  A    He was the Comandante of Direccion Federal De

17  Seguridad in Guadalajara in 1984.

18  Q    Do you know whether he was involved in any illegal

19  activities?

20  A    Yes, I do.

21  Q    And what were those?

22  A    He was specifically sent to Guadalajara by the chief

23  of the agency to take care of the narcotics traffickers and

24  make sure they weren't interfered with.

25  Q    He was a drug trafficker; correct?

721

1   A    He was the police officer who was specifically ordered

2   from Mexico City, and on many occasions, in my presence,

3   reprimanded by the director of his agency for not giving

4   enough cooperation to the traffickers.

5   Q    Was he also a bank robber?

6           MR. CARLTON:  Objection.  Speculation.  Beyond the

7   scope.  Irrelevant.

8           MR. RUBIN:  If he knows.

9           THE COURT:  What was the question?

10          MR. RUBIN:  I asked him if he was involved in bank

11  robberies.

12          THE COURT:  You may answer, if you know.

13          THE WITNESS:  I believe he was, yes.

14  BY MR. RUBIN:

15  Q    Was he involved in hijacking trucks?

16  A    I think that he was, yes.

17  Q    Was he involved in burglary?

18  A    I don't know.

19  Q    Now, did there come a time when you learned from

20  others that Mr. Fonseca planned to murder Mr. Castel del

21  Oro?

22  A    Yes, that time did come.

23  Q    And at that time --

24  A    I didn't learn it from others.  I learned it from him,

25  himself.

722

1    Q    You learned it from Mr. Castel del Oro?

2    A    Yes.

3    Q    Did you feel an obligation to warn him?

4    A    No.

5    Q    Let me ask you this:  Are you testifying here today

6    because you feel it's a moral obligation or because of the

7    benefits you are receiving from the government?

8    A    Would you list those benefits, please?

9    Q    Well, you received, would you agree, Mr. Medvene went

10   through the payments, but they totaled approximately

11   $150,000; is that correct?

12   A    Yes.  I keep going through that in my mind, and

13   abandoned more than $500,000 worth of property in Mexico to

14   come up here and receive $130,000, and I'm getting this

15   wonderful immunity so that my family can be afraid for --

16   can fear for their lives for the rest of their lives.

17   Somehow I just don't see the --

18   Q    Well, sir, if you went back to Mexico --

19   A    -- I don't see the profit, but --

20   Q    Well, sir, if you went back to Mexico, wouldn't you

21   have to go into prison?  Weren't you sentenced to prison?

22   A    If I had never come up here, I wouldn't have been

23   sentenced to prison.

24   Q    If you went back to Mexico, would you have to go back

25   to prison?

723

1    A    Perhaps so.  Perhaps not.

2    Q    So?

3    A    It's a lot less likely there than here.

4    Q    And isn't it true that one of the reasons you are here

5    is to avoid being in a Mexican prison?

6    A    Absolutely not.  I was not sentenced to anything.  I

7    had set aside that conviction and was well on the way to

8    negating that before I ever came up here.

9    Q    This $500,000 property you received was from the

10   profits from drug trafficking?

11   A    Absolutely not.

12   Q    Where did you obtain the money to purchase a

13   $500,000 --

14   A    When I first went to Mexico in 1968, we purchased on

15   time a piece of property for $20,000.  We sold that piece

16   of property for 300 -- 280-some thousand dollars in 1974,

17   and purchased another piece of property with the proceeds

18   in Acapulco.  And whatever was left to be paid off there,

19   we paid it off strictly with the profits made every month

20   by renting the house out.  This was 1984 before I even knew

21   Mr. Fonseca.

22   Q    Sir, concerning the other benefits, you understand

23   that your activities, or do you understand that your

24   activities, working for Mr. Fonseca would expose you to

25   criminal liability in the United States for being part of a

724

1   conspiracy to traffic in drugs?

2   A    I was working on radios.

3   Q    You were just following orders?

4   A    Had to.

5   Q    You were following orders?  You weren't part of the

6   conspiracy?

7   A    Do I have a Hitler response?  I was just putting in

8   radios.

9   Q    And, sir, nonetheless, the government is giving you

10  immunity; correct?

11  A    That is correct, because there is obviously a danger

12  about talking about any of those things.  I wasn't under

13  any criminal investigation.  I wasn't running from anybody.

14  Q    Sir, if you didn't have the immunity you would be

15  subjecting yourself to possible incarceration for many

16  years for drug trafficking; isn't that correct?

17  A    I wasn't under any criminal investigation.  I was

18  working for Fonseca.  I didn't have an arrest warrant or

19  anything like that.  I didn't do anything.  I wasn't a

20  partner there.  I was their slave.

21  Q    So, sir, have you ever offered to tell the government

22  you don't want immunity and don't need it?

23  A    I am not that dumb, sir.  I went to school.

24          THE COURT:  We will take our noon recess at this

25  time.

725

1                    (Jury out)

2           THE COURT:  Now, do you wish to pursue the

3    identity of this person further?

4           MR. MEDVENE:  It is not necessary, Your Honor.

5           THE COURT:  In that case, we don't need to go into

6    it further.

7           We will reconvene at 1:30.

8                    (Luncehon recess had.)

726

LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 7, 1992

(1:30 P.M.)

THE COURT:  You may continue.

MR. RUBIN:  Thank you, Your Honor.

CROSS-EXAMINATION (Continued)

BY MR. RUBIN:

Q    Mr. Harrison, with respect to your gunshot wounds that
you suffered in 1984, Dr. Machain was not the physician
that treated you for them, was he?

A    No.

Q    Now after you got out of the hospital, within months
you went to work for Colombian drug traffickers; isn't that
correct?

A    I went to for work for the same people, state police
instead of the State of Jalisco, who took me out to work
for the people.  They had a contract with them.  It
wasn't -- these people weren't my contracts.  I didn't know
them at all.

Q    So the state police assigned you to work for Colombian
drug traffickers; is that correct?

A    They picked me up in a patrol car and took me out
there and said you put in a radio system.

Q    Was the state police also drug traffickers at that
time?

A    Yes.

727

1    Q    And at the time you went to work for these new people,

2    you knew they were drug traffickers as well?

3    A    Well, Mr. Rubin, the entire government operata was

4    involved in this trafficking.  I don't know where I could

5    have gone to work that I wouldn't have known that somebody

6    was involved in drug trafficking.  They all were.

7    Q    I was referring to the Colombians that you then went

8    to work for and set up radio systems.  You knew they were

9    drug traffickers, did you not?

10   A    When I saw them.  When I first saw them there, yes, of

11   course.

12   Q    Turning your attention to the larger plan that you

13   made reference to in your direct testimony, could you

14   explain what this larger plan was?

15   A    Will you refresh my memory?

16   Q    I believe you indicated that you said you had been

17   placed in your drug trafficking position by an ally of the

18   United States as part of a larger plan?

19   A    I think you're probably interpreting that a little

20   subjectively.  These -- I'm just saying that Mexico was an

21   ally of the United States.  It wasn't up to me to question

22   their governmental decisions or their governmental policy,

23   and that I did not go and try to go to the president of the

24   United States and tell them maybe the president of Mexico

25   is doing something wrong.  It wasn't my -- you were telling

728

1    me:  Why didn't I go and tell somebody.  Who would I tell?

2    The United Nations?

3    Q    And since your testimony in June of 1990, how many

4    meetings have you had with either governments, government

5    attorneys, or D.E.A. agents concerning this case?

6    A    I haven't counted them.  Concerning the testimony,

7    none.  Meetings, sometimes they invite me to lunch or

8    something like that, many.

9    Q    Prior to testifying today, did you have any meetings

10   with government attorneys concerning your testimony?

11   A    Oh, yes.

12   Q    How many meetings did you have?

13   A    I believe there were probably five.

14   Q    And it's true, is it not, that during those meetings

15   government attorneys went over the questions that they were

16   going to ask you?

17   A    They did the same thing every time, Mr. Rubin.  They

18   sat me down in front of them and said, "What is your

19   testimony?"  And I went over it and they had my testimony

20   in their hands.  And at the end, they told me, "If there

21   had been anything different, we would have prosecuted you

22   for perjury."

23   Q    Sir, my question to you --

24   A    That's the truth.  You want the truth?

25   Q    Sir, my question to you was:  During the meetings, did

729

1   you go over the questions that you were going to be asked?

2   A    No, I did not.

3   Q    Did you go over the areas of questioning that you

4   would be asked about?

5   A    No.   What happened is exactly what I told you what

6   happened on each occasion.

7         MR. RUBIN:   Your Honor, no question pending.

8   BY MR. RUBIN:.

9   Q    At the time you agreed to cooperate with the

10  government, were you employed?

11  A    Was I employed?   Yes.

12  Q    And where were you --

13  A    I had my own business.

14  Q    What kind of business was that?

15  A    I was a consultant for radio -- radio systems, radio

16  communication systems, PBX systems.

17  Q    How long have you been in that business?

18  A    I had been doing it on my own for about six months.

19  Q    And how much money had you earned in that business?

20  A    How much money did I clear?

21  Q    Yes.

22  A    The last month that I was there I cleared roughly 13

23  million pesos, which would have been about three, $4,000.

24  I don't know.

25  Q    And the $150,000 that you received from the government

730

1  has been tax free, has it not?

2  A    Well, I don't think it's been tax free.  We have been

3  waiting to see -- they're probably going to change our

4  names, probably going to give us new identities.  We

5  haven't known -- okay, let's go point by point.

6          MR. RUBIN:  Your Honor, could I move to strike the

7  testimony as non-responsive to the question?

8          THE COURT:  Well, it's an attempted response.

9  Make your question more specific.

10  BY MR. RUBIN:

11  Q    Sir, have you paid income taxes on any of the money

12  that you received from the government?

13  A    Not yet.

14  Q    You received some of the money in 1989; true?

15  A    That's true.

16  Q    And 1990?

17  A    That's true.

18  Q    Did you file tax returns?

19  A    No.

20  Q    You intend to file 1989 tax returns?

21  A    I am sure that when the trial is over and we have new

22  identities, we will be obligated to account for everything,

23  I'm sure.

24  Q    And you will do that?

25  A    I suppose so.  I'm not a fortuneteller.

731

1    Q      Did you ever go by the name Mr. Williams?

2    A      No.

3           MR. RUBIN:  No further questions.  Thank you.

4           THE COURT:  Any redirect examination?

5           MR. CARLTON:  Briefly, Your Honor.

6                    REDIRECT EXAMINATION

7    BY MR. CARLTON:

8    Q      During the time that you worked for Ernesto Fonseca,

9    were you aware that he had many houses?

10   A      Yes, I was.

11   Q      And, likewise, did Caro-Quintero have many houses?

12   A      Yes, he did.

13   Q      Were you familiar with these houses, several of them?

14   A      Some of them.  Some of them, yes.

15   Q      Did you know of any houses owned by those individuals

16   or their associates in the immediate vicinity of 881 Lope

17   de Vega?

18   A      No.  No, I don't know of any.

19   Q      When you testified in June 1990, were you asked about

20   the location of the party at which Caro danced with the

21   stallions?

22   A      Yes, I was.

23   Q      Were you asked about the location at which Mr. Zuno

24   met with Fonseca?

25   A      Yes.

732

1   Q    And did you testify at that time that the dancing

2   stallion's party was at the Las Fuentes house and the

3   meeting was at the Cuarzo house?

4            MR. MEDVENE:  Objection.  Leading and suggestive.

5            THE COURT:  The objection is sustained.  Restate

6   your question.

7   BY MR. CARLTON:

8   Q    What did you testify in 1990 as to the locations of

9   those two events?

10  A    I testified at the Grand Jury --

11           MR. RUBIN:  Objection, Your Honor.

12           THE WITNESS:  -- in 1990 and today the same thing.

13  Nothing has changed.

14           THE COURT:  What is it?

15           MR. RUBIN:  Objection.  Improper questioning.

16  What he testified to, the transcript speaks for itself, not

17  his recollection.  It's not relevant.

18           MR. CARLTON:  The transcript is not in evidence.

19           THE COURT:  Well, that is the proper way to

20  present what he testified to, questions and answers.

21  BY MR. CARLTON:

22  Q    The transcript of the June 1990 trial, Volume 14, Page

23  47, were you asked this question and did you make this

24  answer:

25               "Question:  Now, where, sir, in

733

1     this house did the alleged meeting take

2     place?

3          "Answer:  Which meeting?  Which

4     house?  I don't want to confuse the two

5     incidents as you are doing.  Tell me

6     what you are talking about and I'll

7     tell you about which one.  One was at

8     the house on Las Fuentes and the other

9     was at the house on Cuarzo.  Tell me which

10    one you're referring to and I'll tell

11    you want to know."

12    Did you make --

13   A     Yes, that was my answer.

14   Q     When you attended class at Berkeley, what was your

15   status at the time as a student?

16   A     I was a non-registered student, as many people were

17   during those years.  I was serious.

18         MR. CARLTON:  May I have just a moment, Your

19   Honor?

20              (Government counsel confer.)

21         MR. CARLTON:  Nothing further.

22         THE COURT:  Anything further?

23         MR. MEDVENE:  We'll read in one portion, Your

24   Honor, in our --

25         THE COURT:  Do you want to read an additional

734

1  portion of testimony?

2         MR. MEDVENE:  Yes, sir, it's a --

3         THE COURT:  Identify it and read it.

4         MR. MEDVENE:  The June 7th, 1990 transcript,

5  Volume 14, Page 45, starting at Line 23:

6              "Question:  Whether" -- I think it

7         should be the word "was" -- "Whether it

8         Mr. Fonseca's house where you claim

9         you saw Mr. Zuno?

10             "Answer:  In the Colonial Las Fuentes

11        and Guadalajara.  It's actually in Zapopan.

12             "Question:  Where is the house?"

13        Line 3:

14             "Answer:  The house is located at

15        Circunvalacion Sur 113, Colonial

16        Las Fuentes."

17        At Line 8:

18             "Question:  Isn't it true, sir,

19        that you told the Grand Jury you did not

20        see Mr. Zuno meet Mr. Fonseca at that

21        house, but you claimed in front of the

22        Grand Jury it was some other house?

23        Isn't that true, sir?

24             "Answer:  Nope."

25        At Line 12.

735

1        THE COURT:  All right.

2        MR. RUBIN:  Nothing further.

3        THE COURT:  You may step down.

4                    (Witness excused.)

5                (Continued on next page)

6    //

7    //

8    //

736

1       THE COURT:  Call your next witness.

2       MR. CARLTON:  Your Honor, the government calls

3  Wilburn Sears.

4            (Witness summoned to courtroom.)

5       THE CLERK:  Please raise your right hand.

6       WILBURN SEARS, PLAINTIFF'S WITNESS, SWORN

7       THE WITNESS:  I do.

8       THE CLERK:  Please be seated.

9       State your full name for the record and spell your

10  last name.

11       THE WITNESS:  My name is Wilburn A. Sears,

12  S-E-A-R-S.

                    DIRECT EXAMINATION

13

14  BY MR. CARLTON:

15  Q    Mr. Sears, what is your present employment?

16  A    I'm a Supervisory Special Agent with the Drug

17  Enforcement Administration.

18  Q    How long have you been employed by the D.E.A.?

19  A    Since it was formed on July 1st, 1973.  Prior to that,

20  I was a Custom's Agent.

21  Q    At any point during your employment with D.E.A., were

22  you assigned to Mexico?

23  A    Yes, sir.

24  Q    During what periods?

25  A    From April, 1980, to August of 1985.

737

1    Q    And at any point during that period, were you assigned

2    to Guadalajara?

3    A    From February of 1982, to August of 1985.

4    Q    Let me draw your attention to August 18th of 1982.

5    A    Yes, sir.

6    Q    Were you asked by Agent Enrique Camarena on that date

7    to assist him in an investigation?

8    A    Yes, sir, I was.

9    Q    And what was that investigation?

10   A    He advised me that two women had come to the

11   Consulate --

12        MR. RUBIN:  Objection; calls for hearsay.

13        THE COURT:  The question was:  What was the nature

14   of the investigation?

15        THE WITNESS:  To take photographs for him.

16   BY MR. CARLTON:

17   Q    What photographs did he ask you to take?

18   A    Of some individual who would hopefully arrive at the

19   Consulate the following day.  Two couples, two men and

20   wife.

21   Q    What was the object of this investigation, besides

22   taking these pictures?

23   A    Identification of the individuals involved.

24   Q    And was there any intention to obtain some documents?

25   A    Yes, sir, there was.

738

1    Q    What documents?

2    A    Additional information relating to an application for

3    a United States VISA for the people involved.   Document

4    pertaining to employment, properties, things along that

5    line.

6    Q    And how were these documents to be obtained?

7    A    They were requested to bring those documents to the

8    Consulate to apply for the VISA.

9    Q    Who was it you were supposed to be looking for on this

10   date --

11   A    The person --

12   Q    -- in this investigation?

13   A    A person identified as Emilio Quintero-Payan and a

14   person identified as Dr. Machain.

15   Q    Did you actually participate in this investigation?

16   A    I did.

17   Q    When was that?

18   A    August the 19th, 1982, at approximately 11:00 a.m.

19   Q    What was your involvement?   What did you do?

20   A    I was across the street from the Consulate from the

21   VISA area, with a camera with a telephoto lens, identified

22   the people in question as they were in the area of the

23   Consulate.   I took their photographs.   I had the film

24   processed and prints made of these photographs, and gave

25   them to Agent Camarena.

739

1    Q    How were you able to identify these persons?

2    A    I had a clothing description of the people involved,

3    and they were pretty easy to spot.

4    Q    I'd ask you to look at Exhibit 125-A, if you would,

5    which I believe is in the cart just to your right, 125-A

6    and C should be there.

7    A    125-A?

8    Q    Yes.

9    A    Yes, sir, I recognize this photograph.

10   Q    Is that one of the surveillance photographs you took?

11   A    It's an enlargement of that surveillance photograph,

12   yes, sir.

13   Q    All right.  And what were they doing as you were

14   taking the photographs?

15   A    Talking.  I couldn't tell exactly.  I was across the

16   street from them.  I could not hear what they were saying.

17   They were talking and milling around.  There were primarily

18   three male individuals.  One was Emilio Quintero-Payan, and

19   one was a Dr. Machain, and I have no idea who the third

20   individual was.

21   Q    And looking at Exhibit 125-A, do you recognize Emilio

22   Quintero-Payan in that photograph?

23   A    I do, sir.

24   Q    And can you describe where he appears in that

25   photograph?

740

1    A    He's the individual standing to the left of the group,

2    with a white short sleeved leisure-type suit jacket on.

3    Q    At the top of the stairs?

4    A    Yes, sir, at the top of the stairs.

5    Q    Do you recognize Humberto Alvarez-Machain?

6    A    Yes, sir.  He's the gentleman to the far right.  You

7    can just barely see his head.

8    Q    I would ask you to look at Exhibit 125-B, which is, I

9    believe, the large photograph on the easel to your right?

10           THE WITNESS:  May I step down, Your Honor?

11           THE COURT:  Yes.

12           THE WITNESS:  Yes, sir.  I recognize this

13   photograph also.  That is an enlargement of the photograph

14   that I took.

15   BY MR. CARLTON:

16   Q    Now, when in time did the events depicted in that

17   photograph relate to the events depicted in 125-A?

18   A    They were within moments -- minutes of each other.  I

19   was just snapping pictures as they were there.  I took

20   no -- no notice of how much time between photographs.

21   Q    Well, did 125-B sequentially follow the events of

22   125-A?

23   A    More or less, yes, sir.  They had come down from the

24   stairs and went down on the sidewalk level.

25   Q    And again, in 125-B, do you see Emilio Quintero-Payan?

741

1   A    Yes, sir, I do.  He is this gentleman right here

2   (indicating), appears to be scratching his nose, in the

3   white, light colored suit and light colored boots.

4   Q    Did you see Humberto Alvarez-Machain in that

5   photograph?

6   A    Yes, sir.  He is the gentleman right here

7   (indicating).  He's partially concealed by the pole.

8   Q    Now, after these individuals milled around outside of

9   the Consulate, did they go somewhere?

10  A    My last observation of them, sir, they were walking

11  away from the Consulate.  Dr. Machain and Emilio

12  Quintero-Payan, and the third male individual that I do not

13  know who he is.  I took a photograph of them when they were

14  walking away.  That's the last time I ever saw them.

15  Q    Did they walk away as a group?

16  A    Yes, sir.

17  Q    Do you have in front of you 125-C?  It should be one

18  of the larger photographs.

19  A    125-C?

20  Q    Yes.

21  A    Yes, sir.  That's the photograph where they were

22  walking away there.  That is a -- also an enlargement of

23  the photograph I took.  That is the last photograph I took

24  of them.

25           MR. CARLTON:  Move the admission of these three

742

1    photographs, Your Honor.

2              MR. RUBIN:  Objection, Your Honor.

3              THE COURT:  Well, we'll defer that then until I

4    hear that.

5    BY MR. CARLTON:

6    Q    After you took these photographs, what did you do?

7    A    I went back to the Consulate and met with Agent

8    Camarena, and I think Agent Varenhorst was there.

9    Q    Did Agent Camarena show you something at that time?

10   A    Yes, sir, he did.

11   Q    If you would look in front of you at what I believe

12   has been marked as Exhibit 178; do you recognize that?

13   A    Yes, sir, I do.

14   Q    What is that?

15   A    It's a copy that was made of identification presented

16   by Dr. Machain.  It's D.F.S. Credentials for the Government

17   of Mexico.

18   Q    And I believe, if you look on the floor, just to your

19   right, there's a large blowup.  Perhaps Agent Kiel can put

20   that on the easel.

21            Is that a blowup of the exhibit you just

22   described?

23   A    Yes, sir, it is.

24            MR. CARLTON:  Move the admission of these items,

25   Your Honor.

743

1          MR. RUBIN:  Objection; irrelevant.

2          THE COURT:  We'll pass the admission.  We'll

3     discuss that later.

4          MR. CARLTON:  Nothing further for this witness.

5          THE COURT:  You may cross-examine the witness.

6          MR. MEDVENE:  We have no questions, Your Honor.

7                    CROSS-EXAMINATION

8     BY MR. RUBIN:

9     Q    Agent Sears, this event happened two-and-a-half years

10    prior to the abduction of Enrique Camarena; isn't that

11    true?

12    A    I don't recall the exact date he was abducted, but I

13    believe that would be the approximate time frame, yes.

14    Q    And, sir, this investigation started the day earlier

15    when Dr. Machain's wife and Payan's wife entered the

16    Consulate; true?

17    A    That was my first advisement of it, yes.

18    Q    And the day earlier, in fact, neither of the husbands

19    were there?  It was only the wives that went to the

20    Consulate; is that correct?

21    A    That is correct.

22    Q    And at that time, the wives requested a VISA to go to

23    the United States; true?

24    A    That's my understanding, yes, sir.

25    Q    Now, at that time, the D.E.A. agents told the wives

744

1  that they had to come back with their husbands and bring

2  identification with them, didn't they?

3  A    I'm not sure if it was D.E.A. or the VISA head, sir.

4  I know that was the request.  I'm not sure who made it.

5  Q    Okay.  But government officials requested the women to

6  bring back their husbands to the Consulate?

7  A    With additional documentation, yes, sir.  That's my

8  understanding.

9  Q    Isn't it true that at that time, normal VISA

10 regulations didn't require women to bring their husbands

11 and additional documentation to get a VISA, did it, did

12 they?

13         MR. CARLTON:  Objection; lack of foundation, Your

14 Honor.

15         THE COURT:  Sustained.

16 BY MR. RUBIN:

17 Q    Do you know whether at that time the ordinary VISA

18 regulations required women to bring their husbands to the

19 Consulate and to bring additional identification?

20 A    Sir, I do not know the answer to that.

21 Q    So -- but it is true that they were requested to do

22 that?

23         THE COURT:  That's already been asked and

24 answered.

25         MR. RUBIN:  Okay.

745

BY MR. RUBIN:

Q    Now, it was at that point that the D.E.A. set up the cameras, knowing that based upon their request, Dr. Machain and Mr. Payan would be coming to the Consulate, true?

A    That is true.

Q    And so this photograph was then -- was a set up photograph waiting for the two husbands to come in together to the Consulate; isn't that true?

A    Which photographs, sir?

Q    The photographs you've identified as 125-A, B, and C?

A    They weren't set up.  I took the photos as they arrived.

Q    Well, you knew they were coming?

A    Yes, sir.

Q    This wasn't a random photograph that you happened to just see the two of them together, not knowing that they would be coming?

        THE COURT:  Counsel, that question's been asked and answered.

BY MR. RUBIN:

Q    Those D.F.S. credentials are dated 1978; isn't that true?

A    Yes, sir, that is correct.

Q    And do you know when those credentials expire, if ever?

746

1    A    I do not believe there is an expiration date on them.

2    Q    Do you know whether Dr. Machain, at that time, was

3    treating wives and family members of D.F.S. officials for

4    their gynecological problems?

5            MR. CARLTON:  Objection; lack of foundation.

6            MR. RUBIN:  I'm asking him if he knows.

7            MR. CARLTON:  Irrelevant.

8            MR. RUBIN:  I'm asking him if he knows.

9            THE COURT:  It's irrelevant if he knows.

10   BY MR. RUBIN:

11   Q    And at the time Dr. Machain came to the Consulate, he

12   also presented a certificate of deposit in a bank; is that

13   correct?

14   A    My recollection is I observed this document, yes.  A

15   copy of this document.

16   Q    It was for a million pesos; is that right?

17   A    I believe the amount was one million pesos.  They had

18   been deposited earlier.

19   Q    And a million pesos is, at that time of exchange, that

20   was less than $5,000?

21   A    I don't recall what the exchange rate was in 1982.

22   I'm sorry.

23           MR. RUBIN:  Nothing further.

24           THE COURT:  Any redirect?

25           MR. CARLTON:  No, Your Honor.

747

1        THE COURT:  You may step down.

2        THE WITNESS:  Thank you, sir.

3                    (Witness excused.)

4        THE COURT:  Call the next witness.

5        MR. MEDRANO:  Government calls Harvey Varenhorst

6   to the stand.

7              (Witness summoned to courtroom.)

8        THE CLERK:  Please raise your right hand.

9        HARVEY VARENHORST, PLAINTIFF'S WITNESS, SWORN

10       THE WITNESS:  Yes, I do.

11       THE CLERK:  Please be seated.

12       State your full name for the record, and spell

13   your last name.

14       THE WITNESS:  Harvey Varenhorst.  V, as in Victor,

15   A-R-E-N-H-O-R-S-T.

16                  DIRECT EXAMINATION

17   BY MR. MEDRANO:

18   Q    Mr. Varenhorst, could you adjust the microphone so I

19   could hear you.

20       THE COURT:  No, not all the way.

21       THE WITNESS:  Right there?

22       THE COURT:  You don't have to speak into it.

23       THE WITNESS:  Okay.  Is that better?

24       THE COURT:  Yes.

25   BY MR. MEDRANO:

748

1    Q    Mr. Varenhorst, were you formerly with the Drug

2    Enforcement Administration?

3    A    Yes.

4    Q    How many years did you work with the D.E.A.?

5    A    Just over 22 years.

6    Q    And your current status, sir?

7    A    Retired.

8    Q    Were you ever assigned to Guadalajara as part of your

9    D.E.A. responsibilities?

10   A    Yes, I was.

11   Q    When was that, Mr. Varenhorst?

12   A    From March of '82 until July of 1984.

13   Q    Mr. Varenhorst, did you ever know Enrique Kiki

14   Camarena?

15   A    Yes, I did.

16   Q    How is it that you knew Camarena?

17   A    Agent Camarena was also assigned to the Guadalajara

18   D.E.A. office.

19   Q    Well, when you got to the Guadalajara office, was

20   Camarena already assigned there?

21   A    Yes, he was.

22   Q    When you left, was he still assigned there?

23   A    Yes, he was.

24   Q    At any point, sir, were you ever involved in the

25   taking of Kiki Camarena's fingerprints?

749

1    A    Yes.

2    Q    Can you explain how that came about?

3    A    Within the Justice Department, D.E.A., we have a --

4    normally every five years they like to bring up the

5    security or background security classification that you

6    have, and they require fingerprints to be sent to D.E.A.

7    headquarters.

8    Q    This is done how often?

9    A    Every five years or so.  There is -- it's supposed to

10   be every -- at least every five years.  Sometimes it goes

11   beyond that.

12   Q    Pursuant to this D.E.A. mandate, did you take

13   Camarena's fingerprints?

14   A    Yes, I did.

15   Q    I ask you to look at Government's Exhibit 26, that

16   should be in front of you, sir.

17   A    Yes.

18   Q    Can you identify that for us?

19   A    It's a fingerprint card of Agent Camarena's

20   fingerprints.

21   Q    Well, are these fingerprints that you took of

22   Camarena?

23   A    Yes, they are.

24   Q    Approximately when?

25   A    October -- the date's on there -- October 21st, 1982.

750

1    Q    And are there any signatures on that fingerprint card?

2    A    Yes, Agent Camarena and also mine.

3    Q    And just briefly, what is the usual procedure for

4    taking those prints when you do take them?

5    A    When we take the fingerprints, I took his

6    fingerprints, then had him sign the card, and after his

7    signature, then I signed the card.

8    Q    And that signature of Camarena on that card, was that

9    done in front of you?

10   A    Yes, it was.

11        MR. MEDRANO:  Your Honor, if it's not in evidence,

12   we move in Exhibit 26.

13        THE COURT:  It may be admitted.

14        (Exhibit 26 received in evidence.)

15   BY MR. MEDRANO:

16   Q    Now, sir, let me direct your attention to about August

17   18 of 1982, Mr. Varenhorst.  At that time, sir, were you in

18   the City of Guadalajara?

19   A    Yes, I was.

20   Q    And on this particular day, were you working with

21   Camarena on any particular investigation?

22   A    Yes.

23   Q    Okay.  Can you tell us what was going on?

24   A    We were entering the Consulate from the parking lot,

25   and he recognized two people in the VISA line.

751

1   Q    Men or women?

2   A    Both of them were women.

3   Q    What did Camarena do after that?

4   A    We went into the VISA Section, and --

5        MR. RUBIN:  Objection; calls for hearsay.

6        MR. MEDRANO:  I'm not asking for --

7        THE COURT:  He asked him what he did, not what he

8   said.

9        MR. RUBIN:  I think because --

10       THE COURT:  What he did is not hearsay.

11  BY MR. MEDRANO:

12  Q    Go ahead, sir.

13  A    Yes.  Agent Camarena and I went into the VISA section,

14  and spoke with the VISA officer, Mr. Richard Helm, and

15  pointed them out, and we wanted to obtain the information

16  that they were producing for a VISA.

17  Q    And were these requests for information conveyed to

18  the two women?

19  A    Yes.

20  Q    Let me direct your attention to the following day,

21  then, August 19.

22       THE COURT:  Is this repeating the last witness'

23  testimony?

24       MR. MEDRANO:  Well, Your Honor, it's further

25  foundation in case there is any concern on the part of

752

1    either counsel or the Court.

2            THE COURT:  I think this is cumulative.  Unless

3    there is something different that wasn't covered by the

4    last witness, so far, it all seems to be about the same.

5            We don't need to hear the same thing from two

6    witnesses.

7            MR. MEDRANO:  Very well, Your Honor.  May I have

8    just one moment, then, please?

9            THE COURT:  Yes.

10               (Government counsel confer.)

11           MR. MEDRANO:  Your Honor, I'll jump to the end of

12   this.

13   BY MR. MEDRANO:

14   Q    If I can ask you, sir, to look at, there should be a

15   small exhibit in front of you, Government Exhibit 178?

16   A    Yes.

17   Q    And can you tell me what that is, sir?

18   A    It's a Mexican Federal Police credential.

19   Q    All right.  And were you involved in photocopying that

20   credential, sir?

21   A    Yes, I was.

22   Q    And just briefly, the circumstances?

23   A    These were documents that were brought in to provide

24   additional information in order to get a VISA, and it was

25   this, plus some financial records, and I believe also the

753

1    passport.

2           MR. MEDRANO:  If I may have just one moment, Your

3    Honor.  I believe I'm just about done.

4    BY MR. MEDRANO:

5    Q    After the copying of the documents, sir, were the

6    originals returned back to the people who had provided the

7    documents?

8    A    Yes.  I returned this particular information, the

9    originals back to the VISA Section.

10   Q    And on this particular day of August 19, did you see

11   Dr. Alvarez-Machain?

12   A    Yes.  I actually saw him when he was leaving the

13   Consulate afterwards.

14   Q    Did you see with him Emilio Quintero-Payan?

15   A    Yes.

16          MR. MEDRANO:  That concludes direct.  Thank you,

17   Your Honor.

18          THE COURT:  Any questions?

19          MR. MEDVENE:  No, sir.

20                     CROSS-EXAMINATION

21   BY MR. RUBIN:

22   Q    Agent Varenhorst, do you know whether the VISA

23   regulations at that time required these women to bring

24   information that was requested, or was this done

25   specifically for them?

754

1   MR. MEDRANO:  Objection; beyond the scope and

2   irrelevant, Your Honor, and lack of foundation.

3   THE COURT:  Sustained.

4   MR. RUBIN:  Nothing further.

5   THE COURT:  You may step down.

6   THE WITNESS:  Thank you.

7   (Witness excused.)

8   THE COURT:  Next witness.

9   MR. CARLTON:  Government calls Mary Boris.

10   (Witness summoned to courtroom.)

11   THE CLERK:  Please raise your right hand.

12   MARY BORIS, PLAINTIFF'S WITNESS, SWORN

13   THE WITNESS:  Yes.

14   THE CLERK:  Please be seated.

15   State your full name for the record, and spell

16   your last name.

17   THE WITNESS:  Mary Boris, B-O-R-I-S.

18   DIRECT EXAMINATION

19   BY MR. CARLTON:

20   Q   Mrs. Boris, what is your present employment?

21   A   I'm an Immigration Inspector.

22   Q   And how long have you been employed by the Immigration

23   Service?

24   A   Thirteen years.

25   Q   What is your present assignment?

755

1    A    I am presently at the San Antonio Airport as an

2    immigration inspector.

3    Q    How long have you been assigned there?

4    A    Four years.

5    Q    And can you briefly describe what your duties are as

6    an Immigration Inspector at the San Antonio Airport?

7    A    I'm an Immigration Inspector, and my main duties are

8    to inspect all passengers arriving foreign.

9    Q    Were you on duty in that position on August 9th of

10   1989?

11   A    Yes, sir.

12   Q    What was your assignment on that day?

13   A    I was working as an Immigration Inspector.  I was

14   working in the morning.  It was a morning duty.  I was

15   working the secondary booth at the San Antonio Airport.

16   Q    While you were on duty at the secondary booth, did you

17   speak with an individual named Ruben Zuno-Arce?

18   A    Yes, sir.

19   Q    Now, may I ask you to stand and look around the

20   courtroom and tell us whether you see Ruben Zuno-Arce, the

21   person you spoke with in 1989?

22   A    Yes, sir, the middle gentleman.

23         THE COURT:  She indicated the defendant.

24   BY MR. MEDRANO:

25   Q    Did you ask Mr. Zuno-Arce some questions on August 9th

756

1   of 1989?

2   A    Yes.

3   Q    And before asking him these questions, did you inform

4   him of his Constitutional Rights?

5   A    Yes, sir.

6   Q    Did he agree to waive those rights?

7   A    Yes, sir.

8   Q    And did he agree to answer your questions?

9   A    Yes.

10  Q    Are you a native Spanish speaker?

11  A    Yes, I am.

12  Q    Did your conversation with Defendant Zuno begin in

13  Spanish?

14  A    Yes, it did.

15  Q    At some point, did the conversation change into

16  English?

17  A    Yes, it did.

18  Q    How did that come about?

19  A    I believe it was Mr. Zuno speaking English back to me.

20  Q    And from that point on, the conversation remained in

21  English?

22  A    Yes, sir.

23  Q    How long did this conversation last?

24  A    Oh, for about an hour, an hour and a half.

25  Q    At some point during the conversation, did you begin

757

1  to record your questions and his answer in writing?

2  A    Yes, I did.

3  Q    And how did you do that?

4  A    Recorded on a typewriter.

5  Q    Would you type out your question as you asked it?

6  A    Yes, sir.

7  Q    Would you type out his response?

8  A    Yes, sir.

9  Q    If his response was a lengthy response, how would you

10 handle that?

11 A    Paraphrased, summarized.

12 Q    Now, did you, when you were finished asking your

13 questions and he was finished with his answers, did you

14 show him the written questions and answers --

15 A    Yes.

16 Q    -- that you had prepared?

17 A    Yes, I did.

18 Q    Why did you do that?

19 A    That's normal procedure in case of any typographical

20 errors or misinformation that might have not been correct.

21 Q    Did you ask him whether the responses, the information

22 given by him as reflected in that document, were correct?

23 A    Yes, I did.

24 Q    Did he read it in your presence?

25 A    Yes, he did.

758

1    Q    Did you review it with him in Spanish?

2    A    Yes, sir.

3    Q    And did he make some changes on it?

4    A    Yes, sir.

5    Q    Did he initial those changes?

6    A    Yes, he did.

7    Q    And when he was finished with that process, did you

8    ask him to sign it at the end?

9    A    Yes, I did.

10   Q    And did he do so?

11   A    Yes, he did.

12   Q    Did you also sign it at the end?

13   A    Yes, sir.

14   Q    And did you explain to him when you asked him to sign,

15   why you wanted him to do that?

16   A    Yes, sir.

17   Q    What was your reason for doing that?

18   A    That everything on the document itself was correct and

19   true.

20   Q    Now, would you please look at what has been marked as

21   Exhibit 124, which is in front of you?

22   A    Yes, sir.

23   Q    Do you recognize that?

24   A    Yes, sir.

25   Q    What is it?

759

1    A    Record of Sworn Statements.

2    Q    How do you recognize it?

3    A    I was the one that did the actual typing and

4    questioning of this document.

5    Q    So is that the document you prepared reflecting the

6    questions you asked of Defendant Zuno and his answers?

7    A    Yes, sir.

8    Q    I'd like to direct your attention to two particular

9    responses in that document.  One of the questions that

10   appears is:  "Where did you live before?"

11         And the response, at least in part:  "In

12   Guadalajara.  I lived at Lope de Vega, Number 881, from

13   1970 to 1982."

14         During your conversation with Mr. Zuno, did he

15   tell you that he lived in Guadalajara continuously during

16   that period?

17   A    Yes, sir.

18   Q    Now, there is another question on this exhibit which

19   says:  "Have you ever lived in the U.S.?"

20         And the response is:  "No, but temporary only for

21   about two months."

22         During your conversation with Mr. Zuno, did he

23   elaborate on that answer?

24   A    Vaguely.  I believe it was he was responding, and he

25   was coming back and forth.  He was entering the country

760

1    back and forth.

2    Q    During the course of your conversation with Mr. Zuno,

3    did his attitude change at all?

4           MR. BLANCARTE:  Objection; relevance.

5           THE COURT:  Overruled.

6           THE WITNESS:  Yes.

7    BY MR. CARLTON:

8    Q    In what way?

9    A    Somewhat evasive.

10   Q    As the interview progressed?

11   A    Yes, sir.

12          MR. CARLTON:  Your Honor, I move the admission of

13   Exhibit 124.

14          THE COURT:  That may be admitted.

15             (Exhibit 124 received in evidence.)

16          MR. CARLTON:  Nothing further.

17          THE COURT:  You may cross-examine the witness.

18                    CROSS-EXAMINATION

19   BY MR. BLANCARTE:

20   Q    Mrs. Boris, on August 9th, 1989, when you interviewed

21   Mr. Zuno at the San Antonio Airport, was Mr. Zuno

22   travelling under his own name?

23   A    Yes, sir.

24   Q    And on that date when you interviewed Mr. Zuno, had

25   Mr. Zuno been travelling into San Antonio airport on a

761

1  regularly scheduled commercial airline?

2  A    I don't know.

3  Q    The people you interviewed that day were entering your

4  inspection line after disembarking from regularly scheduled

5  commercial airlines; isn't that correct?

6  A    No, sir.  I was not working inspections at the time.

7  I was not on primary.  I was on secondary.  So I was not

8  doing the actual primary inspection.

9  Q    The people that you were inspecting in secondary

10 inspection, were people who were entering San Antonio

11 International Airport off of regularly scheduled commercial

12 airlines; isn't that correct?

13 A    Yes, sir.

14 Q    When you interviewed Mr. Zuno on August 9th, 1989, he

15 answered every one of your questions; isn't that correct?

16 A    Yes, sir.

17 Q    Is it correct that at some point in your interview of

18 Mr. Zuno, you began to take handwritten notes of his

19 answers?

20 A    I did.

21 Q    And isn't it correct that you began to take those

22 handwritten notes prior to the typewritten statement that

23 you just testified about earlier?

24 A    I did.

25 Q    And you have your typewritten notes?

762

1   A    No, sir.  The typewritten or handwritten?

2   Q    Strike that.

3        Do you have your handwritten notes of your

4   interview with Mr. Zuno?

5   A    No.

6   Q    What did you do with those handwritten notes?

7   A    I believe they were thrown away.

8   Q    Isn't it correct that as part of your secondary

9   inspection interview with Mr. Zuno, you inspected his

10  luggage?

11  A    Yes, sir.

12  Q    Did you find any drugs or other contraband in Mr.

13  Zuno's luggage?

14  A    No, sir.

15  Q    Isn't it true that as part of your interview and

16  inspection of Mr. Zuno on August 9th, 1989, you checked his

17  passport?

18  A    Yes, sir, I did.

19  Q    And you checked all travel documents he had in his

20  possession; isn't that correct?

21  A    Yes, sir.

22  Q    And those proved to be valid; isn't that correct?

23  A    Yes, sir.

24  Q    Isn't it true that after you had interviewed Mr. Zuno,

25  after he had answered each and every one of your questions,

763

1   after you had inspected his luggage and checked his travel

2   documents, you allowed him to enter into the United States?

3   A    I don't understand your question.

4   Q    After you had conducted your interview and the search

5   of Mr. Zuno's luggage, and after you had inspected his

6   passport and travel documents, isn't it true that Mr. Zuno

7   was allowed to enter the United States?

8   A    I do not know.

9   Q    Was he arrested by you?

10  A    No.  He was not arrested by me.

11  Q    And you released him from your custody; isn't that

12  correct?

13  A    I completed my inspection.  I do not know what

14  happened afterwards.

15  Q    He was allowed to leave; isn't that true?

16  A    I don't know.

17  Q    Isn't it true, Mrs. Boris, that as you sit here today,

18  you know for a fact that Mr. Zuno left you, and was allowed

19  to enter into the United States?

20          MR. CARLTON:  Asked and answered, Your Honor.

21          THE COURT:  Overruled.  You may answer.

22          THE WITNESS:  I do not know.  I completed my

23  inspection; and as far as Immigration was concerned, I

24  completed it.

25          MR. BLANCARTE:  Move to strike as non-responsive.

764

1  My question was:  Whether subsequent to the interview --

2  THE COURT:  Counsel, overruled.  She did say she

3  didn't know.

4  BY MR. BLANCARTE:

5  Q    To the best of your personal knowledge, after you had

6  completed your interview, Mr. Zuno was not detained any

7  further by any other agency of the U.S. Government; isn't

8  that correct?

9  MR. CARLTON:  Asked and answered, Your Honor.

10  THE COURT:  Well, you may answer that question.

11  THE WITNESS:  I don't know.

12  MR. BLANCARTE:  Thank you.

13  THE COURT:  Any further questions for this

14  witness?

15  MR. CARLTON:  No, Your Honor.

16  THE COURT:  You may step down.

17  (Witness excused.)

18  //

19  //

20  //

21

22

23

24

25

765

1      THE COURT:  Call your next witness.

2      MR. CARLTON:  Your Honor, the government calls

3  Jorge Godoy.

4          JORGE GODOY, PLAINTIFF'S WITNESS, SWORN

5      THE WITNESS:  I do swear, sir.

6      THE CLERK:  State your full name for the record

7  and spell your last name.

8      THE WITNESS:  Jorge Godoy-Lopez, G-o-d-o-y.

9              DIRECT EXAMINATION

10  BY MR. CARLTON:

11  Q   Mr. Godoy, are you a Mexican citizen?

12  A   Yes.

13  Q   Were you born in Mexico?

14  A   Yes.

15  Q   And whereabouts were you raised in Mexico?

16  A   In Guadalajara, Jalisco.

17  Q   Did you attend school in Guadalajara?

18  A   Yes.

19  Q   And when did you finish your schooling?

20  A   Here in Los Angeles.

21  Q   When?

22  A   In 1978.

23  Q   At that point did you return to Mexico?

24  A   Yes.

25  Q   And did you obtain a job down there?

766

1    A    Yes.

2    Q    What job did you get?

3    A    Judicial police officer.

4    Q    Before beginning work as a judicial police officer,

5    did you have to undergo some training?

6    A    No.

7    Q    Do you recall about when it was that you began your

8    work as a judicial police officer?

9    A    In 1979, approximately in the month of March.

10   Q    Now was this for the Jalisco State Police?

11   A    Yes.

12   Q    Who was your first supervisor?

13   A    Gabriel Gonzales-Gonzales.

14   Q    Where was your first assignment?

15   A    In the town of Colotlan, Jalisco.

16   Q    Where is that in relation to Guadalajara?

17   A    It's seven miles away from Guadalajara, towards the

18   north of Jalisco.

19          THE INTERPRETER:  Excuse me, Counsel.  Seven

20   hours, not miles.

21   BY MR. CARLTON:

22   Q    What were your duties in Colotlan as an agent for the

23   Jalisco State Police?

24   A    Homicide investigations, land problems, crimes having

25   to do with cattle.

767

1    Q    And in the course of your work in Colotlan did you

2    have to work with a particular state prosecutor?

3    A    Yes.

4    Q    Who was that?

5    A    Edgar Levi-Gallardo.

6    Q    At some point were you transferred away from Colatlan?

7    A    To the City of Guadalajara.

8    Q    And about when was that?

9    A    In the middle of 1979.

10   Q    What was your assignment when you were transferred

11   back to Guadalajara?

12   A    To the area of metropolitan homicide.

13   Q    Who was your supervisor there?

14   A    Francisco Valdez-Sanchez commander of metropolitan

15   homicide.

16   Q    At some point were you assigned to the Red Cross

17   ambulances?

18   A    To the first aid posts of the -- along with the agents

19   of the district attorney, prosecutor.

20   Q    Now at some point while you were assigned to

21   Guadalajara with the homicide detail, did you ever report

22   to an individual named Ernesto Piliado?

23   A    Yes.

24   Q    When did you first report to him, about?

25   A    Around the beginning of 1980.

768

1  Q    How long did you remain in this assignment in

2  Guadalajara?

3  A    Whole year of 1980 up until the end.

4  Q    Did you then transfer to another location?

5  A    Yes.

6  Q    Where?

7  A    The City of San Juan de Los Lagos, Jalisco.

8  Q    Where is that in relation to Guadalajara?

9  A    About 150 kilometers from the City of Guadalajara

10 towards Jalisco.

11 Q    Who was your supervisor in San Juan de Los Lagos?

12 A    Martel Diaz-Denis.

13 Q    While you were in San Juan de Las Lagos did you also

14 work with a particular state prosecutor?

15 A    Yes.

16 Q    Who was that?

17 A    Armando Cuellar.

18 Q    How long were you assigned to San Juan de Las Lagos?

19 A    About three months.

20 Q    What happened then?

21 A    I was transferred to the City of Guadalajara.

22 Q    What was your duty there?

23 A    Commissioned to the Federal Judicial Police with the

24 command of Francisco Valdez-Sanchez to the helicopter

25 section.

769

1  Q     And did you work with F.M.J.P. agents in that

2  assignment?

3  A     Yes.

4  Q     Are you familiar with a Nicolas Flores-Almazan?

5  A     Yes.

6  Q     Who was that?

7  A     He was the commander for the Western Region of the

8  Mexican Republic.

9  Q     At the same time did you meet an individual named Juan

10  Gilberto Hernandez-Parra?

11  A     Yes.

12  Q     I would ask you to look to your right, I believe is an

13  exhibit marked 118.  Do you recognize the person in that

14  photograph?

15  A     Yes.

16  Q     Who is that?

17  A     Juan Gilberto Hernandez-Parra.

18  Q     At some point while you were assigned in Guadalajara

19  were you transferred to the robbery unit?

20         THE INTERPRETER:  Which unit?

21         MR. CARLTON:  To the robbery unit.

22         THE WITNESS:  Yes.

23  BY MR. CARLTON:

24  Q     About what time period?

25  A     In the year of 1981, around the month of April.

770

1   Q      Did there come a time when you resigned from the state

2   police?

3   A      Yes.

4   Q      Why was that?

5   A      Because I had some problems with some car thieves and

6   Commander Francisco Valdez-Sanchez didn't give me all the

7   support, but gave it rather to the car thieves.

8   Q      Why did that cause you to resign?

9   A      Because he took me to a restaurant-bar there in

10  Guadalajara where there was a lady.  The place's name was

11  Armando del Toro.  And he introduced me to the lady and he

12  said, "Thanks to this lady, they are not going to kill

13  you."

14         And I said that that wasn't right.  How was he

15  supporting them, giving his support to them, and not to us

16  who were his agents.

17  Q      So you resigned?

18  A      That was the cause why I resigned.

19  Q      Did you get another job?

20  A      Yes.

21  Q      What was that?

22  A      I started a store of sales of carpets and mats and

23  curtains and covering table, contact paper.

24  Q      Where was this?

25         MR. BLANCARTE:  Objection; relevance.

771

1          THE COURT:  Sustained.

2    BY MR. CARLTON:

3    Q     How long did you work in this carpet business?

4          MR. BLANCARTE:  Objection; relevance.

5          THE COURT:  Sustained.

6    BY MR. CARLTON:

7    Q     At some point did you return to your employment at the

8    state police?

9    A     Yes.

10   Q     When was that?

11   A     The beginning of 1983.

12   Q     And where was your first assignment after your return?

13   A     In Ciudad Guzman.

14   Q     Eventually were you transferred back to Guadalajara?

15   A     Yes.

16   Q     And when was that?

17   A     It was around March, April 1983.

18   Q     Who were your supervisors in this position?

19         MR. BLANCARTE:  Objection; relevance.

20         THE COURT:  Sustained.  Just a moment.  Get to the

21   point, if you have one.

22         MR. CARLTON:  There is a point to all of this,

23   Your Honor.  And it will all relate.

24         THE COURT:  Next question.

25   BY MR. CARLTON:

772

1    Q    Do you know an individual named Rene Lopez-Romero?

2    A    Yes.

3    Q    And how was it you met him?

4    A    We were colleagues at the same group, at the homicide

5    group, of the judicial police in Jalisco.

6    Q    During this period you have just been describing?

7    A    Yes.

8    Q    Juan Bernabe-Ramirez do you know him?

9    A    Yes.

10    Q    How do you know him?

11    A    From the same metropolitan homicide detail.

12    Q    Raul Lopez-Alvarez do you know that individual?

13    A    Yes.

14    Q    And how so?

15    A    From that same section of the judicial police.

16    Q    Victor Manuel Lopez-Razon do you know him?

17    A    Yes.

18    Q    How do you know him?

19    A    In the forth metropolitan homicide detail.

20    Q    Do you know an individual known as Cochiloco?

21    A    Yes.

22    Q    How was it you first came to meet him?

23    A    That was at a christening with the Commander Francisco

24    Valdez-Sanchez.

25    Q    How were you introduced to Cochiloco at that time?

773

1   A    He was introduced to me as Commander Martinez.

2   Q    Who introduced him in that regard?

3   A    Francisco Valdez-Sanchez.

4   Q    If you would look at what has been marked as Exhibit

5   123.  Do you recognize that photograph?

6   A    Yes.

7   Q    Who is that?

8   A    Manuel Salcido-Uzueta.

9   Q    Also known as Cochiloco?

10  A    Yes.

11          THE COURT:  Let me ask you to stand back farther

12  this way so the jury can see the witness.

13          THE INTERPRETER:  Yes, Your Honor.

14  BY MR. CARLTON:

15  Q    Did you attend a party at a location called Los

16  Caciques?

17  A    Yes.

18  Q    Do you recall about when that was?

19  A    In the new year of 1984.

20  Q    And did you see Cochiloco at that party?

21          MR. MEDVENE:  Objection.  These questions are

22  leading and suggestive, Your Honor.

23          THE COURT:  Overruled.

24          THE WITNESS:  Yes.

25  BY MR. CARLTON:

774

1    Q    Who took you to that party?

2    A    Ernesto Piliado-Garza.

3    Q    And was he your supervisor?

4    A    Yes.

5    Q    Let me draw your attention to early 1984.  Are you

6    familiar with an individual named Carlos Ochoa?

7    A    Yes.

8    Q    And who was that?

9    A    He was the commander of the metropolitan homicide

10   detail.

11   Q    At some point in early 1984 did something happen to

12   him?

13   A    Yes, he was shot.

14   Q    And did you participate in an investigation of that

15   incident?

16   A    Yes.

17   Q    And in the course of that investigation did you raid a

18   ranch?

19   A    Yes.

20   Q    And did you find anything there?

21   A    Yes.

22   Q    What did you find?

23   A    Marijuana.

24   Q    Anything else?

25   A    And cocaine.

775

1   Q     Now, who were your supervisors on this raid?

2   A     Gabriel Gonzalez-Gonzalez, Ruben Gamon, Ernesto

3   Piliado.

4   Q     What happened with this marijuana?

5   A     It was returned.

6   Q     And the cocaine?

7   A     Yes.

8   Q     What happened to that?

9   A     They returned it to some drug smugglers, traffickers.

10  Q     Were your ever paid any money in relation to this

11  marijuana?

12  A     Yes.

13  Q     Who paid it to you?

14  A     Ernesto Piliado-Garza gave it to me.

15  Q     How much did he give you?

16  A     I don't remember the amount exactly.

17  Q     Now about this time did you notice any changes in the

18  lifestyles of your fellow state police officers?

19          MR. BLANCARTE:  Objection, leading and suggestive.

20          THE COURT:  Sustained.

21  BY MR. CARLTON:

22  Q     Did you notice any changes in the weapons that your

23  fellow state police officers carried?

24          MR. BLANCARTE:  Objection; relevance.

25          THE COURT:  Sustained.

776

1  BY MR. CARLTON:

2  Q    Were there any changes in the murder rate in

3  Guadalajara during this period?

4           MR. MEDVENE:  Relevancy, materiality.

5           THE COURT:  Sustained.

6  BY MR. CARLTON:

7  Q    In early 1984 were limitations placed on your ability

8  to investigate certain homicides?

9  A    Yes.

10 Q    And how were these limitations conveyed to you?

11          MR. MEDVENE:  Relevancy, materiality, Your Honor.

12          THE COURT:  The objection is sustained.

13          We'll take our afternoon recess at this time.

14                  (Recess had)

15          THE COURT:  Proceed.

16              DIRECT EXAMINATION (Continued)

17 BY MR. CARLTON:

18 Q    Mr. Godoy, do you know an individual named Ernesto

19 Fonseca?

20 A    Yes.

21 Q    When did you first meet him?

22 A    In the middle of 1984.

23 Q    What were the circumstances?

24 A    I was introduced to him as a commander from the home

25 office at the Libanes club.  Introduced me to him, the

777

1  person who introduced him to me were Jose Maria

2  Carlos-Ochoca and Ernesto Piliado-Garza.

3  Q    Were they your supervisors in the state police at the

4  time?

5  A    My commander was Jose Maria Carlos-Ocoha and Ernesto

6  Piliado-Garza was my group chief.

7  Q    Would you please look at what has been marked as

8  Exhibit 127?

9  A    Yes.

10 Q    Do you recognize that?

11 A    That's the Libanes club.

12 Q    All right.  Would you please look at what has been

13 marked as Exhibit 105.  Who is that?

14 A    Ernesto Rafael Fonseca-Carrillo.

15        MR. CARLTON:  Move the admission of 127 and 105.

16        THE COURT:  They may be admitted.

17        (Exhibits 127 and 105 received in evidence)

18 BY MR. CARLTON:

19 Q    Did Comandantes Carlos-Ochoca and Piliado tell you why

20 they were introducing you to Fonseca?

21 A    That I should put myself under his orders and provide

22 security to him when he would circulate around certain

23 areas of Guadalajara to make sure that he was not stopped

24 by anybody.

25        For that I had to get my credentials from the

778

1  Judicial Jalisco State Police.

2  Q    Did you stay at the Libanes club for some period of

3  time with Ernesto Fonseca?

4  A    Yes.

5  Q    Did you see other people that he was meeting with

6  there?

7  A    Yes.

8  Q    How long did you stay there on this occasion?

9  A    Approximately two days.

10  Q    And can you tell us names of some of the people that

11  you saw during this period?

12  A    Javier Barba, Eliseo Vasquez-Velasco, Antonio

13  Vasquez-Velasco, Rafael Caro-Quintero, Paco Tejeda, and

14  agents from the D.F.S.  And the Negro Vielma.  And the

15  Lieutenant Colonel from the Mexican Army, Jorge Garma,

16  and other people.

17  Q    You saw all of these people meeting with Fonseca while

18  you were there?

19  A    Yes.

20  Q    I would like you to look at Exhibit 19A, if you would.

21  Do you recognize that person?

22  A    Yes.

23  Q    Who is that?

24  A    Rene Lopez-Romero.

25  Q    And 122?

779

1   A   He looks like Javier Barba.

2   Q   Did you meet an individual named Serjio Espino while

3   you were at the Club Libanes?

4   A   Yes.

5   Q   And who was he?

6   A   He was the commander of political and social

7   investigations.

8   Q   Now were you paid for your time with Ernesto Fonseca

9   on this occasion?

10   A   Yes.

11   Q   And when your service with him was finished did you

12   return to your work at the state police?

13   A   Yes.

14   Q   Did your commanders give you any further instructions

15   about working for Fonseca?

16   A   Yes.

17   Q   What did they tell you?

18   A   Nobody should say anything about it.  They were going

19   to continue to send me to accompany him.

20   Q   So did you work for Ernesto Fonseca again?

21   A   Yes.

22   Q   How often?

23   A   There was several occasions after the first time.

24   Q   All while you were employed by the state police?

25   A   Yes.  Because my commanders themselves, Mr. Ochoa and

780

Mr. Piliado, were rotating a group of us.

Q    Where would you go when you went to work for Ernesto Fonseca on these occasions?

A    I go to another of his homes in La Bajadita.

Q    And what would you do there?

A    I would have to be there to follow his orders.  When he left, I would go out with him with Samuel Ramirez-Razo.

Q    Who was Samuel Ramirez-Razo?

A    He was Ernesto Fonseca-Carrillo's right-hand man.

Q    Did there come a time when you stopped working for the state police?

A    Yes.

Q    About when was that?

A    It was around the middle of 1984.

Q    Why was it that you stopped working for the state police?

A    There were problems that the commander that they didn't want to support us when we had to go to roll call. And they wanted us to give them money from the money that Ernesto Fonseca gave us.

Q    So you decided to go where?  What did you do after leaving the state police?

A    I went to see Ernesto Fonseca and explained the whole problem of what was going on.  And Ernesto Fonseca told me: Don't worry.  Stay there with him.  And later he was going

781

1   to talk to the state judicial police superiors.

2   Q    Now do you know an individual named Cesar Fonseca?

3   A    Yes, sir.

4   Q    Who is that?

5   A    He is Ernesto Rafael Fonseca-Carrillo's half brother.

6   Q    Did you work for him for some time?

7   A    Yes.

8   Q    When did you begin working for him?

9   A    Approximately in the month of July.

10  Q    How long did you work for him?

11  A    For about a month.

12  Q    And then what happened?

13  A    Then he transferred me again from Ernesto Fonseca to

14  him.

15  Q    Let me see if I understand.  You were working for

16  Cesar Fonseca for a month; correct?

17  A    Yes.

18  Q    And then where did you go to work?

19  A    Oh, yes.  I went to work with Mr. Cesar Fonseca at his

20  home to give him security, to make sure he wasn't stopped.

21  And if he were stopped, I would show my badge to give him

22  that security.

23  Q    Did you eventually return to work for Ernesto?

24  A    Yes.

25  Q    How did that come about?

782

1    A    It's because there was some problems in Ernesto

2    Fonseca's family itself.   Cesar Fonseca with Antonio

3    Fonseca and some of their other half brothers.   They were

4    all fighting.   And I would tell them to calm down and to

5    think about Ernesto Fonseca; that how was it possible they

6    could be fighting among themselves and their own family.

7         Then after that, the half brothers of the Cesar

8    Fonseca with whom he had the problem went out on the street

9    and they confronted the municipal police of Guadalajara.

10   And two of Cesar Fonseca's half brothers died in the

11   confrontation.

12        And Ernesto Fonseca sent for me to explain to him

13   what had happened there among his family.   I explained they

14   were fighting among themselves, but I calmed them down.

15        He said I had to stay with him then because

16   otherwise afterwards El Gueron and the doctor were going to

17   kill me.

18        But Ernesto Fonseca would quiet them down.

19   Q    You made a reference to "the doctor".   Who were you

20   referring to?

21   A    Half brother of Ernesto Fonseca Carrillo.   His name is

22   Antonio Fonseca.

23   Q    Was "the doctor" his nickname?

24   A    Yes.

25   Q    And eventually did you come to work for Ernesto

783

1  Fonseca?

2  A    Yes.

3  Q    Are you familiar with the location known as the Rancho

4  La Rose?

5  A    Yes.

6  Q    Have you ever been there?

7  A    At a party.

8  Q    About when did this party take place?

9  A    In the month of August of 1984.

10 Q    How was it you came to be at this party?

11 A    It was because Mr. Ernesto Fonseca, since I worked his

12 security, we would go wherever he'd go.  So then we went to

13 the Rancho del la Rosa.  We arrived there during the

14 morning hours to prepare a party because Ernesto Fonseca

15 was going to marry a lady by the name of Rosado.

16 Q    What were your duties as this party?

17 A    I would be at the entrance to the dance hall and

18 guarding the gentleman to make sure that nothing would

19 happen to him.  And at the same time control some cognac

20 bottles, bottles of cognac, to make sure that no one would

21 take them and so that there would be enough drinks to go

22 around.

23 Q    Now, did you stand at the entrance to the dance hall

24 on the first day of this party?

25 A    Yes, sir.

784

1   Q    Did you see the guests enter the dance hall?

2   A    Yes.

3   Q    Now the among the traffickers that you were familiar

4   with at the time, who did you see enter this dance hall?

5   A    Rafael Caro-Quintero, with his people, his guards,

6   Paco Tejeda; Almado Rattan, Miguel Flores, the phantom.

7   And other people whose names I don't remember from Rafael's

8   group.

9        Also Manuel Salcido-Uzueta, the Cochiloco.   Serjio

10  Salcido-Uzueta.   Javier Barba.   Abelardo, the engineer.

11  Emilio Quintero-Payan.   And other drugs traffickers, more,

12  additional.

13  Q    Did you see other individuals go into the dance hall

14  as well, besides these traffickers?

15  A    Yes.

16  Q    Who was it you saw?

17  A    Ruben Zuno-Arce, Enrique Alvarez del Castillo, Miguel

18  Aldana, Javier Garcia-Paniagua, Carlos Aceves-Fernandez,

19  Serjio Espino-Verdin, Juan Gilberto Hernandez-Parra, Jaime

20  Alberto-Ramirez, Carlos Aceves, El Negro, Gabriel

21  Gonzalez-Gonzalez, and other people.

22  Q    Now you mentioned Ruben Zuno-Arce, had you seen him

23  before this occasion?

24  A    Yes.

25  Q    Can you look around the courtroom today and see if you

785

1  see in this courtroom the person you know as Ruben

2  Zuno-Arce.  If you would then point to him.

3  A    The gentleman in the middle over there with the

4  headset.

5         THE COURT:  Indicating Mr. Zuno.

6  By MR. CARLTON:

7  Q    Now, you mentioned the name Enrique Alvarez del

8  Castillo, who was he?

9  A    At that time he was governor of the state of Jalisco.

10  Q    What did you see him do?

11  A    He was toasting with all the group of drug traffickers

12  and all the people there at the party.

13  Q    And defendant Zuno, what did you see him do?

14  A    He was also greeting people, talking with them,

15  toasting with them, and going along with the rhythm of the

16  party.

17  Q    Jaime Alberto-Ramerez, do you know who he was?

18  A    Yes.

19  Q    Who was that?

20  A    He was the attorney general for the state of Jalisco.

21  Q    Carlos Aceves?

22  A    He was the then director of the Jalisco State Judicial

23  Police.

24  Q    Javier Garcia-Paniagua?

25  A    He was a politician from right there in Mexico.  He

786

1   had been head of the D.F.S.

2   Q    Now how long did these individuals stay at this party?

3   A    More or less approximately to the middle of the night.

4   Q    Did you see them leave?

5   A    Yes.

6   Q    How long did this party continue?

7   A    It went on through the night and through the next day.

8   Q    And did you stay at the party during this entire time?

9   A    Yes.

10  Q    Let me draw your attention to late August of 1984.

11  Did you attend a meeting at which some maps were discussed?

12        MR. BLANCARTE:  Objection, leading and suggestive.

13        THE COURT:  The objection is sustained.

14  BY MR. CARLTON:

15  Q    After this party at Rancho La Rosa did you attend a

16  meeting at the La Bajadita house?

17  A    Yes.

18  Q    About when was that?

19  A    Around the end of the month of August of 1984.

20  Q    And how did this meeting take place, can you describe

21  it?

22  A    Yes.  It was at Ernesto Fonseca's house.  The house

23  called La Bajadita.  We were there, and Ernesto Fonseca

24  came out of his room and they called some other people to

25  say that the gentleman was already waiting for him.

787

1          And Abelardo, the engineer arrived, Javier Barba,

2   Jorge Fonseca know as El Gueron, Jorge Garma, the agent

3   Juan Gilberto-Parra from the Federal Judicial Police and

4   two other additional people.

5   Q    Where did you see these people?

6   A    Down there at the Bajadita, there is an office which

7   is underneath the house, and they were all around Ernesto

8   Fonseca showing some maps that they had.

9   Q    Where were you?

10  A    I was right down at the bottom of the stairs inside

11  the office itself.

12  Q    Doing what?

13  A    I was there for whatever Ramiro-Razo asked me to do,

14  to bring them anything they wanted, and also to avoid my

15  other colleagues for Ernesto Fonseca to come there.

16  Q    So what did you see these individuals doing?

17  A    There was some handmade maps that were passed around.

18  And there was some handmade maps where there was a drawing,

19  a sketch where there was marijuana plantings of which some

20  were to be destroyed and others were to be left standing

21  for harvest.

22  Q    Is this what you overheard them discussing?

23  A    Yes.

24  Q    How long did this meeting last?

25  A    About 30 minutes.

788

Q    And when this meeting was over did you see what everyone there did, where they went?

A    Each person took the map that he had been given to take them to each office to which each person corresponded.

Q    What do you mean by that?

A    Jorge Garma took a map for the 15th military zone for General Santoya.  Juan Gilberto-Parra took another one for the Judicial Federal Police for the helicopter section. Another map was taken for the governor Enrique Alvarez del Castillo to give it to Pablo Aleman-Diaz who was the 7th Colonel in charge of the anti riot police for the state of Jalisco.  And another to Javier Barba for recognizing of the fields that were to be destroyed and the fields that were to be left standing.

     All of that for the purpose so that when a police agency would find or a public servant security agent would find they would first notify their superiors.  They would give the order regarding which of the fields were to be destroyed and which were to be left standing.

Q    Now, I'd ask you to look at what has been marked as Exhibit 121A and B if you would.

A    Yes.

Q    Do you recognize those photographs?

A    Yes.

Q    What are they?

789

1    A     Here is the Bajadita house.

2    Q     Indicating 121B?

3    A     Yes.

4    Q     Thank you.  You can put those down.

5          121A, what do you recognize that as?

6    A     This house is a continuation of the house at La

7    Bajadita.

8          MR. CARLTON:  Your Honor, move the admission of

9    these photographs.

10         THE COURT:  They may be admitted.

11         (Exhibits 121A and 121B received in evidence)

12   BY MR. CARLTON:

13   Q     After this meeting that took place at La Bajadita that

14   you just described what did you do?

15   A     They ordered me to go to Javier Barba and Jorge

16   Fonseca, El Gueron and Serjio Valencio, and I, Jorge Godoy,

17   to the area of Talpa, Mascota.

18   Q     Where is Talpa in relation to Guadalajara?

19   A     It's towards the shore, south in Jalisco.

20   Q     You were to proceed from Talpa to somewhere else?

21         MR. BLANCARTE:  Objection; leading and suggestive.

22         THE COURT:  Overruled.

23         THE WITNESS:  To Mascota.

24   BY MR. CARLTON:

25   Q     What did you do on this journey?

790

1   A   We arrived at a field before the City of Mascota which

2   is to the right.  We got out of the van we were in and

3   Javier Barba ordered us to leave the rifles in the van.

4   And there we walked to a large marijuana field.

5          Javier Barba asked the gentleman who were there

6   whether Ruben Zuno was around.  And they told Barba wait a

7   minute.  They were going to find --

8          MR. MEDVENE:  Objection; hearsay, Your Honor.

9          THE COURT:  Overruled.

10          THE WITNESS:  Then a few minutes later Ruben Zuno

11   showed up and he greeted Javier Barba and Jorge Fonseca.

12   They greeted each other.  He said, "How are you.  The

13   gentleman sends his greetings."

14          And Javier Barba said to Mr. Zuno that, "Here are

15   the maps.  Everything that's going to be destroyed and

16   everything that is going to be left as it is."

17          And Mr. Zuno answered him to, "Not worry.  That

18   he, himself, was going to check the fields which were to be

19   destroyed and which were to be left standing."

20          The gentleman greeted me.  After Mr. Zuno was

21   going to call Ernesto Fonseca.

22   BY MR. CARLTON:

23   Q   Does the name El Senor mean anything to you?

24   A   As the gentleman we were referring to, Ernesto

25   Fonseca.

791

1   Q    So when you use that term "El Senor," you are

2   referring to Fonseca?

3   A    Yes, sir.

4   Q    How long did this meeting in the field take place or

5   last?

6   A    About 30 minutes.

7   Q    And what did you do then?

8   A    From there I went back to where the group of my

9   colleagues was.  And they remained conversing, talking, and

10  I don't know what they have said.

11  Q    Did you go somewhere else from Mascota?

12  A    To the City of Guadalajara.

13  Q    Now during the course of this trip that you just

14  described, did you see any other marijuana fields besides

15  this one?

16  A    No -- yes, besides that I already seen some other

17  fields in the area of Talpa, Puente Grande, and Tomatlan.

18  Q    Did you notice any difference in the way that some of

19  these fields were maintained?

20       MR. BLANCARTE:  Lack of foundation.

21       THE COURT:  What is the objection?

22       MR. BLANCARTE:  Lack of foundation.

23       THE COURT:  Well, sustained.

24       The question is very vague and ambiguous as well.

25  BY MR. CARLTON:

792

1    Q    Did these fields appear to be as well-tended as the

2    field that Mr. Zuno was in?

3         MR. BLANCARTE:   Objection, leading and suggestive.

4         THE COURT:   And irrelevant.

5         The objection is sustained.   Also calls for a

6    conclusion.

7    BY MR. CARLTON:

8    Q    Did you see any fields that were to be destroyed?

9    A    Yes.

10   Q    How did those fields look?

11   A    The ones that were to be destroyed we could see that

12   they had just thrown down the seeds and allowed the plants

13   to grow.   They weren't cared for like the other fields.

14   They were not being worked on by the farmers like the

15   others.   And some of them appeared to be neglected, while

16   others looked proper, where the plants were growing

17   properly.

18   Q    After returning from this trip what did you do?

19   A    We went to La Bajadita.

20   Q    Now, I'd like you to look at what has been marked as

21   Exhibit 170.

22   A    Yes.

23   Q    Do you recognize that?

24   A    Yes.

25   Q    What is that?

793

1   A     It's a common bank which is on the Avenue of Lopez

2   Mateos and Plaza del Sol.

3   Q     Did you ever go there?

4   A     Yes.

5   Q     When?

6   A     Around the beginning of September of 1984.

7   Q     How was it you went to that bank then?

8   A     It was because we were at the Bajadita and Samuel

9   Ramirez-Razo asked me to go with him and he had two

10  suitcases in his hands.  He gave me a suitcase.  And we got

11  into a Mustang, a red Mustang he had.  Then we headed to

12  the bank and we went to the second floor.  And there Samuel

13  Ramirez-Razo took out a deposit/withdrawal slip from his

14  pocket.

15  Q     How could you tell this was a withdrawal slip?

16  A     Because Samuel Ramirez-Razo took it out in my presence

17  and I saw that it was signed by Ernesto Fonseca-Carrillo.

18  And he gave that same slip to the bank manager and said

19  that it was correct, that there was no problem, and from

20  there we went to the bank vault.

21  Q     What happens there?

22  A     They started to take out rolls of $50 bills, and

23  twenties and fifties.

24  Q     Is this American currency?

25  A     Yes, dollars, sir.

794

1    Q    Where were you?

2    A    I was there at the door to the vault.

3    Q    What was it you saw from there?

4    A    I saw that the secretary was taking the packs of bills

5    and putting them in a little counting machine.  And then

6    she would take them out and put them together again and

7    give them to Samuel Ramirez and we're putting them all

8    inside the suitcases.

9    Q    What happened then?

10   A    And Samuel saw that I was seeing that since I was

11   there and it seemed like a lot of money.  Samuel turned and

12   saw me.  And he said, "Please go outside and wait for me in

13   the bank lobby."

14        About a 30 minute period went by, then Samuel came

15   out of the vault with the two suitcases.  And he gave one

16   to me.  And the suitcase felt heavy.

17        From there we went down and we got into the red

18   Mustang.

19   Q    Where did you go next?

20   A    And from there we went to the Jalisco State Government

21   City Hall.

22   Q    Now, I would ask that you look at what has been marked

23   as Exhibit 130.

24   A    Yes.

25   Q    Do you recognize that?

795

1  A    Yes.   That is the government palace.   On the second

2  floor is the office of Governor Enrique Alvarez del

3  Castillo.

4        MR. CARLTON:   Move the admission of Exhibit 170

5  the bank photograph and Exhibit 130.

6        THE COURT:   They may be admitted.

7        (Exhibits 130 and 170 received in evidence)

8  BY MR. CARLTON:

9  Q    When you got to the governor's mansion, what happened?

10 A    We arrived and parked in the governor's exclusive

11 parking spot.   And then a guard who was there guarding the

12 parking lot said that we couldn't park there; that was

13 exclusively for the governor, for his vehicles.

14       So Samuel Razo took out his credential from the

15 home office and he said, "Look, we are from the home office

16 and the governor is expecting us.   We won't be long."

17       Then the guard allowed us to park there.   And

18 after that, we went into the building and we went up to the

19 upper floor, and went into the governor's office.

20 Q    And let me stop you there for a minute, Mr. Godoy.

21       THE INTERPRETER:   I hadn't finished the

22 translation.

23       And there in front of the office there is a

24 reception area with a secretary.

25 BY MR. CARLTON:

796

Q    Did Samuel have a credential from the secretary of Gobernacion?

A    Yes, from the Federal home office.

Q    Now, when you got to the governor's office on the second floor, what happened?

A    Then Enrique Alvarez told the secretary that he would like to see the governor.  And the secretary got on the intercom.

Q    Did you say Enrique Alvarez said he would like to see the governor?

A    No.  Samuel Ramirez-Razo wanted to see the governor Enrique Alvarez del Castillo.  Then the secretary called him and said, "Okay.  You can go in."

Q    Did you announce who you were?

A    Yes.  We were going there from El Senor.

       And the governor, Enrique Alvarez del Castillo, said, "That's fine.  I've been waiting for them."

       And when we went into the office, Samuel Ramirez-Razo took the other bag from me and then he said, "Sir, this is from El Senor."

       "Tell him thank you very much, greet him on my behalf and later on I will call him."

       And then from there Samuel made a -- he turned around and both of us left quickly.  And then we left in the red Mustang towards La Bajadita.  And I, being curious,

797

1    asked him how much money is that?

2            He said, "You couldn't imagine.  And what you've

3    just seen, don't tell anybody."

4    Q    About when did this happen?

5    A    More or less in September of 1984.

6    Q    Did you make another money delivery after this one?

7    A    About one or two weeks later.

8    Q    How did this next delivery take place?

9    A    We were at the Bajadita house and Ernesto Fonseca was

10   there and the D.F.S. agent whose sur name was Molina and

11   Samuel Ramirez-Razo, Javier Barba, and Abelardo, the

12   engineer, and I was outside of the room, the door was

13   opened, and Samuel Ramirez-Razo and Molina came out with

14   two suitcases.   Samuel Ramirez-Razo asked Molina, "Who do

15   you want to take from the whole group?"  And he pointed to

16   me, Godoy.

17   Q    Had you seen these suitcases before?

18   A    I'd seen them two or three days before, sir.

19   Q    How was it that you had seen them previously?

20   A    Because they called some people to come and clean the

21   carpets.  And since there was nobody there, El Senor was

22   not there, the others weren't there, Samuel had left me

23   there to guard the place, to make sure that nothing would

24   be taken by the carpet cleaners.

25           When we went into the room in the area of the

798

1  closet in the bathroom, they had to move everything to

2  clean the carpets and those two suitcases were there in the

3  closet.  And I was going to grab them to move them but I

4  felt they were quite heavy.  I left them there, but out of

5  my curiosity I opened them to see what they were.  And

6  there I saw that they were packages of money from here,

7  from the United States.  They were dollars.

8  Q    Now when Molina asked you to go with him, did you feel

9  these suitcases again?  Did you pick them up?

10  A    Yes.  I took one of the suitcase and Molina was

11  carrying the other one.

12  Q    How did the suitcase feel when you picked it up?

13  A    Heavy.

14  Q    So what did you and Molina do?

15  A    We went with Samuel Ramirez-Razo in the vehicle

16  belonging to Ernesto Fonseca to the Guadalajara, Jalisco

17  Airport.

18  Q    What did you do when you got there?

19  A    There was already a mini jet there.  The engines were

20  heated and running and ready to takeoff.

21  Q    What did this jet look like?

22  A    It was a new turbo mini jet.  It was beige color with

23  strips of red and kind of a darkish brown.

24  Q    Did you meet anybody else at the airport?

25  A    Yes, Miguel Flores and the phantom were already there.

799

1   Rafael Quintero's peoples.   Then Miguel Flores said to me,

2   "My, kid, do you know where we are going?"

3            I said, "I don't know."

4            He said, "Well, we are going to the number one

5   military camp."

6            I said, "You must be kidding.   Why are we going to

7   go there?"

8            But then we did board the plane, and there were

9   another two suitcases the same size as the ones we were

10  carrying.   Then we headed flying towards Mexico City.   We

11  must have been flying for about 30, 35 minutes.   And, in

12  fact, we were coming down at the number one military camp

13  which is in the southern area of the City of Mexico.

14  Q    When you landed were you met by anybody?

15  A    Yes.   There were four military people when the door to

16  the plane opened.

17  Q    And then what happened?

18  A    Then we got out with fear, myself, each of us with a

19  bag.

20  Q    Where did you go?

21  A    We went into the military base facilities into the

22  offices and another of the military people went into an

23  office and then he came out.   And he said, "The general is

24  waiting for you."

25           So then we went in and we saw the general, and

800

1   Molina said to the general, "Here, this is from the Senors

2   from over in Guadalajara."

3   Q   Now when you refer "the general," do you know the name

4   of that individual?

5   A   Yes.  He was number one, Juan Arevalo-Gardoqui.

6   Q   Would you look at what has been marked as Exhibit 131.

7   Do you recognize that photograph?

8   A   Yes.  Yes.  That is Juan Arevalo-Gardoqui, the

9   general.

10         MR. CARLTON:  Move the admission of 131, Your

11   Honor.

12         THE COURT:  It may be admitted.

13            (Exhibit 131 received in evidence)

14   BY MR. CARLTON:

15   Q   What happened next?

16   A   They were drinking together and the general offered us

17   a drink, and Manuel Valencia said that we had orders from

18   the Senors that we have to go right back.

19   Q   And --

20   A   And the general said, "No, the person in charge here

21   is me."

22   Q   What happened then?

23   A   See, then later on we said goodbye to him and rushed

24   back to the plane.  The plane never even stopped its

25   engines.  And we went out.  It already turned around ready

801

1    to get on the strip and takeoff.

2    Q    Now, did you know who Juan Arevalo-Gardoqui was at the

3    time?

4    A    Yes, sir.

5    Q    How did you know that?

6    A    Because I seen him on the media.  He would be

7    introduced as the Mexican General of the Army.

8    Q    Do you know an individual Humberto Alvarez-Machain?

9    A    Yes.

10   Q    How is it you know him?

11   A    He was introduced to me in Guadalajara.  The person

12   who introduced him to me was El Cava, Cesar

13   Fonseca-Carrillo.

14   Q    When did this occur?

15   A    It was in the year of 1984, in the middle of the year

16   of 1984 when I had been commissioned to Cesar Fonseca-

17   Carrillo.

18   Q    Can you describe this incident?

19   A    Cesar Ernesto-Fonseca invited me to come and see a

20   house that he was building over at the university

21   neighborhood.  Then when we got there and we were standing

22   outside the lot, he said, "Hold on.  I'm going to call Dr.

23   Alvarez."

24        Then he rang the bell and the doctor came out.

25   And greeted and he introduced him to me.  Just said, "This

802

1   is a friend of mine."

2           Then we just greeted each other, "Hello, hello."

3   And we went on to the lot.  Then on the lot he said, "Look,

4   Doctor, how my house is shaping up."

5           He said, "There is going more or less.  Look to

6   what I have here to one side of my stomach."

7           He undid his belt and showed him that he had a

8   lump.  And he said it was a hernia.  And if you don't want

9   to be operated that you need meanwhile special truss for

10  that hernia.

11  Q    That's what Dr. Alvarez Machain said?

12  A    Yes, he recommended that.

13  Q    Did anything else happen at this meeting?

14  A    Then Fonseca took out a little bag of cocaine and gave

15  it to the doctor.

16  Q    Now, looking around the courtroom today do you see

17  anyone who you can identify as Dr. Alvarez-Machain, the man

18  you meet on that occasion?

19  A    Yes.

20  Q    Can you indicate where you see this person?

21  A    The gentleman (indicating).

22           THE COURT:  Indicating the defendant.

23  BY MR. CARLTON:

24  Q    During the time that you worked for Ernesto Fonseca

25  did you see Humberto Alvarez-Machain on any other

803

occasions?

A    Yes.  I saw him right there at the Bajadita.  He had some serum in his doctor's bag because Ernesto, Rafael and Ernesto Fonseca would go on two or three day drinking binges and his hangovers would be pretty severe.  And he had to inject some serums, vitamins and some German injections through the IV entry area.

        Then I saw him again at some other parties, like at the Horse Shoe Ranch with Caro-Quintero, and the whole group.  All the drug traffickers would get together.

        Later and at some apartments in Loma Bonita.  When the doctor had been injured after they killed his cousins, then I saw that he changed some gauzes on an injury that he had on his stomach.

Q    Who was changing gauze for whom?

A    Dr. Alvarez to the person they called the doctor, Antonio Fonseca.

Q    When was this?

A    It was during the last months of 1984; that was before Antonio Fonseca was killed.

Q    And did you ever see Dr. Alvarez-Machain on any other occasions?

A    Yes.  Once at the house called Las Fuentes where they were shooting up the armor on the Marquis, on the Grand Marquis, to see if the armor could sustain the shots.

804

1    At that time El Gueron told me to get up in the

2 car.  And El Gueron wanted to kill me because of the

3 situation, because of what had happened to his other half

4 brothers.  And what I did is, I went up to the upper floor

5 and from a room I was looking out on the back garden.  They

6 already had a band.  And they were all drinking.  He was

7 there drinking with all of them.

8    THE COURT:  Counsel, I want to adjourn a little

9 bit early in order to give the jury a little more time to

10 get home before any further rain might fall.

11    We will adjourn for the evening at this time.  We

12 will reconvene tomorrow morning at 9:30.

13    (Proceedings adjourned)

14    *   *   *   *   *   *

15    I, MARY TUCKER, CSR, do hereby certify that

16    the foregoing transcript is true and correct.

17

18

19    _M_ary Tucker                    6·17·93

20    MARY TUCKER, CSR                 DATE

21

22

23

24

25