

424

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE EDWARD RAFEEDIE, JUDGE PRESIDING

FILED

Jun 18 1993

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

- - - - -

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,        )
                               )
        vs.                    )     Case No. CR-87-422-ER
                               )
RAFAEL CARO-QUINTERO, et al.,   )
                               )
              Defendants.       )
_____)

ORIGINAL

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

FRIDAY, DECEMBER 4, 1992

MARY TUCKER, CSR 9308
Official Court Reporter
429-D U.S. Courthouse
312 North Spring Street
Los Angeles, Calif. 90012
213/687-0530

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

425

1   APPEARANCES:

2

3       For the Plaintiff:

4           TERREE A. BOWERS
            United States Attorney
5           ROBERT BROSIO
            Assistant United States Attorney
6           Chief, Criminal Division
            JOHN CARLTON
7           Assistant United States Attorney
            MANUEL MEDRANO
8           Special Assistant United States Attorney
            312 North Spring Street
9           Los Angeles, California  90012

10

11

12      For the Defendant:

13          JAMES E. BLANCARTE
            MARY FULGINITI
14          JEFFER, MANGELS, BUTLER & MARMARO
            2121 Avenue of the Stars
15          10th Floor
            Los Angeles, California  90067
16                  - and -
            EDWARD M. MEDVENE
17          JACK R. LUELLEN
            MITCHELL, SILBERBERG & KNUPP
18          11377 West Olympic Boulevard
            Los Angeles, California  90064

19

20

21

22

23

24

25

426

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| MALONE, MICHAEL | | | | |
| By Mr. Carlton | | | 433/435 | |
| By Mr. Rubin | | 428 | | 434 |
| | | | | |
| FERNANDEZ, PAUL | | | | |
| By Mr. Carlton | 436 | | | |
| | | | | |
| LUGO, CHARLES | | | | |
| By Mr. Carlton | 452 | | | |
| By Mr. Medvene | | 488 | | |
| By Mr. Rubin | | 490 | | |
| | | | | |
| CELAYA, ANTONIO | | | | |
| By Mr. Carlton | 492 | | | |
| | | | | |
| RETAMOZA, FRANK | | | | |
| By Mr. Medrano | 498 | | 543 | |
| By Mr. Medvene | | 533 | | |
| By Mr. Rubin | | 537 | | |
| | | | | |
| RICEVUTO, ANTHONY | | | | |
| By Mr. Medrano | 546 | | | |
| | | | | |
| HOLLESTELLE, EUGENE | | | | |
| By Mr. Carlton | 557 | | | |
| By Mr. Rubin | | 570 | | |
| | | | | |
| HARRISON, LAWRENCE | | | | |
| By Mr. Carlton | 573/597 | | | |
| | | | | |
| GOMEZ, THOMAS | | | | |
| By Mr. Medrano | 589 | | | |

427

INDEX

| EXHIBITS | FOR IDENTIFICATION | IN EVIDENCE |
|----------|--------------------|-------------|
| 19A | | 610 |
| 105 | | 582 |
| 108 | | 459 |
| 111A–I | | 478 |
| 112 | | 478 |
| 114 | | 560 |
| 115B | | 370 |
| 119 | | 585 |
| 121A–B | | 605 |
| 122 | | 616 |
| 123 | | 617 |
| 127 | | 610 |
| 133A–B | | 610 |

428

LOS ANGELES, CALIFORNIA; FRIDAY, DECEMBER 4, 1992

(9:30 A.M.)

(Jury in.)

MICHAEL MALONE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

THE COURT:  Counsel, did you have some questions for this witness?

MR. RUBIN:  I wanted to address the Court first.

THE COURT:  Just a moment.  Good morning.

THE COURTROOM:  Good morning, Your Honor.

MR. CARLTON:  Just for the record, Your Honor, the parties have stipulated that small photographs of the various comparison charts that Mr. Malone testified to yesterday could be placed on Exhibits 81 and 82, and each of these charts is connected by a line to the location where the questioned item depicted on the chart was located.

THE COURT:  Very well.  You may cross-examine this witness.

MR. RUBIN:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. RUBIN:

Q    Agent Malone, how long did it take you to do all the vacuum sweepings in the house there at --

THE COURT:  Just a moment.  I've received this note, and I want you to understand that you cannot discuss

1    this case at any time, even when you are all present, until

2    it's over with and has been submitted to you.  There should

3    be no discussion whatsoever about the case.

4         I clarify that because one of the jurors has asked

5    me to do so.  The case is not to be discussed among

6    yourselves at any time until after it has been submitted to

7    you.

8         MR. RUBIN   May I proceed, Your Honor?

9         THE COURT:  Yes.

10   BY MR. RUBIN:

11   Q    Agent Malone, about how long did it take you to do all

12   the sweepings at 881 Lope de Vega?

13   A    The two rooms that I myself swept were the guest house

14   and Bedroom Number 6.  It took about an hour to do the

15   guest house, and about a half an hour to do Bedroom

16   Number 6 because it is a much smaller rug.

17   Q    And do you know how long it took to do the other

18   remaining rooms by the other agents?

19   A    I wasn't there.

20   Q    Do I understand correctly that the sweeping of these

21   rooms is a very careful and precise process where you have

22   to go slowly to make sure you pick up every possible piece

23   of evidence that you can?

24   A    That is correct, yes.

25   Q    And you did it in that very painstaking manner?

430

1    A    Yes, I did.

2    Q    Now, was that also the same kind of procedure that you

3    used for the two cars that were swept?

4    A    Exactly.

5    Q    Now, turning to the car, the Grand Marquis, were you

6    able to identify any hairs of Humberto Alvarez-Machain in

7    that car?

8    A    No, there were none.

9    Q    In the VW Atlantic, were you able to identify any

10   hairs of Humberto Alvarez-Machain in that car?

11   A    No, there were none.

12   Q    In Room 4, Bedroom 4, there were found the hairs of

13   Enrique Camarena?

14   A    That is correct.

15   Q    In Bedroom 4, did you find any hairs of Dr. Machain?

16   A    There were none.

17   Q    In Room 3 you also found hairs of Enrique Camarena?

18   A    No.   The guest house and Bedroom 4 were the two rooms.

19   Q    Okay.   In the guest house, you found hairs of Enrique

20   Camarena?

21   A    Yes, I did.

22   Q    Did you find any hairs of Dr. Machain in the guest

23   house?

24   A    There were none.

25   Q    In fact, isn't it true, that nowhere in the house,

431

1    after all this searching and sweeping, did you find a

2    single hair of Dr. Alvarez-Machain?

3    A    That is correct.

4    Q    Now, turning to the bathroom in the guest house where

5    the syringe was located, you indicated that it had -- had

6    it appeared to you that it had been cleaned?

7              THE COURT:  What, the syringe or the --

8              MR. RUBIN:  Oh, excuse me.

9    BY MR. RUBIN:

10   Q    The bathroom?

11   A    The walls had been cleaned.  The walls of the shower

12   had been cleaned up to a height of about six,

13   six-and-a-half feet, and then the remaining foot,

14   foot-and-a-half, was dirty again.  So the shower was the

15   only place that was really cleaned.

16   Q    What about the floor?  Did it appear to be washed or

17   cleaned?

18   A    The floor of the shower, but not the rest of the --

19   Q    Not the rest of the bathroom?

20   A    Correct.

21   Q    Did you find any hairs in the bathroom of the guest

22   house of anybody?

23   A    I found a few, I believe.

24   Q    Were you able to identify those hairs?

25   A    I did not associate anybody to those hairs, no.

432

1   Q      The syringe that you found was lying opened and

2   exposed and easily visible for you to see?

3   A      Yes.  Very visible.

4   Q      And there was also a piece of paper in the bathroom?

5   A      Yes.  There was some miscellaneous items, mostly

6   papers, and the syringe.

7   Q      Any other physical objects besides the syringe and

8   some paper?

9   A      No.

10  Q      Was there a medicine cabinet in the bathroom?

11  A      I don't believe so, no.

12  Q      And just to be clear, I take it then that you didn't

13  find or see any kind of medicine vials of any kind in the

14  bathroom?

15  A      No, there were none.

16  Q      When we talk about the syringe, the syringe you found

17  didn't have the needle section attached to it, did it?

18  A      That is correct.

19  Q      It just had the plastic part where the medicine is

20  held?

21  A      Yes.  Just the syringe itself.

22  Q      Okay.  Was the plunger still in the -- I'm not sure

23  I'm using the right word, plunger, but the part that you

24  press down to move the medicine or drug forward, was that

25  still in the plastic syringe?

433

1   A    I can't recall right now.

2   Q    Could you look at Government's Exhibit 57.

3         THE COURT:  It's not necessary, Counsel.  If the

4   exhibit's in evidence, it's not necessary for the witness

5   to tell us what it looks like.

6   BY MR. RUBIN:

7   Q    You found some fibers, carpet fibers on Camarena's

8   body?

9   A    Two different types, yes.

10   Q    Okay.  Were you ever able to match up those carpet

11   fibers with any carpet that was located in Dr. Machain's

12   office or his home?

13   A    I was never sent any from his office or home.

14   Q    So there is no match in that respect, is there?

15   A    That is correct.

16         MR. RUBIN:  No further questions.  Thank you.

17         THE COURT:  Do you have any further questions for

18   this witness?

19         MR. CARLTON:  Just a couple, Your Honor.

20                 REDIRECT EXAMINATION

21   BY MR. CARLTON:

22   Q    Agent Malone, are you familiar with scientific studies

23   concerning the rate at which people lose their hair?

24   A    Yes, I am.

25   Q    And as a general rule, what is that rate?

434

1    A    The rate of hair loss is about a hundred hairs a day,

2    but, of course, that includes your entire body.  Nobody

3    broke it down into head hairs, pubic hairs, whatever, and

4    it's only a problem if you are not putting them back.

5    Q    Does that vary from person-to-person?

6    A    It's pretty constant.

7    Q    Is it possible then that someone could be in a

8    location for some period of time and not lose any hairs at

9    all?

10   A    Oh, it's possible.

11        MR. CARLTON:  Nothing further.

12        MR. RUBIN:  I have some questions about that.

13                    RECROSS-EXAMINATION

14   BY MR. RUBIN:

15   Q    Agent Malone, would it be fair to say then that the

16   less period of time that somebody stayed in a particular

17   location the less likely that they are to drop hair in that

18   spot; correct?

19   A    Yes.  Yes.

20   Q    So if somebody was there very, very briefly, you may

21   find no hairs there?

22   A    That is correct.

23   Q    And if somebody was there for a longer period of time,

24   a day or a day-and-a-half continuously, it's far more

25   likely that there would be hairs in that location; correct?

435

1   A    Let's just say it would be more likely.

2         MR. RUBIN:  Thank you.  No further questions.

3               FURTHER REDIRECT EXAMINATION

4   BY MR. CARLTON:

5   Q    Agent Malone, have studies been done on the

6   transference of hairs from one object to another?

7   A    Yes, many studies.

8   Q    Is it possible, based on the results of these studies,

9   that hairs that might have been deposited in one place

10  could stick to something and be transferred somewhere else?

11  A    Yes.  This is called a secondary indirect transfer.

12        MR. CARLTON:  Nothing further.

13        THE COURT:  All right, sir.  You may step down.

14        THE WITNESS:  Thank you, Your Honor.

15               (Witness excused.)

16        THE COURT:  Next witness, please.

17        MR. CARLTON:  Your Honor, the government calls

18  Guadalupe Gamez.

19               (Witness summoned to courtroom.)

20        THE CLERK:  Please raise your right hand.

21        PAUL FERNANDEZ, PLAINTIFF'S WITNESS, SWORN

22        THE WITNESS:  Yes.

23        THE CLERK:  Please be seated.

24        State your full name for the record and spell your

25  last name.

436

1        THE WITNESS:  Paul Fernandez.

2             DIRECT EXAMINATION

3    BY MR. CARLTON:

4    Q    Mr. Fernandez, do you work for the Drug Enforcement

5    Administration?

6    A    Yes.

7             THE COURT:  Just a moment.  Did you say this

8    witness' name was Gamez?

9             MR. CARLTON:  Well, I was going to elaborate on

10   that at this point, Your Honor.

11            THE COURT:  All right.

12   BY MR. CARLTON:

13   Q    Do you use the name Guadalupe Gamez?

14   A    Yes.

15   Q    Do you use that name in the course of your work with

16   the Drug Enforcement Administration?

17   A    Yes.

18   Q    And in what capacity do you work for the Drug

19   Enforcement Administration?

20   A    As an informant.

21   Q    And how long have you been doing that?

22   A    Eleven years.

23   Q    In the course of your work as an informant for the

24   D.E.A., have you been paid?

25   A    Yes.

437

1   Q      How many investigations have you worked on?

2   A      Over a hundred.

3   Q      Did you work on an investigation involving an

4   individual named Manuel Chavez?

5   A      Yes.

6   Q      When did you first meet him?

7   A      In 1983.

8   Q      Was that in the course of one of these investigations?

9   A      Excuse me?

10  Q      Was that in the course of one of these investigations

11  for the D.E.A.?

12  A      Yes.

13  Q      What was your purpose in meeting him at that time?

14  A      To do a heroin trade.

15  Q      Were you trying to buy heroin from him or sell it to

16  him?

17  A      To buy it.

18  Q      Were you working with a D.E.A. agent at that time?

19  A      Yes.

20  Q      Was that transaction completed in 1983?

21  A      No.

22  Q      Now, did you meet again with Mr. Chavez in the Mexican

23  State of Zacatecas?

24  A      Yes.

25  Q      And at that time, what was Mr. Chavez' job?

438

1  A     Administrator.

2  Q     Administrator of what?

3  A     Of the marijuana fields.

4  Q     Of which marijuana fields?

5  A     Of the ones in Zacatecas.

6  Q     About when was this meeting, the second meeting, with

7  Mr. Chavez?

8  A     September of 1983.

9  Q     Now, at that time, did he offer you a job?

10  A     Yes.

11  Q     And did you report this information to the D.E.A.?

12  A     Yes.

13  Q     And at some point, did you work with D.E.A. Agent

14  Enrique Camarena on this investigation?

15  A     Yes.

16  Q     Did Agent Camarena give you some instructions as to

17  what you should do with this job offer?

18  A     Yes.

19  Q     What were those instructions?

20  A     To locate the ranches, and in the future to make

21  heroin purchases.

22  Q     And did you accept the job?

23  A     Yes.

24  Q     And did you continue to work with Agent Camarena on

25  this investigation?

1    A    Yes.

2    Q    How long did you work for Manuel Chavez?

3    A    About six months.

4    Q    In this job, did you report directly to him?

5    A    Yes.

6    Q    Were you paid for your work?

7    A    Yes.

8    Q    What was the job that he offered to you and that you

9    accepted?

10   A    His assistant.

11   Q    What were you supposed to assist him with?

12   A    To make purchases of food, to take the workers to the

13   ranches, to answer the phones.

14   Q    Now, generally what was it that Manuel Chavez did?

15   A    He would manage the marijuana fields, make sure that

16   the money wasn't short, and that the plantings were done

17   properly, to pay the workers.

18   Q    Did he administer all of these operations?

19   A    Yes.

20   Q    And did he report to someone else?

21   A    Yes.

22   Q    To a group of people?

23   A    Yes.

24   Q    And who were some of those people?

25   A    Rafael Caro-Quintero, Ernesto Fonseca, The Blue One,

440

1   Cochiloco, and Miguel Felix-Gallardo.

2   Q    Were there others as well?

3   A    The group was large.

4   Q    How many marijuana ranches did Mr. Chavez supervise?

5   A    Over 40.

6   Q    Where were these located, generally?

7   A    Mostly in the State of Zacatecas.

8   Q    Now, did Chavez have a base of operations from which

9   he supervised all of these ranches?

10  A    Yes.

11  Q    Where was that?

12  A    In Fresnillo, Zacatecas.

13  Q    In supervising these operations, did he utilize a

14  radio system?

15  A    Yes.

16  Q    And where was that radio system based?

17  A    At Manuel Chavez' house.

18  Q    In the course of your work for Mr. Chavez, did you

19  have occasion to use this radio system?

20  A    Yes.

21  Q    Became familiar with it?

22  A    Yes.

23  Q    How many frequencies did this radio system have?

24  A    Four.

25  Q    And were each of these frequencies assigned to some

441

1  person or group of persons?

2  A   Yes.

3  Q   Who where they assigned to?

4  A   The Federal Security Agency, the Federal Justice

5  Department, the State Judicial Police, and the Municipal

6  Police.

7  Q   Did you have occasion to communicate with this radio

8  system with these various agencies?

9  A   Yes.

10  Q   And to receive communications from them?

11  A   Yes.

12  Q   Generally, what did these communications involve when

13  they were dealing with those agencies?

14  A   Pardon me?

15  Q   When you were dealing with those agencies on the

16  radio, what was the nature of these communications you had?

17  A   How the planning was going, whether there was a

18  problem, different topics.

19  Q   So they were involved in the operation also?

20  A   Yes.

21  Q   Now, how many persons where employed in these

22  operations, if you know?

23  A   Over 500.

24  Q   Where were they housed?

25  A   At hotels and on the ranches.

442

1   Q    Where were the hotels?

2   A    In Fresnillo, Zacatecas.

3   Q    Now, how much land was intended to be cultivated with

4   marijuana in these operations?

5   A    Over 4,000 hectares.

6   Q    That was the plan?

7   A    Yes.

8   Q    In actuality, how much was planted?

9   A    During my time, about 600 hectares.

10  Q    Do you know how many acres are in a hectare?

11  A    Pardon me?

12  Q    How many acres, if you know, are in a hectare?

13  A    Yes.

14  Q    How many?

15  A    Two-and-a-half.

16  Q    And was there any estimate as to how much marijuana

17  was going to be produced per hectare of land?

18  A    By hectare or by acre?

19  Q    Well, if you know, either one?

20  A    There was a possibility that in some areas you could

21  produce a ton per hectare, and in other areas you could

22  possibly get a ton from two hectares.

23  Q    How many workers were to be hired eventually?

24  A    Over 1,500.

25  Q    Now, when planting of these fields commenced, and the

443

1   workers were at the fields, where they allowed to leave?

2   A    Only the foreman.

3   Q    In the course of your work for Manuel Chavez, did you

4   learn whether these fields were protected from

5   interference?

6   A    Protected what?

7   Q    Were you involved in making any pay-offs to law

8   enforcement agencies in the area?

9   A    Yes.

10  Q    And how often where these payments made?

11  A    Every 20 days or a month.

12  Q    What agencies were paid?

13  A    The Federal Judicial, the Federal Security Agency, the

14  Judicial Police, and the Municipal Police.

15  Q    Who was the Comandante for the D.F.S. in that area?

16  A    There were two.

17  Q    Who where they?

18  A    Nunez Aparicio and Negro Guarma (phonetic).

19  Q    Did they receive payments, to your knowledge?

20  A    Yes.

21  Q    Who was the Comandante of the Mexican Federal Judicial

22  Police in that area?

23  A    Galo Gutierrez.

24  Q    Did he receive payments, as well, to your knowledge?

25  A    Yes.

444

1   Q    Do you know whether the military had any involvement

2  with these fields?

3   A    They said that there was such involvements.

4   Q    Did you ever see the military in the area?

5   A    Yes.

6   Q    And what where they doing?

7   A    They would just be patrolling the fields.

8   Q    Patrolling for what purpose, do you know?

9   A    Security.

10  Q    Now, why were all of these payments of money made to

11  these law enforcement agencies?

12  A    So the people who had nothing to do with the fields

13  would not come in, or to avoid other gangs from coming in.

14  Q    Did these agencies ever report to you that the D.E.A.

15  was in the area?

16  A    Yes.

17  Q    What were you told?

18  A    That the D.E.A. was around there, that we should be

19  careful.

20  Q    Now, in the course of your work at these fields, did

21  you ever become involved with a shipment of rifles?

22  A    Yes.

23  Q    Can you describe that incident?

24  A    Manuel Chavez arrived at the house, and some trucks

25  arrived and a Marquis automobile with crates of rifles.

445

1    Q    What kinds of rifles?

2    A    AK-47's.

3    Q    What was done with these rifles?

4    A    We took them to another of Manuel's houses.  And then

5    we went and delivered some others to -- some others to some

6    other people at a hotel.

7    Q    Who did you deliver them to?

8    A    The helpers from the Federal Security Agency.

9    Q    Now, when you say the "Federal Security Agency," do

10   you know the Direccion Federal De Seguridad?

11   A    Yes.

12   Q    Did you ever see D.F.S. agents assisting in this

13   operation?

14   A    Yes.

15   Q    What would they do?

16   A    They would escort us.  They would go with us to

17   wherever we were going.  They would make sure that nobody

18   interfered with our work.

19   Q    How about Mexican Federal Judicial Police, did they

20   also assist?

21   A    Yes.

22   Q    And what would they do to assist?

23   A    They would give us security.

24   Q    And State Police, did they do the same thing?

25   A    Yes, all of them.

446

1    Q    Now, do you know an individual named -- or have you

2    seen an individual named Rafael Caro-Quintero?

3    A    Yes.

4    Q    Did you see him in Fresnillo?

5    A    Yes.

6    Q    About how many times?

7    A    Two or three times.

8    Q    When was the first time?

9    A    In 1984, in February, around the beginning of

10   February.

11   Q    Can you describe that incident?

12   A    Yes.  He arrived at the Del Fresno Hotel in Fresnillo,

13   Zacatecas.  Manuel Chavez and I arrived.  They greeted each

14   other and hugged each other.  Then they went inside the

15   hotel.

16   Q    Was Caro accompanied by anybody at the time?

17   A    Yes.

18   Q    How many people?

19   A    There were quite a few.

20   Q    And what was their function, do you know?

21   A    They were Federals.

22   Q    When was the next time you saw Caro in Fresnillo?

23   A    It was about a month later.

24   Q    What happened?

25   A    He arrived at the La Fortuna Hotel with Commander

447

1   Nunez Aparicio, and left money with him and instructions.

2   Q     Instructions for what?

3   A     Regarding the plantings.

4   Q     Did you see Caro again?

5   A     Yes.

6   Q     When?

7   A     Around April or the beginning of May.

8   Q     What was the occasion?

9   A     He arrived there at Manuel Chavez' house.  Delivered

10  money to them.  They made plans regarding plantings, and

11  they had their meeting there.

12  Q     Do you know who else was present during that meeting?

13  A     The D.F.S., Galo Gutierrez, Negro Guarma, and several

14  other people.

15  Q     Did you report all of this information to

16  Agent Camarena?

17  A     Yes.

18  Q     And at some point during the investigation, did you

19  introduce Agent Camarena to Manuel Chavez?

20  A     Yes.

21  Q     And was Agent Camarena using a false name?

22  A     Yes.

23  Q     What was that false name?

24  A     Javier Quintero.

25  Q     What was the purpose in your introducing Agent

1   Camarena to Manuel Chavez?

2   A    To do business.

3   Q    When you say "do business," what do you mean by that?

4   A    Marijuana and heroin trade.

5   Q    And was a heroin transaction with Chavez eventually

6   completed?

7   A    Yes.

8   Q    Do you recall when that was?

9   A    Around April.

10  Q    Of 1984?

11  A    Yes.

12  Q    Was the heroin delivered to Agent Camarena or to

13  someone else?

14  A    To another agent.

15  Q    At some point, did Agent Camarena tell you that the

16  fields were going to be raided?

17  A    Yes.

18  Q    And was a plan entered into with him as to how you

19  were to pursue the investigation before the raid?

20  A    Yes.

21  Q    What was it you were supposed to do?

22  A    We were going to make a large order for marijuana, the

23  largest we could make, and try to do the same operation

24  with heroin.

25  Q    How much marijuana were you trying to acquire?

449

1    A    Ninety tons.

2    Q    And who was this marijuana to be purchased from?

3    A    From Manuel Chavez and Romero Morales.

4    Q    You were also to try to purchase some heroin?

5    A    Yes.

6    Q    Who from?

7    A    From Chombe Medina and Manuel Chavez.

8    Q    Now, in furtherance of this investigation, did you fly

9    to Zacatecas City?

10    A    Yes.

11    Q    Do you recall about when that was?

12    A    In May.

13    Q    Early part, late part, do you know?

14    A    Around the middle.

15    Q    And who did you meet with in Zacatecas City?

16    A    Romero Morales and Manuel Chavez.

17    Q    Where did you meet with them?

18    A    At the airport.

19    Q    Were there any other persons at the airport when you

20    met with them?

21    A    Yes.

22    Q    Who where these people?

23    A    They were the commanders from the Federal Judicial

24    Police and the D.F.S., and the State Judicial Police.

25    Q    Did you go to inspect some marijuana?

1    A    Yes.

2    Q    Where was that marijuana located?

3    A    At the edge of the town of the City of Zacatecas.

4    Q    At a ranch or some other location?

5    A    Yes.

6    Q    Was anyone else present at that ranch when you viewed

7    the marijuana?

8    A    Yes.

9    Q    Who where those other people?

10   A    The guards.

11   Q    Were these guards associates or affiliated with some

12   law enforcement agency, to your knowledge?

13   A    Possible.

14   Q    From there did you go to inspect an air strip?

15   A    Yes.

16   Q    And eventually did you meet with Agent Camarena again?

17   A    Yes.

18   Q    Did you and Agent Camarena talk with Manuel Chavez by

19   telephone?

20   A    Yes.

21   Q    And did you discuss with him buying some heroin?

22   A    Yes.

23   Q    Did you go into Mexico to meet with Manuel Chavez for

24   that purpose?

25   A    Yes.

451

1   Q     Was he to accompany you back into the United States to

2   deliver the heroin to Agent Camarena?

3   A     Yes.

4   Q     Was he able to do that?

5   A     No.

6   Q     Did he give the heroin to you?

7   A     Yes.

8   Q     Did you deliver it to Agent Camarena?

9   A     Yes.

10  Q     Did you ever see him, Agent Camarena, again?

11  A     No.

12        MR. CARLTON:  May I have just a moment, Your

13  Honor.

14              (Government counsel confer)

15        MR. CARLTON:  Nothing further, Your Honor.

16        THE COURT:  Do you wish to cross-examine the

17  witness?

18        MR. MEDVENE: I have no questions, Your Honor.

19        THE COURT:  Do you have any questions?

20        MR. RUBIN:  No questions, Your Honor.

21        THE COURT:  You may step down.

22              (Witness excused.)

23        THE COURT:  Call the next witness.

24        MR. CARLTON:  Your Honor, the government calls

25  Charles Lugo.

452

1              (Witness summoned to courtroom.)

2              THE CLERK:  Please raise your right hand.

3              CHARLES LUGO, PLAINTIFF'S WITNESS, SWORN

4              THE WITNESS:  I do.

5              THE CLERK:  Please be seated.

6              State your full name for the record and spell your

7    last name.

8              THE WITNESS:  Charles, initial "A", last name

9    Lugo, L-U-G-O.

10                       DIRECT EXAMINATION

11   BY MR. CARLTON:

12   Q    Mr. Lugo, are you presently employed?

13   A    Yes, sir.

14   Q    By whom?

15   A    The Drug Enforcement Administration.

16   Q    How long have you been employed by the D.E.A.?

17   A    Since 1972 with its predecessor agency.

18   Q    And in the course of your employment, were you ever

19   assigned to Mexico?

20   A    Yes, I was.

21   Q    During what period?

22   A    1977 to 1985.

23   Q    What assignments did you have down there?

24   A    Primarily I was in intelligence, and for the most part

25   I was the Intelligence supervisor for D.E.A. at the United

453

1    States Embassy in Mexico City.

2    Q    What was the objective in gathering intelligence down

3    in Mexico?

4    A    To obtain information regarding the trafficking of

5    narcotics between our borders and Mexico, and locate the

6    source of supply, crops, cultivation, and identify the

7    major violators.

8    Q    In the course of your work down there, did you

9    work closely with the Mexican government?

10   A    I did.

11   Q    With any particular agency?

12   A    Yes, sir.  The Mexican Federal Judicial Police.

13   Q    Now drawing your attention to August of 1984, what was

14   your assignment at that time?

15   A    I was assigned to manage and coordinate a project that

16   we had named Operation Vanguard.

17   Q    What was Operation Vanguard?

18   A    It was a program designed to verify the eradication

19   efforts of the Mexican government.

20   Q    The "eradication efforts" that you refer to, what are

21   those?

22   A    The destruction, eradication of marijuana and opium

23   poppy crops.

24   Q    Was this part of a program in conjunction with the

25   United States?

454

1   A      Yes, sir.  It was a bilateral operation between the

2   United States and Mexico.

3   Q      What was the organization of this eradication program

4   within Mexico?

5   A      Within -- with regards to D.E.A., I was the

6   supervisor.  I had 20 American agents, D.E.A. agents, and I

7   worked closely with the Inspector General's Office of

8   Mexico.

9   Q      And the purpose in your work was to verify the efforts

10  of the Mexican eradication program?

11  A      That is correct, sir.

12  Q      How was the Mexican eradication program organized?

13  A      That was -- worked under a department from the

14  Attorney General's Office.  Their purpose was to locate,

15  verify, identify, and destroy the crops under cultivation,

16  such as marijuana and opium fields.

17  Q      Who was in charge of that from the Mexican side?

18  A      Under the Attorney General's Office it would be the

19  Deputy Attorney General Luis Porte Petit, and the

20  department head in charge of this particular area was Sam

21  Lopez.

22  Q      And were you familiar with the resources available to

23  the Mexican eradication program?

24  A      Yes, sir.

25  Q      Generally, what were those?

1   A    The American eradication program had in the excess of

2   40 helicopters, and anywhere from 15 to 26 wing aircraft.

3   Q    So when the Mexico eradication program destroyed a

4   marijuana or poppy field, would they convey that

5   information to you and then you would attempt to verify it

6   with your Operation Vanguard resources?

7   A    Right, sir.

8   Q    When did Operation Vanguard come into being?

9   A    It kicked off in October of '84.

10  Q    And why was it created?

11  A    Because the information we were receiving from the

12  Mexican government regarding the destruction of crops did

13  not jive with the information and intelligence that we were

14  obtaining in regards to how many crops were being

15  destroyed.

16  Q    Did you encounter any problems in the organization of

17  Operation Vanguard?

18  A    Yes, I did.

19  Q    What where those problems, generally?

20  A    The manager of the Vanguard operation, the Mexico City

21  Manager, presented too many obstacles when we were trying

22  to get the program off the ground.

23  Q    What were those obstacles?

24  A    Mainly the principal one at the beginning was that

25  they did not have the sufficient manpower, that is, trained

456

1   pilots to conduct such an operation as we had.

2   Q    Did you know whether that was true or not?

3   A    That was incorrect.

4   Q    Did you convey that information to him?

5   A    I did.

6   Q    What happened then?

7   A    I informed him I had information regarding a list of

8   pilots, Mexican pilots, that were available to him and how

9   he could get in touch with them so that we could get this

10  operation off the ground.

11  Q    And eventually did it come into operation?

12  A    Well, he presented another obstacle at that particular

13  time?

14  Q    What was that?

15  A    Budget.  They did not have the resources financially

16  to finance the program and pilot training.

17  Q    Was that obstacle overcome?

18  A    Yes, sir.

19  Q    How?

20  A    I advised him that through the American Embassy down

21  there and the Narcotics Assistance Unit, that we would

22  provide the funds for him to train the pilots as soon as

23  they were identified.

24  Q    And then did Operation Vanguard get underway?

25  A    Yes, sir.

1  Q    All right.  Now --

2  A    I'm sorry, sir.  Not at that particular point either.

3  Q    Well, at what date did it come into effect?

4  A    It finally came to a date in October, and we had a

5  problem with the aircraft.

6  Q    In October of 1984, were you involved in an

7  investigation in the State of Chihuahua?

8  A    In October, sir?

9  Q    October 1984?

10  A    No, sir.

11  Q    Did you receive information at that point about

12  marijuana growing in the State of Chihuahua?

13  A    I did, sir.

14  Q    And where was this information obtained?

15  A    Three independent sources from informants that

16  provided us information to our two domestic offices and one

17  in Mexico.

18  Q    What was the nature of this information?

19  A    That there were large fields of marijuana under

20  cultivation in the State of Chihuahua, with the excess of

21  maybe eight to ten thousand workers cultivating fields.

22  Q    Did you attempt to corroborate this information?

23  A    I did, sir.

24  Q    What was done?

25  A    We dispatched a couple of D.E.A. agents stationed out

458

1    to Chihuahua City, Chihuahua, to make contact with the

2    Mexican authorities there and solicit their cooperation in

3    verifying the information.

4    Q    Was that assistance obtained?

5    A    No, sir.

6    Q    What did you do next?

7    A    When the agents informed me -- after the agents had

8    spent three days in Chihuahua without obtaining the

9    cooperation of the Mexican government, I was informed in

10   Mexico City of this particular obstacle, and I discussed it

11   with my immediate supervisors, and we decided to contact

12   the Mexican Federal Judicial Police to solicit their

13   cooperation.

14   Q    So did you, in fact, contact the M.F.J.P.?

15   A    I did, sir.

16   Q    Who?

17   A    In the M.F.J.P.?

18   Q    Yes.

19   A    The Director, Manuel Ibarra.

20   Q    Now, if you would please look, I believe, on the cart

21   next to you is an exhibit marked 108, or it may be in front

22   of you there.

23   A    108?

24   Q    Yes.

25   A    Yes, sir.

459

1    Q    Do you recognize that?

2    A    I do, sir.

3    Q    Who is that?

4    A    That is the Director of the Mexican Federal Judicial

5    Police, Manuel Ibarra, at that particular time when I was

6    stationed in Mexico.

7         MR. CARLTON:  Thank you.  Move its admission, Your

8    Honor.

9         THE COURT:  It may be admitted.

10         (Plaintiff's Exhibit 108 received.)

11   BY MR. CARLTON:

12   Q    When was it that you met with Manuel Ibarra?

13   A    It was on the night of November the 6th, 1984.

14   Q    Was anyone else with you?

15   A    Mr. Ed Heath, the special agent in charge of our

16   office in Mexico City, the Country Attache.

17   Q    What was the subject of your discussion with Manuel

18   Ibarra at that time?

19   A    To relay the information we had regarding the

20   intelligence of the fields in Chihuahua, the amount of

21   workers there, and the size of the fields, and to solicit

22   again cooperation in verifying this information, and the

23   eventual destruction of the fields.

24   Q    What was his response?

25   A    At first he was kind of astounded that we had this

460

1   type of information available.   Nevertheless, he agreed to

2   cooperate.

3   Q    Now, with his agreement, could you go raid the fields

4   or did you need someone else's permission to do that?

5   A    We would have to get somebody else's authority.

6   Q    Whose authority did you need to obtain?

7   A    The Attorney General's Office of Mexico.

8   Q    Did you seek to obtain that permission?

9   A    On the following morning we met with the Deputy

10  Attorney General of Mexico and the director of the

11  eradication program and four to five other subordinates.

12  Q    Who where they?   What where their names again?

13  A    The Deputy Attorney General is Luis Porte Petit, and

14  the director of the eradication program, Dr. Sam Lopez, and

15  four subordinates, which names I don't immediately recall

16  right now.

17  Q    Did you communicate to these individuals the

18  information you had about marijuana growing in the State of

19  Chihuahua?

20  A    I did, sir.

21  Q    Did you ask them to do something?

22  A    I did, sir.

23  Q    What?

24  A    To assist us in verifying this information and the

25  eventual destruction of the fields.

461

1    Q    Did they agree?

2    A    No, sir.

3    Q    Did they pose obstacles to doing this?

4    A    Yes, sir.

5    Q    What were those obstacles?

6    A    At the first point, they felt that we were

7    over-emphasizing our intelligence and somewhat exaggerating

8    the amount of people in the field, and consequently felt

9    that they should be given a little more time to verify the

10   information themselves, anywhere from seven to ten days,

11   that they would verify it and let us know.

12   Q    What was your response?

13   A    That our information seemed to be very concrete.  We

14   also had night witness account, and therefore, we felt that

15   we had to work immediately before there was a leak, and for

16   security purposes we should act immediately.

17   Q    Did they then agree to conduct these raids?

18   A    No, sir.

19   Q    What happened next?

20   A    They stated, in effect, their information was correct,

21   that they did not have the sufficient equipment, logistics

22   to conduct such an operation.

23   Q    What was your response?

24   A    The logistics that they were referring to were

25   helicopters and fixed aircraft and so on and so forth.  I

462

1    informed them that I was aware of where they could obtain

2    these helicopters and fixed wing aircraft.

3    Q    Did they verify that information?

4    A    They did, sir.

5    Q    Did they then agree to conduct these raids?

6    A    No, sir.

7    Q    What happened?

8    A    They told me that they did not have enough fuel for

9    the airplanes and the helicopters and the agents on the

10   ground to conduct this operation.

11   Q    Did you know that to be true?

12   A    That's incorrect, sir.

13   Q    Did you convey that information to them?

14   A    I did, sir.

15   Q    Did they verify your information?

16   A    They did.

17   Q    What happened at that point?

18   A    They located the fuel that was necessary for the

19   operation.

20   Q    Was an agreement then made to raid the fields?

21   A    No, sir.

22   Q    What happened?

23   A    Now they had manpower problems.

24   Q    How was that resolved?

25   A    For this particular effort, it would necessitate some

463

1   enforcement action of which the Attorney General's Office

2   was not capable of providing.  They were mostly

3   administrators of different programs, therefore, they would

4   need the manpower in the form of law enforcement personnel

5   to conduct a raid of such magnitude.

6   Q    And what manpower was available?

7   A    The Attorney General's Office at that particular time

8   they told me they had no manpower available.

9   Q    Did you know otherwise?

10  A    Yes, sir.

11  Q    And who was available?

12  A    The Mexican Federal Judicial Police.

13  Q    Was that made known to these individuals?

14  A    I informed them that maybe they should contact the

15  director of the Judicial Police to see if he would provide

16  the manpower.

17  Q    And did they do that?

18  A    Yes, sir.

19  Q    And the availability of the manpower was confirmed?

20  A    Yes, sir.

21  Q    Then was an agreement made to raid the fields?

22  A    It was an agreement to travel to Chihuahua City that

23  evening to discuss it and plan our strategy.

24  Q    In fact, did you go to Chihuahua City that evening?

25  A    I did, sir.

464

1    Q    Who did you go with?

2    A    I traveled with the -- one of the zone coordinators

3    for the eradication program, one M.F.J.P. Comandante, and

4    two other subordinates, that I don't recall, that we flew

5    to Chihuahua City, Mexico.

6    Q    Who was the M.F.J.P. Comandante?

7    A    We flew in a leer jet, and I don't recall who the

8    comandante was at this time.

9    Q    What was the plan for raiding these fields?

10   A    The plan was not put together until that evening after

11   I met with the comandante from the M.F.J.P. that was

12   dispatched there from another zone.

13   Q    I see.  Who was that?

14   A    Comandante Miguel Aldana.

15   Q    Now, had you known Miguel Aldana before this?

16   A    Yes, sir.

17   Q    When did you first meet him?

18   A    Approximately 1975.

19   Q    And you had worked with him during that period

20   afterwards?

21   A    Yes, sir.

22   Q    If you would look, please, at what has been marked as

23   Exhibit 109.  Do you recognize that?

24   A    I do, sir.

25   Q    Who is that?

465

1  A    Comandante Miguel Aldana.

2  Q    What was his position at the time; do you know?

3  A    He was a chief of Interpol for Mexico.

4  Q    That's a position within the M.F.J.P.?

5  A    Under the director of the M.F.J.P., yes, sir.

6  Q    When you got to Chihuahua City, what did you do?

7  A    I met with two of our D.E.A. agents there, and later

8  with another D.E.A. agent and our informant, and discussed

9  the nature of the information that he had provided.

10 Q    Did you have a meeting with Aldana at some point?

11 A    I did, sir.

12 Q    About what time?

13 A    Approximately 10:00 p.m. that night.

14 Q    And did you convey to him the information you had

15 about the marijuana fields?

16 A    I did.

17 Q    And at that point, was the plan to raid these fields

18 developed?

19 A    Right, sir.

20 Q    What was the plan?

21 A    We were in Chihuahua City at the time, and we checked

22 a map of the area and determined that the area in question

23 was a municipality called Bufalo, which was located

24 geographically in a triangular area, west and southwest,

25 from three towns on the main highway, and that that town

466

1  had mountains in the back, so we decided that we would

2  conduct a two-prong operation, by land and by air. Come in

3  from Ciudad Jimenez and in air from Hidalgo del Parral.

4  Q    Do you have in front of you Exhibit 110?

5  A    I do, sir.

6  Q    Could you hold that up, please.

7        What does that exhibit depict?

8  A    This is a map of the State of Chihuahua.

9  Q    Can you indicate on there, just by pointing, if you

10  would, where the City of Chihuahua is?

11  A    Right there, sir (indicating).

12  Q    And generally, can you indicate what area these fields

13  where supposed to be in?

14  A    I previously circled the area where the fields were

15  located.

16  Q    I see.  You can put it down now.  Thank you.

17        Did you solicit the assistance of the army in this

18  plan?

19  A    We did.

20  Q    Did you meet with a representative of the army?

21  A    Yes, sir.

22  Q    When did the meeting conclude?

23  A    It was shortly after midnight on that particular day,

24  which would be the night of the 7th.  It would be early

25  morning of the 8th, shortly after midnight.

467

Q      So one prong of this raid was to depart from Hidalgo

Del Parral?

A      That would be the aircrafts.

Q      And the other prong was to depart from Ciudad Jimenez?

A      That is correct.

Q      And what contingent was to leave from that area?

A      We had the army with some representatives from the

Mexican Federal Judicial Police staging in Ciudad Jimenez

to conduct their land operation.  We staged at Airport

Hildalgo Del Parral with his own coordinators from the

Attorney General's Office to conduct the overflights.

Q      When did you arrive at Hildalgo Del Parral?

A      Approximately 8:00, 8:30 the morning of the 8th.

Q      Did you meet there with Comandante Aldana and the

representative of the Attorney General's Office?

A      I traveled with Comandante Aldana from Chihuahua City

to Hildalgo Del Parral, and consequently met with the

representatives of the Attorney General's Office.

Q      What were you to do when you got there?

A      We were to advise them of our plan and our strategy,

and then conduct a three helicopter overflight to verify

the existence of the fields and confirm our information,

and then direct the land troops into those particular

areas, and then with the other helicopters provide manpower

support.

468

Q    Now, were you to depart in these helicopters as soon as possible?

A    Yes, sir.

Q    Were you able to do that?

A    No, sir.

Q    Why not?

A    Again, I was met with several obstacles from both the Comandante Aldana and the other zone coordinator.

Q    What were these obstacles?

A    We were actually on the field getting ready to take off, and they would go back and tell me that they had to make a phone call to Mexico City to talk to their supervisor, and they'd come back and tell me they couldn't get ahold of the supervisor, then the other would go back and say, "Well, I've got to get more orders from my supervisor."

     So this went on essentially in that respect for approximately two hours, where they just kept delaying that they did not have the proper details as to how to further the operation.

Q    Did you get angry with them?

A    I was upset, yes.

Q    What did you decide to do, ultimately?

A    I told them that I was very concerned about the D.E.A. agents that had been on the ground, and consequently, if

469

1    anything, for security purposes, that I was going to take

2    off in the helicopter, and we decided that I would fly one

3    helicopter, the zone coordinator would fly another

4    helicopter, and the comandante would fly another

5    helicopter.  Since they would not take off, I told them

6    that I was going to take off in mine because I was

7    concerned.

8    Q    And is that what happened?

9    A    The comandante then decided that he would leave one of

10   his subordinates to obtain information from Mexico City,

11   that he would fly with me, or rather in his helicopter.

12   Q    That's Aldana?

13   A    Yes.

14   Q    Did the representative of the Attorney General's

15   Office fly also?

16   A    No, sir.

17   Q    Now, before leaving in the helicopter, did you ask

18   your pilot how much fuel you had?

19   A    I did, sir.

20   Q    What did he tell you?

21   A    He says in excess of three hours, maybe

22   three-and-a-half hours.

23   Q    When you got into the air, did you see any marijuana

24   fields?

25   A    Yes, I did.

1    Q    About how much time passed?

2    A    Fifteen, twenty minutes when I was in the air.

3    Q    What was it you saw?

4    A    I saw a large, green, oasis-type looking field in the

5    desert, that with my experience in Mexico, this type of

6    work, I determined it to be marijuana fields.

7    Q    Did you have an estimate for the size of this field?

8    A    Anywhere 80 to 100 hectares.

9    Q    Now, did you communicate with Comandante Aldana at or

10   about this time?

11   A    Previously to that, Comandante Aldana had radioed to

12   me in his helicopter that he had located a similar field,

13   and had requested that I join him in landing.

14        Simultaneously to this broadcast is when I located

15   my field and informed him that I was going to land over in

16   my area, and consequently, I did land over.

17   Q    Now, when you landed, what did you see?

18   A    I saw evidence of several workers that obviously had

19   vacated the area.  We located approximately 15 to 20

20   workers, peasants, that were still in the area.  We found

21   long, maybe 100 yard long barrack-type structures with

22   corrugated roofs, with kitchen areas, food supplies:  Eggs,

23   potatoes, bread, and storage areas where they had manicured

24   marijuana, piled up in piles.  We saw some irrigation.  We

25   saw some diesel powered motors for irrigation.  Some man-

471

1    made wells, et cetera.

2    Q     Did you meet with Comandante Aldana again?

3    A     Yes, we did.  He came over to where I was.

4    Q     And what was the subject of your discussion at that

5    point?

6    A     He congratulated me, and the D.E.A. in particular, for

7    providing this information of such magnitude.  The fields

8    where the largest he had ever seen.  There were definitely

9    larger than I had ever seen.  He was very well satisfied

10   that our objective had been met, and, therefore, we should

11   report this information to the proper authorities on his

12   side, and, of course, on my side, and, therefore, advise

13   them that our objective had been met.

14   Q     Did you agree with that?

15   A     No, sir.

16   Q     Did you tell him so?

17   A     Yes, sir.

18   Q     What did you do next?

19   A     I told him that I was not convinced that this was all

20   the marijuana fields that had been -- that we had been told

21   about, and, therefore, we should continue with the

22   operation to see if we could locate some more, that I had

23   heard that there were larger ones.

24   Q     And did he agree then to go back up with you and look

25   for more fields?

472

1   A    No.  He felt that maybe we should go back and stage

2   again and make some phone calls back to Mexico City so he

3   could report to his supervisors and I could report to my

4   supervisors.

5   Q    Did you agree with that?

6   A    No, I didn't.

7   Q    What was done?

8   A    I advised him that we had to continue with the

9   operation, and he felt that it was concluded.

10  Q    Well, did you go back up in the helicopters?

11  A    After much deliberation, I told him that if, in fact,

12  we were to return to Mexico City and report our findings,

13  that I would be summoned to the Ambassador's Office, and I

14  would have to report to the Ambassador of the United States

15  that our mission and our objective had not been met.

16  Q    What was his response?

17  A    He felt that we could then, maybe, do some more

18  overflights to see if we could locate any more.

19  Q    Did he speak with his pilot?

20  A    Did I speak with his pilot?

21  Q    No.  Did he speak with his pilot?

22  A    Yes, he did.

23  Q    And what did he tell you after having that

24  conversation?

25  A    Well, I had already got in my helicopter to take off,

473

1    and he got in his, and then he waved me down and we both

2    came out and met, and he informed me that his pilot had

3    said that he did not have enough fuel and had to return

4    back to base.

5    Q    What did you do?

6    A    I told him to join me in my helicopter.

7    Q    Did he agree to do that?

8    A    He asked the pilot in my helicopter if he had any

9    fuel, and my pilot said he had no more fuel, either.

10   Q    Now, did you know that to be true or untrue?

11   A    That was incorrect.

12   Q    What happened then?

13   A    I informed Comandante Aldana that I had already

14   previously spoke with the pilot before I left the base, and

15   he had told me that he had anywhere from three to

16   three-and-a-half hours of flying time, and we had only

17   flown like 15 to 20 minutes, so we still had a lot of fuel

18   left.

19   Q    So did you go up in the helicopter at that point?

20   A    We did.

21   Q    Did Comandante Aldana fly with you?

22   A    Yes, he did.

23   Q    Did you find another field?

24   A    Yes, sir.

25   Q    How did this field compare to the first one that you

474

1    saw?

2    A    It was twice the size of the original one that I had

3    located, maybe 200 hectares.

4    Q    Did you land at this field?

5    A    Eventually, yes.

6    Q    What did you find there?

7    A    Very similar structures as to the first field that we

8    located.  That is, the large wooden barrack-type buildings,

9    corrugated roofs, marijuana drying on the roof tops,

10   kitchen area, infirmary, doctor's area; if I may, a

11   prostitute area, headquarters, and again, manicured

12   marijuana, fields that were irrigated, marijuana fields

13   being irrigated, several workers.

14   Q    When you say "several," what do you mean?

15   A    I would say at this particular time close to a

16   thousand.  And in the infirmary, we found some people that

17   were being held captive in the infirmary, sick people that

18   could not work were being held captive.  They were bound

19   and tied down.

20   Q    Now, if you would, please, I believe in front of you

21   are exhibits marked 111-A through I.  Can you look at

22   those.

23   A    Yes, sir.

24   Q    Do you recognize those?

25   A    I do, sir.

475

1    Q    And generally, what do they depict?

2    A    The first few depict the area from an overflight which

3    show all the barracks that I just mentioned.  It shows the

4    marijuana being dried out on top of the roofs and on the

5    sides, and some of the workers milling around.

6         The other one, 11-G, shows some of the utensils

7    that were used in the camp, such as the green plates, the

8    white cups with the black border, the boxes that were used

9    to compress the marijuana and store it in, and some

10   cellophane bags.

11   Q    All right.  Now, where these all of the fields that

12   you found on that date, that is November 8th, I believe?

13   A    After we located this particular one, the large one,

14   we flew again and located approximately four more of

15   smaller size within a few minutes from that area.

16   Q    And then did you conclude your operations for the day?

17   A    Yes, we did.

18   Q    Did you fly again on the following day, November 9th?

19   A    Yes, sir.

20   Q    And were you involved in destroying the marijuana that

21   was found at these camps?

22   A    Yes, I was, sir.

23   Q    How did that occur?

24   A    Again, I suggested that before I return to Mexico City

25   to brief the Ambassador, that I would have to go back with

1    information that this field had been destroyed.  I met with

2    obstacles.   The Attorney General's Office now had several

3    representatives up there, and they said that they would

4    take care of the business of destroying it.

5    Q    What was your response?

6    A    I told them that I could not return to Mexico City

7    without knowledge of the destruction of this marijuana so

8    that I could report to the Ambassador.

9    Q    And did they agree?

10   A    They felt that they did not have the means to destroy

11   such a large amount of marijuana and the barracks and so on

12   and so forth.

13   Q    What was your response to that?

14   A    I told them to destroy it the same way we use to

15   destroy it all the time.

16   Q    What was that?

17   A    That is by going to the helicopters, getting some fuel

18   from the helicopters, spreading the fuel, and just lighting

19   it.

20   Q    Was that done?

21   A    Yes, sir.

22   Q    Now, do you know whether any of these operations were

23   videotaped during the period that you were involved?

24   A    Yes, sir.

25   Q    Would you please look at Exhibit 112.

1   A    Yes, sir.

2   Q    Do you recognize that?

3   A    Yes, sir.

4   Q    What is it?

5   A    That is a particular tape that contains excerpts from

6   the original tape that was taken by the Mexican government

7   of the area and the fields.

8   Q    Generally, what do these excerpts depict?

9   A    Essentially, what is in this photograph here, shows

10  the area itself, shows the marijuana growing, shows the

11  marijuana under cultivation, shows the manicured marijuana,

12  shows the trucks that were in the area, shows the

13  structures that were in the area, and some of the people

14  that where employed in that particular area for the

15  cultivation and manicuring.

16  Q    Does it also show the destruction of the marijuana?

17  A    And eventually it shows the destruction of the

18  marijuana, which is also depicted in 11-H and 11-I.  It

19  shows the burning of the buildings and destruction of the

20  property.

21       MR. CARLTON:  Your Honor, at this time, I would

22  move the admission of all of the exhibits that Agent Lugo

23  has discussed, including Exhibit 112, the videotape.

24       THE COURT:  It maybe be admitted.

25       (Plaintiff's Exhibits 111-A through 111-I

1          and Exhibit 112, received.)

2          MR. CARLTON:  And I would ask for permission to

3    play the videotape for the jury.  It's about three or four

4    minutes long.

5          THE COURT:  Go ahead.

6               (Videotape played for the jury.)

7    BY MR. CARLTON:

8    Q    Now, Agent Lugo, the videotape showed many people

9    carrying what appeared to be Christmas trees.  Were those

10   the marijuana plants?

11   A    Yes, sir.

12   Q    How long did this eradication effort continue?

13   A    Approximately ten days.

14   Q    And were other fields besides the ones that you've

15   just described destroyed during this period?

16   A    Yes, there were others located and destroyed.

17   Q    Do you know in total how much marijuana was destroyed

18   in the course of this operation?

19   A    Cumulative, all the fields in question, totaled

20   approximately 10,000 metric tons.

21   Q    Now, in your position as chief of intelligence in

22   Mexico, were you familiar with the price of marijuana at

23   the time?

24   A    Yes, sir.

25   Q    And what was that price?

479

1    A    Wholesale in Mexico, $250 a kilogram.

2    Q    And in the United States, do you know?

3    A    Five hundred dollars a kilogram on the street.

4    Q    So did you come to some estimate as to what the

5    possible or probable value of the destroyed marijuana was?

6    A    Yes, sir.

7    Q    What was that?

8    A    Based on the street value in the U.S. wholesale,

9    approximately $5 billion.

10   Q    And two-and-a-half billion in Mexico?

11   A    Right, sir.

12   Q    In the course of your efforts in this investigation,

13   did you have any conversations with any of the workers at

14   the scene?

15   A    I did.

16   Q    Did they ask you any questions?

17   A    Yes, sir.

18   Q    And did any of these questions strike you as unusual,

19   did they stick in your mind?

20   A    Yes, sir.

21   Q    What were they?

22   A    In particular, they were somewhat amazed and surprised

23   that we had conducted this raid, because they had observed

24   the helicopters that we had flown in to be the same

25   helicopters that had been used on almost an everyday

1   purpose to come to this camp to bring supplies and

2   representatives from, I guess, the Cartels, to inspect the

3   ground and so forth; and they felt that, why were we using

4   the same helicopters that the other people were using and

5   then conduct a raid.

6           MR. CARLTON:   Your Honor, this might be an

7   appropriate time to take the morning break.

8           THE COURT:   We'll take our morning recess at this

9   time.

10          THE CLERK:   Please rise.   This Court now stands in

11  recess.

12                          (Recess had.)

13                          (Jury in.)

14          THE COURT:   You may continue.

15                  DIRECT EXAMINATION (Continued)

16  BY MR. CARLTON:

17  Q    Agent Lugo, how did you learn of the abduction of

18  Enrique Camarena?

19  A    From my supervisor in Mexico City, Mr. Ed Heath.

20  Q    When did you learn that?   When did you first receive

21  that news?

22  A    I don't recall the exact date, but it was the Friday

23  morning after the Thursday abduction.

24  Q    And did you meet with Manuel Ibarra in relation to the

25  abduction?

481

1    A    I did, sir.

2    Q    Who else was with you?

3    A    Mr. Ed Heath.

4    Q    When did you go meet with him?

5    A    On that Friday morning.  When I learned of the

6    abduction, we traveled to Director Ibarra's office at

7    approximately 11:30 that morning.

8    Q    And what was discussed at that meeting?

9    A    We talked to Director Ibarra regarding our information

10   and our suspicions that Kiki Camarena was missing, and

11   solicited his cooperation in starting an investigation.

12   Q    What was his response?

13   A    He appeared somewhat solemn, in my opinion, as if he

14   was aware, and he informed us that he had no people or no

15   agents in Guadalajara at that particular time that could

16   assist us.

17   Q    And how did you and Mr. Heath respond to that?

18   A    Mr. Heath became very angry over the fact that he had

19   no agents in Guadalajara, because in our experience and

20   Mr. Heath's experience, there had always been agents,

21   especially in that particular office, available to us at

22   any particular time or moment, or we can locate them for

23   whatever purpose we deemed; but at that particular time he

24   told us that there were no agents available whatsoever, and

25   wouldn't be any there for a couple of days.

482

1   Q      Did he eventually agree to provide some agents from

2   elsewhere?

3   A      Yes, sir.

4   Q      From where, do you know?

5   A      In his office, he directed his executive secretary to

6   bring in one of the comandantes stationed there in Mexico

7   City, who did come in, and the director instructed him to

8   get a contingent of Mexican agents and travel to

9   Guadalajara immediately and meet with our agent in

10  Guadalajara.

11  Q      Do you know the name of that comandante?

12  A      Yes, sir.  I believe his name was Brusolo.  Something

13  like that, I recall.

14  Q      About what time of the day was it that Ibarra ordered

15  this comandante to depart for Guadalajara?

16  A      Would have been around noontime, a little bit after

17  12:00.

18  Q      Did you and Mr. Heath then return to the embassy?

19  A      Yes, sir.

20  Q      Now, at this point, did you know who was going to be

21  in charge of the Mexican end of the investigation?

22  A      No, sir, not that particular time.

23  Q      Did you have someone in mind?

24  A      I personally had somebody that I recommended.

25  Q      Who was that?

1    A    Premier Comandante Florentino Ventura.

2    Q    Why was it you recommended Comandante Ventura?

3    A    In my experience in Mexico City, I had worked several

4    bilateral operations, Mexican and U.S. Government, third

5    country national, and so forth, and I was very impressed

6    with investigative methods and conclusions, mostly

7    successful in operations, and I felt that he was the most

8    qualified.

9    Q    Was that recommendation accepted?

10   A    No, sir.   I did not recommend him to anyone in

11   particular.   I personally spoke to him on the telephone.

12   Q    And did you communicate your feelings to him?

13   A    Yes, I did, sir.

14   Q    What was his response?

15   A    He felt that I would jeopardize his position within

16   his system or organization if we were to recommend him.   At

17   this particular time he was kind of, as they say in Mexico,

18   he was frozen, so he had no real duties at that particular

19   time.   And consequently if the U.S. Government were to

20   approach his supervisor, he said it would jeopardize his

21   position within the government.

22   Q    Who eventually was appointed to head up the

23   investigation from the standpoint of the M.F.J.P.?

24   A    At that particular time, Comandante Ventura informed

25   me that Comandante Pavon would be in charge of the

484

1   investigation.

2   Q    Now, did you know this individual Pavon?

3   A    Yes, sir.

4   Q    When had you first met him?

5   A    Approximately 1978.

6   Q    And had you worked with him in the intervening years?

7   A    Not directly with him.  He was assigned to some

8   details in which I was involved in with the Mexican

9   government.  He was a -- he was just a rookie, so to speak,

10  when I met him.

11  Q    And did you have an opinion as to his competence as an

12  investigator?

13  A    Yes, sir.

14  Q    What was that opinion?

15  A    I felt he was not qualified to conduct this type of

16  investigation.

17  Q    Now, eventually did you fly to Guadalajara in relation

18  to the Camarena investigation?

19  A    I did, sir.

20  Q    Do you recall when that was?

21  A    It was the evening of that particular Friday -- I'm

22  sorry, it was not the evening of that Friday.  It was

23  approximately 4:00 o'clock on the following morning.

24  Q    And when you got to the airport, it was the airport in

25  Mexico City, I believe, who did you see there?

485

1    A    Yes.  It was approximately 4:00 o'clock in the

2    morning, and the people that I ran into at the airport were

3    the two comandantes and their contingent of men that had

4    been assigned in my presence by Ibarra to travel to

5    Guadalajara.

6         On that afternoon at 12:00 noon, they were

7    instructed to go to Guadalajara immediately; and that

8    evening and morning after 4:00 o'clock in the morning when

9    I arrived at the airport, I ran into them.

10   Q    Did you have some discussion with them as to --

11   A    I did.

12   Q    -- why they were delayed?

13   A    Yes, sir.

14   Q    Why was that?

15   A    The first excuse that they gave me was that there were

16   no flights available to them to go to Guadalajara.  I

17   informed them that I was well aware of the airline

18   schedules down there, that there is a plane going to

19   Guadalajara approximately every hour; and then they

20   informed me -- well, maybe there is, but I'm talking about

21   occupancy, there was no seats available."

22        And I says, in my experience, I says, "You could

23   have taken the Attorney General's jet or you could have

24   commanded a plane.  You've done it before in my presence."

25        They said, "Well, we tried to pay, but on that

486

1   particular day, it was payday, and the airlines would not

2   accept our paychecks."

3   Q    What was your response to that?

4   A    I told them, I says, "In my experience with you people

5   down here, you are never delayed if you really want to go

6   somewhere."

7   Q    Now, when you arrived in Guadalajara, what did you do?

8   A    I checked in my hotel real quick, and I went to the

9   Mexican Federal Judicial Police Office.

10  Q    Let me ask you, how long does it take to fly from

11  Mexico City to Guadalajara?

12  A    Approximately an hour.

13  Q    So you went to the M.F.J.P. Office in Guadalajara?

14  A    Yes, sir.

15  Q    What did you do there?

16  A    I met with one of the representatives of the M.F.J.P.

17  that was there at the office, and identified myself, and

18  requested the presence of Comandante Pavon.

19  Q    What were you told?

20       MR. BLANCARTE:  Your Honor, objection as to each

21  and every detail.

22       THE COURT:  Yes, I agree.  The objection is

23  sustained.

24       Let's get on to the point.

25  BY MR. CARLTON:

487

1    Q    Did you meet with Comandante Pavon?

2    A    Yes, I did.

3    Q    And did you ask him to do something?

4    A    Yes, sir.

5    Q    What did you ask him to do?

6    A    To initiate an investigation into the absence of Kiki

7    Camarena.

8    Q    Did you have some particular locations you wanted

9    investigated?

10   A    Yes.  We had several locations that we felt were

11   suspicious that could be investigated.

12   Q    Did you provide those locations to him?

13   A    Not at that particular time.

14   Q    What was his response when you asked him to search the

15   various locations?

16   A    He informed me that he would have to get the

17   authorization from his supervisor, Ibarra, in Mexico City,

18   at which time I informed him that I was already aware that

19   he had this information because I had already met with

20   Ibarra that morning, and Ibarra had told us that he would

21   be instructing his people to conduct this investigation.

22   Q    Did he say anything else about his ability to search

23   these locations?

24   A    Yes, sir.  He said that we would have to provide the

25   information and he would have to check with Mexico City,

488

1    get authorization, and obtain search warrants.

2    Q    Now, in the time period that you worked in Mexico, had

3    you ever known the M.F.J.P. to obtain search warrants

4    before searching a location?

5    A    In the 12-plus years that I worked with them, they had

6    never, ever, ever obtained a search warrant.

7    Q    Is the name Nazar Haro familiar to you?

8    A    Yes, sir.

9    Q    Who was that?

10   A    He was the director of the Felicon Federal De

11   Seguridad.

12   Q    During what period?  Was he the director in 1982?

13   A    I was not stationed there at that particular time, but

14   it seems to me like he was at that particular time the

15   director.

16   Q    And, say, 1978; do you know?

17   A    Previous to '82, yes, sir.

18        MR. CARLTON:  Nothing further, Your Honor.

19        THE COURT:  Did you wish to cross-examine the

20   witness?

21        MR. MEDVENE:  Just a question or two, Your Honor.

22                       CROSS-EXAMINATION

23   BY MR. MEDVENE:

24   Q    Did you conduct certain searches in Guadalajara?

25   A    I personally didn't.

489

1   Q     Were certain searches conducted in Guadalajara, to

2   your knowledge?

3   A     To the best of my knowledge, yes, sir.

4   Q     And searches of where?

5   A     Houses, premises --

6             MR. CARLTON:  Objection; lack of foundation, Your

7   Honor.

8             THE COURT:  Overruled.

9             THE WITNESS:  Residences, vehicles, curtilages,

10  premises.

11  BY MR. MEDVENE:

12  Q     Of known narcotic traffickers?

13  A     Yes, sir.

14  Q     No reference was found to the name Ruben Zuno in any

15  of the searches; isn't that correct?

16            MR. CARLTON:  Objection; lack of foundation.

17  Speculation.

18            THE COURT:  Sustained.

19  BY MR. MEDVENE:

20  Q     Were telephone records, telephone books, obtained in

21  some of the searches, to your knowledge?

22  A     I was not present, sir.

23  Q     Did you review what was obtained in the searches?

24  A     No, sir.

25  Q     In the course of your investigation, did you ascertain

490

1    whether in the course of the searches there was no

2    reference to Ruben Zuno's name in anything that was found?

3             MR. CARLTON:  Objection, lack of foundation,

4    speculation.

5             THE COURT:  Sustained.

6             MR. MEDVENE:  I have nothing further.  Thank you

7    very much.

8             MR. RUBIN:  Very briefly, Your Honor.

9                       CROSS-EXAMINATION

10   BY MR. RUBIN:

11   Q    Agent Lugo, concerning all of the drug eradication

12   efforts that you described, and which were in the film and

13   so forth, it's true, is it not, that you don't have any

14   information that Dr. Alvarez-Machain was involved in any of

15   those drugs operations; isn't that right?

16   A    In regards to the eradication?

17   Q    Yes.

18   A    No, sir.

19   Q    My statement was correct; is that right?

20   A    It's true, sir.

21   Q    And you indicated that you did recommend a premier

22   comandante that you wanted to be involved in the

23   investigation of the disappearance of Camarena; is that

24   right?

25   A    The D.E.A. --

491

1          THE COURT:  Counsel, don't ask him what he has

2     testified to.  If you have a question to ask him about his

3     testimony, ask him.

4     BY MR. RUBIN:

5     Q     This premier comandante you believed was honest and

6     was not corrupt; is that correct?

7     A     Which one, sir?

8     Q     Mr. Florentino Ventura?

9     A     He was tainted.

10    Q     Okay.  Did you recommend him?

11    A     Yes, sir.

12          MR. RUBIN:  Nothing further.

13          THE COURT:  Are you just curious about these

14    things, Counsel?

15          MR. RUBIN:  No.  Your Honor, there is a reason for

16    it.

17          THE COURT:  Please step down.

18                    (Witness excused.)

19          THE COURT:  Call the next witness.

20          MR. CARLTON:  Your Honor, the government calls

21    Antonio Celaya.

22                (Witness summoned to courtroom.)

23          THE CLERK:  Please raise your right hand.

24    ANTONIO CELAYA, PLAINTIFF'S WITNESS, SWORN

25          THE WITNESS:  I do.

492

1          THE CLERK:  Please be seated.

2          State your full name for the record and spell your

3    last name.

4          THE WITNESS:  Antonio A. Celaya.  Spelling of the

5    last name, C-E-L-A-Y-A.

6                        DIRECT EXAMINATION

7    BY MR. CARLTON:

8    Q    Mr. Celaya, are you presently retired?

9    A    Yes, sir, I am.

10   Q    Did you work for the D.E.A. at some point?

11   A    Yes, sir.

12   Q    During what period?

13   A    I was with Narcotic Enforcement from 1963 until 1985.

14   Q    What was your assignment in November of 1984?

15   A    I was in the Eradication Program working out of

16   Northern Mexico.

17   Q    And at some point during November of 1984, were you

18   ordered to Chihuahua City?

19   A    Yes, sir, I was.

20   Q    And did you travel with anyone else?

21   A    Yes, I did.

22   Q    What was your purpose in going there?

23   A    I was given instructions to go from Nogales, Sonora to

24   Chihuahua, with the aircraft, that is two helicopters and a

25   fixed wing aircraft, and the crews, to Chihuahua to assist

493

1    in an operation.

2    Q    Who was your supervisor at the time?

3    A    Edward Heath was the regional director for Mexico, and

4    Charlie Lugo was the manager of the program I was working

5    on.

6    Q    Did you participate in eradicating any marijuana

7    fields in the Chihuahua area when you arrived there?

8    A    Yes, sir.

9    Q    And on what date did you begin your involvement in

10   this operation?

11   A    I received a phone call on November 8th, the evening

12   hours.  I proceeded to Chihuahua on November 9th, and was

13   briefed that evening, and started working on the 9th in

14   Chihuahua.

15   Q    Now, did you direct your aircraft to fly to any

16   particular location?

17   A    Yes, sir, I did.

18   Q    Where?

19   A    I instructed the helicopter pilots and the fixed wing

20   aircraft to fly east and north of Chihuahua City.

21   Q    Now was this in a different direction than fields that

22   had previously been located in this operation?

23   A    Yes, sir.

24   Q    Why did you direct your aircraft in these other

25   directions?

494

1    A    After my briefing in Chihuahua on November 9th, that

2    evening, I was told that they had -- the operation had been

3    at Bufalo, which would have been south of Chihuahua City.

4    That there were large -- many people, men, who had been at

5    those camps.  I was given descriptions, equipment they

6    carried, such as blankets, cups, things.

7         So I went out on the street after the briefing and

8    started talking to campesinos, to the people I saw.  I saw

9    hundreds of men carrying gray blankets and brown blankets,

10   and cups that fit the descriptions that I received from the

11   briefing.

12        I went out and talked to any of those that would

13   talk to me.  I kept getting the information that they did

14   not come from the south, they had come from the east and to

15   the north.

16   Q    So you dispatched your aircraft to look in that area?

17   A    Yes, sir.

18   Q    Did these aircraft find any fields?

19   A    On November 10th, they found fields and two camps.

20   Q    And did you eventually fly to any of these fields?

21   A    Yes, sir, I did.

22   Q    When?

23   A    On the 11th, I -- on November 11th, I went in one of

24   the helicopters.  I flew to the Chinecueta Mountains where

25   I found two camps, and also observed several large fields

495

1    of marijuana.

2    Q    Did you see any people in the area?

3    A    Yes, sir, I did.

4    Q    What did you do?

5    A    As we were flying to the camps, approximately 55 miles

6    northeast of Chihuahua City, over a mesa out in the middle

7    of the desert, I observed thousands of men on this mesa,

8    and I ordered the helicopter to land.

9         When I got out, these people were telling me they

10   had been in the marijuana camps, they had been slave labor,

11   they had been there for a long period of time, and they

12   were claiming to be dying of thirst and hunger, and that

13   they were trying to get out.

14   Q    Did you ever determine how many of these people there

15   were?

16   A    Yes, sir.

17   Q    How many?

18   A    5,857 that I managed to get a count on.

19   Q    Did you eventually visit a camp?

20   A    Yes, sir, I did.

21   Q    And did you go with any representatives of the

22   M.F.J.P.?

23   A    Yes, sir.

24   Q    Who was that?

25   A    There was a comandante, his commanding officer of the

496

1  M.F.J.P., and two or three of his agents, plus my

2  helicopter pilot.

3  Q    And at this camp, what did you see there?

4  A    The camp was built in a bowl, a geographic bowl.  You

5  couldn't see it from the ground, but from the air you could

6  make out 12 or 13 large framed, wooden framed buildings,

7  with black tarp and yellow tarps over them.  There was

8  marijuana drying on the hillsides and along the road.

9  Marijuana being in various stages of processing, in piles,

10 throughout the camp.  I found generators.  I found all

11 types of equipment.  I found food for thousands of people

12 or for men, and I found a few people still left in Camp

13 Number 1 where I landed.

14 Q    Was there another camp that you also visited?

15 A    There was a second camp about 10 kilometers due north

16 that I did not land at, but I overflew.

17 Q    And was any marijuana destroyed at these two camps?

18 A    Yes, sir.

19 Q    Was this marijuana in addition to the marijuana that

20 had been destroyed prior to your arrival in Chihuahua?

21 A    Yes, sir.

22 Q    How long did you remain involved in this operation?

23 A    About five more days until it was totally destroyed,

24 then I went back, overflew the areas to verify that the

25 camps had been destroyed and the fields had also been

497

1   destroyed.

2   Q     From the workers that you interviewed, did you learn

3   who some of the owners of these camps were?

4   A     Yes, sir.  They claimed it was Caro-Quintero and his

5   organization.

6              MR. CARLTON:  Nothing further, Your Honor.

7              THE COURT:  Any questions?

8              MR. MEDVENE:  No questions, Your Honor.

9              MR. RUBIN:  No questions.

10             THE COURT:  You may step down.

11             THE WITNESS:  Thank you.

12                     (Witness excused.)

13             THE COURT:  Call the next witness.

14             MR. CARLTON:  Your Honor, at this time the

15  government calls Frank Retamoza to the stand.

16                (Witness summoned to courtroom.)

17             THE CLERK:  Please raise your right hand.

18          FRANK RETAMOZA, PLAINTIFF'S WITNESS, SWORN

19             THE WITNESS:  I do.

20             THE CLERK:  Please be seated.

21             State your full name for the record and spell your

22  last name.

23             THE COURT:  State your full name and spell your

24  last name.  Do you speak English?

25             THE WITNESS:  Yes, I do, sir.

498

1   My name is Frank Retamoza.   My last name is

2   spelled R-E-T-A-M-O-Z-A.

                            DIRECT EXAMINATION

4   BY MR. MEDRANO:

5   Q      How old are you, Mr. Retamoza?

6   A      Thirty-eight.

7   Q      Married?

8   A      Yes, I am.

9   Q      Children?

10  A      Yes.

11  Q      Where were you born?

12  A      I was born in California.

13  Q      At any time in your life have you resided in the

14  Republic of Mexico?

15  A      Yes.

16  Q      When was that, briefly?

17  A      Since I was three, up until I was 19 years old.

18  Q      After that, what happened?

19  A      I came back to the States.

20  Q      What part of the United States?

21  A      I came to California, the County of Los Angeles, and

22  the suburb of San Pedro.

23  Q      How old were you when you came to the United States?

24  A      Around 19 years old.

25  Q      You speak Spanish as well, sir?

499

1    A    Yes, sir.

2    Q    Are you bilingual in English and Spanish?

3    A    Yes, sir.

4    Q    And very briefly, since 1973, what have you been

5    employed by or as?

6    A    I have been a machinist ever since I came here.

7         MR. MEDRANO:  Your Honor, is it just me or am I

8    having trouble hearing the witness?

9         THE COURT:  Well, the witness is speaking softly,

10   but let's just move this a little bit to the side here, but

11   don't speak directly into it.

12        THE WITNESS:  Okay.

13        MR. MEDRANO:  Thank you, Your Honor.

14   BY MR. MEDRANO:

15   Q    Let me direct your attention to 1981, Mr. Retamoza.

16   Did you ever return to the Republic of Mexico?

17   A    Yes, I did.

18   Q    For what purpose, sir?

19   A    I went back to try to finish my school -- my schooling

20   in Mexico.

21   Q    In any specific area or study?

22   A    Yes.  I went back to the area of Guadalajara and

23   Jalisco, Mexico.

24   Q    To study what, specifically?

25   A    Civil engineering.

500

1    Q     How long did that last when you went to school there?

2    A     It lasted about the school year.

3          MR. MEDRANO:   May I have just one moment, Your

4    Honor?

5          THE COURT:   Yes.

6    BY MR. MEDRANO:

7    Q     Do you know a man by the name of Miguel

8    Felix-Gallardo?

9    A     Yes, I do, sir.

10   Q     In fact, are you related to this man?

11   A     Yes, I am.

12   Q     What relationship is that?

13   A     We're cousins.

14   Q     Is that a first cousin?

15   A     Yeah, first cousin.

16   Q     On what side of your family?

17   A     My mother's side.

18   Q     Now, if I can ask you to look at what should be

19   exhibit -- is that Exhibit 104 in front of you, sir?

20   A     Yes, it is.

21   Q     Okay.   Can I just hold that up towards you and ask you

22   if you can recognize that?

23   A     Yeah, I do.

24   Q     Who is that?

25   A     That's my cousin.

501

Q     You can put that down.  Thank you.

      At any point in the early '80's, did you have an opportunity to meet with Felix-Gallardo in Mexico?

A     Excuse me.  What?

Q     In the early '80's, did you meet with Felix-Gallardo?

A     Yeah, I did.

Q     Where exactly?

A     I met with him in Tijuana, Baja, California.

Q     For what purpose was that, sir?

A     Well, I went there to take care of some family business, you know.  Specifically, my mom's businesses, which was property involved, you know.

Q     Was any money owed?

A     There was some money owed from the part of Miguel, my cousin, to my mom.

Q     When you met with Felix-Gallardo, was he in the company of anybody?

A     Yeah, there was other people.

Q     Were any of those people law enforcement, if you recall?

A     Yes.  There were some law enforcement, Mexican law enforcement.

Q     What agency?

A     I think it was the D.F.S.

Q     At any point, sir, did you have an opportunity to

502

1   return to Mexico to continue your studies there?

2   A    Yeah, I did.

3   Q    And approximately when would that have been?

4   A    I believe it was the summer of 1981.

5   Q    How long were you there that time?

6   A    That was the time when I spent about a school year in

7   Guadalajara.

8   Q    And still to study civil engineering?

9   A    Yeah.

10   Q    At any time, Mr. Retamoza, did you discuss with Mr.

11   Felix-Gallardo the purchase of any type of equipment?

12   A    Yes, I did.  I did, yes.

13   Q    What type of equipment was that?

14   A    Basically communication equipment.  You know, like

15   radios, walkie-talkies, and things like that.

16   Q    Who was to buy this equipment?

17   A    I was supposed to buy it.

18   Q    Were you provided sums of money for that purpose?

19   A    Yes.  Yes, definitely.

20   Q    By who?

21   A    By him, by Felix-Gallardo.

22   Q    How much, sir?

23   A    About $20,000.

24   Q    Did you end up buying this equipment?

25   A    Yes, I did.

503

1    Q    Who did you end up providing it to?

2    A    Excuse me?

3    Q    Who did you end up providing it to?

4    A    I took it down to Mexico and I delivered it to him.

5    Q    To Felix-Gallardo?

6    A    Felix-Gallardo, right.

7    Q    Now, Mr. Retamoza, directing your attention to about

8    1982, at any point, Mr. Retamoza, did you, yourself, become

9    involved in the sale of cocaine?

10   A    Yes, I did.

11   Q    Can you just tell us how that occurred?

12   A    Well, when I left the States and went to Mexico to

13   pursue my, you know, finishing my schooling over there.  I

14   had an agreement with Felix, with my cousin, you know, that

15   if I went there, my mom would move into my property, the

16   property that I own up until then, and he would -- he was

17   going to pay the mortgage that I that -- you know, that was

18   on the house, plus my equity.

19   Q    This is while you would go to school?

20   A    Yes.

21   Q    Continue.

22   A    So I spent a full school year in Mexico and nothing

23   like that happened, so I had to return.  And upon my

24   return, I kept pressing Miguel and my mom to either, you

25   know, let me occupy the house back, or, you know, get them

504

1    to pay for my equity so I could, you know, maybe buy

2    another house or just, you know.

3    Q    Felix-Gallardo owed you money then?

4    A    Yes.

5    Q    Did he, in fact, pay you this money?

6    A    Well, in a way he did.

7    Q    What did he do?

8    A    He gave me two kilos.

9    Q    Two kilos of what?

10   A    Of cocaine.

11   Q    Up to that point, had you ever sold cocaine?

12   A    No, I never did.

13   Q    Had you ever been involved in that sort of business?

14   A    No, sir.

15   Q    So now you have two kilos of coke?

16   A    That is correct.

17   Q    What did you do?

18   A    Not much.  The only thing I could do is call Miguel

19   back and ask him, you know, what's that all about, you

20   know, and I did that.

21   Q    And did you attempt to sell those two kilos?

22   A    Not the first two kilos, no, I did not.

23   Q    What did you do with them?

24   A    I called him and I asked him, you know, I told him,

25   you know, I never -- I don't know what I could do with this

1   because I don't know anybody that would want it, and he

2   says, "Well, don't worry about it.  I'll refer you to

3   somebody," and then he did.

4   Q    Who was that somebody?

5   A    Oh, I don't know who he was, but there was a guy that

6   he was -- he was called Mike, or he said he was called

7   Mike.  I don't know.  Mike.  That's the only thing I know

8   about this guy.

9   Q    Did you meet with Mike?

10  A    Yes, I did.

11  Q    What happened with Mike?

12  A    I just delivered the two kilos that I had.

13  Q    Was he supposed to then pay you money later?

14  A    Yes, he was.

15  Q    Did he ever pay you the money for those two kilos?

16  A    No, sir, he never did.  I never saw him again.

17  Q    Did you advise your cousin Felix-Gallardo what had

18  happened to those two kilos?

19  A    Yeah, after a while, you know, that I kept calling and

20  calling this guy, you know, I just couldn't get in touch

21  with him anymore; and, yes, I did told my cousin, you know,

22  that this guy had disappeared on me, you know, and I

23  couldn't get the money.

24  Q    What was Felix's reaction to that?

25  A    Well, he -- he was upset.  He was, you know, saying

506

1    that I was good for nothing, you know, and that he had

2    already helped me, and now I, you know, I had to do my

3    part, you know, trying to collect this money.  And things

4    of that nature.

5    Q    What happens next with you and Felix-Gallardo?

6    A    Well, nothing happens as far as the first two kilos,

7    you know.  I never got to see Mike again.  I never got the

8    money.  But then Miguel told me, "Well, if you can find

9    this guy, you know, I'll give you another chance."  So he

10   gave me four more kilos.

11   Q    Were you successful in trying to get rid of those four

12   kilos?

13   A    Not really.  I, again, got into more trouble, you

14   know.

15   Q    Did you end up returning any of that cocaine to

16   anybody?

17   A    I did.  I returned part of that -- those four kilos.

18   Q    To who?

19   A    To him.

20   Q    Now, at this point in time, Mr. Retamoza, who owes who

21   money between yourself and Felix-Gallardo?

22   A    Well, now at this time, I owe him, but at the same

23   token he owes my mom, you know, still.

24   Q    Who owed who more, let's put it that way?

25   A    Well, I guess I did.  I never knew how much he owes my

507

1    mom.

2    Q    Did you have any idea now how much you owed him in

3    light of the missing cocaine?

4    A    Well, he told me that each kilo was worth $40,000, so

5    you can figure that out, $160,000.

6    Q    Let me direct your attention still to 1982 or 1983.

7    You ever heard of a person by the name of Gloria Ibarra?

8    A    Who?

9    Q    Gloria Ibarra?

10   A    Jorge Ibarra?

11   Q    Gloria.  Gloria.

12   A    Oh, Gloria Ibarra, yes, I have.

13   Q    Did you ever have any contact with this person?

14   A    Yes.

15   Q    What exactly, or briefly, was that contact?

16   A    Well, it was a lady that came out from Guadalajara,

17   you know, across the border and driving a car, you know,

18   and then he contacted me when he was around in town.

19   Q    Who contacted you?

20   A    Well, first Miguel, and then I -- actually, I

21   contacted her, you know.  Once I got the information from

22   Miguel, I contacted her.

23   Q    Did you enter into then another arrangement with

24   Felix-Gallardo at this point?

25   A    Yes, I did.

508

1    Q    What was that, Mr. Retamoza?

2    A    Well, with this other, say, services that I was

3    providing for him, you know, I was to earn enough money to

4    pay him back.

5    Q    Just what was the services, exactly?

6    A    I was supposed to take this, you know, the car that

7    this lady, Gloria Ibarra, was driving.  I was supposed to

8    take the car and unload it.

9    Q    Unload it of what?

10   A    Of cocaine.

11   Q    Where was the cocaine in the car?

12   A    The cocaine was stashed in the fuel tank.

13   Q    Well, did you do this more than once?

14   A    Oh, yeah, many times.

15   Q    Approximately total, how many times did you do this,

16   unloading this hidden cocaine?

17   A    To be honest, you know, I never counted the times, but

18   it was somewhere around 60 times or 80 times.

19   Q    Each time you did it, approximately how much cocaine

20   was hidden in the car?

21   A    It was -- again, you know, it was sometimes more,

22   sometimes less, but I'd say about 18 K's, 18 kilos.

23   Q    Now, after you received this cocaine, did you receive

24   instructions from Felix-Gallardo to do anything with it?

25   A    Yeah.  After I had it in my possession, then I

509

1    received further instructions, yes.

2    Q    To do what?

3    A    To deliver it to other people.

4    Q    Let me direct your attention to about 1984,

5    Mr. Retamoza.  At any point, are you ever involved with the

6    receipt of cocaine that arrives by aircraft?

7    A    Yes, I did.

8    Q    How many times did that occur that you were involved

9    in that?

10   A    I was involved twice.

11   Q    I'm sorry?

12   A    Two times.

13   Q    Where did this occur?

14   A    This took place in a remote area in the County of

15   Maricopa.

16   Q    What do you mean by "remote area"?

17   A    Well, it was in the mountains.

18   Q    Was there an airport there?

19   A    No, no.  It was not an airport.  It was just like a

20   flat land-type thing, you know.  Just clandestine-type of

21   landing strip, you know.

22   Q    Is that where a plane would arrive?

23   A    Yes.

24   Q    And would it contain anything?

25   A    Yeah.

510

1   Q      What?

2   A      It would have a load of cocaine.

3   Q      Once you received this cocaine, what did you do with

4   it?

5   A      Well, the first time, I -- I took it to a place that

6   we had previously rented in the area of Lake Elsinore.

7   Q      What would happen to the cocaine after that?

8   A      Again, they would be, you know, taken over by some

9   other individuals, and they would see that it got to the --

10  to other people.

11  Q      You mentioned there was a second load as well?

12  A      It was a second load, but that one, it was done a

13  little different.  I just took the load and delivered it to

14  a person in Santa Monica.

15  Q      Approximately what quantity in each load was involved?

16  A      It was around the same, 600 kilos, both loads.

17  Q      Still directing your attention to 1984, Mr. Retamoza,

18  did you ever have an opportunity to meet with

19  Felix-Gallardo in Guadalajara?

20  A      In 1984?

21  Q      Yes.

22  A      Yes.

23  Q      Where would this meeting have taken place?

24  A      In Guadalajara.

25  Q      At a residence or where?

511

1    A    It's just, yeah, in a residence.

2    Q    Of who?

3    A    Miguel.

4    Q    Miguel Felix, your cousin?

5    A    Right, my cousin.

6    Q    Now, on this particular occasion, was there anyone

7    else present that you saw or met for the first time?

8    A    Yes.  There were -- there was a gentleman -- a person

9    there that I never met before.

10   Q    Now, if I can ask you to look to your right, there

11   should be a photograph there, Exhibit 49, a small -- do you

12   see that, sir?

13   A    Yes.

14   Q    Tell me what that is?

15   A    That's Don Jose.

16   Q    That's the man you met?

17   A    Yes.

18   Q    Now, did you ever know Don Jose by any other name?

19   A    I later learned, yeah, his name was Matta.

20   Q    Matta?

21   A    Matta, uh-huh.

22   Q    At this particular meeting, did you have any

23   conversation with Matta?

24   A    Yes, I did.

25   Q    Did this conversation involve cocaine trafficking?

512

1   A    Yes, it did.

2   Q    Still in 1984, sir, do you ever have an opportunity to

3   go back to Los Angeles?

4   A    Excuse me?

5   Q    In 1984 --

6   A    Right.

7   Q    -- are you ever back in L.A.?

8   A    Oh, yes.

9   Q    In addition to the receipt of hidden cocaine in either

10  a vehicle or airplanes, did you ever start doing any other

11  functions for Felix-Gallardo in Southern California?

12  A    Yes.

13  Q    What was that, Mr. Retamoza?

14  A    I -- I was supposed to pick up money from different

15  sources, you know.

16  Q    Was this money from the sale of cocaine?

17  A    Yes.

18  Q    All right.  Once you received the money, what would

19  you do with it?

20  A    Mostly I had to take it down to Mexico.

21  Q    How much money would you have to accumulate before you

22  were prepared to take a trip down to Mexico with it?

23  A    This had to be at least $4 million to be able to make

24  a trip.

25  Q    Once you went down to Mexico with the money, who did

513

1    you deliver it to?

2    A    I delivered it to Miguel.

3    Q    Approximately how many such trips did you make, sir?

4    A    Had to be at least anywhere from 15 to 20 trips.

5    Q    You mentioned it had to be at least four million; is

6    that right?

7    A    That's correct.

8    Q    But was it ever more than that, whenever you took

9    money down there?

10   A    Oh, yeah.   Four million was just the least amount that

11   we would make a trip for, you know, but it could have been

12   more than that.

13   Q    Approximately how much money did you transport in this

14   fashion down to Felix-Gallardo?

15   A    Well, I'd say -- I'd say around from $150 to $200

16   million.

17   Q    When you delivered this money, would you also deliver

18   it to Mr. Matta, Don Jose?

19   A    It was my understanding that the money belonged to

20   both, the two of them.

21   Q    Now Mr. Retamoza, you mentioned earlier the

22   communications equipment.   Did you ever see Felix-Gallardo

23   utilize the equipment that you had purchased?

24   A    Oh, yeah.

25   Q    Did you ever see Mr. Matta utilize that equipment?

514

1    A    Yes.

2    Q    And did they have any particular radio or code name

3    that they utilized?

4    A    Yes, they all did.

5    Q    What was Felix-Gallardo's, if you recall?

6    A    Well, everybody referred to him on the radio as M-1.

7    Q    M-1?

8    A    Right.

9    Q    How about Mr. Matta?

10   A    Mr. Matta was -- everybody referred to him as --

11   including himself, you know, as Pony.

12   Q    Pony?

13   A    Like the horses, the little horses.

14   Q    I want to direct your attention, Mr. Retamoza, to

15   about June 21 or 22 of 1984.  On or about this date, are

16   you in the Los Angeles area?

17   A    Yes, sir, I was.

18   Q    On or about June 21, did you meet a man by the name of

19   Tomas Vias?

20   A    Yes, I did.

21   Q    And how did that come about?

22   A    I was in my place of work at the time, you know, and I

23   received a call, and it was Tomas, and he said to me that

24   he was at the airport, at the LAX, and he wanted me to go

25   and pick him up.

515

1    Q    Did you do so?

2    A    I did.  I did so.

3    Q    Then what did you do with him afterwards?

4    A    I took him to a hotel.

5    Q    In what part of town?

6    A    It was somewhere in Anaheim, the City of Anaheim.

7    Q    Anaheim?

8    A    Right.

9    Q    What happens next with you and Mr. Vias?

10   A    Well, that day, after --

11   Q    Yes.

12   A    -- after he checked into the hotel?

13   Q    Yes; correct.

14   A    Well, we went out shopping.

15   Q    Okay.  Subsequently?

16   A    We came back to the hotel and there were other people,

17   you know, people that he knew.

18   Q    Okay.  At any point, did you see any money?

19   A    Yes.  Shortly after, you know, we went back to the

20   hotel, there were people counting money and other people

21   bringing in money and --

22   Q    Was this being counted by hand?

23   A    No.

24   Q    How?

25   A    It was being counted by, you know, special equipment

516

1    used to count money, counters, money counters.

2    Q    Approximately how much money did you see there on that

3    occasion?

4    A    There was around $4 million, something like that.

5    Q    That night, where did you stay?

6    A    Where did I stay?

7    Q    June 21; correct?

8    A    Yeah, I stayed in my house.

9    Q    Okay.  Let's go now to June 22.  On June 22, sir,

10   besides the money at the hotel, did you have any money at

11   your house?

12   A    Yes, I did.

13   Q    Approximately how much?

14   A    I had something like seven million, something like

15   that.

16   Q    On June 22, do you see Tomas Vias again?

17   A    I did.

18   Q    And where at?

19   A    At my house.

20   Q    At some point, sir, does anything unusual occur when

21   he is at your house?

22   A    Yes, it does.  Yes, it does.

23   Q    What was that?

24   A    I called the hotel and --

25   Q    Are you referring to the Anaheim Hotel?

517

1   A    Yes.  The hotel where they were staying.  I called

2   because prior to it, we had requested the assistance of one

3   of the persons that were staying there, and this guy never

4   showed up in my house, so I made an attempt to get in touch

5   with him to see what happened, you know, why he didn't show

6   up.

7   Q    Did you reach anybody?

8   A    Well, I reached somebody.  Yes, somebody answered the

9   phone, and he told me that Carlos, the person that I was

10  trying to contact, was not there at the moment.

11  Q    Did this person give you his name?

12  A    Well, he said a name.

13  Q    What was that?

14  A    Antonio.

15  Q    All right.  So what do you do next?

16  A    Nothing.  I just go back and help Tomas and some other

17  guys that were there counting, and I just started counting

18  myself, you know.

19  Q    At any point, do you try to contact the hotel again?

20  A    Oh, yeah, you know, like maybe 30, 40, an hour maybe

21  later I called again.

22  Q    Did this same Antonio answer?

23  A    The same Antonio answered, yes.

24  Q    At any point, do you advise Mr. Vias that this Antonio

25  is answering the phone?

518

1    A    Well, by after the third time that I, you know, tried

2    to contact Carlos, yes, I asked Tomas, you know, "Is

3    anybody in your group, you know, by the name of Antonio?"

4            He says, "Why"?

5            "I've been calling, you know, about three times

6    already, and he keeps answering the phone and Carlos is not

7    there."

8    Q    Did Mr. Vias get upset?

9    A    First he was just surprised, you know, and then later

10   he got upset.

11   Q    What happens next then?

12   A    We called again, but now he is listening, you know.

13   He's listening in on the other phone, and he hears the

14   voice also, and then he gets upset.

15   Q    At this point, are you very concerned about the money

16   at the hotel?

17   A    Me?  No.

18   Q    Mr. Vias?

19   A    Vias, well, he was more than -- I suppose, you know,

20   he was more concerned about his son than the money, I

21   suppose.  You know, I'm not really sure.  He was upset and

22   concerned, but I suppose he was concerned more about his

23   son.

24   Q    Ultimately, sir, there was seven million in your

25   house; correct?

519

1   A    That is correct.

2   Q    What did you do with that money after these phone

3   calls?

4   A    Well, when Tomas was going around my house, you know,

5   bumping his head into the wall, I just thought, you know,

6   that the best thing for me to do was try to get the money

7   out of the house just in case, you know, and I put all of

8   the money in the suitcases and put them in the trunk of one

9   of the cars that were parked -- that was parked inside the

10  garage at my house.

11  Q    Eventually, did you take that money outside of the

12  country?

13  A    Eventually I did.

14  Q    Who did you deliver it to?

15  A    I delivered it to Miguel.

16  Q    Now, at this point, did you learn what had happened to

17  the four million at the hotel?

18  A    Yeah, sure I did.

19  Q    What?

20  A    There was a seizure, you know.  The police came and

21  seized the money.

22  Q    And did you ultimately learn the name of the person

23  who identified himself as Antonio to you on the phone?

24  A    Yeah, I did.

25  Q    Who was that?

520

1    A    It was the name of -- it was a D.E.A. agent.   His name

2    Antonio Ricevuto.

3    Q    Did you deliver your $7 million to Felix and Matta?

4    A    Yes, I did, sir.

5    Q    Did you apprise them of the Anaheim seizure?

6    A    Advise them?

7    Q    Did you tell them what had happened?

8    A    I briefed them, yes.

9    Q    What was their reaction?

10   A    They were very upset.   They were very mad, I would

11   say.

12   Q    Directing your attention to about September of 1984,

13   Mr. Retamoza, did Matta or Felix ever discuss with you any

14   other seizures of any sort that they had suffered?

15   A    Yes.   Yes, they did.

16   Q    Where did this conversation take place?

17   A    I believe it was in Miguel's residence, Miguel's

18   house.

19   Q    In Guadalajara?

20   A    Yes.

21   Q    What were you advised at that time?

22   A    Well, they were always, you know, trying to not comply

23   with the agreement that we had already agreed to, and that

24   was basically, you know, they didn't want to pay me what --

25   the money that they agreed to pay me.   And so they would

521

1    say that those agreements that we made before are no longer

2    valid because we have had, you know, losses, like seizures,

3    you know, of money and dope and --

4    Q    Did he identify any geographical location of any of

5    those seizures?

6    A    Yeah, they did.

7    Q    Where?

8    A    Oh, for one thing, I remember they mentioned, you

9    know, that they had a seizure of dope in Arizona.

10   Q    At any point, sir, did either of these two men discuss

11   with you pay-offs of any sort?

12   A    Well, it was the same time as we were discussing, you

13   know, these losses, you know.  They also mentioned that all

14   of the money that I delivered to them, it wasn't only, you

15   know, the money that they would put in their pockets, you

16   know.  All of this or a large part of this money would be

17   used to pay-off, you know, different people.

18   Q    So where these pay-offs part of their own expenses?

19   A    That's what they claimed to be, yes.

20   Q    Mr. Retamoza, every time you saw Matta, did he have

21   bodyguards?

22        MR. BLANCARTE:  Objection, Your Honor, relevance

23   as to this witness' --

24        THE COURT:  Sustained.

25   BY MR. MEDRANO:

522

1   Q    Finally, sir, let me direct your attention to early

2   1983.  Are you familiar with an area called Altata?

3   A Yes, I am.

4   Q    What is that?

5   A    Well, it's like a resort.

6   Q    Where is it located?

7   A    It's on the northwest of Culiacantaloa (phonetic).

8   Q    Were you ever there at or about that timeframe?

9   A    Yes, I was.

10   Q    Who else was there with you?

11   A    Well, I went with Miguel, you know.

12   Q    While you were there, did anything happen unusual?

13   A    Well, yeah.  There was a -- there were always, you

14   know, unusual things happening around there, you know.

15   Q    Anything specially unusual?

16   A    Specially unusual?

17        MR. RUBIN:  Objection, Your Honor, relevance.

18        MR. MEDRANO:  Your Honor, I'm about finished with

19   this direct.

20        THE COURT:  Well, get on the same track.

21        MR. MEDRANO:  Very well, Your Honor, I'll move on.

22   BY MR. MEDRANO:

23   Q    At any point, sir, are you or Felix-Gallardo visited

24   by any official of the Mexican government?

25   A    Yes.

523

1    Q     Okay.  Tell us how that happened?

2    A     I suppose that you -- well, yes, there were an

3    official like -- there was a helicopter at one time landed

4    on the -- in front of the -- this house where I was staying

5    with Miguel.  It was his property.

6    Q     Where did it land?  On the beach?

7    A     It landed right on the beach.

8    Q     Did you see who came out of this helicopter?

9    A     Yes.  There was a -- this guy that came out of the

10   aircraft and approached Miguel.

11   Q     Is he dressed in any special way?

12   A     Well, he saluted, for one thing, you know.

13   Q     Did he have a uniform on?

14   A     He had a uniform on, yes.

15   Q     And saluted who?

16   A     Miguel.

17   Q     Did he talk to Miguel Felix?

18   A     Yes.  He wishes me and Miguel, so he wasn't saluting

19   me, you know, saluted Miguel.

20   Q     Eventually, did that man leave in the helicopter?

21   A     Yeah, he did.

22   Q     Finally, sir, you have heard of the man named Rafael

23   Caro-Quintero?

24   A     Yes, I did.

25   Q     Did you ever see Caro-Quintero with Felix?

524

1    A    Yes, sir.

2    Q    Did you ever see him with Matta?

3    A    Yes, I did.

4    Q    During the time that we discussed this morning?

5    A    That is correct.

6         MR. MEDRANO:  May I have just one moment, Your

7    Honor?

8         THE COURT:  Yes.

9         MR. MEDRANO:  Your Honor, I can conclude direct

10   right now.  Would you like me to do that?

11        THE COURT:  Yes.

12        MR. MEDRANO:  If I may have one moment.

13   BY MR. MEDRANO:

14   Q    You're familiar with a program called the Witness

15   Security Program?

16   A    Yes, I am, sir.

17   Q    At any point, did you enter that program?

18   A    Yes, I did.

19   Q    Approximately when?

20   A    1989 in June.

21   Q    Did any other members of your own family also enter

22   into that program?

23   A    Yes, most of my immediate family went in there as

24   well.

25   Q    Approximately how many people are we talking about?

525

1   A   About 30 people.

2   Q   In this program, do you receive subsistence monthly?

3   A   Yes, I do.

4   Q   Approximately how much?

5   A   About $1,600.

6   Q   To be used for what purpose?

7   A   For subsistence, you know, for every day expenses.

8   Q   Why did you join that program?

9   A   Excuse me?

10  Q   Why did you join the program?

11  A   Well, because I thought, you know --

12          MR. RUBIN:  Objection; relevance.

13          THE COURT:  Sustained.

14  BY MR. MEDRANO:

15  Q   And finally, are you familiar with a hotel called the

16  Las Americas Hotel?

17  A   Yes, I am.

18  Q   Where is that located?

19  A   Las Americas is located on a big street in

20  Guadalajara, that's called Lopez Mateos.

21  Q   Is that owned by Felix-Gallardo?

22  A   That was my understanding.

23  Q   And did Mr. Felix-Gallardo own other hotels in

24  Guadalajara?

25          MR. BLANCARTE:  Objection; relevance.

526

1          THE COURT:  Sustained.

2    BY MR. MEDRANO:

3    Q    Finally, sir, you mentioned Mr. Tomas Vias.  Did he

4    also work for Felix-Gallardo?

5    A    Yes, he did.

6          MR. MEDRANO:  One moment, Your Honor.

7          That's it, Your Honor.  Thank you.

8          THE COURT:  Do you wish to cross-examine this

9    witness?

10          MR. MEDVENE:  Yes, Your Honor, briefly.

11          THE COURT:  And you, Counsel?

12          MR. RUBIN:  Yes, Your Honor, I believe so.

13          THE COURT:  All right.  We'll adjourn at this time

14    and reconvene at 1:30.  The jury will be excused.

15          THE CLERK:  Please rise.

16                    (Jury out.)

17          THE COURT:  Counsel, this morning a juror gave me

18    a note which I discussed with the jury without discussing

19    it with you, but I want to read it to you.

20          "The jurors agree that the case is not to be

21    discussed amongst ourselves before all the evidence has

22    been presented.  However, there has been an exception

23    expressed that the case can be discussed, provided all

24    jurors are present.  Please clarify if the above exception

25    is allowable.  Thank you."

527

1     That's the note to which I responded this morning.

2          Now, you wanted to take up something with the

3     Court?

4          MR. MEDVENE:  Yes, Your Honor.  We wanted to alert

5     Your Honor that -- we should have mentioned this

6     yesterday -- with respect to Mr. Flores.  The government

7     has given us a 404(b) Notice on Mr. Flores.  We think it

8     incumbent that before the witness takes the stand there be

9     some --

10          THE COURT:  Just a moment.  Why did you give a

11     404(b) Notice?

12          MR. MEDRANO:  May I have just one moment, Your

13     Honor?

14          MR. CARLTON:  Your Honor, 404(b) Notice was

15     provided in relation to some of Mr. Flores' testimony,

16     because it pertains to drug trafficking by Ruben Zuno

17     during 1984, which is not connected directly, as far as we

18     know, with other members of the Cartel.

19          We believe that the evidence is relevant to the

20     case, but in an excess of caution, we thought we would

21     provide a 404(b) Notice to the defense because it's not

22     direct evidence of association.  We believe it's indirect.

23          THE COURT:  Well, is this the evidence you are

24     objecting to?

25          MR. MEDVENE:  Yes.  And this is the evidence --

528

1        THE COURT:  If this is evidence that doesn't

2    relate to this Cartel that's subject of the indictment,

3    then it should not be used as a part of the evidence

4    against the defendant --

5        MR. CARLTON:  Well, Your Honor --

6        THE COURT:  You must first have evidence to

7    connect him to the Cartel.

8        MR. CARLTON:  There will be much other evidence

9    connecting him to the Cartel.  This is simply a piece of

10   the puzzle showing -- it tends to show what the nature of

11   his connection to the Cartel was.  It also shows the

12   relationship --

13       THE COURT:  What is the evidence?

14       MR. CARLTON:  Perhaps Mr. Medrano can summarize

15   that.

16       MR. MEDRANO:  I can summarize that briefly, Your

17   Honor.  Mr. Flores will say he was a lieutenant in the

18   military.  At one point, he and other soldiers received

19   orders to go to the area of Mascota, where you know, that's

20   where Zuno resides, to find and eradicate marijuana fields.

21   Flores will say he's under the command of a Captain

22   Rodriguez.  They go out.  They find lots of marijuana

23   fields.

24       Let me tell you what he's going to say and then

25   I'll tell you how we're going to deal with any possible

529

1  hearsay issue.

2          They are instructed to find marijuana, arrest

3  people, interview those people to find out who the owner of

4  the marijuana is.  Flores does that, is advised by numerous

5  peasants and people who worked there, that all that belongs

6  to Zuno.  In response to those inquiries, the soldiers go

7  to a ranch owned by Zuno to look for him.  At that moment,

8  he's not there.

9          They go back, start finding and eradicating more

10  marijuana.  Again, they are told the same thing by the

11  arrestees that it all belongs to Zuno.

12          Again, they go back to the ranch.  This time there

13  is Zuno and Zuno meets with Captain Rodriguez, and much to

14  the surprise of Mr. Flores, who's of lower rank, Zuno is

15  never arrested.  He asks his boss, Rodriguez, why not, and

16  Rodriguez essentially puts him off for now saying, "Well,

17  we're looking into it."

18          They continue to find and eradicate more

19  marijuana.  Continually they're told it all belongs to

20  Zuno, and finally --

21          THE COURT:  Do you have any evidence that this

22  marijuana was on his land, or just these statements by

23  these people that were interviewed?

24          MR. MEDRANO:  We have those statements, Your

25  Honor, and there is one thing I forgot to tell you.  In one

530

1    occasion, Flores will say he observes Zuno meeting with his

2    boss, Captain Rodriguez, and again, Flores asks his boss

3    why Zuno has not been arrested.   Rodriguez says -- gets

4    angry at him and tells him not to worry about it, and

5    simultaneously shows him a roll of bills.

6              Now, it's our position that these various

7    statements do not constitute hearsay, because they are not

8    offered for the truth of the matter.

9              THE COURT:   The statements of whom?

10             MR. MEDRANO:   Well, let's start with the peasants

11   or the people, the arrestees, who advise that the marijuana

12   fields --

13             THE COURT:   Why aren't those hearsay?

14             MR. MEDRANO:   Pardon?

15             THE COURT:   Why aren't those hearsay if they are

16   offered to prove that he owns the land?

17             MR. MEDRANO:   But it's not offered that he owned

18   the land, Your Honor.   It shows a couple of things, the

19   state of mind of Flores who's doing the investigation

20   pursuant to orders, and when he receives this information,

21   he continues to --

22             THE COURT:   Why are we concerned with the state of

23   mind of Flores at all in this case?

24             MR. MEDRANO:   Well, that fact, Your Honor, plus

25   the role of Flores, is to find and locate the owner.   Based

531

1    on that, that leads us to Zuno, and Zuno's ranch.

2            THE COURT:  There are a number of things here

3    that have been discussed.  First, it's my view that the

4    statements elicited from these people that worked there in

5    these fields cannot be offered as evidence of proof that

6    the fields belonged to the Defendant Zuno.  It's simply

7    hearsay.

8            MR. MEDRANO:  Your Honor, there is one additional

9    thing.

10           THE COURT:  That's one category of evidence.

11   Now --

12           MR. MEDRANO:  There is one thing I forgot to tell

13   you that you need to know that Flores will say.  After

14   Rodriguez, his boss, meets with Zuno, after Flores sees

15   Rodriguez with this role of bills, suddenly everything is

16   called off by Rodriguez.  Flores is called out of the

17   fields when he is trying to eradicate a huge field.  He's

18   told, "Forget it, come back, we are going back to

19   Guadalajara."

20           So all the operations cease after Flores observes

21   Zuno meeting with his boss.  Now --

22           THE COURT:  Just a moment.  I'm not going to let

23   you call this witness unless you submit to me a written

24   offer of proof indicating precisely what you are going to

25   ask him, and what theory of admissibility you rely upon.

532

1          The statements made by these workers in the field

2     that the land belongs to Zuno are not admissible to prove

3     that the land belongs to Zuno.  If you have no other proof

4     that the land on which this marijuana was growing belongs

5     to Zuno, and you are trying to whip up something to

6     contrive to reach that result without competent evidence.

7          So I want an offer of proof from you exactly what

8     this fellow is going to say, and on what theory of

9     admissibility you rely to have it introduced.  Can you do

10    that before you call the witness?  So you'd better find

11    another witness.

12         MR. MEDRANO:  We'll certainly try, Your Honor.  We

13    will do our best.

14         MR. MEDVENE:  Will we be served with the offer of

15    proof, Your Honor?

16         THE COURT:  Yes.

17         MR. MEDVENE:  Thank you.

18         THE CLERK:  Please rise.  This Court stands in

19    recess.

20              (Lunch recess taken.)

21    //

22    //

23

24

25

533

LOS ANGELES, CALIFORNIA; FRIDAY, DECEMBER 4, 1992

(1:30 P.M.)

(Jury in.)

THE COURT:  You may cross-examine the witness.

MR. MEDVENE:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MEDVENE:

Q    Mr. Retamoza, Ruben Zuno was not at any meeting you testified about this morning involving drug trafficking; is that correct?

A    That is correct, sir.

Q    And his name was not mentioned at any meeting you testified about this morning involving drug trafficking; is that correct, sir?

A    That is correct.

Q    You never delivered any monies to Mr. Zuno for any purpose?

A    No, sir, I never did.

Q    Mr. Zuno never delivered any drugs to you?

A    No, sir, never did.

Q    And Mr. Zuno was not involved in any way in any of the cocaine transactions you talked about this morning; isn't that correct, sir?

A    No, I don't think so.

Q    Now, you say you don't think so.  My statement's a

534

1    correct one?

2    A    Yeah, I think so.  I believe that they are, sir.

3    Q    You start getting paid by the D.E.A. some time in

4    1989?

5    A    I don't understand your question.

6    Q    When did you start receiving payments from the D.E.A.?

7    A    I never did, sir.  I never received any payments from

8    the D.E.A.

9    Q    Have you received any payments from any government

10   agency, to your knowledge?

11   A    I believe that you're referring to the money that I

12   get for subsistence every month?

13   Q    Yes.

14   A    Yeah, that was after I joined the Witness Protection

15   Program, yes.

16   Q    And you mentioned you were receiving approximately

17   $1,600 a month?

18   A    Right.

19   Q    Did you start receiving payments under that program

20   sometime in 1989?

21   A    Sometime in 1989; that is correct.

22   Q    Approximately August?

23   A    Approximately June.

24   Q    June.

25        Is it true some months you received as much as

535

1    $14,000?

2    A    Excuse me?  What is it again?

3    Q    Is it true that in some months you received as much as

4    $14,000 a month?

5    A    Sir, no.  That's -- well, I -- no, that's not true.  I

6    always receive the same amount, the -- I always received

7    the same amount, sir.

8    Q    Isn't it true that since you started receiving

9    payments, you have received some $900,000?

10   A    I have not received it, sir.  I have not received

11   $900,000, no.  They might incur, you know, in expenses that

12   are amounted to that figure, but I didn't receive the money

13   in my hands, you know.

14   Q    Well, who received the money?

15   A    I only received the --

16          MR. MEDRANO:  Objection, Your Honor, lack of

17   foundation.

18          THE COURT:  The objection is sustained.

19   BY MR. MEDVENE:

20   Q    Well, did you receive, either directly or indirectly

21   for yourself or for your benefit, some $900,000 since

22   approximately August of 1989?

23   A    No, I didn't, sir.

24          MR. MEDVENE:  Excuse me one second, Your Honor.

25   BY MR. MEDVENE:

536

1  Q     Would it be fair to say that you received

2  approximately $900,000 for yourself and all family members

3  since August of 1989?

4  A     I repeat, sir, I -- I as to my understanding, that the

5  expenses that the government incur in taking care of me and

6  my family all through this ordeal, you know, that we went

7  through, you know, getting relocated and all of that,

8  that's my understanding that the expense amounted to that,

9  but I never received that money.

10 Q     All right.  So you understand your expenses since

11 about August of '89 amount to about, for you and your

12 family, about $900,000; is that correct?

13 A     That's my understanding, yes.

14 Q     Now, is it also true, sir, that you were provided with

15 immunity from prosecution in those jurisdictions where you

16 were previously involved in narcotic trafficking?

17 A     Yes; that is correct.

18 Q     And you received immunity from prosecution,

19 specifically in the Central District of Los Angeles?

20 A     Yes.

21 Q     The Eastern District of California?

22 A     Yes.

23 Q     The Southern District of California, including

24 San Diego?

25 A     That is correct.

537

1   Q     The Southern District of Florida?

2   A     That is correct.

3   Q     District of Arizona?

4   A     Yes; that is correct.

5   Q     And the Federal District of Washington, D.C.?

6   A     I believe so, yes.

7         MR. MEDVENE:  I have nothing further, Your Honor.

8         THE COURT:  Do you have any questions?

9         MR. RUBIN:  Yes, Your Honor.

10        MR. MEDVENE:  Excuse me.  May I ask to approach

11   the witness, Your Honor, for purposes of asking if this

12   information the government gave us, if he's aware if it's

13   accurate, for purposes of marking it for identification and

14   then moving it into evidence?

15        MR. MEDRANO:  Objection --

16        MR. MEDVENE:  It's his payment schedule.

17        THE COURT:  The request is denied.

18        MR. MEDVENE:  All right, Your Honor.

19        THE COURT:  Do you have any questions?

20        MR. RUBIN:  Yes, Your Honor.

21                    CROSS-EXAMINATION

22   BY MR. RUBIN:

23   Q     Mr. Retamoza, it is true, is it not, you received

24   substantial benefits from the United States Government?

25        THE COURT:  Counsel, do we need that?

538

1      MR. RUBIN:  I would like to go into it in a little

2  bit more detail, Your Honor.

3      THE COURT:  Well, then get to the detail.

4  BY MR. RUBIN:

5  Q    Concerning the immunity that you were given in all of

6  those districts, turning first to the one in Seattle, that

7  one involved a case where you were accused or you were

8  involved in the sale of half a kilogram of cocaine;

9  correct?

10 A    Yeah, yes.

11 Q    And when you got the immunity for being involved in

12 that crime, did you understand that the potential penalty

13 for imprisonment for that single crime alone was a minimum

14 of five years in prison?

15 A    No, not really.  I know that, you know, that crimes

16 that I had incurred were big, yes, I knew that; but as far

17 as numbers, I didn't know.

18 Q    And isn't it true, would it be fair to say, that for

19 all the crimes you committed, you were facing hundreds,

20 potentially hundreds of years in a federal prison; isn't

21 that true?

22 A    I am not aware of the term that I would serve if I

23 were convicted of all of those crimes.  I'm not really

24 aware.

25 Q    Did you have counsel with you when you negotiated

539

1    these immunity agreements with the government?

2    A    I did.

3    Q    And at a time, was the potential penalties discussed

4    to those crimes before you entered the immunity agreements?

5    A    Might have been, but I don't remember, really.

6    Q    Now, it's true, is it not, that from 1982 to 1987 you

7    were a drug trafficker; correct?

8    A    Excuse me?

9    Q    You were a drug trafficker from 1982 to 1987; isn't

10   that right?

11   A    Yes; that is correct.

12   Q    And because of the agreements you have with the

13   government, you will not be prosecuted for any of those

14   crimes from 1982 to 1987; correct?

15   A    That is correct.

16   Q    Now, in 1982, you said you became involved in drug

17   trafficking to help your mother; is that right?

18   A    No, not really.  That wasn't my intention, to help my

19   mother, no.  I was just trying to get paid, you know, my

20   own money.

21   Q    Now, did at any point, at the very beginning, did you

22   ever consider calling the police and advising them that you

23   were being given cocaine?

24   A    On, no, never.  No.

25   Q    Instead you took the cocaine and you tried to sell it;

540

1    correct?

2    A     Yes.

3    Q     And then the cocaine deals that you were involved in

4    got bigger and bigger; isn't that right?

5    A     Well, I was a cocaine dealer for a very short period.

6    I mean, I doubt -- I just couldn't handle that part of the

7    business.

8    Q     Well, when I say a dealer, I mean involved in a

9    cocaine conspiracy.  The conspiracies that you became

10   involved in got bigger and bigger?

11   A     Oh, yeah; that is correct.

12   Q     And at any time, did you consider going to the police

13   and telling them about these cocaine conspiracies?

14            MR. MEDRANO:  Objection, asked and answered, Your

15   Honor.

16            THE COURT:  Sustained.

17   BY MR. RUBIN:

18   Q     In 1983 the kilogram that went in your car came in

19   through the car tank -- gas tank for the car, were 54

20   kilograms in each car; isn't that true?

21   A     Wait a minute.  Can you rephrase that question?

22   Q     Sure.  In 1983 your cousin Felix sent a female courier

23   driving a car full of cocaine to you?

24   A     Right.

25   Q     And, in fact, it wasn't 18 kilos that were in each

541

1  car, it was 54 kilos that were in each car?

2  A    Says who?

3  Q    Is that correct?

4  A    No, it's not.

5  Q    Do you know how much a kilogram is in pounds?

6  A    Yes.

7  Q    How much is it?

8  A    Well, it's two pounds plus.

9  Q    So the airplane flights that you were involved in,

10 each one was about 1,200 or to 1,500 pounds of cocaine;

11 correct?

12 A    Yes, that is correct.

13 Q    That's more than half a ton of cocaine each flight

14 that you were involved in; isn't that right?

15 A    That is correct, yes.

16 Q    And the money that you transported from California

17 totaled approximately $150 million; true?

18 A    Yes.

19 Q    So you personally took $150 million out of the United

20 States to give it to your cousin, the drug trafficker, in

21 Mexico; is that right?

22        THE COURT:  The question has been asked and

23 answered.

24        Did you hear me, Counsel?

25        MR. RUBIN:  Yes, Your Honor, I heard you.

542

BY MR. RUBIN:

Q    This $909,000 that you and your family received includes money for not only subsistence, but for housing, medical, and everything; correct?

A    It's not all correct, no.  It's not like you say.

Q    So you don't receive payment -- the government doesn't pay for your medical expenses or housing expenses?

A    Wait a minute.  I didn't quite understand your question --

Q    Okay.

A    -- the first time.

Q    It is true, is it not, that this $909,000 that you and your family have received from the government in three years, includes, in addition to subsistence, housing, medical, everything's paid for by the government; correct?

A    No, it's not quite that way.  From the $1,600 that I receive a month, I have to pay my housing.  I do have to pay my housing.  There's only -- when they pay my housing, it's only when I'm in the process of being relocated that they have to pay the hotel expense, you know.  That's the only time when they pay my housing.  That's not taken out of the $1,600.

Q    Well, in fact, they also pay your medical expenses; is that true?

A    That they do, yeah.

543

1   Q     You pay income taxes on any of the benefits you

2   receive from the government money?

3   A     No, sir, I don't.

4   Q     Anyone advise you whether or not you have to pay

5   income taxes on that?

6   A     No, nobody has said anything about that, but since you

7   don't receive a W-4 Form a year, you know, I don't see how

8   you can pay the taxes on that money that you receive.

9   Q     Now, at any of the meetings that you testified about

10  this morning, Dr. Humberto Alvarez-Machain was not present,

11  was he?

12  A     I didn't quite get your question.  What is it?

13  Q     In the meetings you testified to this morning,

14  Dr. Humberto Alvarez-Machain was not present, was he?

15  A     I never heard -- I never knew -- I just don't know any

16  of the defendants.

17          MR. RUBIN:  Okay.  No further questions.

18          THE COURT:  Anything further?

19          MR. MEDRANO:  Very briefly.

20                      REDIRECT EXAMINATION

21  BY MR. MEDRANO:

22  Q     Mr. Retamoza, this figure of over $900,000 involves

23  expenses for not only you and your immediate family; is

24  that correct?

25          MR. BLANCARTE:  Objection, asked and answered.

544

1            MR. MEDRANO:  Your Honor --

2            THE COURT:  Sustained.

3    BY MR. MEDRANO:

4    Q    Were there over 30 family members that were brought to

5    the United States?

6            MR. RUBIN:  Objection; asked and answered;

7    leading.

8            THE COURT:  Sustained.

9    BY MR. MEDRANO:

10   Q    Finally, Mr. Retamoza, the portions of the sums

11   received, is part of that used for relocation when

12   necessary?

13           MR. BLANCARTE:  Same objection.

14           THE COURT:  Overruled.

15           THE WITNESS:  Yes, sir.

16   BY MR. MEDRANO:

17   Q    And that relocation is for your protection?

18   A    That is correct.

19   Q    Also for the protection of any other family members

20   that have to be relocated?

21           MR. BLANCARTE:  Objection; relevance.

22           THE WITNESS:  That's correct.

23           THE COURT:  Counsel, when you object, you must

24   rise.

25           MR. BLANCARTE:  I'm sorry, Your Honor.

545

1        THE COURT:  Now, that you have, your objection is

2   overruled.

3   BY MR. MEDRANO:

4   Q    Did you hear the question, Mr. Retamoza?

5   A    Yes, I -- I did, and yes, I said "yes."

6   Q    $900,000 has not just been given to you to spend; is

7   that correct?

8   A    No.  No, that's not correct.

9        MR. RUBIN:  Objection; asked and answered.

10       THE COURT:  Sustained.

11       MR. MEDRANO:  One moment, Your Honor.

12             (Government counsel confer.)

13  BY MR. MEDRANO:

14  Q    Why are you in the Witness Security Program?  Why did

15  you join the Witness Security Program?

16       MR. RUBIN:  Objection; irrelevant.

17       THE COURT:  Yes, that was asked and previously

18  objected to and sustained.

19  BY MR. MEDRANO:

20  Q    Mr. Retamoza, to this day, sir, do you have concerns

21  for your safety?

22       MR. RUBIN:  Objection; irrelevant.

23       MR. BLANCARTE:  Objection --

24       THE COURT:  Sustained.

25  BY MR. MEDRANO:

546

1   Q    Mr. Retamoza, do you have any immediate plans to

2   return to the Republic of Mexico?

3            MR. BLANCARTE:  Objection; relevance.

4            THE WITNESS:  No way.

5            THE COURT:  Sustained.

6            MR. MEDRANO:  One more moment, Your Honor.

7                  (Government counsel confer.)

8            MR. MEDRANO:  That concludes redirect.

9            THE COURT:  All right.  You may step down, sir.

10                     (Witness excused.)

11           THE COURT:  Call the next witness.

12           MR. MEDRANO:  At this time, Your Honor, we call

13   Tony Ricevuto to the stand.

14                  (Witness summoned to courtroom.)

15           THE CLERK:  Please raise your right hand.

16        ANTHONY RICEVUTO, PLAINTIFF'S WITNESS, SWORN

17           THE WITNESS:  I do.

18           THE CLERK:  Please be seated.

19           State your full name for the record and spell your

20   last name.

21           THE WITNESS:  Anthony Ricevuto, R-I-C-E-V, as in

22   Victor, U-T-O.

23                  DIRECT EXAMINATION

24   BY MR. MEDRANO:

25   Q    Mr. Ricevuto, are you employed by the Drug Enforcement

547

1   Administration?

2   A     Yes, I am.

3   Q     How long have you served with the D.E.A.?

4   A     Pardon me, sir?

5   Q     How long have you been with the D.E.A.?

6   A     Approximately 20 years.

7   Q     Where are you currently assigned to?

8   A     I am currently assigned to the Los Angeles area.

9   Q     Are you presently the supervisor in Los Angeles?

10  A     I am senior inspector of the -- in Los Angeles.

11  Q     Now, sir, let me direct you to around 1984.  Were you

12  familiar with an operation called Operation Padrino?

13  A     Yes, sir, I was.

14  Q     Padrino in Spanish means what, sir?

15  A     The Godfather.

16  Q     And did you have a supervisory role in this

17  investigation?

18  A     Yes.  I was the case agent for that investigation.

19  Q     And the purpose of the investigation?

20  A     We were targeting some traffickers from Culiacan,

21  Sinaloa, Mexico and from Guadalajara, Mexico.

22  Q     And the initial or first target of this investigation

23  was who?

24  A     A person by the name Jorge Fadalla (phonetic).

25  Q     Were agents from other countries also involved in this

548

1    investigation?

2    A    Yes, sir.  We were --

3         THE COURT:  You've answered the question.

4    BY MR. MEDRANO:

5    Q    From where?

6    A    From Mexico, from Spain, from Columbia, and also

7    various cities in the United States.

8    Q    And briefly, sir, what investigative techniques were

9    utilized when you began this investigation?

10   A    We were using surveillance, wire taps, Title 3

11   Investigations, pin registers, and the usage of informants.

12   Q    Now, at some point, did the targets of the

13   investigation change for Operation Padrino?

14   A    Yes, they did.

15   Q    To who?

16   A    It changed from Jorge Fadalla to Miguel Felix-Gallardo

17   and Ramon Matta-Ballesteros.

18   Q    Now, sir, on the basis of your 20 years as an agent,

19   is it unusual for this to occur that the focus of an

20   investigation change over time?

21   A    Not at all.

22   Q    Why is that, sir?

23   A    Because once we start an investigation, at sometimes

24   we have to start it at some point where we feel that we

25   have a bona fide target.

549

1        In time, as we're going through an investigation,

2   we find a person of higher echelon, so we would then change

3   the target directory.

4   Q    I'd like to direct your attention to approximately

5   June 22nd of 1984.  At that time, are you in Los Angeles?

6   A    Yes, sir, I am.

7   Q    And were you involved in surveillance or investigation

8   for Operation Padrino?

9   A    Yes, I was.

10  Q    And can you tell us what occurred on this day?

11  A    Yes.  I received information that there were -- there

12  was a couple of people at a hotel in Anaheim, California,

13  that were associated with Miguel Felix-Gallarado.  I had

14  surveillance initiated from the Santa Ana Field Division --

15  Field Office -- I'm sorry.  They commenced surveillance at

16  about 2:00 o'clock that day.  I joined them about 6:00

17  o'clock that night and was kept in frequent radio contact

18  throughout the whole surveillance.

19  Q    Now, does any of this involve what is referred to as a

20  moving surveillance?

21  A    Yes, it was.

22  Q    What does that mean, briefly?

23  A    It means from the hotel that we had targeted, a

24  subject left that hotel and was driving his vehicle out

25  towards another area.

550

1   Q    Let me stop you there.  As part of this investigation,

2   as of this date, June 22, 1984, had you ever heard of the

3   name of Frank Retamoza?

4   A    Yes, I did.

5   Q    In what way?

6   A    I had pin registers.  I think I had about six or seven

7   pin registers.  That's recording telephones that are

8   outgoing from residences on about six or seven different

9   residences, and a lot of these residences were calling over

10  to Mr. Retamoza's house in Harbor City, California.

11  Q    So by this date, you knew of this man?

12  A    I knew of him, yes, sir.

13  Q    Did you consider him part of this investigation?

14  A    I considered him a -- basically one of the targets we

15  were looking at, sort of a typical person, because so many

16  people were calling him, and he in turn were calling other

17  people -- other persons.

18  Q    Were you kept abreast of the status of the

19  surveillance during the day, June 22?

20  A    Yes, sir.

21  Q    At any point, do you learn anything?

22  A    Yes.  That the agent that was in charge of the Santa

23  Ana Office, advised me that they were going to stop a

24  vehicle in the Harbor City area off the freeway.

25  Q    And was that, in fact, done?

551

1    A    Yes, it was.

2    Q    And the results of that traffic stop?

3    A    The results were that the person that they stopped

4    consented to a search of his vehicle, and then in the trunk

5    was found a money counting machine.

6    Q    As a result of that find, did that lead you anywhere

7    else as part of your investigation on this day?

8    A    Yes.  At that time, I was back to the original hotel

9    in Anaheim, California.

10   Q    What occurred at that hotel, sir?

11   A    At the hotel, while we were waiting for the other

12   agents and this person to return, I started looking at the

13   phone numbers that were dialed from the hotel rooms, and I

14   noticed that one of the numbers that were dialed belonged

15   to Frank Retamoza in Harbor City and also to a couple other

16   individuals that I had suspected at the time to be

17   involved.

18   Q    At that point, did you learn the location of any

19   specific hotel rooms in that hotel?

20   A    Yes.  We had -- well, actually we had two hotel rooms

21   under surveillance.  One was a double -- double hotel room,

22   suite-type, and there was another one not far, maybe about

23   on a lower floor, an upper floor.

24   Q    So what happened on June 22, sir?

25   A    When Frank Briggs returned with the subject -- I

552

1  believe his name was Felix, the last name of Felix -- we

2  gained permission from him to go into one of the hotel

3  rooms.

4  Q    By the way, I take it -- is this Miguel Felix-Gallardo

5  or is this another Felix?

6  A    It's another Felix.  It was just some other person

7  with the same last name.

8  Q    Go ahead.  What happened?

9  A    As we got into the hotel room, there were -- there was

10 a female and a young boy about seven years old.  We asked

11 them who they were, and when the young boy repeated his

12 name, I knew immediately who his father was.  He has the

13 same name as his father.

14          In looking around the room, there were a bunch of

15 boxes and duffel bags, and there was one orange nylon

16 duffel bag.  You could actually see through it.  It was

17 very thin, and the only thing we could see was just nothing

18 but money throughout that whole bag.

19 Q    Did you have an opportunity to search this room?

20 A    Yes.  We had a -- the lady gave us a consent search of

21 the room, and in that room we found $2.1 million.

22 Q    Now, what's the next thing that occurs after you find

23 this money?

24 A    We went right over to the other set of rooms, of

25 course, and we were not permitted to search.  We had to

553

1    draw up a search warrant, so we stayed in the first room.

2    We just secured the second room and we were drawing up a

3    search warrant.

4    Q    And this was to allow you to search that second room?

5    A    Exactly.

6    Q    So during, while you're waiting for this to be done,

7    does anything happen in the room?

8    A    Yes.  We received several phone calls.

9    Q    Can you tell me about that?

10   A    Yes.  I received a call and I answered the phone, and

11   the person asked who it was, and I told him that it was

12   Antonio.  And he wanted to know who I was, and I just said

13   a friend, and he sort of didn't say anything and he just

14   dropped the phone.

15   Q    You mean hung up?

16   A    Just hung up, I mean.  And then about a couple minutes

17   later he called back again, and it was sort of like a

18   little bit more panicky, you know, who are you; and again I

19   just said a friend.  The phone went down again and he

20   called a third time and really that was it.  He wouldn't

21   call back anymore.

22   Q    Now, did you ultimately learn the identity of that

23   person who was calling you?

24   A    Yes, I did.

25   Q    Who was that, sir?

554

1    A    Frank Retamoza.

2    Q    At any time, were you able to procure a search warrant

3    for the second hotel room?

4    A    Yes, we did.  That same night, about 2:00 o'clock in

5    the morning -- well, the next morning.

6    Q    Did you execute that search warrant?

7    A    Yes, we did.

8    Q    What were the results of that search?

9    A    Another $2 million.

10   Q    In what kind of container, if you recall?

11   A    Again, they were in boxes, in suitcases.  There were

12   some other documents there that we also seized from banks

13   throughout the nation.

14   Q    Let me direct your attention now to approximately

15   August 14 of 1984.  At that date, sir, are you still

16   involved with Operation Padrino?

17   A    Yes, I was.

18   Q    On this day, sir, was there any particular type of

19   seizure on August 14 of '84?

20   A    There was a large cocaine seizure in Young, Arizona.

21   Q    The quantity?

22   A    It's about 1,400 pounds.  A little bit over 1,400

23   pounds.

24   Q    If I can direct your attention to about November 26th

25   of 1984.  On this particular day, was there any type of

555

1    seizure as part of Operation Padrino?

2    A    May I consult my notes for just a second on this?

3              MR. MEDRANO:  Your Honor, may the witness refresh

4    his memory?

5              THE COURT:  Go ahead.

6              THE WITNESS:  Thank you, sir.

7              On the date again, sir?  I'm sorry.

8    BY MR. MEDRANO:

9    Q    November 26, '84?

10   A    Yes.  There was another large seizure in Kingman,

11   Arizona.

12   Q    What quantity?

13   A    About another 1,400 pounds of cocaine.

14   Q    Finally, Agent Ricevuto, let me direct your attention

15   to about November 17 of 1984.  Are you still working

16   Operation Padrino?

17   A    Yes, I am.

18   Q    Are you still targeting Matta and Felix?

19   A    Yes, I am.

20   Q    Up to this point, sir, all the seizures that you've

21   described, were they affiliated with the Matta and Felix

22   organization?

23   A    Yes, they were.  What we found in both seizures were

24   common packaging.  The packaging had on the kilogram

25   packages, as they were wrapped, they had a golden llama

556

1  imprinted on them.  So they're like a trademark-type.  And

2  that's how we were able to distinguish that all these

3  seizures were connected.

4  Q    Finally, if I can direct your attention to on or about

5  November 17 of 1984.  Was there any type of additional

6  currency seizure on that day as part of Operation Padrino?

7  A    Yes, sir.  We seized a small quantity of cocaine,

8  about nine or ten pounds, on that day.  Again, the

9  packaging was the same.  We continued because we had been

10  doing some extra surveillance, and we seized $3.5 million

11  in West Covina, California.

12  Q    And again, part of Operation Padrino?

13  A    Yes, sir.

14          MR. MEDRANO:  If I may have just one moment, Your

15  Honor.  I believe I'm done.

16              (Government counsel confer.)

17          THE COURT:  Yes.

18          MR. MEDRANO:  Thank you, Your Honor.

19          MR. MEDVENE:  I have no questions.

20          MR. RUBIN:  No questions.

21          THE COURT:  You may step down.

22          THE WITNESS:  Thank you, Your Honor.

23              (Witness excused.)

24          THE COURT:  Call the next witness.

25          MR. CARLTON:  The government calls Eugene

557

1   Hollestelle.

2           (Witness summoned to courtroom.)

3           THE CLERK:  Please raise your right hand.

4       EUGENE HOLLESTELLE, PLAINTIFF'S WITNESS, SWORN

5           THE WITNESS:  Yes.

6           THE CLERK:  Please be seated.

7           State your full name for the record and spell your

8   last name.

9           THE WITNESS:  Eugene J. Hollestelle,

10  H-O-L-L-E-S-T-E-L-L-E.

11                      DIRECT EXAMINATION

12  BY MR. CARLTON:

13  Q    Mr. Hollestelle, how old are you?

14  A    Thirty-six.

15  Q    And what is your present employment?

16  A    Roofing salesman.

17  Q    Do you know an individual named Donald Walters?

18  A    Yes.

19  Q    When did you first meet him?

20  A    April of 1983.

21  Q    Where was that?

22  A    In Los Angeles, at the South Coast Plaza down in Costa

23  Mesa.

24  Q    Did you go to another location and meet with him at

25  that time?

558

1    A    Yes, I did, at his home.

2    Q    Where was that located?

3    A    In Huntington Beach.

4    Q    And what did you discuss during this meeting?

5    A    Off loading of marijuana from airplanes.

6    Q    Was an offer of employment made to you?

7    A    Yes, it was.

8    Q    And what were you asked to do?

9    A    Just to drive a truck out, unload the planes, and

10   bring the trucks back full of marijuana.

11   Q    Drive out to where?

12   A    At that time, we had a small strip set up out in

13   Parker, Arizona.

14   Q    Who was operating these airplanes?

15   A    Donald Walters.

16   Q    Now, did you participate in off loading one of these

17   aircrafts?

18   A    Yes, I did.

19   Q    Do you recall when that occurred?

20   A    It was late April or early May of 1983.

21   Q    And how much marijuana was involved on that occasion?

22   A    I believe there was between 900 and 1,000 pounds on

23   that occasion.

24   Q    And did you learn who this marijuana was obtained

25   from?

559

1    A    Yes.

2    Q    Who was that?

3    A    Rene Verdugo.

4    Q    Now, did you and Mr. Walters discuss any other

5    mechanisms for bringing in marijuana?

6    A    Yes, we did, after that first load.

7    Q    Do you know where the first load came from?

8    A    No, I'm not familiar with that.

9    Q    Okay.  And what were your discussions with Mr. Walters

10   about other mechanisms for bringing in the marijuana?

11   A    What we decided to do was to obtain a helicopter to

12   start bringing it in.

13   Q    And what did you do in furtherance of that plan?

14   A    Mr. Walters put in a lot of time searching for a

15   helicopter.  We also stopped at the Long Beach Airport

16   where they keep a search and rescue helicopter, the

17   Sheriff's Department does, and we looked through that and

18   decided that would suit our purposes.

19   Q    And Mr. Walters was a pilot?

20   A    Yes, he was.

21   Q    Why was it you wanted to use a helicopter instead of

22   an airplane?

23   A    It would be easier if some sort of surveillance, we

24   could go ahead, set down right where we were at with a

25   minimum of area, and get away from the helicopter, and make

560

1   it a lot easier.

2   Q    Were you looking for a helicopter with a certain cargo

3   capacity?

4   A    Yes.  We wanted something a good size that we could

5   fit a ton or better in.

6   Q    Now, did you ever meet Rene Verdugo?

7   A    Yes, I did.

8   Q    I'd ask you to look at Exhibit 114, if you would.

9   Would you hold that up?

10          Do you recognize that?

11  A    Yes, that's Rene Verdugo.

12          MR. CARLTON:  Move its admission, Your Honor.

13          THE COURT:  It may be admitted.

14          (Plaintiff's Exhibit 114 received.)

15  BY MR. CARLTON:

16  Q    When did you first meet him?

17          You can put the photograph down.

18  A    I believe June or July of 1983.

19  Q    Do you recall where that was?

20  A    Yes, in a restaurant in San Pedro.

21  Q    Was anyone else present?

22  A    Myself, Rene Verdugo, Teresa Verdugo, and Donald

23  Walters.

24  Q    What was the discussion that evening?

25  A    What Rene Verdugo had done was brought some money up,

561

1    I guess, to pay for the helicopter.  Mr. Walters located a

2    helicopter at that point in time.

3    Q    Do you know where Rene Verdugo lived?

4    A    Yes, in Mexicali.

5    Q    And did you take this briefcase somewhere else?

6    A    Yes, we did.

7    Q    Where did you go?

8    A    To Mr. Walters' home in San Pedro.

9    Q    And what was done with the briefcase at that point?

10   A    At that point, I don't remember whether it was that

11   evening or the next morning that we counted the money that

12   was in the briefcase, then it was taken by Patricia

13   Scialampo and I never saw it after that.

14   Q    How much money was in the briefcase?

15   A    I believe there were $500,000 in the briefcase.

16   Q    Who was Patricia Scialampo?

17   A    Mr. Walters' secretary.

18   Q    This money was for the purpose of buying a helicopter?

19   A    Yes.

20   Q    Now, were you ever involved in purchasing cashier's

21   checks in relation to this?

22   A    Yes.

23   Q    When was that?

24   A    I believe that began in probably late July, early

25   August, and went at least until mid September of 1983.

562

1    Q    And what was the total value of the cashier's checks

2    that you purchased?

3    A    $375,000.

4    Q    And where did you get the money to purchase these

5    cashier's checks?

6    A    It was my understanding it was from the briefcase.

7    Q    What were you to do with these cashier's checks?

8    A    They were taken to a place called Dick Sawyer

9    International to purchase the helicopter.

10   Q    Now, did you actually go to Dick Sawyer International

11   to purchase a helicopter?

12   A    Yes.

13   Q    Where was that located?

14   A    Yukon, Oklahoma.

15   Q    When did you go there?

16   A    I believe it was late September or barely October of

17   1983.

18   Q    Were you going there to buy a specific helicopter?

19   A    Yes.

20   Q    And who picked it out?

21   A    Donald Walters.

22   Q    Do you know what kind of a helicopter it was?

23   A    Yes, it was a Scorskey S-58-T.

24   Q    What was the purchase price for that helicopter?

25   A    $425,000.

563

1   Q    When you went to Oklahoma to Dick Sawyer

2   International, did you go there with the full purchase

3   price.

4   A    No.   I made a number of trips there.

5   Q    On the first trip, how much money did you take?

6   A    I believe that time I brought $25,000 in cash and half

7   of the cashier's checks.

8   Q    Did you ever return with the balance of the purchase

9   price?

10  A    Yes, I did.

11  Q    And did anyone go with you?

12  A    Yes.

13  Q    Who was that?

14  A    Ted Cash.

15  Q    What was his involvement in all of this?

16  A    He was going to be a pilot for that helicopter.   At

17  that point in time, Mr. Walters didn't know how to fly

18  helicopters yet.   He was just a fixed wing pilot.

19  Q    And what was done when you got to Dick Sawyer

20  International on this occasion?

21  A    There were some improvements that Mr. Cash wanted

22  made, an extra fuel tank, some other little improvements

23  that he wanted done, so he pointed those out.   We tested

24  the helicopter.

25  Q    Now, did you later see this same helicopter in

564

1    Arizona?

2    A    Yes.

3    Q    About when was that?

4    A    About November of 1983.

5    Q    And where was it in Arizona that you saw the

6    helicopter?

7    A    Out by Stanfield, Arizona.

8    Q    Now, what was to be your role in the use of this

9    helicopter?

10   A    I was to be the ground crew leader.  That meant that I

11   made sure that the trucks got there.  I unloaded the

12   helicopter out to the trucks.  And generally took charge of

13   the operation on this side of the border.

14   Q    Where was this helicopter supposed to pick up the

15   marijuana?

16   A    I believe it was Corborca.

17   Q    In Mexico?

18   A    Mexico, yes.

19   Q    And did you develop a location where it was to land

20   and drop off the marijuana?

21   A    Yes, we did.

22   Q    Where was that?

23   A    Near Stanfield, Arizona.

24   Q    Did you assist in locating that?

25   A    Yes.

565

1   Q     What was your plan as far as the off loading of this

2   marijuana was to proceed?  How did your operation work?

3   A     What we would do is we had radios in our trucks.  The

4   trucks would proceed out to the spot, and then when Mr.

5   Walters was coming in, he would mention a prearranged code,

6   and at that time, we would light up a red flare so that he

7   could find us, and then the helicopter would set down, I

8   would open the door and begin to throw the bales of

9   marijuana out the door.  And other gentlemen would load it

10  into the trucks, and we would refuel the helicopter at that

11  same time, and then drive the trucks out, back to Tucson.

12  Q     What kind of trucks where these?

13  A     There was an '87 Chevy -- '78 Chevy, a '76 Chevy, and

14  we had a '79 Ford pickup.

15  Q     And were they arranged in some particular formation to

16  make the off loading easier?

17  A     Yes.

18  Q     Well, how much marijuana could the helicopter carry?

19  A     These were between three and 4,000 pounds per trip.

20  Q     And were you to be paid for all of this?

21  A     Yes.

22  Q     How was your pay --

23  A     I was --

24  Q     -- calculated?

25  A     I was paid $7,500 per load.

566

1   Q     How many loads were you involved with?

2   A     Thirty to forty.

3   Q     Now, if you would, please, look at what has been

4   marked as Exhibit 115-B.  Do you recognize that?

5   A     Yes.

6   Q     What is that?

7   A     This is the helicopter that we used to fly the

8   marijuana in.

9   Q     Please show that to the jury.

10          You can put it down.  Thank you.

11          When did this helicopter operation begin, begin

12   operating?

13   A     November of 1983.

14   Q     And between that period and Christmas of 1983, do you

15   recall how many loads of marijuana were brought in?

16   A     Nine or fifteen, I don't remember which.  There were

17   two periods there.  I've --

18   Q     After the marijuana was off loaded into the pickup

19   trucks, what would the trucks do?

20   A     They would drive out of the desert back to the house

21   in Tucson.

22   Q     And was the marijuana temporarily stored there before

23   being distributed elsewhere?

24   A     Yes.

25   Q     When the marijuana arrived and was placed in the stash

567

1    house, would you notify Donald Walters?

2    A    Yes.

3    Q    How would you do that?

4    A    I'd call him at Rene Verdugo's house in Mexicali.

5    Q    Now, did you ever speak with Rene Verdugo about this

6    marijuana you were receiving?

7    A    Yes, a few times.

8    Q    And what was his source for this marijuana?

9    A    From my understanding, it was Rafael Caro-Quintero.

10   Q    After Christmas of 1983, did you continue in this

11   helicopter smuggling operation?

12   A    Yes.

13   Q    And between then and say late February, about how many

14   loads did you bring in?

15   A    Well, as I was saying earlier, it was either nine or

16   15.   I don't remember whether we did nine before Christmas

17   and 15 after, or 15 before Christmas and nine after.   It

18   was one of those two figures.

19   Q    Um-um.   And at that point, was the helicopter used to

20   bring in some marijuana from Thailand?

21   A    Yes.

22   Q    Eventually was the helicopter used again to bring in

23   more loads from Mexico?

24   A    Yes.

25   Q    And when did it resume doing that?

568

1   A     September, 1984.

2   Q     How many additional loads of marijuana were you

3   involved in at that point?

4   A     I would say there's probably another 12 to 15 at that

5   point.

6   Q     Did you ever met an individual named Manuella

7   Caro-Quintero?

8   A     Yes.

9   Q     When was that?

10  A     In the summer of 1984.

11  Q     Who was she?

12  A     Rafael Caro-Quintero's sister.

13  Q     What was the occasion of your meeting her?

14  A     She was up here to do some shopping for a boutique she

15  had recently purchased in Guadalajara.

16  Q     Who introduced you to her?

17  A     Donald Walters.

18  Q     And did you speak with Rene Verdugo about her?

19  A     Yes.

20  Q     What did he tell you about her?

21  A     He just asked me to take care of her because it was

22  the big guy's sister.

23  Q     Who did you understand the "big guy" to refer to?

24  A     Rafael Caro-Quintero.

25  Q     Mr. Hollestelle, were you arrested and convicted in

569

1   relation to this smuggling operation?

2   A    Yes.

3   Q    And what was your sentence?

4   A    Three years probation.

5   Q    Do you have any other convictions?

6   A    Yes.

7   Q    What for?

8   A    Cocaine, possession of cocaine.

9   Q    And did you have an agreement with the government in

10  relation to your testimony?

11  A    No.

12  Q    Did you participate in selling some of the marijuana

13  that was brought in from Mexico?

14  A    Yes, I did.

15  Q    Did you profit from that?

16  A    Yes, I did.

17  Q    You've been involved in drug dealings since you were

18  14 years old?

19  A    Yes.

20        MR. CARLTON:  One moment, Your Honor.

21        THE COURT:  Yes.

22              (Government counsel confer.)

23        MR. CARLTON:  Your Honor, I would move in Exhibit

24  115-B at this point.

25        THE COURT:  It may be admitted.

570

1          (Plaintiff's Exhibit 115-B received.)

2          MR. CARLTON: I have nothing further.

3          THE COURT:  You may cross-examine the witness.

4          MR. MEDVENE:  No questions, Your Honor.

5          MR. RUBIN:  Briefly, Your Honor.

6                        CROSS-EXAMINATION

7   BY MR. RUBIN:

8   Q    Mr. Hollestelle, your conviction for conspiracy to

9   possess marijuana with intent to distribute was in 1986; is

10  that correct?

11  A    No, 1987.

12  Q    Okay.  You were arrested in '86 and the conviction was

13  in '87; is that correct?

14  A    Yes.

15  Q    And that's the conviction that you received the

16  three-year probationary sentence for?

17  A    Yes.

18  Q    When did you first agree to cooperate and give

19  information to the government with regard to your drug

20  trafficking activities?

21  A    August of 1987.

22  Q    Was that before or after you were sentenced on the --

23  A    Before.

24  Q    -- marijuana conviction?

25  A    Before.  It was before I was sentenced.

571

1   Q    And was your probationary sentence part of an

2   agreement with the government where they made a

3   recommendation for probation because you agreed to testify?

4   A    I have no way of knowing why they did what they did.

5   I didn't have any sort of an agreement at all.  There was

6   no agreement to recommend probation or anything else.  I

7   was kind of flying blind.

8   Q    At your sentencing, did the government recommend

9   probation for you as your sentence?

10  A    I don't remember.

11  Q    And at the same time you agreed to help the

12  government, the government also started paying you money;

13  isn't that true?

14  A    Yes.

15  Q    In fact, for the year 1987, after you had just been

16  convicted for drug trafficking, they paid you $7,150; is

17  that correct?

18  A    Yes, but a lot of that was for travel back and forth

19  to talk with them and be debriefed.

20  Q    And some of it was for information, wasn't it?

21  A    No.

22  Q    Now, as part of your agreement with the government to

23  cooperate with them, did you understand that you weren't to

24  commit any further crimes?

25  A    I don't understand what you're saying.

572

1   Q    Well, when you and the government agreed that you

2   would help them in this case and testify, did they explain

3   to you that your drug trafficking days are over and you

4   weren't to commit any other crimes?

5   A    Yes.

6   Q    And despite that, isn't it true that you were then

7   convicted on yet another drug charge in 1990; true?

8   A    Wrong.

9   Q    When was your cocaine conviction?

10  A    1984.

11  Q    Were you found guilty in 1990 of any crime?

12  A    No.

13  Q    Now, at any of these meetings that you had concerning

14  the importation of the marijuana, did you ever meet Dr.

15  Humberto Alvarez-Machain?

16  A    No.

17  Q    Ever speak to him?

18  A    No.

19          MR. RUBIN:  No further questions.

20          MR. CARLTON:  Nothing further, Your Honor.

21          THE COURT:  You may step down.

22                      (Witness excused.)

23          THE COURT:  Next witness.

24          MR. CARLTON:  The government calls Lawrence

25  Harrison.

573

1          (Witness summoned to courtroom.)

2          THE CLERK:  Please raise your right hand.

3          LAWRENCE HARRISON, PLAINTIFF'S WITNESS, SWORN

4          THE WITNESS:  I do.

5          THE CLERK:  Please be seated.

6          State your full name for the record and spell your

7     last name.

8          THE WITNESS:  Lawrence Victor Harrison.

9          THE CLERK:  You may be seated.

10          THE WITNESS:  My name is Lawrence Victor Harrison.

11     H-A-R-R-I-S-O-N.

12                     DIRECT EXAMINATION

13     BY MR. CARLTON:

14     Q    Mr. Harrison, how old are you?

15     A    I'm 48.

16     Q    Now, were you born with the name Lawrence Victor

17     Harrison?

18     A    No, I was not.

19     Q    Is that a name that you adopted at some point?

20     A    Yes, I did.

21     Q    When was that?

22     A    1965, I believe.

23     Q    And have you used it pretty continuously since then?

24     A    Yes, I have.

25     Q    In all of your dealings?

574

1    A    Yes, I have.

2    Q    You are an American citizen?

3    A    Yes, I am.

4    Q    Did you attend colleges and universities here in the

5    United States?

6    A    Yes, sir, I did.

7    Q    Were you formally enrolled in any of those?

8    A    No, I was not.

9    Q    Pardon me?

10   A    No, I was not.

11   Q    And at some point, did you travel to Mexico?

12   A    Yes, I did.

13   Q    When did you first travel to Mexico?

14   A    1968.

15   Q    Did you travel to and from Mexico periodically after

16   that?

17   A    From then until 1971, yes.

18   Q    What happened in 1971?

19   A    I became a full time resident of Mexico.

20   Q    And how long thereafter did you live in Mexico?

21   A    I stayed in Mexico until the latter part of 1989.

22   Q    How did you support yourself when you first moved to

23   Mexico?

24   A    When I first moved to Mexico, I obtained employment as

25   a law clerk for an attorney in the City of Guadalajara, and

575

1   I worked with him until 1976.

2   Q    So this was 1971 to 1976?

3   A    Yes, sir.

4   Q    And in 1986, what was your work?

5   A    In 1986?

6   Q    '76, I'm sorry.

7   A    In 1976 I began to work for a social service law

8   office of the C.N.O.P., which is an organ of the P.R.I.

9   Political Party in Mexico.

10  Q    Can you explain for the ladies and gentlemen of the

11  jury what the P.R.I. is?

12           First of all, is that an acronym for something

13  else?

14  A    That's an acronym for the Institution of Revolutionary

15  Party.  It's the dominant major political party in Mexico.

16  Q    And you stated that you worked for the C.N.O.P.  What

17  is that?

18  A    That's is an organism, one of three sections of the

19  P.R.I. Party.  They have a Farmer's Section, a Worker's

20  Section, and a Popular Section, and that is the Popular

21  Section.  That's the organization that represents all of

22  those members of the Party that are not either farmers or

23  workers.

24  Q    What was it that you did for the C.N.O.P.?

25  A    I worked in their law office doing law cases for -- at

576

1   no charge -- for the members of the leagues of the C.N.O.P.

2   Q    So you were working as a lawyer at this point?

3   A    Yes, I was.

4   Q    Was it necessary at that time to be licensed as a

5   lawyer in Mexico?

6   A    It was not.  There were many people that worked

7   without licenses.  Even today, 80 percent of Mexican

8   attorneys are not licensed.

9   Q    Now, if you worked for no pay for the C.N.O.P., how

10  did you make a living?

11  A    Well, we were allowed to charge expenses on some cases

12  which covered our living expenses on some cases, especially

13  if we had to go outside the city; and besides that, I had

14  my own clients.

15  Q    How long did you continue to do that kind of work?

16  A    I worked at that office until the latter part of 19 --

17  the first part of 1980.  The latter part of 1979.

18  Q    What did you do then?

19  A    I moved to Acapulco.

20  Q    And what was the reason for moving to Acapulco?

21  A    I had purchased a home there in 1974, which I had been

22  renting out, and I decided to go and live in it.

23  Q    What did you do with your law practice when you went

24  to live in Acapulco?

25  A    Left it in the hands of the law clerks who were

577

1    working at that time for me.  The C.N.O.P. had moved out of

2    that office by that time, and they were working for me.  I

3    left it in their hands.

4    Q    Did you eventually return to Guadalajara?

5    A    Yes, I did.

6    Q    When was that?

7    A    It was 1980.

8    Q    And why did you return to Guadalajara?

9    A    I was bored.  I didn't have anything -- I found

10   nothing to do in Acapulco, and I wanted to get back to

11   doing something.  So I returned.  I was also worried about

12   my law office, so I returned to Guadalajara.

13   Q    Did you intend on resuming your law practice?

14   A    It wasn't my intention to exactly resume it.  I went

15   back to Guadalajara to find out what else I could do.

16   Q    Were you able, in fact, to resume your law practice?

17   A    For two or three weeks, yes, but the situation had

18   changed a great deal.  I had some problems with the

19   government and I decided not.

20   Q    Not to do it?

21   A    Um-um.

22   Q    So you closed the office?

23   A    Yes, I closed the office.

24   Q    And did you then decide upon another avenue of

25   employment?

578

1    A    Yes, I did.

2    Q    What was that?

3    A    I offered my services as an electronics coordinator to

4    the various police agencies in the City of Guadalajara and

5    the federal agencies trying to get a job.

6    Q    How was it you decided to become involved in

7    electronics at this time?

8    A    I had always had an interest in electronics, and I had

9    installed my own radio system in Guadalajara, which the

10   police agencies had seen and appreciated, and so it was

11   kind of a natural thing for me to do, to offer those

12   services to them.

13   Q    And how did you go about offering your services to

14   these police agencies?

15   A    Well, one of the agencies with which I had had

16   problems as an attorney was the Secretaria De Gobernacion,

17   so it was natural for me to offer my services to them.

18   They wanted me to continue being an attorney.  I didn't

19   want to continue being an attorney on the terms that they

20   had offered me, so I said, "Instead of this, I'll fix your

21   radios for you," and I also circulated a resume'.

22   Q    What other agencies did you solicit this way?

23   A    I solicited the State Judicial Police of the State of

24   Jalisco, the Federal Judicial Police, the Federal Highway

25   Patrol.

579

1    Q    Did any of these agencies take you up on your

2    solicitation?

3    A    I received work with officials of the State Police

4    Department and with comandantes of the Federal Security

5    Directorate.

6    Q    And specifically, in the Federal Security Directorate,

7    is that the same as the D.F.S.?

8    A    That is the D.F.S.

9    Q    Specifically, who with the D.F.S. did you work with?

10   A    The first work I was given was by Comandante Emilio

11   Escandon, who was the comandante of Durango, of the

12   detachment in Durango, and from there I was given work with

13   Comandante Martinez, who was the head of the office in

14   Guadalajara.

15   Q    What kind of work did you do for them?

16   A    Just maintaining repeater systems and radio systems

17   that they already had installed.  I also fixed some TV's

18   for them, and other electronic work as they asked me to do

19   it.

20   Q    How long did you continue to provide this kind of

21   electronic work to the D.F.S. in Guadalajara?

22   A    Well, I eventually performed the same type of work for

23   other comandantes of the D.F.S., and other organizations of

24   the Secretary of the Interior in other parts of Mexico.

25   But I continued more or less on a full time basis as an

580

1    electronics technician for the government until 1984.

2    Q     Now, are you familiar with another organization known

3    as the I.P.S.?

4    A     Yes, I am.

5    Q     What is that?

6    A     In Spanish, that means Investigaciones Politicos y

7    Sociales.   It means the political and social investigations

8    unit of the Secretary of the Interior.

9          Originally the I.P.S. was to investigate political

10   crimes and the D.F.S. was to execute the orders of arrest

11   or containment, or whatever the orders that would be given,

12   pursuant to the investigation made by the I.P.S.   But the

13   truth is they traded these duties off.

14   Q     At some point, did you perform electronics work for

15   persons associated with the I.P.S.?

16   A     Yes, I did.

17   Q     When did you begin doing that?

18   A     Well, I did it on a piecemeal basis in Matamoros.   One

19   time in Tapic, Nayarit, but I did it on a full time basis

20   in Guadalajara from 1983 until 1984.

21   Q     While you were working for the F.D.S. and the I.P.S.,

22   were you issued any credentials by these agencies?

23   A     Yes, I was given credentials by the local comandante

24   for which I worked.

25   Q     What kind of credentials did you receive?

581

1    A    I was given what are known as Oficio De Comision.

2    They are local -- they are papers signed by the local

3    comandante.   Your picture is put on it, a seal is sealed

4    over your picture, and it says that you have been appointed

5    to duties with that local comandante.

6    Q    Were there any other kinds of credentials?

7    A    There were credentials issued through Mexico City on a

8    special machine.   They had to have a photograph on them.

9    They are much like the machine that issues the driver's

10   licenses here in California.   It's a machine that the

11   credential comes altogether in plastic.

12   Q    Do you know an individual named Ernesto Fonseca?

13   A    Yes, I do.

14   Q    And when did you first meet him?

15   A    I met him in 1981, the latter part of 1980 or the

16   first part of 1981.

17   Q    I should ask, during the time period that you lived in

18   Mexico, did you become fluent in Spanish?

19   A    Yes, I did.

20   Q    Would you please look at what has been marked as

21   Exhibit 105.

22   A    This is -- yes, I'm looking at it.

23   Q    Would you please show that to the ladies and gentlemen

24   of the jury.

25        Do you recognize that photograph?

582

1   A      This is Ernesto Fonseca-Carrillo.

2   Q      Thank you.

3          MR. CARLTON:  Move admission of 105, Your Honor.

4          THE COURT:  It may be admitted.

5              (Plaintiff's Exhibit 105 received.)

6          THE COURT:  Do not ask the witness to display

7   before it is.

8          MR. CARLTON:  Thank you.

9   BY MR. CARLTON:

10  Q      Did you eventually come to work for Ernesto Fonseca?

11  A      I was originally ordered to Mr. Fonseca's house.  I

12  was told by the -- by Comandante Martinez that they were

13  componaros, that means colleagues, part of the same

14  organization.  They told me that they had some kind of a

15  problem with their radios and I was sent there to fix their

16  communication problem.

17  Q      And do you recall when this was?

18  A      This was in the first part of 1981, the last part of

19  1980.  I had only been with Comandante Martinez a few weeks

20  when I was told to go to this house.

21  Q      And did you, in fact, go to that house?

22  A      Yes, I did.

23  Q      Where was it located?

24  A      It was in the Colonia Las Fuentes.  The address is

25  Circunvalacion; that's C-I-R-C-U-N-V-A-L-A-C-I-O-N, SUR,

583

1  that's S-U-R, 113.

2  Q    When you got there, what was it that you did?

3  A    Well, they had a radio system -- they had a VHF radio

4  system installed which wasn't working, and they also had a

5  high frequency ship-to-shore radio system that they had

6  installed in their home, and tried to communicate with

7  ranches and other properties that they had within the State

8  of Jalisco.

9  Q    Did you fix that system?

10  A    I couldn't.  I fixed the VHF system.  The

11  ship-to-shore system was totally inadequate for the place

12  where it was.  It was poorly installed, poorly maintained.

13  It was impossible for me to repair it, and I advised them

14  that I didn't think they should repair it anyway since the

15  only frequencies that it had were the mobile stations of

16  the telephone company and the U.S. Coast Guard.

17  Q    Now, did you do any more work for Ernesto Fonseca

18  after that incident?

19  A    Well, he kept me at his home full time after that.  He

20  had me fixing his television sets, and his wife's reducing

21  machine, and a lot of other electronic work, and

22  maintaining the repair of the VHF system that had been

23  installed there.

24  Q    At some point, did you return to the United States?

25  A    Yes, in 19 -- I believe it was the latter part of 1982

584

1    and the first part of 1983.  I'm not sure on the dates of

2    that, but I --

3    Q    Was this additional work for Ernesto Fonseca that you

4    just described performed before you went to the United

5    States or after, after your return?

6    A    It was both before and after, because I was ordered

7    back to his house, and I also joined his organization after

8    I returned from the United States also, so it was before

9    and after.

10   Q    When was it that you returned from the United States

11   to Guadalajara?

12   A    The first part of 1983.

13   Q    Do you know an individual Serjio Espino-Verdin?

14   A    Yes, I do.

15   Q    How do you know him?

16   A    I had known him early on in 1982 as an agent working

17   in the northern part of the country, of the D.F.S., and I

18   saw him again in 1983.  He told me that he had just been

19   appointed coordinator of the Office of Gobernacion, that's

20   Secretary of the Interior in Guadalajara, and specifically

21   as the comandante of the I.P.S. Office.

22   Q    And you were still working for the I.P.S. Office at

23   that time?

24   A    I had just returned from the United States, and I been

25   given a lot of television sets to repair by Ernesto

585

1    Fonseca's brother, and I was also doing piecemeal work for

2    the I.P.S. -- not the I.P.S., but the D.F.S. -- in other

3    parts of the country.

4    Q    If you would look at what has been marked as Exhibit

5    119.

6         Do you recognize that?

7    A    Yes, I do.

8    Q    What is it?

9    A    It's a photograph of Comandante Serjio Espino-Verdin.

10        MR. CARLTON:  Move admission of 119, Your Honor.

11        THE COURT:  It may be admitted.

12        (Plaintiff's Exhibit 119 received.)

13   BY MR. CARLTON:

14   Q    At some point, did Comandante Espino give you some

15   orders in relation to Fonseca?

16   A    Yes.  He told me as soon as he had assumed the

17   comandante, he told me that I should go over to their

18   house, that they were having communication troubles again,

19   that they wanted a new radio system installed, that they

20   weren't satisfied with the old one that they had.

21   Q    Now, at this point in time, was Comandante Espino your

22   superior within the I.P.S.?

23   A    Yes.  He had taken control.  He had taken charge of

24   the I.P.S. Office in Guadalajara.  He had asked me to join

25   him.

586

1   Q    At about that same time, had you been approached by

2   someone from Fonseca's group?

3   A    Yes.  Within a matter of weeks he asked me to go to

4   their house.  On almost the same day that he asked me to go

5   to their house, I was approached by one of Mr. Fonseca's

6   workers who asked me if I would be willing to join their

7   organization.

8   Q    And did you do so?

9   A    Well, I did so, but I continued to report to

10  Comandante Espino-Verdin.  He said, "Yes, go ahead and do

11  it, just keep me informed of what they are doing," even

12  though he was a member of their organization, also.  During

13  the time that he wasn't there, he told me, "You watch and

14  you tell me what they are doing."  He also had me do some

15  extra work for them at their house.

16  Q    Where was it that you went to work for Ernesto

17  Fonseca?

18  A    Originally, I returned to the house at Circunvalacion

19  Sur.

20  Q    And eventually did you move into one of Ernesto

21  Fonseca's residences?

22  A    Yes.  Mr. Fonseca almost immediately changed to a

23  residence at the corner of Obsidiana, that's

24  O-B-S-I-D-I-A-N-A, and Cuarzo, C-U-A-R-Z-O in Residencial

25  La Victoria in Guadalajara, and I moved in.  I was ordered

587

1  to attend him 24 hours a day at that house.

2  Q     Did you live there full time?

3  A     Twenty-four hours a day.

4  Q     How long did you live there?

5  A     I lived there for three or four months.

6  Q     And generally during what period; do you recall?

7  A     This was during the middle part of 1983.  It was -- I

8  had a birthday there.  I had only been there a short amount

9  of time.  I was born in September.  I left that house in

10 January or February of the next year which was 1984.

11 Q     After leaving that house, did you continue to work for

12 Ernesto Fonseca?

13 A     Yes.  I continued to work for Ernesto Fonseca.  I had

14 already installed a radio system.  It was impossible for me

15 to just leave it.  He wouldn't let me.

16 Q     How long did you continue to work for Ernesto Fonseca?

17 A     I continued to work for Ernesto Fonseca and for the

18 government until September the 11th of 1984.

19 Q     Let's talk about this radio system.  Did you actually

20 create a radio system for Ernesto Fonseca?

21 A     I designed it, created it, installed it, and

22 maintained it.

23 Q     When did you begin your design work?

24 A     In July of 1983, more or less.  I did the original

25 work.  It took me about a month to work up the plans and do

588

1    the admittance studies, and I purchased the components in

2    August, I think.

3    Q    When was it completed, essentially?

4    A    Well, it was essentially never completed.  It was

5    installed and working, but it was a system that I was

6    adding components on to all the time, and essentially I

7    suppose it's one of those things that you make that's

8    never, ever completed.  I mean, it was working.  It was

9    installed and functioning, but I still had plans for it.

10              MR. CARLTON:  Your Honor, would this be a good

11   time for the afternoon break?

12              THE COURT:  We'll take our afternoon recess at

13   this time.

14              THE CLERK:  Please rise.  This Court stands in

15   recess.

16                         (Recess taken.)

17                         (Jury in.)

18              THE COURT:  Where is the other witness?

19              MR. MEDRANO:  With the Court's permission, Your

20   Honor, Mr. Gomez is an agent from out-of-state.  We wanted

21   to take him out of order.  He's on and off in five minutes,

22   and that way we can --

23              THE COURT:  All right.

24              MR. MEDRANO:  If that's all right with the Court?

25              THE COURT:  That's fine.

589

1      MR. MEDRANO:  Then we will recontinue with

2  Mr. Harrison.  Thank you.

3              (Witness summoned to courtroom.)

4      THE COURT:  Swear the witness.

5      THE CLERK:  Please stand and raise your right

6  hand.

7      THOMAS GOMEZ, PLAINTIFF'S WITNESS, SWORN

8      THE WITNESS:  I do.

9      THE CLERK:  Please be seated.

10     State your full name for the record and spell your

11  last name.

12     THE WITNESS:  My name is Thomas Gomez, G-O-M-E-Z.

13                  DIRECT EXAMINATION

14  BY MR. MEDRANO:

15  Q    Mr. Gomez, are you a D.E.A. agent?

16  A    Yes, I am.

17  Q    Currently assigned to what city?

18  A    I'm stationed in Tucson, Arizona.

19  Q    How long have you been with the D.E.A.?

20  A    Approximately 17 years.

21  Q    At any point, sir, did you have an opportunity to

22  serve in Guadalajara in the latter part of 1984?

23  A    Yes, sir, I did, from October 14th to November 14th,

24  1984.

25  Q    And your purpose in being there, Agent Gomez?

590

1    A    I was sent there to follow some suspects in the City

2    of Guadalajara.  I was sent there to photograph them,

3    record their radio transmissions, and attempt to identify

4    any associates of these traffickers.

5    Q    Can you tell me who you are talking about?

6    A    Miguel Angel Felix-Gallardo, Ernesto Fonseca, Rafael

7    Caro-Quintero, and Ramon Matta-Ballesteros.

8    Q    In addition, sir, where there any particular areas

9    that you were trying to focus on in Guadalajara in doing

10   this surveillance?

11   A    Yes.  There were several areas that I concentrated on.

12   One was the La Langosta restaurant owned by an individual

13   named Cochiloco, Manuel Salcido-Uzueta, the Guadalajara

14   International Airport, the private hangers belonging to

15   Felix-Gallardo and Rafael Caro-Quintero, a motel called Las

16   Americas Royal Suites, and a communications center in the

17   neighborhood area of Guadalajara that belonged to

18   Felix-Gallardo.

19   Q    During this time frame that you've described, you did

20   surveillance work in those particular areas?

21   A    Yes, sir, I did.

22   Q    Now, if I can direct your attention to that same

23   timeframe, did you ever have an opportunity to do some

24   surveillance at the Guadalajara Airport?

25   A    Yes, sir, I did.  Multiple times I went to the

591

1    airport.

2    Q    Can I ask you, sir, not to speak directly into the

3    mic.  Maybe stand back just a couple of inches.

4              THE COURT:  The mic should be to your left.

5              THE WITNESS:  Okay.

6              THE COURT:  You don't need to lean over it.

7              THE WITNESS:  All right.

8    BY MR. MEDRANO:

9    Q    And I'm sorry I interrupted you.

10   A    Multiple times I -- I went to the Guadalajara Airport

11   and conducted surveillance there.

12   Q    And as part of your general surveillance, did you ever

13   see Felix-Gallardo?

14   A    Yes.  After about one week after I arrived there, I

15   was in a Cessna 210 aircraft with a pilot named Alfredo

16   Zavala, Agent Kiki Camarena, and we were taxing out, and a

17   jet was taxing in.  We criss-crossed each other, and I made

18   eye contact with Felix-Gallardo.  He was on the right-front

19   seat of the jet.  That's the first time I laid eyes on him

20   and he had observed me.

21   Q    Was there a second time, Agent Gomez?

22   A    The second time was at the communication center.  He

23   was getting out of his car with several other individuals

24   around him.  They were carrying weapons, long armed

25   weapons, what appeared to be bodyguards for Mr. Gallardo.

592

1          The third time I saw him was at the Cessna hanger

2   of the airport on November 14th, about 11:00 o'clock in the

3   morning.

4   Q    I'd like to focus on that last occasion that you

5   described.

6          How did you get to the airport?

7   A    I was driving a rental car, and I paid a guard.  I

8   was -- I had paid several times before that.  I would pay

9   him "X" amount of dollars to allow me access into that

10  controlled area, and I entered.

11  Q    Were you alone on this day?

12  A    No, I had a junior partner that I instructed to

13  photograph the interior of the hangers as I drove by

14  slowly.

15  Q    And was this done?

16  A    Yes.

17  Q    Did anything happened while the photographs were being

18  taken?

19  A    As my partner was photographing, I was driving real

20  slow in front of the hangers.  Felix-Gallardo was standing

21  to the left of the vehicle I was driving, and he observed

22  what we were doing.

23  Q    How close did you come?

24  A    He was within five feet.  We both startled each other.

25  I then advised my partner, "Let's get out of here."

593

1   Q    Your partner's name, by the way?

2   A    Hector Sanchez.

3   Q    What happened next?

4   A    I drove away, and I saw Felix run into the hanger, and

5   a black, approximately '82 Chevrolet car, came after us;

6   and I drove to the public section of the airport.

7   Q    Now, before leaving that hanger area, were you able to

8   look into the hanger?

9   A    Yes, sir.

10  Q    Could you tell me what you saw in that hanger before

11  you departed?

12  A    There were several aircraft, an Aero Commander,

13  Felix's vehicle that I had seen him in before, several

14  people meandering inside.

15  Q    What type of vehicle, by the way?

16  A    It was a gold Mercury Marquis.

17  Q    Take up from there.  What happened next?

18  A    The black Chevrolet followed us.  I accelerated to a

19  high rate of speed.  It kept up.  There were two

20  individuals in it.  I decided to evade these individuals or

21  avoid contact.  I parked the vehicle I was driving and went

22  into the Guadalajara Airport where there was a lot of

23  people to avoid these people that were following us from

24  the hanger.

25  Q    To go to the airport from the hanger, did you drive at

594

1   a fast rate of speed?

2   A    Yes, sir.  I had to drive up to the main highway, and

3   then back into the airport, and I went as fast as I could,

4   and I saw that this vehicle was obviously in a chase after

5   us.

6   Q    What happens next?

7   A    Inside the airport, we hid among shops and among

8   groups of people, pockets of people.  Twenty minutes later

9   I attempted to leave again with my partner, and as I was

10  getting into the car, I saw those same individuals in the

11  black car turn their heads, and they started their engine,

12  so I decided it wasn't safe then to leave.  We went back

13  into the airport.

14          At that time, I spotted the gold Mercury Marquis.

15  Two more individuals, and at that point they started to

16  follow us into the airport.

17  Q    So what happens now that you and the agent are in the

18  airport?

19  A    During this entry into the airport, these individuals

20  were following us.  They had bulges under their suit coats.

21  They were holding on to what I felt were weapon or had seen

22  to be weapons prior, so we avoided, we kept moving from

23  pockets of people to pockets of people so we wouldn't get

24  real up close contact with these individuals.

25          I saw that eventually they would make contact with

595

1   us, so I directed my partner to call the Consulate, the

2   U.S. in Guadalajara, and see what they could do to give us

3   a hand.

4   Q     Did you contact the Consulate?

5   A     Yes.  My partner called the Consulate, and eventually

6   they dispatched approximately 11 Mexican Federal Judicial

7   Policemen to give us a hand.

8   Q     And the four men that were outside, waiting for you,

9   where they armed?

10  A     Yes, sir.  They were definitely armed.  They had

11  weapons under their suit coats.

12  Q     Were you escorted off the premises by these 11

13  M.F.J.P. agents?

14  A     The 11 M.F.J.P. agents were over.  They had shotguns

15  at high port.  The head of the Federal Mexican Federal

16  agents told me to get into a circle.  They formed a circle

17  and they asked me to get into the circle, that they would

18  escort us out of the airport, by these other armed

19  individuals, that they would put cars in front and back of

20  the car I was driving, and escort us out of the airport to

21  their comandante or their headquarters.

22  Q     Was this, in fact, done?

23  A     Yes, they formed a circle, and I got into the circle,

24  and the other armed individuals from the Gallardo hanger,

25  they approached the circle and stopped short.

596

1    Q     And incidentally, when the M.F.J.P. were sent to

2    assist, where any D.E.A. agents accompany those M.F.J.P.

3    agents?

4    A     To the best of my recollection, there were three

5    agents.  There was Kiki Camarena.  There was Agent

6    Bachelier, and an Agent Wallace that had accompanied these

7    11 federal -- Federal Mexican Policemen to escort us out of

8    the airport.

9           MR. MEDRANO:  Your Honor, may I have just one

10   moment, please.

11          THE COURT:  Yes.

12              (Government counsel confer.)

13          MR. MEDRANO:  That concludes direct.  Thank you.

14          THE COURT:  Any questions for this witness?

15          MR. MEDVENE:  I have no questions, Your Honor.

16          MR. RUBIN:  No questions.

17          THE COURT:  You may step down.

18              (Witness excused.)

19          MR. CARLTON:  The government recalls Lawrence

20   Harrison.

21              (Witness summoned to courtroom.)

22     LAWRENCE HARRISON, PREVIOUSLY SWORN, RESUMED STAND

23          THE CLERK:  Mr. Harrison, you have previously been

24   sworn and I remind you that you are still under oath.

25              Restate your name for the record, please.

597

1      THE WITNESS:  Lawrence Harrison.

2              DIRECT EXAMINATION (Continued)

3  BY MR. CARLTON:

4  Q    Mr. Harrison, when we left off, you had mentioned that

5  you had completed -- completed a portion of the radio

6  system that you were creating for Ernesto Fonseca.

7          Can you describe that system?

8  A    It was a VHF radio system.  It was centered on a

9  frequency above 148 megahertz.  There were approximately --

10         THE COURT:  You can sit back.

11         THE WITNESS:  All right.  Thank you.

12         THE COURT:  Just leave this to the side there.

13         THE WITNESS:  There were originally 25 radios that

14 grew to 80 stations that consisted of, by the time I left

15 off, it consisted of four repeaters that were interlaced

16 together and were accessed by portable radios.  The

17 majority of them were portable hand-held radios.  There

18 were one or two base stations.

19 BY MR. CARLTON:

20 Q    Let's talk a little more specifically about how this

21 system worked.  You said that there were some repeaters

22 accessed by some hand-held radios.

23         What's a repeater?

24 A    Well, a repeater is a -- actually a rebroadcaster.

25 It's a radio that listens on one frequency.  It's situated

598

1    on a high spot, with commanding altitude and location, so

2    that there is no obstacle between the transmitting radio

3    and the receiver portion of the repeater.

4            It receives the low power hand-held radio signal

5    and rebroadcasts it over a large area with a larger signal.

6    Q    So if someone was using this system, they would have a

7    small hand-held radio?

8    A    It was designed in that manner.  They would be able to

9    use only walkie-talkies or hand-held radios so they

10   wouldn't have to have bulky large radios and wouldn't have

11   to have antennas on their cars or on their houses.

12   Q    And this was a low power device, this hand-held radio?

13   A    Hand-held radios is five watts going into the final

14   stage.  It puts out around four watts normally, and that is

15   picked up by the repeater and rebroadcast with from 30 to

16   150 watts, depending on the repeater size.

17   Q    Was it possible to communicate throughout the

18   Guadalajara area with this system?

19   A    It was possible to communicate throughout the

20   Guadalajara area and/or large portions of the State of

21   Jalisco.

22   Q    Was the reception equally good throughout that area?

23   A    The reception is never equally good throughout any

24   area where there are repeater systems.  There are always

25   dead spots, spots where they are fading that is not --

599

1  Q    Now, after this system was essentially created, did

2  you have continuing responsibilities with regard to it?

3  A    Yes.  I had to maintain it.  I had to repair the

4  radios that they broke.  They tended to shoot them

5  sometimes.  They let the batteries run down and they'd get

6  angry at them and they'd shoot them, so they'd bring them

7  to me.  You know, I had to fix them.  They'd drop them or

8  leave them in water or burn cigarettes on them.  I repaired

9  the radios that they broke.  I also maintained the main

10 system.

11         The repeater sites themselves were maintained by

12 batteries that were on hills that nobody else knew where

13 they were.  Generally there no was electricity.  They were

14 run on large deep cycle batteries and we had to recharge

15 the batteries at regular intervals.

16 Q    So did you continue to maintain this system during the

17 rest of the time that you worked for Ernesto Fonseca?

18 A    Yes, I did.

19 Q    While you were working for Fonseca, were you still

20 paid by the governmental agencies you were working for?

21 A    Yes.  Comandante Espino continued to pay me and on a

22 regular basis.

23 Q    And were you also paid by Ernesto Fonseca?

24 A    Mr. Fonseca would -- I -- whenever it pleased him, he

25 would take a large roll of bills out of his pocket and give

600

1   you a large amount of money, but it wasn't like a regular

2   payday or a stated rate of pay.

3   Q    And did you continue to report to Serjio Espino while

4   you were working for Fonseca?

5   A    Yes.  I daily divided my time between the I.P.S.

6   Office and Mr. Fonseca's house.  I would take 15 minute and

7   run over to the I.P.S. Office and report to Comandante

8   Serjio.  I would speak to him while he was at Mr. Fonseca's

9   residence, because he came there often.

10  Q    Did you consider Ernesto Fonseca himself to be your

11  superior officer in some way relative to the I.P.S.?

12  A    Yes.  He was my superior officer.  He had a valid

13  credential, senior investigator's credential from the

14  I.P.S. Office.  I saw it on many occasions, and he was

15  acknowledged by Comandante Serjio to be a member in good

16  standing of the I.P.S.

17  Q    When you say "Comandante Serjio," are you referring to

18  Espino?

19  A    Yes, I'm referring to Espino-Verdin.

20  Q    Did you, besides creating and maintaining this radio

21  system, perform any other kind of work for Fonseca?

22  A    Well, Mr. Fonseca gave duties to anybody at hand as

23  the duties came up.  If you were in his house and he wanted

24  you to do something, he sent you to do it.  But, yes, I did

25  many other duties for him.

601

1    Q    Did you perform other kinds of electronics work as

2    well?

3    A    I repaired stereos, television sets, still his wife's

4    reducing machine that she seemed to blow up every month.

5    Q    And on occasion, were you ordered to escort vehicles?

6    A    Yes, I was.

7    Q    Do you recall how many occasions that happened?

8    A    The occasions that I recall were four.

9    Q    And what was it on these occasions that you were

10   ordered to do?

11   A    Well, they would order -- they would say who has

12   credentials of all the people that were in the house.  Some

13   people had State Judicial Police credentials.  Some people

14   had Federal Judicial Police credentials.  Some people had

15   D.F.S.  Some people had I.P.S.  And some people were from

16   the military.  And if they were going to go pass the

17   military checkpoint, they wanted people with D.F.S. or

18   I.P.S. credentials.  If they were going to go pass the

19   Judicial Police checkpoint, they wanted people with -- they

20   wanted, you know, to be of the same corporation as the

21   checkpoint that you were going to go by, so they would say

22   who has credential, and then they would say get in the car

23   and you're going to escort something back from a certain

24   point.

25   Q    You used the word "corporation"?

602

1   A    That's a Mexican word, corporation.  It means

2   agencies, police agencies.

3   Q    So each of these times you were ordered to go to a

4   particular place?

5   A    Yes.  Go to a particular place, wait for a convoy,

6   form into the convoy ahead and behind it, turn on our red

7   lights and sometimes our sirens, and escort it to -- back

8   to the City of Guadalajara.

9   Q    On these four occasions, where were you ordered to go?

10  A    We went once to a ranch called Puayna (phonetic),

11  which is outside the City of Guadalajara.  We went twice to

12  Meca, which is in the Valley of Meca, about 25 miles from

13  Guadalajara.  And we went once to the top of Mascota area.

14  Q    Where is Mascota?

15  A    Mascota is in the hills on the way to the coast.  You

16  have to go on an unpaved highway and you reach -- it's a

17  hill town.

18  Q    Directing your attention to that Mascota trip, when

19  did that occur?

20  A    That occurred sometime in 1983, the latter part of

21  1983, I would assume.  I don't -- I didn't note down the

22  date.

23  Q    Specifically, what was it that you did in relation to

24  that trip?

25  A    We drove to a point outside the City of Mascota.  We

603

1   set up a roadblock on the road where we were.  We waited

2   there for two or three hours.  We were contacted on the

3   radio by Mr. Fonseca's brother, who was heading up the

4   convoy, saying, "We are on our way, stand by on the side of

5   the road, and when we go by, form up."  And as they went by

6   we formed up ahead of them and behind them and escorted

7   them.

8   Q    What was it that you escorted?

9   A    Well, it was a truck with a tarp over it.  I don't

10  know what was in the truck.  I assume -- I don't know.

11  Q    What kind of a truck?

12  A    It was a stake bed truck that was pretty heavily

13  loaded.  It was sagging in the back.  I can't tell you the

14  contents because I don't know.

15  Q    And where did it go?  Where did this truck go?

16  A    We escorted it back to Guadalajara.

17  Q    Did you encounter any roadblocks on the way?

18  A    We encountered an army roadblock just before the

19  junction of the road with the main highway to Nogales.

20  Q    Do you know where this truck came from?

21  A    I assumed it came from Mascota.  We were right outside

22  the city.

23  Q    Was the same procedure followed each time?

24  A    Yes, more or less that was the procedure, except for

25  once at Pueyna.  Pueyna was a ranch.  There was a ranch

604

1  their owned by Mr. Fonseca, and we drove right in and we

2  didn't have to wait for the convoy to come out.  We drove

3  right in and waited around there until they were ready to

4  go.

5  Q    Did you ever see what these trucks were loaded with?

6  A    Well, I didn't.  Did I ever see it?  No, I didn't.  I

7  saw it later, after it had been unloaded, but I didn't see

8  it while it was on the truck.

9  Q    What did you see later, then?

10 A    It was marijuana.

11 Q    Now, do you know who the source of this load on the

12 Mascota trip was?

13 A    I only know what I was told.  I don't know.  I don't

14 have any --

15 Q    And what were you told?

16       MR. MEDVENE:  Objection --

17       MR. RUBIN:  Objection; hearsay.

18       THE COURT:  Sustained.

19 BY MR. CARLTON:

20 Q    During the time that you worked for Ernesto Fonseca,

21 did you become familiar with his various residences?

22 A    Yes, I did.

23 Q    He had a number of these residences in the Guadalajara

24 area?

25 A    He had 20 or 30 houses in Guadalajara.

605

1    Q    Now, during the time that you worked for him, which of

2    these houses did he live in?  Do you recall?

3    A    Well, he maintained a march from one house to the

4    next.  He lived in La Fuentes, then he to the Cuarzo house

5    then he went to another house that he had built, and then

6    he moved to a place called La Bajadita.

7    Q    I believe in front of you should be two exhibits

8    marked 121-A and B.  Do you see those?

9    A    Yes, I do.

10   Q    Do you recognize those photographs?

11   A    Yes.

12   Q    And what do they depict?

13   A    They depict -- this is the La Bajadita.

14   Q    What's the number on that one?

15   A    121-A.

16        This is also the Bajadita from around the corner.

17        MR. CARLTON:  I move the admission of these

18   exhibits, Your Honor.

19        THE COURT:  They may be admitted if not

20   previously.

21     (Plaintiff's Exhibits 121-A and 121-B received.)

22        MR. CARLTON:  Excuse me, Your Honor, may I have a

23   moment?

24        THE COURT:  Yes.

25   BY MR. CARLTON:

606

1    Q     Are you familiar with the location known as Club

2    Lebonaise?

3    A     Yes, I am.

4    Q     What is that?

5    A     It's a club that was originally formed by a wealthy

6    Lebanese immigrant who lived in Mexico and Guadalajara, and

7    they sold it somewhere around 1984, and it was purchased by

8    Mr. Fonseca.  I was there when he was

9    dealing -- making the overtures to buy the Club Lebonaise.

10   We also had meetings there later on, parties.

11   Q     During the time that you were working for Ernesto

12   Fonseca, did you see him conducting his business?

13   A     Yes, I did.

14   Q     Then did you see him meeting with various persons?

15   A     Yes, I did.

16   Q     Were there some persons that he would meet with more

17   often than others?

18              MR. RUBIN:  Objection, vague as to time.

19              THE COURT:  Overruled.

20              THE WITNESS:  Are you differentiating meetings as

21   business meetings from to meet, to just meet and greet a

22   person or --

23   BY MR. CARLTON:

24   Q     Let's deal with business meetings at this point.

25   A     Yes, I saw many business meetings.

607

1  Q     And were there some people he met with on these

2  occasions more than others?

3  A     Yes.

4  Q     And among the people he met with for business

5  purposes, were there some that he treated with more

6  deference or respect than others?

7  A     There were some that he treated with more deference

8  and respect, and there were others where there was a lack

9  of deference.  They were more or less as equals.

10 Q     And of those who he treated more deferentially, who

11 did he meet with most often?

12 A     The ones that he treated deferentially were his

13 subordinates.  The ones where there was a lack of deference

14 or a lack of -- there was respect, but that if he treated

15 certain people as his equals, then they were partners or

16 his --

17 Q     All right.  Who did he treat as his equals?

18 A     As his equals, he treated Miguel Felix-Gallardo,

19 Rafael Caro-Quintero, Manuel Salcido-Uzueta.

20 Q     Is he also known Cochiloco?

21 A     Salcido-Uzueta, yes, that's Cochiloco.  That was his

22 nickname.

23        Also, as El Azul.  Those where his -- and those

24 where his major partners.

25 Q     What would you see these people doing together?

608

1  A    They would -- they normally frequented each other when

2  they were all together in the same city.  They were not

3  always all together in the same city, but when they were

4  all together, they always frequented each other as far as

5  coming over.  But, you know, they paid a ritual visit to

6  each other when they were in town.

7        And sometimes they would meet together and make,

8  what I took to be business decisions, because they would go

9  off by themselves and closet themselves, and then come out

10 and announce the decisions having to do with the

11 organization or transporting something from one place to

12 another, or dispositions as far as the organization was

13 concerned.

14 Q    Where did most of these meetings take place that you

15 saw?

16 A    Most of them that I saw where at the three houses, La

17 Bajadita, Cuarzo and Las Fuentes.

18 Q    Are you familiar with the Hotel Las Americas?

19 A    Yes, I am.

20 Q    And how is it that you are familiar with that

21 location?

22 A    That hotel was owned by Miguel Felix.  The chief of

23 the Homicide Bureau, the State Judicial Police was

24 quartered there.  Mr. Barba -- Javier Barba, who was also a

25 member of Mr. Fonseca's retinue, and later on a partner,

609

1    also hung out there with the head of the -- with the chief

2    of the Homicide Bureau.  They called me there on a regular

3    basis to sweep the lines, to make sure there were no taps

4    on the telephones.

5    Q    And to your knowledge, did Miguel Felix have an office

6    there?

7    A    He had an office, but it was an office maintained by

8    his administrator, Tomas Vias.

9    Q    Looking in front of you, do you see Exhibit 133-A?

10   A    Yes.

11   Q    What's the exhibit just in front of you, that you are

12   holding in your top hand?

13   A    These are both the same.

14   Q    Oh, I see.

15   A    They are not the same, but they are the same place.

16   Q    Okay.

17   A    The same place.

18   Q    And you're looking at 133-A and B?

19   A    Yes.

20   Q    Let me ask you, what is the exhibit you're holding in

21   your left hand?  What's the number on that?

22   A    This one?  This one is 127.

23   Q    Do you recognize that?

24   A    It's the Club Lebonaise.

25   Q    All right.  You can put that down for us.

610

1        And then looking at 133-A and B.

2    A    133-A and B are more of Hotel Las Americas.

3        MR. CARLTON:  All right.  Your Honor, I move the

4    admission of 127, 133-A and B.

5        THE COURT:  They may be admitted.

6     (Plaintiff's Exhibits 127, 133-A and 133-B received.)

7    BY MR. CARLTON:

8    Q    Do you know an individual named Rafael Caro-Quintero?

9    A    Yes, I do.

10   Q    And how is it you first met him?

11   A    I first met him at Mr. Fonseca's house in Las Fuentes

12   in 1982.

13   Q    Did you ever do any work for him?

14   A    Without him knowing it, yes.  I designed and sent a

15   radio system up to Corborca, Sinora, which he utilized at

16   his ranch.  He later came down and told me how good it was

17   without knowing that I had made it.

18   Q    And do you have in front of you Exhibit 19-A?

19   A    Yes, I do.

20   Q    Do you recognize that?

21   A    Rafael Caro-Quintero.

22       MR. CARLTON:  Move the admission of 19-A, Your

23   Honor.

24       THE COURT:  That may be admitted.

25           (Plaintiff's Exhibit 19-A received.)

611

BY MR. CARLTON:

1

Q     At some point, did Caro actually use Fonseca's radio

2

system, to your knowledge?

3

A     Yes.   When he originally returned to Guadalajara,

4

which was in, I believe, November, or before November of

5

1983, he merged his group into Mr. Fonseca's group, and

6

they both used the radio system that I had installed.

7

Q     How long did that continue?

8

A     That continued up until the last part of 1983 and they

9

had a falling out.

10

Q     Did he continue to use the radio system into some part

11

of 1984?

12

A     Yes, but on a less and less, and they finally

13

established another system with Miguel Felix.

14

Q     Did you assign call signals to the individuals who

15

where allowed to use Fonseca's radio system?

16

A     The original call signals for the core group of Mr.

17

Fonseca.   I did not assign the call signals, and I did not

18

assign my own call signal.   That was assigned to me by

19

them.   But I did assign the call signals to the members of

20

the State Judicial Police, the army, and to Mr. Rafael

21

Caro-Quintero's group because they were added on later.

22

Q     What call signal did you assign to Caro?

23

A     R-1.

24

Q     R dash 1?

25

612

1    A    Yes.

2    Q    Did you ever see Caro and Fonseca working together?

3    A    Yes, I did.

4    Q    What was it you saw in this regard?

5    A    Well, the first time I saw them, they were sitting

6    together at a desk, calling people in the United States.   I

7    remember that they were dialing long distance, and they

8    were getting mad at people, saying they weren't paying them

9    for the marijuana that they had sent them, and they were

10   speaking they had given one person 1,000 pounds and another

11   person 500 pounds, and they keep saying that to pay the

12   money; and Mr. Fonseca would speak softly to them and say

13   that Rafa was getting mad, and then he'd pass the phone to

14   Rafa who'd say he was going to kill them; and then Rafa

15   would pass the phone back to Mr. Fonseca who was saying he

16   couldn't control Rafa.   They were, more or less, doing a

17   Mutt and Jeff routine to try to get these people to pay up

18   on the overdue marijuana from the United States.

19   Q    Did you see this repeated on other occasions?

20   A    Yes, I did.

21   Q    Now, you say that there was a falling out between the

22   two of them in late '83 or early '84?

23   A    Yes.

24   Q    Did they, to your knowledge, continue to do business

25   together after that?

613

1    A    Yes, they did continue to do business.

2    Q    Did they continue to do business together during the

3    entire period that you were working for Ernesto Fonseca?

4    A    Yes, they did continue to do business together.

5    Q    And do you know an individual named Miguel

6    Felix-Gallardo?

7    A    Yes, I do.

8    Q    How do you know him?

9    A    I met him at Mr. Fonseca's house and at his parties.

10   Q    If you look at what's been marked as Exhibit 104.  Do

11   you recognize that?

12   A    Yes, it's Miguel Felix-Gallardo.

13   Q    All right.  Thank you.

14   A    Not a very good picture, but it is him.

15   Q    How many times have you met Miguel Felix?

16   A    Many, many occasions.  I don't know.  I don't know if

17   I can put a number on it.  It was more than 25.  About a

18   hundred.  Many, many times.

19   Q    Likewise, Caro, how many times have you met him?

20   A    Many, many times.  I saw him on a daily basis, and I

21   would see him four or five times a day many times, and over

22   a period of five years, I saw him --

23   Q    Where was it that you would see him?

24   A    I would see him at Mr. Fonseca's house, at his own

25   house, at restaurants, at the Federal Judicial Police

614

1  office, at the Gobernacion Offices, at parties,

2  everywhere.  Everywhere that I was -- that I had to

3  frequent because of my duties.  It was the same

4  organization.

5  Q    Did you ever hear Fonseca refer to him as one of his

6  partners?

7  A    Mr. Fonseca complained that Rafa had been, more or

8  less, his protege, but had gotten too big for his britches,

9  and was now disputing his power with him.

10  Q    When was this?

11  A    All the time -- well, this was the last part of 1983

12  and almost the first half of 1984, he would shake his head

13  and say, "Oh, Rafa, I made you what you are and now you

14  are -- now you're trying to take my power away from me,"

15  and -- but in a kindly way.  It wasn't as if he were

16  really --

17  Q    How did Fonseca refer to Felix?

18  A    They referred to Mr. Felix-Gallardo with a great deal

19  of respect during the latter portions of 1984 and the

20  first -- the latter portions of 1983 and the first part of

21  1984.  Mr. Felix wasn't around them that much.  He had

22  absented himself from their company.

23  Q    And do you know why that was?

24  A    Mr. Felix told me that Rafael and Ernesto were two

25  rowdy, that they were too splendid, that they were

615

1   attracting too much attention, and that he was getting a

2   lot of heat from Mexico City because of their antics and

3   that he felt himself to be more refined than they were; and

4   for that reason, he didn't want to be associated as closely

5   with them, to be seen with them, even though he continued

6   to do business with them.

7   Q    What did you understand his reference to "getting heat

8   from Mexico City" to mean?

9   A    Well, these people had connections in Mexico -- not

10  connections -- they were directly ordered to do what they

11  were doing from Mexico City.  They were given the

12  concession to run narcotics in that particular area, right

13  from Mexico City from the various dependencies of the

14  Mexican government, and if -- if they attracted too much

15  attention or got too far out of line, they would use --

16  they would receive reprimands from the high political

17  officials in Mexico City.

18  Q    Nevertheless, despite this falling out, do you know

19  whether Felix continued to do business with Caro-Quintero?

20  A    Yes, he did, he continued to do business.  I know they

21  continued to do business.

22  Q    Now, you mentioned a name, Javier Barba?

23  A    Yes.

24  Q    Who was that?

25  A    Javier Barba-Hernandez had been a student organizer, a

616

1    contender for the presidency of various -- I'm trying to

2    think of how to say it in English.  They have what is known

3    as bachelor's school.  It's really like high school here.

4    It's like all of high school and the first year of college

5    here.  And he had contended for the presidency of various

6    of these schools, and I knew him then, and later on he

7    reappeared with Mr. Fonseca.

8    Q    Do you have before you Exhibit 122?

9    A    Yes.

10   Q    What does that depict?

11   A    That's Javier Barba-Hernandez.

12        MR. CARLTON:  I move its admission, Your Honor.

13        THE COURT:  It may be admitted.

14            (Plaintiff's Exhibit 122 received.)

15        MR. CARLTON:  May it be shown to the jury?  Thank

16   you.

17   BY MR. CARLTON:

18   Q    How often did you see Javier Barba with Fonseca?

19   A    When he arrived with Mr. Fonseca, which was somewhere

20   around August of 1984 -- of 1983, I saw him thereafter

21   daily with Mr. Fonseca.

22   Q    Juan Matta, did you ever see him?

23   A    Yes, I did.

24   Q    How many times?

25   A    I saw him two or three times.  I didn't see him as

617

1   often as the others, but I saw him two or three times.

2   Q      Where was it that you saw him?

3   A      I saw him at a couple of parties, and at Mr. Fonseca's

4   house once.

5   Q      Looking in front of you at Exhibit 49, do you

6   recognize that photograph?

7   A      That's Juan Matta.

8   Q      Manuel Salcido, you mentioned him previously.

9   A      Yes.

10  Q      How often did you see him in the company of Ernesto

11  Fonseca?

12  A      Many, many times.

13  Q      Looking at Exhibit 123.

14  A      This is him.

15          MR. CARLTON:  All right.  Move the admission of

16  123.

17          THE COURT:  It may be admitted.

18          (Plaintiff's Exhibit 123 received.)

19  BY MR. CARLTON:

20  Q      Is the name Samuel Ramirez-Razo familiar to you?

21  A      Yes.

22  Q      Who was he?

23  A      He was an assistant of Mr. Fonseca.

24  Q      And what was his position in the organization, so far

25  as you could tell?

618

1   A     When I first became acquainted with him, he was like

2   the ramrod.  He was the second in command, an executive

3   officer of the organization.  He was later pushed out of

4   that position and Mr. Barba took it over.

5   Q     And he continued to work for Ernesto Fonseca after

6   that?

7   A     Yes.

8   Q     Do you know the name Jorge Godoy?

9   A     Yes.

10  Q     Who was that?

11  A     He had been a member of the State Judicial Police, and

12  he worked for Mr. Fonseca.

13  Q     In what capacity?

14  A     Just as a bodyguard and a general fact totem.

15  Q     Rene Lopez, is that name familiar to you?

16  A     He had also been a member of the State Judicial

17  Police, and he also was a worker for Mr. Fonseca.

18  Q     Ramon Lira?

19  A     Same thing.

20  Q     Do you know Humberto Alvarez-Machain?

21  A     Yes, I do.

22  Q     Did you ever see him at Ernesto Fonseca's residence?

23  A     Yes, I did.

24  Q     On how many occasions?

25  A     On many occasions.  I also saw him with the D.F.S.

619

1    Q     I ask you to look around the courtroom --

2    A     I don't have to.  He's sitting right over there.

3          THE COURT:  Indicating the defendant.

4          THE WITNESS:  The Doctor.  Anyway, he knows me.  I

5    know him.  He is sitting there.

6    BY MR. CARLTON:

7    Q     Now, you said that you saw him many times at Ernesto

8    Fonseca's residence?

9    A     Yes.

10   Q     What did you see him doing there?

11   A     Well, many times I -- he -- he was attending to them

12   as a physician, and then he would stay afterwards and they

13   would talk over old times and just sit around and talk with

14   each other.

15         But, primarily what he would do is he would come

16   to inject them.  They had purchased some rejuvenating

17   potions or something that he injected into them on a

18   regular basis.

19         Sometimes they got sick smoking too much base

20   cocaine and he would come and attend to them.

21   Q     You said you also saw him at the D.F.S.?

22   A     Yes.  He and another doctor, Dr. Cisneros (phonetic),

23   attended to the D.F.S. also.  They were the doctors of the

24   D.F.S. in Guadalajara.

25   Q     Did you ever see him at parties given by Ernesto

620

1     Fonseca?

2     A    Yes.

3     Q    And how often, how many times do you think you saw him

4     in the company of Fonseca or at one of his social

5     gatherings?

6     A    Twenty, twenty-five times.  It's hard to put a number

7     on it.  Less than I saw the other people.  He was not a

8     regular.  He wasn't there everyday, but he was obviously a

9     confident of theirs and --

10          MR. RUBIN:  Objection; calls for conclusion.  Move

11    to strike.

12          THE COURT:  Overruled.

13    BY MR. CARLTON:

14    Q    Have you ever heard of an individual Mahea Monhey

15    (phonetic)?

16    A    I've heard of him, yes, but I never met him.

17    Q    Did he have any association with the group of

18    traffickers that you were working with that you were aware

19    of?

20    A    Yes.  I know he had an association with them, but I

21    never met the man.

22    Q    Was he a doctor?

23    A    They told me that he was a doctor.  They referred to

24    him as doctor, yes.

25    Q    And was he a doctor for the traffickers, to your

621

1   knowledge?

2   A    They just referred to him.  They did not -- I wasn't

3   able to observe what his relationship -- I never met him.

4   He lived up in the northern part of the country and I never

5   saw him in Guadalajara.

6   Q    Ruben Zuno, do you know him?

7   A    Yes, I do.

8   Q    When did you first meet him?

9   A    I first saw him and his brothers -- we weren't

10  presented formally, but they were together in the same

11  room, and probably in 1972 or 1973.  His father helped me a

12  great deal when I first went to Guadalajara.  I met his

13  father when I was giving some conferences at a press club

14  in Guadalajara, and I met his entire family then.  I met

15  Ruben Zuno then.  I saw him over the years many times.

16  Q    When is the last time that you saw him in Mexico?

17  A    The last time was at a coming out party for Alciia

18  Sanchez-Flores in 1989, I think, at the Temple Del Sol in

19  Guadalajara.

20  Q    Do you see Ruben Zuno in court today?

21  A    Yes, he is sitting over there.

22          THE COURT:  Indicating the --

23          THE WITNESS:  He has got a gray sweater on.

24  BY MR. CARLTON:

25  Q    Mr. Harrison, let me direct your attention to November

622

1    of 1983.  Did you attend a party during that month at the

2    house located at Circunvalacion Sur 113 in Colonia La

3    Fuentes?

4    A    Yes, I did.  I'm not sure of the date.  I -- it was

5    around that time, but I attended a party there, yes.

6    Q    Was Ernesto Fonseca living in the house at the time?

7    A    No, he was not.  He had already moved out.

8    Q    What was it -- well, were you asked to do something at

9    the house on the day of the party?

10   A    Mr. Fonseca's sent me there in the afternoon to bring

11   the beer and to bring some supplies there, and also to look

12   over the security arrangements.  I had installed the

13   security system at that house, and he wanted me to look it

14   over because they were going to have the party there that

15   night.  And make some adjustments to the electrical

16   installation, and I got there around 3:00 o'clock in the

17   afternoon.

18   Q    How long did you stay there?

19   A    I stayed there until the next day.  I left around

20   12:00 o'clock that night, and I came back, and I helped

21   clean up the next day around 5:00 o'clock in the afternoon.

22   The party went all day and all night.

23   Q    An what was your function there during the party?

24   A    I was working for Mr. Fonseca and doing whatever he

25   asked me to do.

1   Q    Do you recall what the occasion for this party was?

2   A    Well, as far as -- I recall what I was told by Mr.

3   Fonseca, that it was the Dia of Rafael, and it was there

4   for the Saints Day for Rafael Caro-Quintero, and Ernesto

5   also called himself Ernesto Rafael, and he celebrated his

6   Saint's Day on the same day as Rafael Caro-Quintero.

7   Q    How many people do you estimate were present during

8   this party?

9   A    There were a lot of the people.  There were 175, 200

10  people.  There was a lot of people there.

11  Q    Were most of the major traffickers there?

12  A    Many of the major traffickers were there.  The

13  comandantes of the Federal Judicial -- yes, many of the

14  major traffickers where there.

15  Q    Were any law enforcement personnel there?

16  A    The major law enforcement officers for all the federal

17  agencies and state agencies, and the State of Jalisco and

18  the country of Mexico were there.  Those that were

19  stationed in the State of Jalisco or in the City of

20  Guadalajara, yes, they were there.

21  Q    Did you see Ruben Zuno there?

22  A    I saw Mr. Zuno appear there, yes.

23  Q    What was it that you saw?

24  A    Mr. Caro-Quintero was -- they had purchased some

25  stallions, some horses, from a famous Mexican singer, and

624

1    these horses had been taught to dance.  And there was a

2    band in the corner of the backyard.  It was a big backyard.

3    And Mr. Caro was up on top of one of these horses making it

4    dance and smoking a big base cigarette, base cocaine

5    cigarette.

6          And at one point he turned the horse over to the

7    horse trainer of the Mexican singer who had brought the

8    horses to deliver them to him, and got down, and about the

9    same time I saw Mr. Zuno appear off to his right and go

10   over to him and they embraced.

11   Q    Is the term "abrazo" familiar to you?

12   A    Yes.

13   Q    What does that mean?

14   A    Well, it has a number of meanings.  Among our group,

15   it was the way we normally greeted each other.  But it also

16   is a traditional, general greeting, especially at parties,

17   and especially if it's somebody's birthday party, that's

18   the way you would greet them.

19          It's kind of, you know, you put your hands around

20   them, and then you slap them on the back and shake hands.

21   Q    Do you recall anything that Mr. Zuno was wearing?

22   A    He was wearing a type of cowboy outfit.  It was not an

23   exaggerated cowboy, but a Western-style outfit with piping

24   on the shoulders and on the sleeves.  He had on a cowboy

25   hat and boots.

625

1  Q     And did you see Zuno at any of Fonseca's residences on

2  any other occasion?

3  A     Ruben came to Mr. Fonseca's house on Cuarzo Street one

4  time while I worked there.

5  Q     Do you recall about when that was?

6  A     It was after having seen him at the house in

7  Circunvalacion, and before the -- before I left that house

8  in January.  I think it was shortly after I saw him at the

9  house at Circunvalacion.  I remember being surprised to see

10 him there at the house at Circunvalacion.  I had not known

11 that he knew these people.  I was surprised to see him

12 there.   I was also surprised to seem him when -- it was

13 part of the same surprise.  I kept saying to myself, "What

14 is he doing here."

15 Q     What did you see him do there?

16 A     He went into Mr. Fonseca's office and spoke with him,

17 or went into his office and they shut the door.  I don't

18 know what they did.

19 Q     Did you see him leave?

20 A     Yes, I did.

21 Q     How long did he stay in the office?

22 A     Forty-five minutes to an hour.

23 Q     During the time that you were working for Ernesto

24 Fonseca, did you see any law enforcement personnel at his

25 residences?

626

1   A     Well, I saw members of all the law enforcement

2   agencies of the State of Jalisco and the Country of Mexico.

3   That includes the State Judicial Police, the State

4   Preventive Police, Municipal Police of Guadalajara, the

5   Federal Judicial Police, the director of the Federal

6   Security Directorate, the Office of Political and Social

7   Investigations, the Federal Highway Patrol, the Mexican

8   Army, and if there is anything I left out, I don't know.

9   This was an operation that included everybody, let's put it

10  that way.

11  Q     Did you ever see whether any of the traffickers who

12  where in this group had law enforcement credentials?

13  A     You mean the major chiefs?

14  Q     Yes.

15  A     The major chiefs all had credentials, as did everybody

16  who was around them.

17  Q     Do you know an individual named Juan Gilberto

18  Hernandez-Parra?

19  A     Yes.

20  Q     And who is that?

21  A     He was a man that worked with the Federal Judicial

22  Police, I believe.  He also worked for Mr. Fonseca.

23  Q     Looking in front of you at Exhibit 118.  Do you

24  recognize that photograph?

25  A     That's him.

627

1    Q    Pardon me?

2    A    That's Juan Gilberto.

3    Q    Thank you.

4         Benjamin Locheo, does that name sound familiar?

5    A    Yes.

6    Q    Who is that?

7    A    He was the subchief of the State Judicial Police who

8    had been assigned to Mr. Fonseca's house by the chief.

9    Q    Ernesto Pulido, is that a name familiar to you?

10   A    He was the operative chief of the State Judicial

11   Police, also assigned to that house by the director of the

12   State Police and Judicial Police.

13   Q    Gabriel Gonzalez-Gonzalez?

14   A    He was the head of the Homicide Squad of the State

15   Judicial Police, also assigned to Mr. Fonseca's house, as

16   well as being assigned to personal duties with Miguel

17   Felix-Gallardo.

18   Q    Nicolas Flores-Almazan?

19   A    Nicolas Flores-Almazan was the comandante of the

20   Federal Judicial Police.  He was daily at Mr. Fonseca's

21   house where they coordinated their activities.

22   Q    And an individual named Salas?

23   A    Salas, that's Lieutenant Colonel Salas was the chief

24   executive officer of the 15th Military Zone.  He was also

25   daily at Mr. Fonseca's house in his full Army uniform.

628

1   Q     I'd like you to look at a photograph in front of you

2   marked 13-A.

3   A     Uh-huh.

4   Q     Did you recognize that?

5   A     This is a house on Lope de Vega, I believe.

6   Q     You may put it down.

7         Are you familiar with that house?

8   A     I only went by there a couple of times, but, yes, I'm

9   familiar with it.

10  Q     And on one of these occasions, did something unusual

11  happen?

12  A     On one of the occasions, we were going -- I was going

13  with another person to another place, and we were driving

14  by there, and Rafa Caro-Quintero was broadcasting.  The

15  signal was so strong that I shut the repeater off and went

16  to simplex, which means that I turned my radio to just be

17  radio-to-radio to see if our signal was really that strong

18  in that area or if somebody was close.  If it had been that

19  strong in that area, I would have been extremely happy that

20  it was a very strong signal.

21        When the signal became still so strong, I lowered

22  the radio to the floor to ground the antenna because that's

23  the way to figure out how far away they are, by where the

24  signal starts to fade.

25        A signal that is within a 30 or 40 foot radius of

629

1    you will come right through the case of the radio, you

2    don't -- even if you have no antenna at all.

3            I had the radio all the way down on the floor of

4    the truck we were in and it was still coming in so strong

5    that I could tell that the person who was broadcasting was

6    broadcasting right close to me, within a 30 or 40 foot

7    radius.  We were driving past that house.

8    Q    You were right in front of that house as this

9    occurred?

10   A    Going past it.

11   Q    And who was it you heard broadcasting?

12   A    Rafael Caro-Quintero.

13   Q    Do you know when this occurred?

14   A    This was probably January or February of 1984.

15   Q    Did you ever return to that house?

16   A    I was sent back to that house later on, yes.

17   Q    And what was the occasion?

18   A    Mr. Barba and Gabriel Gonzalez, who was the head of

19   the Homicide Bureau of the State Judicial Police, were at

20   the Hotel Las Americas, and I had gone there that day to

21   sweep the lines, and Mr. Barba and Mr. -- and Gabriel said,

22   "We want you to go over and look at the gate."

23           I want to say something.  In earlier testimony, I

24   said gate because in Spanish that's "puerta", and when I

25   first testified I really didn't -- I wasn't translating

630

1    very well.  I hadn't spoken English in a number of years.

2    Puerta really means garage door.  They said, "Go over and

3    look at the garage door."

4    Q    What else was said about this house when these

5    instructions were given?

6    A    They said it was Rafa's house, to go over to Rafa's

7    house and look at the garage door, and did I remember where

8    it was because the person that had been with me that day

9    told them that we had gone -- we had driven by that house.

10   Q    So did you go to house?

11   A    Yes, I did.

12   Q    What happened there?

13   A    I knocked on the gate, not the garage door, and a

14   person came out.  I said, "I'm here to look at the gate --

15   the garage door, the puerta."

16        He said, "There's nobody here.  You can't come in

17   right now."

18        I said, "Well, they sent me over here," and he

19   said, "Well, there's nobody here.  The patron is not here.

20   You will have to come back later."

21   Q    Those the only two occasions you've been attending?

22   A    The only two occasions.

23   Q    Do you know an individual named Miguel Vielma?

24   A    Yes.

25   Q    Who is that?

631

A       Comandante Miguelantes Vielma was a comandante of the

Direccion de Federal Security Directorate.  I had known him

for many years.  His last post was chief of the D.F.S.

detachment in the City of Zacatecas.

Q       Did you ever see him in the company of Ernesto

Fonseca?

A       Yes.

Q       Do you recall the date at which you went to Lope de

Vega in relation to the door, fixing the door, the gate?

A       It was two or three weeks after we had driven by

there.  It was -- I couldn't tell you the exact date, but

it was March.  It could have been as late as April or -- I

didn't note the date down or anything.

Q       You're not certain of the date?

A       I'm not certain.  It was after we had gone -- driven

by there, and it was close enough in time that they

remembered that Juan had been with me that day, told them

that we had driven by that house.

Q       Now, you've mentioned that Miguel Vielma was

in -- you saw him in the presence of Fonseca.  How many

times?

A       All the time.  He was always with Mr. Fonseca.  He was

always in Mr. Fonseca's presence, and many things that I

had to do with the organization and Mr. Fonseca, I took up

with Mr. Vielma who lived closed to me.  He lived about six

632

1    blocks away from where I lived, and many times, instead of

2    going over to Mr. Fonseca's house, I would deal directly

3    with Vielma.

4    Q    Let me draw your attention to March or April of 1984,

5    that time period.  At some point in that time period, were

6    you involved in counting money for Ernesto Fonseca?

7    A    Yes.  Well, first of all, they asked me to buy some

8    money counters.  They didn't ask me to buy them, they asked

9    me to tell them what they needed.  They related -- Mr.

10   Fonseca and one of his assistants showed me a suitcase full

11   of money, and they said that the suitcase -- the man that

12   had picked it up said, "I picked it up, it had a million

13   dollars in it."

14            But when we counted it, it was only $980,000, and

15   now I don't know what to do because I failed the boss and I

16   don't know what to do.  And Mr. Fonseca said, "What can we

17   do?"

18            I said, "Well, there are electronic money counters

19   that you can purchase and they will give you an accurate

20   count in a short amount of time as to how much money there

21   is and you won't go through this laborious hand counting of

22   money, especially that much money, where you'd be so likely

23   to make a mistake."

24   Q    So did you go out and acquire money counters?

25   A    I didn't acquire them.  I gave them a description of

633

1  what was needed.  They acquired seven of them at first, and

2  then some more, and they brought them down there, and they

3  called me when they had acquired them.

4  Q    Did you use these machines?

5  A    We, all together, used them.  They were four or five

6  of us.  There was an awful lot of money.

7  Q    What was it you were asked to do with these machines?

8  A    We were asked to take large cardboard boxes,

9  four-by-four cardboard boxes, take the money out, count

10  them, keep a tally, and put them over against the opposite

11  wall.  This was an enormous amount of money.

12       This was -- by the time I had finished counting it

13  was more than $380 million, and the actual -- the tally was

14  supposed to be $400 million.  That was what our goal was.

15  It was -- there was just boxes and boxes.  There was an

16  enormous amount of money.

17  Q    Other people assisted you in this?

18  A    Yes.

19  Q    How many?

20       THE COURT:  What kind of currency was it?

21       THE WITNESS:  It was U.S. currency.  There were

22  20's -- the lowest of them was 20's, and then it went up to

23  50's and some 100's, but most of them were 20's.  It was a

24  hard job.

25  BY MR. CARLTON:

634

1  Q    Do you know what was done with this money?

2  A    Mr. Fonseca related that this was his portion of a

3  large payment of money to a high government official.  I

4  don't know what the exact total amount was, but his portion

5  was to be the $400 million.  That wasn't all of it.  I

6  mean, he was just putting in one part and the other people

7  who were with him were going to put in their part also.

8  Q    How long did this whole process take?

9  A    Oh, we spent four or five weeks.  It was -- we were

10 making mistakes.  Sometimes they would put the wrong box

11 over, bring it back and do it.  I'd never seen that much

12 money in my life.  It was like -- it was an enormous task.

13 Q    Are you familiar with an individual called El Doc or

14 El Doctor?

15 A    Yes.

16 Q    Who was that?

17 A    Mr. Fonseca's brother.

18 Q    What was his true name?

19 A    Roberto Fonseca.

20 Q    Pardon me?

21 A    Roberto Fonseca.

22 Q    And El Gueron, is that name familiar to you?

23 A    Mr. -- Mr. Fonseca described him as his son, but I

24 don't know by which of his wives that he --

25 Q    Now, you continued to work for Ernesto Fonseca until

635

1    September 11th of 1984?

2    A    That's correct.

3    Q    At some point, did you make some efforts to extricate

4    yourself from this relationship?

5    A    Yes, I did.

6    Q    What was it you tried to do?

7    A    I tried to leave.

8    Q    Why was that difficult?

9    A    They began to distrust anything American.  They had

10   felt comfortable with anything American before July of

11   1984, and then all of a sudden, they began to say that the

12   Americans had betrayed them and that the Americans where

13   out to get them and that they no longer had any deal with

14   them, and that they couldn't go on.

15        And, they started to look at me as if I were some

16   kind of plant or a spy.  First, the people from Sinaloa

17   said, "We don't want him around the house anymore.  We

18   don't want him to attend the parties, and I won't go if he

19   goes."

20        And I -- finally I said to Mr. Fonseca, I said, "I

21   don't want to work for you any longer.  I would rather

22   leave.  I'm not happy here," but I wasn't allowed to speak

23   to him on many occasions.  They walled him off.

24        Gobernacion told me, "You stay there, you stay

25   there."  And I told Gobernacion, "These people are going to

636

1    have problems.  They're all going to be arrested.  The

2    Americans are going to denounce them.  Let's get out of

3    here.  I don't want to be here any longer."

4            And, as an American, it was getting down to the

5    point where I had to -- they asked me, they said, "If you

6    had to fight your country for us, would you do it?"

7            And I said, "Don't make -- don't ask me to make

8    that choice.  Don't ask me to fight my own country for

9    you."  I said, "I'm working here for this country.  I'm

10   trying to be loyal and everything, but don't come and say I

11   have to go and attack the United States."

12           By that time, I figured, well, it's going to come

13   down to that choice.  I don't want to -- I don't want to

14   have to make that choice.  I want to get out.

15   Q    How was it, your relationship with Ernesto Fonseca,

16   came to an end?

17   A    He sent me out to be killed.  He set up an ambush.  I

18   told him that I knew that it was an ambush.  He assured me

19   that it wasn't.  One day he sent two people over to my

20   house with guns, and said -- who said they had specific

21   orders to pick me up and take me out to this place.  And I

22   told them it was an ambush.  And they said, "No, no, no."

23           I said, "It's an ambush.  They are going to shoot

24   us all."

25           And they said, no.  And I said, "I will drive you

637

1   by and you will see the entire State Judicial force outside

2   there, the ones that work for Mr. Fonseca, all of them out

3   there lined up."

4           So as I was driving by, they saw that, but the

5   person that was with me, he said, "Let's go get them

6   anyway," and he opened the door and jumped out of the car,

7   and I grabbed him by the neck of the collar of his shirt,

8   and I dragged him back inside the pickup truck and I drove

9   around the corner; and I attempted to call Mr. Fonseca and

10  I attempted to call the head of the Gobernacion Office,

11  because I felt that if I did it publicly on the radio that

12  maybe they would not do it.

13          We were immediately surrounded by 50 individuals

14  with highpowered rifles and they just -- they just opened

15  fire.

16  Q   And were you hit?

17  A   I was shot nine times.  My partner was shot four

18  times.  He was -- laid out in the street, but he was still

19  alive.  I had positioned myself behind the wheel of the car

20  as I had been taught to do.  I held them off for a long

21  time.  Too many people gathered around and they said,

22  "Well, how about you giving up?"

23          I gave up.

24  Q   Were you hospitalized as a result of this incident?

25  A   Yes, I was.

638

1   Q       Who was in command, if you know, of the State Police

2   group that was shooting at you?

3   A       Comandante Lopez Razon.

4   Q       Victor Manuel Lopez-Razon?

5   A       That's correct.  I had seen him work -- I had seen him

6   planning together with Mr. Barba and Mr. Fonseca.  They

7   planned this ambush together in front of me.  I saw them

8   doing this.  I knew what they were doing.

9   Q       Were you charged with some crimes in relation to this

10  incident?

11  A       Yes.  They took the radios that we had and said that

12  they we must have robbed them because we didn't have the

13  bill of sale for them on our person.  They tore up my

14  oficio de comision and said that I was impersonating an

15  officer, even though my partner had his own metallic badge

16  with him, and that was even admitted into evidence before

17  the court.

18          They said that we were extorting money from the

19  persons we were taking the radios from, even though they

20  were members of the same gang.  We were charged with an

21  entire litany of crimes, of fabricated crimes, to cover up.

22  And they boasted.  They said we have assinated you and your

23  partner legally.  We've done it with the law.

24  Q       Were you convicted of those crimes?

25  A       I was not convicted until I came up here.  And after I

639

1    testified at one point against Mr. Zuno, my sentence was

2    doubled.

3    Q    Do you have any prior convictions here in the United

4    States?

5    A    I was arrested for two marijuana cigarettes in 1971

6    and given probation.

7    Q    Do you know an individual named Antonio Garate?

8    A    Yes, I do.

9    Q    Did you do any work with him in 1985?

10   A    I did work for him in 1985, yes.

11   Q    And what was the nature of that work?

12   A    He sent me to -- he sent me in a State Police car to

13   set up a radio system for a bunch of Colombians.  There was

14   an airstrip somewhere close to where I set the radio

15   system.  I didn't see the airstrip.  I did set up a

16   communication system, and I guided Colombian aircraft in

17   and out of this airport from Columbia with radio contact --

18   radio controlled them from Columbia to this airport.

19   Q    And what was your understanding of the nature of this

20   operation, of what you were doing?

21   A    Mr. Garate told me that it was a police operation,

22   that I should see everything that was being done there and

23   report back to him.

24   Q    When did you move to the United States permanently?

25   A    In the latter part of 1989.

640

1    Q    Prior to -- immediately prior to coming here --

2    A    I didn't move to the United States.  You guys wouldn't

3    let me go back.

4    Q    Why was that?

5    A    Because you thought I would get killed.

6    Q    Immediately prior to coming to the United States, what

7    was your employment down in Mexico?  What were you doing

8    there?

9    A    I was running my own consulting agency for

10   communications.  I was also working for the election

11   campaign of the former governor of the State of Jalisco.

12   Q    Were you affiliated with a company called Arboleras

13   Communications?

14   A    That's what we called my company.  It was really a

15   consulting company.  I was the company.

16   Q    During what period of time were you involved with

17   that?

18   A    The company, I had been doing that for about six

19   months before I came up here.

20   Q    What kind of work did that involve?

21   A    Well, as I had been affiliated with the election

22   campaign, they gave me a whole lot of clients, mostly major

23   members of the P.R.I. Party.  Some of them were major

24   organizations tied into the traffickers who had given

25   financing to the campaign, and these recommendations were

641

1   give directly by the director of finance of the state

2   government, who had been my superior in the campaign.   And

3   I also had a good reputation for radio communications in

4   Guadalajara, and I had a number of large corporate clients.

5   Q     Has the government entered into any agreements with

6   you?

7   A     The agreement -- I agreed to testify on behalf of the

8   government.  You don't owe me anything.  I don't have any

9   expectations at all.  I didn't want to testify.  When you

10  asked me to, I told you I would honor my word, and I have

11  honored by word by coming here and testifying.

12  Q     Do you receive living expenses?

13  A     Yes.  The government has tried to keep us alive since

14  we got here so that we could testify at the trial.

15  Q     Was your family relocated to the United States also?

16  A     Yes.

17  Q     Have you been granted immunity for your testimony?

18  A     I certainly hope so.

19  Q     Have you ever used the name Lawrence Victor

20  Harrison-Cummings?  Is that name familiar to you?

21  A     If you give your name to an official agency in Mexico,

22  you must give a maiden name of your mother.  So if you use

23  your own name and add your mother's maiden name onto it,

24  now people are saying I used a different name.  If you --

25  the Mexican government, in an agreement I made with them so

642

1    I wouldn't come up here, gave me full immigration.

2            They said, "Well, what was your mother's maiden

3    name," and I gave them my mother's maiden name.

4    Q    Is that typical in Mexico --

5    A    Yes.

6    Q    -- to use a hyphenated last -- pardon me, can you wait

7    until I finish the question.

8    A    A Latin country, and as the Romans did, that's where

9    the original creation comes from.  You give the padre name,

10   which is your father's name, and after that the madre name,

11   which is your mother's name, to show the union of the two

12   families.  That comes from the --

13   Q    And that explains the name Harrison-Cummings?

14   A    That's right.

15           MR. CARLTON:  Just a moment, Your Honor.

16           Nothing further at this time, Your Honor.

17           THE COURT:  You may cross-examine the witness.

18           MR. MEDVENE:  Could we start Tuesday morning so we

19   can go straight through?

20           THE COURT:  Monday morning.

21           MR. MEDVENE:  Monday morning?

22           THE COURT:  Monday morning.

23           MR. RUBIN:  Your Honor, I think I may have another

24   matter on calendar for Monday.

25           THE COURT:  Well, something will have to be done

643

1    about it.

2            We will resume this case on Monday morning at

3    9:30.  I would ask the jurors to return at that time.

4            Please remember your obligation not to discuss

5    this case with each other or with anyone else, and not to

6    form or express any opinion or conclusion about this case

7    until it has been submitted to you, and please avoid the

8    exposure to any media, either written, video, or audio.

9            Have a nice weekend.

10           THE CLERK:  Please rise.

11                       (Jury out.)

12           THE CLERK:  You may be seated.

13           THE COURT:  We'll see you on Monday, Counsel.

14           MR. MEDVENE:  If the Court please, we didn't want

15   to move to strike at the time because we were surprised at

16   certain testimony.  It appeared that --

17           THE COURT:  Well, why don't you write a motion to

18   strike for the testimony you think --

19           MR. MEDVENE:  I want to make the record clear now.

20   This witness was asked a question where he said his

21   sentence was doubled because he testified against Mr. Zuno.

22           There is no foundation.  If the prosecution knew

23   that was coming, we cite it as inappropriate, ask for a

24   curative instruction, and we ask for a mistrial.

25           I mean, there's no foundation for that answer.  I

644

1   didn't want to highlight the fact that he previously

2   testified in another trial.  The government clearly had to

3   know.

4          I would ask if the government knew that was

5   coming, but there was clearly no foundation for it.  It

6   talked about testifying at the prior trial, which we were

7   just going to use as a reference per Your Honor's

8   instruction.  Now --

9          THE COURT:  He didn't say anything about the prior

10  trial.

11         MR. MEDVENE:  Yes, he did, sir.

12         THE COURT:  He said he testified against Zuno,

13  period.

14         MR. MEDVENE:  Well --

15         THE COURT:  He didn't say anything about any

16  trial.

17         Now, did you know that witness was going to

18  testify in that manner?

19         MR. CARLTON:  Your Honor, I had no idea that he

20  was going to say that, and I would offer to stipulate that

21  that reference to his sentencing be doubled be stricken

22  from the record.  I did not know that he was going to say

23  that.

24         THE COURT:  Well, I accept the representation that

25  they didn't know, and I will be glad to strike it from the

645

1   record --

2           MR. MEDVENE:  Yes.

3           THE COURT:  -- and ask the jury to disregard it.

4           MR. MEDVENE:  Can you excuse me for one second?

5           THE COURT:  Pardon?

6           MR. MEDVENE:  Can you excuse me for one second?

7           THE COURT:  Yes.

8           MR. MEDVENE:  Thank you, Your Honor.

9           THE COURT:  Thank you.

10          MR. RUBIN:  Your Honor.  I have one matter

11   concerning the Jenck's statements.

12          THE COURT:  Concerning what?

13          MR. RUBIN:  The Jenck's statements.  Now that we

14   are on Monday, we're starting -- can I assume the

15   government can be ordered to give us the statements now?

16          THE COURT:  For Monday's witnesses?

17          MR. RUBIN:  For Monday's witnesses?

18          THE COURT:  Yes.

19          MR. MEDRANO:  Of course, Your Honor, we'll take

20   care of that.

21          THE COURT:  All right.

22          MR. MEDVENE:  If you'll also give us -- I'm

23   sorry -- if you will also -- will you also give a curative

24   instruction, Your Honor?  You're going to ask them to

25   disregard --

646

1    THE COURT:  Well, what instruction are you

2  suggesting?  You want to suggest an instruction?

3    MR. MEDVENE:  Yes, Your Honor.

4    THE COURT:  Well, do so.

5    MR. MEDVENE:  We'll try to write one out, Your

6  Honor.

7              (Proceedings adjourned.)

8                 *   *   *   *   *   *

9    I, MARY TUCKER, CSR, do hereby certify that

10   the foregoing transcript is true and correct.

11

12

13   _Mary Tucker_____     6-17-93

14    MARY TUCKER, CSR                    DATE

15

16

17

18

19

20

21

22

23

24

25