93-50311

FILED

JUN 18 1993

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

1

2

3

4

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE EDWARD RAFEEDIE, JUDGE PRESIDING

- - - - -

5

6     UNITED STATES OF AMERICA,      )
                                     )
7               Plaintiff,           )
                                     )
8          vs.                       )    Case No. CR-87-422-ER
                                     )
9     RAFAEL CARO-QUINTERO, et al.,  )
                                     )    ORIGINAL
10              Defendants.          )
      _____)

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                    LOS ANGELES, CALIFORNIA

17                 WEDNESDAY, DECEMBER 2, 1992

18

19

20

21

22              MARY TUCKER, CSR 9308
                Official Court Reporter
23              429-D U.S. Courthouse
                312 North Spring Street
24              Los Angeles, Calif. 90012
                213/687-0530

25

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

2

1    APPEARANCES:

2

3        For the Plaintiff:

4            TERREE A. BOWERS
             United States Attorney
5            ROBERT BROSIO
             Assistant United States Attorney
6            Chief, Criminal Division
             JOHN CARLTON
7            Assistant United States Attorney
             MANUEL MEDRANO
8            Speical Assistant United States Attorney
             312 North Spring Street
9            Los Angeles, California  90012

10

11       For Defendant Zuno:

12           JAMES E. BLANCARTE
             MARY FULGINITI
13           JEFFER, MANGELS, BUTLER & MARMARO
             2121 Avenue of the Stars
14           10th Floor
             Los Angeles, California  90067
15                - and -
             EDWARD M. MEDVENE
16           JACK R. LUELLEN
             MITCHELL, SILBERBERG & KNUPP
17           11377 West Olympic Boulevard
             Los Angeles, California  90064
18

19

20

21

22

23

24

25

3

I N D E X

| | PAGE |
|---|---|
| OPENING – PLAINTIFF | 5 |
| OPENING – DEFENDANT ZUNO-ARCE | 31 |
| OPENING – DEFENDANT ALVAREZ-MACHAIN | 50 |

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| KUYKENDALL, JAMES | | | | |
| By Mr. Carlton | 59 | | 154 | |
| By Mr. Medvene | | 122 | | |
| By Mr. Rubin | | 147 | | |
| | | | | |
| LEYVA, SALVADOR | | | | |
| By Mr. Medrano | 158 | | | |
| By Mr. Rubin | | 192 | | |
| | | | | |
| ACUNA, MIGUEL | | | | |
| By Mr. Medrano | 193 | | | |
| By Mr. Medvene | | 203 | | |
| By Mr. Rubin | | 203 | | |

4

1

2

**I N D E X**

| EXHIBITS | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 1 | | 156 |
| 2 | | 156 |
| 3A | | 68 |
| 3B | | 69 |
| 4 | | 70 |
| 5 | | 73 |
| 6 | | 156 |
| 8A-L | | 96 |
| 10 | | 107 |
| 11A-C | | 115 |
| 12A-C | | 117 |
| 17 | | 164 |
| 18A-B | | 183 |
| 19A | | 175 |
| 19B | | 184 |
| 20 | | 179 |
| 21 | | 203 |
| 49 | | 188 |
| 104 | | 198 |
| 118 | | 101 |
| 157 | | 122 |
| 158A-B | | 122 |
| 163 | | 176 |
| 165 | | 122 |

5

1    LOS ANGELES, CALIF.; WEDNESDAY, DECEMBER 2, 1992; 10:00 AM

2                            (Jury in)

3            THE COURT:  Ladies and gentlemen of the jury, at

4    this time the Court will afford counsel an opportunity to

5    make an opening statement to the jury.  I want to caution

6    you that what counsel say during the opening statement is

7    not evidence.  It should not be considered as evidence.

8    The purpose of the opening statement is to enable counsel

9    to tell you what they expect the evidence will be during

10   the presentation of the case.  This will help you to

11   understand the case and help you to be able to follow the

12   evidence as it is presented in court.  Keep in mind, when

13   they have finished making opening statements, you will

14   still not have any evidence which you may consider for the

15   purpose of this trial.  That evidence only comes when the

16   first witness begins to testify.

17           Now the government counsel will proceed with the

18   opening statement at this time.

19           MR. CARLTON:  Thank you, Your Honor.

20           Good morning, ladies and gentlemen.  My name is

21   John Carlton.  I am an Assistant United States Attorney,

22   and I'm one of the prosecutors representing the government

23   in this case.  I share that responsibility with another

24   Assistant United States Attorney.  His name is Manuel

25   Medrano.  He will be sitting here at the counsel table with

6

1    me.

2            During the course of trial, you will also see one

3    or two other individuals sitting at this counsel table.

4    One of them is Douglas Keel, another is named Hector

5    Berrellez.  Both Mr. Keel and Mr. Berrellez are agents of

6    the United States Drug Enforcement Administration or the

7    D.E.A., and they will assist in the presentation of the

8    case to you.

9            Let me now summarize for you very briefly what the

10   government expects that the evidence in this case will

11   show.

12           This is Enrique Camarena-Salazar.  His friends

13   knew him as Kiki.  Kiki was raised in the area of Calexico,

14   California.  Did a tour with the United States Marine

15   Corps, and served with the Calexico Police Department,

16   Imperial County Sheriff's Department.  And in 1974 he

17   joined the D.E.A. as a Special Agent.

18           In 1980 Kiki Camarena was transferred to the

19   D.E.A.'s office in Guadalajara, Mexico.  He moved there and

20   lived there with his family at that time.  He continued to

21   live there until 1985.

22           In February of 1985, Kiki Camarena was clearing

23   his case load in Guadalajara because he was scheduled to be

24   transferred to the D.E.A.'s office in San Diego, California

25   in March of that year, just about a month away.

7

1        On February 7th, 1985, Kiki Camarena had an

2   appointment in Guadalajara to meet his wife for lunch.   And

3   he never made that appointment.   One month later his

4   tortured body was found lying in a field outside of the

5   small town of Zamora about 60 miles from Guadalajara.

6        What happened to Kiki Camarena?   Why did his path

7   lead to that barren field in Zamora?   That is what this

8   case is about.

9        Ladies and gentlemen, the evidence will show that

10  Kiki Camarena was murdered because he, and the D.E.A. for

11  which he worked, threatened the operations of a huge

12  international narcotics enterprise.   And that enterprise is

13  referred to in the indictment, and I will refer to it

14  today, as the Guadalajara Narcotics Cartel.   It's based in

15  Guadalajara, Mexico.

16       This Cartel grew and distributed marijuana on a

17  massive scale, employing thousands of workers on huge

18  desert plantations.   It also imported and distributed in

19  the United States vast quantities of cocaine.

20       And the drugs produced and distributed by the

21  Cartel were worth literally billions of dollars.   In order

22  to protect this investment, the Cartel made pay-offs to

23  virtually every level of Mexican law enforcement, to

24  prominent politicians, to members of the military.

25       The evidence will show that those pay-offs didn't

8

1  get the job done.  Because in 1984 and early 1985, the

2  Cartel suffered a series of devastating losses at the hands

3  of law enforcement, amounting to thousands of tons of

4  marijuana and billions of dollars in cash.  The Cartel

5  blamed the D.E.A. for those losses.  In particular, the

6  Cartel blamed the Guadalajara office of the D.E.A. and one

7  agent in that office, Kiki Camarena.

8         Beginning in the Fall of 1984, the Cartel made

9  plans to retaliate against the D.E.A.  And on February 7th,

10 1985, they carried out those plans by kidnapping Agent

11 Camarena, torturing him, interrogating him, and murdering

12 him.

13        Now, one of the persons who participated in the

14 planning of the kidnapping sits here in this courtroom

15 today.  His name, Ruben Zuno-Arce.  He is one the

16 defendants.  For those of you who can see him, he is

17 sitting right there with the headphones in the blue jacket.

18        There is another defendant in this court today.

19 His name is Humberto Alvarez-Machain.  He sits there in the

20 green jacket.  He is a medical doctor.

21        And the evidence will show that he assisted the

22 Cartel and was present at the torture and interrogation of

23 Kiki Camarena.

24        Now that is a thumbnail sketch of what the

25 government expects the evidence will show.  What I would

9

1    like to do now is to go over it in a little bit more

2    detail.

3        The persons who were involved with this Cartel

4    came from many walks of life.  Some of them were primarily

5    marijuana traffickers.  Some cocaine traffickers.  Some

6    bodyguards.  Some leaders of the Cartel.  And there were

7    politicians.  There were military people.  People who

8    worked in law enforcement.

9        But the evidence will show that all of these

10   people worked together and they worked together for one

11   overriding purpose, and that purpose was to make vast

12   amounts of money from the trafficking of narcotics.

13       Now, what I'd like to do now is to talk about a

14   few of the leaders of this Cartel.  These are names that

15   you will be hearing over and over again throughout this

16   case, and it will pay to become familiar with them now.  It

17   will assist in your understanding of the evidence as it's

18   presented.

19       First there are the traffickers, the people who

20   produce and distribute the narcotics.  And among the

21   traffickers one of the names you will be hearing most often

22   is Rafael Caro-Quintero.  And I will refer to him by the

23   short name reference of Caro.  Also know, by the way, as

24   Rafa.

25       In 1985, Rafa was in his twenties.  Very poorly

10

1   educated.   Known for his temper and his taste for flashy

2   jewelry.   He was also one of the most powerful drug lords

3   in all of Mexico.

4        You will hear that wherever he went Caro was

5   accompanied by a retinue of bodyguards, many of whom were

6   members of various law enforcement agencies.

7        You'll also be hearing quite a bit about an

8   individual named Ernesto Fonseca-Carrillo, or Fonseca.   He

9   had several nicknames also.   Among them Don Neto and El

10  Senior.

11       Fonseca was Rafa's mentor.   In effect, he was the

12  old man of the Cartel.   Like Rafa, he was accompanied by an

13  entourage of bodyguards, many of whom were state police

14  agents.   And they accompanied him as he moved from one to

15  another of his many, many houses in the Guadalajara area.

16       Miguel Felix-Gallardo is the other third

17  trafficker about who you will be hearing quite a bit.   He

18  was a cocaine trafficker.   He was sophisticated of the

19  group.   You'll hear that he owned several hotels in the

20  Guadalajara area, including one called the Las Americas

21  Hotel.

22       The prominent politicians were also involved with

23  the Cartel.   You will be hearing about the Governor of

24  Jalisco, Enrique Alvarez del Castillo.   For those of you

25  who are not aware of this, Mexico is like the United

11

1    States, in a sense that it is a republic consisting of many

2    separate states.  One of those states is called Jalisco,

3    and the capital of Jalisco is Guadalajara.  Enrique Alvarez

4    del Castillo was the Governor of Jalisco.

5         You'll hear that he presided in that position over

6    the unprecedented rise of the Guadalajara Cartel.  The

7    unprecedented rise of power of the Cartel which was made

8    all the easier by the assistance of the state police force.

9    And in return for this assistance and protection, Enrique

10   Alvarez del Castillo was paid large sums of money by the

11   Cartel.

12        Another individual about whom you will hear is the

13   Secretary of Gobernacion, Manuel Bartlett-Diaz.

14   Gobernacion is a department of the Mexican Federal

15   Government.  It doesn't translate very well, but in that

16   capacity Bartlett was responsible for a number of agencies,

17   quasi law enforcement agencies, one of which is known as

18   the D.F.S.

19        As you will hear, many of the major traffickers

20   had D.F.S. credentials.  Many of the individuals who

21   protected their activities and protected them were D.F.S.

22   agents.

23        But the Cartel's influence also extended to

24   virtually the highest levels of Mexican law enforcement.

25   For instance, you will be hearing about the director of the

12

1    Mexican Federal Judicial Police, or the M.F.J.P.   His name

2    is Manuel Ibarra-Herrera.

3             The M.F.J.P. was the one law enforcement agency in

4    Mexico charged with responsibility for investigating

5    narcotics crimes, and it was the one agency with which the

6    D.E.A. in Mexico had to work.   Despite this, many

7    comandantes and agents of the M.F.J.P. assisted the

8    traffickers in their operations.

9             And you will hear also about Miguel Aldana-Ibarra,

10   who in 1984 was the head of the Mexican branch of Interpol,

11   the international police agency.   He was the cousin of

12   Manuel Ibarra who was his superior.   You will hear that

13   Aldana consistently attempted to delay and hamper D.E.A.

14   investigations in Mexico.

15            But the military also assisted the traffickers.

16   You will hear about the Minister of Defense Juan

17   Arevalo-Gardoqui.   In return for the assistance that the

18   military provided to protect many of the traffickers'

19   operations, Juan Arevalo-Gardoqui received large amounts of

20   money from the traffickers.

21            Now, this is just a partial cast of characters in

22   this case.   There were many, many other persons associated

23   with this Cartel, including the two defendants in the

24   courtroom.

25            What I would like to do now is to summarize for

13

1    you some of the more significant losses that were inflicted

2    on the Cartel in 1984 and 1985 as a result of D.E.A.

3    investigative activities.

4         In late 1983, Agent Camarena became involved in an

5    investigation, the purpose of which was to purchase some

6    heroin from an individual named Manuel Chavez.

7         In the course of that investigation, Agent

8    Camarena worked with an informant, an individual who

9    provided information to the D.E.A., and at his

10   instructions, the informant accepted a job with Manuel

11   Chavez.

12        As it turned out, Chavez was the foreman of a

13   series of marijuana plantations in the Mexican state of

14   Zacatecas.  These plantations were owned by Caro and

15   Fonseca and other members of the group.

16        Zacatecas is a dry desert state and these

17   plantations were irrigated from deep desert wells.  They

18   were cultivated with large farm equipment, thousands of

19   workers were to be employed.  And in order to protect its

20   investment, the Cartel paid off virtually every level of

21   Mexican law enforcement in the area:  The M.F.J.P., the

22   D.F.S., the state police, even the military.

23        You hear that even the local comandantes of the

24   M.F.J.P. and the D.F.S. were on the Cartel's payroll.  All

25   of this information was presented to the M.F.J.P. in Mexico

14

1    City, to Manuel Ibarra.  And a plan was formulated to raid

2    these fields.  Those plans were to be kept in the utmost

3    secrecy.  But you will hear that when the raids were

4    carried out, almost no one associated with the operations

5    were present.  Even the local comandante of the M.F.J.P.

6    and of the D.F.S. were gone.

7         Despite this, the blow to the Cartel was

8    significant.  Over 100 acres of marijuana were destroyed,

9    ten tons of manicured marijuana were seized, 200 liters of

10   hashish oil, and 6,500 pounds of marijuana seeds, which you

11   will hear was enough to plant 6,500 acres.  So this

12   inflicted a loss in the millions of dollars.

13        You will be hearing about another investigation as

14   well, named Operation Padrino, out of Guadalajara.  This

15   was an international investigation which eventually came to

16   focus on two individuals in particular, Miguel Felix, one

17   of the Cartel leaders, and an individual named Juan Matta.

18        In the course of the investigation, it was learned

19   that large amounts of cocaine were being brought up from

20   Columbia, through Mexico, and distributed in the United

21   States.  Juan Matta was the connection to the sources of

22   cocaine which was delivered to Miguel Felix and his

23   associates, who delivered it through Mexico into the United

24   States.

25        You will be hearing about the vast scope of this

15

1    cocaine smuggling operation.  From 1984 to early 1985

2    alone, approximately $150 million dollars in drug profits

3    were delivered to Felix and Matta and their associates in

4    Mexico as a result of their operations in the Southwestern

5    United States.

6             In June of 1984, law enforcement authorities in

7    Anaheim, California, seized $4.1 million of these drugs

8    profits.

9             Yet a third investigation about which you will

10   hear involved the largest marijuana bust in history in

11   Mexico in the State of Chihuahua.  This investigation began

12   when numerous sources of information came to the D.E.A. and

13   told the D.E.A. that vast tracts of land in Chihuahua were

14   being cultivated with marijuana.

15            The agents made efforts to corroborate this

16   information, which again was presented to Mexican

17   authorities in Mexico City.  And, again, a plan was made to

18   raid these fields.  A plan which was to be kept in the

19   utmost secrecy.  And again when the fields were raided, no

20   one of significance to the operation was there.

21            The head of these raids from the Mexican end of

22   things was Miguel Aldana, the Interpol guy.  And although

23   he consistently attempted to hamper the D.E.A.'s efforts,

24   the blow to the Cartel in this instance was monumental.

25            You will be seeing that these were substantial

16

1    operations.  Again, there were wells to irrigate the

2    fields, farm equipment, buildings and facilities for

3    sorting, manicuring, packaging marijuana, all of that was

4    destroyed.  Over 6,000 workers were detained and over

5    10,000 tons of marijuana were destroyed, worth at the

6    wholesale level somewhere in the area of $5 billion.

7           Now, following on the heels of these tremendous

8    losses in 1984 was yet another seizure in early 1985.  The

9    evidence will show that during 1984 and early '85, the

10   Cartel imported approximately 60 tons of marijuana into

11   Arizona using a helicopter.  This helicopter would land in

12   a remote desert site where it would be off-loaded in a

13   matter of minutes by a highly trained ground crew.  And the

14   marijuana would be put into pickup trucks, where it would

15   be taken to Tucson and then distributed elsewhere,

16   including to California.

17          The owner, the source of the marijuana, was Rafael

18   Caro, but the man who ran the operation was another

19   individual named Rene Verdugo.  You will be hearing more

20   about him in a few minutes.

21          In any event, on February 5th, 1985, two days

22   before Agent Camarena's abduction, law enforcement

23   authorities in Arizona intercepted the pickup trucks just

24   after the helicopter had made a delivery.  The helicopter

25   was able to get away, but inside the pickup trucks, the

17

1    agents found approximately two tons of manicured marijuana.

2          So that summarizing all of this, between May of

3    1984 and February of 1985, which was a period of just over

4    seven months, the Cartel suffered a series of devastating

5    blows, resulting in losses to it in the billions of

6    dollars.   And the Cartel blamed the D.E.A. for those

7    losses.

8          Ladies and gentlemen, you will be hearing

9    eyewitness testimony that beginning in the Fall of 1984, a

10   series of meetings were held in the Guadalajara area.   Now,

11   you will be hearing from many, many witness in this case.

12         Some of these witnesses were participants in

13   these events, including the kidnapping of Agent Camarena,

14   and other serious crimes.   Some of these witnesses have

15   been paid money by the government for living expenses, for

16   protection, and a few have been given promises of immunity,

17   but they will testify as eyewitnesses.

18         And what some of them will tell you is that during

19   these meetings, the subject that was discussed was the

20   disruption that was being caused to the Cartel's operations

21   by the D.E.A. and what was to be done about it.

22         These meetings were attended by representatives of

23   every group that had an interest in the Cartel's

24   operations.   There were the traffickers, the main

25   traffickers:   Caro, Fonseca, Felix.   Prominent politicians

1    attended some of these meetings, including the Governor

2    Enrique Alvarez and the Minister of Gobernacion, Manuel

3    Bartlett.  The Mexican law enforcement was represented at

4    several in the person of Manuel Ibarra and Miguel Aldana.

5    And the military was represented also by the Minister of

6    Defense himself Arevalo-Gardoqui.  And one of the

7    defendants in this courtroom was also present at several of

8    these meetings and an active participant, and that was

9    Ruben Zuno-Arce.

10        You will hear that at the beginning of these

11   meetings there was some discussion about trying to bribe

12   the agent to get him to cooperate.  But it was agreed that

13   if that was not possible, he was to be picked up and taken

14   care of.

15        Ladies and gentlemen, the evidence will show that

16   is exactly what happened.

17        On February 7th, 1985, Kiki Camarena worked

18   through the morning at the D.E.A. office, and about two

19   o'clock in the afternoon he left the office in the U.S.

20   Consulate in Guadalajara to meet his wife for lunch.

21        As he walked across the street from the Consulate

22   building, towards his pickup truck, he was accosted by

23   several bodyguards of Caro and Fonseca.  One of these

24   people showed him a credential and said something to the

25   effect that, "the comandante wants to see you," and

19

1    Camarena was then forced into a small car at gunpoint.

2         He was then driven to another location in

3    Guadalajara.  A location about which you will be hearing

4    quite a bit, 881 Lope de Vega Street.

5         Kiki Camarena was held at that location for at

6    least the next day, all the while being beaten and

7    interrogated about his activities and the activities of the

8    D.E.A. in Mexico.

9         By February 8th of 1985, Kiki Camarena was dead.

10        About 6:30 in the morning on February 8th, his

11   wife placed a telephone call to the D.E.A. Agent Victor

12   Wallace.  Victor was an old friend of the Camarenas who had

13   been transferred to the D.E.A. office in Guadalajara a few

14   months before.

15        Mrs. Camarena asked him if he knew where Kiki

16   might be, which he didn't.  And from that point on the

17   D.E.A. began an intense effort to find Kiki Camarena.

18        The first thing that was found was Camarena's

19   truck parked across the street where he had left it the day

20   before.  His credentials and his gun were found up in his

21   desk.  The agents then went to their counterparts for

22   assistance, the M.F.J.P., but were told that most of the

23   M.F.J.P. agents were not available.  They were off in

24   another state on another investigation.  The state police

25   flatly refused to cooperate.

20

1     It wasn't until the following day, February 9th of

2  1985, that any M.F.J.P. reinforcements arrived in

3  Guadalajara.  About 50 agents, maybe, showed up in

4  Guadalajara, headed by an individual named Armando Pavon.

5     Shortly after their arrival, later in the day on

6  February 9th, the D.E.A. intercepted some radio

7  transmissions indicating that one of the traffickers was

8  attempting to depart from the Guadalajara airport.  So

9  Comandante Armando Pavon and his M.F.J.P. agents, along

10  with several D.E.A. agents, rushed to the Guadalajara

11  airport to intercept this departing trafficker.

12     What they found was Rafael Caro-Quintero

13  attempting to leave in a small jet.  This jet was

14  surrounded by heavily armed bodyguards.

15     I should point out that at that time, none of the

16  agents at the airport, none of the agents in Mexico, the

17  D.E.A. agents, knew what Caro looked like.

18     In any event, there was a tense stand-off between

19  the bodyguards and the M.F.J.P. agents.  And at that

20  moment, Caro asked to speak with Pavon.  The two of them

21  then walked to the back of the airplane and had a

22  conversation, and Pavon went into a nearby hanger where he

23  placed a telephone call.

24     And the evidence will show that he rarely made any

25  significant move without calling his superior, Manuel

1    Ibarra.  When he returned, Pavon announced that it was all

2    right, that the people at the airplane were D.F.S. agents

3    and he let the plane go.  And as the plane taxied away,

4    Rafael Caro stood in the doorway of the plane, toasted

5    everyone with champagne, and said that the next time they

6    should arm themselves with something bigger than toys.

7            In the month following Caro's flight from

8    Guadalajara, the United States maintained constant pressure

9    on Mexican authorities to find Kiki Camarena.  And in

10   response to that pressure, the M.F.J.P. conducted a series

11   of raids and searches at locations in the Guadalajara area.

12           But you will hear that the M.F.J.P. did not

13   initiate most of those raids, they followed leads that were

14   provided to them by the D.E.A.  And in any event, most of

15   these raids and searches were utterly fruitless.  No

16   suspects of any significance were found.  Almost no

17   evidence was located.  In some cases, food would be on the

18   stove.  The television would be on.  But no one would be

19   present.

20           The D.E.A. began to suspect that they weren't

21   obtaining the full cooperation of the M.F.J.P.

22           Now, you will hear that while the D.E.A. and the

23   M.F.J.P. were running around Guadalajara looking for the

24   traffickers, the traffickers were moving around the

25   Guadalajara area keeping one step ahead.  Nevertheless,

22

1   this pressure was having some impact.

2       You will hear about a meeting that was held at one

3   of the residences of Ernesto Fonseca in late February of

4   1985.  Attending this meeting were some of the major

5   traffickers, representatives of the M.F.J.P., and the state

6   prosecutor's office, among others.

7       And the traffickers complained that the situation

8   was getting difficult, and asked what could be done about

9   it.  And the response was that the problem should be taken

10  out of Jalisco and put into another state.

11      Ladies and gentlemen, the evidence will show that

12  is precisely what happened.

13      On February 28th of 1985, Comandante Pavon met

14  with several D.E.A. agents in Guadalajara, and he showed

15  them a letter, a letter that had supposedly been received

16  by the M.F.J.P. in Mexico.  This letter appeared to have

17  been postmarked in Los Angeles, and stated that Camarena

18  had been abducted by mistake by members of the Bravo

19  family, who had a ranch in the neighboring state of

20  Michoacan, and that if the authorities wanted to find Agent

21  Camarena's body, they should look at the Bravo Ranch.

22      So several days later the ranch was searched by

23  several D.E.A. agents, and others, but no body was found.

24      The next day, however, the D.E.A. was notified

25  that two bodies had been found lying in a field a short

23

1  distance from the ranch, across the road.  The D.E.A.

2  agents went to Mexico, examined the bodies, and one of

3  which was positively identified as that of Kiki Camarena.

4         Ladies and gentlemen, you will be hearing quite a

5  bit of forensic evidence in the case.  Forensic evidence is

6  scientifically analyzed physical evidence.  Some of this

7  forensic evidence derives from the autopsy of Agent

8  Camarena's body.  You will be hearing from the man who

9  conducted that autopsy, Dr. Spencer.

10         He will tell you that Agent Camarena had several

11  broken bones, broken arm, broken ribs, his skull was

12  fractured in many places, on top, cheekbones.  Dr. Spencer

13  will tell you that there was evidence of bruising on the

14  back of Agent Camarena's head, indicating that he had been

15  hit with a blunt instrument, and that a hole had been

16  driven through the top of Agent Camarena's skull with a

17  blunt instrument, and it was that blow which caused his

18  death.

19         Dr. Spencer will also testify that his examination

20  revealed no evidence that Agent Camarena's body had been

21  laying exposed for any significant period of time.

22         There is other forensic evidence associated with

23  the body, about which you will hear.  There was a sheet.

24  There was tape, which apparently had been used as a

25  blindfold.  There was binding rope, various articles of

24

1    clothing.  Head hair was obtained from the body.  And in

2    addition, a sample of soil was scraped from the body.

3         You will hear that that soil did not match the

4    soil at the location where the bodies were found, but it

5    did match soil at another location in a large park outside

6    of Guadalajara in the State of Jalisco.

7         And you will be hearing about other physical

8    evidence obtained from 881 Lope de Vega.  In April of 1985,

9    Mexican authorities notified the United States authorities

10   of this location, and at that time, and again in June,

11   F.B.I. agents were allowed to examine this residence.  And

12   while they were there, they conducted extensive sweeping

13   and collected what evidence they could, and they found a

14   number of pieces of evidence that will be significant to

15   the case.

16        Among other things, they found many, many hairs.

17   They found hairs at several locations in the house.  They

18   found hairs in a small Volkswagen automobile on the

19   property.  And they found hairs in what I will refer to as

20   the guest house, which was a small building located

21   adjacent to the swimming pool.  And all of those -- a

22   number of those hairs matched in every comparable respect

23   the hairs of Kiki Camarena.  Some of those hairs had been

24   forcibly removed.

25        There were various carpet samples taken from 881

25

1   Lope de Vega.   And the fibers from these carpet samples

2   matched fibers that were scraped from Agent Camarena's

3   burial shroud, and fibers that were obtained from the

4   blindfold, and other locations.   The burial shroud itself,

5   the sheet, that had been associated with the body, was

6   matched in every comparable respect some pillow cases found

7   at 881 Lope de Vega.

8           And there were other items that were found, and I

9   will discuss these in a bit more detail later, but among

10  them were plastic bags, and a syringe.

11          Other hair matches were also made, not just with

12  Agent Camarena, hair matching those of Juan Matta were

13  found in two locations at 881, including the guest house.

14  Hair matching Rene Verdugo, the man who ran the helicopter

15  operation, was also found at that location.   And hair

16  matching in every comparable respect, the hair of another

17  individual named Serjio Espino-Verdin, was found at 881

18  Lope de Vega.

19          Ladies and gentlemen, you will also hear that

20  while he was being interrogated, Agent Camarena was being

21  taped.   These tapes reveal certain information.   Among the

22  information on the tapes, three voices have been

23  identified:   Agent Camarena's voice, the voice of Rafael

24  Caro-Quintero, and the voice of Serjio Espino-Verdin, whose

25  hair was found at the location and who was revealed on the

26

1   tapes really to be the primary interrogator of Agent

2   Camarena.

3           And the tapes also revealed, based upon

4   information contained in them, that they were made at 881

5   Lope de Vega.

6           What were the roles of these two defendants in

7   this crime?  Many, many people were involved in this crime,

8   but only two are on trial here today.  And one of them is

9   Ruben Zuno-Arce.

10          The evidence will show that Ruben Zuno was a

11  wealthy individual, with well-connected family relations.

12  And as a matter of fact, one of his relatives, Luis

13  Echeverria, his brother-in-law, was the former president of

14  Mexico, one of the former presidents of Mexico.

15          Ruben Zuno has held himself out as a legitimate

16  businessman with interest in the area of Mascota in

17  Jalisco.  But the evidence will show that he led a double

18  life of sorts because he was also a marijuana grower and a

19  trafficker.  He coordinated his trafficking activities with

20  other members of the Cartel.  He socialized with other

21  members of the Cartel.  And he helped them plan the

22  kidnapping of Kiki Camarena.

23          You will hear from people who were there that

24  Ruben Zuno attended several pre-abduction meetings at which

25  the kidnapping was discussed, that he actively participated

27

1    in those meetings, and that he urged the deed be done.

2            And you will hear that by his own admission, Ruben

3    Zuno-Arce owned the house at 881 Lope de Vega, at least

4    until January 11th of 1985.  Less than a month before Agent

5    Camarena's abduction.

6            The evidence will show also that that Rafael Caro

7    was present at that house before January 11th of 1985, and

8    that Ruben Zuno was present afterwards.

9            So in sum, Ruben Zuno was a member of the Cartel

10   and a moving force in the abduction of Kiki Camarena.

11           What was the role of Humberto Alvarez Machain?

12   Well, he was a medical doctor and he assisted the Cartel

13   with medical services.  He attended to the traffickers'

14   injuries.  He revitalized people who had partied too much.

15           You will also hear that he was present at 881 Lope

16   de Vega when Kiki Camarena was being held there and

17   interrogated, and that Dr. Alvarez Machain was there to

18   assist the Cartel with his medical services.  He wasn't

19   there -- his role wasn't the same as some of the other

20   individuals.  He wasn't a bodyguard.  He wasn't an

21   interrogator.  He was there as a medical doctor.

22           Ladies and gentlemen, you will hear that Defendant

23   Alvarez was brought to the United States against his will,

24   and after arriving here, he made statements.  And in those

25   statements he admitted being at Lope de Vega, and he

1   admitted seeing Agent Camarena.  Twice.

2       What he claims was that on the first occasion he

3   went to a bedroom and looked in and there was Agent

4   Camarena, and on the second occasion he went back to the

5   bedroom and looked in and this time Agent Camarena was

6   being attended by another doctor.

7       You will also hear that Defendant Alvarez has

8   admitted being at the airport on February 9th, 1985, when

9   Pavon allowed Caro to flee.  You will be hearing evidence

10  that when the FBI agents searched the residence at 881 Lope

11  de Vega, they found in the bathroom of the guest house,

12  lying on the floor, a syringe.  In that syringe were traces

13  of a drug called Lidocaine.

14      Ladies and gentlemen, the evidence will show that

15  Lidocaine is one of the first things that a doctor will

16  turn to, to stabilize a fibrilating heart.  That's a heart

17  that has begun to vibrate so quickly it doesn't pump blood.

18  And the evidence will show that heart fibrilation can be

19  caused by the very sort of injuries suffered by Enrique

20  Camarena.

21      You will also hear, ladies and gentlemen, that in

22  their search of the Lope de Vega residence, the agents

23  found some plastic bags, like dry cleaner's bags, in the

24  closet in one of the bedrooms.  On those bags were found

25  fingerprints, and those fingerprints have been matched to

29

1    the fingerprints of Defendant Humberto Alvarez-Machain.

2        So Defendant Alvarez admits that he was at Lope de

3    Vega as an observer to the Camarena interrogation.  Ladies

4    and gentlemen, the evidence will show that he was much more

5    than that.

6        The Judge has summarized for you what the charges

7    against each of these defendants are.  I'll do it again

8    very briefly.

9        Both defendants are charged with conspiracy to

10    commit violent crimes in aid of a racketeering enterprise,

11    that is, the kidnapping and murder of Agent Camarena.

12        Both defendants are charged with committing a

13    violent crime in aid of a racketeering enterprise, again

14    the kidnapping of Agent Camarena.

15        Both are changed with conspiracy to kidnap a

16    Federal agent and with the kidnapping of a Federal agent.

17        And lastly, Defendant Alvarez-Machain alone is

18    charged with felony murder in relation to Agent Camarena's

19    death.

20        That, ladies and gentlemen, is what the government

21    expects the evidence in the case will show.  There will be

22    many, many witnesses, many pieces of evidence.

23        I want to thank you in advance for your patience

24    and careful consideration of all of that evidence.  When

25    the evidence has been fully presented, the government will

30

1    have an opportunity to discuss it with you in light of the

2    law as you are instructed by the Judge, and at that time, I

3    or AUSA Medrano, will ask you to find each of these

4    defendants guilty as charged.  I'm confident that you will.

5              Thank you.

6                        (Contined on next page)

7    //

8    //

9    //

1       THE COURT:  Counsel for Mr. Zuno, you may --

2       MR. MEDRANO:  Your Honor, may we have just 30

3  seconds to peruse the last few charts of Mr. Medvene?

4       THE COURT:  You may not.  I expect you to do that

5  before we convene.

6       MR. MEDRANO:  Very well, Your Honor.  Thank you.

7       MR. MEDVENE:  If the Court please, the prosecution

8  team, defendants, and defense counsel, ladies and gentlemen

9  of the jury, my name is Edward Medvene.  It's my pleasure,

10  along with co-counsel James Blancarte and Mary Fulginiti to

11  represent Ruben Zuno-Arce.

12       Mr. Arce, would you stand up.

13            (Defendant Zuno-Arce complies.)

14       MR. MEDVENE:  There is no question, ladies and

15  gentlemen, that Enrique Camarena was kidnapped, tortured,

16  and killed.  The issue in this case is:  Did Ruben

17  Zuno-Arce have any part in the planning of that kidnapping.

18  Ruben Zuno-Arce did not have any part in planning the

19  kidnapping.  The prosecution says he did.  And that's

20  really what the case is about.

21       The prosecution after some six years, from '85,

22  basically through 1990, into '91, after one of the most

23  extensive and exhaustive investigations known to the

24  Federal government, after the expenditure to witnesses

25  alone, you're going to hear in this case, that came up from

32

1    Mexico of some $2.7 million to get testimony.

2            After advertisements in papers during those six

3    years, after offers of relocation to the United States, and

4    jobs here, and freedom and immunity for a variety of

5    crimes, from murder to drugs to whatever, after all of

6    that, strippen away everything, strippen away the drugs and

7    the atrocities that occurred, that are not contested, came

8    up with one individual, one, for the six years or so into

9    '91, who claimed he attended a meeting where Ruben Zuno was

10   present and the kidnapping planned.  One witness.

11           And the case is essentially about the veracity of

12   that one witness.  We'll see what else there is, but for

13   six years, there was that one witness.

14           And you will hear of that witness' motivation to

15   be untruthful.  You will hear how this witness, Mr.

16   Cervantes, was out of a job, had been fired in 1989.  The

17   most he made in all of '87 and '86 and '88 was $1,000 a

18   year.  In all of '89, through November, he made $500,

19   without work.

20           He was put in touch with the D.E.A., you will

21   hear, by a man named Garate Bustamante, a man he had known

22   many years prior to that and who he worked with in this

23   corrupt police force the prosecution has talked about.

24           You will hear how all of the sudden, being out of

25   a job and in need of money, Bustamante finds him and he

1    finds Bustamante; and Bustamante, you will hear, was the

2    procurer of witnesses in large part for the prosecution.

3         Bustamante, you will hear, was a man who was

4    present in December of 1984 at a meeting where the

5    kidnapping and murder of Enrique Camarena was planned.

6    Where Enrique Camarena's picture was shown around.  This

7    procurer of witnesses was there.  Mr. Zuno wasn't there.

8    No testimony he was.  Nothing to do with him.

9         But this procurer of witnesses was there.  His

10   reward is no prosecution, payment of money if he supplies

11   people, and he supplied after six years Hector

12   Cervantes-Santos.

13        You'll hear the out-of-work Mr. Santos who made

14   $500 in '89, comes to Los Angeles, no information the first

15   time about Mr. Zuno attending any kidnapping meetings when

16   he comes about November 24th, and then the payments start

17   to come.  And you'll see the payments, and I won't go

18   through them in detail now, but they take five sheets.

19   They average $5,000 a month.  Some $175,000 to this

20   out-of-work man who made $500 in all of '89.

21        In '89, you will see he was paid close to $11,000.

22   It takes five sheets to do this.  The next year he makes

23   about $70,000.  The next year $50,000.  This year in excess

24   of another $30,000.  We'll go through all of these sheets

25   for you, documenting the payments he received for his

34

1    testimony, in addition to being able to live here in this

2    country.

3         Now, in addition to the motive, and we'll deal

4    with more about him in a few minutes and whether he is

5    believable, because strippen everything, at least for six

6    years, we'll hear what else they have in this trial.

7    That's what they have.

8         You'll hear about significant inconsistencies in

9    his story that we'll talk about in a few minutes, saying

10   there were meetings when Mr. Zuno was there, and then

11   saying there weren't, and there are other meetings, and

12   then there weren't.  And there were certain people present

13   and then they weren't.  And he could overhear things and

14   then he couldn't.

15        Not trivial, but you'll hear from the evidence

16   significant things.  And you'll understand why the man's

17   story continually changed, because you'll hear that he

18   purported to hear what he claims he heard because he was a

19   bodyguard of Javier Barba-Hernandez, a narcotic trafficker

20   and liaison person with these bad people, with Quintero and

21   Fonseca.

22        And you'll hear how he really didn't hold that

23   job.  Somebody else was caretaker.  He was never even

24   there.  He never was at any meetings.  He created these

25   meetings.  And you'll hear from that person, and you'll

1    hear from other people that will say he never even worked

2    for this individual, which will explain to you why this

3    story keeps changing.

4         But in addition to the contradictions, and real

5    question about:  Does this man really exist?  Did he exist

6    in the position he said he had?  The prosecution's own

7    witnesses in large part will substantiate Mr. Zuno's claim.

8    Mr. Zuno's statement, "I was not there.  I did not plan,

9    have any part in planning any kidnapping."

10        You'll hear from the prosecution's own witnesses

11   that a physical kidnapping took place.  There's no question

12   about it.  That Enrique Camarena was tied up.  That he was

13   taken to Lope de Vega.  That he was questioned.  That he

14   was interrogated.  That he was hit.  That he was

15   brutalized.  That he was killed.  That he was buried.  And

16   he was buried again.

17        Ruben Zuno, by the Government's own evidence, did

18   not do any of those things.  My gosh, they'll appall us.

19   They appall us.  But he did not do those things.  You'll

20   hear the Government makes no contention he did any of those

21   things.  Because he did not.

22        In addition to the Government's own witnesses, you

23   will hear the physical evidence and the forensic evidence.

24   You'll hear of the hair -- it doesn't change -- of Matta.

25   Of Verdugo.  Of Serjio Virgin.  Not of Mr. Zuno because he

36

1    wasn't there.   There's no contention he was in that house

2    during those terrible days.

3            Fingerprints found.   None of Mr. Zuno's cause he

4    wasn't there.

5            The interrogation tape.   You've heard of voices.

6    Not Mr. Zuno's, he wasn't there.   Name is not mentioned.

7    Questions not asked about him.

8            And also through the prosecution's own witnesses

9    will be developed circumstantial evidence.   You'll hear

10   various counts, but 30 to 50 people were at Lope de Vega.

11   People that participated.   People that were there.   Various

12   named defendants.   Ruben Zuno was not there.   You'll hear

13   of phone records.   These bad people calling out from Lope

14   de Vega for others to come, and visit the house, and come

15   to Guadalajara.

16           They bring this Matta, this animal from Columbia,

17   they bring him up here.   They bring other people up here.

18   Mr. Zuno's not even in Guadalajara.   You'll hear that he

19   was in Mascota.   A rural town, five hours by dirt road at

20   the time.   Four or five hours by dirt road from

21   Guadalajara.

22           These 30 to 50 people were there, but not

23   Mr. Zuno.

24           You'll hear from the Government's own witnesses

25   that the participants fled.   Caro-Quintero gets on a plane

37

1    and makes his deal with this Pavon Reyes and leaves

2    Guadalajara.  And eventually you'll hear winds up in Costa

3    Rica and is arrested there with many henchmen.

4         You'll hear Ernesto Fonseca leaves Guadalajara and

5    goes to Puerto Vallarta and is arrested.  You'll hear

6    others are travelling here and there, and hiding, and

7    changing names, and doing this and that.  Not Ruben Zuno.

8    He's in Mascota.  Living openly, you'll hear.  Travelling

9    to the United States, you'll hear, in his own name, own

10   identity.  No different name.

11        The question the evidence will present for you,

12   when you'll sift through and step back from the atrocity,

13   is:  Did he plan the kidnapping?

14        In light of the fact that the Government's own

15   evidence shows he's not at the scene.  No physical evidence

16   points to him.  Telephone records don't point to him.  He

17   doesn't flee.  And the evidence will present the issue:

18   Does it make sense that the man who owned the Lope de Vega

19   house to within a month of when this happened, we'll talk

20   more about that later, a house that you'll hear is next to

21   his brother's house and across the street from his mother's

22   house, would plan a kidnapping and plan it and plan the

23   torture and brutality and have it in his own house?

24        You'll be asked:  Does that make any sense?

25        Well, who is Ruben Zuno?  Ruben Zuno is a 62 year

1   old gentleman, a citizen of Mexico.  Married.  A number of

2   children.  Hasn't lived in Guadalajara on a permanent basis

3   since 1978.  Moved to Mascota, this rural town, on a

4   permanent basis in approximately 1982.

5          You'll hear he earned a living in Mascota growing

6   fruit and preserving it.  Building doors and windows.  Some

7   cattle.  Medium successful.

8          You'll hear his sister was married and is married

9   to a gentleman who in 1970 was president of Mexico.  No

10  involvement you'll hear of Mr. Zuno in politics for some

11  ten years prior to the '85 abduction.

12         He did own Lope de Vega.  There's no question

13  about it.  Lope de Vega is a residence in Guadalajara.  He

14  acquired the vacant land, you'll hear, from his family in

15  1970.  He built a house there in early '70 for himself and

16  his family, and lived there for a number of years.

17         He moved from Guadalajara in about '78.  Rented

18  the house in '79.  No longer a need for the house once he

19  moved away permanently.  And you'll hear sold the house in

20  an arm's length transaction.  Arm's length, that means an

21  open transaction, his name, third-party.  You'll hear a

22  fair price, the market value, some 70 million pesos.  At

23  that time about 300-plus thousand dollars.

24         He sold the house to a man whose name you'll hear,

25  Ruben Sanchez-Barba.  No prior business relationship

39

1  between Mr. Ruben Zuno and that man.  No particular

2  acquaintanceship or knowledge with Mr. Zuno and that man,

3  or his family.  The house was sold, handshake, December

4  22nd.  Mr. Zuno removed whatever limited furniture was in

5  there on the 23rd that the buyer wanted removed.  Money was

6  transferred a couple weeks later.  Keys transferred.

7        And after that, this Ruben Sanchez-Barba and his

8  family took over the house, fixed it up, and it will be

9  developed that they, those people, had a prior relationship

10  with Caro-Quintero.  They sold or made some arrangement

11  with Caro-Quintero to use this house.  That's Lope de Vega.

12        Man's got a property in '70, sold it month or two

13  before the occurrence to people who developed, had a

14  relationship, had the house up for sale, and sold it.

15        Well, why are we here?  You've heard a terrible

16  thing happened.  An atrocious thing.  A D.E.A. agent was

17  killed, and you can imagine the fervor that would cause

18  within an agency, to reach out in all directions and find

19  anybody that might have any knowledge, any knowledge, about

20  what occurred.

21        Ruben Zuno's connection, he owned the Lope de Vega

22  house at one time.  And you will even hear on Lope de Vega,

23  how in 1986, a year or so after the occurrence, Jaime

24  Kuykendall, who will be a Government witness, who was the

25  head of the Guadalajara Office of the D.E.A., wanted to

40

1 talk to Ruben Zuno, find out about the house, what he knew

2 about it, and Ruben Zuno voluntarily came to the United

3 States.  Didn't ask for anything.  Answered all the

4 questions Jaime Kuykendall had about the house.  Came up,

5 answered the questions, went back.  I mean, the questions

6 he asked, he answered what he was asked about the house.

7 Told everything he knew.

8      But you had this aggressive investigation, this

9 reaching out.  Who might have any information, and a need

10 to get out to the community this kind of atrocity may never

11 happen again.  And in trying to get out that message, you

12 will hear that thousands of, if not millions of dollars,

13 were out there on the street for people that might give

14 testimony.

15      Offers a relocation, offers of this, offers of

16 that.  And a situation was created where a person or

17 persons could take advantage of the offers that were made

18 out there and give untruthful testimony.

19      And there was pressure.  You'll hear, for example,

20 of a David Macias, a man who was apparently a drug dealer.

21 Who is in a far away prison.  You'll hear that he was

22 brought to Los Angeles.  That this same Mr. Cervantes had

23 claimed that David Macias was Mr. Zuno's chauffeur, and had

24 brought him to various of these kidnapping meetings.

25      And they said to Mr. Macias, "Tell us, weren't you

1   Ruben Zuno's chauffeur?"

2          And he said, "No."  And you'll hear Mr. Zuno

3   didn't have a chauffeur.  And he said, "No, I wasn't his

4   chauffeur."

5          And he said, "Well, tell us, you know Ruben Zuno,

6   don't you?"

7          And he said, "No."

8          "Well, you brought him to meetings, didn't you?"

9          "No."

10         "You saw this?"

11         "No, I never met him.  I don't know him."

12         "Look, you're going back in solitary confinement.

13   It would be good for you if you knew him.  Now, we think

14   you knew him."

15         "I don't know him."

16         He's put back in solitary confinement.

17         Other people succumbed to the pressure.  The

18   money.  Mr. Cervantes was one of them that succumbed.

19         We talked some about the money, $175,000.  Let's

20   talk a little bit more about Mr. Cervantes.

21         You will hear in terms of believability on these

22   three meetings he's going to tell you about that Mr. Zuno

23   attended, that in the past, to either the D.E.A. or under

24   oath to the Grand Jury, he never said that Mr. Zuno was

25   ever at any meeting where a kidnapping was discussed in

42

1   September of '84.  Never said it on five, six, seven

2   occasions we're going to document for you.  But in May of

3   1990 he claims he was present.

4        You will see on prior occasions he said Mr. Zuno

5   was present at an early October meeting where the

6   kidnapping was discussed.  In May of 1990, he'll admit

7   there was no such meeting.

8        He said there was a wedding some time in October.

9   We are going to present evidence that there was no wedding,

10  as he described it.

11       But he claims in January 2nd and January 11th

12  meetings with the D.E.A., that prior to the meeting there

13  was a kidnapping discussion and Mr. Zuno was present.  And

14  in May of 1990 the man said there weren't one, there were

15  two meetings.  At the pre-wedding meeting Zuno was not

16  present.  He claimed that there was a meeting one week

17  after the wedding, to the D.E.A. or the Grand Jury, and

18  admits now that there was no meeting.  He claims there was

19  a January 1985 meeting where Mr. Zuno was present at the

20  kidnapping discussion.  He claims now there was no meeting.

21       Even things like who was present at

22  meetings -- we'll give you one example, the first meeting.

23  The first meeting where he claims the kidnapping was

24  discussed.  He told the D.E.A. Manuel Ibarra was present.

25  In May of '90, he is not present.  Caro-Quintero he told

1   the D.E.A. was present.  In May of '90 he's not present.

2   Fonseca, present, not present.  Garcia Paniagua, not

3   present, in May of '90 present.  Manuel Ibarra, present to

4   the D.E.A., not present May of '90.  Marcelina Paniagua,

5   not present to the D.E.A., present in May of '90.  Matta,

6   present, not present.  Pavon-Reyes, present, not present.

7   Manuel Salcido, not present, present.

8          You are going to have to decide if you can believe

9   him.

10          Now, you'll also hear that one meeting he said was

11   at a baptism, and there will be testimony there was no

12   baptism.  One meeting was a wedding, there will be

13   testimony there was no wedding.

14          And what developed, ladies and gentlemen, after

15   May of 1990 is, the D.E.A. was informed -- information was

16   given through the defense that Mr. Cervantes never held the

17   position that he claimed he held.  That another gentleman

18   was the caretaker.  He will state there was no Mr.

19   Cervantes.  He was never there.  That there was one house

20   that this Javier Barba-Hernandez had, this summer house,

21   that Mr. Cervantes never worked there.

22          And after that, what happened?  Well, what

23   happened after that is this need, again, this need to throw

24   out this net.  This need to finish.  We don't know who's

25   going to be here, and who came after six years.  We know

44

1   what they had after six years, Cervantes.  We don't know

2   what came after six years in '91, '92, what people are

3   going to say.

4           What we do know is some of the people that may say

5   something are involved in the kidnapping of four American

6   Jehovah's Witness missionaries who were murdered.  You may

7   hear from them that they are now in the United States, and

8   they are going to maybe testify against Zuno, and they got

9   bad things to say, and they are going to be able to live

10  here and work here and get paid.

11          You'll hear about people that possessed and

12  distributed narcotics, heroin, cocaine, marijuana.  People

13  involved in theft, bribery of a Federal agent, obstruction

14  of justice, unlawful possession of firearms, robbery,

15  assault, use of many aliases.  You may hear from all of

16  these people.  They may say bad things.  You'll have to

17  evaluate.

18          Why weren't they here the first six years, first

19  seven years?  How come now?  You'll hear what these folks

20  were offered.  These folks that first came after six, seven

21  years.

22          Just the witnesses up from Mexico $2.7 million.

23  Cervantes alone $175,000.  Immunity from prosecution.

24  Housing.  Relocation to the U.S.  Permanent residency in

25  the U.S.  Living expenses for them and their families.

45

1  Medical expenses.  Travel expenses.  INS work permits.

2  Agreements not to prosecute.  That was the payment.

3       And one who is expected to testify now after seven

4  years, he may be at a meeting or something, buck up

5  Cervantes, who's there evidence now never even was there,

6  is this fellow, Rene Lopez-Romero, who you'll hear gets

7  security for himself and family, living expenses of $3,000

8  a month, an INS work permit when this case is concluded,

9  when he finishes testifying here.

10      And you'll hear he was involved in the kidnapping

11  and murder of these folks in December of '84.  Missionaries

12  approached the front door.  Fonseca thought they were

13  D.E.A. agents.  This person worked for this animal,

14  Fonseca.  They interrogated them, blindfolded them.  After

15  the interrogation they were taken to a home.  They were

16  interrogated further.  They were tortured.  They were

17  murdered.  You will hear, if he testifies in this case,

18  he's going to get his $3,000, be able to live here and work

19  here.

20      Now, you'll have to decide sometime, and try hard

21  to avenge a terrible thing.

22      The issue as we said in the case is:  Is there

23  competent evidence the kidnapping was planned?

24      Now, I left for last, I'll take a few more

25  minutes, the drug evidence.  No question drugs are bad.

1    Massive drugs.  The issue is:  Did he plan the kidnapping?

2     Drug evidence in two areas.  The Government may well

3    say -- apparently from the opening is going to say -- Mr.

4    Zuno was a marijuana dealer.  He will tell you he was not a

5    marijuana dealer.

6         More important than that, a man named Jesus

7    Anaya-Labra, who worked in the Mexican government for some

8    of these bad people, will tell you that on one occasion a

9    Javier Barba-Hernandez went to him, Anaya-Labra, and said,

10   "Do you know Ruben Zuno?  Ruben Zuno is reporting marijuana

11   fields in Mascota owned by myself and Quintero.  You better

12   tell him to stop doing that if he knows what's good for

13   him."  You'll hear that testimony and then be able to judge

14   if Mr. Zuno did that, is he a member of some Cartel with

15   these people?  You will hear that.

16        So there will be some testimony he was involved,

17   some testimony he wasn't involved, this testimony of

18   Anaya-Labra, but nothing to do with that he planned the

19   kidnapping.

20        But even more important, the Government's spent

21   considerable time in their opening on the Guadalajara Drug

22   Cartel.  If we listen closely to what they say the evidence

23   is going to show, they said there were main traffickers:

24   Quintero, Fonseca, Miguel Felix, Felix-Gallardo, various

25   underlings.  Not Zuno involved in this Cartel with

1  marijuana.

2         You'll hear that what caused this kidnapping of

3  Enrique Camarena was Zacatecas, the large marijuana fields.

4  You'll hear about Zacatecas.  Huge, immense, but you'll

5  hear from Jaime Kuykendall, ten families had plants there

6  at Zacatecas, the farms.  The overseer or the protector was

7  Quintero.  There were financiers, there were

8  agriculturalists.  Lots of people.  Not Ruben Zuno.

9         You'll hear about Padrino.  You heard the cocaine

10  operation.  Got this Matta in Columbia, and Gallardo

11  shipping stuff up here.  Ruben Zuno nothing of any kind to

12  do with cocaine.  Believe no evidence of any kind, and

13  nothing to do with those million of dollars of cocaine

14  you're going to be hearing about.

15         When that testimony comes in, listen to it, is

16  Ruben Zuno's name mentioned?  Chihuahua, what was called

17  the largest, or whatever the words were, marijuana fields.

18   You'll hear of Caro-Quintero's involvement in Chihuahua,

19  in Bufalo, Mexico.  No involvement of any kind of Mr. Zuno.

20  The Arizona seizure.  No involvement of any kind of

21  Mr. Zuno.

22         Now, those were the four instances the prosecutor

23  talked about as what hurt the Cartel.  It's believed there

24  will be no testimony of any kind that Mr. Zuno was involved

25  in any of the three huge marijuana plantations or in the

1   cocaine transaction.  He wasn't in this Cartel.

2        I leave you with this, ladies and gentlemen:

3   Jaime Kuykendall, a friend of Enrique Camarena's, a man who

4   ran the Guadalajara office of the D.E.A., '82, '83, '84,

5   '85, supervised the investigation initially.  Eighteen,

6   nineteen years with the D.E.A.  The man Zuno voluntarily

7   went up to Texas to see in '86.  Jaime Kuykendall said, a

8   man who had extensive knowledge -- we know what's going to

9   be said now, but we can tell you what he has said under

10  oath -- a man who has extensive knowledge of Guadalajara,

11  whose job was investigating the families and the bad guys

12  down there.  We can tell you what he said under oath in May

13  of '90.  "There was no evidence Zuno was a member of the

14  Guadalajara Drug Cartel."  B, "There was no evidence Mr.

15  Zuno was involved in the kidnapping of Enrique Camarena."

16       There may be an attempt to discount that or the

17  fact that he is out of the investigation the end of '85 and

18  '86.  But he investigated this.  What is there?  This Mr.

19  Cervantes, what is there?

20       We ask only that you keep your eye on the ball.

21  The ball is:  What connective evidence is there?  What

22  evidence -- not about was there a murder.  Not about is

23  there lots of drugs out there.  Not about is there badness

24  or are we sick in our stomach.  Not about that.  But what

25  connective evidence is there, that Ruben Zuno planned, and

49

1    is that connective evidence relevant?  Is that connective

2    evidence believable?

3         We'll ask you, ladies and gentlemen, at the end of

4    all the testimony, to return a verdict of not guilty.

5         Thank you very much for your attention.

6         THE COURT:  We will take our morning recess at

7    this time.  The jury may be excused.

8         Please rise.

9                      (Jury out.)

10        THE COURT:  Counsel, will you be intending to make

11   an opening statement on behalf of your client?

12        MR. RUBIN:  I will, Your Honor.  I will.

13        THE COURT:  All right.  We'll proceed with that

14   when we resume.

15        MR. MEDVENE:  May we address you for one moment

16   on --

17        MR. RUBIN:  What time to be back, Your Honor?

18        THE COURT:  Fifteen minutes.

19        MR. MEDVENE:  May we address you for one second?

20        THE COURT:  Yes.

21        MR. MEDVENE:  We could do it later if you want.

22        There's a metal detector outside, Your Honor.  We

23   think -- we never had one before Mr. Matta.  We had one for

24   Mr. Matta.  We don't think there's a need for one.  We just

25   raise with Your Honor, our concern, even though the jury's

1    on another floor, what the case is about the allegation of

2    violence.  Security detectors mean violence.  We don't

3    think there is a need, and we respectfully ask it be

4    removed.

5             THE COURT:  Counsel, the question of whether

6    there's a need is left to the people who are responsible

7    for that type of decision, and I don't interfere with that.

8    I would just as soon not have it, but they believe it is

9    necessary, and I don't think it's prejudicial in this case.

10            MR. MEDVENE:  All right, sir.  Thank you.

11                      (Recess taken.)

12                      (Jury in.)

13            THE COURT:  Counsel, you may proceed with your

14   opening statement.

15            MR. RUBIN:  Thank you, your Honor.

16            Good morning, ladies and gentlemen.  My name is

17   Allen Rubin, and I represent Dr. Humberto Alvarez-Machain,

18   seated in the green jacket at counsel table.

19            First, let me say I don't have any flip charts to

20   show you, and I plan on being brief.  And the reason is

21   because the truth doesn't need to be adorned with charts or

22   graphics or fancy pictures, and it doesn't take a long time

23   to speak the truth.

24            And the truth in this case is that Dr. Humberto

25   Alvarez-Machain is got guilty of these charges.

1    Before I talk about what I think the evidence will

2  show, let me tell you little a bit about Dr.

3  Alvarez-Machain, because in the final analysis, you will be

4  judging the guilt or innocence of a human being, of a

5  person.  Not a name on an indictment, not a figure just

6  sitting there, but a human being.

7    He was born in Guadalajara, Mexico.  Lived there

8  his entire life.  He's 44 years old.  In 1975, '75, he

9  graduated from the University of Guadalajara Medical

10  School.  After that, he specialized in OB-GYN, certainly a

11  specialty that would not be in high calling for the

12  Guadalajara Drug Cartel.  He is married, with four

13  children.

14    Throughout these events, he lived openly in

15  Guadalajara.  Lived there under his own name.  Went to

16  work.  Had his practice.  Never fled, never ran from

17  anything.  And the reason for that is that he wasn't guilty

18  of anything.

19    Now, this case is a very, very emotional case.

20  It's an inflammatory case.  And the Government, from the

21  opening statement on, will use that emotion, will try to

22  use that emotion to it's advantage.  And so we'll hear

23  about Rafael Caro-Quintero toasting his escape from

24  Guadalajara, and we'll hear about millions of dollars in

25  drugs, and we'll hear about drug lords and the tortured

52

1  body of Enrique Camarena found in the barren fields.

2       And all of that may, indeed, be true, but it has

3  absolutely nothing to do with judging the guilt or

4  innocence of Dr. Alvarez-Machain.  You cannot rely on

5  emotions.  You can't rely on how what a terrible crime or

6  what atrocities were inflicted.

7       This case is too important to be swept away

8  by emotions.  You are here to look at the evidence.  And

9  the Judge has already told you that you can't be concerned

10 with emotions, but only evidence.

11      Now the evidence will show what this case is

12 really about.  That for whatever reason, understandable

13 grief for a fallen comrade, whether it's the anger at the

14 Mexican officials who they believe injured their ability to

15 stop the flow of narcotics into this country, but for

16 whatever reason, as sometimes happens, like Watergate or

17 Iran Contra, our Government is out of control.

18      MR. CARLTON:  Objection, Your Honor;

19 argumentative.

20      THE COURT:  Yes.  Counsel, this is not the time to

21 argue the merits of the case.

22      MR. RUBIN:  Thank you, Your Honor.

23      THE COURT:  Confine yourself to stating an offer

24 of proof.

25      MR. RUBIN:  I think the evidence will show that

53

1    this case has gone past legitimate investigation.

2              MR. CARLTON:  Objection renewed, Your Honor.

3              THE COURT:  Sustained.  That's an argument, not an

4    opening statement.

5              MR. RUBIN:  Your Honor, thank you.

6              Now, the sole issue for you to decide in this case

7    is whether the Government can prove to you beyond a

8    reasonable doubt, beyond a reasonable doubt, that Dr.

9    Alvarez-Machain had anything to do with this terrible

10   crime.

11             So much of this case will not even be disputed.

12   There will be no dispute that there is a Guadalajara Drug

13   Cartel.  There will be no dispute that they sold millions

14   of dollars of narcotics.  There will be no dispute that

15   some people may have kidnapped and murdered Enrique

16   Camarena to get back at them.  No dispute.

17             Your job is to focus on, as Mr. Medvene said, the

18   connecting evidence in this case.  To see if there is any

19   connecting evidence that says that Dr. Alvarez-Machain did

20   any of this.

21             Now, in their efforts to try and make a case, you

22   will hear evidence that the Government has done a number of

23   things.  They've given away money by the hundreds of

24   thousands, millions of dollars to people who -- to call

25   them not solid citizens is to use the understatement of a

54

1    lifetime -- they have put drug dealers on the payroll.

2    They have put murderers on the payroll.  They have given

3    amounts of money that would lead these people to accuse the

4    defendants of killing Camarena, killing anybody, killing

5    President Kennedy.

6           Now, the most shocking example of all is when the

7    Government indicated that Dr. Alvarez-Machain, in relation

8    to the statement you will hear he gave to the D.E.A. after

9    his arrest, was that the Government said he was taken

10   against his will.  In fact, on April 2nd, 1990, Government

11   agents, working through hired Mexicans who they arranged

12   with the D.E.A. to do this violently, violently, and at

13   gunpoint, kidnapped Dr. Alvarez-Machain from his medical

14   office in Guadalajara, after he had finished shopping, a

15   day of shopping with his niece.

16          They then held him hostage and flew him

17   surreptitiously to El Paso, Texas, where he was delivered

18   into the waiting arms of the D.E.A.  At that point he was

19   questioned for hours, and finally after going through this

20   entire process, he gave them a statement.  And the evidence

21   will show that after all of this, that statement was not a

22   voluntary statement, was certainly not freely given.  It

23   was the product of a man who, indeed, had been kidnapped at

24   gunpoint.

25          And what did he say?  He still, after all of that,

1   after all of that activity, said -- never, never stated

2   that he ever did anything to Enrique Camarena.  Never.  You

3   will not hear one statement coming from Dr. Alvarez-Machain

4   that says he ever did anything to Enrique Camarena.  And

5   that's the question before you.

6          Now, you've heard the Government's opening, and,

7   again, much of it has absolutely nothing to do with

8   Dr. Alvarez-Machain.  There is a Guadalajara Drug Cartel,

9   and there will not be one shred of evidence in this case

10  that Dr. Alvarez-Machain sold narcotics, transported

11  narcotics, arranged for the growth of marijuana, or had

12  anything to do with the business of selling narcotics, and

13  that is what the business of the Cartel was, to sell

14  narcotics.  By their own statements, there will not be one

15  shred of evidence that he is involved in that.

16         By their own statements, not one shred of evidence

17  that he planned the kidnapping, attended the meetings, or

18  had anything to do with the planning and kidnapping of

19  Enrique Camarena.  Not a shred of evidence will come

20  forward that he had anything to do with the execution of

21  the kidnapping.

22         So, then what is the evidence that they're going

23  to suggest?  Well, first, they'll suggest to you, as they

24  said, that he was in the Drug Cartel.  And that was because

25  he gave medical attention to Cartel members.  And, in fact,

1  I believe the evidence will show that at one time, he did

2  treat the grandfather of Rafael Caro-Quintero for a

3  prostate problem.

4       And the evidence will show that that, giving

5  medical care to anybody, does not make you a member of a

6  Cartel to sell drugs.

7       Now, the sole allegation against Dr.

8  Alvarez-Machain, in fact, focuses on a very narrow time

9  period.  That's the period between February 7th and

10 February 8th, at 881 Lope de Vega.  The rest of it, by the

11 Government's own statement, he has nothing -- he's not

12 involved -- he's not involved with it afterwards, the

13 planning of moving the bodies or anything else.

14 Dr. Alvarez-Machain assists in some way in the questioning

15 and the interrogation of Enrique Camarena.

16      The evidence, in fact, more appropriately the lack

17 of evidence, because it is the Government's burden, it will

18 be a stunning lack of evidence that he did anything to

19 Enrique Camarena that, in fact, the Government's theory is

20 a concoction of trying to put together various little items

21 of evidence.

22      For example, and I won't go through it all, cause

23 I promised I would be brief, the syringe.  The syringe that

24 was found with Lidocaine in it.  That syringe will also be

25 found to have had traces of Vitamin B in it as well.  And

57

1   that will become significant.

2        More significantly, a syringe that was found two

3   months after these events, two months later, did not have

4   any fingerprints on it, nothing to indicate, as you would

5   press a syringe down and possibly leave a thumb print, no

6   fingerprint of Dr. Machain on there.  Nothing to show that

7   he was the one that used that syringe.

8        In addition, there will be no evidence, no blood

9   tracings or anything else to show that, in fact, that

10  syringe was used on Enrique Camarena.  It is just a

11  syringe.  There's no blood in that syringe that matches

12  Enrique Camarena.  No hair.  No nothing.

13       There were 20, 30, 40 people in that house, all of

14  whom could have used it, and all of whom could have used it

15  for some other reason.  No connection.

16       The autopsy of Agent Camarena, again, shows no

17  evidence of Lidocaine in his body, or focus on the

18  injuries.  In fact, when you look at the forensic evidence,

19  for example the hairs, you won't see any hair of

20  Dr. Alvarez-Machain in the room where Enrique Camarena was

21  supposedly questioned and interrogated.

22       On the interrogation tapes, you will not see any

23  voice of Dr. Alvarez-Machain on those tapes if he was

24  assisting.  I suggest to you that there also won't be any

25  indication on the tapes of requesting medical care, or

58

1   asking for medical care, or getting an injection of any

2   kind at that time.

3        Focus on that period of time, focus on the lack of

4   evidence.

5        Now, at the close of the case, I will come back to

6   you again to discuss what the evidence was.  What the lack

7   of evidence was, and what it means.  And at that time I'll

8   ask you, representatives of our country, to show the world

9   that justice prevails in this country despite heinous

10  crimes, despite emotions; and return the only possible

11  verdict in this case, and that's a verdict of not guilty.

12       Thank you.

13            (Continued on next page)

14  //

15  //

16  //

17

18

19

20

21

22

23

24

25

1          THE COURT:  Call the government's first witness.

2          MR. CARLTON:  Your Honor, the government calls

3    James Kuykendall.

4               (Witness summoned to courtroom.)

5          THE CLERK:  Please raise your right hand.

6        JAMES KUYKENDALL, PLAINTIFF'S WITNESS, SWORN

7          THE WITNESS:  I do.

8          THE CLERK:  Please be seated.

9          State your full name for the record, and spell

10   your last name.

11         THE WITNESS:  My name is James Kuykendall.  The

12   last name is K-U-Y-K-E-N-D-A-L-L.

13                    DIRECT EXAMINATION

14   BY MR. CARLTON:

15   Q    Mr. Kuykendall, what is your present employment?

16   A    I'm a self-employed private investigator.

17   Q    Have you ever been employed by the Drug Enforcement

18   Administration?

19   A    Yes, sir, I was.

20   Q    During what period?

21   A    From the creation of the Drug Enforcement

22   Administration in July of 1973 until June of 1989, when I

23   retired.

24   Q    What was your employment in law enforcement, if any?

25   A    Could I have the question again, please?

60

1    Q    Prior to working with the D.E.A., did you have any law

2    enforcement experience?

3    A    Yes, sir, I did.  I joined the United States Border

4    Patrol in September of 1958, and I transferred to U.S.

5    Custom's from the Border Patrol in 1966 as an investigator.

6    Q    At some point in your career with the Drug Enforcement

7    Administration, were you assigned to Mexico?

8    A    Yes, sir, I was.

9    Q    And during what period was that?

10   A    From February the 15th of 1982, until the end of

11   September, 1985.

12   Q    And what was your position in Mexico?

13   A    I was the resident agent in charge of the Drug

14   Enforcement Administration Office in Guadalajara.

15   Q    In the course of your work with the D.E.A. in Mexico,

16   did you become familiar with its functions and purpose down

17   there?

18   A    Yes, sir, I did.

19   Q    What was that?

20   A    I believe that the primary purpose, function that the

21   D.E.A. had in Mexico, was to gather intelligence on the

22   narcotics traffic and the activities of the major

23   traffickers working in Mexico, and to pass that information

24   along to the D.E.A. Headquarters and the United States

25   Government through channels.

1     We were also tasked with searching for and

2  obtaining information, actionable information, on the every

3  day activities of narcotic traffickers, and providing that

4  information to our counterparts in the Mexican government,

5  and attempting to either make large seizures or have some

6  impact on the drug traffic through arrests.

7  Q     And in performing those functions was the D.E.A.

8  vested with any authority in Mexico?

9  A     No, sir, we had no authority.

10  Q     Were you required to work with Mexican authorities

11  then?

12  A     Yes, we were.

13  Q     And which Mexican authorities was the D.E.A. required

14  to work with?

15  A     The Mexican Federal Judicial Police.

16  Q     Can you describe the D.E.A.'s organization within the

17  Country of Mexico?

18  A     At the time, there were five resident agent offices in

19  various parts of the country, which reported to the Special

20  Agent in charge, whose office was in the Embassy in Mexico

21  City.

22  Q     And Guadalajara was one of those resident agent

23  offices?

24  A     That is correct.

25  Q     And as the resident agent in charge, were you the head

62

1    of that office?

2    A    Yes, sir, I was.

3    Q    In the course of your work with the D.E.A. in Mexico,

4    did you become familiar with the structure in a general way

5    of the Mexican Government?

6    A    Yes, sir, I did.

7    Q    And in a general way, how was and is the Mexican

8    Government structured?

9    A    Basically along the same lines that the United States

10   Government is structured.   It has a president, an executive

11   branch, a legislative branch, and a judicial branch.

12   Q    Are there several levels of government within the

13   country?

14   A    Yes, sir.   There were -- are Federal Governments,

15   State Governments and Municipal Governments.

16   Q    And did you also become familiar while you were

17   assigned to Mexico with the various Mexican law enforcement

18   agencies?

19   A    Yes, sir, most of them.

20   Q    And what were those?

21   A    Well, there was the Immigration, Customs, the Mexican

22   Federal Judicial Police, and there were a couple of gray

23   enforcement agencies that worked under the Secretary of the

24   Government.

25   Q    In Spanish, what would that be?

63

1    A    The Secretary of Government?

2    Q    Yes.  What would be the Spanish word for that?

3    A    Secretaria De Gobernacion.

4    Q    Now, you have mentioned the Mexican Federal Judicial

5    Police.  Was that a branch or an agency of the Federal

6    Government?

7    A    Yes, it was.

8    Q    Was it an agency of a particular department within the

9    Federal Government?

10   A    It was under the Mexican Attorney General's Office.

11   Q    Did the M.F.J.P., or would the M.F.J.P. have an

12   equivalent agency within United States law enforcement?

13   A    It would have to be the Drug Enforcement

14   Administration.

15   Q    In the course of your work with the M.F.J.P., did you

16   become familiar in a general way with the way the M.F.J.P.

17   was structured?

18   A    Yes, sir, I did.

19   Q    How was that?

20   A    They had a director in Mexico City.  He had several

21   subdirectors.  And then while I was there, the organization

22   was restructured.  In the beginning they had comandantes

23   scattered throughout the country that had several states

24   under their responsibility, but I believe about the first

25   of 1983, it became a state.  They restructured it so that

64

1    the comandantes had responsibility for a state only.

2    Q    Now, you've used the term "comandante".   What would

3    that be equivalent to in English?

4    A    Well, the way -- in the Mexican Federal Judicial

5    Police, he was the equivalent to the agent in charge of the

6    office.

7    Q    Supervisor of some sort?

8    A    Yes.

9    Q    Were there various levels of comandante?

10   A    Yes, there were.   Based upon the importance, I

11   suppose, that the organization gave to the area where the

12   office was located.

13   Q    Are you familiar with the term "premier comandante"?

14   A    Yes.

15   Q    And "segundo comandante"?

16   A    Yes.

17   Q    How would those relate to one another in terms of

18   authority?

19   A    The premier comandante, the first comandante, had more

20   authority, I suppose, than the segundo.

21   Q    And below the comandantes were agents?

22   A    Well, they had group supervisors, usually, and then

23   agents.

24   Q    You've also referred to the Direccion Federal de

25   Seguridad or D.F.S.?

1  A    I didn't, but there was another organization called

2  the Direccion Federal de Seguridad.

3  Q    Do you know what the function of that agency was?

4  A    I'm not sure.  It was -- apparently they were supposed

5  to report on political activities, different -- throughout

6  the country.

7  Q    In your experience, did the army have any involvement

8  in law enforcement activities within Mexico?

9         MR. RUBIN:  Objection; lack of foundation.

10        THE COURT:  Overruled.

11        THE WITNESS:  The army was deeply involved in the

12  eradication campaign in Mexico, and sometimes they even

13  made seizures and arrests of narcotic traffickers on their

14  own.  And when the Mexican Federal Judicial Police

15  conducted any of its operation, they went to the army for

16  backup support and it was provided at times.

17  BY MR. CARLTON:

18  Q    Were there any state level law enforcement agencies?

19  A    Yes, there were.

20  Q    Within the State of Jalisco, what were those?

21  A    There was the State Judicial Police.  There was the

22  State Department of Traffic.  The State Judicial Police was

23  broken down into sections, as well.

24  Q    What kinds of sections?

25  A    Related to crimes, actually.  To homicide and robbery,

66

1    that sort of thing.

2    Q    To your knowledge, did the State Judicial Police have

3    any authority to investigate narcotic-related crimes?

4    A    No, not directly.

5    Q    What Mexican law enforcement agency was vested with

6    that authority?

7    A    The Mexican Federal Judicial Police.

8    Q    Were there any other law enforcement authorities in

9    Mexico having authority to investigate narcotics crimes?

10   A    No.

11   Q    Below the level of State Police, were there also local

12   police?

13   A    In Guadalajara there was a Municipal Police.

14   Q    Now, returning to the Guadalajara Office of the

15   D.E.A., during the time that you were the resident agent in

16   charge of that office, did that office have a particular

17   geographic responsibility?

18   A    Yes, sir, it did.  We were responsible for the seven

19   central-western states, Mexican states.

20   Q    Do you recall the names of those states?

21   A    Yes.  It would have been Nayarit, Jalisco, Colima,

22   Michoacan, San Luis Potosi, Aguascalientes, Guanajuato and

23   Zacatecas.

24   Q    Now, turning to the map which appears on the easel to

25   your right, can you indicate with the pointer where those

67

1    states are located?

2    A    This is the central section of Mexico, and encompasses

3    those seven states.

4    Q    Several states have been outlined on that map.   Can

5    you identify those?

6    A    Would be Jalisco, and Zacatecas and Aguascalientes is

7    included in there also.

8    Q    And another state in the upper part of Mexico is

9    outlined?

10   A    That's Chihuahua.

11   Q    If you would remove that map, there is another map

12   just behind it.   And do you recognize that map?

13   A    It's a map of the State of Jalisco.

14   Q    Was Guadalajara located within the State of Jalisco?

15   A    It is the capital of the State of Jalisco.

16   Q    Can you indicate with the pointer where on the map

17   Guadalajara is located?

18   A    It's right here, almost in the center (indicating).

19   Q    You can return to your seat now.

20        Where within Guadalajara was the United States or

21   the D.E.A.'s office located?

22   A    It was located in the building that housed the

23   Consulate General.

24   Q    The Consulate General --

25   A    The United States Consulate General.

1    Q     And if you would, please, turn to the photographs

2    which are in the cart just next to you.  Do you see

3    Exhibits 3-A and 3-B?

4    A     Yes, sir, I do.

5    Q     Looking at Exhibit 3-A, do you recognize that?

6    A     Yes, sir, I do.

7    Q     What is that?

8    A     That is a picture of the United States Consulate

9    General Building in Guadalajara, at the corner of Progreso

10   and Libertad.

11          MR. CARLTON:  Your Honor, I would move that it be

12   admitted, and that the witness be permitted to display it

13   to the jury.

14          THE COURT:  It may be admitted, but it's not

15   necessary to display it.

16          (Exhibit 3-A received in evidence.)

17   BY MR. CARLTON:

18   Q     Looking at Exhibit 3-B, do you recognize that?

19   A     Yes, sir, I do.

20   Q     What is that?

21   A     It's an overhead view from an airplane or helicopter,

22   something, of the same corner, with a -- very corner of the

23   Consulate General Building and a restaurant, and the

24   parking lot across the street.

25   Q     Does the Consulate General Building appear in the

69

1    upper right-hand corner of the photograph?

2    A    Yes, it does.

3    Q    And the restaurant across the street appears in the

4    lower central part of the photograph?

5    A    That's correct, sir.

6    Q    What's the name of that restaurant?

7    A    At the time it was called the Camelot.

8             MR. CARLTON:  I move that this be admitted, also.

9             THE COURT:  It may be admitted.

10            (Exhibit 3-B received in evidence.)

11   BY MR. CARLTON:

12   Q    Mr. Kuykendall, if you look behind the map of Jalisco,

13   I believe there is Exhibit Number 4, a map of Guadalajara.

14            MR. RUBIN:  Your Honor, may I stand so I can see?

15            MR. CARLTON:  Actually, it's behind that map.

16            THE COURT:  Yes.

17   BY MR. CARLTON:

18   Q    Can you indicate on the map, where the United States

19   Consulate was located?

20   A    Right here on Progreso and Libertad Streets

21   (indicating).

22   Q    Have you marked on that map that location?

23   A    Yes, sir, I have.

24            MR. CARLTON:  Your Honor, I would move that

25   Exhibit 4 be admitted.

70

1          THE COURT:  It may be admitted.

2              (Exhibit 4 received in evidence.)

3   BY MR. CARLTON:

4   Q    You may return to your seat.

5          Mr. Kuykendall, during the time that you were

6   assigned to Guadalajara, what was the general organization

7   of the Guadalajara Office of the D.E.A.?

8   A    We had a staffing ceiling of six agents; and during

9   the three-and-a-half years I was there, we did have six

10  agents for about four or five months.  We had a staffing

11  ceiling of three secretaries, two secretaries in the

12  beginning and three secretaries in the end.  I was the

13  agent in charge, and we had from three to six investigators

14  during that period of time.

15  Q    Did all of these people report to you?

16  A    Yes, they did.

17  Q    And you reported to who?

18  A    I reported to the special agent in charge in Mexico

19  City or his assistant special agent in charge.

20  Q    Can you describe generally what were the duties of a

21  D.E.A. agent in Guadalajara during this period?

22  A    To respond to any and all requests that we received

23  from other offices concerning investigations that they

24  might have going.  The agent was expected to develop and

25  control sources of information.  If he was assigned an

71

1   ongoing investigation or intelligence probe, he was

2   expected to handle that.  And generally work any targets of

3   opportunity that might come our way.

4   Q     Were agents occasionally required to perform

5   undercover investigations?

6   A     Yes, sir, they were.

7   Q     And were agents required to make reports generally of

8   the investigations they were working on?

9   A     Yes, they were.

10  Q     Well, you've mentioned that the level of staffing at

11  the office varied during the period that you were there.

12  Can you describe the level of staffing as it varied during

13  1984?

14  A     From the beginning of the year until June, there were

15  five agents in the office.  In June two of the agents

16  transferred out.  In September another agent was

17  transferred in.  In October another agent was transferred

18  out.

19  Q     Who was that agent?

20  A     In October?

21  Q     Yes.

22  A     His name was Roger Knapp.

23        And in December we -- the latter part of November

24  another agent came.

25  Q     Who was that?

1   A      Alan Bachelier.

2   Q      Are you familiar with an agent, Victor Wallace?

3   A      Yes, sir.

4   Q      When did he arrive?

5   A      In September of 1984.

6   Q      In February of 1985, how many agents were actually

7   working out of the Guadalajara office?

8   A      There were four agents permanently assigned to the

9   office, including myself, and we had a temporary -- an

10  agent temporarily assigned there.

11  Q      Who were the four agents assigned to the office in

12  February of 1985?

13  A      There was myself, Special Agent Enrique Camarena,

14  Special Agent Victor Wallace, and Special Agent Alan

15  Bachelier.

16  Q      Over time did you encounter difficulties in getting

17  agents to come to Guadalajara?

18          MR. RUBIN:  Objection; relevance.

19          THE COURT:  Sustained.

20  BY MR. CARLTON:

21  Q      Are you familiar with Enrique Camarena?

22  A      Yes, sir.

23  Q      When did you first meet him?

24  A      February of 1982.

25  Q      Where was that?

73

1    A    In Guadalajara at the D.E.A. office.

2    Q    Was he assigned to the office at that time?

3    A    Yes, sir, he was.

4    Q    Do you know when he was first assigned there?

5    A    I -- probably the summer of 1980.

6    Q    If you would look to the cart, please, to what has

7    been marked as Exhibit 5.

8    A    Yes, sir.

9    Q    Do you recognize that?

10   A    Yes, sir.

11   Q    And what is that?

12   A    That's a picture of Special Agent Enrique Camarena.

13        MR. CARLTON:  Move that it be admitted.

14        THE COURT:  It may be admitted.

15        (Exhibit 5 received in evidence.)

16   BY MR. CARLTON:

17   Q    In the course of your work down in Guadalajara, and

18   your work with Agent Camarena, did you become friends with

19   him?

20   A    Yes, sir, I did.

21   Q    Did you socialize with him?

22   A    Yes, sir.

23   Q    Are you familiar with the term "confidential

24   informant"?

25   A    Yes, sir, I am.

74

1   Q      What does that mean to you?

2   A      That was a human source of information utilized by

3   agents in the Drug Enforcement Administration to provide or

4   obtain information concerning the drug traffic.

5   Q      Were confidential informants used by the Guadalajara

6   office during the period that you were there?

7   A      Yes, sir, they were.

8   Q      Were there various kinds of people, types of

9   confidential informants?

10  A      There were various types of people that were utilized

11  as confidential informants.

12  Q      What were they?  What were those different types of

13  people?

14         MR. RUBIN:  Objection; not relevant.

15         THE COURT:  Sustained.

16  BY MR. CARLTON:

17  Q      Were some of the confidential informants used by the

18  Guadalajara office actual participants in drug trafficking?

19  A      Yes, sir, they were.

20  Q      And were other confidential informants not actual

21  participants in drug trafficking?

22  A      That's also correct.

23         MR. RUBIN:  Objection; relevance.

24         THE COURT:  Overruled.

25         THE WITNESS:  That is correct, sir.

75

BY MR. CARLTON:

Q     As a general rule, were confidential informants who
worked for the Guadalajara office paid by the D.E.A.?

A     Almost all of them.

Q     And how was that pay calculated?

A     If they were paid in relation to a case that resulted
in arrests and seizures over a short period of time, then
generally the payment was based upon the quantity of drugs
seized, or the importance of the trafficker, or the
importance of the impact that was made on the traffic.

        If the informant was someone that was placed in a
position that -- and told hopefully to remain there over a
length of time, an investigative group or a pattern, then
we tried to pay them on a salary.

Q     Were confidential informants important to the
successful functioning of the D.E.A. office?

A     We would not have been able to function without them.

Q     Why was that?

A     We didn't have access to the people or information
they might have had; and since we were so few, we needed
the addition -- additional manpower afforded us by these --
all of these people we could muster up.

Q     Do you know what the population of Guadalajara was in
1984?

A     It was about two million.

76

1    Q    Now, were informants supervised by anybody within the

2    office?

3    A    Yes, sir.  A special agent was assigned to supervise

4    every informant.

5    Q    Do you know an individual named Alfredo Zavala?

6    A    I did, yes, sir.

7    Q    How did you know him?

8    A    He was an informant in the office.

9    Q    During 1984, who supervised Alfredo Zavala?

10   A    Special Agent Enrique Camarena.

11   Q    Was Mr. Zavala an informant who was a participant in

12   drug trafficking, or the other kind of informant?

13            MR. RUBIN:  Objection; relevance.

14            THE COURT:  Overruled.

15            THE WITNESS:  He was not a participant in the drug

16   trafficking.

17   BY MR. CARLTON:

18   Q    Now, as the resident agent in charge of the

19   Guadalajara office, did you make it your business to become

20   familiar with the investigations that were conducted by

21   that office?

22   A    Well, it was obligatory on my position that I do so,

23   but I would have done it anyway.

24   Q    What did you do to familiarize yourself with those

25   investigations?

1    A      I was present during most of the debriefings that were

2    made of the various informants utilized in the office.   I

3    interviewed the agents to find out how their investigations

4    were going.   And, of course, I had to interview and approve

5    all of the reports that were written on the investigations

6    in the office.

7    Q      And in this manner, did you also become familiar with

8    the informants that the office was using?

9    A      Yes, sir, I did.

10   Q      During the time that you were the resident agent in

11   charge in Guadalajara, was that office able to pursue all

12   of the investigations that you felt were worthy of being

13   pursued?

14   A      No, sir.

15   Q      Why was that?

16   A      A lack of resources.

17   Q      Did you then have to prioritize your investigations in

18   some way?

19   A      Yes, we did.

20   Q      What criteria did you use for doing that?

21   A      We targeted the people and organizations that we had

22   identified as being the major drug trafficking

23   organizations within our area of responsibility.   And we

24   put as much manpower and resources toward those targets as

25   possible, but we also worked on any targets of opportunity

78

that might appear.

Q    Which individuals was the Guadalajara office devoting
substantial resources to investigating during 1984; do you
recall?

A    Yes, sir, I do.

Q    Who were they?

A    Felix-Gallardo, Juan Matta-Ballesteros, Ernesto
Fonseca-Carrillo, Rafael Caro-Quintero, Juan Jose
Quintero-Payan, Emilio Quintero-Payan, Juan
Esparragosa-Moreno, Manuel Salcido, Romero Morales-Felix.

THE COURT:  Now, we're going to take our noon
recess at this time.  The jury will be excused.

Please remember the admonition not to discuss this
case with each other or anyone else, and to avoid exposure
to any publicity, whether in writing, or hearing, by
television, radio, or newspaper.

You may be excused.

(Jury out.)

THE COURT:  Counsel, on at least two occasions
prior to this trial, I have tried to suggest to you that
you streamline the presentation of this evidence, because
in the two trials we've had previously, this evidence,
which takes most of the time in this case, is the evidence
relating to this narcotics Cartel, which has been largely
undisputed by anybody in any of the trials we've had

79

1  before.

2          Now, you have spent about 40 minutes with this

3  witness, and you have, except for the last two or three

4  questions, not elicited any questions or any answers that

5  would help this jury decide this case.

6          I want you to review this evidence that you intend

7  to present, and I see by your initial effort here and the

8  number of witnesses and the exhibits that you intend to

9  use, that you intend to go through this painstaking menushi

10  as we have before.  I don't intend to stand for it.  I

11  think it's a waste of the Court's time.  It's a waste of

12  the jury's times, and it's a waste of my time.  I have a

13  lot of other cases.

14          So an element of your case is to establish the

15  existence of a narcotics Cartel, but it seems to me that

16  you could elicit the information to do that in far less

17  time than you anticipate taking.

18          And these defendants have already indicated they

19  are not disputing the existence of the narcotics Cartel,

20  and what this case boils down to is the involvement of

21  these defendants with this Cartel.

22          So I wish you would be more to the point, and just

23  elicit the facts that are necessary to establish your

24  claim.  This doesn't help the jury to hear all of this

25  evidence.  That's not really going to help them.

80

1          MR. CARLTON:  Well, Your Honor, I thought that

2    some background information was useful and would be useful

3    to the jury, but I'll certainly take your admonition --

4          THE COURT:  The first 35 minutes you spent with

5    this witness is not going to be useful to the jury.  Not

6    only was it boring, it has very little relevance.  So I

7    think you ought to get to the point.  If you have some

8    point to make with this witness or any other witness, get

9    to the point.

10          MR. CARLTON:  Very well, Your Honor.

11          THE CLERK:  Please rise.  This Court is now in

12    recess.

13               (Luncheon recess had.)

81

1   LOS ANGELES, CALIF.; WEDNESDAY, DECEMBER 2, 1992; 1:30 PM

2              (Jury out.)

3        THE COURT:  Let the record show the Court has

4   convened.  All defendants and counsel are present, without

5   the jury.

6        I want to rule on this application for an order

7   pursuant to 28 USC 1292(b).  You wanted to be heard?

8        MR. CARLTON:  Just briefly, Your Honor, on the

9   issue of whether this interlocutory appeal should be

10  permitted.

11       Point One is that Section 1292 allows for this

12  kind of a thing when the order appealed from may materially

13  advance the ultimate termination of the litigation.

14  Government's position is that since the case is already

15  going to trial, no appeal that can be pursued in an

16  interlocutory way is going to advance the termination of

17  the litigation.

18       This is exactly the kind of thing that can be

19  pursued in a post-trial appeal.  And there is a possibility

20  if an appeal is certified at this point, that the Court of

21  Appeals may stay the trial.

22       The government's position is that that's not in

23  anybody's interest; that the determination of guilt should

24  follow as quickly as possible, and that this issue can be

25  appealed from, along with all the other issues that may go

1   on up to the Ninth Circuit.

2       THE COURT:  Is it your intention to ask the Court

3   of Appeal to stay this trial?

4       MR. HOFFMAN:  Well, Your Honor, we have certainly

5   asked the Court of Appeals to do that before, and have not

6   been successful.  So I have a feeling whether we ask them

7   or not, it wouldn't matter.

8       But if the Court were to condition the order on us

9   not asking for that, we would certainly be willing to say

10  that we would not ask for a stay, in addition to asking for

11  the immediate appeal.

12      Our purpose in this is to present this to the

13  Ninth Circuit, and ask them to handle it on an expedited

14  basis.

15      THE COURT:  Well, why couldn't this be presented?

16  This trial is not going to take very long, you know.  Why

17  couldn't it be presented after the trial?

18      MR. HOFFMAN:  Well, Your Honor, it's not clear how

19  long the trial will take.  I mean, the government has said

20  it has 50 witnesses.  It is a jury trial.  The holidays are

21  coming up.

22      I think one of the reasons why this makes sense,

23  even if there is a guilty verdict in the case, is that

24  these issues are segregatable from the question of guilt or

25  innocence, and can be resolved much more quickly than an

83

1    appeal that would require the preparation of transcripts,

2    and all the delay.  And he has been in jail for nearly

3    three years.  So every day --

4            THE COURT:  All right.  I don't want to hear any

5    more argument.

6            MR. HOFFMAN:  Yes, Your Honor.

7            THE COURT:  I want to get on with the trial.

8            MR. HOFFMAN:  The answer is that --

9            THE COURT:  Your answer is you are not going to

10   seek a stay or ask --

11           MR. HOFFMAN:  Not in connection with the petition.

12   We have to file a petition after your order to the Ninth

13   Circuit.  We will not ask for a stay in that petition.

14           THE COURT:  I will grant the order pursuant to 28

15   USC 1292(b).  I think arguably this case may fall within

16   the criteria for that.  There will be no stay.

17           MR. HOFFMAN:  Thank you, Your Honor.  Can we pick

18   up a copy of the order from your clerk?

19           THE COURT:  Yes.

20           MR. MEDRANO:  Your Honor, may we bring something

21   else up with the Court?

22           THE COURT:  I would prefer not, until the recess.

23   I want to get started with the trial.

24           MR. MEDRANO:  Very well, Your Honor.

25           THE COURT:  Bring the jury in.

1       This order does not include anything about a stay.

2       MR. HOFFMAN:  No, it does not, Your Honor.

3       THE CLERK:  Please rise.

4                       (Jury in.)

5       THE CLERK:  You may be seated.

6       THE COURT:  You may proceed.

7               DIRECT EXAMINATION  (Continued)

8   BY MR. CARLTON:

9   Q    Mr. Kuykendall, were you involved in an investigation

10  in the Mexican State of Zacatecas in 1983, and '84?

11  A    Yes, sir.

12  Q    How did you become aware of that investigation?

13  A    Through an informant that was being handled by Special

14  Agent Camarena.

15  Q    What was that informant's name?

16  A    Juan Gomez.

17  Q    When did this investigation begin?

18  A    About November of 1983.

19  Q    And who was the case agent on the investigation?

20  A    Special Agent Enrique Camarena.

21  Q    Did you participate in planning the objective of the

22  investigation?

23  A    Yes, sir, I did.

24  Q    What was the initial objective of this investigation?

25  A    To attempt to obtain a seizure of a large quantity of

85

1   heroin, and hopefully the arrest of some major heroin

2   traffickers.

3   Q    In the course of the investigation, did you obtain

4   information concerning drugs, other than heroin being

5   involved?

6   A    Yes, sir, we did.

7   Q    What other drugs?

8   A    Large scale marijuana cultivations and sale.

9   Q    And as a result of this other information, were the

10  objectives of the investigation modified?

11  A    Yes, they were.

12  Q    In what way?

13  A    We retained the original objective of trying to make

14  the heroin seizure and the arrests, and we decided to

15  pursue a long term investigation into the cultivation of

16  the marijuana plantations.

17  Q    How was this investigation initially being carried

18  out?

19  A    The informant already had an acquaintanceship with a

20  trafficker in the City of Fresnillo, Zacatecas.  And the

21  plans were for one of the agents to go undercover and

22  negotiate with that trafficker.

23  Q    Did you engage in any activities to corroborate the

24  information that the informant was providing to you?

25  A    Yes, we did.

86

1  Q     And what was it that you did?

2  A     Special Agent Camarena assumed an undercover role, and

3  actually met with the trafficker in Zacatecas.  We made

4  some airplane overflights of the area that we were

5  receiving information about where the cultivations were,

6  and we made vehicular trips into the area to verify the

7  sites that we were told about.

8  Q     Now concerning these overflights, did you go on any of

9  these overflights?

10 A     I went on one.

11 Q     And what were you looking for?

12 A     Fields.

13 Q     Fields of --

14 A     Cultivated fields in deserted areas of the state.

15 Q     Now, looking to your right on the board, you will see

16 Exhibit 6.  Do you recognize that?

17 A     Yes, sir.  It's a map of the State of Zacatecas.

18 Q     And can you indicate what area it was that you flew

19 over?

20 A     This is the capital of the State of Zacatecas.  The

21 name is Zacatecas.  This is Fresnillo, Zacatecas.  The

22 overflights were in the north-central area of the state.

23 Q     Thank you.

24        Who accompanied you on this overflight?

25 A     The pilot of the aircraft was Alfredo Zavala, and

1    Special Agent Camarena was in the airplane with us.

2    Q    Did you see anything of significance to your

3    investigation during this flight?

4    A    We saw what we had gone to see, yes.  We saw

5    cultivated fields in remote areas, far from any centers of

6    population, far from any dwellings.  Each field had an

7    irrigation pump adjacent to it or near it.  Some of the

8    pumps were either diesel or gasoline powered, since there

9    were no electrical lines there.  And in other occasions,

10   there were electrical lines that came directly to the pump.

11   Q    Were you able to see where these electrical lines

12   originated?

13   A    They originated back at the main trunk lines, near the

14   major highway.

15   Q    Do you know who operates the electrical utilities in

16   Mexico?

17   A    It's a government agency.

18   Q    Do you have any estimate for the total size of the

19   cultivated fields that you saw during this overflight?

20   A    Several hundred, seven or eight hundred acres.

21   Q    You mentioned that there was a second overflight?

22   A    Yes, sir, there was.

23   Q    Did you go on that overflight?

24   A    No, I did not.

25   Q    Did you authorize that overflight?

88

1    A    I authorized the flight and the expenses.

2    Q    And who participated in that second overflight?

3    A    Alfredo Zavala and Enrique Camarena.

4    Q    You also mentioned that vehicular trips were taken to

5    the area.  Did you participate in any of those?

6    A    Yes, sir, I did.

7    Q    Where did you go?

8    A    I went to the City of Zacatecas, the City of

9    Fresnillo, Zacatecas, and into the area north of those two

10   cities, to the desert area.

11   Q    Just so there's no confusion, is there a city in the

12   State of Zacatecas also named Zacatecas?

13   A    Yes, sir, the capital of the State.

14   Q    Now, in your trips to Zacatecas City and to Fresnillo,

15   did you see anything that you considered significant in

16   your investigation?

17   A    We saw -- what we saw corroborated what the informant

18   and other sources of information had told us.  That there

19   were many people, men, young men, staying in the various

20   hotels in the two cities, driving late model automobiles.

21   They were the kind of people that we had come to recognize

22   as being part of the group of traffickers.  We were able to

23   pick out the landmarks that the informant had told us about

24   that would lead us into the various cultivating areas.

25   Q    When you had corroborated the informant's information

89

1    to your satisfaction, what did you do next in this

2    investigation?

3    A    Well, the investigation was ongoing.  At a certain

4    point, it was -- a decision was made to attempt to further

5    the heroin investigation by making an undercover purchase

6    of a quantity of heroin.

7    Q    How was that pursued?

8    A    We obtained funding for it, and Agent Camarena

9    arranged a delivery of a quantity of heroin from the

10   trafficker in Fresnillo, Zacatecas.

11   Q    Do you recall when that occurred?

12   A    April.  I believe it was in April of 1984.

13   Q    At some point in the investigation, was a decision

14   made to raid these fields?

15   A    Yes, sir.

16   Q    About when was that?

17   A    About mid-May of 1984.

18   Q    And at the same time that the fields were to be

19   raided, were other objectives being pursued in this

20   investigation?

21   A    We were continuing with the objective of making a

22   large heroin seizure.

23   Q    In order to raid the fields, did you have to

24   coordinate your activities with any Mexican agencies?

25   A    Yes, sir, we did.  With the Attorney General's Office

90

1    and the Mexican Federal Judicial Police.

2    Q    And what did you do in that regard?

3    A    Agent Camarena and I attended a meeting in Mexico City

4    with representative of the two organizations.

5    Q    Do you recall who those representatives were?

6    A    Assistant Attorney General named Luis Porte Petit, and

7    Manuel Ibarra.

8    Q    And in the course of the investigation, had you

9    received information about the local comandantes in

10   Zacatecas of the M.F.J.P. and the D.F.S.?

11   A    Yes, sir, we have.

12   Q    What was that information?

13           MR. RUBIN:  Objection; calls for hearsay.

14           THE COURT:  Overruled.

15           THE WITNESS:  That they were involved in the

16   protection of the cultivations in the area, in the

17   protection of the traffickers, and that they were

18   themselves involved in trafficking.

19   BY MR. CARLTON:

20   Q    Do you remember the names of those comandantes?

21   A    Yes, sir, I do.

22   Q    Who were they?

23   A    The comandante of the Mexican Federal Judicial Police

24   was a man named Carlos Guiterrez-Martin, and the D.F.S.

25   comandante was Miguel Guillermo.

1    Q    Was this information passed along to Manuel Ibarra and

2    Porte-Petit?

3    A    Yes, it was.

4    Q    What was the response of these individuals to the

5    information that you communicated to them?

6    A    I'm not too sure.  They thought we were right, but

7    they agreed or decided to stage a raid of the area and try

8    to see if, in fact, the cultivations did exist, and if so,

9    to seize and destroy them.

10    Q    Was a date decided upon?

11    A    Yes, sir, there was.  I think it was the first part of

12    June.

13    Q    Was that date changed at any point?

14    A    Yes, it was.

15    Q    Why was that?

16    A    We were told that a Mexican army general had been

17    flying in his light plane, and the light plane had crashed

18    landed in a field of marijuana.  That they had been -- the

19    army then became aware there was cultivations of marijuana

20    in the area, and were going to start destroying the

21    cultivations.  The Attorney General's Office wanted to get

22    in there and seize as much of it as they could before that

23    took place.

24    Q    Did you actually participate in the raids on these

25    fields?

1    A    Yes, sir, I did.

2    Q    When did they begin?

3    A    I believe May 27th -- 26th -- May the 26th.

4    Q    How were these raids to be carried out?

5    A    The Attorney General's Office provided helicopters or

6    sent helicopters to look for and find the fields, and then

7    to subsequently spray any cultivations they found with

8    herbicide.

9         The Mexican Federal Judicial Police sent in a

10   large number of agents to conduct arrests and raids and

11   whatever else took place.

12   Q    How many D.E.A. agents participated in that?

13   A    There were four of us on the first day, and then

14   Special Agent Camarena joined us.

15   Q    Where were the D.E.A. agents supposed to meet up

16   initially with the Mexicans?

17   A    We all met, with the exception of Special Agent

18   Camarena, we all met in Aguascalientes.

19   Q    And where was Aguascalientes in relation to Zacatecas

20   and Fresnillo?

21   A    It's -- oh, it's about hundred miles from Fresnillo.

22   Less than that, maybe 60 miles.

23   Q    Who was leading the Mexican contingent?

24   A    Comandante Miguel Aldana-Ibarra was in charge of the

25   agents, and the eradication campaign people were under the

93

1   direction of a man named Mario Alberto Cueva.

2   Q     What was your involvement in the raids on the first

3   day?

4   A     I was constantly in the company of Comandante Aldana.

5   Q     What did you do?

6   A     We went from -- we visited all of the hotels where we

7   had the information that the traffickers had been staying,

8   and where we had previously seen these people staying, and

9   then we went to the home of the trafficker that we had been

10  receiving information about, a man named Manuel Chavez.

11  Q     You say you visited the hotels.  What was done when

12  you arrived at these hotels?

13  A     Well, except for one very low class or cheap hotel,

14  the other hotels were almost empty, almost deserted.

15  Q     Did you fly in any helicopters on this first day?

16  A     Yes, sir, I did.

17  Q     And in the course of that flight, did you find

18  anything of significance to the investigation?

19  A     Yes, I did.  Yes, we did.

20  Q     What was that?

21  A     We had -- we were looking for a stash of money, one

22  that we had been told about.  We went to the ranch of a man

23  named Romero Morales, who we knew to be a major trafficker.

24  At that site there was a laborer who told us that Romero

25  Morales had another ranch where he stored marijuana.  That

1    man went with us in the helicopter.  We flew to the other

2    site, and, in fact, found a large quantity of marijuana

3    stored there.

4    Q    Did you seek permission for the other D.E.A. agents to

5    fly in helicopters, also?

6    A    Yes, sir.

7    Q    Who did you seek that permission from?

8    A    From Mario Cueva.

9    Q    And was that permitted?

10   A    Not the first day.

11   Q    Was a reason given to you?

12   A    No.

13   Q    How long did these raids continue?

14   A    Two-and-a-half days.

15   Q    And in the course of these raids, do you know how many

16   acres of cultivated marijuana were destroyed?

17   A    Perhaps a hundred.

18   Q    Looking at the photographs next to you in the cart,

19   would you please look at what has been marked as Exhibit

20   8-A.

21   A    Yes, sir.

22   Q    Do you recognize that?

23   A    Yes, sir, I do.

24   Q    What is it?

25   A    It's a picture of the airport in Zacatecas, located

95

1  halfway between the City of Zacatecas and the City of

2  Fresnillo.  It depicts a number of, I guess there are three

3  helicopters from the eradication campaign.  One airplane

4  from that eradication campaign.  Civilian aircraft and

5  three D.E.A. agents.  In the background there are several

6  of the Mexican officials that participated.

7  Q    Would you look at what has been marked as Exhibit 8-B.

8  A    Yes, sir.

9  Q    Do you recognize that photograph?

10  A    This is a photo of the dwelling or small ranch where

11  we located the stash of marijuana.

12  Q    How much marijuana did you find at this location?

13  A    About ten tons.

14  Q    Did you find anything else?

15  A    We found about 6,000 pounds of marijuana seed, and 200

16  liters of hash oil.

17  Q    Do you know what hashish oil is?

18  A    It's the extract from the marijuana plant.

19  Q    And, Agent Kuykendall, have you looked previously at

20  all of the photographs that have been marked 8-C through

21  8-L?

22  A    Yes, sir.

23  Q    What do those photographs depict, generally?

24  A    Well, they are pictures of the interior of the ranch

25  house, showing sweepings and seed left on the floor.

96

1    Pictures of the boxes that were -- empty boxes that were

2    utilized to store the marijuana.  And then there are

3    pictures of the marijuana and marijuana seed and hash oil

4    after they had been removed to a yard behind the offices of

5    the Mexican Federal Judicial Police in Zacatecas.

6            MR. CARLTON:  Your Honor, may Mr. Kuykendall show

7    these briefly to the jury.

8            THE COURT:  All right.  Briefly.

9            (Witness shows photographs to jury.)

10           THE COURT:  That's sufficient.

11           MR. CARLTON:  Move them into evidence.

12           THE COURT:  You should have done that first.

13           They may be received.

14         (Exhibits 8-A through 8-L received in evidence.)

15   BY MR. CARLTON:

16   Q    While these raids were being initiated, was Agent

17   Camarena engaged in another aspect of this investigation?

18   A    Yes, sir, he was.

19   Q    What was that?

20   A    He was in Laredo, Texas and McAllen, Texas pursuing

21   the original objective of the investigation, a delivery of

22   heroin, and the added objective of trying to secure

23   delivery of a large quantity of marijuana.

24   Q    Was that heroin actually delivered?

25   A    Yes, it was.

1  Q     At the conclusion of these raids, did you find as much

2  cultivated marijuana as you had expected going in?

3  A     No, sir, we did not.

4  Q     And did you believe that you had obtained the full

5  cooperation of the Mexican Federal Judicial Police in this

6  investigation?

7          MR. RUBIN:  Objection; irrelevant to his belief.

8          THE WITNESS:  No, I did not.

9          THE COURT:  Sustained.

10  BY MR. CARLTON:

11  Q     In the course of carrying out these raids on the

12  fields, did the Mexican Federal Judicial Police conduct

13  themselves in a way that you considered, based on your past

14  experience in working with them, to be unusual?

15          MR. RUBIN:  Same objection.

16          THE COURT:  Overruled.

17          THE WITNESS:  In looking for the fields?

18  BY MR. CARLTON:

19  Q     Well, in the whole series of raids and in the cities

20  and in the fields?

21  A     No, I don't think they did.

22  Q     Did they limit their questioning of suspects in ways

23  that was significant to you?

24  A     Yes, they did.

25  Q     What ways?

98

1   A    They -- some of the people that they did pick up, some

2   of the laborers, and even the person who was arrested in

3   Reynosa, wanted to provide information concerning the

4   financiers and heads of the operation, and the Mexican

5   authorities were not interested in listening to that.

6   Q    Did you ask them?

7   A    Yes, I did.

8   Q    And they refused?

9   A    That's correct.

10  Q    Did you come to some conclusion as to whether there

11  was corruption within the M.F.J.P. in relation to this

12  operation?

13  A    Yes, I did.

14        MR. RUBIN:   Objection; calls for a conclusion.

15        THE COURT:   Overruled.

16  BY MR. CARLTON:

17  Q    What was your opinion based upon?

18  A    I did not think they were being honest in their

19  investigation.

20  Q    In the course of your working with the M.F.J.P., would

21  you inform the M.F.J.P. of the identities of confidential

22  informants working for you?

23  A    Almost never, sir.

24  Q    Why not?

25  A    We didn't trust them.  We felt for the security of the

99

1    lives of the informants.

2    Q      Are you familiar with an investigation known as

3    Operation Padrino?

4    A      Yes, sir.

5    Q      Was that conducted out of the Guadalajara office?

6    A      The -- most of it was, yes, sir.

7    Q      What was the focus of that investigation?

8    A      It was focused against a cocaine trafficking

9    organization, whose two leaders were a man named Miguel

10   Angel Felix-Gallardo and Juan Matta-Ballesteros.

11   Q      And in the course of this investigation, did you learn

12   of a threat conveyed by Felix?

13   A      Yes, I did.

14   Q      How did you come to learn of that?

15   A      Special Agent Camarena told me.

16   Q      What was the nature of this threat?

17   A      The message to us, to the D.E.A. office in

18   Guadalajara, was that Miguel Felix wasn't doing anything,

19   which we took to mean he wasn't involved in any traffic,

20   and that he knew that we were watching him, to leave him

21   alone, that we should concentrate on Rafael Caro-Quintero.

22   Q      Who communicated this threat to the D.E.A.?

23   A      An ex M.F.J.P. comandante named Manuel Espindola.

24   Q      Did you do anything in response to receiving this

25   threat?

100

1   A    Special Agent Camarena was instructed to write a

2   memorandum to the agent in charge, through me, which he

3   did, and we sent it forward.

4   Q    Are you familiar with the Hotel Las Americas in

5   Guadalajara?

6   A    Yes, sir, I am.

7   Q    Did you travel to that location on March 30th of 1984?

8   A    Yes, sir, I did.

9   Q    Why did you do that?

10  A    I just was -- wanted to go see who was there.

11  Q    In your mind, was this hotel associated with any

12  subjects of the investigation in the office?

13  A    It was owned by Miguel Angel Felix-Gallardo.

14  Q    Is that why you went there?

15  A    Yes, it is.

16  Q    While you were there, did you see anything of

17  significance to your investigation?

18  A    I spent a few minutes in the bar, a discotheque bar

19  there, and when I was leaving, as I was walking across the

20  driveway to return to where I had parked my car, a black

21  Grand Marquis, two-door, drove through the driveway, almost

22  in front of me, and parked in the parking lot.

23       Two gentlemen -- the doors were opened and two

24  gentlemen got out carrying submachine guns, and I knew both

25  of the men.  They held the seats forward and two older men

101

1   got out of the backseat of the car.

2   Q    Did you recognize any of these individuals?

3   A    As I say, I knew the two men in the front seat.  The

4   driver was a Mexican Federal Judicial Police agent named

5   Juan Gilberto-Hernandez, and the other guy in the front

6   seat was a Mexican Federal Judicial Police agent, but I

7   don't remember his name.

8   Q    I believe on the cart next to you should be what is

9   marked as Exhibit 118.  Do you see that?

10  A    118?

11  Q    118, yes.

12  A    Yes, sir.

13  Q    And do you recognize that?

14  A    Yes, sir, I do.

15  Q    What is it?

16  A    It's a picture of a man that is known to me to be

17  named Juan Gilberto-Hernandez.

18          MR. CARLTON:  Move that this be admitted, Your

19  Honor.

20          THE COURT:  It may be admitted.

21            (Exhibit 118 received in evidence.)

22          MR. CARLTON:  May Mr. Kuykendall display it to the

23  jury?

24          THE COURT:  What is the point of that?  Some other

25  time.

102

1      The jury will have the opportunity to see all of

2 the exhibits.  It's not necessary to exhibit every one.

3      MR. CARLTON:  Very well, Your Honor.

4 BY MR. CARLTON:

5 Q   At some point, was Felix's threat to the D.E.A.

6 repeated to you?

7 A   Yes, it was.

8 Q   When was that?

9 A   I believe it was in July of 1984.

10 Q   And who communicated this?

11 A   Manuel Espindola.

12 Q   What was the substance of this threat?

13 A   Well, the -- I went to visit him with the other agents

14 in the office to find out exactly what the substance was of

15 the threat, and ask him if the threat was, in fact, a

16 threat, and he stated that coming from Miguel Felix that it

17 was definitely to be taken as a threat.

18 Q   Are you familiar with an individual named Cesar

19 Garcia-Bueno?

20 A   Yes, sir, I am.

21 Q   And where did you meet him?

22 A   He was an informant of the office in Guadalajara.

23 Q   Who was his supervising agent?

24 A   Enrique Camarena.

25 Q   Was he working on any investigations for the office in

103

1    1984?

2    A    Yes, sir, he was.

3    Q    Who was he investigating at that time?

4    A    Juan Jose Quintero-Payan, Emilio Quintero-Payan,

5    Ernesto Fonseca, Rafael Caro-Quintero.

6    Q    At some point, did Mr. Garcia-Bueno have to be

7    evacuated from Guadalajara?

8    A    Yes, sir, he did.

9    Q    Did the D.E.A. pay for that?

10   A    Yes, sir, we did.

11   Q    Why was it that he had to be evacuated?

12   A    As a result of injuries, gunshot injuries he received.

13   Q    Do you recall when that was?

14   A    The shooting was September 29th, 1984.

15   Q    And when was he evacuated?

16   A    About a month later.

17   Q    At some point, did a D.E.A. agent have to be evacuated

18   from Guadalajara?

19   A    Well, a D.E.A. agent had to leave premature to the

20   time he was supposed to leave.

21   Q    Who was that?

22   A    Roger Knapp.

23   Q    When did he leave?

24   A    About the end of October of '84.

25   Q    Why did he leave?

104

1   A    Because of a machine gun -- machine gunning of his

2   official automobile in front of his house.

3   Q    Now, drawing your attention to February 7th of 1985,

4   did you work on that day?

5   A    Yes, sir, I did.

6   Q    When you arrived at the office -- let's back up a day.

7   Let's talk about -- I'm sorry -- February 7th of 1985.

8           Where would agents in the D.E.A.'s Guadalajara

9   office park their vehicles when they were at work?

10   A    After January the 1st of 1985, we parked, for the most

11   part, parked our automobiles in front of and to the side of

12   a restaurant that was across the street from the Consulate,

13   named The Camelot.

14   Q    When you arrived at the office on February 7th, did

15   you see a vehicle in that parking lot which you knew to be

16   Agent Camarena's?

17   A    Yes, sir, I did.

18   Q    What kind of a vehicle was that?

19   A    It was a blue Ford pick-up.  I believe a 1984 model.

20   Q    When did you arrive in the office?

21   A    About 9:00 A.M.

22   Q    Did you see Agent Camarena in the office that morning?

23   A    Yes, sir, I did.

24   Q    Did he work through the morning?

25   A    Yes, he did.

105

1    Q    And did he leave the office at some point during the

2    day?

3    A    About 2:00 or 2:15 in the afternoon.

4    Q    Did he return to the office at any point during that

5    day?

6    A    No, sir, he did not.

7    Q    Did you receive a telephone call from Agent Victor

8    Wallace the following morning?

9    A    Yes, sir.

10   Q    About what time?

11   A    About 6:30 A.M., more or less.

12   Q    And what was the nature of his call?

13   A    He called to ask if I had any idea where Kiki might

14   be, Enrique Camarena.

15   Q    Did you?

16   A    No, I didn't not.

17   Q    Well, you worked with Agent Camarena for a number of

18   years; correct?

19   A    At that time, about three years.

20   Q    And you came to know him pretty well?

21   A    Yes.

22   Q    Based on your knowledge and familiarity with him, was

23   he the kind of person to have stayed out all night and not

24   have called anyone?

25   A    No, he would not have done that.

106

1    Q    Were you alarmed at this news from Agent Wallace?

2    A    Yes.

3    Q    Did you and he discuss what to do about it?

4    A    Yes, we did.

5    Q    Did you devise some plan?

6    A    Yes.  Agent Wallace was to take his wife and go to

7    Mrs. Camarena's home, and I went to the Consulate to begin

8    to look for any traces of Special Agent Camarena, to call

9    friends and associates.

10   Q    Did you pass the information about his absence on to

11   your superiors?

12   A    Yes, I did.

13   Q    When you arrived at the Consulate, did you notice

14   anything that struck you as unusual?

15   A    Agent Camarena's blue Ford pick-up was parked exactly

16   where it had been parked the previous evening.  There was

17   dew on the ground.  There was no dew under the truck.  The

18   door was unlocked and the alarm was turned off.

19   Q    When you went to the D.E.A. office, did you examine

20   Agent Camarena's desk?

21   A    Yes, I did.

22   Q    Did you find anything of significance there?

23   A    He was generally a neat person.  And his work from the

24   previous day was on his desk.  The desk drawer was open,

25   partially.  His credentials were there.  His weapon was

107

1    there.

2    Q    If you'll look in the book in front of you at what's

3    been marked as Exhibit 10, please.

4    A    Yes, sir.

5    Q    Do you recognize that?

6    A    Yes, sir, I do.

7    Q    What is that?

8    A    They are the credentials, the Drug Enforcement

9    Administration credentials for a special agent, of Enrique

10   Camarena.

11           MR. CARLTON:  Move its admission, Your Honor.

12           THE COURT:  It may be admitted.

13           (Exhibit 10 received in evidence.)

14   BY MR. CARLTON:

15   Q    Well, in the course of this day, February 8th, 1985,

16   what was it that you did in order to locate Agent Camarena?

17   A    The other personnel from the office were summoned, and

18   everybody began an exhaustive telephone search in the

19   beginning, contacting everybody we knew, calling hotels,

20   calling police departments, hospitals.

21           We had several conversations with our superiors in

22   Mexico City, and then later with the D.E.A. Headquarters.

23   The people in Mexico City contacted the Mexican Federal

24   Judicial Police and asked for assistance, and we did the

25   same thing in Guadalajara.

108

1   Q    Were any of these efforts successful?

2   A    Well, the efforts in Guadalajara were not, but Mexico

3   City called to inform us that the Mexican Federal Judicial

4   Police were sending a number of troops to help out.

5   Q    Was the State Police approached for cooperation?

6   A    Yes, sir, they were, but that was on the following

7   day.

8        Well, no, I'm sorry.  We did go to them on that

9   day.  Yes, we did.

10  Q    Did they provide that cooperation?

11  A    No, they did not.

12  Q    At some point during this day, did you receive any

13  news about Alfredo Zavala?

14  A    Yes, we did.

15  Q    What was that?

16  A    That he was missing.  That he had been abducted from

17  the highway.

18  Q    And was that information significant to you also in

19  your search for Agent Camarena?

20  A    Yes, sir.  It pretty well made it obvious to us that

21  the kidnapping had to be related to the narcotics

22  trafficking.

23  Q    At some point, did you receive assistance from the

24  Mexican Federal Judicial Police?

25  A    Yes, we did.  They began to arrive during the early

109

1    morning hours of February the 9th, and by 8:00 o'clock in

2    the morning there was at least 75 or 80 agents of the

3    Mexican Federal Judicial Police in Guadalajara to assist.

4    Q    Who was in command of this Mexican contingent?

5    A    First Comandante Armando Pavon-Reyes.

6    Q    Had you ever worked with him before?

7    A    No, I had not.

8    Q    Did you formulate any opinions as to his competence,

9    based upon your work with him on this investigation?

10   A    That would be hard to say, because it was my opinion

11   that everything he did, both before he took any action and

12   afterwards, was coordinated, or perhaps he was asking

13   permission or guidance from his boss in Mexico City.

14   Q    At some point during the day, did you dispatch some

15   D.E.A. agents to the Guadalajara Airport?

16   A    I told them to get in the automobiles with the Mexican

17   Federal Judicial Police who were going to the airport.

18   Q    Why were they going to the airport?

19   A    We had a radio scanner on the frequency of Miguel

20   Angel Felix-Gallardo in the D.E.A. office, and someone

21   overheard a radio message from Miguel Felix to his base

22   station, probably the Hotel Las Americas or his office,

23   advising that he was leaving town, to bring a large sum of

24   money to the airport.

25        We conveyed this information to Comandante Pavon,

110

1    and he decided to begin his investigation by going to the

2    airport and trying to find this aircraft or find Miguel

3    Felix.

4    Q    How did all of these agents get to the airport?

5    A    In rented cars.

6    Q    Who rented those cars?

7    A    We did.  The D.E.A. contingent did.

8    Q    At this time did you have a photograph in your office

9    of Rafael Caro-Quintero?

10   A    No, there was no photograph of Rafael.

11   Q    You didn't know what he looked like?

12   A    No.

13   Q    Do you know whether any of the agents in the office

14   knew what he looked like?

15   A    No, they did not.

16   Q    Now, after this incident, how did you assist in the

17   investigation?

18   A    By providing leads to the Mexican Federal Judicial

19   Police, by providing addresses of homes, businesses,

20   ranches, relatives, names of relatives, names of

21   associates.  We also accompanied them on most of the raids

22   or investigations that they undertook.

23   Q    Did you participate in some of those?

24   A    Yes, sir, I did.

25   Q    Did you work with them on a daily basis?

111

1    A    Yes, we -- yes, I did.

2    Q    During what period of time did this continue?

3    A    Until March the 5th.

4    Q    In the course of your work with the M.F.J.P. on this

5    investigation, did you develop an opinion as to whether

6    they were prosecuting this investigation aggressively?

7    A    I felt that they were not.

8    Q    What led you to that conclusion?

9    A    They were usually very aggressive in their

10   investigations, and at least in their country they -- when

11   they wanted to be, they were very efficient at it.  And

12   suddenly they were adhering very strictly to all the rules

13   of law which hadn't been the case in the past.

14   Q    Were many of these searches initiated by the M.F.J.P.?

15   A    Very few.

16   Q    Were any significant suspects captured as a result of

17   these searches and raids?

18   A    No.

19   Q    Was any significant evidence encountered or found as a

20   result of these searches and raids?

21   A    On one occasion, yes, sir.

22   Q    What was that?

23   A    That would have been the office of Miguel Felix and

24   Thomas Valles Corral.

25   Q    Let me draw your attention to February 28th, 1985, and

112

1    I'd ask you to look at what has been marked -- and this

2    should be in the book in front of you -- as Exhibits 12-A,

3    B, and C.

4    A    Yes, sir.

5    Q    Do you see those?

6    A    Yes, sir.

7    Q    Do you recognize them?

8    A    Yes, sir, I do.

9    Q    What is Exhibit 12-A?

10   A    That's a copy of a letter that I saw the morning of

11   February the 28th.  Comandante Armando Pavon removed it

12   from his desk and showed it to several of the agents there,

13   and we read it.

14   Q    Where was this that he was showing it to you?

15   A    In the M.F.J.P. Office.

16   Q    Did you read it at the time?

17   A    Yes, sir, I did.

18   Q    And 12-B, what is that?

19   A    That's an envelope addressed to the Jalisco State

20   Attorney General from someone named Adan Vega, postmarked

21   in California.

22   Q    Have you read this letter in its entirety?

23   A    Yes, sir, I have.

24   Q    Look at Exhibit 12-C.  Do you recognize that?

25   A    Well, it's a translation of a letter.

113

1    Q      An English translation?

2    A      Yes, sir.

3    Q      Have you had an opportunity to compare the English

4    translation to the letter itself?

5    A      Yes, sir, I have.

6    Q      Is that a fair and accurate translation?

7    A      Yes, sir, it is.

8    Q      And did you discuss this letter with Comandante Pavon

9    on the 28th?

10   A      Yes, sir, I did.

11   Q      What was the substance of the letter?

12   A      The substance of the letter is that -- alleges that

13   Special Agent Enrique Camarena had been kidnapped by

14   mistake, a case of mistaken identity.  That some drug

15   traffickers had hired a man named Manuel Bravo and his sons

16   to kidnap Special Agent Camarena, or to actually try to

17   kidnap another man named Guillen, I believe, and that they

18   had mistakenly kidnapped Special Agent Camarena, taken him

19   to their ranch, at which time they discovered the mistake,

20   and that they were afraid to turn him loose.  And it's

21   advising the authorities that if they went to this ranch

22   they would most likely find the body.

23   Q      Where was that ranch located?

24   A      Near La Barca, Michoacan.

25   Q      Michoacan is another State in Mexico?

114

1   A    Yes, it is.

2   Q    As a result of this information, did you and

3   Comandante Pavon arrive at some sort of a plan to follow-up

4   on it?

5   A    Well, it was probably not between the two of us.  But

6   the group decided to pursue that lead, as we pursued all of

7   the leads that came our way.  And the plans were made to

8   go, I think, on the following Saturday to raid this or

9   investigate this place.

10  Q    Let me draw your attention to March 26th of 1985.  Did

11  you participate in finding a Mercury Marquis automobile on

12  that date?  On or about that date?

13  A    What is a Ford Grand Marquis.  It's a Mexican make.

14  Yes, sir.

15  Q    All right.  How did that come about?

16  A    An informant provided information to one of the agents

17  in the office, Alan Bachelier, that he knew the location of

18  an automobile that had been used in the abduction of the

19  D.E.A. agent.  He provided the identification of the site,

20  and we went to that site.

21  Q    When you got there, what did you find?

22  A    We found in a new, very low rent subdivision being

23  developed outside the loop that surrounds the city, an

24  incomplete cinder block house.  And in one of the rooms,

25  this automobile, a black, four-door, Grand Marquis had been

115

1   placed inside the car -- inside the house, and then the

2   cinder blocks loosely stacked to conceal it.

3   Q      Were these cinder blocks removed?

4   A      Yes, they were.

5   Q      I would ask you to look at what has been marked -- it

6   should be in the cart next to you -- 11-A through C.

7   A      Yes, sir.

8   Q      Do you recognize those?

9   A      Yes, sir, I do.

10  Q      What do they depict?

11  A      The first photo is a photo of the house, the

12  incomplete house.  The three men in there are Mexican

13  Federal Judicial Police agents, and they are removing the

14  bricks and entering the house.

15         The second one, 11-B, is the same three agents,

16  and they are continuing the same task.  And you can now see

17  the automobile being revealed.

18         And the third one is a photo of the automobile

19  itself, parked at the offices of the Mexican Federal

20  Judicial Police in Guadalajara after it was removed there.

21         MR. CARLTON:  Move their admission, Your Honor.

22         THE COURT:  They may be admitted.

23   (Exhibits 11-A through 11-C received in evidence.)

24  BY MR. CARLTON:

25  Q      Now, during what period, Mr. Kuykendall, did you

116

1    participate on a daily basis in this investigation?

2    A    Until I was transferred out of Guadalajara.

3    Q    And that was when?

4    A    End of September, 1985.

5    Q    Would you please look at what has been marked for

6    identification in the book, I believe, as Exhibit 22.

7    A    Yes, sir.

8    Q    Do you recognize any of the persons in that

9    photograph?

10   A    Yes, sir, I do.

11   Q    Who do you recognize?

12   A    I recognize two people in this photograph.  The man in

13   the left foreground is Enrique Camarena.  And the man in

14   the far background is a Mexican Federal Judicial Police

15   agent.  I believe he is an ex agent.  His name is Roberto

16   Valdez.

17   Q    Can you tell from that photograph where the photograph

18   was taken?

19   A    It was taken in the offices of the Mexican Federal

20   Judicial Police in Guadalajara.

21   Q    Can you tell about when the photograph would have been

22   taken?

23   A    I believe, because Agent Camarena is wearing a

24   mustache in this photo, that it was probably made in 1983.

25   Q    Thank you.

117

1          Moving to 1986, did you meet with an individual

2   named Ruben Zuno-Arce at some point during 1986?

3   A    Yes, sir, I did.

4   Q    Do you recall when?

5   A    I believe it was September 26th.

6   Q    Where did this meeting occur?

7   A    At a place called Jim's Restaurant on Blanco Road and

8   Interstate Highway Loop 14 in San Antonio, Texas.

9   Q    Was anyone else present during this meeting?

10  A    Yes, sir.

11  Q    Who?

12  A    An ex D.E.A. agent named Art Rodriguez.

13  Q    Looking around the courtroom today, do you see here

14  the Ruben Zuno-Arce with whom you met on that day?

15  A    Yes, sir, I do.

16  Q    And where?

17  A    He is seated at the table in the gray suit.

18         THE COURT:  Indicating Mr. Zuno-Arce.

19         MR. CARLTON:  Your Honor, at this time, may I move

20  the admission of Exhibits 12A through C, the letter, the

21  envelope and English translation.

22         THE COURT:  They may be admitted.

23     (Exhibits 12-A through 12-C received in evidence.)

24  BY MR. CARLTON:

25  Q    During the course of this meeting, did Mr. Zuno give a

118

1    statement to you?

2    A    Yes, sir.

3    Q    And what was the subject of this meeting?

4    A    The ownership or -- the ownership of the house

5    located -- house and property located at 881 Lope de Vega

6    in Guadalajara.

7    Q    Now, at this time were you actively involved in the

8    Camarena investigation?

9    A    It's my opinion, yes.

10   Q    Pardon me?

11   A    It's my opinion, yes.

12   Q    What was it that Mr. Zuno told you about 881 Lope de

13   Vega?

14   A    That he had acquired the house or the property, I

15   believe, at the time of his marriage or about the time of

16   his marriage, and had constructed a dwelling on it, had

17   lived there for a number of years, had left the house to

18   live in San Antonio, Texas for a number of years, and then

19   sold the house.  There was more to it than that.  That's

20   basically it.

21   Q    Did he say when he had left or ceased living in

22   Guadalajara?

23   A    I believe he said he left there in 1978.

24   Q    Did he say when he returned?

25   A    It seems to me that he said he came back to stay in

119

1   the house a few times in 1984, so I --

2   Q    What did he tell you about selling the house?

3   A    That he had been contacted by a Dr. Sanchez-Barba, who

4   wanted to buy the house.  That they made a gentleman's

5   agreement to sell it, and then followed that up with a

6   formal transaction.  I believe the first part of January he

7   was paid for -- he was paid with two checks, by two checks

8   for the house.

9   Q    Do you recall the amount that he told you he was paid?

10  A    Seventy million pesos.

11  Q    And these checks were from who?

12  A    From Ruben Sanchez-Barba and his brother Jesus --

13  Q    Do you recall the --

14  A    Jesus Sanchez-Barba.

15  Q    And did he tell you what happened in relation to the

16  sale after the receipt of these checks?

17  A    They turned the house over.  That he was asked to

18  remove most of the furniture, but to leave, I believe,

19  leave the dining room set and some rustic living room

20  furniture.

21  Q    Did Mr. Zuno talk about the telephone at 881 Lope de

22  Vega?

23  A    It was probably in answer to a question.  I do not

24  recall, but he told me the name of the person who the

25  telephone had been registered to.

120

1    Q      Who was that?

2    A      Man named Romero Nuno.

3    Q      Now, I'd ask you to look in the book at what has been

4    marked as Exhibits 158-A and B, if you would.

5    A      Yes, sir.

6    Q      Do you recognize 158-A?

7    A      Yes, sir.

8    Q      What is that?

9    A      It is a handwritten statement, written by Jose Ruben

10   Zuno-Arce in my presence, and in the presence of Special

11   Agent Rodriquez on that date, or ex Special Agent

12   Rodriquez.

13   Q      That statement is in Spanish?

14   A      Yes, it is.

15   Q      And what is 158-B?

16   A      It is a translation of that statement.

17   Q      Have you had an opportunity to compare the English

18   translation with the Spanish original?

19   A      Yes, I have.

20   Q      Is that a fair and accurate translation?

21   A      Yes, it is.

22   Q      I should ask you at this point, are you fluent in

23   Spanish?

24   A      Almost.

25   Q      How much of your career has been spent on the Mexican

121

1    border or in South America?

2    A    I was born in Eagle Pass, Texas.

3    Q    That's right on the border?

4    A    Yes.  And I lived all of my life there, expect for

5    seven years in Ecuador, and three-and-a-half years in

6    Mexico.

7    Q    All right.  Would you look at what has been marked as

8    Exhibit 165 and Exhibit 157.

9    A    157?

10   Q    157, yes.

11   A    Yes, sir.

12   Q    Looking first at 157.  Do you recognize that?

13   A    Yes, I do.

14   Q    What is that?

15   A    I say copies of a bunch of information that was

16   conveyed to me by mail from Mr. Zuno-Arce in Mexico.

17   Q    Now, how did this come about?

18   A    When we met in San Antonio, he advised me that he had

19   some information that he wanted to provide to me, and asked

20   for my phone number.  And I gave it to him, and I got his

21   phone number.  And, in fact, he did call, and said he had

22   the information and asked how he could send it to me.  I

23   advised him to go to the Consulate and talk to one of the

24   secretaries, and she would mail it, and that is what

25   occurred.

122

1    Q    What kind of information was it that he wanted to

2    send, did he say?

3    A    Concerning people involved in drug trafficking.

4    Q    And looking at Exhibit 165, do you recognize that?

5    A    It's some handwritten notes in my handwriting.

6    Q    And what information do those notes reflect?

7    A    Well, it's the names and telephone numbers of some

8    individuals.  I believe it must be something that I got

9    from Mr. Zuno-Arce over the telephone.

10        MR. CARLTON:  Move Exhibits 158-A and B, 157, and

11   165 into evidence, Your Honor.

12        THE COURT:  They may be admitted.

13   (Exhibits 158-A, 158-B, 157 and 165 received in evidence.)

14        MR. CARLTON:  May I have just a moment?

15             (Government counsel confer.)

16        MR. CARLTON:  Nothing further at this time.

17        THE COURT:  You may cross-examine the witness.

18        MR. MEDVENE:  May I approach the witness?

19        THE COURT:  Yes.

20                 CROSS-EXAMINATION

21   BY MR. MEDVENE:

22   Q    Good afternoon, Agent Kuykendall.

23        You mentioned that with reference to certain

24   confidential informant information you received about

25   Zacatecas, that you verified that information; is that

123

1    correct?

2    A     We verified as much we could, yes, sir.

3    Q     Was it your practice generally to verify informant

4    information to make sure it was accurate?

5    A     That was if we could, yes, sir.

6    Q     Why did you feel that was necessary?

7    A     To be sure ourselves that the information we were

8    receiving was correct.

9    Q     Because you were getting information from somebody who

10   might be being paid money, and you wanted to make certain

11   that the information wasn't being made up, or wanted to

12   make sure it wasn't inaccurate?

13   A     That would be one of the reasons, yes, sir.

14   Q     At Zacatecas you investigated the information that you

15   had been given and you found that it was correct?

16   A     That is correct.

17   Q     Now, after verifying the information on Zacatecas, did

18   you prepare a memorandum that's marked 400 and is in front

19   of you?

20   A     This piece of paper was prepared by Special Agent

21   Enrique Camarena, sir.  I was the approving officer.

22   Q     And does that memorandum reflect the investigation by

23   Mr. Camarena of the Zacatecas fields?

24   A     Up to that point, the date on the piece of paper, yes,

25   it does.

124

1    Q    And basically, there were ten families that owned a

2    variety of fields in Zacatecas; is that correct?

3    A    According to our information.

4    Q    And a variety of individuals in each family?

5    A    I'm sorry?

6    Q    And a variety of individuals under each family

7    grouping?

8    A    Yes, sir.

9    Q    Is it correct that Caro-Quintero generally supervised

10   the overall operation of Zacatecas?

11             MR. CARLTON:  Objection on hearsay grounds, Your

12   Honor, lack of foundation.

13             THE COURT:  Sustained.

14   BY MR. MEDVENE:

15   Q    Is it true that based on your information, the overall

16   operation of the Zacatecas fields was under the direction

17   of Caro-Quintero?

18             MR. CARLTON:  Same objection, Your Honor.

19             THE COURT:  Well, you may answer, if you know.

20             THE WITNESS:  That was what our information was,

21   sir.

22   BY MR. MEDVENE:

23   Q    And he provided protection?

24   A    Well, the protection was provided by the police

25   agencies in the area.

125

1    Q    And your understanding was he made the arrangements

2    with those agencies to provide the protection; is that

3    correct?

4    A    He and other traffickers.

5    Q    Yes.  The other traffickers that are listed as part of

6    the ten families?

7    A    That's what we were told.

8    Q    And is it also true that based on your investigation,

9    you learned that it was initially Felix-Gallardo who

10   introduced Caro-Quintero and Fonseca and other Cartel

11   members to various powerful politicians and police

12   officials in Guadalajara?

13          MR. CARLTON:  Objection.  Hearsay, lack of

14   foundation.

15          THE COURT:  Overruled.  You may answer.

16          THE WITNESS:  I wish I knew that, sir.  I don't

17   know.

18   BY MR. MEDVENE:

19   Q    Now, Mr. Zuno is not listed as one of the ten families

20   that owns or has any involvement in Zacatecas; is that

21   correct?

22   A    That is correct.

23   Q    Now, there was a meeting you had before the Zacatecas

24   raid with Manuel Ibarra in Mexico City; is that correct?

25   A    Yes, sir.

126

1    Q    And prior to that meeting, did you prepare certain

2    handwritten notes, or were certain handwritten notes

3    prepared that were turned over to the Mexican Attorney

4    General's Office?

5    A    I think that was at the second meeting, but, yes, we

6    did -- I did.

7    Q    You have in front of you what is marked 401.  Are

8    those the notes?

9    A    Yes, sir.

10   Q    And what do those notes purport to relate?

11   A    The names of the financiers of the operation.  The

12   names of the foremen or managers of the operation.  Some of

13   the traffickers that would be found up there.  The names of

14   the D.F.S. comandante, and the M.F.J.P. comandante, and the

15   State Judicial Police comandante.  The names of some motels

16   where the traffickers were staying.  The names of some of

17   the growers, and the names of some of the areas where they

18   were supposed to have been cultivations found.  The name of

19   the principal person that we were working against and his

20   help telephone numbers.  The name of a radio technician who

21   was supposed to have been the person who had installed

22   their radio network.

23   Q    And did you give this information to Mr. Ibarra with

24   reference to Zacatecas for purposes of their office

25   conducting an investigation into these people?

127

1    A    Yes, I did.

2    Q    Mr. Zuno's name, by the way, is not one of those

3    listed under any of the categories that you identified; is

4    that correct?

5    A    That is correct.

6    Q    Now, at the initial meeting in Zacatecas when there

7    was discussion of the Zacatecas raid or an upcoming

8    Zacatecas raid, Mr. Camarena was present, was he not?

9    A    The initial meeting was in Mexico City.

10   Q    Yes.

11   A    Yes, he was present.

12   Q    And Mr. Ibarra knew that Mr. Camarena was involved

13   along with you in planning this Zacatecas raid?

14   A    Yes, sir.

15   Q    Now, at or around the time of the raid, you had told

16   us Enrique Camarena was also investigating or trying to put

17   together a cocaine purchase?

18   A    Heroin purchase.

19   Q    A heroin purchase.  And that was with a gentleman

20   named Manuel Chavez?

21   A    Yes, sir.

22   Q    And the idea was for Chavez to deliver the heroin in

23   the United States so he could be arrested in the United

24   States?

25   A    That is correct.

128

1    Q    And Chavez didn't come to the United States, but had

2    somebody else bring the heroin over here; is that correct?

3    A    Yes, it is.

4    Q    So the heroin was transferred to Mr. Camarena in an

5    undercover capacity in the U.S.?

6    A    Yes.

7    Q    Is it true that Mr. Camarena -- Mr. Camarena at the

8    time of the purchase, as far as Mr. Chavez was concerned,

9    was working in an undercover capacity?

10   A    That's right.

11   Q    Mr. Chavez was a right-hand man, so to speak, of

12   Caro-Quintero?

13   A    Yes.

14   Q    Is it correct that after the transfer of the heroin,

15   that Enrique Camarena flew to where Mr. Chavez was in

16   Reynosa, Mexico?

17   A    Well, he drove there.  Reynosa is right across the

18   river --

19   Q    All right.

20   A    -- from where he was at.

21   Q    And he arrested or participated in the arrest of Mr.

22   Chavez there in Reynosa?

23   A    That is correct.

24   Q    And he, Mr. Chavez, knew at that time when Mr.

25   Camarena arrested him he was no longer undercover, he was a

129

1  D.E.A. agent; is that correct?

2  A    Yes, it is.

3  Q    Now, Mr. Camarena and Mr. Chavez then flew from

4  Reynosa to Zacatecas?

5  A    Yes, sir.

6  Q    And Mr. Camarena in Zacatecas then participated in the

7  remainder of the Zacatecas operation?

8  A    That is correct, sir.

9  Q    And as part of the Zacatecas operation, when arrests

10  were made, he was in the same room as Mr. Chavez?

11  A    He would have been at some time.

12  Q    And Mr. Chavez certainly knew, to the best of your

13  knowledge, that Mr. Camarena was very much involved in this

14  Zacatecas raid?

15  A    I think so.

16  Q    Now, Mr. Aldana was with you at Zacatecas, I think you

17  told us.

18  A    It would be more correct to say I was with him.

19  Q    You were with him.  And you were with him, was it in

20  the helicopter for awhile?

21  A    Right.

22  Q    And is it correct that he also saw Mr. Camarena there

23  in Zacatecas?

24  A    Yes, sir.

25  Q    And he knew when he saw Mr. Camarena there in

130

1    Zacatecas in May of '84, that Mr. Camarena was a D.E.A.

2    agent?

3    A    Yes, he did.

4    Q    The other operation you spoke about, Operation

5    Padrino, was a cocaine arrangement basically between Mr.

6    Matta and Felix-Gallardo; is that correct?

7    A    They were the principal traffickers in the

8    investigation.

9    Q    And was Matta the one that supervised the cocaine

10   coming from Columbia through Mexico to the United States?

11   A    I believe he was the connection.

12   Q    He was the connection.

13        And he was the Colombian connection?

14   A    Yes.

15   Q    And was Mr. Gallardo the Mexican connection?

16   A    He was that, and the transporter.

17   Q    All right.  And he transported the cocaine to the

18   United States?

19   A    Yes.

20   Q    Multi-million dollar transactions?

21   A    Yes.

22   Q    And there were certain monies seized in Anaheim?

23   A    Yes.

24   Q    Mr. Zuno was no way involved in that cocaine

25   transaction, to the best of your information; is that

131

1    correct?

2                MR. CARLTON:   Objection; lack of foundation.

3                THE COURT:   Overruled.

4                THE WITNESS:   That's correct.

5    BY MR. MEDVENE:

6    Q    Now, after the kidnapping of Agent Camarena, is it

7    true that you worked all waking hours, all working hours,

8    from the kidnapping through the end of September, on the

9    Camarena abduction in trying to figure out what happened

10   and who did it?

11   A    No.   No, we had other things to do.   I worked on it a

12   lot, but we had other things to do.

13   Q    Fair to say you put in a lot of time working on it?

14   A    Yes, sir.

15   Q    D.E.A. agents came in to participate in the

16   investigation from the United States?

17   A    Yes, sir, they did.

18   Q    You had a lot of agents down there?

19   A    Yes, we did.

20   Q    You'd characterize it as an intensive investigation?

21   A    Yes, sir.

22   Q    During the course of the investigation, is it correct

23   that you pursued a number of investigative techniques in

24   trying to solve who was involved in the kidnapping?

25   A    Yes.

132

1    Q    You collected phone records?

2    A    Yes.

3    Q    And you collected phone records from Mr. Quintero for

4    places where you knew he frequented?

5    A    We had a lot of phone records from homes where he

6    lived.  I guess we gathered up some more.

7    Q    You gathered up phone records from a number of

8    individuals, such as, did you gather up phone records of

9    places where Fonseca frequented?

10   A    I don't recall, sir.

11   Q    You participated in raids along with the M.F.J.P. of

12   various houses of known traffickers?

13   A    The agents participated in almost all of them.  I went

14   on some of them.

15   Q    There was a photo shown to you.  Was that 20 -- I'm

16   not sure -- was it 22 or 28?  Was that photo of Mr.

17   Camarena you said taken in 1973 in the M.F.J.P. offices?

18   A    I believe I said '83, sir.

19   Q    Yes, in '83.  What number is that?  That's 22, I

20   believe, sir.

21   A    It's 22.

22   Q    Is that Exhibit 22?

23   A    Twenty-two; yes, it is.

24   Q    I don't know if you mentioned where that was found.

25   Was that found during a raid?

133

1    A    Yes, it was.

2    Q    Was that found during a raid of Felix-Gallardo's

3    house?

4    A    Yes, it was.

5    Q    Based on your investigation, did you ascertain that

6    Ernesto Fonseca had ordered somebody named El Sammy to go

7    with someone named Parra and pick up Agent Camarena on

8    February 7th?

9         MR. CARLTON:   Objection, lack of foundation.

10   Hearsay.   Speculation

11        THE COURT:   Overruled.

12        THE WITNESS:   I think that's something that was

13   related from the Mexican Federal Judicial Police.   I don't

14   know where they got that information from.

15   BY MR. MEDVENE:

16   Q    But that was the information that you had that certain

17   Fonseca pistoleros, bodyguards, picked up Enrique Camarena

18   in front of the American Consulate?

19   A    As I say, that came from the Mexican Federal Judicial

20   Police in Mexico City.   I don't know where they got it

21   from.

22   Q    Okay.   And you found out that Mr. Camarena was taken

23   by the people that picked him up to 881 Lope de Vega?

24   A    The forensic evidence places Agent Camarena at that

25   residence, sir.

134

1    Q    Now, based on your investigation, you ascertained that

2    881 Lope de Vega had recently been acquired by Quintero

3    from a couple of businessmen who handled in the past his

4    investments; is that correct?

5    A    I don't know if they handled his investments.  They

6    had acquired real estate for him in the past.

7    Q    And those individuals were the ones that you named

8    that bought this property Ruben Sanchez-Barba and Jesus

9    Sanchez-Barba, his brother?

10   A    I think there might have been another brother involved

11   in the business right, but that's correct.

12   Q    And you ascertained in the course of your

13   investigation that after these people had purchased the

14   property from Ruben Zuno, before February 7th they caused

15   it to be fixed up, painted and cleaned up, generally?

16   A    I think that perhaps so.  I don't know the answer to

17   that.  I read some Sixes done by somebody else that says

18   that.  I don't know the answer.

19   Q    Is that William Kunz?

20   A    I think so.

21   Q    He was D.E.A. Washington that was investigating the

22   Camarena kidnapping?

23   A    I think he was in charge of the investigation.

24   Q    Your understanding from the information you received

25   was that the people that bought the place from Ruben Zuno,

135

1    this Jesus Sanchez-Barba and Ruben Sanchez-Barba, fixed up

2    the place and it was then given or sold to Caro-Quintero?

3           MR. CARLTON:  Objection.  Irrelevant.  Lack of

4    foundation.

5           THE COURT:  Asked and answered.  Sustained.

6    BY MR. MEDVENE:

7    Q    There came a time, I believe, when you said that while

8    in Texas with the D.E.A. still working on the Camarena

9    investigation, you wanted to talk to Ruben Zuno-Arce; is

10   that correct?

11   A    I talked to him, sir.

12   Q    Yes.  Prior to talking to him, you made a decision you

13   wanted to talk to him?

14   A    I must have.

15   Q    Must have.  And did you inform him, either directly or

16   through former D.E.A. Agent Art Rodriguez, that you would

17   go to Mexico to talk to him?

18   A    I don't think so.  I don't recall saying that.

19   Q    At any rate, Mr. Zuno voluntarily came up to Texas to

20   see you?

21   A    As far as I know.

22   Q    And he met you and he answered the questions you asked

23   him?

24   A    That is correct.

25   Q    He didn't refuse to answer any questions?

136

1    A    No, sir.

2    Q    He didn't ask for any immunity before he answered your

3    questions?

4    A    No.

5    Q    He didn't ask for a payment of any money before he

6    answered your question?

7    A    No, he did not.

8    Q    Didn't ask for relocation before he answered your

9    questions?

10   A    No.

11   Q    Whatever you asked him, he answered?

12   A    Correct.

13        THE COURT:  Asked and answered.

14   BY MR. MEDVENE:

15   Q    Now, he told you, among other things, did he not, that

16   he acquired the property in 1969 or 1970 from his parents?

17   A    I think he said '70.

18   Q    And that he built the house there that now stands

19   there at or around that time in 1970?

20   A    Some time after he acquired the property.

21   Q    Some time around 1970?

22   A    After he got the property.  I'm not sure what date he

23   said he built the house, sir.

24   Q    Okay.  Now, he told you for a period of time he rented

25   the house out?

137

1    A    That is correct.

2    Q    And did he tell you he rented the house out for about

3    four years when he was not living in Guadalajara?

4    A    I think so, something like that.

5    Q    And after '84, before selling the property, he said on

6    occasion from time to time he'd spend the night there?

7    A    I think that's what he said.

8    Q    When you interviewed him, the former D.E.A. Agent Art

9    Rodriguez, was he also present?

10   A    Yes, he was.

11   Q    And did you ask Mr. Zuno on that occasion if he could

12   come up -- did either you or Mr. Rodriguez ask him, "If you

13   could develop any information or have any information about

14   drug dealings in Mascota or anybody in Mascota that might

15   be involved in drugs, could you please send that

16   information to us"?

17   A    I don't know whether I asked him or whether he

18   volunteered it.  In my job as a D.E.A. agent, if he would

19   have volunteered it, I would gladly have taken it.

20   Q    So you either asked him or he volunteered to do it?

21   A    I guess so.

22   Q    Subsequent to that, he caused information to be sent

23   to you?

24   A    Yes, he did.

25   Q    I'm about done, Mr. Kuykendall.  Thank you.

138

1          Seventy million pesos, can you remember back, was

2    the exchange rate then, would that be about 300 plus

3    thousand dollars that Mr. Zuno sold the house for?

4    A    Someone just told me that it was about $330,000.

5    Q    You say "someone", someone on the prosecution side?

6    A    Yes.

7    Q    Okay.  Is it true, Mr. Kuykendall, that after you

8    questioned Mr. Zuno in Texas in September of '86, you told

9    him he could return to Mexico whenever he wanted?

10   A    I don't think that I told him something like that.

11   I --

12   Q    Well, you didn't arrest him?

13   A    No.

14   Q    And is it true that, to the best of your knowledge,

15   after your interview, there was no evidence that you knew

16   of that Mr. Zuno was involved in the kidnapping of Enrique

17   Camarena?

18          MR. CARLTON:  Objection, Your Honor.  Lack of

19   foundation.

20          THE COURT:  Overruled on that ground.

21          MR. CARLTON:  Your Honor, this is the subject of a

22   request at the recess.

23          THE COURT:  The objection is irrelevant.

24          MR. CARLTON:  Objection, Your Honor, irrelevant.

25          THE COURT:  Sustained.

139

1          Just go on, please.

2          MR. MEDVENE:  That's my last question, but may I

3     be heard on that, Your Honor?

4          THE COURT:  Yes.  We'll take our afternoon recess

5     at this time.

6          THE CLERK:  All rise.

7                    (Jury Out.)

8          THE CLERK:  You may be seated.

9          THE COURT:  What is the relevance of what he knew

10    at that time?

11         MR. MEDVENE:  Well, the question we asked, Your

12    Honor, was related to any evidence he knew of that Mr. Zuno

13    was involved in the kidnapping.  We asked that direct

14    question last time.  You permitted it over objection, and

15    the relevance, and the relevance is that he conducted an

16    investigation, an intensive investigation, reviewed data,

17    the government asked him a million questions going to his

18    investigation --

19         THE COURT:  Get to the point.

20         MR. MEDVENE:  Well, the point is, as head of the

21    Guadalajara office, as very much involved in the

22    investigation, he ought to be allowed to --

23         THE COURT:  You are saying that there is some

24    evidentiary value to the fact that by that time and in the

25    course of investigating the case he had no knowledge of --

140

1          MR. MEDVENE:  No evidence --

2          THE COURT:  No evidence --

3          MR. MEDVENE:  -- of Zuno's involvement in the

4    kidnapping.  I specifically didn't --

5          THE COURT:  The evidentiary value is inferential?

6          MR. MEDVENE:  Yes, sir.

7          THE COURT:  And so therefore he was not involved?

8          MR. MEDVENE:  Yes.  Oh, yes.  Yes, sir, because he

9    was involved in the investigation.  He went on raids, et

10   cetera.

11         THE COURT:  What is your objection to this

12   question?

13         MR. MEDRANO:  Yes, briefly, Your Honor.  There are

14   several objections.

15         First of all, besides it being irrelevant and

16   hearsay, it frankly opens up the door, because Mr. Medvene

17   intentionally has framed his question to get one little

18   tidbit that Mr. Kuykendall at that juncture, at that point

19   in time, did not regard Mr. Zuno as a member of the Cartel.

20         Here's the problem with that:  If he asks the

21   question of either this witness or Mr. Ayala, who is coming

22   up very shortly:  Did we have information in the '70's and

23   '80's that Mr. Zuno was a trafficker, the answer to that is

24   unequivocally yes.

25         THE COURT:  That isn't what he asked.

141

1          MR. MEDRANO:  No, Your Honor, and I agree.  But

2     he's framing the questions in such a manner --

3          THE COURT:  He asked if he had any evidence that

4     he was involved in the kidnapping.

5          MR. MEDRANO:  Yes, Your Honor, but that's

6     tantamount to asking a -- well, that's our position that he

7     is a member -- that he is a trafficker preliminarily, and

8     ultimately a member of the Cartel.  Whether or not this

9     particular witness -- and even the witness acknowledges

10    that there were many people who were working on the

11    investigation at that point -- if one particular witness,

12    this agent doesn't have information that ties him to the

13    Cartel, that doesn't mean other agents do not have such

14    information.

15         THE COURT:  All right.

16         MR. MEDRANO:  It opens up --

17         THE COURT:  He may ask the question, and the

18    witness may answer.

19         MR. MEDRANO:  Very well.

20         THE COURT:  Now, Mr. Rubin, you can't have things

21    both ways.  You told this jury here that you were not

22    contesting the existence of this Cartel, et cetera, et

23    cetera, and you're making these inane objections.  And,

24    now, if you want to object, you can.  But whether it's

25    evidence, it does no harm to your client.  I don't know why

142

1   you object.

2            MR. RUBIN:  Well, after doing that, Your Honor, I

3   just put the appropriate objection, but at the end, let

4   them go.

5            THE COURT:  All right.

6            MR. RUBIN:  I thought it might speed things up.

7            THE COURT:  I see that the government has

8   streamlined the presentation of this evidence, which I

9   think is fine.  That's the way.  Just elicit the facts that

10  you need to elicit.

11           MR. RUBIN:  Your Honor, I have one matter.

12           MR. MEDRANO:  Your Honor, may I ask just one

13  additional question in light of your ruling as to Mr.

14  Medvene's question?

15           Are we, allowed then, on redirect to ask the next

16  logical question, that shortly at a later time this witness

17  and others have knowledge that Mr. Zuno is a member of the

18  Cartel responsible for the kidnapping, so does that mean we

19  can ask that next question, because it opens up the door by

20  virtue of this question?

21           THE COURT:  Well, you ask the question and I'll

22  rule on, if there's an objection.

23           MR. MEDVENE:  If the Court please, we limited the

24  question to evidence of the kidnapping.  There are two

25  questions, I'm asking one.  I'm asking any evidence he's

143

1    involved in the kidnapping.

2            THE COURT:   I don't want to waste a whole recess

3    with this.

4            MR. MEDVENE:   If the government is going to be

5    permitted to ask that, I will withdraw the question.   It

6    doesn't seem to me that whether he has any information on

7    the Cartel -- and we can talk about that in a minute -- has

8    anything to do with it:  Do they have evidence he's

9    involved in the kidnapping?  If you are going to permit

10   that question, I'm won't ask this.

11           THE COURT:   Well, then, you shouldn't ask it

12   because I would permit it.

13           MR. CARLTON:   Thank you, Your Honor.

14           MR. MEDVENE:   In other words, if we ask any

15   evidence, he's involved in the kidnapping --

16           THE COURT:   You asked that for the purpose of

17   inferring that he was not involved in the kidnapping.

18           MR. MEDVENE:   Yes.

19           THE COURT:   They may then ask about evidence from

20   which an inference to the contrary may be made.

21           MR. MEDVENE:   Well, the witness has already said

22   that he had no evidence that he was even involved in the

23   Cartel.  What Mr. Medrano is saying is some other witness

24   is going to say he read faxes and has third-hand

25   information he was involved in marijuana.

144

1      THE COURT:  I can't believe this argument, and I

2  don't want it to continue.  You may ask the question that

3  was objected to before.  I don't know what question these

4  people are going to ask.  If they ask it, and you don't

5  like it, you can object to it.

6      MR. MEDVENE:  Well, I won't ask this question if

7  you are going to allow a question of the witness -- of this

8  witness or Mr. Ayala:  Do they have any information that

9  third parties said Mr. Zuno was a trafficker?  I'm asking

10  this witness --

11      THE COURT:  Okay.  I'm not going to permit that,

12  if that's what you have in --

13      MR. MEDRANO:  No, that's not my question, Your

14  Honor.

15      THE COURT:  What is your question?

16      MR. MEDRANO:  If Mr. Medvene's question is at this

17  point in time, in or about February or March of '85, this

18  witness has any information that Zuno was part of the

19  Cartel responsible for the kidnapping --

20      THE COURT:  No.  He just asked him if he had any

21  evidence of his involvement in the kidnapping.

22      MR. MEDRANO:  -- at that specific time --

23      THE COURT:  Yes.

24      MR. MEDRANO:  -- in February or March, then it is

25  our position that we can ask either this witness or

145

1    subsequent agents that are coming up shortly, at a

2    subsequent time did those agents have information that he

3    was involved with the kidnapping.

4            THE COURT:  Well, whether they had information

5    really is not relevant.  It's what evidence of his

6    involvement is what is relevant here.

7            MR. MEDRANO:  We agree.

8            THE COURT:  If you're going to present evidence of

9    his involvement, I don't know why you are concerned about

10   this.

11           MR. MEDRANO:  My concern is his closing argument,

12   Your Honor.  He's going to stand up and say February of '85

13   100 agents are in town and they don't have any --

14           THE COURT:  Then you can say and point to what was

15   learned afterwards and the testimony of your own witnesses

16   here that implicate him.  I don't know why that's a

17   problem.

18           MR. MEDRANO:  Very well, Your Honor.

19           THE COURT:  Now, what, Mr. Rubin?

20           MR. RUBIN:  Your Honor, very briefly.

21           The government has not given us an exhibit list or

22   a copy of the exhibits, and so when the witness is

23   referring to an exhibit, I have no way of referring to it,

24   seeing what they are doing, or even know whether it's

25   objectionable to or not.  I believe we've asked them and

146

1    they've refused to give it to us.

2            THE COURT:  You don't have a copy of the exhibits

3    for him?

4            MR. CARLTON:  Copy of the exhibits?

5            THE COURT:  Yes.

6            MR. CARLTON:  Your Honor, we have made available

7    to them all of our exhibits.  We did not make a copy of the

8    exhibits for the defense.  They've had opportunity to look

9    at them.

10           THE COURT:  Counsel, if you have a problem with

11   any exhibit, I will defer ruling on it until you have had a

12   chance to see it.

13           MR. RUBIN:  That's all I wanted to be able -- I

14   don't know what number they are talking about.

15           MR. MEDVENE:  Your Honor, what about the list

16   itself?

17           THE COURT:  Well, you can give them a copy of the

18   list.

19           MR. RUBIN:  They've refused.

20           THE COURT:  That's really all you need.

21           THE CLERK:  Please rise.

22                          (Recess taken.)

23                          (Jury in.)

24           THE COURT:  You may continue.

25   BY MR. MEDVENE:

147

1    Q    Mr. Kuykendall, at the --

2              THE COURT:  Just ask the question.

3              MR. MEDVENE:  Yes, sir.

4              THE COURT:  You don't need to say what happened

5    before we adjourned.

6    BY MR. MEDVENE:

7    Q    Mr. Kuykendall, you had no evidence that Mr. Zuno was

8    involved in the kidnapping of Enrique Camarena after you

9    completed your interview with Mr. Zuno; is that correct?

10   A    Yes, it is.

11   Q    Hum?

12   A    Yes.

13             MR. MEDVENE:  Thank you.  Very much.

14             THE COURT:  Do you have any questions you wish to

15   ask this witness?

16             MR. RUBIN:  Just a few, Your Honor.

17                       CROSS-EXAMINATION

18   BY MR. RUBIN:

19   Q    Agent Kuykendall, how long were you at the D.E.A.?

20   A    From 1973 until 1989.

21   Q    Twenty-six years?  Sixteen years.  I'm sorry.

22             During that period of time, did you deal with

23   informants on a regular basis?

24   A    Yes.

25   Q    And it would be true, is it not, that in your

148

1   experience that in many occasions informants give you

2   incorrect information; true?

3   A    It happens.

4   Q    And, in fact, one of your jobs as an agent is to,

5   first of all, assess the credibility of the particular

6   informant; true?

7   A    Yes.

8   Q    For example, someone who is a solid citizen might be

9   given more initial credibility than someone who's been

10  involved in crimes themselves; correct?

11  A    Well, information is information.

12        MR. CARLTON: Calls for speculation, Your Honor.

13  Objection.

14        THE COURT:  Sustained.

15  BY MR. RUBIN:

16  Q    Now, and it's also true that oftentimes in order to

17  get information you had to pay money or the informant won't

18  give you the information; true?

19  A    Yes, it is.  That's true.

20  Q    And it's also true, is it not, in your experience that

21  many times informants will lie to you about information in

22  order to obtain money?

23  A    It happens, sir.

24  Q    And so in those instances, it's important to try and

25  corroborate those informants with whatever information you

149

1    can get; correct?

2    A    Correct.  Right.

3    Q    Now, turning to Zacatecas.  Do you have Exhibits 400

4    and 401 in front of you still?

5    A    Yes, sir.

6    Q    Mr. Medvene asked you about there were ten families

7    that were under investigation for Zacatecas, and turning

8    that into individuals, there were 31 -- how many

9    individuals were under investigation?

10    A    Well, this particular D.E.A. Six lists the members of

11    the various groups as we knew them at the time according to

12    the information from the informant.

13    Q    Okay.  Now, first of all, so we don't get caught in

14    terminology, when you a "D.E.A. Six," you are referring to

15    the report form that the D.E.A. agent files on a particular

16    case?

17    A    It is an internal report.

18    Q    Okay.  Now, turning to the end of that report, does it

19    help refresh your memory exactly how many people were in

20    those ten groups?

21    A    There are 32 names on this -- in this report.

22    Q    And of those 32 names, is Dr. Alvarez-Machain's name

23    among them?

24    A    No, it is not.

25    Q    And at any time during the Zacatecas operation, did

150

1    you have any information that Dr. Machain was involved in

2    the narcotics trafficking in Zacatecas?

3    A    No.

4    Q    Now, turning to the aftermath of the Camarena

5    kidnapping, approximately what day did you really confirm

6    in your mind that something was wrong and that Agent

7    Camarena was missing?

8    A    Oh, I think as soon as I heard from Agent Wallace that

9    he hadn't arrived home.  Because that was not common

10   behavior for him, and there was an atmosphere of tension.

11   Q    And as soon as that occurred, you spoke to higher ups

12   in the D.E.A. in the United States in Washington?

13   A    I reported it to my immediate supervisor about --

14   probably about 7:30 that morning, eight o'clock.

15   Q    And you mentioned your resources in that office.  Did

16   you get increased authorization to spend resources for

17   information that would help you solve the Camarena

18   kidnapping and ultimately murder?

19   A    Increased funding?

20   Q    For example, were you authorized to put out rewards

21   for information in the Guadalajara community?

22   A    About -- I believe about ten days following the

23   kidnapping or perhaps a little less.  A reward was offered.

24   Q    How much was that reward for?

25   A    I believe it was $50,000.

151

1    Q     Was that reward publicized to the Guadalajara

2    community?

3    A     Yes, it was.

4    Q     How was it publicized?

5    A     I'm sure it was put in the newspaper.

6    Q     So the D.E.A. made it well known to everybody in the

7    area that --

8              THE COURT:   Counsel, it sounds like the same

9    question.

10   BY MR. RUBIN:

11   Q     Did they put out television advertisements as well?

12   A     I don't recall, sir.

13   Q     Now, turning to the cooperation of the Mexican

14   government you talked about, the first information you

15   received about 881 Lope de Vega was from Mexican police; is

16   that correct?

17   A     It was relayed from the Mexican authorities to me,

18   yes.

19   Q     D.E.A. didn't discover that address on their own; that

20   was given to them?

21   A     That is correct.

22   Q     Subsequently you were able to confirm the information

23   that the Mexican authorities gave you that Agent Camarena

24   had been at that location?

25   A     Yes.

152

1   Q    When was the first date, if you know, that D.E.A.

2   authorities went to 881 Lope de Vega?

3   A    April.  I believe it was the 12th, I think.

4   Q    So it was more than two months after the events that

5   D.E.A. agents actually were able to go in to 881 Lope de

6   Vega, search it, and look for evidence; true?

7   A    Yes.

8   Q    Now, prior to that time, had that home been secured or

9   had a police line put around it, or kept pristine in any

10  way that you are aware of?

11  A    Prior to what time, sir?

12  Q    Prior to April 12th of 1985?

13  A    Prior to the time the D.E.A. agents got there?

14  Q    Correct.

15  A    When the D.E.A. agents first arrived at the place, it

16  was in the custody of the Mexican Federal Judicial Police.

17  Q    Do you know what date the Mexican police took custody

18  of that property?

19  A    I would imagine a day or two prior to that, at the

20  most.

21  Q    So you would agree with me then that it was in the

22  custody of no law enforcement official for a period of two

23  months between the time Agent Camarena was there and the

24  time it went into law enforcement authorities --

25          MR. CARLTON:  Objection.  Lack of foundation.

153

1   Speculation.

2          MR. RUBIN:  -- that you are aware of?

3          MR. CARLTON:  Irrelevant.

4          THE COURT:  The witness has already answered the

5   question.  You need not put his answer into the form of a

6   question and state it again.  Once is enough.

7   BY MR. RUBIN:

8   Q    Did you participate in the search of 881 Lope de Vega?

9   A    Yes, sir, I was there.

10  Q    What portions of the house did you search?

11  A    Well, I and the other D.E.A. agents who were there,

12  really were following the lead of the FBI people who had

13  been brought in because they were, and are, very expert at

14  what they do.  We were --

15  Q    Okay.  So the search was really conducted by FBI and

16  you were there accompanying them --

17  A    Yes, sir.

18  Q    -- is that a fair statement?

19  A    Yes, sir.

20  Q    Was there a phone, a telephone at 881 Lope de Vega

21  when you participated or accompanied the FBI in the search?

22  A    Yes, there was.

23  Q    Did you subsequently obtain phone records for that

24  telephone?

25  A    Yes.

154

1           MR. RUBIN:  Nothing further.  Thank you.

2           THE COURT:  Redirect?

3           MR. CARLTON:  Yes, Your Honor.

4                    REDIRECT EXAMINATION

5    BY MR. CARLTON:

6    Q    Mr. Kuykendall, recalling Exhibit 157, the materials

7    that Mr. Zuno sent to you, did you read those materials?

8    A    Yes, I did.

9    Q    Was there something about them that struck you as

10   unusual?

11          MR. MEDVENE:  Objection.  Calls for a conclusion,

12   Your Honor.

13          THE COURT:  Overruled.  You may answer.

14          THE WITNESS:  Well, all of the information on

15   there -- most of the information on there, names and

16   addresses, phone numbers, were people in the California

17   area.

18   BY MR. CARLTON:

19   Q    When you met with Mr. Zuno in 1986, what was your

20   assignment within D.E.A.?

21   A    I was the resident agent in charge of the D.E.A.

22   Office in Laredo, Texas.

23   Q    During what time period were you assigned to that

24   office?

25   A    Until March of 1989.

155

1    Q    You mentioned that in response to a question of Mr.

2    Rubin, that at the time you received information about

3    Agent Camarena's abduction, there was an atmosphere of

4    tension.

5            What did you mean by that?

6    A    There had been threats and violence against D.E.A.

7    agents and our sources.

8    Q    Had this atmosphere changed over time?

9    A    I believe that it was.  We felt more tense as the days

10   went by.

11   Q    During what period were you feeling this tension?

12   A    From early 1984.

13   Q    When you first arrived at the Lope de Vega residence,

14   were the M.F.J.P. there?

15   A    Yes, they were.

16   Q    What was going on at the house when you first arrived?

17   A    There was a television camera crew across the street.

18   They already had TV cameras set up on the front of the

19   house.  And Comandante Brusolo was there with several

20   Mexican Federal Judicial Police agents, and there were

21   some, appeared to be laborers, who were cleaning up the

22   grounds.  But outside of that, people were just sort of

23   standing around.  They had been advised we were coming.

24           MR. CARLTON:  May I have a moment, Your Honor?

25           THE COURT:  Yes.

156

1              (Government counsel confer.)

2    BY MR. CARLTON:

3    Q      During the time that you were the resident agent in

4    charge in Laredo, were you assigned to the Camarena

5    investigation on a regular basis?

6    A      I participated.  I'm not -- I didn't -- I wasn't

7    reassigned to a geographical location.

8    Q      You weren't in charge of the investigation?

9    A      No, sir, I was not.

10             MR. CARLTON:  Your Honor, at this point, I would

11   also move Exhibits 1, 2 and 6 in, which I don't believe I

12   moved in previously.  The maps.

13             THE COURT:  Yes, they may be received.

14             (Exhibits 1, 2 and 6 received.)

15             MR. CARLTON:  Nothing further.

16             THE COURT:  Any further questions?

17             MR. MEDVENE:  No, Your Honor.

18             MR. RUBIN:  No, Your Honor.

19             THE COURT:  You may step down.

20             (Witness excused.)

21             THE COURT:  Call the next witness.

22             MR. CARLTON:  Your Honor, the parties have entered

23   into a stipulation, which I would like to read into the

24   record at this time, if I could.

25             THE COURT:  All right.  Ladies and gentlemen of

157

1   the jury, a stipulation is an agreement between the

2   parties, and whatever they have stipulated to here you may

3   accept as fact and consider it as part of the evidence in

4   this case.

5       You may read the stipulation.

6       MR. CARLTON:   This is stipulation Number One:

7       "If called and sworn as a witness, Mrs. Enrique

8       Camarena would testify as follows:   On the

9       morning of February 7th, 1985, her husband,

10      Enrique Camarena, left their residence in

11      Guadalajara, Jalisco, Mexico, to go to work.

12      She never again saw him alive.   Mrs. Camarena

13      had a luncheon appointment with her husband on

14      February 7th, 1985, at approximately 2:00 p.m.

15      He never appeared for that appointment.

16      "Mrs. Camarena called D.E.A. Special Agent

17      Victor Wallace by telephone at approximately

18      6:30 a.m. on February 8th, 1985, and informed

19      him that Enrique Camarena had not returned home

20      the previous evening.   Agent Wallace was the

21      first person with whom Mrs. Camarena spoke

22      about this matter.

23      "Mr. and Mrs. Camarena were planning to leave

24      Guadalajara at the end of February, 1985 because

25      Enrique Camarena was to be transferred to the

158

1          D.E.A. office in San Diego, California at the

2          beginning of March, 1985.

3          "The voice of Enrique Camarena can be heard

4          on Exhibits 152 and 153, responding to questions

5          asked by other persons."

6          That's it.

7          THE COURT:  Very well.  That becomes part of the

8   evidence in this case.

9          Call your next witness.

10         MR. MEDRANO:  Your Honor, at this time, the

11  government calls Salvador Leyva to the stand.

12         (Witness summoned to courtroom.)

13         THE CLERK:  Please raise your right hand.

14         SALVADOR LEYVA, PLAINTIFF'S WITNESS, SWORN

15         THE WITNESS:  I do.

16         THE CLERK:  Please be seated.

17         State your full name for the record, and spell

18  your last name.

19         THE WITNESS:  Salvador Leyva, L-E-Y-V-A.

20                  DIRECT EXAMINATION

21  BY MR. MEDRANO:

22  Q    Mr. Leyva, are you a special agent with the D.E.A.?

23  A    Yes, sir.

24  Q    How long have you been a D.E.A. agent?

25  A    For about ten years.

159

1    Q     Any law enforcement experience prior to your becoming

2    a D.E.A. agent?

3    A     Yes, sir.  Los Angeles Police Officer for about

4    two-and-a-half years.

5    Q     Anything else?

6    A     I worked for the U.S. Customs Office for the port of

7    entry.

8    Q     How long did you do that?

9    A     Another two years.

10   Q     Are you fluent in Spanish?

11   A     Yes, sir, I am.

12   Q     Both oral and written skills?

13   A     Yes, sir.

14   Q     Let me direct your attention to about February of

15   1985, Mr. Leyva.  Where were you stationed at or about that

16   time?

17   A     At the time, I was stationed in Mexico, in Acapulco,

18   Mexico.

19   Q     For any particular reason that you were assigned

20   there?

21   A     Yes, sir.  I was part of the Operation Vanguard, which

22   was an operation between the United States and Mexico for

23   the eradication of poppy fields, marijuana fields.

24   Q     Was there any D.E.A. representative who headed up this

25   Operation Vanguard?

160

1   A    Yes, sir.  In Mexico City, it was Charlie Lugo.

2   Q    Now, Mr. Leyva, let me direct your attention more

3  specifically to on or about February 8 of 1985.  On that

4  particular time, are you still in Mexico?

5   A    Yes, sir, Acapulco.

6   Q    What happened?

7   A    I received a call from Charlie Lugo that afternoon and

8  told me to report to our office in Mexico City, because

9  Special Agent Enrique Camarena was missing.

10   Q    Did you go to Mexico City?

11   A    Yes, sir.

12   Q    How did you get there?

13   A    We flew.

14   Q    Upon your arrival, are you brought up to speed on the

15  status of the missing agent?

16   A    Yes, sir, I believe --

17       THE COURT:  You have answered the question.

18       THE WITNESS:  Yes, sir.

19  BY MR. MEDRANO:

20   Q    Now let me direct your attention to the following day,

21  February 9 of 1985.

22   A    Yes, sir.

23   Q    Are you still in Mexico City?

24   A    Yes, sir.

25   Q    Do you ever leave Mexico City?

161

1    A    Yes, sir.

2    Q    Where do you go?

3    A    We flew from Mexico City to Guadalajara.

4    Q    What time did you arrive in Guadalajara?

5    A    Approximately 4:00, 4:30 A.M.

6    Q    On February 9th?

7    A    Yes, sir.

8    Q    Upon your arrival, I take it, at the airport in

9    Guadalajara?

10   A    Yes, sir.

11   Q    Where do you go from there?

12   A    We went directly to the U.S. Consulate in Guadalajara.

13   Q    Incidentally, when you flew from Mexico City to go to

14   Guadalajara, was anyone with you?

15   A    Yes, sir.

16   Q    Who, Mr. Leyva?

17   A    From the D.E.A., Charlie Lugo and two or three D.E.A.

18   agents; from the M.F.J.P., which is the Mexican Federal

19   Judicial Police, I had Comandante Brusolo, and about 20 or

20   more Mexican Federal Judicial Police officers.

21   Q    And were there any other D.E.A. agents that

22   accompanied you from Mexico City to Guadalajara?

23   A    Yes, sir.

24   Q    In addition to Lugo, I mean?

25   A    Yes, sir.

162

1   Q     All right.   You arrived at the airport February 9th.

2   What happens next?

3   A     We drove to the U.S. Consulate in Guadalajara.

4   Q     And then?

5   A     From there we went directly to the Mexican Federal

6   Judicial Police Office, which is located a few blocks from

7   the Consulate.

8   Q     February 9, 1985, was there more than one M.F.J.P.

9   office in Guadalajara?

10  A     Not to my knowledge.

11  Q     Did anyone else from the D.E.A. accompany you to the

12  M.F.J.P. office?

13  A     Yes, sir.   Charlie Lugo and all the agents -- I can't

14  recall their names -- and also Jaime Kuykendall, I believe.

15  Q     And Jaime is known as James Kuykendall?

16  A     That is correct.

17  Q     And in February of 1985, what is Mr. Kuykendall's

18  title or position?

19  A     He was the resident agent in charge of the Guadalajara

20  D.E.A. office.

21  Q     What's the next thing that happens now that you are at

22  the M.F.J.P. office, Agent Leyva?

23  A     We waited and half an hour later, approximately,

24  comandante -- Premier Comandante Armando Payon-Reyes

25  arrived.

163

1   Q    Let me stop you there.  "Premier comandante," is

2  "premier" translated "first" or "one"?

3   A    First comandante.

4   Q    First Comandante?

5   A    Comandante.

6   Q    Do you know what a "premier" or first comandante is?

7   A    Yes, sir.

8   Q    What is that, Agent Leyva?

9   A    Basically that means that he is in charge of a very

10  large area, and he has under him a lot of people.

11   Q    And does a premier comandante answer to anybody or

12  report to anybody?

13   A    Yes, sir.

14   Q    To who?

15   A    To the director of M.F.J.P. at that time, I believe it

16  was Mr. Ibarra.

17   Q    To your knowledge, do you know how many premier

18  comandantes there were in Mexico when you were there in

19  February of '85?

20   A    To the best of my knowledge, probably about 20.

21   Q    What happens next, still at the M.F.J.P. office?

22   A    We requested the assistance of M.F.J.P. to locate

23  Enrique Kiki Camarena.

24   Q    Do you know a man by the name of Armando Pavon-Reyes?

25   A    Yes, sir.

164

1   Q    Who is this?

2   A    He was the premier comandante in charge of the

3   Camarena investigation in Guadalajara.

4   Q    Okay.  Did you see him at the M.F.J.P. office?

5   A    Yes, sir.

6   Q    If I can direct you to your right, Agent Leyva, there

7   should be a stack of exhibits already set up for you.

8   A    Yes, sir.

9   Q    Do you see Exhibit 17 there, and can you hold it up,

10   point it towards me, and can you tell me who that is?

11   A    This is Comandante Armando Pavon-Reyes.

12        MR. MEDRANO:  Your Honor, I would seek the

13   admission of Exhibit 17.

14        THE COURT:  It may be admitted.

15        (Exhibit 17 received in evidence.)

16        MR. MEDRANO:  You can set that down, Agent Leyva.

17   BY MR. MEDRANO:

18   Q    In February of 1985, Agent Leyva, who was the director

19   of the M.F.J.P.?

20   A    To the best of my recollection, Manuel Ibarra.

21   Q    Agent Leyva, with the arrival of Comandante Pavon, do

22   you make any requests of him once he arrives?

23   A    Yes, sir.  We made several requests and gave him

24   information as to the possible whereabouts of Kiki Camarena

25   that day.

165

1  Q    Did Pavon-Reyes act on the information provided by you

2  and other agents?

3  A    No, sir.

4  Q    What did he do?

5  A    Nothing.

6  Q    Was this frustrating to you and other D.E.A. agents?

7  A    Yes, sir.

8  Q    Are you in effect just waiting around?

9  A    We waited and waited and kept requesting, and asking,

10 and begging.

11 Q    Would Pavon act?

12 A    No, sir.

13 Q    What happens next, Agent Leyva?

14 A    Just waited all day, sir.

15 Q    At some point, do you end up leaving the M.F.J.P.

16 office in Guadalajara?

17 A    Yes, sir.

18 Q    Well, tell us what happens?

19 A    Approximately one o'clock, two o'clock, Comandante

20 Pavon told me that he needed approximately 10, 15 cars in

21 order to act, and to do whatever we were requesting to do.

22 Q    Was that request a surprise to you in any way?

23 A    Yes, sir.

24 Q    Why is that?

25 A    Because outside of the M.F.J.P. office, I could see

166

1   all kinds of cars, 10, 15, 20 cars that belonged to the

2   agents that had arrived that -- during the day with the

3   M.F.J.P. personnel.

4   Q      Did you do anything in response to Pavon's request to

5   you?

6   A      Yes, sir.

7   Q      What was that, Agent Leyva?

8   A      I went and I rented about 15, 20 vehicles from, I

9   believe, Avis Rent-A-Car.

10  Q      Once they were rented, what happened to the vehicles?

11  A      After we rented, we -- I got the assistance from

12  M.F.J.P. personnel and D.E.A. and brought them back to the

13  the D.E.A. -- I mean to the M.F.J.P. office in Guadalajara.

14  Q      Approximate time, now, if you know, on February 9th?

15  What is the approximate time?

16  A      This time probably around 2:30, 2:45.

17  Q      Did anything happen after you rented the vehicles?

18  A      Yes, sir.  Comandante Pavon gave the order to all the

19  personnel to get in the cars and to follow him.

20  Q      Is this done?

21  A      Yes, sir.

22  Q      At any point, do you ask Pavon where you are going?

23  A      Yes, sir.  Before I got into one of the cars, I asked

24  him where are we going so I could report this to my

25  supervisor, at the time, Jaime, James Kuykendall.

167

1   Q    Did he answer you?

2   A    No, sir.

3   Q    Do you end up entering one of the cars that you had

4   obtained?

5   A    Yes, sir.

6   Q    Is anyone in the vehicle with you?

7   A    In the vehicle -- we actually were the second vehicle.

8   It was driving Comandante Espino.  Next to him was Agent

9   Licenciado Savedra, behind Comandante Brusolo and myself.

10  Q    Let me stop you there.  You said Licenciado Savedra.

11  Would you tell us what "Licenciado Savedra" means in

12  English?

13  A    Normally Licenciado in Mexico is somebody who has a

14  license to practice law or any other type of -- just a

15  license, Licenciado Savedra.

16  Q    So if you had an engineering license, you could still

17  be called Licenciado?

18  A    That's correct.

19  Q    What agency was Savedra associated with?

20  A    I.P.S.

21  Q    Can you tell us what I.P.S. is?

22  A    Investigaciones Politicos y Sociales, which means

23  investigation dealing with political and social issues.

24  Q    Is it comparable to any American agency that you are

25  aware of?

168

1    A    Possibly the C.I.A.

2    Q    Now, you mentioned that Mr. Brusolo, Comandante

3    Brusolo, was in the car as well?

4    A    Yes, sir.

5    Q    And what agency is he with?

6    A    M.F.J.P., Mexican Federal Judicial Police.

7    Q    Other than Pavon, I take it he's in his own vehicle?

8    A    Pavon is in the vehicle leading, yes, in the front.

9    Q    You're in the second car?

10   A    Yes, sir.

11   Q    Any other cars tagging along?

12   A    Twenty or more cars, a caravan.

13   Q    Going together?

14   A    Yes, sir.

15   Q    Where do you go?

16   A    Well, we left the M.F.J.P. office, and we went

17   directly to a gas station.  Some of the cars needed to be

18   gassed up.

19   Q    Who paid for the gas?

20   A    I did.

21   Q    When you're at the gas station, do you ever ask anyone

22   where you're going?

23   A    Again, I was in the second car.  Comandante Pavon came

24   to the window and asked me for money, and I asked him,

25   "Where are we going?"  No response.

169

1    Q    After the cars gassed up, do you leave together again?

2    A    Yes, sir.

3    Q    Can you tell us where you went?

4    A    Went directly to the Guadalajara International Airport

5    hangers, the private section.

6    Q    How long a drive from the gas station to the airport?

7    A    Approximately 20 minutes.

8    Q    Now, what happens upon your arrival at the airport,

9    Agent Leyva?

10   A    We arrived at the airport, went into the private area

11   where they keep the private aircraft.  Comandante Pavon

12   stops his vehicle.  We all stop one behind another.  And he

13   got out of the vehicle.

14   Q    What happened to the rest of you?

15   A    We all got out of our vehicles.

16   Q    Now, are there M.F.J.P. agents that had also

17   accompanied Pavon-Reyes to the airport?

18   A    Yes, sir.

19   Q    Are they armed?

20   A    Yes, sir.

21   Q    Do you recall the types of weapons they had?

22   A    They had what I would call AR-15's, semi-automatic

23   weapons.

24   Q    Is that a long weapon or a rifle?

25   A    Yes, sir.

170

1    Q     And is that an automatic or semi-automatic weapon?

2    A     Semi-automatic weapon.

3    Q     And just very briefly, tell us the difference between

4    an automatic and a semi-automatic.

5    A     A semi-automatic weapon, what you do, every time that

6    you press the trigger, one bullet will go off.  And the

7    fully automatic, every time you press the trigger, many

8    bullets come out.

9    Q     As in a machine gun, for example?

10   A     That's correct.

11   Q     Pick up from the moment that Pavon gets out of his

12   vehicle, what happened from there?

13   A     Comandante Pavon gets out of the vehicle very fast.

14   We stopped.  A lot of confusion.  And he shouted, "Camara

15   Circulo" which means "chamber a round," and everybody did,

16   and it was a lot of noise, metal-type noise. Q    As rounds

17   were being chambered?

18   A     Yes, sir.

19   Q     In the weapons that the agents, the M.F.J.P. agents

20   were carrying?

21   A     Yes, sir.

22   Q     And bear with me, but when you "chamber a round," what

23   does that do in effect with regard to a weapon?

24   A     What it does, you chamber the round, and it goes into

25   the area where the bullet can be actually fired.

171

1    Q     And does this make some sort of noise when that

2    happens?

3    A     Loud noise.

4    Q     Incidentally, were you armed when you arrived at the

5    airport, Agent Leyva?

6    A     Yes, sir.

7    Q     What are you carrying?

8    A     .38 revolver, Smith and Wesson, six shot.

9    Q     What happens after everyone finishes chambering a

10   round?

11   A     Comandante Pavon ran to where a Falcon Jet was parked,

12   and we -- I ran behind him and everybody ran towards that

13   area.

14   Q     Approximately what distance did you run?

15   A     Thirty, thirty-five feet.

16   Q     Feet or yards?

17   A     I'm sorry, yards, I think.

18   Q     Did the Falcon Jet have any kind of identification on

19   it?

20   A     In the tail, I think it had the number XD-Boy-VRB,

21   letters.

22   Q     Do you observe anyone near the vicinity of the Falcon

23   Jet when you arrived there?

24   A     The Falcon was here, and I observed around seven,

25   eight people looking towards us, and pointing machine guns.

172

1   Q     Pointing at who?

2   A     Us, in our direction.

3   Q     What happens next, Agent Leyva?

4   A     We got closer.  I was right behind Comandante Pavon,

5   and Comandante Pavon gave them the order.  He said, "Drop

6   your weapons."  It was like a motion, "Drop your weapons."

7         They said, "No, you drop yours," and they -- we

8   were ready to enter into a shooting.  It was a standoff.

9   Q     A confrontation?

10  A     Confrontation, I'm sorry.

11  Q     Now, these seven or eight men, they were armed; is

12  that correct?

13  A     Yes, sir.

14  Q     Do you recall what type of weapons they had, Agent

15  Leyva?

16  A     They had the Russian or Red China made AK-47's.

17  Q     Is there a term or slang for that in Spanish?

18  A     Cuerno Cabrio.

19  Q     Which literally translated means what?

20  A     Goat's --

21  Q     Horn?

22  A     -- horn.

23  Q     Do you know why it's called a goat's horn?

24  A     Because the magazine, when the normal magazine is --

25  if this is the weapon, it comes -- it goes like this

173

1    (indicating), in a semi-round oval.

2    Q    Like a horn?

3    A    Like a horn.

4    Q    Well, were these automatic weapons that these seven or

5    eight men held?

6    A    Yes, sir.

7    Q    Is there anything unique about the magazine that was

8    used to hold the ammunition for these weapons?

9    A    Yes, sir.  I never seen this before.  They had a drum

10   about this big (indicating), black drum in the bottom.

11   Q    Attached to the weapon?

12   A    Attached to the weapon.

13   Q    And you're familiar with firearms, I take it?

14   A    Yes, sir.

15   Q    Is that where the ammunition is held?

16   A    That is correct.

17   Q    And you'd never seen a round like this before?  Pardon

18   me, a magazine like this before?

19   A    Not before, no.

20   Q    Now, typically, a normal magazine for this goat's horn

21   weapon holds how many rounds?

22   A    Thirty.

23        MR. MEDVENE:  Objection.  Your Honor, letting this

24   go on.  It is totally irrelevant.

25        THE COURT:  Yes.  Sustained.

174

1      MR. MEDRANO:  I'll move on, Your Honor.  Thank

2   you.

3   BY MR. MEDRANO:

4   Q    Let's go back to the confrontation, Agent Leyva.  What

5   happens as both sides are yelling at each other?

6   A    Rafael Caro-Quintero asks who is the comandante in

7   charge of our group.

8   Q    Was there any response?

9   A    Yes.  Pavon said that he was.

10  Q    Let me direct you, again, to your right, Exhibit 19-A.

11  A    18-A?

12  Q    19-A.

13      THE COURT:  You should have somebody assist the

14  witness.  It might save time.

15      MR. MEDRANO:  Very well, Your Honor.  If, with the

16  Court's permission, may I have Agent Berrellez stand right

17  next to Mr. Leyva?

18      THE COURT:  Yes.

19  BY MR. MEDRANO:

20  Q    Could you hold that up for me, sir, and tell me what

21  that is?

22  A    A picture, sir.

23  Q    Of?

24  A    Rafael Caro-Quintero.

25      MR. MEDRANO:  Your Honor, we seek its admission at

175

1      this time.

2                  THE COURT:  It may be admitted.

3                  (Exhibit 19-A received in evidence.)

4      BY MR. MEDRANO:

5      Q     Agent Leyva, what happens after Pavon says he's in

6      charge?

7      A     He walked to where Rafael Caro-Quintero was, and they

8      talked a little bit.  I couldn't hear what they were

9      saying.  Then they turned around and went behind of the

10     leer jet.

11     Q     What are they doing there?

12     A     What they did, they talked.

13     Q     Let me take you back a moment to the other armed men

14     protecting the jet.  Were you able to subsequently

15     recognize any of those men?

16     A     Yes, sir.

17     Q     Can you give me a name?

18     A     Bernabe.

19     Q     I'm going to ask you to look at Exhibit 163.  Hold

20     that up toward me, and tell me what that is, please.

21     A     Yes, sir.  This is the man that I -- one of the men

22     that I saw at the airport.  Bernabe.

23     Q     Is this Bernabe?

24     A     Yes, sir.

25                  MR. MEDRANO:  You can put that down.

176

1        Your Honor, we seek its admission.

2        THE COURT:   It may be admitted.

3            (Exhibit 163 received in evidence.)

4   BY MR. MEDRANO:

5   Q     Was he one of the armed men?

6   A     Yes, sir.

7   Q     Was he pointing a gun at you?

8   A     He was pointing the gun directly at me.

9   Q     Now, at this point, can you tell us the distance

10  between the armed men and the rest of the M.F.J.P. agents

11  and yourself?

12  A     Ten yards, no more than that.   About 20 feet.

13  Q     Before Caro-Quintero goes to speak to Pavon-Reyes, he

14  was in the company of his armed men?

15  A     Yes, sir.

16  Q     Where was he in relation to the other men?

17  A     He was in the middle.

18  Q     And Mr. Bernabe was where in relation to

19  Caro-Quintero?

20  A     He was on the right of Rafael Caro-Quintero.

21  Q     Now, let's pick it up where you have Pavon and Caro a

22  way -- near the airplane, is that correct?

23  A     Yes, sir.

24  Q     And they were talking there long?

25  A     No.   Couple two, three minutes.

177

1   Q   Okay.   Then what happens next?

2   A   They shook hands, and embraced, and walked back to the

3   original place where they started.

4   Q   At any point, do you receive any orders from Pavon?

5   A   All of us, to put the weapons down.

6   Q   The M.F.J.P.?

7   A   M.F.J.P., yes.

8   Q   Did they comply?

9   A   Yes, sir.

10  Q   Caro's men, did they put their weapons down?

11  A   No, sir.

12  Q   What's the next thing that happens, Agent Leyva?

13  A   After they talked for a couple of minutes, Comandante

14  Pavon turned around and started walking in a -- towards the

15  office of a hanger, and Caro-Quintero walked and just

16  leaned on a station wagon, white station wagon, that was

17  parked right next to the jet.

18  Q   Any plates on that station wagon?

19  A   No plates, to my recollection.

20  Q   And Caro-Quintero is at that station wagon?

21  A   Yes, sir.   He's just leaning on the front part of the

22  station wagon.

23  Q   What had happened to Pavon-Reyes?

24  A   Pavon-Reyes started walking towards the hangers,

25  toward the office.

178

1    Q    All right.   What happens next?

2    A    Caro-Quintero shouted to one of his men, says, "I want

3    you to call the comandante.   I want to know what the hell

4    is going on here."

5         And at this point, I saw Comandante Pavon going

6    into the office and ordering two of his agents to stay

7    outside and to guard the main door, and I followed him.

8    Q    You followed Pavon?

9    A    Yes, sir.

10   Q    Let me take you back to Caro-Quintero.   Was anyone

11   with him near that station wagon?

12   A    There was a man with a shotgun.

13   Q    Was he pointing the shotgun at anyone?

14   A    He was pointing the shotgun at us, in our direction.

15   Q    At any point did he ever lower his weapon?

16   A    No, sir.

17   Q    Now, where specifically did Pavon walk to after

18   talking to Caro-Quintero?

19   A    To the office.   There's an M.F.J.P. office at the

20   hangers.

21   Q    Now, Agent Leyva, had you been to that M.F.J.P. office

22   at the hanger before?

23   A    A couple of times, yes, sir.

24   Q    Before we get to that office, I want you to describe

25   for us Caro-Quintero in terms of what he was wearing?

179

1   A    Rafael Caro-Quintero was wearing a lot of, an

2   excessive amount of jewelry on his chest, and a bracelet on

3   his right arm about probably four or five-inch bracelet,

4   impressed with diamonds, rubies, and I could see the

5   initials "R-1," "R-1."

6   Q    What was that inscribed in?

7   A    I beg your pardon?

8   Q    R-1 was written?

9   A    In the bracelet, and he also had a .45 -- well, I

10  could see just the handles of a -- what appeared to be a

11  semi-automatic .45 with a lot of diamonds and also rubies.

12  Q    If I can ask you to turn to Exhibit 20 to your right

13  there.  Can you tell me what that is?

14  A    Yes, sir.

15  Q    What is it?

16  A    This is the bracelet that Rafael Caro-Quintero was

17  wearing that day.

18  Q    At the airport?

19  A    Yes, sir.

20          MR. MEDRANO:  Please put it down.

21          Your Honor, we move its admission.

22          THE COURT:  It may be admitted.

23          (Exhibit 20 received in evidence.)

24  BY MR. MEDRANO:

25  Q    Pick up where you follow Pavon to the hanger, please.

180

1    A    Yes, sir.

2    Q    Start from there.

3    A    I followed Pavon.  His men attempted to stop me.  I

4    just went in.  And when I got to where Pavon was, he was

5    looking away from me and he had the telephone in his ear.

6    Q    Was he saying anything?

7    A    He was just saying, "Yes, sir.  Yes, sir.  Yes, sir,"

8    about three or four times with a lot of respect.

9    Q    And Pavon's back was to you?

10   A    Yes, sir.

11   Q    Did he know you were there?

12   A    No, sir.

13   Q    What happened next, Agent Leyva?

14   A    He hung up the phone, turned around, saw me, and he

15   was surprised and got really upset.

16   Q    What happened?

17   A    He went to where his men were located, the two guards,

18   and told them -- asked them why they allowed me to go in.

19   Q    What were his exact words, if you recall.

20              THE COURT:  Isn't that sufficient?

21              MR. MEDRANO:  Very well, Your Honor.  I'll move

22   on.

23   BY MR. MEDRANO:

24   Q    Was there any response to that inquiry?

25   A    Yes, sir.  They told him that they thought that I was

181

1    with Comandante Pavon.

2    Q    What happens next, Agent Leyva?

3    A    I followed Pavon back to where the jet is located, the

4    Falcon Jet.

5    Q    What happens when Pavon gets there?

6    A    Again, he shakes hands with Rafael Caro-Quintero.

7    They embraced.  They walked back to the tail of the jet.

8    Q    Go ahead.

9    A    They talked for little bit again.  They seemed to be

10   very happy.  They embrace again, and come back to their

11   original -- where they started.

12   Q    Were you able to see a pilot or anyone else for that

13   aircraft?

14        MR. BLANCARTE:  Objection, Your Honor.  This

15   doesn't have anything to do with either of these two

16   defendants.

17        THE COURT:  Sustained.

18   BY MR. MEDRANO:

19   Q    All right.  Well, what happens next then after they

20   return from their talk?

21   A    After they returned?

22   Q    From the tail end of the aircraft.

23   A    They greeted and said goodbye, and Caro-Quintero

24   ordered a couple of his men to get in the jet.

25   Q    What happens next?

182

1  A    I -- one of Pavon's men shouted to a female that was

2  in the cockpit and said, "Where is the comandante -- where

3  is the captain of this airplane?"

4       And the girl came down the airplane with her hands

5  raised and said, "Don't shoot.  Don't shoot.  I'll bring

6  him."

7       So she -- then she left and brought back the

8  captain of the aircraft, and got in the cockpit of the

9  aircraft and they started the engines.

10 Q    Were either of those two persons ever questioned in

11 your presence?

12 A    No, sir.

13 Q    Does Caro-Quintero at any point get into this Falcon

14 Jet?

15 A    Yes, sir.  After his two men got into the jet, he got

16 into the jet, and then came out to the main door.

17 Q    I don't understand.  What do you mean "came out to the

18 door"?

19 A    He just stood in the door, the open door, and holding

20 champagne, drink a little bit, and the AK-47 in his left

21 hand, and shouted, "My children, next time bring better

22 weapons," while toasting at us.

23 Q    When that is going on, is the aircraft moving at all?

24 A    Very, very slowly.

25 Q    It's taxiing?

183

1   A     Taxiing slowly.

2   Q     Did you see anyone else inside the aircraft as this is

3   happening?

4   A     I saw a man of about 50 years old, wearing a dark

5   leisure suit, dark complex.

6   Q     Mr. Leyva, did the Falcon Jet depart from the

7   Guadalajara Airport?

8   A     Yes, sir.

9   Q     Did anyone make any effort to stop that aircraft?

10  A     No, sir.

11  Q     What happened to the man who was near the station

12  wagon with the shotgun?

13  A     They departed also with the rest of the men.

14  Q     If I can ask you to look at Exhibits 18-A and B.  18-A

15  first, what is that, sir?

16  A     This is the Falcon Jet that Caro-Quintero left the

17  airport in Guadalajara.

18  Q     Look at 18-B as well, please.

19  A     This is also the jet.

20        MR. MEDRANO:  Your Honor, we move the admission of

21  both at this time.

22        THE COURT:  They may be admitted.

23        (Exhibits 18-A and 18-B received in evidence.)

24  BY MR. MEDRANO:

25  Q     Agent Leyva, that book in front of you -- before I

184

1     forget -- can you turn to Exhibit 19-B.

2     A    Yes, sir.

3     Q    And just tell me what that is, sir.

4     A    This is a photo of Rafael Caro-Quintero.

5             MR. MEDRANO:  You can close the book.

6             Your Honor, we seek the admission of 19-B as well.

7             THE COURT:  It may be admitted if it hasn't

8     already.

9             MR. MEDRANO:  Not that particular photograph, Your

10    Honor.

11            (Exhibit 19-B received in evidence.)

12    BY MR. MEDRANO:

13    Q    Mr. Leyva, at any point, did anyone from

14    Caro-Quintero's contingent show any kind of credentials to

15    you or Pavon-Reyes?

16    A    No, sir.

17    Q    When this was transpiring right in front of you, did

18    you know what Caro-Quintero looked like?

19    A    No, sir.

20    Q    Did you later learn that?

21    A    Yes, sir.

22    Q    When you're there, do you ask anyone who this guy is?

23    A    I asked -- when the jet was taxiing, I asked

24    Comandante Pavon who was that man with the bracelet and all

25    the gold, and he told me it was his good friend

185

1    comandante -- Comandante Rogelio Munoz.

2    Q    Was he referring to Caro-Quintero?

3    A    Yes, sir.

4    Q    Ultimately, Agent Leyva, do you end up leaving the

5    vicinity of the airport?

6    A    Yes, sir, I left.

7    Q    By yourself?

8    A    No.  Again, with Comandante Brusolo, Espino, and

9    Savedra.

10   Q    Did you have any conversation with those men when you

11   were in the car?

12   A    Yes, sir.  Comandante Brusolo told me, "You know,

13   Leyva, you know and I know that some of our men are on the

14   take.  We can't take these mafiasos into our office because

15   they will retaliate later."

16   Q    Agent Leyva, let me direct your attention now to on or

17   about February 12 of 1985, sir.  At that date, are you

18   still in the City of Guadalajara?

19   A    Yes, sir, I am.  I was.

20   Q    And are you still part of the investigative team

21   concerning Camarena's disappearance?

22   A    Yes, sir.

23   Q    Do you receive any particular assignment on February

24   12, Agent Leyva?

25   A    Yes, sir.

186

1  Q    What was that, sir?

2  A    I was told that Ramon Matta-Ballesteros was staying at

3  a hotel in Guadalajara, the Plaza del Sol area, and I was

4  requested to go undercover and to rent a room.

5  Q    Did you, in fact, go to that hotel?

6  A    Yes, sir.

7  Q    By yourself?

8  A    No, with another agent.

9  Q    Who?

10  A    Aguilar, I can't recall the first name.

11  Q    What happens when you arrived at the hotel?

12  A    We arrived to the hotel.  I observed about

13  approximately 15 men in the hotel, armed guards.

14  Q    What particular area of the hotel do you see them?

15  A    They were in different areas.  They were next to the

16  elevators, and in the lobby and scattered around.

17  Q    And, again, are you there looking for anyone?

18  A    For Rafael -- Ramon Matta-Ballesteros.

19  Q    Who happens next, Agent Leyva?

20  A    After my partner got a room, we walked to where our

21  room was located.

22  Q    What floor were you on?

23  A    Well, what we did, I was -- we then took the elevator,

24  punched every single floor to make -- to find out where

25  Ramon Matta-Ballesteros was located.  And --

187

1   Q    Very well.   Then what happened?

2   A    We finally observed on the 7th Floor, to the best of

3   my recollection, there were a lot of armed men, and our

4   room was on the 8th Floor.

5   Q    What did you surmise from finding all of these armed

6   men on that floor?

7   A    That Ramon Matta-Ballesteros was staying at that

8   floor.

9   Q    Okay.   Ultimately you go to your hotel room?

10  A    Yes, sir.

11  Q    What happens next, Agent Leyva?

12  A    I called our surveillance personnel, or I called the

13  office of the D.E.A., and just gave them information about

14  our room number and all of that.

15  Q    What did you do next?

16  A    I was told to go -- well, Agent Aguilar --

17           THE COURT:   Counsel, is all this detail necessary?

18           MR. MEDRANO:   I'll move it along, Your Honor.

19           THE COURT:   Get to the point.

20           MR. MEDRANO:   Very well.

21  BY MR. MEDRANO:

22  Q    Agent Leyva, at any point, do you have to go down

23  stairs to this hotel?

24  A    Yes, sir.

25  Q    While there, do you see anybody?

188

1    A    Yes, sir.

2    Q    Who is it that you observed?

3    A    I observed Ramon Matta-Ballesteros in the lobby of the

4    hotel.

5    Q    Was he by himself, sir?

6    A    No, sir, with some bodyguards.

7    Q    And were those bodyguards armed?

8    A    Yes, sir.

9    Q    Can I ask you to look at Exhibit 49 to your right

10   there?  Hold that up towards me and tell me what that is,

11   sir?

12   A    This is a picture of Ramon Matta-Ballesteros.

13            MR. MEDRANO:  Thank you.  You can put it down.

14            Your Honor, we seek its admission.

15            THE COURT:  It may be admitted.

16            (Exhibit 49 received in evidence.)

17   BY MR. MEDRANO:

18   Q    After seeing Matta downstairs, do you go back up to

19   your room?

20   A    Yes, sir.

21   Q    Subsequently, sir, did you end up terminating your

22   surveillance at that hotel?

23   A    Yes, sir.

24   Q    One final thing, Agent Leyva:  Operation Vanguard, you

25   participated in that program?

189

1   A   Yes, sir.

2   Q   And again, what was the purpose of the program?

3   A   The eradication of marijuana fields.

4   Q   When did you participate in it?

5   A   On February -- January, February, 1985.

6   Q   And when participating, where were you based out of?

7   A   Acapulco, Mexico.

8   Q   Did it require overhead flights?

9   A   Yes, sir.

10  Q   And did you participate in those flights?

11  A   Yes, sir.

12  Q   Where specifically?  What area?

13  A   We were at Eltitui.

14  Q   Spell that, please.

15  A   E-L-T-I-T-U-I.

16  Q   And you were based out of there?

17  A   Yes, sir.

18  Q   Where would you do the flights over?

19  A   We would fly in the State of Guerrero.

20  Q   When you did these flights, who accompanied you?

21  A   The pilot, a member of the M.F.J.P. that will take

22  care of the maps, an M.F.J.P. officer with a machine gun,

23  and myself.

24  Q   Would you ever go up on these overflights with a real

25  or printed map?

190

1   A      Yes, sir.

2   Q      When you did that, would you fly over the area of

3   Guerrero?

4   A      Yes, sir.

5   Q      Looking for what?

6   A      For fields, marijuana fields.

7   Q      And if you found a field, what would you do with that

8   information?

9   A      What we would do, we would mark in the map, and check

10  the coordinates to come back on a later date, and

11  eradicate.

12  Q      And eradicate it in what way?

13  A      By chemicals.

14  Q      Now, were there ever occasions, Agent Leyva, that you

15  went up, same flights, but with a different sort of map?

16  A      They were handmade, hand drawn maps.

17  Q      Were these flights any different from the other types

18  of flights you described?

19  A      Yes, sir.

20  Q      In what way?

21  A      Well, in the first flight, we will comb the area in

22  looking for the fields.  With the handmade maps, they will

23  take us to where they wanted us to see the fields.  So they

24  already had them picked.

25  Q      You would go directly to those areas?

191

1    A    Yes, sir.

2    Q    Would you comb the other areas as you used to with the

3    other printed maps?

4    A    No, sir.

5         MR. BLANCARTE:  Objection, Your Honor, relevance.

6         MR. MEDRANO:  Your Honor, this ties into an

7    upcoming witness.

8         THE COURT:  This has been covered before.

9         MR. MEDRANO:  Well, after this, Your Honor, this

10   ties into an upcoming witness.  I'll be out of here in one

11   minute, Your Honor.

12        THE COURT:  All right.

13        MR. MEDRANO:  That's the sole purpose for it.

14   Thank you.

15   BY MR. MEDRANO:

16   Q    With the hand drawn maps you would not comb the entire

17   area?

18   A    No, sir.

19   Q    You would go just to the specific areas marked on the

20   map?

21   A    Directly with the next.

22   Q    Did that strike you as unusual, if and when that

23   happened?

24   A    Yes, sir.

25   Q    Why is that, sir?

192

1  A    Because I would protest.  And I said we have to cover

2  the whole area, and they said, no, just -- we have

3  information that marijuana fields are there, and therefore,

4  we are going, and that was the end of that.

5  Q    The hand drawn maps, on occasion did you ever find

6  marijuana?

7  A    Yes, sir.

8  Q    What size quantities?

9  A    Very little.  Very little, small quantities, and the

10  plants were very small.

11          MR. MEDRANO:  May I have just one moment, Your

12  Honor?

13              (Government counsel confers.)

14  BY MR. MEDRANO:

15  Q    Finally, Agent Leyva, when you're up, what type of

16  aircraft would you go in?

17  A    We used a Cessna, I believe it was 212, but it was

18  enough for four or five people.

19          MR. MEDRANO:  That concludes direct.

20          Thank you, Your Honor.

21          THE COURT:  Do you have any questions?

22          MR. MEDVENE:  I have no questions.

23          MR. RUBIN:  One question.

24                  CROSS-EXAMINATION

25  BY MR. RUBIN:

193

1    Q     Agent Leyva, were you ever able to identify the woman

2    that was on the plane?

3    A     Yes, sir.

4    Q     What was her name?

5    A     I can't recall.

6            MR. RUBIN:  No further questions.

7            THE COURT:  You may step down.

8            THE WITNESS:  Thank you, Your Honor.

9                    (Witness excused.)

10           THE COURT:  Call the next witness.

11           MR. MEDRANO:  Your Honor, at this time we call

12   Michael Acuna to the stand, Your Honor.

13           (Witness summoned to courtroom.)

14           THE CLERK:  Please raise your right hand.

15           MICHAEL ACUNA, PLAINTIFF'S WITNESS, SWORN

16           THE WITNESS:  I do.

17           THE CLERK:  Please be seated.

18           State your full name for the record, and spell

19   your last name.

20           THE WITNESS:  Miguel R. Acuna, A-C-U-N-A.

21                    DIRECT EXAMINATION

22   BY MR. MEDRANO:

23   Q     Sir, are you employed by the D.E.A.?

24   A     Yes, sir, I am.

25   Q     Are you a special agent?

194

1    A    Yes, sir, I am.

2    Q    How long have you served with the D.E.A.?

3    A    Twenty years.

4    Q    What is your current assignment?

5    A    I'm a Group Supervisor at the Atlanta Field Division

6    of the Drug Enforcement Administration.

7    Q    Are you fluent in Spanish?

8    A    Yes, sir, I am.

9    Q    Oral and written skills?

10   A    Yes, sir.

11   Q    Have you ever worked in Mexico, Mr. Acuna?

12   A    Yes, sir, I have.

13   Q    When was that?

14   A    Between 1980 and 1985.

15   Q    Let me direct your attention to April of 1984.  Where

16   were you assigned at that time?

17   A    I was assigned to the Mexico City office.

18   Q    In February of 1984, did you ever have any assignments

19   dealing with surveillance of targets out of your office?

20   A    April of 1984?  Yes, sir, I did.

21   Q    What was your assignment in April?

22   A    In April, I was assigned to go to Guadalajara, City of

23   Guadalajara, and assist in some surveillance of some

24   certain residences that we needed to locate.

25   Q    Does anyone assist you in Guadalajara when you do

195

1   this?

2   A     Yes, sir.  On April of that year, I went to

3   Guadalajara and met with Agent Roger Knapp, and we set out

4   to locate a certain address or a certain dwelling that we

5   believed to be an office use by Miguel Felix-Gallardo.  We

6   had the number and the street name, and we went to the

7   general area to try to locate this office.

8   Q     What was that street name?

9   A     Chimalpopoca.

10   Q     Did you proceed to that area?

11   A     Yes, sir.  It's located in -- near the southwest end

12   of the City of Guadalajara, and we took a vehicle, and we

13   drove up to that area, and we started looking for the

14   number that matched the address we were looking for,

15   Chimalpopoca, until eventually we located the dwelling.  We

16   found it.

17   Q     What kind of car were you in, sir?

18   A     We were in a four-door Crown Victoria.

19   Q     Who was driving?

20   A     Roger Knapp, Agent Roger Knapp, was driving it.

21   Q     Did you have any kind of method when you were trying

22   to find this location?

23   A     Yes.  The reason we wanted to locate the house, and

24   the way we did that particular surveillance was that we had

25   the number and the name of the street.  And by previous

196

1    surveillances, we had gone to the street and realized that

2    the street numbers did not follow a numerical sequence.

3    They kind of jumped back and forth.

4            So that particular time, we decided to go to one

5    end of the street and just follow the street until we

6    actually located that number, which is what we eventually

7    did.

8    Q    By the way, were you dressed in civilian clothes at

9    that time?

10   A    Yes, sir, we were.

11   Q    And now your vehicle, were there any police markings

12   on it of any sort?

13   A    No.  It was normal, everyday-type of vehicle that

14   would blend in with the surroundings.

15   Q    Now, give us a time frame of the day when you are

16   doing this?

17   A    Early afternoon.

18   Q    Now, what do you observe while doing your

19   surveillance?

20   A    After we located the address, we didn't want to be

21   noticed by anyone, so we just drove by the address, and

22   then we made a couple of blocks and -- with the intent of

23   going by the address again to further look at the place.

24           As we were doing that, we approached the Street of

25   Chimalpopoca and another street about -- running

197

1  perpendicular to Chimalpopoca.  As we come to that

2  intersection, we yielded to three vehicles that were coming

3  directly in front of us on Chimalpopoca.  They proceeded on

4  Chimalpopoca, and as they passed, we made a left turn and

5  we got right behind them.

6  Q    Can you describe any those three vehicles you saw?

7  A    The one was a white Mustang.  The other one was a

8  four-door Grand Marquis.

9  Q    What happened next?

10 A    The --

11       MR. RUBIN:  Your Honor, I will object on relevance

12 grounds.

13       THE COURT:  Well --

14       MR. MEDRANO:  I'll go through this very quickly,

15 Your Honor.

16       THE COURT:  Let's get to point.

17       MR. MEDRANO:  Very well, Your Honor.

18 BY MR. MEDRANO:

19 Q    After you spot the vehicles, does any of the vehicles

20 do anything?

21 A    Yes, sir.  The two other vehicles proceeded by the

22 address.  One of the vehicles stopped and backed into

23 the -- one of the garages of the addresses we were looking

24 at, the subject address.

25       And we -- since we were already behind those

198

1   vehicles, we continued in going around the street, and as

2   we passed by the garage that had opened and let the vehicle

3   go into, I observed the driver of the car being Miguel

4   Felix-Gallardo.

5   Q    I'm going to ask you to turn -- stand up to pick up

6   the exhibit that's leaning on that cart.  Keep going

7   straight.  There you go.  Exhibit 104.  Can you hold that

8   up toward me and tell what that is?

9   A    This is a picture of Miguel Felix-Gallardo.

10          MR. MEDRANO:  You can put that down.  Thank you,

11  sir.

12          Your Honor, we move its admission.

13          THE COURT:  It may be admitted.

14          (Exhibit 104 received in evidence.)

15  BY MR. MEDRANO:

16  Q    Now, sir, did anything unusual happen after you saw

17  Felix-Gallardo back into that residence?

18  A    As soon as we saw that, Mr. Roger Knapp said we'd

19  better move out of the area because Miguel Felix-Gallardo

20  probably saw us.  So we immediately began driving out of

21  the immediate area.

22          As we were driving out of the area, he makes a

23  second comment to the effect that he felt that we'd been

24  followed by the white Mustang that we had earlier seen.  I

25  mentioned to Mr. Knapp that we should be very careful

199

1    because in all likelihood Felix-Gallardo did observe us.

2              So as we were driving out, I also told Roger Knapp

3    that we'd better -- I'd better open the glove compartment

4    and let the radio, the two-way radio we had in the car

5    become visible, and in the event we got stopped, so we had

6    some type of a story to tell these people, so we would not

7    look like we were the police or doing anything we are not

8    supposed to be doing in that area.

9    Q    At any point, are you stopped?

10   A    Yes, sir, very shortly.

11   Q    Who stops you?

12   A    Very shortly thereafter, the occupants in the white

13   Mustang signaled us with guns, coming out of the -- out of

14   their windows to stop.  We proceeded to stop.  Once we

15   stopped, I got out of the vehicle.  About the same time,

16   the people in the white Mustang were coming out of their

17   vehicle.  They had their guns visible.  There was four

18   people, all of them had weapons.

19             I approached one of them.  One of them approached

20   me.  We both asked, almost at the same time, for

21   identification.  They told me they were D.F.S. agents, that

22   they worked for the police.  They were conducting a

23   political investigation near the area, and they were

24   wondering who we were.  We identified ourselves as

25   employees of the American Consulate in Guadalajara.

200

1        I showed them my Diplomatic Identification I carry

2   with me.  They were satisfied.  We were satisfied.  We got

3   in our car and we left.

4   Q    You were allowed to leave at that point?

5   A    Yes, sir, we were.

6   Q    Very well, sir.

7        Finally, let me ask you to turn to one more area.

8        You were assigned to assist in the Camarena

9   investigation in February of '85?

10  A    Yes, sir, I was.

11  Q    And as part of that, were you involved in the searches

12  of any residences in Guadalajara?

13  A    Yes, sir, I was.

14  Q    And specifically, sir, did you have occasion to go to

15  a residence located on Street Mixcoatal, M-I-X-C-O-A-T-A-L?

16  A    Yes, sir, I did.

17  Q    And why did you go to that residence?

18  A    Well, at the time, we were looking for any leads that

19  might lead us to the location of Agent Camarena.  He had

20  been missing for a few days by that time, and our main

21  purpose in doing these searches was trying to locate

22  Camarena, or anything that might lead us to his location.

23  So to that end, we proceeded to search this residence and

24  on --

25  Q    Who did this residence belong to?

1   A    The residence belonged to Miguel Felix-Gallardo.

2   Q    When you got there, was anyone at the house?

3   A    Yes.  The woman identified as Miguel Felix's wife was

4   in the residence.

5   Q    Was this a large house?

6   A    Yes, sir, it was a very large house.  Large grounds.

7   Had a swimming pool, tennis courts, a two story building,

8   rooms quite large.

9   Q    Is the house ultimately searched, Agent?

10   A    Yes, sir.  We secured the house, and we had a lot of

11   agents there, and some of the agents proceeded to search

12   the residence according to a plan we had formulated earlier

13   in the day.

14   Q    Did you, yourself, Agent Acuna, participate in the

15   search?

16   A    Yes, sir.  I participated in the search, specifically

17   in the area of a library that was part of the house.  And I

18   directed my search exclusively to a large desk that was

19   located inside the library.

20   Q    What did you find there, sir?

21   A    I found several photographs, other business cards,

22   invoices, regular paperwork that you would normally find in

23   a desk.

24   Q    And what did the business cards reflect?

25   A    Business cards, numerous businesses in which Miguel

202

1   Felix was listed as the owner.  They included flower shops,

2   fertilizer companies, real estate investments, that kind of

3   a thing.

4   Q    And you mentioned you found photographs; is that

5   correct?

6   A    Yes, sir.  We found several photographs in the inside

7   of the desk in the center drawer, primarily.

8   Q    Photographs of what, sir?

9   A    Several of the individuals that had been targeted for

10  investigation under Operation Padrino.

11  Q    For example?

12  A    Miguel Felix's picture was there.  Juan Ramon

13  Matta-Ballesteros, Herman Harper, Tomas Valles-Corral,

14  Donaldson's picture.  There was many, many pictures in

15  there.

16  Q    Did you ever find any photograph of Matta with Felix

17  in the same photograph?

18  A    Yes, sir, we did.

19  Q    Look at that black book directly in front of you.

20  Would you look at exhibit -- that black binder right in

21  front of you -- Exhibit 21, sir.  Did you find the exhibit?

22  A    Yes, sir, I did.

23  Q    Can you tell me what that is?

24  A    That's the -- a copy of the actual picture that I

25  found in the desk of Miguel Felix-Gallardo that day.

203

1    Q    What does it depict?

2    A    It depicts Ramon Matta-Ballesteros and Felix-Gallardo

3    in the same picture, leaning against the four-door Rolls

4    Royce.

5              MR. MEDRANO:  You can put that down.

6              Your Honor, we seek its admission at this time.

7              THE COURT:  It may be admitted.

8                 (Exhibit 21 received in evidence.)

9              MR. MEDRANO:  May I have just one moment?

10                  (Government counsel confer.)

11             Your Honor, that concludes direct.

12             THE COURT:  Any questions?

13                      CROSS-EXAMINATION

14   BY MR. MEDVENE:

15   Q    You didn't find any business cards of Mr. Zuno in the

16   search of Felix-Gallardo's house, did you?

17   A    No, sir, I did not.

18   Q    No pictures of Mr. Zuno, did you?

19   A    No, sir, I did not.

20   Q    No reference of any kind to Mr. Zuno in any telephone

21   books or whatever, did you?

22   A    No, sir.

23             MR. MEDVENE:  Thank you.

24             THE COURT:  Do you have any questions, Counsel?

25                      CROSS-EXAMINATION

204

1    BY MR. RUBIN:

2    Q      Did you find any photographs of Dr. Machain in the

3    search?

4    A      No, sir, I did not.

5    Q      Find any business cards of Dr. Machain?

6    A      No, sir.

7    Q      Find any reference to Dr. Machain in your search?

8    A      No, sir.

9              MR. RUBIN:  No further questions.

10                    (Witness excused.)

11             THE COURT:  We will adjourn at this time, ladies

12   and gentlemen, and reconvene tomorrow morning at 9:30.

13             Please keep the Court's admonition in mind.  I

14   remind the jury of its obligation not to discuss this case

15   with each other or with anyone else, not to form or express

16   any opinion or conclusion about this case, and to avoid all

17   exposure to any publicity about this case:  Newspaper,

18   radio, or television.  I depend on you to do that.

19             You may be excused.

20             THE CLERK:  Please rise.

21             (Proceedings adjourned.)

22                  *   *   *   *   *   *

23   //

24   //

25   //

205

1     I, MARY TUCKER, CSR, do hereby certify that

2     the foregoing transcript is true and correct.

3

4

5     *Mary Tucker*                        6-17-93

6     MARY TUCKER, CSR                     DATE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25