15-98

1   WITNESS LIST AND ELIMINATE ANY OTHER CUMULATIVE WITNESSES.

2   IT IS PARTICULARLY A SIN TO PRESENT CUMULATIVE EVIDENCE OF

3   UNDISPUTED FACTS.

4           MR. GURULE:  FINE, YOUR HONOR.  WE APOLOGIZE TO

5   THE COURT AND WE WILL STRIVE HARDER TO AVOID THAT.

6           THE COURT:  NOW, WHAT OTHER MATTERS DID YOU WISH

7   TO BRING UP TO THE COURT?

8           YOU MAY STEP DOWN.

9           MR. PANCER:  AFTER MR. TARLOW IS FINISHED, I

10  HAVE A MATTER.

11          THE COURT:  YES.

12          MR. TARLOW:  WE HAVE BEEN TRYING, YOUR HONOR,

13  FOR AT LEAST A COUPLE OF WEEKS, AND CERTAINLY LAST WEEK --

14  MR. RANDOLPH HAS SENT A LETTER TO THE GOVERNMENT TO GET

15  THE EXHIBITS, THE ORIGINALS OF THE EXHIBITS OF EVERY PIECE

16  OF PAPER THAT WAS SEIZED IN COSTA RICA BY THIS AGENT AS

17  BEING PART OF THE CASE IN ORDER TO CROSS-EXAMINE THE

18  AGENT, SHOW HIM THE EXHIBITS, AND INTRODUCE THE ORIGINAL

19  OF THE EXHIBIT INTO EVIDENCE.

20          FOR EXAMPLE, THE ONE CARD THAT HE SHOWED -- HE

21  HAS GOT A CARD WHICH HAS NUMBERS WHICH ARE RELATIVE TO

22  THIS CASE.  THIS IS ONE PHONE NUMBER FOUND AMONG THOUSANDS

23  OR HUNDREDS OF PHONE NUMBERS, AND THE ANSWERS THAT WE NEED

24  TO FIND OUT, AND IT IS NOT THAT DIFFICULT BUT SOMEHOW

25  THERE HAS BEEN A PROBLEM.  NO. 1, HAVE WE SEEN EVERY PIECE

15-99

1   OF PAPER THAT HAS BEEN SEIZED IN COSTA RICA IN CONNECTION

2   WITH THIS CASE?  AND I THINK WE CAN BE TOLD YES OR NO.

3   AND IF NO, THEN WE HAVE TO FIND OUT WHAT THERE IS LEFT AND

4   WHY WE ARE NOT GETTING IT BECAUSE IT WAS SEIZED HAVING TO

5   DO WITH PROVING THESE CHARGES.

6          THE SECOND POINT IS WHERE ARE THE ORIGINALS OF

7   ANY OF THESE OTHER DOCUMENTS THAT ARE AVAILABLE SO I CAN

8   QUESTION THIS WITNESS ABOUT THESE OTHER DOCUMENTS AND

9   INTRODUCE THE OTHER DOCUMENTS INTO EVIDENCE?  IT OUGHT NOT

10  TO BE A VERY DIFFICULT TASK, AND I DON'T KNOW WHAT THE

11  OBSTACLE IS IN GETTING IT DONE.

12          THE COURT:  DO YOU WISH TO RESPOND TO THAT?

13          MR. GURULE:  ONCE AGAIN THIS IS ANOTHER CASE OF

14  MR. TARLOW EXAGGERATING IN TERMS OF WHAT HIS EFFORTS HAVE

15  BEEN AND THEN MINIMIZING WHAT THE GOVERNMENT'S EFFORTS

16  HAVE BEEN IN TERMS OF PROVIDING FULL DISCOVERY IN THIS

17  CASE.  WE HAVE MR. TARLOW CROSS-EXAMINING A WITNESS ABOUT

18  DOCUMENTS THAT HAVE BEEN SEIZED AND SO ON, ATTEMPTING TO

19  MISLEAD THE JURY RELATIVE TO WHAT THE GOVERNMENT HAS

20  DISCLOSED.

21          MR. TARLOW FAILS TO ADMIT VERY CONVENIENTLY THAT

22  THE GOVERNMENT HAS DISCLOSED NUMEROUS DOCUMENTS AND IN MY

23  OPINION ALL OF THE DOCUMENTS THAT WERE SEIZED AT THE LA

24  QUINTA RESIDENCE, INCLUDING TWO ADDRESS BOOKS, INCLUDING

25  PHOTOCOPIES OF EACH AND EVERY ONE OF THE BUSINESS CARDS

15-100

1   THAT WERE FOUND AT LA QUINTA, AND IN MY OPINION AGAIN,

2   HAVING SPOKEN TO THE AGENT WHO WAS INVOLVED IN THE SEARCH,

3   HAVING SPOKEN TO HEADQUARTERS IN WASHINGTON, D.C., THESE

4   WERE IN FACT THE DOCUMENTS THAT WERE SEIZED.

5          AS TO THE QUESTION OF THE ORIGINALS, SOME OF THE

6   ORIGINALS ARE WITH THE COSTA RICAN AUTHORITIES, AND THEY

7   HAVE GIVEN US COPIES, AND THAT IS WHAT WE HAVE.

8          THE COURT:  YOU HAVE GIVEN THEM EVERYTHING THAT

9   YOU HAVE THAT WAS SEIZED IN THAT CASE DOWN THERE WHERE HE

10  WAS ARRESTED?

11         MR. GURULE:  YES, YOUR HONOR.  AGAIN I HAVE

12  TAKEN EFFORTS TO SPEAK WITH THE AGENT WHO WAS INVOLVED IN

13  THE SEARCH, AND I HAVE GONE FURTHER AND SPOKEN TO DEA

14  HEADQUARTERS TO SEE IF THERE ARE ANY ADDITIONAL DOCUMENTS

15  BACK THERE.  AGAIN I DON'T KNOW WHAT ELSE I CAN DO

16  REGARDING THAT.

17         MR. TARLOW:  WELL, I ACCEPT HIS REPRESENTATION.

18  YOUR HONOR, IF HE IS SAYING --

19         THE COURT:  WELL, YOU WON'T ACCEPT HIS

20  REPRESENTATION --

21         MR. TARLOW:  I DO, AS LONG AS HE IS SAYING --

22         THE COURT:  YOU KEEP ASKING THESE WITNESSES AND

23  TRYING TO --

24         MR. TARLOW:  JUDGE, MR. RANDOLPH WENT UP AND

25  SPENT TIME UP THERE AND COULDN'T GET ANSWERS TO THESE

15-101

1   QUESTIONS.  WE SENT THEM A LETTER ABOUT IT.  IF HE IS

2   SAYING -- IF WHAT HE IS TELLING US NOW, THAT IS ALL I

3   NEEDED WAS A DEFINITIVE ANSWER, ALL THE PAPERS SEIZED AT

4   COSTA RICA --

5            THE COURT:  THAT IS WHAT HE SAID.

6            MR. TARLOW:  -- WE HAVE GOT.  NOW, HE DID SAY LA

7   QUINTA, AND NOT THE OTHER RESIDENCE.  BUT IF HE MEANS WE

8   HAVE ALL THE PAPERS SEIZED, THAT IS ALL.  I DON'T HAVE ANY

9   PROBLEM WITH THAT IF THAT IS WHAT HE IS TELLING US.

10           THE COURT:  THAT IS WHAT HE SAYS.

11           MR. GURULE:  THAT IS CORRECT.

12           MR. TARLOW:  ALL RIGHT.  THAT IS THE END OF THAT

13  QUESTION.  NOW THAT WE KNOW THAT WE HAVE RECEIVED IN

14  DISCOVERY EVERY DOCUMENT THAT WAS SEIZED, WHERE ARE THE

15  ORIGINALS SO THEY CAN BE USED WITH THE WITNESS.

16           THE COURT:  WELL, HE STATED IN HIS STATEMENT

17  THAT SOME OF THE ORIGINALS ARE IN COSTA RICA WITH THE

18  COSTA RICAN GOVERNMENT.

19           DID YOU PROVIDE THE ORIGINALS?

20           MR. GURULE:  WE DID A COUPLE OF THINGS.  WE MADE

21  COPIES OF EVERYTHING THAT WE HAVE THAT WERE TAKEN FROM THE

22  LA QUINTA RESIDENCE.  FURTHERMORE, WE HAVE INVITED DEFENSE

23  COUNSEL TO COME IN AND VIEW THE ORIGINALS OF THE DOCUMENTS

24  THAT WE HAVE.  THEY HAVE COME IN AND THEY HAVE DONE THAT.

25  THEY HAVE TAKEN ADVANTAGE OF THAT.

15-102

1    MR. TARLOW: I WOULD LIKE THE ORIGINALS BROUGHT

2    DOWN TO COURT. I DON'T KNOW HOW TO GET THEM HERE. I WANT

3    TO LOOK AT THEM AND SHOW THEM TO THE WITNESS AND ASK HIM,

4    "DID YOU FIND THIS WHEN YOU DID THAT SEARCH? DID YOU FIND

5    THIS PIECE OF PAPER? WHAT ABOUT THIS PIECE OF PAPER?" I

6    WANT TO GET THEM IN EVIDENCE.

7    THE COURT: WHAT DO THE ORIGINALS PROVIDE THAT

8    THE COPIES DO NOT?

9    MR. GURULE: I AM AT A LOSS, YOUR HONOR.

10    FURTHER, THIS LETTER THAT MR. TARLOW IS REFERRING TO THAT

11    HE SENT THE GOVERNMENT THAT WE FAILED TO RESPOND TO I

12    FOUND ON MY TABLE --

13    MR. TARLOW: I DIDN'T --

14    MR. GURULE: -- WHEN I CAME IN THIS MORNING. WE

15    HAVE MR. TARLOW TRYING TO CREATE THE IMPRESSION WITH THE

16    COURT THAT THE GOVERNMENT IS DOING SOME EVIL DEED TO TRY

17    TO SUPPRESS EVIDENCE. THIS IS JUST ANOTHER OF MANY

18    ATTEMPTS OF THIS BY MR. TARLOW THAT THE GOVERNMENT IS

19    OBJECTING TO, IT IS TIRED OF, AND I THINK IT IS TOTALLY

20    UNPROFESSIONAL.

21    MR. TARLOW: LET'S GET BACK TO WHAT WE ARE

22    TALKING ABOUT. I AM TRYING TO GET THE ORIGINALS. HE

23    INTRODUCED AN ORIGINAL EXHIBIT FOR THE EXHIBITS HE IS

24    USING. IF I WANT TO PUT IN EXHIBITS, I CERTAINLY HAVE THE

25    RIGHT TO HAVE THE ORIGINALS IN THE COURTROOM AND SEE WHAT

15-103

1   THE ORIGINALS ARE LIKE AND TO SEE --

2         THE COURT:  HE SAID YOU WERE INVITED TO REVIEW

3   ALL THE ORIGINALS.

4         MR. TARLOW:  I WANT THEM HERE TO USE THEM.  I

5   CAN'T GET THEM OUT OF THE U.S. ATTORNEY'S OFFICE.

6         THE COURT:  TELL ME SPECIFICALLY WHAT YOU WANT

7   TO USE.

8         MR. TARLOW:  THE PAPERS THAT WERE SEIZED WITH

9   THE PHONE NUMBERS ON THEM.

10        THE COURT:  THAT IS TOO GENERALIZED.  WHAT IS IT

11  YOU NEED?  YOU HAD THE OPPORTUNITY --

12        MR. TARLOW:  THE PHONE BOOKS.

13        THE COURT:  YOU HAVE SEEN ALL THE EXHIBITS.

14        MR. TARLOW:  PHONE BOOKS AND ALL PIECES OF PAPER

15  AND CORRESPONDENCE WITH PHONE NUMBERS ON THEM IS WHAT I

16  WANT.

17        THE COURT:  LOOK, I HAVE TOLD YOU BEFORE THAT

18  THE TIME TO HAVE DONE THIS DISCOVERY WAS BEFORE THE TRIAL

19  STARTED.  THESE EXHIBITS WERE MADE AVAILABLE TO YOU PRIOR

20  TO THE TIME THAT THE TRIAL STARTED.  I AM NOT GOING TO

21  ALLOW THE USE OF THE TRIAL FOR A FISHING EXPEDITION.

22        MR. TARLOW:  NOTHING TO DO WITH FISHING, YOUR

23  HONOR.  I WANT TO PUT THEM IN EVIDENCE.  HOW DO I PUT THEM

24  IN EVIDENCE?

25        THE COURT:  SPECIFY WHAT YOU WANT TO PUT INTO

15-104

1    EVIDENCE.

2              MR. TARLOW:  THE PAPERS SEIZED AT LA QUINTA.

3              THE COURT:  THAT IS NOT SUFFICIENT.  YOU HAVE TO

4    MAKE A MORE SPECIFIC SHOWING, AND IF YOU CANNOT, THEN THAT

5    IS THE END OF IT.

6              MR. TARLOW:  I WILL MAKE A MORE SPECIFIC SHOWING

7    RIGHT NOW.

8              THE COURT:  DO IT.

9              MR. TARLOW:  TWO PHONE BOOKS SEIZED AT LA

10   QUINTA.

11             THE COURT:  YOU MEAN ADDRESS BOOKS?

12             MR. TARLOW:  ADDRESS BOOKS WITH PHONE NUMBERS IN

13   THEM.

14             THE COURT:  HAS COUNSEL BEEN PROVIDED WITH

15   COPIES OF THAT?

16             MR. GURULE:  HE CERTAINLY HAS, YOUR HONOR.

17   MONTHS AGO.  AS EARLY AS FEBRUARY.

18             MR. TARLOW:  YES, I HAVE.

19             THE COURT:  HAVE YOU EXAMINED THE ORIGINALS?

20             MR. TARLOW:  I DON'T KNOW IF WE HAVE SEEN THE

21   ORIGINALS OR NOT.  WE HAVE SEEN THE COPIES.

22             THE COURT:  DO YOU KNOW IF THERE IS ANYTHING

23   DIFFERENT ABOUT THE ORIGINALS?

24             MR. TARLOW:  NO, I DO NOT KNOW THAT THERE IS

25   ANYTHING DIFFERENT ABOUT THE ORIGINALS OTHER THAN IT IS AN

15-105

1   ORIGINAL EXHIBIT, AND THAT IS WHAT I SHOULD PUT INTO

2   EVIDENCE.  WHY SHOULD I HAVE TO DEAL WITH COPIES --

3          THE COURT:  THAT IS TRUE.  THE ORIGINALS ARE

4   GENERALLY WHAT ARE PUT IN EVIDENCE, AND NOT COPIES.

5          MR. GURULE:  AGAIN, I JUST NEED TO KNOW, YOUR

6   HONOR, WHAT IT IS SPECIFICALLY THAT MR. TARLOW WANTS.

7          THE COURT:  HE SAYS HE WANTS THE PHONE BOOKS.

8          MR. GURULE:  FINE.  I UNDERSTAND THAT FOR THE

9   FIRST TIME.

10          THE COURT:  WHAT ELSE DO YOU WANT?

11          MR. TARLOW:  I WANT THE DISCOVERY GIVEN NUMBERS

12   538 TO 564.  I MEAN, THESE ARE THE NUMBERS THAT HE PUT IN

13   HIS OWN DISCOVERY:  THE ORIGINALS OF THE DOCUMENTS 538 TO

14   564.

15          THE COURT:  ALL RIGHT.  DO YOU KNOW WHAT THOSE

16   ARE?

17          MR. GURULE:  I'D HAVE TO TAKE A LOOK AT THE

18   DISCOVERY.  I AM NOT SURE MR. TARLOW KNOWS WHAT THEY ARE.

19          MS. BROOKS:  I HAVE THEM RIGHT HERE.

20          THE COURT:  JUST A MOMENT.

21          MR. TARLOW:  I HAVE THEM RIGHT HERE.

22          THE COURT:  JUST A MOMENT.  HAVE THESE BEEN

23   OFFERED BY THE GOVERNMENT?

24          MR. GURULE:  NO.

25          THE COURT:  DO YOU INTEND TO OFFER THESE?

15-106

1        MR. TARLOW:  YES, YOUR HONOR, CERTAIN OF THEM.

2        THE COURT:  ARE YOU STIPULATING THAT THEY MAY BE

3   RECEIVED IN EVIDENCE?

4        MR. TARLOW:  WHICH ONES ARE WE TALKING ABOUT?

5        THE COURT:  THE ONES YOU JUST IDENTIFIED AND

6   WANTED THE ORIGINALS FOR.  BECAUSE IF THERE IS NO

7   OBJECTION BY THE GOVERNMENT, I WILL RECEIVE THOSE IN

8   EVIDENCE.

9        MR. TARLOW:  LET ME JUST LOOK AND SEE WHAT I AM

10  STIPULATING TO.

11       MR. GURULE:  WE WOULD REQUEST AT LEAST THE NOON

12  HOUR TO REVIEW THEM AND SEE IF WE WOULD STIPULATE TO THEM.

13  IF THERE IS NO DISPUTE, WE WILL.

14       MR. TARLOW:  I THINK THE ANSWER IS YES, I AM

15  STIPULATING TO THE ONES MARKED 538 TO 564.

16       THE COURT:  YOU STIPULATE THAT THEY MAY BE

17  RECEIVED IN EVIDENCE?

18       MR. TARLOW:  YES, YOUR HONOR.

19       THE COURT:  ALL RIGHT.

20       MR. TARLOW:  I'D LIKE THE TWO PHONE BOOKS DOWN

21  HERE TO LOOK AT THEM BEFORE I STIPULATE TO THE ORIGINALS.

22  THERE IS SOME CORRESPONDENCE OR OTHER DOCUMENTS THAT I AM

23  LOOKING FOR.  ONE INVOLVES A MAN NAMED CARELA AND SOME

24  KIND OF AN AIRPLANE SALE DOCUMENT WHICH WAS FOUND THERE

25  INVOLVING THE SALE OF PLANES BY MY CLIENT TO CARO-

15-107

1   QUINTERO; SOME DOCUMENTS INVOLVING LAURA PERALTA, THE REAL

2   ESTATE WOMAN THAT SOLD THESE HOUSES; A DOCUMENT INVOLVING

3   CELMAN BARRENECHEA.  I BELIEVE IT RELATES TO A GATE AT THE

4   HOUSE.

5          OFF THE TOP OF MY HEAD, THOSE ARE THE DOCUMENTS

6   I AM LOOKING FOR.

7          MR. GURULE:  NOW WE KNOW.  WE WILL GET THOSE.

8          THE COURT:  FINE.  YOU PRODUCE THOSE.

9          MR. GURULE:  CERTAINLY, YOUR HONOR.

10         MR. TARLOW:  NOW, YOUR HONOR, THIS LIST THAT I

11  HAVE JUST GIVEN IS MY OFF THE TOP OF MY HEAD COMMENTS AS

12  TO WHAT I THINK THE DOCUMENTS ARE.  MR. GURULE IS TELLING

13  US THAT EVERYTHING IS THERE WE HAVEN'T DISCOVERED.

14         MR. GURULE:  I HAVE SAID IT TWICE.  I WILL SAY

15  IT AGAIN IF MR. TARLOW WANTS ME TO REPEAT IT.

16         MR. TARLOW:  IF WE CAN HAVE THOSE DOWN HERE AND

17  I CAN DEAL WITH THE WITNESS WITH THOSE DOCUMENTS IF THEY

18  COULD HAVE THEM DOWN HERE AT 1:30.

19         THE COURT:  HAVE THEM DOWN HERE.

20         MR. TARLOW:  YOUR HONOR ASKED ME ABOUT OTHER

21  MATTERS.  DOES YOUR HONOR WANT TO PROCEED WITH THOSE?

22         THE COURT:  BE BRIEF.

23         MR. TARLOW:  YES, YOUR HONOR.  YOUR HONOR HAS

24  SAID THAT YOU ARE DEALING WITH THIS TELEVISION BROADCAST.

25         THE SECOND THING IS WE HAVE A MOTION THAT HAS

15-108

1   BEEN PENDING FOR SOME TIME NOW.  I BELIEVE THE GOVERNMENT

2   HAS RESPONDED.

3           THE COURT:  WHAT IS THAT?

4           MR. TARLOW:  OKAY.  THIS IS REGARDING THE

5   COMPUTERIZED TOLL RECORD ANALYSIS.

6           THE COURT:  I AM NOT PREPARED TO RULE ON THAT.

7           MR. TARLOW:  THERE IS A REPLY THAT WE JUST FILED

8   ACTUALLY YESTERDAY, BUT THAT DOCUMENT IS MATERIAL TO

9   EXAMINING EVERY WITNESS THAT IS COMING UP FOR THE

10  GOVERNMENT, INCLUDING MR. DE LA TORRE.

11          THE COURT:  WHAT IS IT?  WHAT IS THE EXHIBIT?

12          MR. TARLOW:  THE GOVERNMENT HAS TAKEN TOLL

13  RECORDS WHICH RELATE TO THIS CASE.

14          THE COURT:  YES.

15          MR. TARLOW:  THEY HAVE TAKEN MANY, MANY RECORDS

16  WHICH WE DON'T HAVE, PUT THEM INTO A COMPUTER.

17          THE COURT:  ALL RIGHT.  I ASKED YOU WHAT IT WAS.

18          MR. TARLOW:  YEAH.

19          THE COURT:  AND YOU SAY THIS IS NECESSARY TO

20  CROSS-EXAMINE EVERY WITNESS?

21          MR. TARLOW:  NOT EVERY WITNESS, YOUR HONOR.  IT

22  IS MR. DE LA TORRE, MR. JAY DE LA TORRE, EVERY OTHER

23  INFORMANT.  NO, IT IS NOT EVERY WITNESS IN THE CASE, BUT

24  IT IS A WHOLE SERIES OF WITNESSES BECAUSE IT RELATES TO

25  THE TELEPHONE TRAFFIC AND WHO THEY ARE CALLING.

15-109

1        THE COURT:  WHAT IS THE POINT?

2        MR. TARLOW:  THE POINT IS THAT WHEN THE COURT

3   HAS AN OPPORTUNITY, I WOULD JUST LIKE THE COURT TO REALIZE

4   THAT THIS IS A PRESSING MATTER THAT WE OUGHT TO GET TO.

5        MR. GURULE:  I AM A LITTLE CONFUSED BECAUSE

6   RELATIVE TO THE TELEPHONE TOLL RECORDS, AGAIN THE

7   DISCOVERY THAT THE GOVERNMENT HAS MADE VERY EARLY ON IN

8   THIS CASE MR. TARLOW HAS RECEIVED COPIES OF ALL THE

9   TELEPHONE TOLLS FROM THE LA QUINTA RESIDENCE.  IT WOULD BE

10  CALLS MADE TO LOS ANGELES, INCLUDING CALLS MADE TO JESUS

11  FELIX-GUTIERREZ'S BUSINESS IN LOS ANGELES TO HIS

12  ASSOCIATES HERE IN LOS ANGELES.  HE DOES HAVE THOSE TO GO

13  AHEAD AND CROSS-EXAMINE THOSE WITNESSES.

14        NOW, HIS REQUEST THAT HE HAS FILED IN HIS MOTION

15  GOES WAY BEYOND THAT.  HE WANTS TELEPHONE TOLLS FROM THE

16  GOVERNMENT -- THERE IS NOT EVEN A TIME LIMIT ON IT.  ANY

17  CALL ASSOCIATED --

18        THE COURT:  WELL, THAT IS THE MOTION THAT IS

19  PENDING.

20        MR. GURULE:  THAT'S RIGHT.

21        THE COURT:  I WILL DEAL WITH THAT.  I DON'T WANT

22  TO HEAR ANY MORE ABOUT THAT NOW.

23        MR. TARLOW:  NO DISPUTE THAT I HAVE THE LA

24  QUINTA RECORDS, YOUR HONOR.  I AM NOT SAYING THAT.

25        THE COURT:  ALL RIGHT.

15-110

1          MR. TARLOW:  THE QUESTION OF BRADY AND PROBATION

2    REPORTS AND THE COURT EXAMINING THE --

3          THE COURT:  WHICH PROBATION REPORT?

4          MR. TARLOW:  ALL RIGHT.  FOR EXAMPLE, MR. DE LA

5    TORRE IS COMING UP.  HIS PROBATION REPORT AND THE

6    PROBATION FILE.  WE FILED A SUPPLEMENTAL BRIEF WITH A

7    NINTH CIRCUIT CASE WHICH SAYS THAT THE COURT SHOULD

8    EXAMINE --

9          THE COURT:  YES.

10          MR. TARLOW:  -- THE PROBATION FILE.

11          THE COURT:  WE HAVE ALREADY BEEN THROUGH THAT

12    WITH ANOTHER DEFENDANT.  I HAVE EXAMINED ANOTHER PROBATION

13    REPORT, CALDERON.

14          MR. TARLOW:  BUT I WANT TO BE SPECIFIC, YOUR

15    HONOR.  THE NINTH CIRCUIT CASE SAYS THE FILE.  IT DOESN'T

16    SAY THE REPORT.

17          THE COURT:  I HAVE READ THE CASE.

18          MR. TARLOW:  ALL RIGHT.  IF YOUR HONOR WOULD

19    JUST TAKE A LOOK AT THAT CASE, AND AS TO MR. DE LA TORRE

20    WE DO NEED THAT MATERIAL.  HE IS GOING TO BE TESTIFYING

21    THIS AFTERNOON.

22          THE COURT:  ALL RIGHT.

23          MR. TARLOW:  THE NEXT THING IS IN TERMS OF -- I

24    WANT TO GET CLEAR WHAT PROCEDURE YOUR HONOR WANTS TO

25    FOLLOW.  WE FILED A MOTION REGARDING JENCKS ACT, REGARDING

15-111

1   ROUGH NOTES, AND WHAT THE PROCEDURES ARE TO FIND OUT HOW

2   YOU DEAL WITH MAKING A DETERMINATION THAT WE HAVE ALL THE

3   JENCKS ACT STATEMENTS, MAKING A DETERMINATION IF ANY OF

4   THE ROUGH NOTES ARE BRADY AND WHETHER ANY ROUGH NOTES HAVE

5   BEEN DESTROYED.

6          ALL I WANT TO KNOW IS HOW THE COURT WANTS TO

7   DEAL WITH OR GET TO THOSE ISSUES SO THAT FACTS GET BEFORE

8   THE COURT.  WE ARE NOT RECEIVING ANY ROUGH NOTES.  THEY

9   ARE NOT BEING SUBMITTED TO THE COURT.  THAT IS NOT TO SAY

10  WE HAVEN'T GOT A COUPLE OF PAGES OF ROUGH NOTES.  BUT THEY

11  ARE NOT BEING SUBMITTED TO THE COURT.  THERE IS NO RECORD

12  AS TO WHAT EXISTS.  AND FOR EACH WITNESS IN MY PART OF THE

13  CASE I WANT TO KNOW ABOUT JENCKS REPORTS.

14          I WANT TO KNOW ABOUT THE ROUGH NOTES, AND I WANT

15  SOME KIND OF HEARING TO DETERMINE THIS HAPPENS.  I DON'T

16  WANT TO DO IT IN FRONT OF THE JURY.  THE COURT CAN JUST

17  TELL US WHAT THE PROPER PROCEDURE IS FOR DOING IT.  I HAVE

18  SUBMITTED POINTS AND AUTHORITIES ON IT.

19          THE COURT:  THE PROPER PROCEDURE IS NOT TO RAISE

20  IT BEFORE THE JURY AND TO DO SO AS YOU ARE DOING NOW.

21          MR. TARLOW:  ALL RIGHT.  MR. DE LA TORRE IS

22  GOING TO BE TESTIFYING.  NOW, HOW DO WE GET THE RECORD OF

23  ALL OF HIS STATEMENTS.  MR. DE LA TORRE WAS QUESTIONED AT

24  SUCH AND SUCH A TIME AND SUCH AND SUCH A TIME.  DO WE HAVE

25  THE STATEMENTS?

15-112

1    THE COURT:  WHAT HAVE YOU BEEN PROVIDED?

2    MR. TARLOW:  AS TO MR. DE LA TORRE, NO ROUGH

3    NOTES OF ANY KIND, NOT ONE ROUGH NOTE, AND PERHAPS TEN

4    PAGES OF STATEMENTS.  I COULD BE OFF BY FIVE PAGES.

5    MR. GURULE:  WE HAVE DISCLOSED, YOUR HONOR,

6    REGARDING JENCKS, ALL DEBRIEFINGS, DEA REPORTS AND

7    DEBRIEFINGS OF ARTURO DE LA TORRE.  THEY HAVE BEEN

8    DISCLOSED.  HIS PRESENTENCE REPORT HAS BEEN SUBMITTED TO

9    THE COURT THIS MORNING.

10    REGARDING THE ISSUE OF THE ROUGH NOTES,

11    MR. TARLOW HAS FILED A MOTION, AND THE GOVERNMENT HAS

12    FILED AN OPPOSITION.  I BELIEVE THE LAW IN THE NINTH

13    CIRCUIT IS THAT ROUGH NOTES ARE NOT JENCKS UNLESS ADOPTED

14    BY THE WITNESS.

15    THE COURT:  THAT'S RIGHT.

16    MR. GURULE:  AND WE HAVE OUR OPPOSITION AND CASE

17    AUTHORITY CITED IN OUR PLEADINGS RELATIVE TO THAT, AND I

18    BELIEVE THAT ROUGH NOTES ARE NOT REQUIRED TO BE TURNED

19    OVER, AND THAT IS THE POSITION THAT THE GOVERNMENT IS

20    TAKING.

21    MR. TARLOW:  LET ME GIVE YOUR HONOR JUST A BRIEF

22    EXAMPLE OF MR. DE LA TORRE ON THE ROUGH NOTES AND HOW THEY

23    PLAY INTO THIS CASE AND HOW WE HAVE TO HAVE A PROCEDURE

24    FOR DEALING WITH THIS.  MR. DE LA TORRE WAS INTERVIEWED BY

25    THE GOVERNMENT IN MARCH OF 1988 -- MARCH, APRIL, MAY,

1   JUNE, AND JULY.  MAYBE ONE OF THOSE THEY MISSED, BUT THEY

2   INTERVIEWED HIM ALL OF THOSE MONTHS AND TOOK ROUGH NOTES.

3          ON AUGUST 16 OR PERHAPS THE 17TH WE FILED A

4   MOTION SAYING WE WANTED ROUGH NOTES.  DATED AUGUST 19 A

5   REPORT IS SIGNED, ONE REPORT, WHICH HAS ALL OF THOSE

6   INTERVIEWS FROM THE PRECEDING FIVE MONTHS IN THE REPORT

7   PREPARED SOMEHOW FIVE MONTHS LATER.  THOSE ROUGH NOTES AS

8   TO WHAT WAS TAKEN DURING ALL OF THESE INTERVIEWS ARE GOING

9   TO COME UP THROUGHOUT HIS EXAMINATION, AND THEY OUGHT TO

10   BE PROVIDED.  THAT IS JUST ONE EXAMPLE.  THERE ARE MANY

11   OTHERS, BUT THIS IS JUST ONE.

12          THEY OUGHT TO BE PROVIDED TO THE COURT FOR THE

13   COURT TO SEE IF THERE IS JENCKS OR BRADY IN THERE AND TO

14   DETERMINE IF ANY HAVE BEEN DESTROYED.  WE DON'T KNOW THAT.

15          THE COURT:  ARE YOU ARGUING A MOTION THAT IS

16   PENDING BEFORE THE COURT?

17          MR. TARLOW:  I AM JUST ADVISING -- NO, YOUR

18   HONOR, I DON'T WANT TO ARGUE THE MOTION.  I AM JUST

19   ADVISING THE COURT --

20          THE COURT:  WELL, I AM GOING TO RULE ON THESE

21   MOTIONS THAT HAVE BEEN FILED, AND I INTEND TO DO THAT.  SO

22   I DON'T WANT TO TAKE UP TIME TO ARGUE THEM NOW.

23          MR. TARLOW:  ALL RIGHT.  I JUST WANT TO FIND OUT

24   WHEN THIS COMES UP WITH MR. DE LA TORRE WHAT PROCEDURE

25   YOUR HONOR WANTS ME TO FOLLOW.

15-114

1        THE COURT:  WHEN MR. DE LA TORRE IS CALLED, YOU

2   WILL KNOW EVERYTHING THAT THE COURT HAS RULED YOU ARE

3   ENTITLED TO AND WHAT YOU ARE NOT ENTITLED TO.  I WILL TAKE

4   CARE OF ALL OF THAT.

5        MR. TARLOW:  THANK YOU, JUDGE.

6        THE COURT:  IS THERE ANYTHING ELSE?

7        MR. PANCER:  YES, YOUR HONOR.  I SUBMITTED TWO

8   MOTIONS ON YELLOW PAPER THIS MORNING.

9        THE COURT:  YES, AND MY OFF-THE-CUFF RESPONSE TO

10  THEM IS THAT NEITHER ONE WAS VERY WELL TAKEN, ALTHOUGH I

11  AM TAKING ANOTHER LOOK AT THEM.

12       MR. PANCER:  YOUR HONOR, I HAVE ESTABLISHED

13  SINCE I FILED THAT THAT THE WITNESS --

14       THE COURT:  FIRST OF ALL, FOR THE RECORD, YOU

15  SHOULD STATE WHAT IT IS YOU HAVE ASKED THE COURT TO DO.

16       MR. PANCER:  WOULD THOSE NOTES BE MADE PART OF

17  THE RECORD?  I UNDERSTAND THAT WHEN I SUBMIT THOSE YELLOW

18  SHEETS, THEY DO BECOME EXHIBITS.

19       THE COURT:  I DON'T HAVE THEM WITH ME HERE.

20       MR. PANCER:  YOUR HONOR, FOR THE RECORD, WE

21  RECEIVED INFORMATION THAT A MANUEL CALDERON IS GOING TO

22  TESTIFY THAT ON TWO OCCASIONS HE SAW RENE VERDUGO WITH

23  JESUS FELIX GUTIERREZ, AND I BELIEVE THOSE OCCASIONS WERE

24  IN 1983.  WE BELIEVE THAT INFORMATION IS INCORRECT; THAT

25  THE WITNESS IS AT BEST MISTAKEN, AND SO WE HAVE ASKED YOUR

15-115

1   HONOR TO SUPPRESS HIS IDENTIFICATION, DEPENDING ON HOW THE

2   IDENTIFICATION WAS MADE.  I HAVE BEEN TOLD THIS MORNING

3   BY, I THINK, MR. GURULE THAT THIS IDENTIFICATION WAS MADE

4   BY THE WITNESS GOING THROUGH SOME KIND OF BOOK WITH

5   PHOTOGRAPHS.

6           IT IS CLEAR, YOUR HONOR, THAT I NEED OUT OF THE

7   PRESENCE OF THE JURY TO GO THROUGH WITH THIS WITNESS THE

8   MANNER IN WHICH HE IDENTIFIED RENE VERDUGO TO DETERMINE

9   WHETHER OR NOT THAT IDENTIFICATION SHOULD BE SUPPRESSED.

10          I CAN TELL YOUR HONOR AS AN OFFER OF PROOF THAT

11  BOTH RENE VERDUGO AND JESUS FELIX-GUTIERREZ, I BELIEVE,

12  WOULD TELL THIS COURT THAT THEY HAD NEVER MET EACH OTHER

13  AND THAT INFORMATION IS INCORRECT AND THAT AT BEST THE

14  WITNESS IS MISTAKEN.  I WOULD WANT A CHANCE TO EXPLORE

15  THAT OUT OF THE PRESENCE OF THE JURY BEFORE THE WITNESS

16  TESTIFIES.  I WOULD ASK THE COURT TO SET A TIME FOR THAT

17  HEARING, YOUR HONOR, PRIOR TO THE WITNESS TESTIFYING.

18          MR. GURULE:  WE HAVE JUST RECEIVED THIS, AS THE

19  COURT HAS, AND WE HAVEN'T HAD AN OPPORTUNITY TO RESPOND

20  AND REVIEW THE CASE AUTHORITY.  ABSENT ANY CASE AUTHORITY,

21  YOUR HONOR, OBVIOUSLY THE GOVERNMENT WOULD OBJECT.  WE

22  THINK THAT ON CROSS-EXAMINATION MR. PANCER WILL HAVE AN

23  OPPORTUNITY TO CROSS-EXAMINE THE WITNESS ABOUT THE

24  PARTICULAR MEETING WHERE HE WAS PRESENT AND ATTEMPT TO

25  IMPEACH HIM.  THAT IS HIS RIGHT, AND IF HE CHOOSES TO GO

15-116

1    AHEAD AND CALLS ANY WITNESSES TO SAY HE WASN'T THERE AT

2    THAT PARTICULAR TIME, THAT IS FINE.  BUT AN EVIDENTIARY

3    HEARING IS NOT REQUIRED, AND I DO NOT BELIEVE THAT THE

4    CASES WOULD SUPPORT THAT.

5         MS. BROOKS:  YOUR HONOR, MR. PANCER HAS ASKED ME

6    TO REMEMBER THIS ALL MORNING.  IT JUST CAME TO ME.  I

7    BELIEVE IT IS UNITED STATES VERSUS BRAITHWAITE WHERE IT

8    WAS HELD THAT THE COURT MUST HAVE A HEARING OUTSIDE THE

9    PRESENCE OF THE JURY TO DETERMINE WHETHER AN OUT-OF-COURT

10   IDENTIFICATION WAS SO UNDULY PREJUDICIAL AS TO AFFECT AN

11   IN-COURT --

12        THE COURT:  JUST A MOMENT.  THE THING THAT YOU

13   SUBMITTED DID NOT SPEAK OF ANY OUT-OF-COURT

14   IDENTIFICATION.  IT JUST SAID THAT THE WITNESS WOULD

15   TESTIFY THAT HE SAW THEM TOGETHER.

16        MR. PANCER:  BUT, YOUR HONOR, SINCE I SUBMITTED

17   THAT, AS I TOLD THE COURT, I HAVE LEARNED THAT THE WITNESS

18   DID MAKE AN IDENTIFICATION OF A PHOTOGRAPH, APPARENTLY,

19   PRIOR TO HIS TESTIMONY HERE IN COURT.

20        THE COURT:  WE ARE NOT SPEAKING HERE OF AN

21   IDENTIFICATION IN WHICH A PERSON WAS IDENTIFIED AS A

22   COMMITTER OF A CRIME.  WE ARE SPEAKING OF AN

23   IDENTIFICATION IN WHICH TWO PEOPLE WERE IDENTIFIED AS

24   BEING TOGETHER.  THAT IS NOT INCRIMINATING IN ANY WAY, NOR

25   DID IT, AS I UNDERSTAND IT, INVOLVE A CRIMINAL ACTIVITY.

15-117

1          MR. PANCER:  NO.  YOUR HONOR, IF WE HAD THIS

2   DISCOVERY SUBMITTED TO US A LITTLE EARLIER, I COULD BRIEF

3   THESE MATTERS BETTER FOR THE COURT.  BUT GIVEN WHEN I GOT

4   THE DISCOVERY, YOUR HONOR, I HAVE DONE THE BEST I CAN.

5   LET ME TELL YOUR HONOR THAT THE WITNESS WILL TESTIFY THAT

6   AT THAT MEETING BETWEEN RENE VERDUGO AND JESUS FELIX-

7   GUTIERREZ, THEY DISCUSSED THE DISTRIBUTION OF MARIJUANA

8   AND THAT SHORTLY AFTER THAT JESUS FELIX GUTIERREZ WAS IN

9   FACT DISTRIBUTING THE MARIJUANA.

10          SO HE IS IDENTIFYING RENE VERDUGO AS GOING TO A

11   MEETING AND ENGAGING IN CRIMINAL ACTIVITY.  THAT MEETING

12   NEVER HAPPENED, YOUR HONOR.  I WANT A CHANCE TO EXAMINE

13   THAT WITNESS OUT OF THE PRESENCE OF THE JURY.

14          THE COURT:  I DON'T THINK YOU HAVE A RIGHT TO

15   EXAMINE THE WITNESS OUTSIDE THE PRESENCE OF THE JURY.  YOU

16   HAVE THE RIGHT TO CROSS-EXAMINE HIM AND YOU HAVE THE RIGHT

17   TO CALL CONTRADICTORY WITNESSES.

18          MR. PANCER:  YOUR HONOR, I WOULD LIKE AT LEAST

19   TO SEE THE 90 PICTURES THAT THEY TELL ME THIS WITNESS WAS

20   SHOWN.

21          THE COURT:  I THINK YOU ARE ENTITLED TO SEE THE

22   PICTURES HE WAS SHOWN.

23          MR. PANCER:  AND, YOUR HONOR, I WOULD ALSO ASK

24   THIS COURT TO HOLD OFF UNTIL I CAN PROVIDE A CITE ON THE

25   CASE.  YOUR HONOR, I AM TOLD BY A VERY RELIABLE SOURCE

15-118

1    THAT BY 1:30 WE SHOULD BE ABLE TO HAVE A CASE AND A CITE

2    FOR YOUR HONOR, AND I WOULD ASK YOUR HONOR TO RECOGNIZE

3    THE PROBLEM.  WHEN I GET SOMETHING ON MONDAY NIGHT OR

4    SUNDAY MORNING OR MONDAY MORNING, AND I HAVE TO BE

5    PREPARED FOR IT ON TUESDAY, SOMETIMES WE DON'T HAVE ALL

6    THE CITES TOGETHER, BUT WE WILL GET THEM FOR YOUR HONOR.

7            THE COURT:  WELL, YOU CAN PROVIDE WHATEVER CITE

8    YOU WISH TO ME AT 1:30.

9            MR. PANCER:  THANK YOU, YOUR HONOR.  THEN, YOUR

10   HONOR, THERE IS ANOTHER MATTER.  THAT IS, YOUR HONOR, THAT

11   ONE OF THE DE LA TORRES IS GOING TO TESTIFY THAT JESUS

12   FELIX-GUTIERREZ MADE A STATEMENT TO THE EFFECT THAT WE HAD

13   TO GET RID OF CAMARENA.  THAT IS THE SUBJECT MATTER OF

14   ANOTHER YELLOW SHEET I SUBMITTED TO YOUR HONOR THIS

15   MORNING.

16           YOUR HONOR, I DON'T THINK THAT STATEMENT SHOULD

17   BE ADMITTED AT THIS TRIAL.  I ASSUME THE GOVERNMENT IS

18   OFFERING IT AS SOME KIND OF AN ADMISSION.  CLEARLY IT

19   IMPLICATES MY CLIENT.  WE ARE BEING DENIED OUR RIGHT TO

20   CONFRONT AND EXAMINE THE WITNESS, YOUR HONOR.  I THINK THE

21   PREJUDICIAL VALUE CERTAINLY OUTWEIGHS THE PROBATIVE VALUE.

22           THE COURT:  BOTH OF THOSE MOTIONS THAT YOU MADE

23   THIS MORNING ARE BEING BRIEFED AT THE PRESENT TIME.

24           BUT WHY WOULDN'T THIS SIMPLY BE AN ADMISSION BY

25   MR. GUTIERREZ ADMISSIBLE ONLY AGAINST HIM, AND NOT THE

15-119

1    OTHER DEFENDANTS, AS WE DID IN THE CASE OF THE OTHER

2    DEFENDANT?

3            MR. PANCER:  YOUR HONOR, THE STATEMENT IS TO THE

4    EFFECT OF "WE," AND THERE ARE THREE DEFENDANTS SITTING IN

5    THIS COURTROOM.  I THINK IT IS GOING TO BE VERY DIFFICULT

6    TO ASK THIS JURY TO SOMEHOW DISREGARD THAT AND USE IT JUST

7    AGAINST -- YES, YOUR HONOR.  WE ARE RELYING ON BRUTON.

8    BRUTON SAID --

9            THE COURT:  I KNOW YOU ARE.

10           MR. PANCER:  BRUTON SAYS THAT THE JURY CAN'T DO

11   THAT; THAT THE JURY IS NOT CAPABLE OF THE MENTAL

12   GYMNASTICS THAT THIS COURT IS GOING TO ASK THEM TO GO

13   THROUGH TO JUST USE A STATEMENT AGAINST MR. FELIX-

14   GUTIERREZ THAT IMPLICATES OTHER PEOPLE.  THEY CAN'T DO IT.

15           THE COURT:  ALL RIGHT.  YOU WILL HAVE A RULING

16   ON IT BEFORE THE WITNESS TESTIFIES.

17           MR. TARLOW:  YOUR HONOR, THERE IS ONE MORE THING

18   ON MR. DE LA TORRE THAT I DIDN'T TELL THE COURT ABOUT.  I

19   WOULD LIKE TO TELL THE COURT SO THAT THE COURT CAN

20   CONSIDER IT.

21           MR. DE LA TORRE IS GOING TO TESTIFY ABOUT

22   MR. FELIX-GUTIERREZ'S COCAINE DEALING.  ALL THROUGH THIS

23   TRIAL I HAVE TAKEN THE POSITION THEY ARE INADMISSIBLE

24   BECAUSE THEY DON'T TIE INTO CARO-QUINTERO.  THESE DON'T.

25   THERE IS NO OFFER OF PROOF.

15-120

1          IF THEY ARE GOING TO BE ADMITTED FOR SOMETHING,

2     I'D ASK FOR A LIMITING INSTRUCTION, BUT I WOULD ASK THE

3     COURT TO REQUIRE THE GOVERNMENT BEFORE PUTTING IN THIS

4     KIND OF COCAINE EVIDENCE -- WHICH WE ONLY ADMITTED TO IN

5     OPENING STATEMENT BECAUSE THE GOVERNMENT IS GOING TO PUT

6     IT IN THE CASE -- THAT THE COURT REQUIRE THE GOVERNMENT TO

7     SHOW HOW THIS COCAINE, WHICH IS NOT CARO-QUINTERO'S, HAS

8     ANYTHING TO DO WITH THIS CASE.

9          AND AT SOME POINT WE HAVE TO --

10         THE COURT:  FIRST, ARE YOU INTENDING TO OFFER

11    THAT KIND OF EVIDENCE?

12         MR. GURULE:  YES, YOUR HONOR, REGARDING SOME

13    DISTRIBUTION THAT HE WAS INVOLVED IN AND LEDGERS THAT HE

14    KEPT ON BEHALF OF JESUS FELIX REGARDING COCAINE THAT HE

15    DISTRIBUTED FOR --

16         THE COURT:  HOW DOES THAT TIE INTO THE

17    RELATIONSHIP WITH CARO-QUINTERO?

18         MR. GURULE:  WE WILL INTRODUCE THROUGH ANOTHER

19    WITNESS, MANUEL CALDERON, PROBABLY THE MOST DIRECT AND

20    INCRIMINATING EVIDENCE OF ALL REGARDING THAT, AND THAT

21    WILL BE JESUS FELIX'S PRESENCE ON ONE OCCASION AT CARO-

22    QUINTERO'S RESIDENCE IN GUADALAJARA WHERE CARO-QUINTERO

23    WAS ASKED TO PROVIDE PROTECTION IN THE FORM OF SECURITY

24    FOR ONE 600-KILO COCAINE LOAD THAT WAS DESTINED FROM, I

25    BELIEVE, BOLIVIA TO COSTA RICA AND ULTIMATELY FOR

15-121

1    DISTRIBUTION IN LOS ANGELES, AND THAT SECURITY WAS

2    PROVIDED.  THEREFORE THERE IS AN INTEREST IN THAT

3    PARTICULAR LOAD.

4          NOW, I WANT TO MAKE ONE POINT OF DISTINCTION.

5    THERE ARE TWO OTHER LOADS THAT MANUEL CALDERON WOULD

6    TESTIFY, TWO 150-KILO LOADS EACH THAT OCCURRED PRIOR TO

7    THAT.  I THINK THAT THOSE ADDITIONAL LOADS ARE LIKEWISE

8    ADMISSIBLE.  WE HAVE CARO-QUINTERO PROVIDING THE

9    PROTECTION FOR THE OFF-LOADING, PROVIDING THE

10   TRANSPORTATION ON THE ONE.

11         I THINK IT IS AN APPROPRIATE ARGUMENT AND

12   INFERENCE THAT CARO-QUINTERO LIKEWISE WAS INVOLVED WITH

13   THE OTHERS, ESPECIALLY THERE WILL BE EVIDENCE THAT THE

14   OTHER TWO LOADS LIKEWISE LANDED IN MEXICO AND WERE

15   IMPORTED INTO THE UNITED STATES FROM MEXICO.

16         MR. TARLOW:  YOUR HONOR, THIS IS DIFFERENT

17   DRUGS.  THEY KEEP MIXING --

18         THE COURT:  WE HAVE BEEN OVER THIS BEFORE.

19         MR. TARLOW:  BUT THOSE DRUGS HAVE NOTHING TO DO

20   WITH THE DRUGS THAT MR. DE LA TORRE WILL TESTIFY ABOUT.

21   NOTHING.

22         THE COURT:  THE COURT WILL RULE THE SAME WAY.

23   THIS EVIDENCE MAY BE RECEIVED BY THE JURY, AND YOU HAVE

24   THE OPPORTUNITY TO CROSS-EXAMINE THE WITNESS.

25         MR. TARLOW:  IS THERE GOING TO BE A LIMITING

15-122

1    INSTRUCTION, YOUR HONOR, AS TO WHAT THE PURPOSE OF THIS

2    IS?

3         THE COURT:  WELL, ARE YOU OFFERING IT FOR ALL

4    PURPOSES OR FOR A LIMITED PURPOSE?

5         MR. GURULE:  WE ARE OFFERING IT TO SHOW HIS

6    MEMBERSHIP IN THE CARO-QUINTERO NARCOTICS ENTERPRISE TO

7    SHOW HIS RELATIONSHIP, HIS ASSOCIATION, HIS POSITION OF

8    CONFIDENCE AND POSITION OF TRUST WITH CARO-QUINTERO; THAT

9    CLOSE ASSOCIATION WHICH LIKEWISE ULTIMATELY TAKES HIM TO

10   COSTA RICA WHEN JESUS FELIX ARRANGES THE FLIGHT OF CARO-

11   QUINTERO.

12        AND AGAIN THE DISTRIBUTION WHICH ARTURO DE LA

13   TORRE IS GOING TO BE TALKING ABOUT IS APPROXIMATE IN TIME

14   TO THE 600-KILO LOAD THAT CARO-QUINTERO PROVIDES THE

15   PROTECTION FOR IN 1983-84.  THAT IS WHAT HE WILL TESTIFY

16   TO.

17        MR. TARLOW:  JUDGE, WHEN YOU SEE THIS EVIDENCE,

18   THERE IS GOING TO BE NO CONNECTION.  IT SEEMS TO ME WE ARE

19   RUSHING TOO FAST TO DEAL WITH AN IMPORTANT ISSUE LIKE THIS

20   WITHOUT REQUIRING SOME PIECE OF EVIDENCE TO BE GIVEN TO

21   YOU THAT SHOWS THIS.

22        THE COURT:  LOOK, I HAVE NEVER BEEN IN A CASE

23   WHERE COUNSEL HAS TRIED TO TAILOR THE EVIDENCE LIKE THIS.

24   THE FACT THAT THIS EVIDENCE IS NOT TO YOUR LIKING DOES NOT

25   MAKE IT OBJECTIONABLE.  IT IS RELEVANT EVIDENCE FROM WHICH

15-123

1   PERMISSIBLE INFERENCES MAY BE RAISED THAT ARE RELEVANT TO

2   THIS CASE AND RELEVANT TO THE ISSUE OF YOUR CLIENT'S GUILT

3   OR INNOCENCE, AND THEREFORE IT MAY BE RECEIVED.

4           MR. TARLOW:  ONLY IF THERE ARE CERTAIN

5   PREREQUISITES, YOUR HONOR, AND THAT IS WHAT I AM SAYING

6   YOUR HONOR HAS NOT BEEN SHOWN.  IT IS ONE THING TO JUST

7   SAY THAT IT IS THIS, BUT THERE IS NO EVIDENCE THAT IT IS

8   GOING TO BE PRESENTED TO YOU.

9           THE COURT:  I DON'T WANT ANY MORE ARGUMENT,

10  COUNSEL.

11          MR. PANCER:  YOUR HONOR, THERE ARE TWO OTHER

12  VERY BRIEF MATTERS.  WE HAVE A MOTION TO REVEAL AN

13  INFORMANT OR SOMEBODY WHO PROVIDED --

14          THE COURT:  IF YOU HAVE A MOTION, WE WILL DEAL

15  WITH IT.  I DON'T WANT TO DISCUSS IT NOW.  ALL OF THE

16  MOTIONS WILL BE DEALT WITH.

17          MR. PANCER:  I JUST WANTED TO ASK YOUR HONOR IF

18  YOU KNEW WHEN YOU MIGHT DEAL WITH THAT.

19          THE COURT:  NO, I DON'T.  AS SOON AS WE GET

20  THEM, WE WORK THEM UP, AND I WILL RULE ON IT.

21          MR. PANCER:  COULD WE HAVE UNTIL 1:45 TO RETURN

22  TODAY?

23          THE COURT:  YES.

24          MS. BARRERA:  YOUR HONOR, JUST FOR THE RECORD, I

25  JOIN MR. PANCER'S MOTION WITH REGARDS TO THE BRUTON ISSUE.

15-124

1        THE COURT:  ALL RIGHT.

2        (NOON RECESS FROM 1:00 P.M. UNTIL 1:45

3        P.M.)

4                        - - -

15-125

LOS ANGELES, CALIFORNIA, TUESDAY, AUGUST 23, 1988, 1:45 P.M.

1          (PROCEEDINGS OUTSIDE THE PRESENCE OF THE

2          JURY.)

3          THE COURT:  FIRST I HAVE A LETTER FROM A JUROR,

4    MR. ALVERO, AND A LETTER FROM HIS EMPLOYER STATING THAT

5    THEY ONLY ALLOW HIM 22 COMPENSATED DAYS ON JURY DUTY AND

6    ATTACHING A COMPANY POLICY OF HUGHES AIRCRAFT.  HE STATES

7    THAT HIS ALLOWABLE 22 DAYS WILL BE UP ON AUGUST 26 AND

8    STATES THAT HE WOULD APPRECIATE IT IF THE COURT WOULD

9    CONTACT HUGHES AND TRY TO EXTEND HIS ALLOWABLE DAYS.

10          "I WOULD BE WILLING TO HAVE THE 30 DAYS THE

11    COURT PAYS DEDUCTED FROM MY HUGHES PAY.  OTHERWISE,

12    ALTHOUGH I WOULD LIKE TO CONTINUE TO SERVE AS A JUROR, THE

13    FINANCIAL BURDEN WOULD BE TOO GREAT FOR ME, AND IT WOULD

14    BE IMPOSSIBLE FOR ME TO CONTINUE TO SERVE."

15          THAT IS A NOTE TO ME.  WHAT DO YOU WISH TO HAVE

16    THE COURT DO ABOUT THIS?

17          MR. GURULE:  I GUESS ONE QUESTION, YOUR HONOR,

18    AT THIS POINT IS HOW MUCH LONGER WILL THE TRIAL CONTINUE,

19    AND I WOULD JUST FOR THE COURT'S INFORMATION REPRESENT

20    THAT THE GOVERNMENT BELIEVES THAT ITS CASE IN CHIEF --

21    THAT THE GOVERNMENT WILL BE RESTING ITS CASE IN CHIEF, I

22    WOULD THINK, BY TUESDAY OF NEXT WEEK, AND THEN THE

23    QUESTION BECOMES HOW LONG ARE WE LOOKING AT IN TERMS OF

24    THE DEFENSE CASE, AND IF THIS IS AN IMPOSITION ON THIS

25    PARTICULAR JUROR, FOR HOW LONG; AND IF IT IS ONLY FOR A

15-126

1   SHORT PERIOD OF TIME, REASONABLE PERIOD OF TIME, WE WOULD

2   SUGGEST THAT HE REMAIN.

3           THE COURT:  OF COURSE, THE JUROR INDICATES THAT

4   HIS PAY WOULD BE DISCONTINUED ON THAT DATE AND THAT HE

5   COULD NOT -- IT WOULD BE A FINANCIAL BURDEN FOR HIM TO

6   CONTINUE.

7           NOW, I COULD DO WHAT THE JUROR SUGGESTS, WHICH

8   WOULD BE TO CONTACT HUGHES AND TRY TO GET AN EXTENSION.

9           MR. GURULE:  WE WOULD CERTAINLY REQUEST THAT OF

10  THE COURT, AND THEN IF THAT BECOMES A PROBLEM -- IF THAT

11  STILL REMAINS A PROBLEM, I THINK WE WOULD OPT FOR THE

12  FIRST ALTERNATE.  THE GOVERNMENT WOULD REQUEST THE COURT

13  TO TAKE THAT ACTION IF THE COURT WOULD PLEASE DO SO.

14          THE COURT:  DOES THE DEFENDANT HAVE ANY

15  SUGGESTIONS?

16          MS. LEYVA:  YOUR HONOR, WE WOULD REQUEST THAT

17  THE COURT DO WHATEVER IT CAN, WHATEVER THE COURT IS

18  PERMITTED TO DO, IN TERMS OF GETTING AN EXTENSION.

19          THE GOVERNMENT HAS INDICATED THAT THE CASE

20  PROBABLY WILL NOT LAST MORE THAN A WEEK, AND PERHAPS WITH

21  THAT KIND OF AN EXTENSION THE COURT CAN CONVINCE HUGHES

22  AIRCRAFT TO DO IT.

23          MR. PANCER:  YOUR HONOR, THE CASE WILL GO LONGER

24  THAN THAT.

25          MS. LEYVA:  YEAH, BUT I MEAN --

15-127

1        THE COURT:  I THINK THAT IT WOULD BE LONGER.

2        MS. LEYVA:  GIVEN THAT THE GOVERNMENT'S ESTIMATE

3   IS ONLY ANOTHER WEEK FOR THEIR CASE, AND NOT ANOTHER THREE

4   OR FOUR WEEKS, THEN IT SEEMS REASONABLE THAT THIS JUROR

5   SHOULD BE ALLOWED TO SERVE THE REMAINDER.

6        MR. TARLOW:  AS FAR AS SCHEDULING INFORMATION, I

7   WANT TO ADVISE THE COURT ON WHAT AT LEAST WE INTEND ON

8   DOING.

9        LAST NIGHT WE RECEIVED APPROXIMATELY A THOUSAND

10  PAGES OF DISCOVERY, WHICH I HAVEN'T EVEN HAD COPIED YET,

11  LET ALONE READ, INVOLVING WITNESSES WE HAVEN'T

12  INVESTIGATED.  WE ARE IN THE PROCESS OF FILING A WRITTEN

13  MOTION TO THE COURT REQUESTING A CONTINUANCE FOR PURPOSES

14  OF INVESTIGATION AND DETAILING WHY, AS THE COURT HAS

15  SUGGESTED EARLIER.

16        SO, IN TERMS OF HOWEVER YOU ARE THINKING ABOUT

17  LENGTH OF TIME, I WANT TO ADVISE THE COURT THAT WE DO

18  INTEND TO DO THAT.

19        THE COURT:  WELL, THE COURT WILL ATTEMPT TO

20  CONTACT -- WILL CONTACT THE EMPLOYER AND SEE WHAT CAN BE

21  DONE ABOUT GETTING THIS JUROR'S TIME EXTENDED.

22        NOW, ON THIS BUSINESS OF THE MOTION TO EXCLUDE

23  THE T.V. BROADCAST FROM EVIDENCE, THE COURT HAS CONSIDERED

24  THAT QUESTION.

25        MR. TARLOW:  YOUR HONOR, WE HAVE A STIPULATION

15-128

1   ON THAT.

2            THE COURT:  YOU HAVE?

3            MR. TARLOW:  YES, YOUR HONOR.

4            THE COURT:  WHAT IS THE STIPULATION?

5            MR. GURULE:  LET ME READ THE STIPULATION.  YOUR

6   HONOR, IT WOULD BE THAT THE WITNESS WOULD TESTIFY THAT --

7   THIS AGAIN IS REGARDING WHEN HE IS IN THE HOTEL ROOM AND

8   THE NEWS BROADCAST COMES ON.  HE WOULD TESTIFY HE HEARD --

9   WHEN THE NEWSCAST BEGAN, HE HEARD THE ANNOUNCER FROM

10  MEXICO CITY STATED THAT AN INDIVIDUAL NAMED JESUS DIAZ DE

11  LEON, ALSO KNOWN AS CACHAS, WAS A SUSPECT IN ARRANGING THE

12  FLIGHT FOR CARO-QUINTERO TO COSTA RICA FROM MEXICO; THAT

13  JESUS DIAZ DE LEON LIVES IN LOS ANGELES AND HAD A SEAFOOD

14  BUSINESS IN LOS ANGELES.  AND AGAIN JUST FOR THE COURT

15  THIS IS WITHIN THE --

16            THE COURT:  IT IS THE SAME STATEMENT THAT IS

17  CONTAINED IN YOUR --

18            MR. GURULE:  THE ONLY THING THAT IS CHANGED --

19            THE COURT:  IS THE WORD "SUSPECT."

20            MR. GURULE:  -- IS THE WORD "SUSPECT" FROM

21  "IMPLICATED."

22            THE COURT:  IS THAT A CORRECT STATEMENT OF THE

23  STIPULATION?

24            MR. TARLOW:  THAT IS, YOUR HONOR.

25            THE COURT:  AND THAT CAN BE READ TO THE JURY OR

15-129

1   THE WITNESS CAN TESTIFY TO THAT?

2           MR. GURULE:  WHAT I PROPOSE IS THAT -- I AM

3   GOING TO NEED A COUPLE OF MINUTES WITH THE WITNESS BEFORE

4   HE TAKES THE STAND SO THAT I CAN EXPLAIN THIS TO HIM.

5   WHEN WE GET TO THAT PARTICULAR POINT IN HIS TESTIMONY, I

6   AM GOING TO INTERRUPT HIM AND PROPOSE AT THAT TIME READING

7   THE STIPULATION AND THEN JUST CONTINUE THE DIRECT

8   EXAMINATION RELATIVE THEN AS TO WHAT JESUS FELIX'S

9   REACTION WAS TO THAT STATEMENT OR THAT BROADCAST.

10          THE COURT:  WHAT HE SAW AND HEARD.

11          MR. GURULE:  RIGHT.  BUT HE WON'T TESTIFY --

12          THE COURT:  IS THAT PROCEDURE ACCEPTABLE?

13          MR. TARLOW:  IT IS NOT ACCEPTABLE IF I COULD

14   KEEP IT ALL OUT.

15          THE COURT:  YOU TOLD ME YOU HAD A STIPULATION.

16          MR. TARLOW:  WE HAVE A STIPULATION --

17          THE COURT:  WELL, HOW DOES THE STIPULATION GET

18   TO THE JURY?  THAT IS WHAT I AM TRYING TO FIND OUT.  CAN

19   WE JUST READ IT?

20          MR. TARLOW:  WE CAN JUST READ IT.

21          MR. GURULE:  WE WILL READ IT.  I PROPOSE,

22   THOUGH, AT THAT PARTICULAR POINT TO PUT IT IN THE PROPER

23   CONTEXT OF THE ENTIRE TESTIMONY.

24          THE COURT:  ALL RIGHT.  YOU WOULD READ IT AT THE

25   TIME THAT THE WITNESS WOULD TESTIFY THAT HE HEARD A

15-130

1   BROADCAST, AND YOU WOULD THEN SAY THAT COUNSEL HAVE

2   STIPULATED TO THIS REGARDING THE BROADCAST AND READ IT?

3          MR. GURULE:  THAT'S CORRECT.

4          THE COURT:  ALL RIGHT.

5          COUNSEL, DID YOU HEAR WHAT I SAID?

6          MR. TARLOW:  I THOUGHT -- THREE PEOPLE WERE

7   TALKING TO ME AT ONCE, YOUR HONOR.

8          THE COURT:  ALL RIGHT.  WELL, HE WOULD BE TAKING

9   THE WITNESS TO THE POINT OF THE BROADCAST, AND AT THAT

10  POINT HE WOULD STATE THAT COUNSEL HAVE REACHED A

11  STIPULATION WITH RESPECT TO THIS BROADCAST AND READ THAT

12  STATEMENT, WHICH HE PREVIOUSLY READ, TO THE JURY, AND THE

13  WITNESS WOULD NOT BE QUESTIONED ABOUT THE CONTENTS OF THE

14  BROADCAST ANY FURTHER.  IS THAT RIGHT?

15         MR. GURULE:  THAT'S CORRECT.

16         MR. TARLOW:  NOW, I TAKE IT THAT IN RELUCTANTLY

17  DOING THIS WE ARE NOT GOING TO GET THE WITNESS PARROTING A

18  STATEMENT OR SAYING SOMETHING BACK WHICH TELLS THE JURY

19  THAT CARO-QUINTERO MADE THE STATEMENT THAT HE WAS

20  INVOLVED.

21         MR. GURULE:  THAT IS A SEPARATE ISSUE.  AND I

22  SAY THAT IS A SEPARATE ISSUE BECAUSE THEN WHAT THE WITNESS

23  IS GOING TO SAY IS THAT HE HAD A CONVERSATION AFTER THAT

24  REGARDING JESUS FELIX'S REACTION AND WHAT DID JESUS FELIX

25  SAY AFTER THAT BROADCAST.

15-131

1        THE COURT:  WELL, HIS CONVERSATIONS WITH JESUS

2  FELIX ARE SEPARATE AND APART.  THIS MOTION ADDRESSES THE

3  EXCLUSION OF THE TELEVISION BROADCAST AND SUBSTITUTES IN

4  ITS PLACE THIS NEUTRAL STATEMENT.

5        MR. TARLOW:  WHAT I AM CONCERNED ABOUT IS THE

6  WITNESS MAKING A STATEMENT WHICH SAYS THAT CARO-QUINTERO

7  SAID SOMETHING ON T.V.  THE WITNESS IS GOING TO START

8  TALKING ABOUT "I WAS WATCHING THE T.V. AND CARO-QUINTERO

9  SAID SOMETHING."

10       MR. GURULE:  NO.

11       MR. TARLOW:  OR THE OTHER SIDE OF IT IS TRYING

12  TO GET A STATEMENT THAT MY CLIENT SAID SOMETHING.

13       THE COURT:  IF THE WITNESS ATTRIBUTES A

14  STATEMENT TO YOUR CLIENT WHICH PARAPHRASES WHAT THE

15  BROADCAST SAID?

16       MR. TARLOW:  FOR EXAMPLE, LET'S ASSUME THE

17  WITNESS WOULD WANT TO SAY, "WHY DID CARO-QUINTERO WANT TO

18  SAY THAT ON TELEVISION?  WHY DID CARO-QUINTERO SAY I

19  HELPED HIM?"  THAT GETS US BACK TO THE SAME PLACE IF WE

20  ARE GOING TO GET TO THE JURY THAT THE T.V. BROADCAST --

21  ACTUALLY THAT ISN'T EVEN CARO-QUINTERO TALKING.  IT IS

22  SOMEBODY ELSE.

23       MR. GURULE:  BUT IT IS A SEPARATE ISSUE.

24       THE COURT:  IT IS A SEPARATE ISSUE.

25       MR. GURULE:  THAT IS AN ADMISSION, AND IT IS

15-132

1   ADMISSIBLE ON A NUMBER OF BASES.

2              THE COURT:  WHAT YOU SOUGHT TO HAVE EXCLUDED

3   HERE WAS THE CONTENTS OF THAT BROADCAST.

4              MR. TARLOW:  THAT IS TRUE.

5              THE COURT:  IT BEING REITERATED THROUGH THE

6   WITNESS'S TESTIMONY, AND THEN YOU HAVE REACHED A

7   STIPULATION WHICH ELIMINATES THE NEED TO HAVE THE WITNESS

8   PARAPHRASE OR DISCUSS THE CONTENTS OF THE BROADCAST.  WE

9   WILL TELL THE JURY THAT YOU HAVE STIPULATED TO THE

10  CONTENTS AS CONTAINED IN A STATEMENT MADE BY COUNSEL.

11             THEREAFTER THE WITNESS'S DISCUSSIONS WITH THIS

12  DEFENDANT IS A DIFFERENT QUESTION, AND TESTIMONY ABOUT

13  THAT, IF THERE IS ANY, WOULD DEPEND UPON THE QUESTION

14  WHETHER IT IS PERMISSIBLE.  EACH QUESTION WOULD BE TREATED

15  SEPARATELY.  IT IS SEPARATE AND APART FROM THIS.

16             NOW --

17             MR. TARLOW:  VERY WELL.  I HAVE A -- I AM

18  AGREEING TO THE STIPULATION, BUT IT IS MY UNDERSTANDING

19  THAT WE ARE NOT GOING TO HAVE THE WITNESS SAY --

20             THE COURT:  WELL, I DON'T KNOW.

21             IS THAT TRUE?  IS THERE AN UNDERSTANDING ABOUT

22  THAT?

23             MR. GURULE:  NO.  NO.  MR. TARLOW AND I

24  DISCUSSED THE CONTENT OF THE T.V. BROADCAST AND IN WHAT

25  FORM THAT SHOULD BE INTRODUCED.  NOW MR. TARLOW IS RAISING

15-133

1    A SEPARATE ISSUE THAT IS NOT CONTAINED IN HIS MOTION, THAT

2    IS, TO EXCLUDE CONVERSATIONS BETWEEN THE WITNESS AND

3    MR. TARLOW'S CLIENT RELATIVE TO WHAT THE CLIENT SAID.  AND

4    SIMPLY THE QUESTION WOULD BE FORMED RELATIVE TO "AT THAT

5    TIME DID JESUS FELIX HAVE ANY REACTION TO THE T.V.

6    BROADCAST?"

7            "YES."

8            "WHAT, IF ANYTHING, DID JESUS FELIX SAY TO YOU,

9    MR. WITNESS, AT THAT TIME?"

10            "HE TOLD ME THAT HE COULDN'T BELIEVE THAT CARO-

11   QUINTERO WOULD FINGER HIM."  OR IT WOULD BE SOMETHING TO

12   THAT EFFECT, "WOULD FINGER HIM THE WAY HE DID."

13            FURTHERMORE, THAT JESUS FELIX STATED AT THAT

14   TIME THAT HE WAS SIMPLY TRYING TO HELP A FRIEND IN COSTA

15   RICA AND DIDN'T EVEN GET PAID FOR HIS EXPENSES AND "HOW

16   COULD CARO-QUINTERO DO THIS TO HIM?"  THAT IS A

17   PARAPHRASE, BUT THAT IS --

18            THE COURT:  WELL, MY VIEW IS THAT THE

19   STIPULATION IS ACCEPTABLE AS A SUBSTITUTE FOR THE

20   BROADCAST, AND THE STATEMENTS, IF ANY, MADE BY THE

21   DEFENDANT TO THIS WITNESS ARE A PROPER SUBJECT OF INQUIRY.

22            MR. GURULE:  THANK YOU, YOUR HONOR.

23            MR. TARLOW:  I AM MORE CONCERNED WITH THE

24   STATEMENT BY THE WITNESS.  WE ARE TALKING ABOUT TWO

25   SEPARATE THINGS.

15-134

1    THE COURT:  THAT WAS NOT RAISED BEFORE JUST NOW.

2    IT IS A FORM OF HIP SHOOTING THAT I AM GETTING TIRED OF.

3    THE MOTION THAT WAS RAISED HERE WAS RELATING TO THE

4    CONTENTS OF THE BROADCAST.  ANY STATEMENTS MADE BY THE

5    DEFENDANT TO THE WITNESS, IF THEY ARE OTHERWISE

6    ADMISSIBLE, MAY BE RECEIVED.

7    MR. TARLOW:  ALL RIGHT, BUT THAT IS NOT THE

8    SCOPE OF MY OBJECTION.  I WANT TO MAKE SURE THAT NOW THAT

9    WE HAVE THIS STIPULATION WE DON'T HAVE THE WITNESS SAYING

10   SOMETHING, THE WITNESS -- I AM NOT TALKING ABOUT WHAT MY

11   CLIENT SAID OR WHAT HE CLAIMS MY CLIENT SAID.  I AM

12   TALKING ABOUT THE WITNESS SAYING SOMETHING ABOUT WHAT HE

13   SAW ON T.V.

14   THE COURT:  WELL, THE WITNESS SHOULD BE

15   ADMONISHED THAT HE IS NOT TO DISCUSS THE CONTENTS OF THE

16   BROADCAST.

17   MR. GURULE:  ABSOLUTELY.  THAT IS WHY I JUST

18   REQUESTED OF THE COURT THAT I WILL NEED TEN MINUTES TO

19   SPEAK TO HIM OUTSIDE.  I WILL TAKE CARE OF THAT CLEARLY.

20   THERE IS NO POINT IN HAVING A STIPULATION IF WE ARE GOING

21   TO GET INTO THAT SUBJECT AREA.

22   MR. TARLOW:  I THINK FOR ONE BRIEF MOMENT IN

23   TIME I THINK THE THREE OF US ARE IN AGREEMENT, YOUR HONOR.

24   THE COURT:  ALL RIGHT.  NOW, THERE HAS BEEN

25   ANOTHER MOTION PENDING HERE.  THESE CITATIONS THAT YOU

15-135

1    HAVE SUBMITTED ARE FAMILIAR CITATIONS TO ME, BUT I AM NOT

2    CERTAIN THAT THEY APPLY IN THIS PARTICULAR CASE.  THAT IS

3    THE PROBLEM.  IS THE IDENTIFICATION MADE BY THIS

4    WITNESS -- WHO IS IT?  DE LA TORRE?

5           MR. GURULE:  MANUEL CALDERON, YOUR HONOR.

6           THE COURT:  IS THE IDENTIFICATION BY CALDERON

7    MADE -- THAT IS, THE IDENTIFICATION WHICH HE WILL TESTIFY

8    TO HAVING SEEN MR. VERDUGO AND MR. GUTIERREZ TOGETHER ON

9    TWO OCCASIONS, IS THAT AN IDENTIFICATION THAT WAS MADE

10   FROM HIM AFTER THE FACT AND BY MEANS OF PHOTOGRAPHS, OR

11   DID HE KNOW THE INDIVIDUALS?

12          MR. GURULE:  YOUR HONOR, WHAT HE SAID WAS, WHEN

13   HE WAS INTERVIEWED, WAS THAT HE WAS INTRODUCED TO HIM AND

14   THAT HE KNEW HIM BY THE NAME --

15          THE COURT:  WHO WAS INTRODUCED TO HIM?

16          MR. GURULE:  RENE VERDUGO WAS INTRODUCED TO THE

17   WITNESS AND THAT HE WAS PRESENT AT A RESTAURANT WHEN THIS

18   INTRODUCTION TOOK PLACE; THAT HE WAS THERE FOR A SHORT

19   PERIOD OF TIME, AND THEN AFTER HE HAD IDENTIFIED THIS

20   INDIVIDUAL, RENE VERDUGO, WHO WAS WITH JESUS FELIX DURING

21   THE SAME MEETING, THEN HE WAS SHOWN A PHOTOGRAPH --

22          THE COURT:  JUST A MOMENT.  WHEN HE WAS

23   INTRODUCED TO MR. VERDUGO, THE OTHER DEFENDANT WAS

24   PRESENT?

25          MR. GURULE:  YES.  AS A MATTER OF FACT --

15-136

1          THE COURT:  WASN'T HE INTRODUCED TO HIM, ALSO?

2          MR. GURULE:  ACTUALLY HE WAS WORKING FOR JESUS

3   FELIX-GUTIERREZ.

4          THE COURT:  HE HAS KNOWN HIM?

5          MR. GURULE:  HE HAS KNOWN HIM FOR AN EXTENSIVE

6   PERIOD OF TIME, AND THEY DROVE TO THE RESTAURANT TOGETHER.

7          THE COURT:  ALL RIGHT.

8          MR. GURULE:  AND THEN MANUEL CALDERON WAS ASKED

9   TO LEAVE JESUS FELIX AT THE RESTAURANT FOR THE PURPOSE OF

10  ATTENDING THIS MEETING.  THEN WHEN MANUEL CALDERON CAME

11  BACK TO THE RESTAURANT AND WENT INTO THE RESTAURANT, THEN

12  HE WAS INTRODUCED BY JESUS FELIX TO RENE VERDUGO,

13  PRESENTED TO HIM UNDER THAT NAME.

14         THE COURT:  IS HE GOING TO IDENTIFY HIM AS THE

15  MAN HE MET AT THAT TIME?

16         MR. GURULE:  I BELIEVE SO.

17         THE COURT:  IS THAT BASED ON A PHOTOGRAPH HE

18  SAW?

19         MR. GURULE:  WELL, AFTER -- WHEN HE SAID THAT

20  THIS PERSON WAS RENE VERDUGO, THEN HE WAS SHOWN A BOOK OF

21  PHOTOS AND ASKED IF THIS PARTICULAR PERSON HE IDENTIFIED

22  AS RENE VERDUGO, WHETHER THAT PERSON'S PICTURE WAS IN THIS

23  SERIES OF PHOTOS, AND THEN HE POINTED HIM OUT, "YEAH, THIS

24  IS THE RENE VERDUGO THAT I MET.  HE WAS INTRODUCED TO ME

25  AND PRESENTED TO ME AS RENE VERDUGO."  HE PICKED OUT A

15-137

1   PHOTOGRAPH.  SO, I MEAN, IT WASN'T A SITUATION WHERE HE

2   WAS SAYING, "I SAW SOMEBODY, BUT I DON'T KNOW WHO THAT

3   PERSON IS, AND LET ME SEE IF I CAN POINT HIM OUT IN THE

4   BOOK."

5           HE IDENTIFIED HIM IN THE FIRST INSTANCE AS BEING

6   RENE VERDUGO, AND THIS WAS JUST FOLLOW-UP INVESTIGATION TO

7   CORROBORATE THE IDENTIFICATION.  SO IT IS NOT A SITUATION

8   WHERE YOU HAVE, FOR INSTANCE, LIKE A BANK ROBBERY AND

9   THEN --

10          THE COURT:  THIS IS WHY I QUESTION THE

11  APPLICABILITY OF THESE CASES, WHICH ARE USUALLY BASED ON

12  IDENTIFICATION WHICH IS MADE WHICH IS IMPERMISSIBLY

13  SUGGESTIVE EITHER THROUGH PHOTOGRAPHS OR A LINEUP, IN

14  WHICH A WITNESS IS ASKED IF HE CAN POINT OUT THE PERSON

15  THAT HE SAW COMMITTING THE ACT OR THE CRIME, THE ROBBERY,

16  OR WHATEVER.

17          THEN IN THAT SITUATION A COURT MAY HOLD A

18  HEARING OUTSIDE THE PRESENCE OF THE JURY TO DETERMINE THE

19  APPROPRIATENESS OF THE LINEUP THAT TOOK PLACE, WHETHER IT

20  WAS PHOTOGRAPHIC OR AN IN-PERSON LINEUP, TO DETERMINE

21  WHETHER OR NOT IT WAS SUGGESTIVE AND TO DETERMINE WHETHER

22  OR NOT THE IDENTIFICATION, THE OUT-OF-COURT

23  IDENTIFICATION, HAS A SOURCE INDEPENDENT OF THE SUGGESTIVE

24  LINEUP.

25          MR. GURULE:  THIS IS A VERY DIFFERENT SITUATION

15-138

1   FROM THAT, YOUR HONOR.

2          THE COURT:  IT SEEMS TO ME THAT IT IS A

3   DIFFERENT SITUATION.

4          MS. BROOKS:  FIRST OF ALL, YOUR HONOR, IF I

5   MIGHT SAY, WHAT COUNSEL HAS JUST TOLD US IS TOTAL NEWS TO

6   US.  WE HAVE NOTHING INDICATING IN DISCOVERY THAT THAT IS

7   WHAT TOOK PLACE.

8          SECONDLY, IT IS OUR CONTENTION, YOUR HONOR, THAT

9   THIS GENTLEMAN CANNOT AND WILL NOT BE ABLE TO IDENTIFY

10  MR. VERDUGO AS BEING THE MAN HE SAW IN THAT RESTAURANT

11  BECAUSE MR. VERDUGO WAS NEVER IN THE RESTAURANT; THAT IF

12  HE DOES PICK HIM OUT IN COURT, IT IS BECAUSE HE WAS SHOWN

13  THE PHOTOGRAPH, AND THAT IS THE ONLY WAY HE COULD KNOW

14  THAT THE MAN SITTING NEXT TO ME IS RENE VERDUGO.

15         THE COURT:  WHAT MAKES YOU SAY THAT?

16         MS. BROOKS:  LIKE HE WAS NEVER IN THE

17  RESTAURANT, YOUR HONOR.  I MEAN, HE JUST WASN'T.  THERE

18  HAS TO HAVE BEEN A SUGGESTIVE IDENTIFICATION PROCEDURE

19  UTILIZED IN ORDER FOR HIM TO IDENTIFY MR. VERDUGO IN

20  COURT.

21         NOW, IF HE IS NOT GOING TO POINT MR. VERDUGO OUT

22  IN COURT, I MEAN, THERE IS NO ISSUE.  BUT WE ARE

23  CONTENDING THAT ANY IN-COURT IDENTIFICATION BY THIS MAN IS

24  BROUGHT ABOUT BY A SUGGESTIVE, OUT-OF-COURT

25  IDENTIFICATION.

15-139

1          THE GOVERNMENT HAS REPRESENTED THAT THERE HAS

2     BEEN AN OUT-OF-COURT IDENTIFICATION BY THIS MAN.  WE ARE

3     CONTENDING THAT IT WAS SUGGESTIVE AND THAT THE IN-COURT

4     IDENTIFICATION IS TAINTED.

5          THE COURT:  YOU ARE CONTENDING IT WAS

6     SUGGESTIVE, BUT YOU DON'T KNOW.

7          MS. BROOKS:  YOUR HONOR, IT HAS TO HAVE BEEN

8     BASED ON THE FACTS THAT I HAVE PRESENTED TO THE COURT.

9     ALL WE ARE ASKING FOR IS A HEARING TO THAT EFFECT.  WE

10    HAVE NO MATERIAL WHATSOEVER INDICATING ANYTHING CLOSE TO

11    WHAT THE GOVERNMENT'S REPRESENTATION HAS BEEN TO THE COURT

12    TODAY.

13         THE COURT:  WILL THE WITNESS IDENTIFY

14    MR. VERDUGO IN COURT?

15         MR. GURULE:  I BELIEVE HE WILL, YOUR HONOR.

16         THE COURT:  THAT MR. VERDUGO WAS THE PERSON HE

17    SAW WITH MR. GUTIERREZ?  IS THAT CORRECT?

18         MR. GURULE:  YES.

19         THE COURT:  THEN I THINK THAT THE COURT WILL

20    HAVE A HEARING OUTSIDE THE PRESENCE OF THE JURY TO

21    DETERMINE WHETHER OR NOT THE IN-COURT IDENTIFICATION OF

22    THIS DEFENDANT IS BASED ON THE PHOTO LINEUP THAT HE SAW OR

23    THE PHOTOGRAPHS THAT HE WAS SHOWN, OR WHETHER HE SIMPLY

24    HAS AN INDEPENDENT RECOLLECTION OF HAVING MET THE

25    DEFENDANT AT THE RESTAURANT.

15-140

1          MS. BROOKS:  THANK YOU, YOUR HONOR.

2          MR. GURULE:  WHEN DOES THE COURT --

3          THE COURT:  WE WILL DO THAT BEFORE THE WITNESS

4    TESTIFIES.

5          MR. TARLOW:  MAY I HAVE A MOMENT TO LOOK AT THE

6    STIPULATION?  MR. GURULE HAS THE ONLY COPY OF THAT.

7          MR. GURULE:  IT WAS DRAFTED BY MR. TARLOW.

8          MR. TARLOW:  IT WAS.

9          (PAUSE.)

10          MR. TARLOW:  THAT IS FINE.  THANK YOU.

11          THE COURT:  LET'S BRING THE JURY IN.

12          BY THE WAY, THESE THINGS THAT YOU ARE ASKING

13    ABOUT, THESE ORIGINAL EXHIBITS, HAVE THEY BEEN PRODUCED?

14          MR. GURULE:  THERE IS ONE DOCUMENT THAT WE ARE

15    TRYING TO FIND THAT WE BELIEVE WE HAVE THE ORIGINAL OF.

16    THE OTHER ORIGINALS THAT WE DO HAVE, WE HAVE PRODUCED, AND

17    HE HAS COPIES OF THE ONE ORIGINAL WE ARE ATTEMPTING TO

18    LOCATE.

19          THE COURT:  ALL RIGHT.  WE WILL PROCEED.

20          (JURY PRESENT.)

21    SANDALIO GONZALEZ, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

22          THE COURT:  DO YOU HAVE ANY FURTHER QUESTIONS OF

23    THIS WITNESS?

24          MR. TARLOW:  YES, YOUR HONOR, I DO.

25          YOUR HONOR, MIGHT I MARK FOR IDENTIFICATION

15-141

1    EXHIBIT D AND ASK THAT IT BE PLACED BEFORE THE WITNESS?

2            THE COURT:  ALL RIGHT.

3                RECROSS EXAMINATION (CONTINUED)

4    BY MR. TARLOW:

5    Q    SIR, YOU HAVE BEFORE YOU EXHIBIT D.  WOULD YOU TAKE

6    THOSE DOCUMENTS OUT, PLEASE?

7    A    (WITNESS COMPLIES.)

8    Q    WOULD YOU REVIEW THEM QUICKLY?

9    A    (WITNESS COMPLIES.)

10            I HAVE.

11    Q    ARE YOU FAMILIAR WITH THOSE DOCUMENTS?

12    A    YES, SIR, I AM.

13    Q    DID YOU OBTAIN THOSE AT THE TIME OF THE ARREST OF

14    CARO-QUINTERO AT LA QUINTA?

15    A    YES, SIR.

16    Q    YOU HAVE BEFORE YOU THE PROSECUTION EXHIBIT 194.  IS

17    THAT CORRECT?

18    A    YES, I DO.

19    Q    AND WERE THE EXHIBITS THAT YOU HAVE, EXHIBIT D MIXED

20    IN WITH WHERE YOU FOUND 194?

21    A    I BELIEVE SO, YES.

22    Q    NOW, YOU ALSO, I BELIEVE, TOLD US ABOUT A BROWN

23    MERCEDES THAT YOU FOUND.  CORRECT?

24    A    BROWN MERCEDES THAT WAS PARKED THERE, YES.

25    Q    DID YOU CONDUCT A SEARCH OF THE BROWN MERCEDES?

15-142

1    A    NO, I DID NOT.

2    Q    LET ME ASK YOU THIS.  DID YOU EVER COME ACROSS ANY

3    DOCUMENTS ABOUT THE OWNERSHIP OF THAT BROWN MERCEDES?

4    A    I DON'T BELIEVE SO, SIR.

5    Q    NOW, DID YOU EVER COME ACROSS ANY DOCUMENTS ABOUT A

6    TRAFFIC ACCIDENT ON MARCH 6, 1985, WHERE MR. BAZAN WAS

7    DRIVING THAT BROWN MERCEDES?

8    A    I DO RECALL SEEING A DOCUMENT ABOUT A TRAFFIC

9    ACCIDENT.

10    Q    NOW, CAN YOU TELL ME WHERE THAT DOCUMENT IS?

11    A    TO THE BEST OF MY RECOLLECTION, THAT DOCUMENT IS IN

12    THE FILE KEPT BY THE COSTA RICAN JUDICIAL POLICE IN SAN

13    JOSE.

14    Q    NOW, DID YOU EVER COME ACROSS A DOCUMENT SHOWING THAT

15    CARO-QUINTERO PURCHASED A BMW FROM AN OFFICER OF THE BANK

16    OF INTERNATIONAL DEVELOPMENT?

17    A    NOT CARO-QUINTERO.  SOMEONE ELSE DID.

18    Q    OKAY.  WHERE IS THAT DOCUMENT?

19    A    AGAIN I BELIEVE IT IS STILL IN THE HANDS OF THE COSTA

20    RICAN AUTHORITIES.

21    Q    ALL RIGHT.  AND THE NAME ON THE DOCUMENT OF THE

22    PURCHASER OF THE BMW?

23    A    I DON'T --

24         MR. CAMPOS:  THAT IS HEARSAY, YOUR HONOR, AND HE

25    HAS SAID HE DIDN'T REMEMBER.

15-143

1      THE COURT:  THE OBJECTION IS SUSTAINED.

2  Q    BY MR. TARLOW:  DID YOU EVER HAVE THAT DOCUMENT?

3  A    I BELIEVE I HAD IT IN MY POSSESSION.  I WAS ALLOWED

4  TO REVIEW THE COSTA RICAN FILE.

5  Q    WERE YOU ALLOWED TO COPY WHAT YOU WANTED?

6  A    YES, I BELIEVE I COULD HAVE COPIED IT.  YES.

7  Q    ALL RIGHT.  WHEN YOU SAY YOU COULD HAVE COPIED IT,

8  YOU MEAN TO TELL US YOU HAD THE OPPORTUNITY TO, BUT

9  DIDN'T, OR THAT YOU MAY HAVE COPIED IT, BUT YOU ARE NOT

10  SURE NOW?

11  A    WELL, THE FILE THAT I AM TALKING ABOUT, SIR, IS KEPT

12  IN THE OFFICE OF THE CHIEF CRIMINAL INVESTIGATOR OF THE

13  JUDICIAL POLICE.  THEY AT THE TIME DID NOT HAVE A COPY

14  MACHINE IN THAT BUILDING, AND I WOULD HAVE HAD TO ASK THEM

15  TO LET ME TAKE THEIR FILE TO OUR OFFICE OR SOMETHING TO

16  COPY IT.  I BELIEVE I JUST OPTED NOT TO DO THAT.

17  Q    LET ME ASK YOU THIS.  THIS FILE THAT YOU ARE TALKING

18  ABOUT THAT YOU LOOKED AT ABOUT THIS CASE IN COSTA RICA,

19  CAN YOU GIVE US AN IDEA HOW BIG THAT WAS?

20      MR. CAMPOS:  OBJECTION, YOUR HONOR.  RELEVANCE.

21      THE COURT:  SUSTAINED.

22  Q    BY MR. TARLOW:  AND, AS FAR AS THE DOCUMENTATION

23  SHOWING WHO IT WAS, WAS EITHER THE OWNER -- WHO IT WAS

24  THAT WAS DRIVING THE BROWN MERCEDES WHEN IT WAS IN A

25  TRAFFIC ACCIDENT ON MARCH 6, 1985, WAS THAT SOMETHING YOU

15-144

1    COULD HAVE HAD THE OPPORTUNITY TO COPY AND DID NOT, OR IS

2    THAT SOMETHING YOU IN FACT COPIED, AND WE DON'T KNOW WHERE

3    IT IS?

4            MR. CAMPOS:  OBJECTION.  ASKED AND ANSWERED.

5            THE COURT:  SUSTAINED.

6    Q    BY MR. TARLOW:  NOW, YOU KNOW THE NAME INEZ CALDERON.

7    CORRECT?

8    A    YES.

9    Q    AND DID THERE COME A TIME WHEN YOU INTERVIEWED THE

10   EX-MRS. INEZ CALDERON, WHO WAS LIVING IN COSTA RICA?

11           MR. CAMPOS:  YOUR HONOR, THAT IS OUTSIDE THE

12   SCOPE OF THE DIRECT.  OBJECTION ON RELEVANCE.

13           THE COURT:  SUSTAINED.

14   Q    BY MR. TARLOW:  DID YOU ACQUIRE ANY DOCUMENTATION

15   WHICH SHOWED THAT MR. INEZ CALDERON HAD OWNED A HOUSE IN

16   COSTA RICA?

17           MR. CAMPOS:  OBJECTION.  HEARSAY, YOUR HONOR, IN

18   TERMS OF WHAT THE DOCUMENTS MIGHT HAVE SAID.

19           MR. TARLOW:  I AM ASKING IF HE HAS THE DOCUMENT.

20           THE COURT:  WELL, YOU DIDN'T ASK THAT.

21           MR. TARLOW:  ALL RIGHT.  I WILL ASK THAT.

22   Q    DO YOU HAVE ANY DOCUMENTS ABOUT THIS HOUSE THAT INEZ

23   CALDERON OWNED IN COSTA RICA?

24   A    I DON'T HAVE THEM WITH ME, BUT I DID OBTAIN THOSE

25   DOCUMENTS.

15-145

1   Q    BUT THAT IS AVAILABLE SOMEPLACE?

2   A    YES.

3   Q    IF WE WANTED THEM.

4        DID YOU EVER OBTAIN ANY DOCUMENTATION ABOUT A

5   DARK BLUE MERCEDES OWNED BY WERNER LOTZ THAT WAS

6   PREVIOUSLY OWNED BY MR. FOWLIE THAT HAD BEEN OWNED BY

7   MR. VESCO?

8        MR. CAMPOS:  AGAIN, YOUR HONOR, IT IS OUTSIDE

9   THE SCOPE.  I OBJECT.

10       THE COURT:  SUSTAINED.

11  Q    BY MR. TARLOW:  DID YOU EVER ACQUIRE MR. WERNER

12  LOTZ'S TELEPHONE TOLL RECORDS FROM COSTA RICA?

13       MR. CAMPOS:  OBJECTION.  THAT IS NOT STAYING

14  WITHIN THE SUBJECT MATTER OF THE TESTIMONY.

15       THE COURT:  THE OBJECTION IS SUSTAINED.

16  Q    BY MR. TARLOW:  WHEN YOU SEARCHED THE HOUSE OF CARO-

17  QUINTERO, DID YOU FIND ANY DOCUMENTATION SHOWING THAT

18  DANNY FOWLIE HAD ENTERED COSTA RICA ON FEBRUARY 15, 1985?

19  A    I DON'T RECALL SEEING THAT AT THAT TIME, NO.

20  Q    BUT YOU DO RECALL SEEING IT AT SOME TIME.  CORRECT?

21  A    I --

22       MR. CAMPOS:  YOUR HONOR, IF IT IS NOT RELATED TO

23  WHAT HE FOUND AT THAT PARTICULAR TIME, IT IS OUTSIDE THE

24  SCOPE, AND I OBJECT ON THAT BASIS.

25       THE COURT:  THE OBJECTION IS SUSTAINED.

15-146

1    Q    BY MR. TARLOW:  NOW, THERE WAS A TIME, AM I CORRECT,

2    SIR, WHEN YOU TRIED TO INTERROGATE CARO-QUINTERO.

3    CORRECT?

4    A    WELL, IMMEDIATELY AFTER THE ARREST, I TRIED TO TALK

5    TO HIM, BUT HE WOULD NOT ADMIT HIS TRUE IDENTITY TO ME.

6    Q    LET ME ASK YOU THIS.  DID YOU HAVE AN OCCASION TO

7    TELL HIM THAT IF HE DIDN'T WANT TO TALK TO YOU, THAT THE

8    COMANDANTE VENTURA WAS ON HIS WAY FROM MEXICO CITY TO TALK

9    TO HIM?

10   A    NO, I DID NOT SAY THAT TO HIM.

11   Q    OKAY.  NOW, BY THE WAY, THERE WERE SOME ITEMS THAT

12   WERE HERE BEFORE.  I GUESS SOMEONE IS BRINGING THEM BACK

13   DOWN.  THERE WERE SOME GUNS THAT YOU TALKED TO US ABOUT.

14   CORRECT?

15   A    YES.

16   Q    NOW, THERE WAS ONE WEAPON, FIRST OF ALL, THAT IS NOT

17   HERE.  CORRECT?

18   A    THAT'S CORRECT.

19   Q    NOW, THAT IS A PISTOL.  CORRECT?

20   A    YES.

21   Q    NOW, CAN YOU TELL ME WHERE THAT -- WHAT CALIBER THAT

22   WAS, APPROXIMATELY?

23   A    IT LOOKED TO ME LIKE A .45.

24   Q    AND CAN YOU DESCRIBE WHAT WAS ON IT FOR ME?

25   A    IT WAS INSCRIBED WITH THE WORDS "DIRECCION FEDERAL DE

15-147

1    SEGURIDAD," I BELIEVE.

2    Q    DID IT HAVE AN EMBLEM ON IT?

3    A    I DON'T RECALL THE EMBLEM, SIR.

4    Q    ALL RIGHT.  WHERE DID YOU FIND THAT?

5    A    THAT WAS ONE OF THE WEAPONS THAT WAS INSIDE THE LA

6    QUINTA CALIFORNIA.

7    Q    AND I TAKE IT YOU DO NOT HAVE THIS DFS .45 PISTOL

8    THAT CARO-QUINTERO HAD WITH HIM.  CORRECT?

9    A    NO, I DON'T HAVE IT.

10   Q    AND CAN YOU TELL US WHERE IT IS?

11   A    I CAN TELL YOU WHERE I WAS TOLD IT IS.

12   Q    ALL RIGHT.

13        MR. CAMPOS:  I WOULD OBJECT TO WHAT HE WAS TOLD.

14   HEARSAY.

15        THE COURT:  SUSTAINED.

16   Q    BY MR. TARLOW:  YOU DO NOT HAVE ACCESS TO IT.

17   CORRECT?

18   A    THAT'S CORRECT.

19   Q    NOW, HOW MANY GUNS DID YOU SAY YOU FOUND?

20   A    I BELIEVE FOUR.

21   Q    AND THAT INCLUDES THE RIFLE?

22   A    YES.

23   Q    NOW, YOU HAD A .45 -- TELL ME WHAT ARE THE FOUR.  THE

24   RIFLE?

25   A    THE RIFLE, THE ONE WITH THE R 1 IN JEWELRY; THE OTHER

15-148

1  WEAPON THAT WAS HERE; IT IS ANOTHER AUTOMATIC; AND THE ONE

2  THAT WE JUST TALKED ABOUT WITH THE INSCRIPTION.

3  Q    AND THE RIFLE --

4  A    EXCUSE ME.  I BELIEVE THERE WAS ANOTHER GUN THERE

5  THAT WAS EVENTUALLY RETURNED.  IT BELONGED TO THE, I

6  THINK, GROUNDS KEEPER OR SOMETHING.

7  Q    NOW, THE RIFLE THAT WE HAD HERE THIS MORNING, WHICH I

8  GUESS SOMEONE WAS BRINGING BACK.

9  A    IT IS UNDERNEATH THE TABLE.

10        MR. TARLOW:  CAN WE PLACE THAT BEFORE THE

11  WITNESS, YOUR HONOR?

12        THE COURT:  YES.

13        (BEFORE THE WITNESS.)

14        THE COURT:  IS IT UNLOADED?

15        THE WITNESS:  YES, SIR.

16  Q    BY MR. TARLOW:  DOES THAT SAY SOMETHING ON IT?

17  A    YES, IT DOES.

18  Q    IS IT IN SPANISH?

19  A    IT HAS -- IT SAYS -- THERE ARE TWO LANGUAGES.  I

20  THINK IT IS FRENCH, AND I THINK -- I AM NOT SURE -- AND

21  SPANISH.

22  Q    OKAY.  WELL, ARE YOU ANY GOOD AT FRENCH?

23  A    NO, SIR.

24  Q    LET'S TRY THE SPANISH ONE.

25  A    THE SPANISH ONE SAYS GUARDIA NACIONAL NICARAGUA.

15-149

1    Q    AND FOR THOSE OF US WHO HAVE TROUBLE WITH SPANISH,

2    WHAT IS THAT?

3    A    THAT MEANS THE NACIONAL GUARD NICARAGUA.

4    Q    THANK YOU, SIR.  BY THE WAY, WAS ANY EFFORT MADE TO

5    FINGERPRINT THAT RIFLE TO SEE IF WERNER LOTZ'S

6    FINGERPRINTS WERE ON THERE?

7              MR. CAMPOS:  OBJECTION.  RELEVANCE AND OUTSIDE

8    THE SCOPE.

9              THE COURT:  SUSTAINED.

10             MR. TARLOW:  MAY I HAVE A MOMENT HERE, YOUR

11   HONOR?

12             (PAUSE.)

13   Q    BY MR. TARLOW:  BY THE WAY, THAT EXHIBIT 194?

14   A    YES.

15   Q    CAN YOU TELL US -- THERE ARE FOUR NUMBERS ON THE TOP

16   THAT HAVE NAMES ON THEM.  CORRECT?

17   A    THERE IS MORE THAN THAT THAT HAVE NAMES.

18   Q    IS THERE ONE THAT SAYS RICARDO AND ONE THAT SAYS

19   ARTURO?

20   A    YES.

21   Q    ALL RIGHT.  NOW, AS TO THE RICARDO ONE, CAN YOU GIVE

22   US THE PHONE NUMBER?

23   A    RICARDO, 722-9935; 722-9950-99-55.

24   Q    AND THE ONE FOR ARTURO DE LA TORRE?

25   A    ARTURO, 724-5357; 728-9944.

15-150

1    Q    OKAY.  NOW, BY THE WAY, DID YOU EVER DO ANY

2    HANDWRITING COMPARISONS TO TRY TO SEE WHOSE HANDWRITING

3    THAT WAS?

4    A    I DIDN'T.

5    Q    DID ANYONE EVER DO IT, IF YOU KNOW?

6    A    I DON'T KNOW THAT.

7    Q    NOW, WHEN YOU WENT TO THE LA QUINTA ADDRESS, A

8    COLONEL LUIS BERANTES WAS IN CHARGE.  CORRECT?

9    A    HE WAS -- COLONEL BERANTES WAS NOT IN CHARGE OF THE

10   ENTRY.  HE WAS IN CHARGE OF THE FOLLOW-UP INVESTIGATION

11   IMMEDIATELY AFTER THE ENTRY.

12   Q    NOW, ONCE THE ENTRY WAS OVER WITH, DID HE -- ONCE THE

13   ENTRY WAS OVER WITH, DID COLONEL BERANTES TAKE CHARGE OF

14   THE SCENE WHILE YOU WERE DOING THE SEARCHING?

15   A    YES, HE DID.  ACTUALLY -- YES, HE DID.

16   Q    NOW, LET ME ASK YOU THIS.  WERE YOU PRESENT WHEN

17   CARO-QUINTERO TOLD ALVERO QUINTERO THAT HE PAID COLONEL

18   BERANTES $60,000 TO GET INTO COSTA RICA?

19        MR. CAMPOS:  OBJECTION, YOUR HONOR.  HEARSAY.

20   IT IS OUTSIDE THE SCOPE AS WELL.

21        THE COURT:  IT IS A COMPOUND QUESTION.

22        MR. CAMPOS:  YES, THE FORM.

23        THE COURT:  THE OBJECTION IS SUSTAINED.

24        MR. TARLOW:  ON WHICH GROUND, YOUR HONOR?

25        THE COURT:  BOTH.

15-151

1        MR. TARLOW:  THAT MAKES IT PRETTY HARD TO

2    REPHRASE IT.

3    Q    IN ANY EVENT, COLONEL BERANTES TOOK CHARGE AND HIS

4    MEN WERE IN THE HOUSE.  CORRECT?

5    A    YES.

6    Q    NOW, LET ME ASK YOU THIS.  WERE YOU EVER PRESENT WHEN

7    THERE WERE ANY COMPLAINTS BY CARO-QUINTERO ABOUT HIS

8    300,000 THAT WAS STOLEN?

9    A    NO, SIR.

10   Q    OKAY.  WHAT IS COLONEL BERANTES' TITLE IN COSTA RICA?

11   A    COLONEL, DIRECTOR OF THE NARCOTICS DIVISION.

12   Q    OF WHAT, SIR?

13   A    COLONEL IN THE CIVIL GUARD.

14   Q    NOW, SIR, AM I CORRECT THAT THIS IS THE SAME COLONEL

15   LUIS BERANTES WHO WAS PRESENT AT THE AIRPORT AND GREETED

16   WERNER LOTZ WHEN HE FLEW CARO-QUINTERO INTO COSTA RICA?

17        MR. CAMPOS:  OBJECTION, YOUR HONOR.  IRRELEVANT

18   AND OUTSIDE THE SCOPE OF THE DIRECT AND HEARSAY.

19        THE COURT:  THE OBJECTION IS SUSTAINED.

20   Q    BY MR. TARLOW:  LET ME ASK YOU THIS.  IN THE COURSE

21   OF YOUR INVESTIGATION, DID YOU HAVE OCCASION TO INTERVIEW

22   COLONEL LUIS BERANTES?

23        MR. CAMPOS:  OBJECTION.  RELEVANCE, YOUR HONOR.

24        THE COURT:  OVERRULED.

25        THE WITNESS:  I NEVER INTERVIEWED HIM.  WE

15-152

1    WORKED TOGETHER.

2    Q    BY MR. TARLOW:  WHILE YOU WERE WORKING TOGETHER, DID

3    YOU HAVE OCCASION TO ASK HIM WHAT HE WAS DOING AT THE

4    AIRPORT 30 FEET FROM WHERE WERNER LOTZ'S PLANE LANDED WITH

5    CARO-QUINTERO?

6              MR. CAMPOS:  OBJECTION, YOUR HONOR.  IT IS

7    OUTSIDE THE SCOPE OF THE DIRECT TESTIMONY.  NOT ONLY THAT,

8    HE IS INTERJECTING EVIDENCE.

9              THE COURT:  THE OBJECTION IS SUSTAINED.

10             MR. TARLOW:  I WILL MOVE ON, YOUR HONOR.

11   Q    NOW, IS COLONEL BERANTES IN CHARGE OF THE NARCOTIC

12   OFFICERS.  IS THAT WHAT HIS JOB IS?

13   A    WELL, YOU HAVE TO TELL ME WHAT PERIOD OF TIME YOU ARE

14   REFERRING TO.

15   Q    AT THE TIME OF THE RAID.  I UNDERSTAND HE WAS FIRED

16   FROM HIS JOB AFTER THESE EVENTS.

17             MR. CAMPOS:  OBJECTION.  OBJECTION.

18             THE COURT:  COUNSEL, WILL YOU STOP MAKING THESE

19   ASSERTIONS.

20             I WILL INSTRUCT THE JURY THAT ASSERTIONS MADE BY

21   COUNSEL, EITHER IN QUESTIONS OR OTHERWISE, ARE NOT TO BE

22   DEEMED AS EVIDENCE IN THIS CASE AND ARE TO BE DISREGARDED

23   AND CONSIDERED ONLY INSOFAR AS THEY REFLECT ON THE

24   WITNESS'S ANSWERS.

25             NO ASSERTIONS.

15-153

1          MR. TARLOW:  WELL, LET ME ASK HIM A QUESTION.

2     Q    SIR, ISN'T IT A FACT THAT AFTER THE INQUIRY BY THE

3     COSTA RICAN OFFICIALS, COLONEL BERANTES LOST HIS JOB

4     BECAUSE OF THIS?

5          MR. CAMPOS:  OBJECTION.  RELEVANCE.  OUTSIDE THE

6     SCOPE OF THE DIRECT.

7          THE COURT:  SUSTAINED.

8     Q    BY MR. TARLOW:  NOW, AM I CORRECT THAT COLONEL

9     BERANTES PERSONALLY CHOSE THE GROUP OF SOLDIERS WHO WOULD

10    CONDUCT THE SEARCH AND SEIZURE AS FAR AS YOU KNOW?

11    A    I SUPPOSE HE DID.  THEY ARE HIS MEN.

12    Q    NOW, YOU TOLD US A BIT ABOUT SOME WIRE TAPS.  WAS

13    THERE A WIRE TAP ON LA QUINTA?

14         MR. CAMPOS:  OBJECTION.  THERE IS NO TESTIMONY

15    REGARDING THAT SUBJECT.

16         THE COURT:  SUSTAINED.

17    Q    BY MR. TARLOW:  DIDN'T YOU TELL US IN YOUR DIRECT

18    TESTIMONY THAT PEOPLE WERE LISTENING ON THE PHONES IN LA

19    QUINTA?

20         MR. CAMPOS:  OBJECTION.

21    Q    BY MR. TARLOW:  YOU TESTIFIED TO THAT ON DIRECT.

22         THE COURT:  JUST A MOMENT.

23         MR. CAMPOS:  YOUR HONOR, IT IS OUTSIDE THE

24    SCOPE.  IT WAS NOT TESTIFIED TO.

25         THE COURT:  WE HEARD WHAT THE WITNESS TESTIFIED

15-154

1   TO, SO THERE IS NO NEED TO ASK HIM WHAT HE TESTIFIED TO.

2   THAT IS ALWAYS AN IMPROPER QUESTION.

3   Q    BY MR. TARLOW:  WHO WAS CONDUCTING THE WIRE TAPS OR

4   EAVESDROPPING THAT YOU REFERRED TO IN DIRECT TESTIMONY?

5   A    I DIDN'T REFER TO ANY WIRE TAPS IN MY DIRECT

6   TESTIMONY IF I RECALL CORRECTLY.

7   Q    WELL, I WILL LOOK AT MY NOTES.  YOU TALKED ABOUT THAT

8   YOU HAD FOUND OUT SOME INFORMATION.  CORRECT?

9   A    I GUESS.  WE FOUND OUT SOME INFORMATION.

10  Q    AND YOU LOCATED THAT HOUSE.  RIGHT?

11  A    NO.  WE WERE TOLD -- WE WERE GIVEN SOME INFORMATION,

12  AND THEN WE LOCATED THE HOUSE.

13  Q    WELL, YOU WERE GIVEN INFORMATION THAT SOMEONE WAS

14  LISTENING ON THE PHONES.  RIGHT?

15          MR. CAMPOS:  OBJECTION.  RELEVANCE, AND ASKED

16  AND ANSWERED.

17          THE COURT:  THE OBJECTION IS SUSTAINED.

18          MR. TARLOW:  YOUR HONOR, HE ABSOLUTELY TESTIFIED

19  TO THIS.

20          THE COURT:  IT IS IRRELEVANT.

21  Q    BY MR. TARLOW:  WAS MY CLIENT'S VOICE HEARD WHEN

22  SOMEONE WAS WIRE TAPPING, LISTENING ON THE PHONES?

23          MR. CAMPOS:  OBJECTION, YOUR HONOR.  ASKED AND

24  ANSWERED.  HE CONTINUES IN THIS INQUIRY.

25          MR. TARLOW:  THAT QUESTION WASN'T ASKED AND

15-155

1   ANSWERED, YOUR HONOR.

2            THE COURT:  THE QUESTION IS IMPROPER IN ITS

3   FORM.

4            MR. TARLOW:  ALL RIGHT.

5   Q    DO YOU HAVE ANY EVIDENCE THAT MY CLIENT'S VOICE WAS

6   HEARD ON THE LA QUINTA PHONES BY ANY LAW ENFORCEMENT

7   OFFICER OR AGENT?

8            MR. CAMPOS:  THAT CALLS FOR SPECULATION, YOUR

9   HONOR.

10            THE COURT:  THE WITNESS MAY ANSWER THAT QUESTION

11   YES OR NO.

12            THE WITNESS:  I HAVE NO KNOWLEDGE OF THAT.

13   Q    BY MR. TARLOW:  NOW, BY THE WAY, WHEN YOU WERE

14   ORGANIZING YOUR SEARCH PARTY OR THE PARTY THAT WAS GOING

15   TO SEIZE LA QUINTA, THERE WAS CERTAIN INFORMATION THAT YOU

16   HAD.  CORRECT?

17   A    WELL, I'D LIKE TO POINT OUT THAT I DIDN'T ORGANIZE

18   ANY SEARCH PARTY.

19   Q    BY THE WAY, DURING YOUR SEARCHING AND EVERYTHING THAT

20   YOU SEIZED, DID YOU FIND -- BY THE WAY, YOU HAVE ALSO

21   ACQUIRED JESUS FELIX'S TRAVEL RECORDS, CORRECT, UNDER THE

22   NAME DE LA TORRE.  CORRECT?

23   A    NOT DE LA TORRE.

24   Q    EXCUSE ME.  UNDER THE NAME DE LEON?

25   A    TRAVEL RECORDS?  YOU MEAN, I TAKE IT --

15-156

1    Q    PASSPORTS IN AND OUT?

2    A    ENTRY AND EXIT RECORDS OF COSTA RICA?

3    Q    RIGHT.

4    A    YES.  RIGHT.  THAT I DID.

5    Q    AND DID YOU ALSO PARTICIPATE IN ACQUIRING THE SAME

6    THING, EXITS AND INS AND OUTS FROM PANAMA FOR MR. FELIX?

7    A    I BELIEVE I ASKED OUR PANAMA OFFICE TO OBTAIN THAT.

8    Q    AND AT SOME POINT YOU EVEN OBTAINED HIS EXITS, INS

9    AND OUTS, FROM COLOMBIA.  CORRECT?

10   A    NO.

11   Q    I WANT TO ASK YOU IF IN THE COURSE OF ANY OF THE

12   PAPERWORK YOU FOUND THAT IF YOU HAVE FOUND ANY PAPERWORK,

13   SEIZED ANY DOCUMENT, INCONSISTENT WITH THIS:  THAT ON

14   FEBRUARY 2ND, 1985, JESUS FELIX LEFT PANAMA FOR COLOMBIA?

15   A    WELL, IF THAT IS A DOCUMENT, I'D HAVE TO SEE THE

16   DOCUMENT.  I DON'T RECALL EXACT DATES NOW, COUNSEL.

17   Q    ALL I AM SAYING IS CAN YOU RECALL ANY DOCUMENT

18   INCONSISTENT WITH THAT?

19        MR. CAMPOS:  IT HAS BEEN ASKED AND ANSWERED,

20   YOUR HONOR.  HE STATED WHAT HE KNOWS.

21        THE COURT:  SUSTAINED.

22   Q    BY MR. TARLOW:  ALL RIGHT.  LET ME ASK YOU THIS, SIR.

23   DID YOU COME ACROSS ANY DOCUMENT ANYWHERE IN YOUR

24   INVESTIGATION AND IN YOUR SEIZURES WHICH IS IN ANY WAY

25   INCONSISTENT WITH JESUS FELIX BEING IN COLOMBIA, PANAMA,

15-157

1    AND COSTA RICA  BETWEEN FEBRUARY 27, 1985 AND FEBRUARY 9,

2    1985?

3            MR. CAMPOS:  YOUR HONOR, THE FORM OF THE

4    QUESTION IS IMPROPER.  IT CALLS FOR SPECULATION.  IT CALLS

5    FOR HEARSAY.

6            THE COURT:  THE OBJECTION IS SUSTAINED.

7    Q    BY MR. TARLOW:  DID YOU SEIZE ANY PAPERWORK AT ALL --

8    STRIKE THAT.

9            BY THE WAY, THIS JEWELRY THAT YOU SHOWED US THE

10   PICTURES OF --

11   A    YES.

12   Q    -- WHAT HAPPENED TO THAT?

13   A    THAT JEWELRY IS IN THE CUSTODY OF THE COSTA RICAN

14   GOVERNMENT IN A VAULT IN THE CENTRAL BANK OF COSTA RICA.

15   Q    NOW, BY THE WAY, I THOUGHT I ASKED YOU THIS, BUT I AM

16   NOT SURE IF I DID.  OTHER THAN THAT ONE GRAND JURY

17   TRANSCRIPT THAT I SHOWED YOU, HAVE YOU EVER TESTIFIED

18   ABOUT THIS CASE BEFORE ANY OTHER GRAND JURY?

19   A    NO, SIR.

20   Q    NOW, YOU MENTIONED THAT YOU PREPARED REPORTS IN THIS

21   CASE.  CORRECT?

22   A    YES.

23   Q    AND IN PREPARING THOSE REPORTS, DID YOU COMPLY WITH

24   THE POLICY IN THE DEA MANUAL THAT THEY SHOULD BE PREPARED

25   WITHIN FIVE WORKING DAYS OF AN INTERVIEW?

15-158

1    MR. CAMPOS:  OBJECTION, YOUR HONOR.  THAT IS

2    REFERRING TO INFORMATION OUTSIDE.  IT IS HEARSAY, AND IT

3    IS NOT RELEVANT.

4    THE COURT:  SUSTAINED.

5    Q    BY MR. TARLOW:  HOW LONG HAVE YOU BEEN WORKING ON

6    THIS CASE?

7    A    I WOULD SAY SINCE I GOT THE FIRST TELEPHONE CALL THAT

8    ENRIQUE CAMARENA HAD BEEN KIDNAPPED.

9    Q    AND IT'S BEEN A MAJOR PART OF YOUR WORK.  CORRECT?

10    A    IT'S BEEN A MAJOR PART OF IT, YES.

11    Q    BY THE WAY, DID YOU CONDUCT AN INVESTIGATION OF HOW

12    MR. CARO-QUINTERO GOT INTO COSTA RICA?

13    A    YES, I DID.

14    Q    AND THAT IS NOT WITHIN THE REPORT YOU HAVE GIVEN ME.

15    CORRECT?  THAT IS ANOTHER SUBJECT?

16    A    THAT WAS DONE AFTERWARDS.

17    Q    DID THERE COME A TIME WHEN YOU GOT ANY PHONE TOLLS

18    FROM COMANDANTE VENTURA?

19    MR. CAMPOS:  OBJECTION.  RELEVANCE.

20    THE COURT:  SUSTAINED.

21    MR. TARLOW:  YOUR HONOR, I HAVE NO FURTHER

22    QUESTIONS AT THIS TIME.  I'D LIKE THE WITNESS TO REMAIN

23    AVAILABLE IN CASE HE IS NEEDED LATER.

24    THE COURT:  IS THERE ANY REDIRECT?

25    MR. CAMPOS:  I HAVE VERY FEW QUESTIONS, YOUR

15-159

1   HONOR.

2                    FURTHER REDIRECT EXAMINATION

3   BY MR. CAMPOS:

4   Q    SPECIAL AGENT GONZALEZ, AFTER CARO-QUINTERO WAS

5   ARRESTED IN COSTA RICA, WOULDN'T YOU HAVE LOVED FOR HIM TO

6   HAVE GONE BACK TO THE UNITED STATES IN U.S. CUSTODY?

7   A    YES, OF COURSE.  THAT IS WHAT WE TRIED TO DO.

8   Q    AND YOU AND YOUR FELLOW DEA AGENTS TRIED TO WORK THAT

9   AS BEST YOU COULD, DIDN'T YOU?

10  A    YES.

11  Q    AND THE MEXICAN GOVERNMENT OFFICIALS WITHIN A DAY OF

12  CARO-QUINTERO'S ARREST WERE IN COSTA RICA DEMANDING HIS

13  CUSTODY.  IS THAT CORRECT?

14  A    THAT IS CORRECT.

15  Q    AND YOU DECIDED IN LIGHT OF THE SITUATION THAT THE

16  BEST YOU COULD HOPE FOR WAS TO HAVE CARO-QUINTERO GO TO

17  MEXICO UNDER ARREST?

18  A    THAT WAS NOT MY DECISION, BUT I THINK THAT WAS THE

19  CONSENSUS FROM DEA, I BELIEVE DEA HEADQUARTERS, AND WE

20  ARRIVED THAT THAT WAS THE BEST THING TO DO.

21  Q    AND THAT WAS AFTER YOU HAD LOOKED INTO WHAT OTHER

22  PROCEDURES WERE AVAILABLE TO THE UNITED STATES WITH

23  RESPECT TO CARO-QUINTERO?

24  A    THAT'S RIGHT.

25           MR. CAMPOS:  NOTHING FURTHER, YOUR HONOR.

15-160

1        THE COURT:  ANY FURTHER QUESTIONS?

2        MR. TARLOW:  YES, YOUR HONOR.  MAY I HAVE A

3  MOMENT TO LOOK FOR A DOCUMENT?

4        (PAUSE.)

5        THE COURT:  ARE YOU READY?  STAY WITHIN THE

6  SCOPE OF THE REDIRECT.

7        MR. TARLOW:  THAT IS ALL IT IS, YOUR HONOR.

8        FURTHER RECROSS EXAMINATION

9  BY MR. TARLOW:

10  Q   SIR, YOU JUST TOLD US HOW YOU WOULD HAVE LOVED TO

11  HAVE HAD CARO-QUINTERO BACK HERE.  CORRECT?

12  A   YES.

13  Q   AND HAVE YOU EVER WORKED IN EITHER OF THESE DISTRICTS

14  BEFORE?

15  A   YES.  I WORKED IN LOS ANGELES.

16  Q   DO YOU KNOW MR. BONNER, U.S. ATTORNEY?

17  A   YES, SIR, I KNOW HIM.

18        MR. CAMPOS:  IT IS IRRELEVANT.

19        THE COURT:  IT IS IRRELEVANT.

20  Q   BY MR. TARLOW:  NOW, LET ME ASK YOU THIS.  DID YOU

21  ASK YOUR SUPERVISOR TO PICK UP THE PHONE AND SAY,

22  "MR. BONNER, IN THE NEXT HALF HOUR CAN YOU GET US AN

23  ARREST WARRANT FOR MARIJUANA SO WE CAN EXTRADITE HIM?"

24  A   NO, I DIDN'T.

25  Q   ALL RIGHT.  YOU KNOW MR. NUNEZ DOWN IN SAN DIEGO,

15-161

1    ANOTHER HARD-NOSED PROSECUTOR.  RIGHT?

2    A    NO, I DON'T KNOW MR. NUNEZ.

3    Q    YOU KNOW THAT OFFICE DOWN THERE.  RIGHT?

4    A    YES, I KNOW THAT OFFICE.

5    Q    HAVE YOU EVER WORKED WITH STEVE NELSON, HEAD OF THE

6    DRUG SECTION?

7    A    NO, I HAVE NOT.

8    Q    ALL RIGHT.  ANYONE EVER CALL UP STEVE AND SAY,

9    "STEVE, WOULD IT TAKE YOU LONGER THAN A HALF AN HOUR TO

10   GET A WARRANT TO EXTRADITE ON MARIJUANA?"

11   A    HALF AN HOUR?

12   Q    HALF AN HOUR.

13           THE COURT:  JUST A MOMENT.

14           MR. TARLOW:  THAT IS MY QUESTION.

15           THE COURT:  ALL RIGHT.  COUNSEL, IF THESE ARE

16   THE TYPE OF QUESTIONS YOU ARE GOING TO ASK, BE SEATED.

17           MR. TARLOW:  I HAVE OTHER QUESTIONS.

18           THE COURT:  THEY ARE PURELY ARGUMENTATIVE

19   QUESTIONS.  YOU HAVE ASKED THEM BEFORE.

20           MR. TARLOW:  I HAVE SOME ADDITIONAL QUESTIONS,

21   YOUR HONOR.

22           THE COURT:  ASK YOUR NEXT QUESTION, AND IT

23   BETTER BE APPROPRIATE IN FORM.

24   Q    BY MR. TARLOW:  SIR, IN FACT, THE GOVERNMENT OF

25   MEXICO WAS ORIGINALLY NOT DOING ANYTHING TO TRY TO GET

15-162

1  CARO-QUINTERO BACK.  ISN'T THAT CORRECT?

2          MR. CAMPOS:  YOUR HONOR, THAT CALLS FOR

3  SPECULATION.  IT CALLS FOR INFORMATION HE DOESN'T HAVE.

4          THE COURT:  THE OBJECTION IS SUSTAINED.

5  Q   BY MR. TARLOW:  SIR, WERE YOU PRESENT WHEN THE HEAD

6  OF THE -- THE C.A., THE ATTACHE, CHECKED AND FOUND OUT

7  THAT MEXICO HADN'T BEEN DOING ANYTHING AND HAD NO INTEREST

8  IN CARO-QUINTERO AND TRIED TO GET THE PROCESS MOVING?

9          MR. CAMPOS:  OBJECTION TO THE FORM OF THE

10 QUESTION.  IT IS OUTSIDE THE SCOPE OF THE REDIRECT.

11         THE COURT:  SUSTAINED.

12 Q   BY MR. TARLOW:  SIR, YOU TESTIFIED BEFORE THE GRAND

13 JURY.  CORRECT?

14         MR. CAMPOS:  ASKED AND ANSWERED.

15         THE COURT:  SUSTAINED.

16         MR. TARLOW:  IT IS A PRELIMINARY QUESTION TO

17 IMPEACHING HIM.

18         THE COURT:  IT IS NOT NECESSARY.  WE ALREADY

19 KNOW HE TESTIFIED.  WE HAVE HAD IT TWICE.

20 Q   BY MR. TARLOW:  WAS THIS QUESTION ASKED AND DID YOU

21 GIVE THIS ANSWER?

22         "DID THE MEXICANS HAVE ANY ARREST WARRANTS?

23         "AS FAR AS I KNOW, I DON'T THINK SO."

24 A   I MAY HAVE SAID THAT.  I WOULD HAVE TO LOOK AT THE

25 TRANSCRIPT.

15-163

1    Q    AND DID YOU SAY:

2              "I THINK CARO-QUINTERO MAY HAVE BEEN WANTED

3         ON SOME OLD NARCOTICS CHARGES"?

4    A    I MAY HAVE SAID THAT, YES.

5              MR. TARLOW:  NO FURTHER QUESTIONS, YOUR HONOR.

6              THE COURT:  ANYTHING FURTHER OF THIS WITNESS?

7              MR. CAMPOS:  NOTHING FURTHER, YOUR HONOR.

8              THE COURT:  YOU MAY STEP DOWN.

9              MR. GURULE:  YOUR HONOR, THE GOVERNMENT WOULD

10   CALL AS ITS NEXT WITNESS MS. LILI ZUNIGA.  I HAVE A FEW

11   EXHIBITS FOR HER IF I COULD APPROACH.

12             THE COURT:  ALL RIGHT.

13             MR. GURULE:  SHE IS ALSO GOING TO REQUIRE THE

14   ASSISTANCE OF AN INTERPRETER.

15             THE COURT:  VERY WELL.

16        LILI ZUNIGA SALAS, PLAINTIFF'S WITNESS, SWORN

17             THROUGH THE SPANISH INTERPRETER

18             THE CLERK:  PLEASE BE SEATED.

19             PLEASE STATE YOUR FULL NAME FOR THE RECORD AND

20   SPELL YOUR LAST NAME.

21             THE WITNESS:  MY NAME IS LILI ZUNIGA SALAS.

22                  DIRECT EXAMINATION

23   BY MR. GURULE:

24   Q    MS. ZUNIGA, ARE YOU A CITIZEN OF COSTA RICA?

25   A    I AM A COSTA RICAN CITIZEN.

15-164

1    Q     AND WHAT IS YOUR OCCUPATION AT COSTA RICA?

2    A     IN COSTA RICA I AM THE DIRECTOR OF THE COMPUTER

3    CENTER OF THE MINISTRY OF PUBLIC SAFETY SECURITY.

4    Q     AND, MS. ZUNIGA, WHAT DOES THAT ENTAIL?  WHAT ARE

5    YOUR RESPONSIBILITIES IN THAT CAPACITY?

6    A     AS THE DIRECTOR OF THE COMPUTER CENTER OF THE

7    SECURITY AGENCY, I KEEP TRACK OF ALL ENTRIES AND EXITS OF

8    PEOPLE IN AND OUT OF THE COUNTRY, BOTH CITIZENS AND

9    TOURISTS.

10   Q     HOW ARE YOU ABLE TO DO THAT?  WHAT DOCUMENTS DO YOU

11   USE?

12         THE COURT:  COUNSEL, DON'T ASK COMPOUND

13   QUESTIONS.  YOU ARE DEALING WITH AN INTERPRETER.

14         MR. GURULE:  I UNDERSTAND.

15         THE COURT:  IF YOU ASK THE QUESTION HOW ARE YOU

16   ABLE TO DO THAT, THAT IS SUFFICIENT.

17   Q     BY MR. GURULE:  HOW ARE YOU ABLE TO DO THAT?

18   A     IN COSTA RICA THERE ARE SOME PORTS OF ENTRY WHICH ARE

19   BOTH BY LAND AND BY AIR AND ALSO SEAPORTS.  THESE PLACES

20   HAVE OFFICES -- OF THESE SECURITY AGENCY OFFICES, WHICH

21   ARE IN CHARGE OF CHECKING ALL MIGRATORY MOVEMENTS OF THE

22   CITIZENS.

23         WE DO THAT BY MEANS OF CARDS WHICH ARE FILLED IN

24   BY THE PASSENGERS WHO ENTER AND THOSE GO ON TYPEWRITTEN

25   LISTS.  AND WE USE THOSE LISTS IN THE COMPUTER CENTER TO

15-165

1    ENTER THAT INFORMATION INTO THE COMPUTER.

2    Q    LET ME STOP YOU RIGHT HERE JUST TO CLARIFY A COUPLE

3    OF POINTS.  SO, THEN, IF A PASSENGER WHO IS TRAVELING IN

4    AND OUT OF COSTA RICA, IS IT NECESSARY FOR THAT PASSENGER

5    TO FILL OUT A PARTICULAR CARD?

6    A    THAT'S RIGHT.

7    Q    AND WHAT INFORMATION -- WHAT TYPE OF INFORMATION

8    WOULD BE ON THAT CARD?

9    A    EACH PASSENGER HAS TO FILL A CARD WHICH IS GIVEN TO

10   HIM OR HER, WHETHER ON THE PLANE OR ON THE BUS, WITH THE

11   FOLLOWING INFORMATION, SUCH AS THE NUMBER OF THE PASSPORT;

12   NATIONALITY; THE NAME, OF COURSE; SOMETIMES THE OCCUPATION

13   IS FILLED IN; THE AGE; AND THE PLACE OF DEPARTURE AND

14   DESTINATION.

15   Q    SO THOSE CARDS WOULD AT THE VERY LEAST CONTAIN THE

16   NAME OF THE PASSENGER?

17   A    YES, OF COURSE.  THAT IS IMPORTANT.

18   Q    AND THE PASSPORT NUMBER OF THAT PASSENGER?

19   A    YES, SIR.  THAT IS IMPORTANT, VERY IMPORTANT.

20   Q    AND THE DATE OF TRAVEL?

21   A    EXACTLY.

22   Q    NOW, AFTER THOSE CARDS ARE FILLED OUT BY THE

23   PASSENGERS, ARE THEY COLLECTED BY PEOPLE THAT WORK WITH

24   YOUR OFFICE?

25   A    THAT'S RIGHT.

15-166

1    Q    AND THEN IS THE INFORMATION THAT IS INSCRIBED ON

2    THOSE CARDS WHICH YOU JUST EXPLAINED, IS THAT INFORMATION

3    THAT IS KEYED INTO YOUR COMPUTER SYSTEM?

4    A    YES, THAT'S RIGHT.

5    Q    SO, THEN, IF YOU WANTED TO KNOW A PARTICULAR TRAVEL

6    OF A PARTICULAR PASSENGER, YOU WOULD JUST NEED TO KEY IN

7    THE NAME OF THAT PASSENGER?

8    A    THAT'S RIGHT.

9    Q    TO OBTAIN A HISTORY OF TRAVEL IN AND OUT OF COSTA

10   RICA?

11   A    EXACTLY.  THAT'S RIGHT.

12   Q    I BELIEVE THAT YOU HAVE A NUMBER OF EXHIBITS IN FRONT

13   OF YOU, AND SPECIFICALLY I'D LIKE TO ADDRESS YOUR

14   ATTENTION TO GOVERNMENT'S EXHIBITS 172 AND 173.  DO YOU

15   HAVE THOSE DOCUMENTS IN FRONT OF YOU?

16   A    I NEED MY GLASSES.  YES, THESE ARE FROM MY OFFICE.

17   Q    LET ME DIRECT YOUR ATTENTION FIRST TO GOVERNMENT'S

18   NO. 172.  I BELIEVE IT IS MARKED WITH A STICKER ON THE

19   BACK OF THE DOCUMENT.

20   A    THIS IS 173.

21   Q    172, PLEASE.

22   A    THIS IS THE ONE.

23   Q    NOW, WHAT IS GOVERNMENT'S EXHIBIT 172?  CAN YOU

24   IDENTIFY IT, PLEASE?

25   A    THIS IS A CERTIFICATE WHICH WAS ISSUED IN THE NAME OF

15-167

1   FELIX-GUTIERREZ JESUS, KNOWN AS JUAN FELIX, OF MEXICAN

2   NATIONALITY; AND HE WAS ENTERED IN OUR COMPUTER MEMORY

3   STARTING JANUARY '80.  JULY '86.

4   Q    LET ME STOP YOU FOR A MINUTE.  I AM GOING TO HAVE YOU

5   LATER EXPLAIN THE DOCUMENT MORE SPECIFICALLY.  BUT AT THIS

6   POINT I JUST WANT TO HAVE YOU IDENTIFY WHETHER OR NOT THIS

7   IS A DOCUMENT THAT REFLECTS THE TRAVEL HISTORY IN AND OUT

8   OF COSTA RICA FOR AN INDIVIDUAL BY THE NAME OF JESUS

9   FELIX-GUTIERREZ.

10  A    THAT'S RIGHT.

11  Q    NOW, DIRECTING YOUR ATTENTION TO GOVERNMENT'S 173, I

12  BELIEVE THAT WAS THE FIRST EXHIBIT THAT YOU IDENTIFIED.

13  A    IT IS THIS ONE.

14  Q    DO YOU HAVE THAT EXHIBIT IN FRONT OF YOU?

15  A    YES.

16  Q    AND IS THAT IN THE NAME OF JESUS DIAZ DE LEON

17  ZAMORANO?

18  A    THAT'S RIGHT.

19  Q    AND DOES THAT PARTICULAR DOCUMENT REPRESENT A HISTORY

20  OF THE TRAVEL IN AND OUT OF COSTA RICA BY THAT INDIVIDUAL?

21  A    THAT IS TRUE.

22  Q    AND JUST GIVE ME THE OUTSIDE DATES.  THAT PERIOD OF

23  TRAVEL WOULD BE BETWEEN WHAT PERIOD OF TIME?  1980.  AND

24  WHAT WOULD BE THE MOST RECENT TRAVEL DATE?

25  A    FROM THE YEAR '80.

15-168

1    Q    UP TO AND INCLUDING WHAT YEAR?

2    A    THIS CERTIFICATES SAYS THAT HE WAS THERE IN JANUARY

3    OF '80 UNTIL THE YEAR OF '86 IN JULY.

4    Q    1986 IN JULY.  OR WOULD THAT BE MARCH OF 1985?

5    A    WELL, FROM '80 TO '86.

6    Q    DOES IT REFLECT TRAVEL BY THAT PARTICULAR INDIVIDUAL

7    IN 1986 OR ONLY UP TO -- ARE THERE TRAVEL DATES LISTED ON

8    THERE UP THROUGH 1985?

9    A    THE LAST TRIP MADE BY THIS INDIVIDUAL -- EXCUSE ME --

10   EXIT ON THE 23RD OF MARCH '85.  THAT IS THE LAST ONE.

11   Q    AND JUST FOR CLARIFICATION, THAT IS MARCH 23RD, 1985,

12   WAS THE LAST EXIT FROM COSTA RICA BY THAT INDIVIDUAL?

13   A    YES, SIR.  YES, SIR.

14   Q    NOW, WITH THE COURT'S PERMISSION, THERE ARE TWO

15   CHARTS, WHICH I BELIEVE ARE BLOW-UPS OF GOVERNMENT'S

16   EXHIBIT 172 AND EXHIBIT 173, AND THOSE CHARTS WERE MARKED

17   FOR IDENTIFICATION PURPOSES AS 172-A AND 173-A.

18           WITH THE COURT'S PERMISSION, I WOULD ASK THAT

19   THE WITNESS BE ALLOWED TO APPROACH THE CHART AND ANSWER

20   SOME QUESTIONS REFERRING TO THE CHARTS.

21           THE COURT:  YOU MAY STEP DOWN.

22           THE WITNESS:  YES.

23           MR. GURULE:  IF I MAY BE PERMITTED TO APPROACH

24   THE LECTERN.  IT WILL JUST BE A FEW QUESTIONS, YOUR HONOR.

25           NOW, THE RECORD SHOULD REFLECT THAT GOVERNMENT'S

15-169

1    172-A IS A BLOW-UP OF THE HISTORY OF TRAVEL FOR JESUS

2    FELIX-GUTIERREZ.

3    Q    IS THAT CORRECT?

4    A    THAT'S CORRECT.

5    Q    AND THAT 173-A IS A BLOW-UP OF THE SAME DOCUMENT THAT

6    YOU PREVIOUSLY IDENTIFIED FOR JESUS DIAZ DE LEON ZAMORANO.

7    IS THAT CORRECT?

8    A    YES, SIR.  THAT'S CORRECT.

9         MR. TARLOW:  MAY I APPROACH SO THAT I CAN SEE

10   THE DOCUMENTS?

11        THE COURT:  DO YOU HAVE THE OTHER DOCUMENTS?

12        MR. TARLOW:  I HAVE THE SMALL ONES.

13        THE COURT:  IF YOU NEED TO APPROACH, YOU MAY.

14   Q    BY MR. GURULE:  WHAT I WOULD LIKE TO ASK YOU, IF YOU

15   WOULD, IS TO IDENTIFY FOR THE MEMBERS OF THE JURY,

16   STARTING FIRST WITH GOVERNMENT'S EXHIBIT 173-A, AGAIN IN

17   THE NAME OF JESUS DIAZ DE LEON, THE NUMBER OF TRIPS IN AND

18   OUT OF COSTA RICA IN 1985 AND IDENTIFY THOSE FOR US,

19   PLEASE.  DO YOU NEED A POINTER?  STARTING AGAIN IN 1985.

20   A    ONLY '85?

21   Q    ONLY 1985.

22   A    HE ENTERED ON THE 28TH OF FEBRUARY OF 1985.

23   Q    WHEN DID HE EXIT?

24   A    AND HE LEFT ON THE 5TH OF MARCH 1985.  HE ENTERED ON

25   THE 8TH OF MARCH OF '85, AND HE LEFT ON MARCH 8, 1985.

15-170

1   Q    LET ME STOP YOU RIGHT THERE.  RELATIVE TO THIS

2   PARTICULAR ENTRANCE AND EXIT ON MARCH 8, 1985, THEN DOES

3   THIS DOCUMENT REFLECT THAT HE ENTERED AND THEN HE LEFT THE

4   COUNTRY ON THE SAME DAY?

5   A    YES.

6   Q    WOULD YOU PLEASE CONTINUE.  I BELIEVE YOU WERE RIGHT

7   HERE.

8   A    HE AGAIN ENTERED COSTA RICA ON THE 17TH OF MARCH

9   1985, AND HE LEFT AGAIN ON MARCH 23 OF 1985.  AND THE NEXT

10  MOVEMENT -- THERE IS NO FURTHER MOVEMENT UNTIL JULY '86.

11  Q    IN EFFECT, JULY 1986 IS WHEN THIS PARTICULAR DOCUMENT

12  WAS PREPARED, IS IT NOT?

13  A    THAT IS WHEN WE HAD THE FILES COMPLETE, AND ON THIS

14  DAY, WHICH IS INDICATED AS AUGUST OF '86 -- '88 -- '86.

15  Q    SO THE LAST ENTRY, THEN, OF THIS INDIVIDUAL THAT YOU

16  HAVE BEEN ABLE TO DOCUMENT WAS ON MARCH 23, 1985?

17  A    YES, SIR.  THAT'S RIGHT.

18  Q    SO THERE ARE A TOTAL OF FOUR EXITS AND ENTRIES

19  BETWEEN FEBRUARY AND MARCH 1985?

20  A    MARCH AND FEBRUARY OF '85.

21  Q    I BELIEVE THERE ARE THREE.

22  A    YES, AS MOVEMENT.

23  Q    LET ME DIRECT YOUR ATTENTION TO GOVERNMENT'S 172-A,

24  IF YOU WOULD, PLEASE, AND I JUST HAVE A COUPLE OF

25  QUESTIONS.

15-171

1          RELATIVE TO THE TRAVEL OF JESUS FELIX-GUTIERREZ,

2    WHICH IS REFLECTED ON THE CHART 172-A, DIRECTING YOUR

3    ATTENTION ONCE AGAIN TO THE YEAR 1985, WHAT TRAVEL IS

4    DOCUMENTED DURING THAT YEAR?

5    A    IN '85?

6    Q    YES.

7    A    HE ENTERED ON JANUARY 26, 1985.  HE LEFT ON

8    FEBRUARY 2ND, 1985.  HE ENTERED ON FEBRUARY 9, 1985.

9    Q    SO JESUS FELIX-GUTIERREZ ENTERED COSTA RICA ON

10   FEBRUARY 9, 1985?

11   A    THAT'S RIGHT.  THAT'S CORRECT.

12   Q    AND WHEN DID HE LEAVE AFTER THAT?

13   A    FEBRUARY 15, 1985.

14   Q    THANK YOU.  NOW, I HAVE TWO MORE QUESTIONS.  RELATIVE

15   TO THIS ADDITIONAL INFORMATION THAT IS LISTED UNDERNEATH

16   THE EXIT AND ENTRIES, THERE APPEARS TO BE TYPED IN

17   SEPARATELY.  COULD YOU BRIEFLY DESCRIBE WHAT KIND OF

18   INFORMATION IS CONTAINED THERE?

19   A    WHEN WE ARE ASKED BY THE POLICE OR BY THE PEOPLE TO

20   CERTIFY TO THIS, WHEN WE ARE ASKED WHERE THEY CAME FROM OR

21   WHERE THEY ARE GOING OR IN WHICH COUNTRIES THEY HAVE BEEN,

22   WE CERTIFY UNDERNEATH BECAUSE THE COMPUTER PROGRAM DOES

23   NOT INCLUDE THIS INFORMATION, ONLY THE DATES.  AND WE

24   COMPLETE THIS TYPING IT UP ON A TYPEWRITER BY HAND.

25   Q    LET ME ASK YOU THIS BRIEFLY.  SO  THIS ADDITIONAL

15-172

1    INFORMATION HERE -- FOR INSTANCE, THERE IS A DATE 1/26/85.

2    IS THAT CORRECT?

3    A    YES.

4    Q    1/26/1985?

5    A    HE ENTERED ON JANUARY 26, 1985.

6    Q    LET ME STOP YOU THERE.  JUST ANSWER MY QUESTION,

7    PLEASE.  DOES THAT PARTICULAR TRAVEL RELATE TO THIS

8    ENTRANCE ON JANUARY 26, 1985?

9    A    AS I SAID --

10    Q    THIS LINE OF INFORMATION IS FURTHER AND FURTHER

11    ELABORATION OF TRAVEL INFORMATION RELATIVE TO THAT FLIGHT?

12    A    THAT'S RIGHT.

13    Q    AND IN FACT ON JANUARY 26, 1985, WHEN JESUS FELIX-

14    GUTIERREZ TRAVELED TO COSTA RICA, HE TRAVELED FROM LOS

15    ANGELES.  IS THAT CORRECT?

16    A    THAT'S RIGHT.  IT SAYS SO HERE.

17    Q    RELATIVE TO THE TRIP ON FEBRUARY 2ND, 1985, IT ALSO

18    SAYS WHERE HE CAME FROM OR WHERE HE WAS TRAVELING FROM TO

19    COSTA RICA?

20    A    HE LEFT PANAMA.  HE ENTERED FROM LOS ANGELES, AND HE

21    LEFT FROM PANAMA.

22    Q    ONE OTHER QUESTION.  RELATIVE TO THE LAST LINE, WHAT

23    DOES THAT REPRESENT?  WHAT TRAVEL DOES THAT REPORT, THE

24    LAST LINE?

25    A    HE LEFT ON THE 15TH OF FEBRUARY OF '85 TO LOS ANGELES

15-173

1    BY THE SAME PORT.

2    Q    JUST GENERALLY RELATIVELY TO EXHIBIT 173, THIS

3    ADDITIONAL INFORMATION THAT IS IN A DARKER PRINT -- DO YOU

4    UNDERSTAND WHAT INFORMATION I AM REFERRING TO HERE?

5    A    YES.

6    Q    IS THAT LIKEWISE AN ELABORATION, SO TO SPEAK, OF THE

7    VARIOUS TRIPS THAT WERE IDENTIFIED UP ABOVE AS EXITS AND

8    ENTRIES BY THAT PARTICULAR PERSON?

9    A    THAT'S CORRECT.

10   Q    AND IT STATES WHERE THE INDIVIDUAL WAS COMING FROM

11   WHEN HE TRAVELED TO COSTA RICA?

12   A    YES, THAT'S RIGHT.

13   Q    AND WHEN HE LEFT COSTA RICA WHERE HE WAS GOING TO?

14   A    THAT'S RIGHT.

15   Q    AND LIKEWISE THE PASSPORT NUMBER APPEARS ON BOTH OF

16   THESE DOCUMENTS?

17   A    EXCUSE ME?

18   Q    DOES THE TRAVELER'S PASSPORT NUMBER APPEAR ON THE

19   DOCUMENT?

20   A    THAT'S CORRECT.

21   Q    THAT IS IN THE UPPER RIGHT-HAND CORNER?

22   A    THAT'S RIGHT.

23   Q    AND LIKEWISE ON EXHIBIT 172-A THE PASSPORT APPEARS IN

24   THE RIGHT-HAND CORNER?

25   A    AS WELL.

15-174

1  Q    AND THEY ARE DIFFERENT PASSPORT NUMBERS.  ISN'T THAT

2  CORRECT?

3  A    THAT IS RIGHT.

4  Q    THANK YOU.  YOU MAY RETURN TO THE STAND, PLEASE.

5  A    (WITNESS COMPLIES.)

6  Q    NOW, LIKEWISE THROUGH YOUR COMPUTER SYSTEM, ARE YOU

7  ABLE TO DETERMINE THE NON-EXISTENCE, IF I CAN USE THAT

8  WORD, OF TRAVEL RECORDS FOR A PARTICULAR PASSENGER?

9  A    YES.

10  Q    AND LET ME DIRECT YOUR ATTENTION TO GOVERNMENT'S

11  EXHIBIT 180.  DO YOU HAVE THAT DOCUMENT IN FRONT OF YOU?

12  A    THIS IS THE ONE.

13  Q    WERE YOU ASKED BY THE AGENTS OF THE DEA TO CHECK YOUR

14  COMPUTER SYSTEM TO SEE IF YOU HAD ANY TRAVEL HISTORY FOR A

15  PERSON BY THE NAME OF RAFAEL CARO-QUINTERO?

16  A    THAT IS CORRECT.

17  Q    AND DOES GOVERNMENT'S EXHIBIT 180 REFLECT THAT?

18  A    THAT'S CORRECT.

19  Q    AND IS THERE ANY TRAVEL DOCUMENTATION FOR RAFAEL

20  CARO-QUINTERO?

21  A    NO, HE HAS NO TRIPS.  NOTHING APPEARED.

22  Q    DIRECTING YOUR ATTENTION TO GOVERNMENT'S EXHIBIT 177,

23  I BELIEVE THAT IS ALSO IN FRONT OF YOU, AND 176.  STARTING

24  FIRST WITH 177 --

25  A    THIS IS THE ONE.

15-175

1    Q    WERE YOU LIKEWISE ASKED TO CHECK YOUR RECORDS IN THE

2    COMPUTER FOR ANY TRAVEL INVOLVING A PERSON BY THE NAME OF

3    RODOLFO LEPE-MONTEZ?

4    A    THAT IS TRUE.

5    Q    IS THAT REFLECTED IN GOVERNMENT'S EXHIBIT 177?

6    A    YES.  NO MOVEMENT APPEARED.

7    Q    NO TRAVEL IS REFLECTED IN YOUR SYSTEM?

8    A    NO.  NO TRIPS.

9    Q    AND, LASTLY, DIRECTING YOUR ATTENTION TO GOVERNMENT'S

10    EXHIBIT 176, WERE YOU ASKED TO CHECK YOUR COMPUTER SYSTEM

11    FOR A PERSON BY THE NAME OF JUAN ESCOBAR-MESA?

12    A    YES, THAT IS TRUE.

13    Q    AND LIKEWISE WAS THERE ANY INFORMATION REGARDING ANY

14    TRAVEL BY THAT INDIVIDUAL?

15    A    ESCOBAR-MESA?

16    Q    YES.  IS THAT REFLECTED IN GOVERNMENT'S EXHIBIT 176?

17    A    YES, IT IS HERE.

18    Q    AND WHAT IS REFLECTED IN THAT DOCUMENT REGARDING ANY

19    TRAVEL BY THAT INDIVIDUAL?

20    A    YES.  THIS STUDY WAS MADE FROM JANUARY '84 UP TO MAY

21    OF '86.

22    Q    WAS THERE ANY TRAVEL?

23    A    YES.  THIS MAN APPEARS TO HAVE ENTERED ON THE 24TH OF

24    JANUARY '85, AND HE LEAVES ON THE 16TH OF FEBRUARY '85.

25    HE ENTERS ON THE 20TH OF FEBRUARY '85, AND HE LEAVES ON

15-176

1    MARCH 6, '85.  HE ENTERS ON MARCH 8, '85, AND HE LEAVES ON

2    MARCH 8, '85.

3    Q    NOW, IF YOU DON'T HAVE ANY TRAVEL DOCUMENTATION IN

4    YOUR COMPUTER SYSTEM BUT YET AN INDIVIDUAL IS FOUND

5    PRESENT IN YOUR COUNTRY, IS THAT INDIVIDUAL THEN IN YOUR

6    COUNTRY ILLEGALLY?

7    A    LOGICALLY SO.

8    Q    AND THAT WOULD BE THE CASE OF CARO-QUINTERO?

9    A    WELL, IF HE DOES NOT SHOW UP THERE AND HE WAS IN

10   COSTA RICA, THAT IS HOW IT HAS TO BE.

11        IT IS ALSO POSSIBLE THAT HE MAY HAVE USED

12   ANOTHER NAME AND THAT NOBODY KNOWS IT, AND THERE IS NO

13   INFORMATION IN REGARD TO THAT.

14        MR. GURULE:  THANK YOU, MS. ZUNIGA.

15        THE GOVERNMENT MOVES FOR THE ADMISSION OF

16   GOVERNMENT'S EXHIBIT 172, THE TRAVEL DOCUMENTS IN THE NAME

17   OF JESUS FELIX-GUTIERREZ; AND EXHIBIT 173, THE DOCUMENTS

18   IN THE NAME OF JESUS DIAZ DE LEON ZAMORANO; 176, 177, AND

19   180, THOSE BEING IN THE NAMES OF RODOLFO LEPE-MONTEZ AND

20   RAFAEL CARO-QUINTERO.

21        THE COURT:  THOSE MAY BE RECEIVED.

22        MR. GURULE:  ALSO THE GOVERNMENT WOULD MOVE FOR

23   THE ADMISSION OF THE BLOW-UPS, EXHIBIT 172-A AND

24   EXHIBIT 173-A.

25        THE COURT:  THEY MAY BE RECEIVED.

15-177

1          MR. GURULE:  THANK YOU, YOUR HONOR.

2          THE COURT:  WE WILL TAKE OUR AFTERNOON RECESS AT

3    THIS TIME.

4          (RECESS FROM 3:40 P.M. UNTIL 3:55 P.M.)

5          THE COURT:  YOU MAY CROSS-EXAMINE THE WITNESS.

6          MR. GURULE:  YOUR HONOR, IF I MAY, I HAVE ONE

7    EXHIBIT THAT I FORGOT TO HAVE THE WITNESS IDENTIFY.  I

8    WOULD JUST HAVE TWO QUESTIONS.

9          THE COURT:  ALL RIGHT.

10   Q    BY MR. GURULE:  MS. ZUNIGA, YOU HAVE IN FRONT OF YOU

11   WHAT HAS BEEN MARKED AS GOVERNMENT'S EXHIBIT 179.  IT IS A

12   ONE-PAGE DOCUMENT.  I BELIEVE IT IS IN THE NAME OF JOSE

13   ALBINO BAZAN-PADILLA.  DO YOU HAVE THAT DOCUMENT?

14   A    YES, I HAVE IT.

15   Q    DOES THAT REFLECT THE TRAVEL HISTORY FOR ALBINO

16   BAZAN-PADILLA?

17   A    YES, THAT'S RIGHT.

18   Q    SPECIFICALLY FOR THE YEAR 1985?

19   A    YES.

20   Q    AND AGAIN THIS DOCUMENT WAS PRODUCED BY YOUR OFFICE?

21   A    THAT'S RIGHT.

22         MR. GURULE:  THE GOVERNMENT WOULD MOVE FOR THE

23   ADMISSION OF GOVERNMENT'S EXHIBIT 179.

24         THE COURT:  IT MAY BE RECEIVED.

25         MR. GURULE:  THANK YOU.

15-178

1       THE COURT:  YOU MAY CROSS-EXAMINE THE WITNESS.

2                     CROSS EXAMINATION

3   BY MR. TARLOW:

4   Q    MS. ZUNIGA, YOU WERE TELLING US SOMETHING ABOUT HOW

5   THIS SYSTEM YOU HAVE WORKS.  IS THAT CORRECT?

6   A    YES, SIR.

7   Q    AND AM I CORRECT TO SAY THAT YOU CAN TELL US WHETHER

8   THERE ARE ENTRIES AND EXITS FOR ANY PERSON WE WOULD ASK

9   YOU ABOUT?

10  A    YES, SIR.

11  Q    THERE ARE CERTAIN DOCUMENTS WHICH WERE PLACED IN

12  FRONT OF YOU.  WERE YOU THE ONE THAT WAS ASKED TO PRODUCE

13  THOSE DOCUMENTS?

14  A    YES, SIR.

15  Q    AND DID YOU PRESS THE COMPUTER YOURSELF, OR DID YOU

16  ASK SOMEBODY ELSE TO DO IT?

17  A    I HAVE MY EMPLOYEES TO DO THAT.

18  Q    AND DID THE REQUEST AS TO WHAT NAMES THE PROSECUTION

19  WAS LOOKING FOR COME THROUGH YOU OR THROUGH SOMEONE ELSE

20  IN YOUR OFFICE?  LET ME STRIKE THAT.

21            WERE YOU PERSONALLY REQUESTED TO RUN THESE NAMES

22  BY THE PROSECUTION, OR DID SOMEONE IN YOUR OFFICE RECEIVE

23  THE REQUEST?

24            MR. GURULE:  OBJECTION AS TO RELEVANCE, YOUR

25  HONOR.

15-179

1              THE COURT:  SUSTAINED.

2    Q    BY MR. TARLOW:  IN CONNECTION WITH THIS CASE, HOW

3    MANY OTHER SEARCHES OF YOUR COMPUTER RECORDS DID YOU MAKE

4    FOR THE PROSECUTION?

5              MR. GURULE:  OBJECTION AGAIN AS TO RELEVANCE,

6    YOUR HONOR.

7              THE COURT:  SUSTAINED.

8              MR. TARLOW:  IS THAT BECAUSE IT IS BEYOND THE

9    SCOPE, YOUR HONOR?

10             THE COURT:  IT IS IRRELEVANT.

11   Q    BY MR. TARLOW:  DID YOU CHECK ANY EXIT AND ENTRIES

12   FOR WERNER LOTZ?

13             MR. GURULE:  OBJECTION ON RELEVANCE, YOUR HONOR.

14             THE COURT:  SUSTAINED.

15   Q    BY MR. TARLOW:  DID YOU CHECK ANY EXIT AND ENTRIES

16   FOR DANNY FOWLIE ON THE 15TH OF FEBRUARY 1985?

17             MR. GURULE:  SAME OBJECTION, YOUR HONOR.

18             THE COURT:  SUSTAINED.

19   Q    BY MR. TARLOW:  DID YOU BRING COPIES OF THESE PAPERS

20   TO COURT WITH YOU?

21             THE COURT:  WHAT PAPERS?

22             MR. TARLOW:  THE PAPERS THAT THE PROSECUTOR HAS

23   PUT IN FRONT OF THE WITNESS.

24             MR. GURULE:  SAME OBJECTION.  RELEVANCE.

25             THE COURT:  SUSTAINED.

15-180

1    Q    BY MR. TARLOW:  BEFORE YOU CAME TO COURT, DID YOU

2    REFRESH YOUR MEMORY BY LOOKING AT ANY PAPERS?

3                MR. GURULE:  OBJECTION AGAIN AS TO THE LACK OF

4    FOUNDATION FOR HAVING ANY NEED TO HAVE HER MEMORY

5    REFRESHED.  THERE HAS BEEN NO EVIDENCE OF THAT.  NO

6    FOUNDATION FOR THAT QUESTION.

7                THE COURT:  THE OBJECTION IS OVERRULED.

8                THE QUESTION IS DID YOU REVIEW ANY DOCUMENTS IN

9    PREPARATION FOR YOUR TESTIMONY?

10               THE WITNESS:  NO.  NO.

11   Q    BY MR. TARLOW:  SO IS THE FIRST TIME YOU SAW THESE

12   DOCUMENTS THAT THE PROSECUTOR HAS PUT IN FRONT OF YOU --

13   STRIKE THAT.

14               DURING THE LAST TWO WEEK WHEN WAS THE FIRST TIME

15   YOU SAW THESE DOCUMENTS THE PROSECUTOR PUT IN FRONT OF

16   YOU?

17   A    WHEN I SIGNED THEM, SIR.

18   Q    BUT AFTER YOU SIGNED THEM, THEY WERE SENT UP TO THE

19   UNITED STATES.  CORRECT?

20   A    THAT'S RIGHT.

21   Q    AND WHAT I WANT TO KNOW IS BETWEEN THAT TIME AND THE

22   TIME THAT YOU TESTIFIED HERE IN THE COURTROOM, HAVE YOU

23   STUDIED ANY DOCUMENTS PREPARING FOR YOUR TESTIMONY IN

24   COURT?

25               MR. GURULE:  ASKED AND ANSWERED, YOUR HONOR.

15-181

1          THE COURT:  SUSTAINED.

2     Q     BY MR. TARLOW:  IS IT YOUR TESTIMONY -- ARE YOU

3     SAYING TO US THAT -- STRIKE THAT.

4          SINCE THOSE DOCUMENTS LEFT YOUR OFFICE -- STRIKE

5     THAT, ALSO.

6          WHAT DATE WERE THOSE DOCUMENTS SENT FROM YOUR

7     OFFICE TO THE UNITED STATES?

8     A     I DON'T KNOW.

9     Q     CAN YOU TELL BY LOOKING AT THE DOCUMENTS,

10    APPROXIMATELY?

11    A     NO, SIR.

12    Q     ARE YOU FAMILIAR WITH THE DOCUMENTS?

13         MR. GURULE:  OBJECTION, YOUR HONOR.  HER

14    TESTIMONY SPEAKS FOR ITSELF.  SHE HAS IDENTIFIED THE

15    DOCUMENTS, AND THEY HAVE BEEN ADMITTED THROUGH HER

16    TESTIMONY.

17         THE COURT:  THE OBJECTION IS SUSTAINED.

18    Q     BY MR. TARLOW:  AFTER THE TIME YOU -- THESE DOCUMENTS

19    WERE SENT TO THE UNITED STATES AND BEFORE YOU SAW THEM

20    HERE IN COURT TODAY, WAS THERE EVER A TIME YOU LOOKED THEM

21    OVER TO REFRESH YOUR MEMORY TO TESTIFY HERE IN COURT?

22         MR. GURULE:  ASKED AND ANSWERED.

23         MR. TARLOW:  I DON'T KNOW WHAT THE ANSWER IS.

24         THE COURT:  IT HASN'T BEEN ASKED AND ANSWERED IN

25    THAT FORM.

15-182

1          THE WITNESS:  DO I HAVE TO ANSWER?

2          THE COURT:  YES.

3          THE WITNESS:  COULD YOU PLEASE REPEAT IT BECAUSE

4     IT BECAME VERY LENGTHY.

5          MR. TARLOW:  COULD THE REPORTER READ IT BACK,

6     YOUR HONOR?

7          THE COURT:  READ THE QUESTION.

8          (QUESTION READ.)

9          THE WITNESS:  NO.

10    Q     BY MR. TARLOW:  WERE COPIES OF THESE DOCUMENTS EVER

11    SHOWN TO YOU BY MR. GURULE IN HIS OFFICE?

12    A     WHO IS MR. GURULE?

13    Q     THE HANDSOME DEVIL HERE.

14         DO YOU WANT TO OBJECT TO THAT?

15         (LAUGHTER.)

16         MR. GURULE:  NO.

17         THE WITNESS:  I JUST SAW THEM OVER THERE, AND I

18    HAVE NOW SEEN THEM OVER HERE.

19         THE COURT:  INDICATING THE BLOW-UPS?

20         THE WITNESS:  YES, SIR.

21         MR. TARLOW:  YOUR HONOR, MIGHT THE WITNESS

22    APPROACH THE BLOW-UP TO POINT TO SOME ITEMS ON IT FOR ME,

23    PLEASE?

24         THE COURT:  YES.

25         MR. TARLOW:  IS THERE A POINTER HANDY?

15-183

1          THE COURT:  YES.

2     Q    BY MR. TARLOW:  NOW, FIRST OF ALL, COULD YOU MOVE TO

3     THE SIDE JUST A LITTLE BIT SO THAT THE JURY CAN SEE.

4     PERHAPS MOVE OVER THIS WAY A LITTLE BIT.  EXCUSE ME.

5     THANK YOU VERY MUCH.

6          BY LOOKING AT THE EXHIBIT YOU HAVE IN FRONT OF

7     YOU, CAN YOU TELL US WHERE MR. DE LEON OR MR. FELIX WAS ON

8     FEBRUARY 2ND, 1985?  COULD YOU POINT TO THAT FOR US,

9     PLEASE?

10    A    (WITNESS COMPLIES.)

11         THE COURT:  WAS THE QUESTION WHERE HE WAS?

12         MR. TARLOW:  WHERE THE RECORD SHOWS.

13         THE COURT:  DO YOU MEAN WHERE THE POINT OF ENTRY

14    WAS?

15         MR. TARLOW:  THAT'S CORRECT.

16         THE WITNESS:  (POINTING).

17    Q    BY MR. TARLOW:  COULD YOU TELL US WHAT THAT SAYS?

18    A    IN 1985, SPECIFICALLY ON FEBRUARY 28 --

19    Q    NO.  FEBRUARY 2ND.  FEBRUARY 2ND, 1985.

20    A    EXCUSE ME.  FEBRUARY 2ND.  WELL, THE 2ND IS NOT ON

21    HERE.  IN '85 IT ONLY SHOWS AN ENTRY ON THE 28TH OF

22    FEBRUARY.  SHOULD I CONTINUE?

23    Q    NO, NOT YET.

24         MAY I APPROACH FOR A MOMENT, YOUR HONOR?

25         THE COURT:  YES.

15-184

1    THE WITNESS:  THIS IS --

2    THE COURT:  THERE IS NO QUESTION PENDING.

3  Q    BY MR. TARLOW:  MY QUESTION WAS:  MR. FELIX, WHO IS

4  MR. DE LEON -- WOULD YOU LOOK AT EITHER OF THOSE AND TELL

5  ME WHERE HE WAS ACCORDING TO THE RECORDS ON THE 2ND OF

6  FEBRUARY 1985?

7  A    HE LEFT COSTA RICA ON THE 2ND OF THE SECOND MONTH OF

8  '85.

9  Q    AND WHERE DID HE LEAVE FOR?

10    THE COURT:  LEAVE FROM?

11    MR. TARLOW:  NO.

12  Q    WHEN HE LEFT COSTA RICA, WHERE WAS HIS DESTINATION?

13  A    HE LEFT FOR PANAMA.

14  Q    ALL RIGHT.  EXCUSE ME.  I AM SORRY.  IS THERE

15  ANYTHING THAT SHOWS THAT HE WAS GOING TO COLOMBIA AFTER

16  PANAMA?

17  A    NOT HERE.

18  Q    NOW, IS THERE ANYTHING THAT SHOWS WHERE HE WAS ON

19  FEBRUARY 8, 1985, OR FEBRUARY 9?

20  A    HE ENTERED COSTA RICA ON THE 9TH OF FEBRUARY '85.

21  Q    FROM WHERE?

22  A    FROM PANAMA, SIR.  IT IS OVER HERE (POINTING).

23  Q    NOW, IS THERE ANYTHING ON THE RECORDS THAT YOU HAVE

24  BROUGHT WITH YOU THAT SHOWS THAT HE WAS NOT IN COLOMBIA

25  BETWEEN THE 3RD OF FEBRUARY 1985, AND THE 9TH OF FEBRUARY

15-185

1    1985?

2            MR. GURULE:  OBJECTION AS TO RELEVANCE, YOUR

3    HONOR.

4            THE COURT:  IT IS ALSO NOT A VERY CLEAR

5    QUESTION.  I DON'T UNDERSTAND IT.

6            MR. GURULE:  DOUBLE NEGATIVES IN THE FORM OF THE

7    QUESTION.

8            THE COURT:  IS THERE ANYTHING THAT INDICATES

9    WHERE HE WAS NOT.

10   Q    BY MR. TARLOW:  IS THERE ANYTHING THAT WOULD INDICATE

11   THAT HE WAS NOT IN COLOMBIA DURING THAT PERIOD OF TIME?

12           THE COURT:  IN COLOMBIA?

13           MR. TARLOW:  COLOMBIA.  THAT IS WHERE HE WAS.

14   THAT'S RIGHT.  BETWEEN 2/2 AND --

15           MR. GURULE:  OBJECTION TO THE COMMENTARY, YOUR

16   HONOR.

17           THE COURT:  THESE RECORDS ARE IN EVIDENCE.  THEY

18   SPEAK FOR THEMSELVES.

19           MR. TARLOW:  WELL, THEY ARE IN SPANISH.

20   UNFORTUNATELY, IT IS HARD WHEN THEY ARE SPEAKING, SOME OF

21   US CAN'T UNDERSTAND IT.

22           THE COURT:  THE FORM OF THE QUESTION IS

23   IMPROPER.  IF YOU ARE ASKING THE WITNESS TO POINT OUT ANY

24   REFERENCE TO COLOMBIA, THAT WOULD BE ONE THING.  BUT WHEN

25   YOU ASK HER IF THERE IS ANYTHING THAT INDICATES HE WAS NOT

15-186

1   IN COLOMBIA, I DON'T KNOW HOW THE WITNESS CAN ANSWER THAT

2   QUESTION.

3   Q    BY MR. TARLOW:  NOW, DO YOU HAVE ACCESS TO THE

4   RECORDS FROM PANAMA?

5            MR. GURULE:  OBJECTION.  IT IS VAGUE.  THE

6   RECORD FROM PANAMA?

7            MR. TARLOW:  IMMIGRATION EXITS AND ENTRIES.

8            THE WITNESS:  SHOULD I ANSWER?

9            THE COURT:  YES.

10            THE WITNESS:  WHETHER I HAVE?

11   Q    BY MR. TARLOW:  YES, WHETHER YOU HAVE --

12            THE COURT:  THE QUESTION WAS WHETHER SHE HAS

13   ACCESS TO THE SAME TYPE OF RECORDS FROM PANAMA.

14            THE WITNESS:  I RECEIVED THE ENTRIES AND THE

15   EXITS AS FAR AS PANAMA IS CONCERNED, BUT NOT THOSE HAVING

16   TO DO WITH PANAMA BECAUSE I DON'T HAVE ANYTHING TO DO WITH

17   THAT IN COSTA RICA.

18   Q    BY MR. TARLOW:  ALL RIGHT.  THANK YOU.

19            THE COURT:  IS THERE ANY REASON FOR THE WITNESS

20   TO REMAIN UP THERE?

21            MR. TARLOW:  I WANT HER TO POINT TO DIFFERENT

22   EXITS AND ENTRIES, YOUR HONOR.  YES, YOUR HONOR.

23   Q    NOW, THE PROSECUTOR ASKED YOU ABOUT CERTAIN EXITS AND

24   ENTRIES IN 1985 THAT APPEAR ON YOUR CHARTS, PARTICULARLY

25   EXITS AND ENTRIES IN FEBRUARY AND MARCH 1985.  DO YOU

15-187

1    RECALL THOSE QUESTIONS?

2    A    YES, SIR.

3    Q    NOW, I WANT YOU TO EXPLAIN TO US -- WOULD YOU GO TO

4    THE OTHER CHART, PLEASE?

5            THE COURT:  LET'S IDENTIFY THIS CHART.  WHAT IS

6    THE NUMBER?

7            MR. TARLOW:  173-C.

8            MR. GURULE:  IT IS 173-A, YOUR HONOR.

9            THE COURT:  ALL RIGHT.

10   Q    BY MR. TARLOW:  NOW, ON FEBRUARY 21, 1980, DID

11   MR. FELIX ENTER COSTA RICA FROM PANAMA?

12   A    FEBRUARY 21?

13   Q    FEBRUARY 21, 1980?

14   A    NO.

15           MR. TARLOW:  MIGHT I HAVE A MOMENT, YOUR HONOR?

16           (PAUSE.)

17   Q    BY MR. TARLOW:  ON MARCH 7, 1981, DID JESUS FELIX

18   ENTER COSTA RICA FROM PANAMA?

19           MR. GURULE:  I AM GOING TO OBJECT AS TO

20   RELEVANCE, YOUR HONOR.  THE TIME PERIOD IS NOT RELEVANT,

21   1981.

22           THE COURT:  OVERRULED.

23   Q    BY MR. TARLOW:  LOOK ON THE DE LEON ONE.  MR. FELIX

24   IS USING THE NAME OF DE LEON.

25   A    I DIDN'T KNOW THAT.  YOU ARE REFERRING TO THIS

15-188

1   DOCUMENT?

2   Q    THAT'S CORRECT.

3   A    BELONGING TO THE DIAZ DE LEON.  PLEASE REPEAT THE

4   DATE.

5   Q    3/7/81.  DID HE ENTER COSTA RICA FROM PANAMA?

6   A    HE ENTERED ON THE 7TH OF MARCH OF '81 FROM PANAMA.

7   Q    AND DID HE LEAVE THE SAME DAY FOR THE UNITED STATES?

8   A    THE SAME DAY.

9   Q    NOW ON MARCH 17, 1981, SAME YEAR, DID HE RETURN TO

10  COSTA RICA FROM THE UNITED STATES?

11  A    YES, SIR.  IT IS HERE.

12  Q    ON MARCH 25, 1981, DID HE LEAVE COSTA RICA FOR

13  PANAMA?

14  A    THE 25TH OF MARCH.  NO.  NO.  EXCUSE ME.  HERE IT IS,

15  OF '81.  25TH OF MARCH OF '81 HE LEFT FOR PANAMA.

16  Q    NOW, LET ME ASK YOU THIS.  ON FEBRUARY 9, 1982, WHICH

17  I BELIEVE -- FEBRUARY 9, 1982, DID HE LEAVE COSTA RICA FOR

18  PANAMA?

19          MR. GURULE:  I AM GOING TO OBJECT TO THIS LINE

20  OF QUESTIONING.  THE DOCUMENT SPEAKS FOR ITSELF.  THOSE

21  DATES ARE ON THE DOCUMENT.  WHERE ARE WE GOING?  OBJECT ON

22  RELEVANCE, YOUR HONOR.

23          THE COURT:  OVERRULED.

24          THE WITNESS:  I CAN ANSWER?

25  Q    BY MR. TARLOW:  YES.

15-189

1    A    ON THE 9TH OF FEBRUARY OF '80 --

2    Q    1982.

3    A    YES, SIR.

4    Q    FEBRUARY 11, 1982?

5    A    HE ENTERED FROM PANAMA.

6    Q    FEBRUARY 11 HE ENTERED COSTA RICA FROM PANAMA.

7    RIGHT?

8    A    YES, SIR.

9    Q    FEBRUARY 11?

10   A    HE LEAVES.

11   Q    HE LEAVES COSTA RICA FOR THE UNITED STATES.   CORRECT?

12   A    YES, SIR.   YES, SIR, HE LEFT.

13   Q    MARCH 5, 1982, HE IS BACK IN COSTA RICA AGAIN FROM

14   PANAMA.   CORRECT?

15   A    THAT'S RIGHT.

16   Q    MARCH 8 HE LEAVES COSTA RICA FOR PANAMA AGAIN.

17   CORRECT?   1982?

18   A    YES, SIR.

19   Q    AND THEN ON MARCH 15, 1982, FINALLY, HE ENTERS COSTA

20   RICA ONCE MORE FROM THE UNITED STATES.   CORRECT?

21   A    YES, SIR.

22   Q    AND STAYS IN COSTA RICA UNTIL MARCH 25TH, 1982.

23   CORRECT?

24   A    YES, THAT'S RIGHT.

25   Q    HE GOES TO PANAMA?

15-190

1   A   YES, SIR.

2   Q   ON THE 27TH OF MARCH 1982 -- EXCUSE ME -- ON THE 27TH

3   OF MARCH 1982, HE RETURNS TO COSTA RICA.  CORRECT?

4   A   YES.

5   Q   AND THEN ON THE 29TH HE LEAVES COSTA RICA FOR PANAMA?

6   A   ON THE 29TH OF FEBRUARY -- I MEAN, MARCH -- IT IS

7   OVER HERE -- TO PANAMA.

8   Q   AND AM I CORRECT THAT WITHOUT GOING OVER ANY OTHER

9   PERIODS OTHER THAN THE FEBRUARY-MARCH PERIOD, THERE ARE

10  FREQUENT EXITS AND ENTRIES FOR MR. DE LEON INTO AND OUT OF

11  COSTA RICA.  IS THAT CORRECT?

12  A   YES, SIR.

13          MR. TARLOW:  THANK YOU, MA'AM.

14          NO FURTHER QUESTIONS, YOUR HONOR.

15          THE COURT:  ANY OTHER CROSS-EXAMINATION OF THIS

16  WITNESS?

17          IS THERE ANY REDIRECT?

18          MR. GURULE:  NO, YOUR HONOR.  MAY THIS WITNESS

19  BE EXCUSED?

20          THE COURT:  YES.

21          WE WILL ADJOURN THIS CASE AT THIS TIME AND

22  RECONVENE TOMORROW MORNING AT 9:30.  THE JURY MAY BE

23  EXCUSED.

24          YOU MAY STEP DOWN.

25          (THE JURY LEFT THE COURTROOM AND

15-191

1          PROCEEDINGS IN OPEN COURT.)

2          THE COURT:  I WILL SHARE A NOTE WITH YOU FROM

3   ONE OF THE ALTERNATE JURORS, WHICH WAS GIVEN TO ME AT THE

4   RECESS, ADDRESSED TO THE CLERK.  IT READS AS FOLLOWS:

5               "IS THERE ANYTHING WE CAN DO ABOUT JUROR

6          DIANE GRIFFIN.  SHE FALLS ASLEEP EVERY DAY

7          DURING TRIAL.  IT IS NOT FAIR TO THE REST OF THE

8          JURORS OR THE TRIAL.  IS THE JUDGE AWARE OF

9          THIS?  THANKS."

10          THIS IS BONNIE CHILDS, ALTERNATE NO. 4.  SHE

11   SITS TWO ROWS IN FRONT OF THIS JUROR.  SINCE WE FIRST

12   DISCUSSED THIS JUROR, I HAVE BEEN WATCHING HER FAIRLY

13   CAREFULLY.  I HAVE NOT OBSERVED ANY SLEEPING.

14          HAVE YOU HAD ANY --

15          MR. PANCER:  YOUR HONOR, I DID NOTICE HER TODAY

16   DOZING, BUT THERE WASN'T MUCH GOING ON.  OTHER THAN

17   OBSERVING IT TODAY, I SAW HER A COUPLE OF TIMES LAST WEEK,

18   NOT FOR PROLONGED PERIODS.

19          I WAS HAVING TROUBLE MYSELF.

20          MR. TARLOW:  THAT WASN'T DURING MY EXAMINATION,

21   WAS IT?

22          THE COURT:  IS IT YOUR POSITION THAT IF SHE MUST

23   SLEEP, IT WOULD BE BETTER DURING THE GOVERNMENT'S CASE?

24          MR. PANCER:  SHE WAS DOZING, YOUR HONOR.

25          MR. GURULE:  I HAVEN'T NOTICED IT, YOUR HONOR.

15-192

1    THE COURT:  WHAT DO YOU SUGGEST WE DO ABOUT
2  THIS, IF ANYTHING?
3    MR. GURULE:  I WOULD SUGGEST THAT UNLESS IT
4  COMES TO OUR ATTENTION AS BEING PROBLEMATIC, THE PARTIES
5  TO THE CASE --
6    THE COURT:  WELL, I PERSONALLY DON'T KNOW HOW
7  THE ALTERNATE NO. 4 COULD KNOW SINCE SHE SITS IN FRONT OF
8  THE JURY BOX HERE, AND THE OTHER JUROR IS TWO ROWS BEHIND
9  HER.
10    MR. PANCER:  IT COULD BE SOMETHING THEY HAVE ALL
11  DISCUSSED.  IT CERTAINLY HAS BEEN GOING ON ON AND OFF
12  SINCE THE TRIAL STARTED.
13    THE COURT:  DO YOU WANT TO CONSIDER EXCUSING HER
14  FROM THE TRIAL?
15    MR. TARLOW:  JUDGE, I THINK WE AT SOME POINT AT
16  THE BEGINNING OF THE CASE SAID, "LET'S GET RID OF HER."
17  AND EVERYBODY SAID, "NO."  AND MY POSITION WAS WELL, HEY,
18  WE WON'T GET RID OF HER.  IF SHE IS SLEEPING, WE WILL HAVE
19  A MISTRIAL.  EITHER SHE HAS BEEN ASLEEP OR SHE IS AWAKE.
20  IF SHE IS ASLEEP, WE SHOULD HAVE A MISTRIAL.  I THINK IF
21  SHE IS AWAKE, THERE IS NO REASON FOR HER TO GO.
22    THE COURT:  THAT IS NOT A VERY HELPFUL COMMENT.
23    (LAUGHTER.)
24    MR. TARLOW:  I KNOW, BUT I SAID AT THE BEGINNING
25  TO LET HER GO WHEN WE THOUGHT SHE WAS SLEEPING.  THEN WE

15-193

1   WERE FORCED TO STAY WITH HER.

2           THE COURT:  I PERSONALLY HAVE NOT OBSERVED

3   ANYONE SLEEPING AND HAVE NOT HAD ANY COMPLAINTS FROM YOU

4   ABOUT IT SINCE THAT TIME.

5           MR. TARLOW:  ARE YOU SOLICITING SOME, JUDGE?

6           THE COURT:  WHAT?

7           MR. TARLOW:  ARE YOU SOLICITING ANY MORE

8   COMPLAINTS?

9           THE COURT:  WELL, I WOULD ASSUME YOU WOULD.  YOU

10  HAVE NOT SHOWN YOURSELF TO BE BASHFUL OR TIMID.  I WOULD

11  ASSUME THAT YOU WOULD CALL THAT TO MY ATTENTION SHOULD IT

12  OCCUR.  I HAVE NOT HEARD FROM ANY DEFENSE COUNSEL, SO I

13  ASSUMED FROM MY OBSERVATIONS THAT SHE HAS BEEN ATTENTIVE.

14          MR. PANCER:  YOUR HONOR, I REFRAINED FROM SAYING

15  ANYTHING BECAUSE WE HAD MADE YOUR HONOR AWARE OF IT.  THAT

16  WAS IT.  I MEAN, THAT IS WHY --

17          THE COURT:  YOU HAVE NOT MADE ME AWARE OF

18  ANYTHING.

19          MR. PANCER:  I MEAN EARLIER ON.

20          THE COURT:  THE FIRST TIME THAT YOU RAISED IT I

21  DID NOT CONCEDE IT BECAUSE I HAD NOT SEEN IT MYSELF, AND

22  SINCE THAT TIME THERE HAS BEEN NO COMPLAINTS FROM ANY OF

23  YOU.  IF YOU WANT TO DO ANYTHING ABOUT THIS, IF YOU WANT

24  THE COURT TO FURTHER INVESTIGATE THE MATTER, NOW IS THE

25  TIME TO SAY SO.  DO NOT BE CAGEY.

15-194

1       MR. PANCER:  COULD WE HAVE A MOMENT, YOUR HONOR?

2   IT IS SOMETHING THAT WE SHOULD TALK ABOUT.

3       THE COURT:  I BRING IT TO YOUR ATTENTION, AND

4   UNLESS I HEAR FROM YOU TO THE CONTRARY ON THE RECORD, I

5   WILL ASSUME YOU HAVE NO OBJECTION.

6       MR. TARLOW:  WELL, I HAVE STATED MY POSITION ON

7   THE RECORD.  IF SHE HAS BEEN SLEEPING, I WANT A MISTRIAL.

8   IF SHE IS AWAKE, THAT IS FINE.

9       THE COURT:  WELL, THAT IS HARDLY A BASIS FOR A

10  FINDING OF FACT.

11      MR. PANCER:  IT IS MY POSITION, YOUR HONOR, THAT

12  WE SHOULD SWEAR IN THE NEXT ALTERNATE; THAT SHE HAS NOT

13  BEEN ATTENTIVE, AND THE DEFENDANTS DESERVE 100 PERCENT

14  ATTENTION.

15      MS. LEYVA:  WE WOULD JOIN IN THAT, YOUR HONOR.

16      MS. BARRERA:  AND, FOR THE RECORD, YOUR HONOR,

17  WE HAVE NOTICED THAT SHE HAS CONTINUED TO DOZE OFF, AND

18  THE REASON I HAVE NOT BROUGHT IT TO THE COURT'S ATTENTION

19  IS THAT WE FELT WE HAD SUFFICIENTLY DONE THAT IN THE

20  BEGINNING, AND BOTH THE COURT AND THE PROSECUTORS HAVE

21  CONSISTENTLY MAINTAINED THAT THEY HAD NOT SEEN HER

22  SLEEPING.  SO AT THAT POINT I JUST BASICALLY GAVE UP

23  BECAUSE I NOTICED SHE WAS SLEEPING ON MORE THAN ONE

24  OCCASION AND BROUGHT IT TO THE COURT'S ATTENTION.

25      THE COURT:  IT'S ONLY BEEN BROUGHT TO THE

1    ATTENTION OF THE COURT ONCE, AND THE COURT WAS NOT ABLE TO

2    VERIFY IT, AND I HAVE WATCHED HER VERY CAREFULLY.  OF

3    COURSE I DON'T WANT A SLEEPING JUROR ON THE CASE IF SHE IS

4    IN FACT.  THE FACT THAT THIS JUROR WRITES TO THE COURT AND

5    SUGGESTS THAT PERHAPS THERE IS A POSSIBILITY.  SINCE THIS

6    IS A JUROR THAT COULD NOT HAVE POSSIBLY SEEN THIS, PERHAPS

7    I SHOULD QUESTION THIS JUROR TO SEE WHETHER SHE HAS ANY

8    PERSONAL KNOWLEDGE ABOUT THIS, OR WHETHER SHE IS SIMPLY

9    DISCUSSING SOMETHING THAT SHE HAS NOT SEEN.  WELL, WE WILL

10   DEAL WITH THAT IN THE MORNING.

11           MR. GURULE:  THE GOVERNMENT HAS NOTHING FURTHER,

12   YOUR HONOR.

13           MR. PANCER:  I DO JOIN MR. TARLOW'S REQUEST

14   CONCERNING THE MISTRIAL, YOUR HONOR.  I KNOW THAT YOUR

15   HONOR HAS DENIED IT, BUT I WANT THE RECORD TO REFLECT

16   THAT.  AND THE OTHER ALTERNATIVE IS THE ONE I SUGGESTED.

17           THE COURT:  THE MOTION IS DENIED.

18           MR. PANCER:  THANK YOU, YOUR HONOR.

19           ARE WE EXCUSED, YOUR HONOR?

20           THE COURT:  WAIT A MINUTE.  THERE IS A MATTER

21   PENDING THAT I CAN RULE ON AT THIS TIME.  THAT IS THE

22   DEFENDANT'S MOTION FOR DISCLOSURE OF THE SOURCE OF THE

23   THIRD TRANSCRIPT OF THE INTERROGATION, THE TRANSCRIPT OF A

24   PURPORTED TAPE, WHICH I EARLIER ORDERED DISCLOSED TO THE

25   DEFENDANTS.

15-196

1       THE COURT HAS REVIEWED IN CAMERA DOCUMENTARY AND

2   TESTIMONIAL EVIDENCE SUBMITTED BY THE GOVERNMENT IN

3   CONNECTION WITH THAT, AND BASED UPON THE REVIEW OF THAT --

4   THOSE DOCUMENTS AND THAT EVIDENCE, IT IS THE COURT'S VIEW

5   THAT THIS MOTION FOR DISCLOSURE SHOULD BE DENIED, AND IT

6   IS DENIED.  BASED ON THE IN CAMERA REVIEW OF THE

7   DOCUMENTARY AND TESTIMONIAL EVIDENCE, THE IDENTITY OF THE

8   SOURCE IS NOT RELEVANT IN THE VIEW OF THE COURT TO ANY

9   MATERIAL ISSUE IN THIS CASE, AND THE DISCLOSURE OF THE

10  IDENTITY OF THAT INDIVIDUAL WOULD IN NO WAY MATERIALLY AID

11  THE DEFENDANTS.

12      SINCE THE SOURCE OF IDENTITY IS NEITHER RELEVANT

13  NOR ESSENTIAL TO A FAIR DETERMINATION OF THE CASE, THE

14  GOVERNMENT IS ENTITLED TO ASSERT THE ROVIARO PRIVILEGE.

15  BECAUSE THE GOVERNMENT WILL STIPULATE TO THE AUTHENTICITY

16  OF THE TRANSCRIPT, THE DEFENDANTS WILL NOT BE PREJUDICED

17  BY THE NON-DISCLOSURE OF THE IDENTITY OF THE INFORMANT.

18      THAT IS THE RULING OF THE COURT AFTER

19  CONSIDERING THE MOTION THAT HAS BEEN FILED AND THE

20  DOCUMENTS THAT I HAVE REFERRED TO.

21      MR. TARLOW:  YOUR HONOR --

22      THE COURT:  ALSO I RULE THAT NO HEARING IS

23  REQUIRED.

24      MR. TARLOW:  CAN THE COURT RESOLVE THIS?  IF I

25  AM WILLING TO STIPULATE WITH THE GOVERNMENT ABOUT THE TAPE

15-197

1    IN ORDER TO HAVE IT ADMITTED --

2              THE COURT:  THE TRANSCRIPT?

3              MR. TARLOW:  THE TRANSCRIPT.  EXCUSE ME.  I

4    DON'T BELIEVE THAT CURES THE PROBLEM, BUT I DON'T WANT TO

5    REARGUE THAT.  BUT BECAUSE OF ALL THE OTHER THINGS THAT WE

6    WANT IN CONNECTION WITH THAT TAPE, PARTICULARLY WHO THE

7    INTERROGATORS ARE, BUT MR. PANCER TELLS ME HE WON'T

8    STIPULATE.  HOW DO WE GET THIS BEFORE THE JURY?

9              THE COURT:  WELL, YOU HAVE TO FIND SOME THEORY

10   OF ADMISSIBILITY.

11             MR. TARLOW:  IF HE WON'T STIPULATE IT IS

12   AUTHENTIC --

13             THE COURT:  WHO WON'T?

14             MR. TARLOW:  MR. PANCER WON'T.

15             THE COURT:  THE GOVERNMENT WILL.

16             MR. TARLOW:  THE GOVERNMENT WILL AND I WILL, BUT

17   I STILL CAN'T GET THE EVIDENCE IN.

18             MR. GURULE:  HE CAN PROPOSE A LIMITING

19   INSTRUCTION, YOUR HONOR, THAT THAT EVIDENCE NOT BE

20   CONSIDERED AGAINST MR. PANCER'S CLIENT.

21             MR. PANCER:  WELL, I WOULD CERTAINLY OBJECT, AND

22   I HAVE A NUMBER OF REASONS, BUT I DON'T WANT TO TAKE THE

23   COURT'S TIME NOW.  I DON'T BELIEVE THAT TRANSCRIPT SHOULD

24   BE ADMITTED IN ITS PRESENT FORM, YOUR HONOR.  I HAVE NO

25   IDEA WHERE THAT CAME FROM, NO IDEA IF IT REPRESENTS A

15-198

1   RECORDING OF AN INTERROGATION, ALTHOUGH YOUR HONOR MAY

2   KNOW THE ANSWERS TO ALL OF THESE QUESTIONS BECAUSE YOU

3   HAVE THE INFORMATION WE DON'T.  BUT THERE IS TOO MUCH

4   INFORMATION I DON'T HAVE BEFORE I WOULD BE WILLING TO

5   STIPULATE.

6           THE COURT:  THAT IS NOT MY PROBLEM.  IF THE

7   TAPE -- THAT IS, THE TRANSCRIPT IS ADMISSIBLE UNDER SOME

8   THEORY, YOU MAY PROFFER AND I WILL RULE ON IT.

9           MR. PANCER:  WE FILED A MOTION CONCERNING ESPINO

10  VERDIN'S STATEMENT.

11          THE COURT:  YES.  I AM WORKING ON THAT.

12          MR. PANCER:  THANK YOU, YOUR HONOR.

13          MR. TARLOW:  YOUR HONOR, COULD I MAKE AN

14  INQUIRY -- OR COULD THE COURT INQUIRE OF THE PROSECUTOR

15  ABOUT A MATTER THAT IS GOING TO COME UP TOMORROW.  THERE

16  IS A POLICE OFFICER WHO IS GOING TO TESTIFY WHO IS GOING

17  TO SAY HE ARRESTED MY CLIENT IN 1976, AND HE HAD THE

18  CACHAS TATTOO ON HIS SHOULDER.  THERE IS NO DISPUTE THAT

19  HE HAD THE CACHAS TATTOO ON HIS SHOULDER.  I AM CONCERNED

20  ABOUT THE PREJUDICIAL EFFECT OF WHAT THE ARREST WAS FOR.

21  SO I WANTED THE COURT TO INQUIRE AS TO WHETHER THE

22  PROSECUTOR HAS ANY INTENTION OF INTRODUCING ANYTHING ABOUT

23  WHAT THE ARREST WAS FOR.

24          MR. GURULE:  LET ME SPEAK WITH MR. TARLOW.

25  MAYBE WE CAN REACH A STIPULATION RELATIVE TO THE TATTOO

15-199

1    BEING ON HIS SHOULDER.  THAT IS THE REASON WE ARE

2    INTRODUCING THAT TESTIMONY.

3           MR. TARLOW:  I STIPULATE THAT SOMEONE WOULD

4    TESTIFY.

5           MR. GURULE:  WE WILL WORK THAT OUT.

6           THE COURT:  SEE IF YOU CAN WORK THAT OUT.

7           MR. GURULE:  I BELIEVE WE CAN.

8           THE COURT:  WE WILL ADJOURN AT THIS TIME.

9           (AT 4:45 P.M. AN ADJOURNMENT WAS TAKEN UNTIL

10    WEDNESDAY, AUGUST 24, 1988, AT 9:30 A.M.)

11                         - - -

12    I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT

13    TRANSCRIPT OF THE PROCEEDINGS HAD ON THE RECORD

14    IN THE ABOVE-ENTITLED MATTER.

15

16    _Velma B. Thomas_        _June 1, 1989_

17    OFFICIAL REPORTER        DATE