1416

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE EDWARD RAFEEDIE JUDGE PRESIDING

- - - - - -

FILED
Jun 18 1993
CLERK, U.S. DISTRICT
CENTRAL DISTRICT OF CAL.
BY

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
      vs.                      )      Case No. CR-87-422-ER
                               )
RAFAEL CARO-QUINTERO, et al.,  )
                               )      **ORIGINAL**
            Defendants.        )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

TUESDAY, DECEMBER 15, 1992

MARY TUCKER, CSR 9308
Official Court Reporter
429-D U.S. Courthouse
312 North Spring Street
Los Angeles, Calif. 90012
213/687-0530

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

1417

```
 1    APPEARANCES:

 2

 3       For the Plaintiff:

 4          TERREE A. BOWERS
            United States Attorney
 5          ROBERT BROSIO
            Assistant United States Attorney
 6          Chief, Criminal Division
            JOHN CARLTON
 7          Assistant United States Attorney
            MANUEL MEDRANO
 8          Special Assistant United States Attorney
            312 North Spring Street
 9          Los Angeles, California  90012

10

11       For the Defendant:

12          JAMES E. BLANCARTE
            MARY FULGINITI
13          JEFFER, MANGELS, BUTLER & MARMARO
            2121 Avenue of the Stars
14          10th Floor
            Los Angeles, California  90067
15               - and -
            EDWARD M. MEDVENE
16          JACK R. LUELLEN
            MITCHELL, SILBERBERG & KNUPP
17          11377 West Olympic Boulevard
            Los Angeles, California  90064
18

19

20

21

22

23

24

25
```

1418

1                      I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GUITRON-ZUNO, MARIA | | | | |
|    By Mr. Blancarte | 1420 | | 1450 | |
|    By Mr. Medrano | | 1434 | | |
| LOPEZ, SALVADOR | | | | |
|    By Mr. Medvene | 1452 | | | |
| ZUNO-ARCE, RUBEN | | | | |
|    By Mr. Blancarte | 1481 | | | |

1419

1                I N D E X

2   EXHIBITS         FOR IDENTIFICATION       IN EVIDENCE

3   411                                  1489
    412A                                1490
4   417                                  1433

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1420

1    LOS ANGELES, CALIFORNIA; TUESDAY, DECEMBER 15, 1992

2              (9:30 AM)

3              (Jury present.)

4         THE COURT:  Call your next witness.

5         MR. BLANCARTE:  Thank you, Your Honor.  Ruben Zuno

6    calls Mrs. Enriqueta Zuno.

7              (Witness summoned to courtroom.)

8         THE CLERK:  Please raise your right hand.

9              (THROUGH SPANISH INTERPRETER)

10   MARIA ENRIQUETA ZUNO, DEFENDANT'S WITNESS, SWORN

11        THE WITNESS:  Yes, I do so swear.

12        THE CLERK:  Please be seated.

13        State your full name for the record, and spell

14   your last name.

15        THE WITNESS:  Maria Enriqueta Guitron-Zuno,

16   G-U-I-T-R-O-N.

17             DIRECT EXAMINATION

18   BY MR. BLANCARTE:

19   Q    Mrs. Zuno, do you know Ruben Zuno-Arce?

20   A    Yes, I do know him.

21   Q    How do you know him?

22   A    Because he's my husband.

23   Q    Do you and Mr. Zuno have any children?

24   A    Yes, we have two.  Jose Alberto, who is nine years

25   old, and Maria who is six years old.

1421

1   Q    And how long have you known Mr. Zuno?

2   A    Approximately 20 years.

3   Q    Where do you and Mr. Zuno have your permanent

4   residence, ma'am?

5   A    In Mascota, Jalisco.

6   Q    And how long have you and Mr. Zuno been permanent

7   residents of Mascota, Jalisco?

8   A    Ever since mid-1982.

9   Q    And when you and Mr. Zuno became permanent residents

10  of Mascota in 1982, where did you live, ma'am?

11  A    With my mother, at my mother's house.

12  Q    And is that in Mascota?

13  A    Yes.

14  Q    And how long did you and Mr. Zuno live with your

15  mother?

16  A    Approximately three years.

17  Q    Were any of your children born while you were living

18  with your mother?

19       MR. MEDRANO:  Relevance, Your Honor.

20       THE COURT:  Sustained.

21  BY MR. BLANCARTE:

22  Q    How many bedrooms in your mother's house?

23       MR. MEDRANO:  Objection; relevance.

24       THE COURT:  Sustained.

25  BY MR. BLANCARTE:

1422

1   Q    Mrs. Zuno, did you and Mr. Zuno ultimately get a home

2   of your own in Mascota?

3   A    Yes, he began to build one.

4   Q    Where is that home in Mascota that you and your

5   husband obtained for yourself located?

6   A    At the farm.  At the ranch called La Jolla, which

7   belongs to my husband.

8   Q    Mrs. Zuno, do you work for a living?

9   A    Yes.

10  Q    And where do you work?

11  A    In the farm.  I'm also in charge of running a small

12  gas station that my husband owns.

13  Q    Briefly, what do you do?  What's the work that you do

14  on the ranch?

15       MR. MEDRANO:  Objection; relevance.

16       THE COURT:  Overruled.  You may answer.

17  BY MR. BLANCARTE:

18  Q    You can answer.

19  A    I work with the workers that work for me.  They prune

20  the trees.  We fertilize the trees.  We apply pesticides to

21  the trees.  We harvest the guava, and I work together

22  alongside of them.

23  Q    You don't actually personally do the things you just

24  described, do you?

25  A    Some of the things I do do myself, because there is a

1423

1   lot of work in the groves, and I have few employees that

2   work for me.

3   Q    How many employees do you have on the farm or on the

4   ranch you talked about?

5   A    Counting in my brother, altogether there are ten.

6   Q    What type of ranch or farm is that?

7   A    We grow -- we have guava trees planted, lemons trees,

8   and some other trees, some peach trees, cactus, and

9   sometimes during the rainy seasons we plant some corn.

10  Q    Do you have any other responsibilities at home other

11  than the chores you described for us?

12  A    Yes.

13  Q    What are they?

14  A    To be there to take care of my children.

15  Q    Mrs. Zuno, do you and your husband own or operate any

16  other businesses in Mascota?

17       In fact, let me strike the question and ask you

18  more specifically.  In the 1980's did you or your husband

19  own or operate any other businesses in Mascota?

20  A    Well, he had a factory where he canned guavas, and

21  that place closed up at the beginning of the '80s.  And

22  that facility where the cannery was located previously,

23  it's now a place that's rented out for -- to celebrate

24  parties, dances.

25  Q    So that building is empty or vacant; is that correct?

1424

1  A    Yes.

2  Q    It's been that way since 1983?

3  A    I had to sell the machinery or the equipment that was

4  inside that cannery.

5  Q    Because the business closed?

6  A    Yes, and I needed the money for the farm.

7  Q    So once it became vacant, is it correct, if the

8  community wanted to have a dance or a wedding, that that

9  facility was available?

10       MR. MEDRANO:  Objection; leading and irrelevant.

11       THE COURT:  Sustained.

12       MR. BLANCARTE:  I will withdraw the question.

13  BY MR. BLANCARTE:

14  Q    Any other businesses that you and your husband owned

15  and operated in Mascota?

16  A    No.

17  Q    Now, how about before the 1980's, any other

18  businesses?

19  A    No.

20  Q    Okay.  Now the gas station that you mentioned,

21  Mrs. Zuno, is that also located in Mascota?

22  A    Yes.  It was built on a piece of land that also

23  belongs to the farm, the land itself.

24  Q    Could you briefly describe how big or what kind of a

25  gas station that is?

1425

1    A    It's a gas station that has three pumps.  Two for

2    regular gasoline and one for diesel fuel.

3    Q    Is that the only gas station in Mascota?

4    A    No.

5    Q    How many others are there?

6    A    One more.

7    Q    When Mr. Zuno built the gas station, do you know how

8    he was able to finance or get the money to build it?

9         MR. MEDRANO:  Objection; relevance.

10        THE COURT:  Sustained.

11   BY MR. BLANCARTE:

12   Q    Did Mr. Zuno ever own a house in Guadalajara in the

13   early 1980's?

14   A    Yes.  He had a house, and he sold it to be able to get

15   money to build the gas station.

16   Q    And is that the house that was located on a street

17   called Lope de Vega?

18   A    That's right.

19   Q    Did you and your husband and your children ever live

20   in that house?

21   A    No.

22        MR. BLANCARTE:  May I have a moment, Your Honor?

23        THE COURT:  Yes.

24             (Counsel confer.)

25   BY MR. BLANCARTE:

1426

1  Q     Mrs. Zuno, have you and your husband ever owned a

2  luxury car commonly known in Mexico as a Grand Marquis?

3  A     No.

4  Q     Have you and your husband ever owned a white pickup

5  truck?

6  A     No.

7  Q     Have you and your husband ever owned any luxury

8  mansions?

9  A     No.

10 Q     Would you briefly describe for us, please, the type of

11 house that you had constructed and which is now your

12 permanent residence in Mascota?

13 A     It's a house built out of brick and tile and wood.

14 It's not a luxurious house at all, no.  It's a comfortable

15 home to live in.

16 Q     How many bedrooms does it have?

17 A     Two.

18 Q     And what kind of furnishings does it have?

19        MR. MEDRANO:  Objection; relevance.

20        THE COURT:  Sustained.

21 BY MR. BLANCARTE:

22 Q     Have you and you husband ever owned any thoroughbred

23 ranches?

24        MR. MEDRANO:  Objection; relevance.

25        MR. BLANCARTE:  I believe the government has

1427

1    brought this out on their --

2              THE COURT:  You may answer.

3              THE WITNESS:  No.  During a period of time he had

4    some cattle at the ranch, but never horses.

5    BY MR. BLANCARTE:

6    Q    And does he have the cattle anymore?

7    A    No.

8    Q    When did he stop having cattle?

9    A    He sold it when the price of cattle was high, and he

10   thought he could make some money on the sale.

11   Q    Do you remember approximately when that was, what

12   year?  If you remember, you don't have to guess.

13   A    It was in the '80s, but I don't remember exactly the

14   year.

15   Q    So the facility where your husband maintained those

16   cattle is that now abandoned on the ranch?

17   A    Yes; that's right.

18   Q    By the way, why did -- if you know -- why did your

19   husband close the business that was for packing guava

20   fruit?

21             MR. MEDRANO:  Objection; asked and answered;

22   relevance.

23             MR. BLANCARTE:  I didn't ask that question.

24             THE COURT:  You may answer.

25             THE WITNESS:  Why did he close it?

1428

1    BY MR. BLANCARTE:

2    Q    Right.

3    A    Because it wasn't cost effective.

4    Q    Mrs. Zuno, where were you born and raised?

5    A    In Mascota, Jalisco.

6    Q    And having been born and raised in Mascota, Jalisco,

7    did --

8         MR. MEDRANO:   Objection, Your Honor, to the form

9    of the question.

10        MR. BLANCARTE:   I'll withdraw it.

11        MR. MEDRANO:   He repeats the testimony through

12   out --

13        MR. BLANCARTE:   I will withdraw it.

14   BY MR. BLANCARTE:

15   Q    In your life, have you ever driven back and forth

16   round trip between Guadalajara and Mascota or Mascota and

17   Guadalajara?

18   A    Yes.

19   Q    Over the course of your lifetime, throughout the year

20   at different times?

21   A    Yes.  Well, yes, but during the rainy season -- well,

22   yes, but you have to come back anyway.  Yes.

23   Q    Okay.  So let's say when conditions are good, dry,

24   good weather?

25   A    Yes.

1429

1    Q    You've driven under those conditions, haven't you?

2    A    Yes.

3    Q    And you, in the mid-'80s, drove that road round trip

4    between Guadalajara and Mascota; is that correct?

5              MR. MEDRANO:  Objection; asked and answered.

6              THE COURT:  Can we get to the point here, Counsel.

7              MR. BLANCARTE:  Yes.  Thank you, Your Honor.

8    BY MR. BLANCARTE:

9    Q    During good conditions, how long would it take you to

10   drive back and forth, let's say one way, between Mascota

11   and Guadalajara?

12   A    Approximately five hours.

13   Q    One way?

14   A    Yes.

15   Q    And in the region of Mascota, Jalisco and Guadalajara,

16   is there something called a rainy season?

17             THE COURT:  Counsel, if you're going to ask her if

18   she's ever driven it in the rainy season, do it.

19             MR. BLANCARTE:  I believe there's a brief

20   foundation for this, Your Honor, and I will be off the

21   subject right away.

22             THE WITNESS:  Yes.

23   BY MR. BLANCARTE:

24   Q    What is the rainy season?  What is the time period?

25   A    It's June, July, August, September, October.  It rains

1430

1    a little bit in November.  And it also rains a little bit

2    in December.

3    Q    Just briefly, what is the height of the rainy season?

4         MR. MEDRANO:  Objection; relevancy.

5         MR. BLANCARTE:  I'll withdraw.

6    BY MR. BLANCARTE:

7    Q    Have you ever driven it during the rainy season?

8    A    Yes.

9    Q    During that part of the year, how long does it take to

10   make a round trip between Mascota, Jalisco-Guadalajara,

11   Guadalajara-Jalisco?

12   A    Well, that all depends on whether it had just rained,

13   and how long it takes for the rivers and the -- the rivers

14   and the small little rivers -- the flow to become lower.

15   It can be up to seven or eight hours.

16   Q    And it is sometimes impassable?

17   A    That's right.

18   Q    Mrs. Zuno, in 1984-'85, was there any kind of

19   celebration in the Town of Mascota?

20   A    Yes.

21   Q    What was that celebration?

22   A    Mascota turned a hundred years from the time it was

23   first established as a city.

24   Q    So the centennial celebration?

25   A    Yes.

1431

1   Q      And did your husband in any way get involved in that

2   centennial celebration?

3             MR. MEDRANO:  Objection; relevance.

4             MR. BLANCARTE:  There is a foundation here, Your

5   Honor.  It will be brief.

6             THE COURT:  Counsel, we've already heard evidence

7   of that.  Get to the point.

8   BY MR. BLANCARTE:

9   Q      During what period of time was your husband involved

10   and what did he do?

11   A      A committee was established to organize the

12   festivities for the centennial, and approximately in

13   mid-1984 -- it was approximately established in 19 --

14   mid-1984, and my husband participated in that committee.

15   The committee was in charge of organizing all of the

16   festivities.

17   Q      What did your husband do?

18   A      He was in charge of organizing the sports, and

19   cultural events, and the social events.

20   Q      Let me take you now to February of 1985.  Do you know

21   if there was some other responsibility that your husband

22   had in the Town of Mascota during that month?

23   A      Yes.

24   Q      And do you know your husband's whereabouts in the

25   month of February, 1985?  You can just answer yes or no.

1    A    Yes.

2    Q    What was that other responsibility that your husband

3    had in February of '85?

4    A    The planning committee for the centennial celebration

5    assigned him an extra duty or obligation during the month

6    of February, more than he had before.  He had to raise and

7    lower the flag on a daily basis, because the month of

8    February is the month of the flag in Mexico.

9         MR. BLANCARTE:  Could I briefly ask that Ms.

10   Fulginiti assist me with an exhibit, Your Honor?

11        THE COURT:  Yes.

12        MR. BLANCARTE:  If you could just prepare Exhibit

13   417.  You can just hold it for a second.  Thank you.

14   BY MR. BLANCARTE:

15   Q    Mrs. Zuno, that other responsibility involving the

16   month of the flag, did Mr. Zuno have that responsibility on

17   a daily basis in February?

18        MR. MEDRANO:  Objection; asked and answered.

19        THE COURT:  Yes.  Sustained.

20   BY MR. BLANCARTE:

21   Q    Did you personally ever go with Mr. Zuno when he

22   fulfilled that responsibility?

23   A    Some of the times.

24   Q    And did anyone else ever go?

25   A    My son, and the members of the committee, and some of

1433

1   the towns' people.

2   Q    It was a public event; is that correct?

3   A    That's right.

4   Q    Any kind of celebration while this ceremony was going

5   on?

6   A    Well, the national hymn or anthem was played, and the

7   flag was raised.

8   Q    Mrs. Zuno, I will ask you to please look at Defendant

9   Zuno's Exhibit 417, without showing it to the jury.  Do you

10  recognize what's depicted on that exhibit?

11  A    Yes.

12  Q    What is it?

13  A    It's La Plaza de la Baudera.  It's one of the places

14  where the flag was raised and brought down.

15  Q    By your husband?

16  A    That's right.

17  Q    Is this one of the places you went with him to do

18  that?

19  A    Yes.

20       MR. BLANCARTE:  I would ask that 417 be moved into

21  evidence, Your Honor.

22       THE COURT:  It may be admitted.

23           (Exhibit 417 received in evidence.)

24  BY MR. BLANCARTE:

25  Q    Mr. Zuno raised and lowered that flag as part of the

1434

1    ceremony every day in February, Mrs. Zuno?

2            MR. MEDRANO:  Objection; asked and answered.

3            THE COURT:  Overruled.

4            THE WITNESS:  That's right.

5    BY MR. BLANCARTE:

6    Q    Did your husband ever use any aliases or go by any

7    other name, other than the name Ruben Zuno-Arce?

8    A    No.

9    Q    When your husband traveled, did he have a passport?

10   A    Yes.

11   Q    And do you know if it was in his name, Ruben

12   Zuno-Arce?

13   A    Yes.

14           MR. BLANCARTE:  Just one moment, Your Honor.

15           No further questions for Mrs. Zuno.

16           THE COURT:  You may cross-examine the witness.

17                        CROSS-EXAMINATION

18   BY MR. MEDRANO:

19   Q    Mrs. Zuno, you love your husband, don't you?

20   A    That's right.

21   Q    You would like to help him?

22           MR. BLANCARTE:  Objection; vague and ambiguous.

23           THE COURT:  Overruled.

24           THE WITNESS:  What do you mean by that?

25   BY MR. MEDRANO:

1435

1 Q    With your testimony today, you would like to help your

2 husband?

3 A    Yes.

4 Q    Now, Zuno in Mascota is regarded in the 1980's as a

5 very important man?

6       MR. BLANCARTE:  Objection, Your Honor.  Outside

7 the scope of direct.

8       THE COURT:  Restate your question, Counsel.

9 BY MR. MEDRANO:

10 Q    Zuno was a member of this centennial committee?

11 A    Yes, as well as other people.

12 Q    He was in charge of the committee?

13 A    No, there was a whole group.

14 Q    He was part of the committee that made all the

15 decisions?

16 A    That's right.

17 Q    Now in the City of Mascota, Zuno -- Mr. Zuno is well

18 regarded; correct?

19 A    The townspeople know him.

20 Q    He is an important man there?

21       MR. BLANCARTE:  Objection; outside the scope, Your

22 Honor.

23       THE COURT:  Overruled.

24       THE WITNESS:  Well, he is like any other person in

25 the town, like myself or anybody else.

1436

BY MR. MEDRANO:

Q    I'd like to talk about other jobs that Zuno had.  He had a position within the government; correct?

MR. BLANCARTE:  Objection; outside the scope of direct.

THE COURT:  Overruled.

THE WITNESS:  In the '70s.

BY MR. MEDRANO:

Q    What was that position, Mrs. Zuno?

A    He worked for Conasupo as the executive representative for the committee, development committee.

Q    Tell us what Conasupo is, please?

A    Conasupo is a business belonging to the government. Well, I'm not sure whether it belongs to the government or whether it's a private business, but it's purpose is the welfare of the people.

Q    And Mr. Zuno was appointed to that position?

A    He was the executive representative.  He was not the head person, the chief.

Q    What years did he serve in that position, Mrs. Zuno?

A    In the '70s.

Q    Do you know the exact years?

A    I don't remember the years exactly, but it was '74 to '76  or '73 to '76.  I don't remember very well.

Q    What year did you and Mr. Zuno get married, Mrs. Zuno?

1437

1    MR. BLANCARTE:  Objection, relevance, Your Honor,

2    reality.

3    THE COURT:  Overruled.

4    THE WITNESS:  In 1989.

5    BY MR. MEDRANO:

6    Q    Now, there came a time that you and Mr. Zuno resided

7    in San Antonio; correct?

8    MR. BLANCARTE:  Objection.  That's out of the

9    scope, materiality, it's vague, a remote time, relevance.

10    THE COURT:  The objection is sustained.

11    Restate your question.

12    BY MR. MEDRANO:

13    Q    Mrs. Zuno, you and your husband, at one point,

14    traveled to the United States; correct?

15    MR. BLANCARTE:  Same objection.  Relevance,

16    outside the scope, vague, ambiguous, and remote in time.

17    THE COURT:  Sustained.

18    BY MR. MEDRANO:

19    Q    Mrs. Zuno, have you and your husband ever traveled to

20    San Antonio, Texas?

21    MR. BLANCARTE:  Same objection, Your Honor.

22    THE COURT:  Sustained.

23    BY MR. MEDRANO:

24    Q    Why did Mr. Zuno sell 881 Lope de Vega in Guadalajara?

25    A    Because we needed money.

1438

1   Q    To buy a gas station?

2   A    To build a gas station.

3   Q    And what year was Lope de Vega sold, Mrs. Zuno?

4   A    In 1984, even though the deed to the property was

5   signed in 1985.

6   Q    When was it sold in '84 then?

7        MR. BLANCARTE:  Objection; relevance, Your Honor.

8   Objection; relevance.

9        THE COURT:  Sustained.

10       MR. MEDRANO:  Your Honor, it deals with Lope de

11  Vega.  Counsel asked questions about that residence.

12       MR. MEDVENE:  Your Honor, he's getting into title

13  documents.  We've gone through this already.

14       MR. MEDRANO:  Your Honor, I'm not asking --

15       THE COURT:  Just a moment.  Restate your question.

16       MR. BLANCARTE:  The only thing I ask --

17  BY MR. MEDRANO:

18  Q    When in 1984 was Lope de Vega sold, Mrs. Zuno?

19       MR. BLANCARTE:  Objection; asked and answered.

20       THE COURT:  Overruled.

21       MR. BLANCARTE:  He asked that very question, Your

22  Honor.

23       MR. MEDRANO:  It was never answered.

24       THE COURT:  Overruled.  You may answer.

25       THE WITNESS:  In December.

1439

BY MR. MEDRANO:

Q    And how much was it sold for, Mrs. Zuno?

A    During that time, it was approximately $300,000.

Q    How much was that in pesos, Mrs. Zuno?

A    Seventy million pesos.

Q    When you and Mr. Zuno would reside in the town of Mascota, Mr. Zuno would travel on occasion; correct?

A    Yes.

Q    He would leave Mascota?

A    Yes.

Q    Sometimes without you; correct?

A    Very few times.

Q    Sometimes he traveled without you; correct?

A    Yes.

Q    Sometimes Mr. Zuno traveled and you did not know where he went; correct?

A    I always knew where he was at.

Q    You knew where he was in February of 1985.  You saw him every day in February; correct?

A    Yes.

Q    Because he went to raise and lower the flag every day?

A    Yes.

Q    That responsibility was given to a very important and wealthy man like Mr. Zuno; correct?

       MR. BLANCARTE:  Objection; relevance and assumes

1440

1  facts that are not in evidence, Your Honor.

2         THE COURT:  Sustained.

3  BY MR. MEDRANO:

4  Q    You did go with Mr. Zuno every day when he raised and

5  lowered the flag; is that right?

6  A    No.

7  Q    Sometimes he did it by himself?

8  A    That's right.

9  Q    But every day in February of 1985, Mr. Zuno was in

10  Mascota?

11        MR. BLANCARTE:  Objection; asked and answered.

12        THE COURT:  Sustained.

13  BY MR. MEDRANO:

14  Q    Mrs. Zuno, you're aware, aren't you, that February

15  24 in Mexico is Flag Day?

16  A    Yes.

17  Q    Incidentally, Mr. Zuno raised the flag at flagpoles

18  other than the one depicted in the photograph; correct?

19  A    Yes.  Yes.

20  Q    Now, for the town of Mascota, there is a small landing

21  strip or airport next to Mascota; correct?

22        MR. BLANCARTE:  Objection; relevance, outside the

23  scope of direct.

24        THE COURT:  Overruled.

25        THE WITNESS:  Yes.

1441

1  BY MR. MEDRANO:

2  Q    In fact, Mr. Zuno in the 1980's owned an aircraft;

3  correct?

4  A    Yes.

5  Q    I'd like to direct your attention to about 1989,

6  Mrs. Zuno.  Now, what was the value of the properties that

7  Mr. Zuno had in 1989?

8          MR. BLANCARTE:  Objection; relevance.  He's

9  talking about 1989.

10          THE COURT:  Overruled.

11          MR. BLANCARTE:  Materiality, Your Honor.

12          THE WITNESS:  In 1989, approximately some 800 or

13  900 thousand million pesos (sic).

14  BY MR. MEDRANO:

15  Q    And in American dollars, that's between 1.5 and $2

16  million; correct?

17          MR. BLANCARTE:  I believe there was a problem with

18  the translation of the amount, Your Honor.

19          MR. MEDRANO:  Objection, Your Honor.  There's an

20  official translator here.

21          MR. BLANCARTE:  There was a mistake and I feel

22  obligated to bring it to the Court's attention.

23          THE COURT:  Restate the question.

24  BY MR. MEDRANO:

25  Q    The value in American money was between 1.5 and $2

1442

1   million; correct?

2   A    No.

3   Q    Well, you remember submitting a declaration on behalf

4   of Mr. Zuno in September of '89, did you not?

5   A    Yes.

6   Q    Didn't you state in that declaration that for the

7   properties of Mr. Zuno, they had a total value of between

8   1.5 and two million American dollars?

9         MR. BLANCARTE:  Objection; relevance, and outside

10  the scope.  We are talking about 1989, remote in time.

11        THE COURT:  Overruled.

12        THE WITNESS:  At that time when I signed the

13  declaration, that's what I thought the properties were

14  worth, but later on I had an evaluation or an assessment

15  made of the properties.

16  BY MR. MEDRANO:

17  Q    So when you signed this under penalty of perjury in

18  September of '89, you were lying at that time?

19        MR. BLANCARTE:  Objection; argumentative, Your

20  Honor.

21        THE COURT:  Sustained.

22  BY MR. MEDRANO:

23  Q    You also stated in your declaration that for these

24  properties you described, there were no mortgages or any

25  money owed on the properties; correct?

1443

1          MR. BLANCARTE:  Objection; relevance; materiality;

2     outside the scope.

3          THE COURT:  Overruled.

4          THE INTERPRETER:  The answer was, "No," Your

5     Honor.

6          MR. MEDRANO:  I didn't hear the answer.

7          THE INTERPRETER:  The answer was, "No."

8          MR. MEDRANO:  May I approach Madam Clerk, Your

9     Honor.

10          THE COURT:  Yes.

11          MR. MEDRANO:  If we may identify that as

12     Government Exhibit 184, Your Honor.

13          THE COURT:  It may be identified as 184.

14          (Exhibit 184 marked for identification)

15     BY MR. MEDRANO:

16     Q    Mrs. Zuno, if you look at the bottom of that document,

17     that is your signature; correct?

18     A    Yes.

19     Q    And with the court interpreter's assistance, if I can

20     direct the witness to the middle of Paragraph 3, the

21     sentence that says, "We do not have any mortgages, nor do

22     we owe any money on any of these properties."

23          You see that, don't you, Mrs. Zuno?

24     A    Yes.

25     Q    And when you and Mr. Zuno resided in the town of

1444

1  Mascota, Mr. Zuno would receive visitors on occasion;

2  correct?

3  A    Yes.

4  Q    And sometimes these visitors would be politicians?

5  A    It was townspeople from Mascota.

6  Q    And there were also visitors from outside of Mascota;

7  correct?

8  A    Yes.

9  Q    And some of these people who visited were politicians;

10  correct?

11         MR. BLANCARTE:  Objection; vague and ambiguous,

12  and asked and answered, Your Honor.

13         THE COURT:  Overruled.

14         THE WITNESS:  Friends of my husband.

15  BY MR. MEDRANO:

16  Q    Mr. Zuno would also be visited from people out of town

17  who were with law enforcement; correct?

18         MR. BLANCARTE:  Same objection, and counsel is not

19  identifying any of these people.  It's also very vague.

20         THE COURT:  The objection is overruled.

21         THE WITNESS:  What are you referring to, like

22  police officers, people like that?

23  BY MR. MEDRANO:

24  Q    Or any other type of law enforcement official,

25  Mrs. Zuno?

1445

1   A    No.

2   Q    Now, with regard to properties, Mrs. Zuno, at one

3   point, you and Mr. Zuno had owned a condominium in

4   Acapulco -- an apartment in Puerto Vallarta; is that

5   correct?

6   A    Yes.

7   Q    Now, taking you back for a moment at the address at

8   881 Lope de Vega.  Now, you have been to that residence

9   before, haven't you?

10  A    The house was rented out until mid-1984.

11  Q    You have been to that house before, haven't you,

12  Mrs. Zuno?

13  A    No.

14  Q    You have not been to a house that was owned by your

15  husband in Guadalajara, is that what you are saying?

16        THE COURT:  Counsel, the witness answered the

17  question.

18        MR. MEDRANO:  I'll move on, Your Honor.

19        If I may have just one moment, Your Honor.  I

20  believe I'm done.

21        THE WITNESS:  He asked whether I lived there;

22  right?

23        MR. MEDRANO:  There is no pending question, Your

24  Honor.

25        THE COURT:  There is no pending question.

1446

1   BY MR. MEDRANO:

2   Q    When Mr. Zuno was visited by people from out of town,

3   those people included at one point or another Enrique

4   Alvarez del Castillo; correct?

5   A    No.

6   Q    Manuel Ibarra-Herrera?

7   A    No.

8   Q    Miguel Aldana?

9   A    No.

10  Q    Finally, Mrs. Zuno, with regard to properties that are

11  owned by yourself and your husband, at one point you have

12  owned a piece of property located at Cora de Lora Street

13  (phonetic) in Zapopan?

14  A    No, not that I remember.

15  Q    And I misspoke.  It was Mr. Zuno himself, not you, who

16  owned that property?

17  A    I don't remember that.

18  Q    And Mr. Zuno also owned a property located on

19  Zacatecas Street?

20       MR. BLANCARTE:  Objection; relevance; vague as

21  pertaining to what town, where; materiality, Your Honor.

22       THE COURT:  Overruled.

23       THE WITNESS:  On Calle Zacatecas?  I don't

24  remember.

25  BY MR. MEDRANO:

1447

1   Q      But you always traveled with your husband when he went

2   out of town; correct?

3          MR. BLANCARTE:   Objection; asked and answered; and

4   misstates the witness' testimony, Your Honor.

5          THE COURT:   Well, if it was asked and answered,

6   how could it misstate the witness' testimony?

7          MR. BLANCARTE:   Asked and answered, Your Honor.

8          THE COURT:   Sustained.

9   BY MR. MEDRANO:

10  Q     Mrs. Zuno, Mr. Zuno also owned in Mascota a residence

11  locate on Hila Romero Gil Street?

12  A     Yes.

13  Q     Mr. Zuno has also owned in Mascota a piece of property

14  called La Higura; correct?

15  A     In the deed the name of La Higura, meaning the fig

16  tree, shows up in the deed, but we know that place as

17  Rancho El Ahuilote.

18  Q     Thank you, Mrs. Zuno.

19         Mr. Zuno has also owned in Mascota property called

20  Buena Vista?

21  A     The deed called -- said -- it's written in the deed as

22  Buena Vista, but we call it La Jolla.

23  Q     Another property in Mascota owned by Mr. Zuno is

24  located on Liandra Via Street (phonetic)?

25  A     Yes.

1   Q     And, in fact, there is more than one property on that

2   particular street owned by Mr. Zuno?

3   A     On Liandra Via?

4   Q     Correct.

5   A     It's just the plot, a lot.

6   Q     And Mr. Zuno owns it?

7   A     Yes.

8   Q     So according to your testimony, Mr. Zuno owns several

9   pieces of property in Mascota?

10  A     Yes.

11  Q     In fact, he is the largest landowner in Mascota;

12  correct?

13  A     No.

14        MR. BLANCARTE:  Objection; lack of foundation.

15        Withdrawn.

16        THE COURT:  Well, the witness' answer may stand.

17  BY MR. MEDRANO:

18  Q     Despite owning all of these properties, Mr. Zuno is

19  not an important man in Mascota; is that correct?

20        MR. BLANCARTE:  Objection --

21        THE COURT:  Sustained.

22        MR. MEDRANO:  May I have just one moment, Your

23  Honor?

24                    (Pause in proceedings.)

25  BY MR. MEDRANO:

1449

1   Q    Finally, Mrs. Zuno, Mr. Zuno, during the time you've

2   been married to him, has had some involvement with the

3   P.R.I., the P-R-I, political party; correct?

4         MR. BLANCARTE:  Objection; relevance; materiality.

5         THE COURT:  Overruled.

6         THE WITNESS:  Yes.

7   BY MR. MEDRANO:

8   Q   To your knowledge, Mr. Zuno, does he know Manuel

9   Ibarra-Herrera?

10        MR. BLANCARTE:  Objection; asked and answered.

11        MR. MEDRANO:  That question was not asked before,

12   Your Honor.

13        THE COURT:  Overruled.  That was not asked.

14        THE WITNESS:  No.

15   BY MR. MEDRANO:

16   Q   To your knowledge, Mr. Zuno knows Enrique Alvarez del

17   Castillo; correct?

18        MR. BLANCARTE:  That was clearly asked and

19   answered.

20        THE COURT:  No.  The prior question asked if he

21   had visited at their home.

22        MR. BLANCARTE:  It's outside the scope, Your

23   Honor.

24        THE COURT:  Overruled.

25        THE WITNESS:  Are you asking me whether he knows

1450

1    him or he was visited by him?

2    BY MR. MEDRANO:

3    Q    Correct.  Knows him.

4    A    You mean Alvarez del Castillo?

5    Q    Yes, Mrs. Zuno.

6    A    Yes, he does.

7    Q    And he also knows Miguel Aldana?

8    A    No.

9        MR. MEDRANO:  Your Honor, that concludes cross.

10   Thank you.

11        THE COURT:  Redirect examination.

12        MR. BLANCARTE:  Just briefly, Your Honor.

13                  REDIRECT EXAMINATION

14   BY MR. BLANCARTE:

15   Q    Mrs. Zuno, do you know what it means to testify under

16   oath in a U.S. Federal Court?

17   A    Yes.

18   Q    And you understand that you're under oath right now to

19   tell the truth?

20        MR. MEDRANO:  Objection, Your Honor, this is

21   irrelevant.

22        MR. BLANCARTE:  It's very relevant.  He brought

23   out --

24        THE COURT:  Just a moment.  Overruled.

25        THE WITNESS:  Yes.

1451

1   BY MR. BLANCARTE:

2   Q    Would you lie for your husband, Mrs. Zuno, under oath

3   in this courtroom?

4   A    No.  No.

5           MR. MEDRANO:  Objection; it's been answered, Your

6   Honor.

7           THE COURT:  Yes.  The question has been answered.

8   BY MR. BLANCARTE:

9   Q    Mrs. Zuno, in 1984 and 1985, how long had it been

10  since your husband, Mr. Zuno, had had any position at all

11  with any part of government in Mexico?

12  A    Eight or nine years.

13  Q    And the condominium that you testified, you were asked

14  if that was in Acapulco.  Is it in Acapulco.

15  A    No, it was in Puerto Vallarta.

16  Q    How big is this condominium?

17          MR. MEDRANO:  Objection; relevance.

18          THE COURT:  Overruled.

19          THE WITNESS:  One bedroom, a living room, and a

20  small kitchen, and a small dining room area.

21          MR. BLANCARTE:  Thank you.  Nothing further, Your

22  Honor.

23          MR. MEDRANO:  No cross.

24          THE COURT:  You may step down.

25          Call your next witness.

1452

1    MR. BLANCARTE:  Just one second, Your Honor.

2    THE COURT:  Do you have further questions for this

3    witness?

4    MR. BLANCARTE:  Nothing further for this witness,

5    Your Honor.  Thank you.

6    THE COURT:  You may step down.

7                 (Witness excused.)

8    THE COURT:  Call the next witness.

9    MR. MEDVENE:  Salvador Delgado Lopez.

10            (Witness summoned to courtroom.)

11   THE CLERK:  Please raise your right hand.

12            (THROUGH SPANISH INTERPRETER)

13   SALVADOR DELGADO LOPEZ, DEFENDANT'S WITNESS, SWORN

14   THE WITNESS:  Yes.

15   THE CLERK:  Please be seated.

16   State your full name for the record, and spell

17   your last name.

18   THE WITNESS:  Salvador Delgado Lopez.

19                 DIRECT EXAMINATION

20   BY MR. MEDVENE:

21   Q    Where do you live, sir?

22   A    In Guadalajara.

23   Q    What is your business or occupation?

24   A    I'm an attorney.

25   Q    Are you licensed to practice law anywhere?

1453

1    A    Yes, ever since 1984.

2    Q    Where are you licensed to practice law?

3    A    In the whole of the Mexican Republic.

4    Q    Do you have a specialty in your law practice?

5    A    Yes, administrative law.

6    Q    And does that specialty include anything regarding

7    properties?

8    A    Yes, it definitely has to do with everything that has

9    to do with real estate.   It's part of my job to investigate

10   titles and to register them properly.

11   Q    When you say it's the job to investigate the titles,

12   how is that done?

13   A    Well, I have experience because I work in a public

14   registry of land.   Starting in 1968 to 1976, at that time

15   it was my job to work at the public offices where all of

16   the publicly owned properties are registered.   The name of

17   those offices is Public Registry of Public Land, which is

18   the equivalent of the Registrars Office here.

19   Q    Did there come a time when you were hired for any

20   purpose by the widow of Javier Barba-Hernandez?

21   A    Yes.   Mrs. Lilia Martinez hired me after her husband

22   was killed, after Barba was killed, to register -- well, to

23   first of all, find out, investigate, what all of his land

24   holdings were, and then to properly register title to them,

25   because she knew -- she knew that the properties had been

1454

1  confiscated by the Attorney General's Office of the

2  Republic.

3  Q    Did you conduct an investigation of all of the

4  properties that Javier Barba-Hernandez owned?

5  A    Yes, I did.  At the offices that I just mentioned a

6  few moments ago, at the public -- Registry of Public Land

7  at the Registrars Office.

8  Q    And in the course of your investigation, did you talk

9  to people and review any documents?

10 A    I interviewed various people at those offices.  I also

11 interviewed regular individual people, relatives of the

12 wife and of that man.  I was given some documentation, such

13 as the record to the title of those public deeds,

14 certificates that are issued by the Registrars Office,

15 which are certificates that attest that there is no lien

16 against those properties.  If you'd like, I can tell you

17 which were the properties that I found were registered.

18 Q    Please.

19 A    I can't remember them all.  I have them written down.

20 Q    Let me ask you, first, based on your investigation,

21 did Javier Barba-Hernandez own any place called Oficina?

22           MR. CARLTON:  Object to this as hearsay, Your

23 Honor.

24           THE COURT:  The objection is sustained.

25           MR. MEDVENE:  He's reviewed the records, Your

1455

1    Honor, and done investigation of everything.

2            THE COURT:  Just a moment.  It's time for our

3    morning recess.  The jury will be excused at this time.

4                        (Jury out.)

5            THE COURT:  Counsel, is it your intention to prove

6    the ownership of property by having this witness testify to

7    the contents of official records that he reviewed?

8            MR. MEDVENE:  It's our intention to get from this

9    witness, who is an expert in this area, an opinion on

10   whether or not Javier Barba-Hernandez ever owned a

11   particular house, and then it's our intention to ask him

12   who actually owned the house.  He also knows who owned the

13   house.

14           The testimony in question, to just refresh Your

15   Honor, is one of the government witnesses, Godoy, claims

16   that there was a meeting at a house owned by Javier

17   Barba-Hernandez called La Oficina that was located two

18   blocks away from the Tonala house.

19           This witness is in a position to say that Javier

20   Barba-Hernandez did not own that house, and the house in

21   question was owned by someone else.

22           THE COURT:  You may step down.

23           Well, you didn't answer my question directly, but

24   it sounds like he is going to testify to the contents of

25   records that he reviewed.

1456

1    MR. MEDVENE:  Well, not with the contents of

2    records --

3    THE COURT:  If that is true, that is improper

4    hearsay, and it also violates the Best Evidence Rule.

5    MR. MEDVENE:  Well, it's not only the content of

6    records, but also the review of his investigation, and he's

7    giving an opinion as to the results of his investigation,

8    and what houses Javier Barba owned.  It would seem to me it

9    would go to weight that he can be cross-examined, but I

10   think that goes to weight, Your Honor.

11   MR. CARLTON:  Your Honor, I think this is a wild

12   expansion under the Rules of Evidence.  If Mr. Medvene's

13   theory was correct, we could put up agents to talk about

14   their opinions as to who owned properties and things like

15   that, and that's never permitted.

16   MR. MEDVENE:  Well, we -- oh, I'm sorry, John.

17   We had a witness get on the stand, Mr. Godoy, who

18   said it was Javier Barba's house without --

19   THE COURT:  Well --

20   MR. CARLTON:  That's what he was told.

21   MR. MEDVENE:  Well, but what he was told is

22   clearly hearsay.

23   MR. CARLTON:  There was no objection.

24   THE COURT:  No objection was made, but that was

25   because he knew the house.  He knew who lived in it.

1457

1    MR. MEDVENE:  Well, that's what he claimed.

2    THE COURT:  Well, it wasn't challenged.

3    Nevertheless, it would be impermissible for this

4    witness to testify as to who owned this house based on his

5    review of the records.  That would be hearsay evidence.  If

6    he has some other personal knowledge about it, then he may

7    testify to it.

8    MR. MEDVENE:  We would ask then, so we don't ask

9    it in front of the jury, Your Honor, I understand your

10   ruling.

11   THE COURT:  Yes.

12   MR. MEDVENE:  It would be my intent then, subject

13   to Your Honor's ruling, to ask him if he knows the owner of

14   the house at Calle Felipe Angelis, which is the location

15   mentioned by the prosecution witness.  He will say, as I

16   understand it, that he knows the owner and he knows --

17   THE COURT:  You mean the owner at the present

18   time?

19   MR. MEDVENE:  Yes.

20   THE COURT:  All right.

21   MR. MEDVENE:  And the owner in 1984.  He'll state

22   what family owns it.  That it's owned by a lawyer, that he

23   knows the lawyer, and he knows who owns the house.

24   THE COURT:  That's personal knowledge.  He may

25   testify to that.

1458

1     MR. MEDVENE:  All right, Your Honor.

2     THE COURT:  Now, this question about these two

3  depositions that you wish to read into evidence --

4     MR. MEDVENE:  Yes, sir.

5     THE COURT:  -- this one witness Sergio -- first of

6  all, you haven't filed any opposition to this.

7     MR. MEDRANO:  Your Honor, we only got the

8  pleading, I believe it was yesterday morning, Your Honor.

9     THE COURT:  Well, do you oppose what has been

10  proposed?

11     MR. MEDRANO:  Very much so.  We'd just like to

12  briefly be heard to tell you what our position is.

13     THE COURT:  Well, let me hear what is your

14  opposition, to who, which witness?

15     MR. MEDRANO:  To both, and for the following

16  reasons.

17     THE COURT:  Both witnesses?

18     MR. MEDRANO:  Yes, Your Honor.

19     THE COURT:  Why do you oppose the reading of their

20  testimony?

21     MR. MEDRANO:  First of all, with Macias-Barajas,

22  it's utterly -- well, besides not -- for both witnesses not

23  having met the standard of showing lack of availability,

24  going beyond that, Your Honor, Macias-Barajas is --

25     THE COURT:  Are you serious?

1459

1        MR. MEDRANO:  Pardon?

2        THE COURT:  You make these statements.  Sometimes

3   you lose your credibility when you make statements that

4   they haven't shown unavailability here.  You don't think

5   they've shown unavailability?

6        MR. MEDRANO:  Well, Your Honor, obviously the

7   Court disagrees with me.  I'll move on to my second

8   argument, then.

9        THE COURT:  Well, don't make those kind of

10  arguments.

11       MR. MEDRANO:  Very well, Your Honor.

12       THE COURT:  That's a good way to lose your

13  credibility.

14       MR. MEDRANO:  Very well.

15       As to Macias-Barajas, Your Honor, it's completely

16  irrelevant for the following reasons:  The gist of that

17  testimony, you may recall, from the last trial --

18       THE COURT:  I remember it well.

19       MR. MEDRANO:  -- that he was -- that he was a

20  driver for Zuno, and Zuno did not go to these -- to La

21  Quinta that Cervantes testified about.  No Cervantes has

22  testified at this trial.  There is no mention of

23  Macias-Barajas.  That testimony is completely irrelevant

24  and has no pertinence to this case.

25       THE COURT:  Well, I'm inclined to agree on the

1460

1    Macias.

2              MR. MEDRANO:   And it's offered for a second

3    reason.   You may recall the second part of his testimony

4    was to --

5              THE COURT:   I know what it was.

6              MR. MEDRANO:   That the government was pressuring

7    him and trying to make him lie.   Your Honor, that's 403

8    barred.   It's irrelevant.   I don't see the relevance of it.

9              THE COURT:   I agree on Macias.   His testimony

10   given at the last trial was in rebuttal of Hernandez'

11   testimony that Macias used to drive Mr. Zuno to Barba's

12   house where he picked up large stashes of money, where he

13   delivered credentials to be used by other traffickers, and

14   then the business about what happened in the jail.   I don't

15   think that's relevant at all to this.

16             MR. MEDVENE:   Two quick points.   One, if not two,

17   government witnesses have claimed Mr. Zuno had a chauffeur.

18    Macias stands for the proposition that he did not have a

19   chauffeur.

20             Secondly, in large part, our cross-examination of

21   the government witnesses, the theory is over-reaching,

22   over-zealousness, maybe in a righteous cause, but over-

23   zealousness.   We think Macias goes to that point.   The

24   testimony --

25             THE COURT:   Are you saying that whatever happened

1461

1    to Macias may have happened to other witnesses?

2         MR. MEDVENE:  We are saying that we ought to be

3    able to circumstantially argue that if Macias was offered

4    favors and was threatened that if he didn't do certain

5    things or say certain things, that we could

6    circumstantially argue that this happened with others.

7         THE COURT:  The answer is you cannot.  Macias'

8    testimony is totally irrelevant.  There has been no claim

9    here that Mr. Zuno had a chauffeur.  The only evidence that

10   has been presented was that the white pickup truck was

11   being driven by someone.

12        MR. MEDVENE:  I think Mr. Godoy, Judge --

13        THE COURT:  And there's been ample evidence

14   presented by Mr. Zuno that he did not have a chauffeur.

15        MR. MEDVENE:  I would just say for Your Honor,

16   just so you consider it, and you can check my memory with

17   prosecutors, that I think Mr. Godoy said at one of the

18   meetings that Mr. Zuno allegedly attended, he was driven

19   there by a chauffeur.  My recollection is not infallible.

20        THE COURT:  I think that you've answered that

21   through --

22        MR. MEDVENE:  In a Grand Marquis, I think he said,

23   Your Honor.

24        THE COURT:  Mrs. Zuno has stated he never had a

25   chauffeur.  The bookkeeper that testified yesterday said

1462

1    the same thing.  I don't think we need the testimony of

2    Macias for those reasons.  And the other witness, now --

3           MR. MEDRANO:  May I be heard on Velasco, Your

4    Honor?

5           THE COURT:  Yes.

6           MR. MEDRANO:  Velasco is going to basically come

7    forward and say that he lived at that house.  That there

8    was no electric gate.  That's irrelevant.  Harrison

9    testified that he misspoke at the first trial.  He came in

10    to fix a garage door, so there's no relevance to that

11    whatsoever.

12           The second point, I imagine, offered by Mr.

13    Velasco, is that he was in that house in 1984, but that is

14    not incompatible with what Harrison says.  That he drives

15    by that house and he hears Caro broadcasting.  There's no

16    indication that Mr. Velasco was at that house.

17           THE COURT:  This witness, Velasco, will testify --

18    did testify that he rented that house?

19           MR. MEDVENE:  Yes, sir.

20           THE COURT:  For what period?

21           MR. MEDVENE:  That he rented the house from

22    approximately May of '78 through May of '84, the exact

23    period when Harrison places Caro-Quintero in the house

24    allegedly making a broadcast, and Virgen says that

25    Caro-Quintero was never at the house.

1463

1        THE COURT:  May of '78 to May of '84 is what he

2    will testify to?

3        MR. MEDVENE:  Yes, sir.

4        THE COURT:  To having rented the house?

5        MR. MEDRANO:  And also Harrison claims a couple of

6    things.  One, hearing the voice of Caro-Quintero

7    purportedly coming from the house.  He testifies, two, that

8    he went to the house on one occasion and knocked at the

9    door to do this or that.

10       Virgen said he lived at the house with his family.

11   Quintero was never in the house, broadcasting or otherwise.

12   And I believe he also deals with Harrison never came to the

13   house.  I'm not positive on the latter point, but I'm

14   positive on the former.

15       THE COURT:  Well, here's what -- I think that

16   testimony is relevant and may be presented, but the

17   government should be allowed to pick the testimony that

18   they're -- on the cross-examination relating to that that

19   they wish to present.

20       MR. MEDVENE:  We were going to read in the whole

21   thing.

22       THE COURT:  Is that necessary, to read in the

23   whole thing?

24       MR. MEDVENE:  It's very short.  It may not be

25   necessary, but unlike Macias, it's very short, Your Honor,

1464

1  but it's up to Your Honor.

2          MR. MEDRANO:  Your Honor, we object to any reading

3  in.  That's improper.  The Court said that the jury could

4  review the interrogation transcripts on their own, and it's

5  improper now to read this testimony because it would give

6  them greater weight.

7          THE COURT:  Well, this is the testimony of

8  Velasco.

9          MR. MEDRANO:  The point is, it should just go back

10 to the jury and let them read it at that time.  What Mr.

11 Medvene is suggesting to have it read to the jury here in

12 open court, and we think that's improper.

13         THE COURT:  Well, that's the customary way of

14 doing it.

15         MR. MEDRANO:  Your Honor, then why weren't the

16 interrogation tapes given to the jury to read in the

17 courtroom, or also read to them?  We asked --

18         THE COURT:  This is the testimony of an

19 unavailable witness.  This is not a tape.  It is not a

20 transcript of a tape.  This is testimony of a witness given

21 in lieu of the witness' in-person testimony.  You read his

22 prior testimony.  That's the way it's done.

23         MR. MEDRANO:  Well, I understand that, Your Honor,

24 but, again, just for consistency sake, we would ask the

25 Court at this time to treat the interrogation transcripts

1465

1   in the same fashion.  We would like those read to the jury

2   as well.  We asked you that two weeks ago and you declined

3   at this point.

4         THE COURT:  We will not read that.

5         MR. MEDRANO:  Very well.  May I ask another thing

6   then, Your Honor?

7         THE COURT:  Yes.

8         MR. MEDRANO:  In light of your ruling, we would

9   like to advise this trier of fact, because we think they

10   deserve to know, that this was a man who was willing to

11   come up here in 1990 to testify, but now mysteriously

12   refuses to come up this time.

13         We think the trier of fact should be apprised of

14   that fact, because obviously, we're deprived of the right

15   of confrontation by not having the man here live to

16   cross-examine him.

17         THE COURT:  Counsel, the issue before the Court is

18   whether prior testimony from another trial may be read.

19   This is not a decision that can be made, conditioned upon

20   the conditions that you are trying to impose upon it.  This

21   is something they have the right, as a matter of law, to

22   present.  The question of whether or not why he is not here

23   I think just opens up too many doors, and it is not

24   necessary to explain it.

25         MR. MEDRANO:  On that point, Your Honor, thank you

1466

1  for your indulgence.  I'd just like to remind the Court

2  that when Mr. Medvene cross-examined our government

3  informants, the repeated questions that arose was why were

4  they not here in May of 1990.  We are just saying what's

5  good for the goose is good for the gander.

6       THE COURT:  It's not the same thing.  He is

7  developing a theory that that this testimony is contrived

8  because it wasn't presented earlier, and that is not the

9  situation here.

10       MR. MEDRANO:  Very well.

11       THE COURT:  We'll take our recess at this time.

12            (Recess taken.)

13       THE COURT:  You may continue.

14  BY MR. MEDVENE:

15  Q    Do you know, sir, the owner of the house at Number One

16  Calle Felipe Angelis in Tonala, Jalisco?

17  A    Yes, sir.  It's a home -- it's a country-type home.

18  Q    Who is the owner?

19  A    That's located very close to a house that used to

20  belong to Javier Barba.  And the owner of that is Mr.

21  Duarte, Jose Luis Duarte.

22  Q    Is that residence about two blocks from 114 Tonala?

23  A    Yes.

24  Q    And the house is owned by Senior Duarte, did he own

25  that home in 1984?

1467

1   A    And I know through Jose Luis, his son, that they used

2   to go to that house ever since Jose Luis was a little

3   child, and Jose Luis is about my age.

4   Q    Was the house ever called Oficina?

5   A    No, never.  It was called Quinta Duarte.

6        MR. MEDVENE:  I have nothing further.  Thank you,

7   sir.

8        THE COURT:  Do you have any questions?

9        MR. CARLTON:  Just a moment, Your Honor.

10       No questions, Your Honor.

11       THE COURT:  Very well, you may step down.

12                    (Witness excused.)

13       THE COURT:  Next witness.

14       MR. MEDVENE:  Sergio Velasco-Virgen.

15                 SERGIO VELASCO-VIRGEN,

16         DEFENDANT'S WITNESS, VIA DEPOSITION

17       THE COURT:  That's the deponent -- the --

18       MR. MEDVENE:  Yes, the testimony we'll read in.

19       THE COURT:  By prior testimony?

20       MR. MEDVENE:  Mr. --

21       THE COURT:  I will advise the jury that this

22   witness, Sergio Velasco-Virgen, is not available to

23   testify, therefore, testimony he previously gave will now

24   be presented, and you may consider this testimony the same

25   as you would any other testimony that has been presented in

1468

1    Court.

2            You are going to ask the questions that were asked

3    of that witness?

4            MR. MEDVENE:  I will ask the questions and Jack

5    Luellen --

6            THE COURT:  He will give the answers?

7            MR. MEDVENE:  He will read the answers.

8            THE COURT:  So these are questions and answers

9    that were previously asked of this witness in another

10   proceeding.

11           You may proceed.

12           MR. MEDVENE:   (Reading.)

13           "Question:  Good afternoon, Mr. Velasco.

14           "Answer:  Good afternoon.

15           "Question:  Mr. Velasco, of what country are you a

16   citizen, please?

17           "Answer:  Mexico.

18           "Question:  And Mr. Velasco, are you familiar with

19   a home known as 881 Lope de Vega?

20           "Answer:  Yes, I'm familiar with it.

21           "Question:  Have you ever lived at 881

22   Lope de Vega?

23           "Answer:  Yes, from May of 1979 until May of 1984.

24           "Question:  Mr. Velasco, did you own that home or

25   did you rent it?

1469

1    "Answer:  I rented the house.

2    "Question:  And do you know a man by the name of

3    Ruben Zuno-Arce?

4    "Answer:  Yes, I know him.

5    "Question:  And did you rent that home from Mr.

6    Zuno?

7    "Answer:  Exactly.  Correct.

8    "Question:  Did 881 Lope de Vega ever have an

9    electric gate, Mr. Velasco?

10   "Answer:  No, never.

11   "Question:  During the time you lived at 881

12   Lope de Vega, did it ever have an electric gate?

13   "Answer:  Never.

14   "Question:  During the time that you lived at 881

15   Lope de Vega, did it ever have any kind of electrified

16   fence?

17   "Answer:  No, never, because in front of the house

18   there is a kindergarten school with a lot of children.

19   "Question:  When you lived at 881 Lope de Vega,

20   did that residence have a swimming pool, Mr. Velasco?

21   "Answer:  Yes.  Affirmative.  A small pool.

22   "Question:  Did you have a dressing room for that

23   pool, Mr. Velasco?

24   "Answer:  Affirmative.  There was.

25   "Question:  Where was the dressing room located,

1470

1  sir?

2       "Answer:  It was located at ten meters -- at ten

3  meters approximately from the pool.  It was a small -- it

4  is a small block where the dressing room was, and it had

5  inside a shower in the bathroom, a full bathroom.  Next to

6  that there was an engine room or the machine room where the

7  filter and the purifier for the pool were, and next to it

8  within the same block that was constructed was the house

9  for a night watchmen.

10       "Question:  When you say 'a house,' you mean a

11  house or a room where the night watchman stayed?

12       "Answer:  It's a room where the night watchman

13  stayed.

14       "Question:  And while you lived at 881

15  Lope de Vega, did you live alone, Mr. Velasco, or did you

16  live there with your family?

17       "Answer:  With my family.  My wife and two

18  daughters.

19       "Question:  And while you lived at 881

20  Lope de Vega, could you tell me the approximate ages of

21  your two children?

22       "Answer:  Six years and eight years when we left

23  Lope de Vega.

24       "Question:  While you lived at Lope de Vega, did

25  your children use that small pool that you described to us

1471

1    earlier?

2              "Answer:  Continuously.

3              "Question:  Did they use that dressing room that

4    you described to us when they used the pool?

5              "Answer:  Affirmative.

6              "Question:  In that dressing room that you

7    described, did it have windows?

8              "Answer:  Yes.  It had small windows in the part

9    very close to the roof.

10             "Question:  Did your children dress and undress in

11   that dressing room when you lived at Lope de Vega, Mr.

12   Velasco?

13             "Answer:  Any time that pool was used, the

14   dressing room was also used.

15             "Question:  Did you and your wife, in fact, dress

16   and undress in that dressing room?

17             "Answer:  Yes, we also did that.

18             "Question:  While you lived 881 Lope de Vega, was

19   there a four-foot wrought iron fence across the front of

20   the house, which you would be -- where the main entrance to

21   that residence was located?

22             "Answer:  Yes."

23             MR. MEDVENE:  Excuse me.  Let me re-read that.

24             "Question:  While you lived at 881 Lope de Vega,

25   was there a four-foot wrought iron fence across the front

1  of the house, which would be where the main entrance to

2  that residence was located?

3          "Answer:  Yes.  It's a small gate, very commonly

4  used in our country.  It's approximately four feet tall,

5  four feet high.

6          "Question:  Was that four-foot high wrought iron

7  fence a decorative fence or a security fence?

8          "Answer:  It's decorative, since that height is

9  not permitted to be used for security reasons.

10          "Question:  That four-foot high wrought iron fence

11  wasn't electrified, was it?

12          "Answer:  No, never.

13          "Question:  Mr. Velasco, do you still live in

14  Guadalajara?

15          "Answer:  Yes, I still live in Guadalajara.

16          "Question:  And have you had occasion to drive by

17  881 Lope de Vega at any time after you moved there -- moved

18  from there?

19          "Answer:  Yes, many times.

20          "Question:  When you lived at 881 Lope de Vega,

21  Mr. Velasco, was there ever a radio communication system

22  located at that residence?

23          "Answer:  Regular telephone.  No other type of

24  communications equipment.

25          "Question:  By regular telephone, do you mean a

1473

1  telephone that's connected by wire to telephone poles?

2          "Answer:  Affirmative.

3          "Question:  Mr. Velasco, do you know who Rafael

4  Caro-Quintero is?

5          "Answer:  Well, it was thoroughly publicized in

6  our country, only what the press had said about him.

7          "Question:  Was Caro-Quintero ever at 881

8  Lope de Vega while you lived there, Mr. Velasco?

9          "Answer:  Never.

10          "Question:  Was anyone by the name of Lorenzo

11  Harrison ever at 881 Lope de Vega while you lived there,

12  Mr. Velasco?

13          "Answer:  No, never."

14          MR. MEDVENE:  Thank you, Your Honor.

15          THE COURT:  All right, you may step down.

16          MR. MEDVENE:  No, I'm sorry.  There is some

17  cross-examination.

18          THE COURT:  Oh, there are some questions you wish

19  to have read?

20          MR. MEDVENE:  And Mr. Medrano might want to --

21          THE COURT:  Very well.

22          MR. MEDVENE:  Do you want me to read it?

23          MR. MEDRANO:  I don't mind Mr. Medvene doing it.

24          MR. MEDVENE:  I'll be happy to.

25          THE COURT:  Just continue with the other

1474

1 questions, then.

2            MR. MEDVENE:  Okay.  (Reading.)

3            "Question:  Good afternoon, Mr. Velasco.

4            "Answer:  Good afternoon.

5            "Question:  Mr. Velasco, what is your date of

6 birth, sir?

7            "Answer:  January 24th, 1944.

8            "Question:  Do you speak English?

9            "Answer:  No.

10            "Question:  What is the first time you met Ruben

11 Zuno-Arce?

12            "Answer:  In 1970.

13            "Question:  In Guadalajara?

14            "Answer:  Affirmative.

15            "Question:  Between 1970 to 1979 you had contact

16 with Ruben Zuno-Arce; correct?

17            "Answer:  Eventually, yes, we did have contact.

18            "Question:  Well, in fact, didn't you do work for

19 Ruben Zuno or even work with Ruben Zuno?

20            "Answer:  No, never.

21            "Question:  What is your job or profession in

22 Mexico?

23            "Answer:  Businessman.

24            "Question:  What is a businessman?  What do you

25 do?

1475

1          "Answer:  My business is the importation of

2    machinery for the forest industry.

3          "Question:  Did you ever sell any of the machinery

4    to Ruben Zuno-Arce?

5          "Answer:  That I remember, only on one occasion,

6    not exactly for his small orchard, only one chainsaw.

7          "Question:  Is that the only time you ever sold

8    anything to Zuno?

9          "Answer:  affirmative.

10         "Question:  Now, Ruben Zuno-Arce has that ranch

11   down in Mascota; correct?

12         "Answer:  I know that he had a ranch out in

13   Mascota.

14         "Question:  It's called La Jolla?

15         "Answer:  Yes, La Jolla.

16         "Question:  Have you been to that ranch?

17         "Answer:  On one occasion.

18         "Question:  When was that, Mr. Velasco?

19         "Answer:  I was there last year after he returned

20   to Mexico.  I don't remember the exact date, but it was

21   approximately October of last year.

22         "Question:  You saw Zuno at La Jolla when you were

23   there; right?

24         "Answer:  Correct, yes.

25         "Question:  To your knowledge, did Ruben Zuno-Arce

1476

1  have any other ranches, other than the one at Mascota?

2          "Answer:  I don't know.  I'm not aware.

3          "Question:  Did you start living at Lope de Vega

4  in May of 1979?

5          "Answer:  Yes.  May of '79.

6          "Question:  Did you pay rent starting in May of

7  '79?

8          "Answer:  Yes.  Rent was paid.

9          "Question:  Do you remember the amount per month?

10         "Answer:  Twenty-five thousand pesos.

11         "Question:  At any point, did the rent ever change

12  that you had to pay to Ruben Zuno-Arce?

13         "Answer:  When the first contract expired, which

14  was for two years, it went up to 50,000 pesos.

15         "Question:  Now, how would you pay Ruben Zuno-Arce

16  this rent money?

17         "Answer:  I made the payment to his mother.

18         "Question:  Every rent payment you made directly

19  to his mother?

20         "Answer:  Yes.  The first two years it was paid

21  before it was due.

22         "Question:  And after that, you made the payments

23  to Zuno's mother?

24         "Answer:  All the payments were made to her.  She

25  lived across -- the house -- across the street from the

1477

1   house.

2           "Question:  When did you leave the Lope de Vega

3   residence for good?

4           "Answer:  The first of May, 1984.

5           "Question:  Why?

6           "Answer:  Because approximately -- I don't

7   remember the exact date, Ruben Zuno made a comment to me

8   that he was living very comfortably in Mascota.  He had his

9   business in Mascota, and therefore he didn't know

10  whether -- he wasn't sure, but he might want to sell the

11  house.  He did not want to keep on renting it at the

12  beginning, after we drew up the second contract.  He

13  commented that he might be living in Mascota.

14          "Question:  You left the house because Ruben Zuno

15  wanted to sell it?

16          "Answer:  No, not necessarily.  Because the

17  contract was about to expire, and it hadn't been decided

18  yet whether it was going to be sold or whether it was not

19  going to be sold.

20          "Question:  When did the contract expire?

21          "Answer:  Exactly in May.  In May of '84.

22          "Question:  Mr. Velasco, did Ruben Zuno-Arce ask

23  you to leave the house in May of '84?

24          "Answer:  No, not in May.  He didn't ask me to

25  leave.

1478

1       "Question:  You left by your own choice?

2       "Answer:  Yes, because the contract expired in

3  May, and also we acquired -- my family and also the

4  children were older.

5       "Question:  Did Ruben Zuno-Arce ever tell you that

6  he wanted to sell the property?

7       "Answer:  Not exactly.  He wasn't sure whether he

8  would keep on renting it, or whether he would make some

9  improvements to sell it.  It wasn't an absolute decision.

10       "Question:  You're aware that after you left, the

11  house was eventually sold?

12       "Answer:  Yes, I found out.

13       "Question:  And it was sold by Ruben Zuno-Arce?

14       "Answer:  Can you read it -- repeat it again,

15  please?

16       "Question:  You're aware that it was Ruben

17  Zuno-Arce that sold the house?

18       "Answer:  Well, it's logical.  If he was the

19  owner, he would have been the only one to be able to sell

20  it.

21       "Question:  Do you know a man by the name Ernesto

22  Fonseca-Carrillo?

23       "Answer:  No, negative.

24       "Question:  After you left the house in May of

25  1984, after that time, you continued to have contact with

1479

1   Ruben Zuno-Arce?

2           "Answer:  Affirmative, yes.

3           "Question:  And did you ever sell anything else to

4   Ruben Zuno-Arce after May of 1984?

5           "Answer:  Can you repeat that again?

6           "Question:  After you left Lope de Vega in May of

7   1984, did you ever sell anything to Ruben Zuno-Arce?

8           "Answer:  To him directly, no.  In the company, I

9   don't know whether some buys were made.  It's a very large

10  company, but not to him directly.

11          "Question:  But you made sales then to business

12  associates of Zuno; correct?

13          "Answer:  They're not his small -- his small shop

14  or it's a wood mill.  He doesn't have any associates

15  regularly, not in a specific location.

16          "Question:  Did you sell anything to business

17  associates of Zuno?  Just answer that question.

18          "Answer:  If I sold it, no.  His sons, who at some

19  times were in charge of the shop, maybe they bought it or

20  bought it at the store.

21          "Question:  You were a friend of Ruben Zuno-Arce;

22  correct?

23          "Answer:  Correct.

24          "Question:  You're concerned what happens to him,

25  don't you --

1480

1      "Answer:  Yes.  It concerns me or it worries me,

2  as it does any friend.

3      "Question:  That's why you've come up here to

4  testify; correct?

5      "Answer:  I came to testify to the truth.

6      "Question:  Because you want to help Ruben

7  Zuno-Arce; correct?

8      "Answer:  I want to help out, to help justice.

9      "Question:  Not to help Ruben Zuno-Arce?

10      "Answer:  Logic, that's logical, I know him."

11      MR. MEDVENE:  That concludes it, Your Honor.

12      THE COURT:  Very well.  You may step down.

13      Call your next witness.

14      MR. BLANCARTE:  The Defense calls Ruben Zuno-Arce.

15      And if I may briefly, Your Honor, we will, by

16  mutual agreement show a brief video tape, which's been

17  marked for identification as Exhibit 410, and rather than

18  stop the tape in the middle of it and try to do a

19  narrative, at the end I will use the exhibits that have

20  been marked for identification, rather than go back to the

21  tape.  Is that acceptable to Your Honor?

22      THE COURT:  Yes.  Swear the witness.

23      THE CLERK:  Please raise your right hand.

24              (THROUGH SPANISH INTERPRETER)

25      RUBEN ZUNO-ARCE, ON HIS OWN BEHALF, SWORN

1481

1       THE WITNESS:  I do so swear.

2       THE CLERK:  Please be seated, and state your full

3   name for the record, and spell your last name.

4       THE WITNESS:  My name is Ruben Zuno-Arce,

5   R-U-B-E-N, Z-U-N-O, A-R-C-E.

6                    DIRECT EXAMINATION

7   BY MR. BLANCARTE:

8   Q    Mr. Zuno, what is your age, sir?

9   A    Sixty-two years old.

10  Q    And are you married, sir?

11  A    Yes, sir.

12  Q    And are you married to Enriqueta Zuno?

13  A    I'm married to her.

14  Q    And Mr. Zuno, tell me, please, where is your permanent

15  residence?

16  A    In Mascota, Jalisco.

17  Q    And how long have you been a permanent resident of

18  Mascota, Jalisco?

19  A    At around mid-1982, more or less, around the month of

20  July, towards the end of July.

21  Q    And when you first became a resident, permanent

22  resident of Mascota, where did you live?

23  A    You mean previously?

24  Q    When you first became a permanent resident of Mascota,

25  where did you live?

1482

1   A    Before that, I lived for certain periods of time in

2   San Antonio, Texas, and before that --

3          THE COURT:  The question is in what place did he

4   first live in Mascota.

5   BY MR. BLANCARTE:

6   Q    Mr. Zuno, do you and Enriqueta Zuno have --

7          THE COURT:  Are you withdrawing the question?

8          MR. BLANCARTE:  Yes, I will withdraw the question.

9          THE COURT:  All right.

10  BY MR. BLANCARTE:

11  Q    Mr. Zuno, do you and Enriqueta Zuno have any children?

12  A    We have two children.

13  Q    And do you own a home in Mascota, Mr. Zuno?

14  A    Yes, in Rancho La Jolla.

15  Q    Rancho La Jolla, what kind of ranch is that?

16  A    It's a fruit producing ranch, farm, basically.

17  Q    And --

18         THE COURT:  Counsel --

19         MR. BLANCARTE:  Yes, sir.

20         THE COURT:  -- rather than have this witness

21  repeat testimony, you may, it seems to me, get through this

22  in a hurry and ask him if he wishes to adopt his wife's

23  testimony with respect to the businesses they own, and the

24  nature of their property, and so forth, so we don't have to

25  go through it again.

1483

1    MR. BLANCARTE:   Thank you, Your Honor.

2  BY MR. BLANCARTE:

3  Q    Mr. Zuno, as to just the Rancho La Jolla farm or

4  ranch, you heard your wife's testimony regarding that

5  subject, did you not?

6  A    I did hear it.

7  Q    And do you wish to adopt Mrs. Zuno's testimony as to

8  Rancho La Jolla?

9  A    Yes.  And also I'd like to back up what she said, that

10  Rancho La Jolla is called Rancho El Ahuilote.  It's called

11  that -- it's named like that in the deed.  I don't know

12  what the reason for that is, but we all call it Rancho

13  Ahuilote because it's right next to the river called El

14  Ahuilote.

15       Rancho La Jolla is what -- everything that we call

16  La Jolla, and there's a hill up and there is a ranch that's

17  called -- she called Buena Vista, but we have always known,

18  ever since I first brought in Rancho La Jolla, and it's

19  a -- it's one continuous, only one total piece of property.

20       All the way from the top of the very high

21  mountain, it's all rocky terrain, full of pine trees --

22            (Interpreter confers with witness)

23       THE WITNESS:  And it comes down all the way to a

24  part called La Jolla, which is a kind of valley.  La Jolla

25  in old Spanish used to be called "The Pot".  It's some kind

1484

1   of an indentation.  And on the --

2            MR. CARLTON:  Objection to the narrative response.

3            THE COURT:  Yes.  I think you've answered the

4   question.

5   BY MR. BLANCARTE:

6   Q    Thank you very much, Mr. Zuno.

7            Mr. Zuno --

8   A    But I want to say it's one continuous unit.  It's not

9   separate ranches.

10  Q    Thank you, Mr. Zuno.

11           Now, Mr. Zuno, you have adopted your wife's

12  testimony as to basically what -- and I think amplified

13  what is Rancho La Jolla -- but there was also some

14  testimony by your wife on cross-examination about other

15  properties.  You, in fact, owned several properties in

16  Mascota; isn't that correct?

17           I will withdraw the question.

18           Do you own several properties in Mascota, Mr.

19  Zuno?

20  A    That's right.

21  Q    Could you briefly describe what other properties you

22  own in Mascota, Mr. Zuno.

23           THE COURT:  Did your wife correctly describe the

24  property that you own in Mascota?

25           THE WITNESS:  She didn't describe it.  She

1485

1   answered the questions of the prosecutor of whether we

2   owned property.

3          THE COURT:  All right.   Proceed.

4   BY MR. BLANCARTE:

5   Q    You can answer the question, Mr. Zuno.  Please

6   describe the other properties or just tell us about the

7   other properties you own in Mascota?

8          THE COURT:  Counsel has asked you what properties

9   you own.

10  BY MR. BLANCARTE:

11  Q    Just list them.

12  A    La Higura, four small lots, which are located in the

13  back part, the deepest part of the lot on what used to be

14  the cannery location.  They don't face the street.

15  Q    Anything else?

16  A    That's all.

17  Q    And to the best of your knowledge, what is the total

18  amount of land -- in Mexico it's hectares, so how many

19  hectares is all of that?

20  A    Two hundred-fifty hectares altogether, with Rancho La

21  Jolla and El Ahuilote, and 12 to 13 hectares -- I'm not

22  exactly sure about that -- on what is called La Argumata.

23  And the four small lots add up to 800 square meters, and

24  what used to be the cannery is somewhere around 1,500

25  meters.  So altogether it's not more than 265 hectares.

1486

1   Q     Mr. Zuno, are you the largest property owner in

2   Mascota?

3   A     No, never.

4   Q     Briefly, without a lot of detail, are there people in

5   Mascota who own over a thousand hectares, if you know?

6   A     Forty or fifty, easily.

7   Q     Forty or fifty people who own more than a thousand

8   hectares.

9   A     Yes, of course.

10  Q     And, if you know, what is the largest or some of the

11  largest property owners, and how much do they own?

12          MR. CARLTON:  Objection; relevancy; hearsay.

13          MR. BLANCARTE:  Your Honor, the government --

14          THE COURT:  You opened this up.  Overruled.

15          THE WITNESS:  Well, for example, there is Miguel

16  Montes, the Buena Brothers, Sinciado Quintero --

17          THE COURT:  I think that's sufficient.

18  BY MR. BLANCARTE:

19  Q     Mr. Zuno, you heard the name Caro-Quintero in this

20  courtroom.  The Caro-Quintero, the Sinciado Quintero owner,

21  that's not -- is that Caro-Quintero you are referring to,

22  if you know?

23  A     There is absolutely no relationship.  There's a lot of

24  people with the last name Quintero in that region of

25  Jalisco.

1487

1    MR. BLANCARTE:  Could I ask the translator to use

2    the hand held mic if it's not a terrible inconvenience.

3    BY MR. BLANCARTE:

4    Q    And you own several, or at least at some point in your

5    life, have owned and operated businesses in Mascota; is

6    that correct?

7    A    That's right.

8    MR. BLANCARTE:  Your Honor, I would like to

9    mention to the Court that the government and defense have

10   agreed that it's acceptable to play what is a video tape,

11   also marked for identification as Exhibit 410, which are --

12   I'd like to move into evidence at this time.

13   THE COURT:  It may be admitted.

14   (Exhibit 410 received.)

15   MR. BLANCARTE:  And I'd like to ask Ms. Fulginiti

16   would assist with the playing of that tape, and what we

17   will do --

18   THE COURT:  How long does it take?

19   MR. BLANCARTE:  Very short.

20   THE COURT:  All right.

21   MR. BLANCARTE:  Just three, four, or five minutes

22   at the most.  We will play that tape in its entirety, and

23   rather than interrupt the process to ask Mr. Zuno to

24   identify it, we will refer to the exhibits that have been

25   marked for identification in order to continue the

1     examination as to those -- as to that line.

2           THE COURT:  That's fine.

3           MR. BLANCARTE:  Thank you, Your Honor.

4           THE COURT:  Let's proceed.  Dim the lights,

5     please.

6           MR. BLANCARTE:  May she enter the well, Your

7     Honor?

8           THE COURT:  Pardon?

9           MR. BLANCARTE:  May this --

10           THE COURT:  Yes.

11               (Video tape played.)

12     BY MR. BLANCARTE:

13     Q    Mr. Zuno, without getting into any detail, do you

14     recognize the scenes depicted in the video tape you just

15     saw?

16     A    Yes, absolutely.

17     Q    And the beginning of the tape which appeared to be a

18     residence, single story residence, did you recognize that

19     building?

20           THE COURT:  Can't we just ask him if that's his

21     house?

22     BY MR. BLANCARTE:

23     Q    Is that your house, Mr. Zuno?  I don't want to lead

24     him too much.

25     A    That's my house.

1489

1   Q   That's the house you own on the ranch/farm, La Jolla?

2   A   That's right.

3   Q   Mr. Zuno, I'd like to refer your attention to Exhibit

4   411, which Ms. Fulginiti will show for you.

5         Do you recognize what is on Exhibit 411?  What is

6   it, sir?

7   A   Yes, I recognize it perfectly well.

8   Q   What is it?

9   A   It's what used to be was used for a while as a stable

10   for the dairy cattle, the dairy cows.

11   Q   Where is that facility located?

12   A   On the east part of Rancho La Jolla, close up to the

13   mountains.

14         MR. BLANCARTE:  I'd ask that Exhibit 411 be

15   admitted into evidence, Your Honor.

16         THE COURT:  It may be admitted.

17         (Exhibit 411 received.)

18   BY MR. BLANCARTE:

19   Q   Did you ever use that facility for cattle?

20   A   That's right.

21   Q   And did you at some point stop using it for that

22   purpose?

23   A   Yes, because of the milk prices.

24   Q   When was that, that you stopped using it?

25   A   Approximately around 1986.

1490

1    Q    Now, I'd like to refer you to Exhibit 412-A.  Do you

2    recognize what is on Exhibit 412-A?

3    A    Yes.

4    Q    Could you please tell us briefly what that is?

5    A    It's what used to be the mechanical shop, the repair

6    shop, and the carpentry shop.  Originally the shop, the

7    repair shop was to repair the machinery that was used, the

8    equipment used at the cannery, and later on it was used as

9    a small carpentry shop.

10   Q    Is that carpentry shop located on property that you

11   own in Mascota?

12   A    Yes.

13            MR. BLANCARTE:   I'd ask that 412-A be moved into

14   evidence, Your Honor.

15            THE COURT:   It may be admitted.

16                (Exhibit 412-A received.)

17   BY MR. BLANCARTE:

18   Q    Is 412-A, is that how it looked in -- how that

19   carpentry shop looked in 19 -- the mid-'80s, Mr. Zuno?

20   A    Yes, that is correct.

21   Q    To your knowledge, is that carpentry shop still used

22   for carpentry purposes?

23   A    That's correct.  We used to make doors, tables, window

24   sashes, you know, the common type of stuff, cheap stuff on

25   a very small scale.  I had one carpenter and a journeyman,

1491

1   and I would help them out myself a lot of the time

2   personally because I know how to use the equipment, the

3   machinery.

4   Q    Mr. Zuno, I'd like to now refer your attention to the

5   video tape we saw, which was Exhibit 410.  We saw the

6   interior of a residence right after what you described as

7   the house you own at Rancho La Jolla.  Do you recognize the

8   interior that was on that video?

9   A    Yes, of course.  And a lot of the furniture that you

10  can see there, like the kitchen, most of that furniture --

11       THE COURT:  I think you've answered the question.

12  BY MR. BLANCARTE:

13  Q    Mr. Zuno, the furniture that we saw in the middle,

14  that interior shot of the video, was that furniture made in

15  that shop which is depicted on Exhibit 412-A?

16  A    That's right.

17  Q    And referring your attention back to what you

18  described and identified as your home on Rancho or La

19  Jolla, how many bedrooms is that, sir?

20       MR. CARLTON:  Objection; relevance.

21       THE COURT:  Sustained.

22       MR. BLANCARTE:  We'll move on.  Thank you, Your

23  Honor.

24       THE COURT:  Well take our noon recess at this

25  time, and reconvene at 1:30.

1492

1  The jury will remember my admonition.

2  (Jury out.)

3  THE COURT:  Counsel, you want to take up something

4  with the Court?

5  MR. MEDVENE:  I want to flag one matter for Your

6  Honor so you can think about it over the break.

7  We would seek to get in, either through

8  stipulation with the government, or if they're not willing,

9  the fact that the government was served on or about

10 November 24th of 1991 with a declaration of Pedro

11 Cuellar-Conrique.

12 The purpose of that, Your Honor, would be to show

13 that as of that date the government knew that we could show

14 that the only witness who testified in the last trial to

15 alleged kidnapping meetings could not have been where he

16 said he was, that he was untruthful to the government when

17 he represented he was, and he was an untruthful witness

18 when he took the stand, and that here was an individual who

19 would so state.

20 THE COURT:  Let me understand this.  You want to

21 present to this jury evidence to impeach a witness who

22 testified in the prior trial, to show that he was not where

23 he said he was, his testimony was false?

24 MR. MEDVENE:  We want to show that the government

25 knew that if they presented that witness this time, their

1    only witness in May of '90, that we would be able to show

2    that witness was false.  That it was only after that date

3    that these two new witnesses came forward.  In other words,

4    it was only after that date that this fellow --

5           THE COURT:  How do you propose to show this?

6           MR. MEDVENE:  Well, we can show that the new

7    witnesses came forward after this date, because --

8           THE COURT:  Well, I think that's in the record

9    when they came forward.

10          MR. MEDVENE:  That's in the record.  We would

11   propose to show, either by putting in this declaration, and

12   making it part of the record, and the service date on the

13   government, or stipulate it with the government.

14          THE COURT:  One moment.  What is this declaration?

15   Whose declaration is it?

16          MR. MEDVENE:  This is the declaration of Pedro

17   Cuellar, saying --

18          THE COURT:  And who is he?

19          MR. MEDVENE:  He was basically the man that

20   Cervantes claimed he was.  In other words, he was

21   basically --

22          THE COURT:  He was Barba Hernandez' employee?

23          MR. MEDVENE:  Yes, sir.

24          THE COURT:  And he would have testified here that

25   he worked for Barba and not the other fellow?

1494

1       MR. MEDVENE:  Not the other fellow.  The other

2  fellow never worked for Barba, and there were no meetings.

3  And all we want to show is that the government was put on

4  notice of that, and it was only after they were on notice

5  that all of a sudden, shortly thereafter, two new witnesses

6  claimed for the first time that they had different

7  kidnapping meetings.

8       Now, we are willing to stipulate with the

9  government; but if they're not willing to enter into the

10  stipulation, we feel we're entitled to put on, not

11  necessarily for the truth of the matter asserted, but just

12  that the government was on notice that they received this

13  declaration on or about the end of November, and Your Honor

14  actually had a motion in front of him in December.

15       THE COURT:  Well, all right.

16       MR. MEDVENE:  That's the sense of it.

17       MR. MEDRANO:  Your Honor --

18       THE COURT:  Do you wish to stipulate to that?

19       MR. MEDRANO:  Absolutely not, Your Honor.  This is

20  walk-in business.  There is no motion filed.  He's known

21  about this for weeks.  This is a witness that you scheduled

22  a hearing for, and the guy didn't show up.  This is blatant

23  hearsay.

24       THE COURT:  Well, it's really irrelevant to this

25  case.

1495

1    MR. MEDVENE:  Not when the government found out

2    that we had the witness, Your Honor, and when the new

3    witnesses suddenly appeared.

4         THE COURT:  Well, look, you're trying to challenge

5    the good faith of the government here.  That's not an issue

6    in this case.

7         MR. MEDVENE:  We're --

8         THE COURT:  What does that tend to prove or

9    disprove, the allegations in this case?  What is it that

10   you hope to derive?

11        Well, I don't want to discuss it further.  It's a

12   very bizarre request, and the Court would deny you.  That

13   is not an appropriate use of that declaration.  It is not

14   admissible.

15        MR. MEDVENE:  Would, Your Honor take -- would Your

16   Honor take -- I won't labor it much more would -- would

17   Your Honor take judicial notice of the fact that as of

18   November of '91, the government had notice that there was a

19   witness who was going to dispute the authenticity of

20   Cervantes?

21        THE COURT:  I would not.

22        All right.  We'll convene at 1:30.

23        MR. MEDRANO:  Your Honor, may we ask what other

24   witness Mr. Medvene has after Zuno, so we can figure out

25   what our rebuttal case is?

1496

1    THE COURT:  Are there any other witnesses -- the

2    clerk informed me that you expect to finish today; is that

3    correct?

4    MR. MEDVENE:  Yes.  We expect not to call any

5    other witnesses, and we would ask Your Honor if at the

6    present time, the government expects any rebuttal case, and

7    who they expect.

8    THE COURT:  Do you anticipate any rebuttal

9    evidence?

10   MR. MEDRANO:  Your Honor, we need to consult over

11   the lunch hour.  The minute we know, we will advise

12   Mr. Medvene.

13   MR. MEDVENE:  We'd like to know what they know

14   now.

15   THE COURT:  You don't know whether you are going

16   to call any --

17   MR. MEDRANO:  Your Honor, we need to know what

18   this man is going to say.  I can't predict what he is going

19   to say.

20   THE COURT:  Well, I mean, aside from this man,

21   what about any other rebuttal evidence?

22   MR. CARLTON:  Your Honor, it's possible that we

23   will be calling Agent Berrellez, and possibly Jorge Godoy,

24   but until the defense case is completed, we can't make a

25   final decision like that.

1497

1    THE COURT:  All right.  But you don't anticipate

2  much more than that?

3    MR. CARLTON:  Certainly it's not going to be very

4  long.

5    THE COURT:  And this would be fairly brief, I

6  assume?

7    MR. MEDVENE:  Yes.

8    THE COURT:  All right.

9    THE CLERK:  Please rise.

10    (Lunch recess taken.)

11    *   *   *   *   *   *

12  I, MARY TUCKER, CSR, do hereby certify that

13  the foregoing transcript is true and correct.

14

15

16  _Mary Tucker_                    6-17-93

17  MARY TUCKER, CSR                     DATE

18

19

20

21

22

23

24

25